CASE NO. 24-2132

# IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KRYSTLE and ANTHONY PERRY, individually and on behalf of
their minor child K.P.

*Plaintiffs-Appellees*

v.

STACY MARTENEY, in her official capacity as the Virtual Learning Coordinator
of the Upshur County Virtual School; CHRISTINE MILLER, in her official capacity
as Superintendent of the Upshur County School District.

*Defendants-Appellants*

and

THE BOARD OF EDUCATION OF THE COUNTY OF UPSHUR, et al.

*Defendants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA AT ELKINS

| **JOINT APPENDIX** |

Robert J. Kent
Ryan S. Moore
Leigh Anne Wilson
**BOWLES RICE. LLP**
501 Avery Street
P. O. Box 49
Parkersburg, WV. 26102
Tele: (304) 485-8500
rkent@bowlesrice.com
rmoore@bowlesrice.com
lwilson@bowlesrice.com

Counsel for Defendants-Appellants -
 Stacy Marteney, Etc., et al.

Aaron Siri
Elizabeth Ann Brehm
**SIRI & GLIMSTAD, LLP**
Suite 500
745 5th Avenue
New York, NY 10151
Tele: (212) 532-1091
aaron@sirillp.com
ebrehm@sirillp.com

Counsel for Plaintiffs-Appellees -
 Krystle and Anthony Perry

*Continuation of Counsel - Inside Cover*

**Continuation of Counsel for Plaintiffs-Appellees**

Walker Moller
**SIRI & GLIMSTAD LLP**
Suite 825-C36
1005 Congress Avenue
Austin, TX. 78701
Tele: (318 224-1105
wmoller@sirillp.com

Christopher D. Wiest
**CHRISTOPHER D. WIEST**
Suite 1280
50 East Rivercenter Boulevard
Covington, KY. 41011
Teke: (513-257-1895
chris@cwiestlaw.com

Counsel for Plaintiffs-Appellees –
Krystle Perry and Anthony Perry

# Joint Appendix Index

District Court Docket Sheet Case No. 224-cv-00018-TSK.....................................JA001

Verified Complaint for Declaratory and Injunctive Relief filed 07-05-2024...........................JA011

    1-1 - Civil Cover Sheet ...................................................................JA070

    1-2 - Exhibit 1 - Proceedings of the Society of Experimental Biology and Medicine... JA072

    1-3 - Exhibit 2 - Deposition Transcript of Stanley A. Plotkin, M.D. ...........................JA081

    1-4 - Exhibit 3 – Highlights of Prescribing Information...................................JA099

    1-5 - Exhibit 4 – Highlights of Prescribing Information ...................................JA108

    1-6 - Exhibit 5 – Brehm Letter to Department of Health and Human Services ..........JA122

    1-7 - Exhibit 6 – Request for Review of Denied Medical Exemption Request Form...JA124

    1-8 - Exhibit 7 – Denial of Religious Exemption Email ..............................JA126

    1-9 - Exhibit 8 – Fayette County WVFOIA Response.................................JA131

    1-10 - Exhibit 9 – Monongalia County WVFOIA Response .....................................JA133

    1-11 - Exhibit 10 – Upshur County WVFOIA Response ...........................................JA139

    1-12 - Exhibit 11 – Harrison County WVFOIA Response  .........................................JA142

    1-13 - Exhibit 12 – West Virginia Medical Exemption Request Form .......................JA145

Plaintiffs' Motion for Preliminary Injunction and Expedited Consideration
  filed 07-11-2024.............................................................................JA148

Plaintiffs' Memorandum in Support of Plaintiff's Motion for Preliminary Injunction
  filed 07-11-2024.............................................................................JA153

    8-1 - Exhibit 1 – Plaintiff K.P. Vaccination Record ...................................JA181

    8-2 - Exhibit 2 – Declaration of Dr. Alvin Moss..........................................JA183

    8-3 - Exhibit 3 – Proposed Order.............................................................JA192

Defendant Doug Cipoletti and Plaintiffs' Joint Motion For Agreed Order filed 07-25-2024.....JA196

Defendants The Board of Education of the County of Upshur, Stacy Marteney
  and Christine Miller's Response to Plaintiffs' Motion for Preliminary Injunction
  and Expedited Consideration filed 07-26-2024 ....................................................JA200

i

21-1- Exhibit 1 – December 18, 2023 West Virginia Department of Education Superintendents' Update ................................................................ JA222

21-2 - Exhibit 2 – Statement of Stacey Marteney ..................................................... JA232

21-3  - Exhibit 3 – (Civil Action No. 5:23-CV-158) Order Denying Plaintiffs' Motion for Summary Judgment and for Permanent Injunction and Granting Defendant's Cross-Motion for Summary Judgment ................................................................................ JA235

Defendant Dr. Matthew Christiansen's Motion for Stay filed 07-26-2024 ............................ JA249

Defendant Dr. Matthew Christiansen's Combined Response in Opposition to Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support of Motion for Stay filed 07-26-2024 ................................................................................ JA252

Defendants the Board of Education of the County of Upshur, Stacy Marteney and Christine Miller's Motion to Dismiss filed 08-02-2024 .................................................... JA270

Defendants the Board of Education of the County of Upshur, Stacy Marteney and Christine Miller's Memorandum in Support of Motion to Dismiss filed 08-02-2024 ....... JA274

Plaintiffs' Reply In Support Of Their Motion For Preliminary Injunction filed 08-02-2024 ................................................................................ JA305

32-1 - Exhibit 1 – Revised Proposed Order ................................................... JA336

Defendant Dr. Matthew Christiansen's Reply in Response to Motion to Stay filed 08-09-2024 ................................................................................ JA340

Transcript of Preliminary Injunction Hearing held 08-12-2024 ............................................ JA346

Plaintiffs' Supplemental Briefing Regarding Ex Parte Young Exception to Eleventh Immunity and Other Issues filed 08-15-2024 ........................................................ JA435

Defendants the Board of Education of the County of Upshur, Stacy Marteney and Christine Miller's Supplemental Briefing in Support of 11th Amendment Immunity filed 08-15-2024 ................................................................................ JA451

Plaintiffs' Response in Opposition to Motion to Dismiss filed 08-16-2024 ............................ JA498

Defendants the Board of Education of the County of Upshur, Stacy Marteney and Christine Miller's Reply in Response to Motion to Dismiss filed 08-22-2024 ................ JA517

Order Granting in Part and Denying in Part Defendants' Motion to Dismiss [ECF No. 29], Granting Plaintiffs' Motion for Preliminary Injunction [ECF No. 7] and Denying Defendant's Motion to Stay [ECF No. 22] filed 10-15-2024 ............................................... JA534

Notice of Appeal filed 11-11-2024 ................................................................................ JA602

APPEAL

# U.S. District Court
## Northern District of West Virginia (Elkins)
## CIVIL DOCKET FOR CASE #: 2:24-cv-00018-TSK

Perry et al v. Marteney et al                          Date Filed: 07/05/2024
Assigned to: Chief District Judge Thomas S Kleeh        Jury Demand: None
Case in other court:  USCA 4th Circuit, 24-02132        Nature of Suit: 440 Civil Rights: Other
Cause: 42:1983 Civil Rights Act                         Jurisdiction: Federal Question

**Plaintiff**

**Krystle Perry**                          represented by   **Aaron Siri**
*Indivudually and on behalf of their minor*                 Siri & Glimstad LLP
*child K.P.*                                                745 Fifth Avenue
                                                           Suite 500
                                                           New York, NY 10151
                                                           888-747-4529
                                                           Email: aaron@sirillp.com
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Christopher D Wiest**
                                                           Christopher D. Wiest
                                                           50 E Rivercenter Blvd, Ste. 1280
                                                           Covington, KY 41011
                                                           Covington, KY 41011
                                                           513-257-1895
                                                           Email: chris@cwiestlaw.com
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Elizabeth A. Brehm**
                                                           Siri & Glimstad LLP
                                                           745 Fifth Avenue
                                                           Suite 500
                                                           New York, NY 10151
                                                           888-747-4529
                                                           Fax: 646-417-5967
                                                           Email: ebrehm@sirillp.com
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **John H. Bryan**
                                                           John H. Bryan, Attorneys at Law
                                                           611 Main Street
                                                           P O Box 366
                                                           Union, WV 24983
                                                           (304) 772-4999

JA001

Fax: (304) 772-4998
Email: jhb@johnbryanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walker D. Moller**
Siri & Glimstad, LLP
1005 Congress Avenue
Suite 925-C36
Austin, TX 78701
318-224-1105
Fax: 646-417-5967
Email: wmoller@sirillp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Anthony Perry** *Individually and on behalf of their minor child K.P.* | represented by | **Aaron Siri** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Christopher D Wiest**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Brehm**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John H. Bryan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walker D. Moller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Stacy Marteney** *in her offical capacity as the Virtual* | represented by | **Leigh Anne Wilson** Bowles Rice LLP - Morgantown 125 Granville Square |

JA002

*Learning Coordinator of the Upshur County Virtual School*

Suite 400
Morgantown, WV 26501
(304) 285-2500
Fax: (304) 285-2530
Email: lwilson@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Kent**
Bowles Rice, LLP
501 Avery Street, Fifth Floor
PO Box 49
Parkersburg, WV 26102
304-420-5504
Email: rkent@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Moore**
Bowles Rice, LLP
501 Avery Street
Parkersburg, WV 26101
304-420-5515
Email: rmoore@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Board of Education of The County of Upshur**

represented by **Leigh Anne Wilson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Kent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Moore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christine Miller**
*in her official capacity as Superintendent of the Upshur County School District*

represented by **Leigh Anne Wilson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Kent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA003

**Ryan Moore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Matthew Christiansen**
*in his official capacities as the State Health*
*Officer and Commissioner of the Bureau of*
*Public Health*
*TERMINATED: 10/15/2024*

represented by **Jonathan Zak Ritchie**
Hissam Forman Donovan Ritchie PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802
Fax: 304-982-8056
Email: zritchie@hfdrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maureen F. Gleason**
Hissam Forman Donnovan & Ritchie, PLLC
700 Virginia Street East
Ste 210
Charleston, WV 25301
681-265-3802
Email: mgleason@hfdrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael B. Hissam**
Hissam Forman Donovan Ritchie PLLC
PO Box 3983
Charleston, WV 25339
681/265-3802
Fax: 304/982-8056
Email: mhissam@hfdrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven R. Compton**
West Virginia Attorney General
Health and Human Services Division
812 Quarrier Street, 6th Floor
Charleston, WV 25301
304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Doug Cipoletti**
*in his official capacity as Executive Director*
*of the West Virginia Virtual School Academy*
*TERMINATED: 08/05/2024*

represented by **Jonathon C. Stanley**
Robinson & McElwee PLLC
400 Fifth Third Center
700 Virginia Street East
Charleston, WV 25301
304-989-2516

Fax: 304-344-9566
Email: jcs@ramlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay Stollings**
Robinson & McElwee PLLC
700 Virginia St, E
400 Fifth Third Center
Charleston, WV 25301
304-651-5671
Email: lindsay.stollings@ramlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bryan Hoylman**                               represented by   **Jonathon C. Stanley**
*In his offical capacity as Chair of the Board*                  (See above for address)
*of Directors of Mountain State Learning*                        *LEAD ATTORNEY*
*Solutions, Inc. d/b/a West Virginia Virtual*                    *PRO HAC VICE*
*Academy*                                                        *ATTORNEY TO BE NOTICED*

**Lindsay Stollings**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/05/2024 | 1 | VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF SUMMARY against Matthew Christiansen, Doug Cipoletti, Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur, filed by Krystle Perry, Anthony Perry. Filing Fee $405. Receipt #AWVNDC-3971224. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1-Proceeding of the Society for Experimental Biology and Medicine, # 3 Exhibit 2-Deposition Transcript of Stanley A. Plotkin, M.D., # 4 Exhibit 3-Highlights Of Prescribing Information, # 5 Exhibit 4-Highlighs of Prescribing Information, # 6 Exhibit 5-Brehm Letter to Department of Health and Human Services, # 7 Exhibit 6-Request for Review of Denied Medical Exemption Request form, # 8 Exhibit 7-Emails between parties, # 9 Exhibit 8-Siri Letter to Fayette County Board of Education, # 10 Exhibit 9-Email dated April 26, 2024, # 11 Exhibit 10-Email dated April 16, 2024, # 12 Exhibit 11-Letter from Harrison County Schools, # 13 Exhibit 12-Request For Medical Exemption From Compulsory Immunization Form)(mas) (Entered: 07/08/2024) |
| 07/08/2024 | 2 | VERIFICATION OF ATTORNEY ADMISSION Re: A. Siri, C. Wiest, E. Brehm and W. Moller. (mas) (Entered: 07/08/2024) |
| 07/09/2024 | 3 | MOTION for Leave to File *to Appear Pro Hac Vice of Elizabeth A. Brehm* by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/09/2024) |
| 07/09/2024 | 4 | MOTION for Leave to File *Application For Admission Pro Hac Vice of Aaron Siri* by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/09/2024) |

JA005

| 07/09/2024 | 5 | MOTION for Leave to File *Application For Admission Pro Hac Vice of Walker Moller* by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/09/2024) |
|---|---|---|
| 07/09/2024 | 6 | MOTION for Leave to File *Application For Admission Pro Hac Vice of Christopher Wiest* by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/09/2024) |
| 07/11/2024 | 7 | MOTION for Preliminary Injunction *And Expedited Consideration* by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/11/2024) |
| 07/11/2024 | 8 | MEMORANDUM *In Support Of Plaintiff's Motion For Preliminary Injunction* by Anthony Perry, Krystle Perry re 7 MOTION for Preliminary Injunction *And Expedited Consideration* . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Bryan, John) (Entered: 07/11/2024) |
| 07/12/2024 | 10 | SUMMONS Returned Executed as to Christine Miller served on 7/12/2024. (Bryan, John) (Entered: 07/12/2024) |
| 07/12/2024 | 11 | SUMMONS Returned Executed as to Stacy Marteney served on 7/12/2024. (Bryan, John) (Entered: 07/12/2024) |
| 07/12/2024 | 12 | SUMMONS Returned Executed as to The Board of Education of The County of Upshur served on 7/12/2024. (Bryan, John) (Entered: 07/12/2024) |
| 07/12/2024 | 13 | SUMMONS Returned Executed as to Doug Cipoletti served on 7/12/2024. (Bryan, John) (Entered: 07/12/2024) |
| 07/12/2024 | 14 | SUMMONS Returned Executed as to Matthew Christiansen served on 7/12/2024. (Bryan, John) (Entered: 07/12/2024) |
| 07/18/2024 | 15 | Pro Hac Vice filing fee received for attorneys A. Siri, C. Wiest, E. Brehm and W. Moller in the amount of $ 800.00, receipt number 200020178. (mas) (Entered: 07/18/2024) |
| 07/19/2024 | 16 | **ORDER APPROVING APPLICATIONS TO APPEAR PRO HAC VICE. (Re: Motions 3 E. Brehm, 4 A. Siri, 5 W. Moller and 6 C. Wiest). Signed by Chief District Judge Thomas S Kleeh on 7/19/2024. (mas)** (Entered: 07/19/2024) |
| 07/23/2024 | 17 | NOTICE of Appearance by Robert J. Kent on behalf of Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur (Kent, Robert) (Entered: 07/23/2024) |
| 07/23/2024 | 18 | NOTICE of Appearance by Ryan Moore on behalf of Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur (Moore, Ryan) (Entered: 07/23/2024) |
| 07/24/2024 | 19 | NOTICE of Appearance by Leigh Anne Wilson on behalf of Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur (Wilson, Leigh) (Entered: 07/24/2024) |
| 07/25/2024 | 20 | MOTION Defendant Doug Cipoletti And Plaintiffs' Joint Motion For Agreed Order by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/25/2024) |
| 07/26/2024 | 21 | RESPONSE in Opposition re 7 MOTION for Preliminary Injunction *And Expedited Consideration* filed by Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Kent, Robert) (Entered: 07/26/2024) |
| 07/26/2024 | 22 | MOTION to Stay by Matthew Christiansen. (Hissam, Michael) (Entered: 07/26/2024) |
| 07/26/2024 | 23 | Memorandum in Opposition re 7 MOTION for Preliminary Injunction *And Expedited Consideration and in Support of 22 MOTION for Stay* filed by Matthew Christiansen. (Hissam, Michael) (Entered: 07/26/2024) |

JA006

CM/ECF - U.S. District Court:wvnd

| 07/29/2024 | 24 | VERIFICATION OF ATTORNEY ADMISSION Re:Maureen F. Gleason. (mas) (Entered: 07/29/2024) |
|---|---|---|
| 07/29/2024 | 25 | Joint MOTION for Leave to File Excess Pages by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 07/29/2024) |
| 07/30/2024 | 26 | NOTICE of Appearance by Jonathan Zak Ritchie on behalf of Matthew Christiansen (Ritchie, Jonathan) (Entered: 07/30/2024) |
| 07/30/2024 | 27 | NOTICE of Appearance by Michael B. Hissam on behalf of Matthew Christiansen (Hissam, Michael) (Entered: 07/30/2024) |
| 07/30/2024 | 28 | **ORDER GRANTING JOINT MOTION FOR PAGE EXTENSION ECF NO. 25 . Signed by Chief District Judge Thomas S Kleeh on 7/30/2024. (mas)** (Entered: 07/30/2024) |
| 08/02/2024 | 29 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur. (Kent, Robert) (Entered: 08/02/2024) |
| 08/02/2024 | 30 | Memorandum in Support re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur. (Attachments: # 1 Exhibit A)(Kent, Robert) (Entered: 08/02/2024) |
| 08/02/2024 | 31 | *Defendant Dr. Matthew Christiansen's* ANSWER to 1 Complaint,,,, by Matthew Christiansen.(Hissam, Michael) (Entered: 08/02/2024) |
| 08/02/2024 | 32 | *Plaintiff's Reply In Support Of Their Motion For Preliminary Injunction* Other Document re 22 MOTION to Stay , 21 Response in Opposition to Motion, *Defendants Motion To Abstain Or, Alternatively, To Stay Under Pullman* filed by Anthony Perry, Krystle Perry. (Attachments: # 1 Exhibit Exhibit A)(Bryan, John) (Entered: 08/02/2024) |
| 08/05/2024 | 33 | **ORDER SCHEDULING HEARING ON MOTION TO STAY ECF NO. 22 AND MOTION FOR PRELIMINARY INJUNCTION ECF NO. 7 . Signed by Chief District Judge Thomas S Kleeh on 8/5/2024. (mas)** (Entered: 08/05/2024) |
| 08/05/2024 | 34 | **ORDER GRANTING JOINT MOTION FOR AGREED ORDER ECF NO. 20 . Doug Cipoletti is hereby DISMISSED from this case. Signed by Chief District Judge Thomas S Kleeh on 8/5/2024. (mas)** (Entered: 08/05/2024) |
| 08/09/2024 | 35 | REPLY to Response to Motion re 22 MOTION to Stay filed by Matthew Christiansen. (Hissam, Michael) (Entered: 08/09/2024) |
| 08/09/2024 | 36 | NOTICE by Anthony Perry, Krystle Perry re 22 MOTION to Stay , 7 MOTION for Preliminary Injunction *And Expedited Consideration Plaintiff's Notice Of Intention To Rely On Additional Authority At August 12, 2024 Hearing* (Bryan, John) (Entered: 08/09/2024) |
| 08/12/2024 | 37 | MEMORANDUM *In Support Of Their Motion For Preliminary Injunction* by Anthony Perry, Krystle Perry . (Attachments: # 1 Exhibit)(Bryan, John) (Entered: 08/12/2024) |
| 08/12/2024 | 38 | MINUTE ENTRY:<br><br>***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.*<br><br>Proceedings held before Chief District Judge Thomas S Kleeh. Motion Hearing held on 8/12/2024 re 22 MOTION to Stay , 7 MOTION for Preliminary Injunction *And Expedited Consideration*, 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . (Court Reporter Rachel Kocher) (dk) (Entered: 08/12/2024) |

JA007

| 08/12/2024 | 39 | **ORDER FOLLOWING HEARING. The Court ORDERS all parties to submit by August 15, 2024, at 5:00 p.m., additional briefing for the Court's consideration of the pending issues. Signed by Chief District Judge Thomas S Kleeh on 8/12/2024. (mas)** (Entered: 08/12/2024) |
|---|---|---|
| 08/12/2024 | 40 | NOTICE by Anthony Perry, Krystle Perry *Plaintiffs' Notice Of Filing Of Subsequent Documents* (Attachments: # 1 Exhibit, # 2 Exhibit)(Bryan, John) (Entered: 08/12/2024) |
| 08/13/2024 | 41 | TRANSCRIPT of Proceedings held on 8/12/2024 before Judge Thomas S. Kleeh. Court Reporter/Transcriber Rachel Kocher, Telephone number (304) 623-7179. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days.. Redaction Request due 9/3/2024. Redacted Transcript Deadline set for 9/13/2024. Release of Transcript Restriction set for 11/12/2024. (rak) (Entered: 08/13/2024) |
| 08/13/2024 | 42 | TRANSCRIPT PURCHASE ORDER by Plaintiffs for proceedings held on 8/12/2024 before Judge Thomas S. Kleeh. (rak) (Entered: 08/13/2024) |
| 08/13/2024 | 43 | TRANSCRIPT PURCHASE ORDER by Matthew Christiansen for proceedings held on 8/12/2024 before Judge Thomas S. Kleeh. (rak) (Entered: 08/13/2024) |
| 08/15/2024 | 44 | Other Document *Plaintiffs' Supplemental Briefing Regarding Ex Party Young Exception To Eleventh Amendment Immunity And Other Issues* filed by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 08/15/2024) |
| 08/15/2024 | 45 | Other Document *Supplemental Brief in Support of the 11th Amendment Immunity* filed by Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Kent, Robert) (Entered: 08/15/2024) |
| 08/15/2024 | 46 | MOTION for Leave to File *Additional Evidence* by Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur. (Kent, Robert) (Entered: 08/15/2024) |
| 08/15/2024 | 47 | Other Document re 39 Order, *Dr. Christiansen's Supplemental Brief* filed by Matthew Christiansen. (Hissam, Michael) (Entered: 08/15/2024) |
| 08/16/2024 | 48 | **ORDER GRANTING LEAVE TO FILE ADDITIONAL EVIDENCE (ECF NO. 46 ). The additional evidence filed at ECF Nos. 45-1, 45-2, and 45-3 SHALL be considered part of the case's factual record. Signed by Chief District Judge Thomas S. Kleeh on 08/16/2024. (snc)** (Entered: 08/16/2024) |
| 08/16/2024 | 49 | RESPONSE in Opposition re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *PLAINTIFFS RESPONSE IN OPPOSITION TO UPSHUR COUNTY DEFENDANTS MOTIONS TO DISMISS* filed by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 08/16/2024) |
| 08/19/2024 | 50 | NOTICE by Matthew Christiansen *of Letter to the Court* (Hissam, Michael) (Entered: 08/19/2024) |
| 08/22/2024 | 51 | REPLY to Response to Motion re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Stacy Marteney, Christine Miller, The Board of Education of The County of Upshur. (Kent, Robert) (Entered: 08/22/2024) |
| 10/15/2024 | 52 | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, AND DENYING DEFENDANTS' MOTION TO STAY: Plaintiffs' 7 MOTION for Preliminary Injunction is GRANTED; Defendant Christiansen's 22 Motion to Stay is DENIED; and Defendants Marteney and Miller's** |

JA008

| | | |
|---|---|---|
| | | **29** Motion to Dismiss is DENIED. Furthermore, D. Mathew Christiansen is hereby DISMISSED as a Defendant in this action. Signed by Chief District Judge Thomas S Kleeh on 10/15/2024. (cnd) (Entered: 10/15/2024) |
| 10/24/2024 | 53 | **FIRST ORDER AND NOTICE REGARDING DISCOVERY AND SCHEDULING:** <br><br> ***NOTICE TO ATTORNEYS*** *: Pursuant to* Rule 7.1 *of the Federal Rules of Civil Procedure, ALL Non-governmental CORPORATE parties must file a DISCLOSURE STATEMENT with the Court. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm* <br><br> **Rule 26 Meeting to be held by 11/25/2024. Rule 26 Meeting Report due by 12/9/2024. Discovery due by 12/30/2024. Signed by Chief District Judge Thomas S Kleeh on 10/24/2024. (cnd)** (Entered: 10/24/2024) |
| 11/11/2024 | 54 | MOTION to Stay *Pending Resolution of Appeal* by Stacy Marteney, Christine Miller. (Kent, Robert) (Entered: 11/11/2024) |
| 11/11/2024 | 55 | NOTICE OF APPEAL as to 52 Order on Motion to Dismiss for Failure to State a Claim,,, Order on Motion for Preliminary Injunction,,, Order on Motion to Stay,,,,,, by Stacy Marteney, Christine Miller. Filing fee $; 605, receipt number BWVNDC-4044202. (Moore, Ryan) (Entered: 11/11/2024) |
| 11/12/2024 | 56 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 55 Notice of Appeal. (mas) (Entered: 11/12/2024) |
| 11/13/2024 | 57 | **ORDER DIRECTING RESPONSE ECF NO. 54 . The Court hereby ORDERS Plaintiffs to respond to the pending motion on or before November 22, 2024. Signed by Chief District Judge Thomas S Kleeh on 11/13/2024. (mas)** (Entered: 11/13/2024) |
| 11/14/2024 | 58 | USCA NOTICE OF APPELLATE CASE OPENING: re 55 Notice of Appeal, filed by Stacy Marteney and Christine Miller. USCA Case Number: 24-2132. Case Manager: Kirsten Hancock (804) 916-2704. (mas) (Entered: 11/14/2024) |
| 11/22/2024 | 59 | RESPONSE in Opposition re 54 MOTION to Stay *Pending Resolution of Appeal PLAINTIFFS RESPONSE IN OPPOSITION TO DEFENDANTS MILLER AND MARTENEYS MOTION TO STAY* filed by Anthony Perry, Krystle Perry. (Bryan, John) (Entered: 11/22/2024) |
| 11/25/2024 | 60 | REPLY to Response to Motion re 54 MOTION to Stay *Pending Resolution of Appeal* filed by Stacy Marteney, Christine Miller. (Moore, Ryan) (Entered: 11/25/2024) |
| 12/09/2024 | 61 | REPORT of Rule 26(f) Planning Meeting. (Moore, Ryan) (Entered: 12/09/2024) |
| 12/30/2024 | 62 | CERTIFICATE OF SERVICE by Stacy Marteney, Christine Miller *Defendants Stacy Marteney and Christine Miller's Initial Disclosures Pursuant to 26(a)(1)*. (Kent, Robert) (Entered: 12/30/2024) |
| 12/31/2024 | 63 | CERTIFICATE OF SERVICE by Krystle Perry, Anthony Perry *PLAINTIFFS INITIAL DISCLOSURES*. (Bryan, John) (Entered: 12/31/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/31/2024 10:44:52 | | |
| **PACER Login:** | rmoorebr1 | **Client Code:** |

CM/ECF - U.S. District Court:wvnd

| **Description:** | Docket Report | **Search Criteria:** | 2:24-cv-00018-TSK |
|---|---|---|---|
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

JA010

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.,*<br><br><br>*Plaintiffs,*<br><br>Against<br><br>STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; AND DOUG CIPOLETTI *in his official capacity as Executive Director of the West Virginia Virtual School Academy*;<br><br>*Defendants.* | ELECTRONICALLY FILED<br>7/05/2024<br>U.S. DISTRICT COURT<br>Northern District of WV<br><br><br>Civil Action No.: 2:24-cv-18 Kleeh |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### SUMMARY

1.      Plaintiffs Krystle Perry and Anthony Perry individually and on behalf of their minor child, K.P. ("**Plaintiffs**" or "the **Perrys**"), maintain profound religious objections to injecting their eight-year-old child, K.P., with the vaccinations required under W.Va. Code § 16-3-4 (c) and (e) ("the **Compulsory Vaccination Law**" or the "**CVL**"). West Virginia prohibits K.P. from attending school in West Virginia unless she receives all the vaccines required under the CVL.

1

JA011

This prohibition on education, confoundingly, extends to virtual school, an option available in West Virginia.

2.      Until very recently, Plaintiffs were able to ensure K.P. received a quality education, while simultaneously upholding their religious integrity. Plaintiffs did so through enrolling K.P. in the West Virginia Virtual Academy (the "**Virtual Academy**"), a robust online learning program created by statute in W.VA. CODE §18-2E-9 in which K.P. was not physically present in a classroom with other children.

3.      This program is a tuition-free online public school available to all West Virginia residents.[1]

4.      When Plaintiffs attempted to re-enroll K.P. in the Virtual Academy during the 2024 school year, including by requesting a religious exemption to the CVL, the request was denied. Virtual Academy officials explained that West Virginia prohibits religious exemptions to the CVL, including for students desiring to further their education remotely.

5.      However, all schools in West Virginia, including the Virtual Academy, permit unvaccinated children to apply for medical exemptions.

6.      Because K.P. is unvaccinated, and lacks secular reasons for being unvaccinated, she was ejected from the Virtual Academy. As a mother who works outside the home, Mrs. Perry is unable to homeschool K.P. Equally problematic, Mr. Perry is 100% disabled and has historically relied heavily on Virtual Academy staff to help facilitate K.P.'s education.  Mr. Perry is now homeschooling K.P., while Mrs. Perry tries her very best to help after she finishes work, causing

---

[1] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com (last visited July 5, 2024).

2

an irregular learning schedule for K.P. Consequently, Plaintiffs have been left for the last six months without viable options to ensure K.P. receives the education her peers enjoy.

7.      Plaintiffs face potential criminal prosecution under W.VA. CODE §18-8-2 if they fail to educate K.P.

8.      The straightforward legal issue presented in the Complaint is whether the State of West Virginia violated and continues to violate the Free Exercise clause of the First Amendment through denying K.P. continued enrollment in the Virtual Academy after she sought a religious exemption to the CVL, while permitting children who remain unvaccinated for secular reasons to enroll in the Virtual Academy, and, in addition, in other public and private schools throughout the state and in other settings that undermine any asserted interest in the prevention of communicable diseases.

9.      Recent and directly on point Supreme Court precedent, as applied specifically to Plaintiffs' situation, makes crystal clear that West Virginia's vaccination policy flagrantly violates the United States Constitution. Accordingly, for the reasons more fully detailed below, Plaintiffs request declaratory and injunctive relief.

**INTRODUCTION**

10.      According to the Pew Research Center, 77% of West Virginians say that "they believe in God with absolute certainty."[2] West Virginia is among the most religious states in America.[3]

---

[2] *See* PEW RESEARCH CENTER, *Religious Landscape Study*, https://www.pewresearch.org/religious-landscape-study/database/west-virginia/ (last visited July 5, 2024).

[3] *See* PEW RESEARCH CENTER, *How religious is you state?* https://www.pewresearch.org/fact-tank/2016/02/29/how-religious-is-your-state/?state=west-virginia (last visited July 5, 2024).

3

11.     Plaintiffs possess deeply held religious beliefs that forbid them from vaccinating K.P.

12.     Those beliefs have been substantially burdened by West Virginia through the CVL.

13.     Mr. and Mrs. Perry's decision to maintain their and K.P.'s religious convictions have required significant sacrifices. Under threat of criminal penalties, Plaintiffs must ensure K.P. receives an education. However, West Virginia has made it virtually impossible in Plaintiffs' specific case to educate their child**, even remotely from home**, and simultaneously uphold their religious convictions.

14.     West Virginia's compulsory school attendance law requires children between the ages of six and seventeen to be enrolled in an education program. *See* W. VA. CODE § 18-8-1a.

15.     West Virginia's Supreme Court of Appeals has held that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in . . . the West Virginia Constitution, make education a fundamental, constitutional right in this State." *Pauley v. Kelly*, 162 W. Va. 672, 707 (W. Va. 1979); *see also State v. Beaver*, No. 22-616, 2022 W. Va. LEXIS 700, at *36 ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right"); *see also Goss v. Lopez,* 419 U.S. 565, 95 (1975) (when state law creates a right to public education, that right becomes protected by the Due Process Clause of the Fourteenth Amendment).

16.     Despite access to public education in West Virginia being deemed as a fundamental right, Plaintiffs' child has nevertheless been excluded from West Virginia's educational system—including the Virtual Academy—because of her parents' religious beliefs.

17.     K.P.  is unable to access the practical and social benefits of a formal education that her peers enjoy, including peers that remain unvaccinated for secular reasons.

4

JA014

18.    In West Virginia, it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox [*i.e.*, varicella], hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine." W. VA. CODE § 16-3-4 (c) and (e).

19.    While it prohibits the option for a religious exemption, West Virginia permits discretionary medical exemptions to the CVL. *See* W. VA. CODE § 16-3-4 (h) (the State Health Officer may grant a medical exemption "upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine.").

20.    This exemption scheme is neither neutral nor generally applicable, and therefore, triggers strict scrutiny. A law triggers strict scrutiny if it is either not generally applicable, or if it lacks neutrality. *Employment Division v. Smith*, 494 U.S. 872 (1990).

21.    The *Smith* framework to addressing free exercise claims grew out of a concern that allowing religious exemptions to certain neutral and generally applicable laws "would be courting anarchy," *Smith*, 494 U.S. at 888, because such laws "could not function" in the face of religious exemptions, *United States v. Lee*, 455 U.S. 252, 260 (1982). In other words, the rationale behind *Smith's* general applicability framework does not hold where a law is readily amenable to a workable religious exemption option, because allowing a religious exemption in such cases does not invoke the concern that every citizen with a purported religious exemption to the law could become a law unto themselves, and permitting exceptions to the law would not "court anarchy." *Smith*, 494 U.S. at 888,

5

22.     West Virginia's vaccination scheme is amenable to exemptions. The government allows for medical exemptions, and does in fact grant many medical exemptions every year. And religious exemptions can just as easily be allowed as medical exemptions are in West Virginia.

23.     That the state refuses to allow for religious exemptions renders the law as not neutral and not generally applicable.

24.     West Virginia is a radical outlier; forty-five states permit both medical and religious exemptions to childhood vaccination laws. Mississippi's vaccination scheme, which also previously lacked a religious exemption option while providing a medical exemption, was recently struck down under the First Amendment. *See Bosarge v. Edney*, 2023 U.S. Dist. LEXIS 67439, at *27 (S.D. Miss. Apr. 18, 2023) (holding that Mississippi's mandatory vaccination scheme, which lacked a religious exemption option but allowed for a medical exemption option, violated the First Amendment).

25.     The overwhelming majority of states have for many decades offered religious exemptions to their school vaccination requirements without generating the "anarchy" the *Smith* Court was so concerned about. Thus, *Smith's* animating rationale does not apply where the government has shown that the law can be seamlessly administered while also permitting exceptions.

26.     West Virginia is also tremendously relaxed in enforcing the CVL, permitting functional exceptions for children who are willfully non-complaint to continue attending school.

27.     As such, childhood vaccination schemes, including in West Virginia, are clearly amenable to exemptions.  The government's refusal to allow for a religious exemption option renders the CVL not generally applicable and not neutral under *Smith*.  The existence of a religious

JA016

exemption in West Virginia would not generate anarchy, because an exemption scheme is already in place.

28.     And the CVL triggers strict scrutiny on additional grounds.

29.     The CVL fails the general applicability test on other grounds because the government permits medical exemptions that are reviewed and accepted or denied on an individualized basis.

30.     Multiple layers of personalized and individualized review of medical exemption requests are performed. At each level, West Virginia officials possess discretion to approve or deny each medical exemption request.

31.     However, Defendants have made a categorical decision that no commensurate process shall be allowed for those desiring to be exempt from the CVL for religious reasons.  Under recent Supreme Court precedent in *Fulton v. City of Philadelphia*, 593 U.S. 522, 537, (2021), the Court held that the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable" where a commensurate mechanism is unavailable to religious adherents. *Id.*

32.     As applied specifically to Plaintiffs' situation, the CVL violates the First Amendment on additional alternative grounds. Independent of *Fulton*, West Virginia's CVL violates the First Amendment because it permits, from a risk perspective, "comparable" secular activity that fatally undermines the State's infectious disease related goals.

33.     A law intended to counteract the spread of infectious diseases is unconstitutional where it permits secular activity while prohibiting similar religious activity. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17-18 (2021) (holding that a New York regulation involving COVID-19 restrictions that prohibited religious gatherings but permitted similar secular gatherings violated the First Amendment); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021)

(holding that a California law intended to slow the spread of COVID-19 violated the First Amendment because it treated "comparable secular activity more favorably than religious exercise.").

34.     Whether two activities are comparable for purposes of the free exercise clause depends on "the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Whether religious and secular conduct is comparable in the infectious disease context, courts are "concerned with the risks [the] activities pose, not the reasons why" the activities are carried out. *Tandon*, 593 U.S. at 62.

35.     West Virginia maintains that it has a compelling infectious disease mitigation interest in requiring children to comply with the CVL while they are physically present at school. However, as applied to the Virtual Academy, this interest is non-sensical, because there is no physical congregation for a course of instruction that is conducted solely online, where the child is physically located only in his or her home.

36.     Further, West Virginia permits a series of comparable secular activities that endanger the state interests undergirding the CVL.

37.     *First*, West Virginia has granted many medical exemptions to the CVL, and these medical exemptions are for children who attend school in-person. Unvaccinated schoolchildren with a medical exemption are permitted to attend school and intermingle with other children on a daily basis. From a risk perspective, a single child with a medical exemption who attends in-person instruction presents an exponentially greater threat to any purported West Virginia public health interests than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

8

38.     *Second*, West Virginia permits scores of unvaccinated children to continue their education, despite non-compliance with the CVL, and these children intermingle in person with their peers on a daily basis. These children have not presented a medical or religious reason for non-compliance with the CVL. From a risk perspective, a single child out of compliance with the law permitted to continue attending school presents an exponentially greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

39.     *Third*, West Virginia permits adults working in the school system—teachers, administrators, lunch staff, bus drivers, etc.—to altogether disregard the vaccination requirements of the CVL. Most adults working in the system have never been required to receive the full menu of vaccines required under the CVL. From a risk perspective, a single adult working in person in the school system who has not received the vaccines required by the CVL presents an exponentially greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

40.     *Fourth*, West Virginia does not place restrictions on unvaccinated children or adults outside of the school setting, or outside of school hours. One unvaccinated child or adult attending a University of West Virginia Mountaineers' basketball game—under the government's logic—presents a considerably greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

41.     *Fifth*, even if the State's infectious disease related goals could logically be restricted to children, and exclusively in a school setting during school hours, West Virginia permits unvaccinated children to be educated in unlimited numbers in "learning pods," a school setting where children intermingle on a daily basis. Under W.V. Code § 18-8-1, the government permits

9

unvaccinated children—whatever their reasons for declining vaccination—to be educated in these learning pods. This too presents a considerably greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

42. Collectively, the aggregation of individual behaviors the government permits—medical exemptions, students who are permitted to attend school on a daily basis while willfully out of compliance with the CVL, teachers and staff who are not subject to the law, the learning pod option for unvaccinated children, and members the general public who have not received vaccines required under the law but who regularly intermingle on school campuses and mass gatherings throughout the state——pose a dramatically greater risk to West Virginia's goals than would permitting K.P. a process to pursue a religious exemption in order to obtain a **virtual** education.

43. Further, this aggregation of individual behaviors Defendants permit pose a significantly greater risk to Defendants' goals than would permitting a religious exemption option to the CVL to all students who attend virtual online schools without in-person instruction such as the Plaintiff.

44. Defendants' actions have deprived and will continue to deprive Plaintiffs of their inalienable rights under the United States Constitution.

45. To be clear, this is an "as applied" challenge. Plaintiffs assert the CVL's specific application to K.P.'s situation violates the First Amendment. Plaintiffs do not assert or seek a ruling on whether the law violates the First Amendment in every conceivable application statewide.

46. Defendants' actions have deprived and will continue to deprive Plaintiffs of their inalienable rights under the United States Constitution.

10

47.    Defendants' actions have irreparably harmed and will continue to irreparably harm Plaintiffs.

48.    Defendants committed each act alleged herein under the color and authority of West Virginia law.

## JURISDICTION AND VENUE

49.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 1343(a). This action arises under the First Amendment to the United States Constitution.

50.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because one or more Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district. More specifically, this action involves K.P.'s disenrollment from West Virginia Virtual Academy, administered through the Upshur County School District. Venue is proper in the District because: (i) Plaintiffs registered and enrolled K.P. in the Virtual Academy through the Upshur County School District; (ii) K.P.'s online learning was administered through the Upshur County School District, from this judicial district and division; (iii) Defendants, by and through their course instruction, communicated such instruction to Plaintiffs and K.P. from this district and division; (iv) Defendants denied Plaintiffs' religious exemption request from this judicial district and division; and (v) the coercion and punishment of Plaintiffs for their religious beliefs were directed from this judicial district and division.

51.    This Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure.

## PARTIES

### I.   PLAINTIFFS ANTHONY AND KRYSTLE PERRY

#### A.  *Plaintiffs Maintain Profound Religious Objections to Vaccination*

52.     Mrs. Perry has been a Christian for most of her adult life. Her Christian beliefs inform every aspect of her life, including how she raises K.P.

53.     The Perrys attend Brooklyn Community Church in Fayetteville, West Virginia.

54.     K.P attends Sunday school with her peers. As a family, the Perrys regularly pray and seek guidance from God. They pray in the mornings, before meals, and regularly read the Bible.

55.     Mrs. Perry has experienced God's healing power in the darkest moments of her life. When she was diagnosed with a blastomycosis, Mrs. Perry feared she would not survive to raise K.P. After much prayer, Mrs. Perry believes God miraculously intervened and healed the condition. She attributes her recovery to the number of people who prayed for her healing and to God's mercy. After this experience, Mrs. Perry's faith grew considerably stronger, and she vowed to put her faith in her God in all aspects of life, especially for health and wellness decisions.

56.     Mrs. Perry presently holds, and for many years has held, sincere religious beliefs in conflict with vaccinating K.P.

57.     When K.P. was born, Mrs. Perry was unaware that many vaccines had illicit connections to abortion.

58.     Mrs. Perry became aware of fetal cell involvement in childhood vaccine development and production in 2018, when K.P. was two years old. Before Mrs. Perry became aware of these connections, K.P. received doses of the vaccines required under the Compulsory Vaccination Law.

12

59.    Relying on the Bible verse Job 31:15, Plaintiffs believe it is God who forms children in the womb. As a mother and devout Christian, Mrs. Perry strongly opposes what she deems as the sin of abortion. She views the taking of an unborn life through abortion as murder. She considers injecting a vaccine that relies on abortion to exist to be a sin – a sin that, in her system of religious beliefs would have eternal consequences for herself, her family, and K.P.

60.    Mr. Perry shares these beliefs.

61.    Religious objections to vaccination based on fetal cell involvement in the development and production of vaccines on the childhood schedule is not an attenuated or foundationless religious objection. Abortion and fetal cell research in the development of childhood vaccines is well-documented. For example, in just one study over 75 normally developing babies were aborted, and while keeping the fetuses alive for harvesting their body parts, had nearly every body part chopped up into little cubes to culture viruses on, including chopping up their tongues, livers, intestines, pituitary glands, kidneys, and hearts. *See* **Exhibit 1**, The Wistar Institute of Anatomy and Biology, *Cytological Virological and Chromosomal Studies of Cell Strains from Aborted Human Fetuses* (May 1966) (detailing aborted pre-born and normally developing children in support of vaccination research and development).

62.    In sworn testimony, Dr. Stanley Plotkin—who is commonly referred to as the "Godfather" of childhood vaccines, and one of lead researchers on the aforementioned study— candidly admitted he worked with the chopped up pituitary glands, kidneys, spleens, and hearts of seventy-six healthy, normally developing babies, whose mutilated bodies were utilized in furtherance of his vaccine research. *See* **Exhibit 2**, excerpts of Deposition of Stanley Plotkin, Jan. 11, 2018, at pdf pp. 9-12 of 17. *See also* excerpt of deposition video of Dr. Stanley Plotkin discussing this study, *available at* https://www.sirillp.com/plotkin-abortion/ (last visited July 5, 2024).

13

63.     Additionally, many of the required vaccines contain genetic material derived from aborted fetuses, materials that would be injected directly into K.P.'s body were Plaintiffs to comply with West Virginia's mandatory vaccination requirements. *See, e.g.,* Food and Drug Administration ("**FDA**") Package Insert for M-M-R II Vaccine, attached hereto as **Exhibit 3**, at pdf p. 8 of 12 (stating the Measles, Mumps, and Rubella ("**MMR**") combination vaccine contains strains of "human diploid lung fibroblasts" cultured from a fetal cell line); *see also* FDA Package Insert for VARIVAX vaccine, attached hereto as **Exhibit 4**, at pdf pp. 9-10 of 16 (stating the Varicella vaccine was propagated in "human diploid cell cultures" and "contains residual components of [a fetal cell line] including DNA and protein").

64.     For Plaintiffs, to vaccinate K.P. would be to force them into participating in an action with illicit connections to the termination of an innocent life, and into activity that condones abortion. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (the First Amendment protects the right to abstain from "performing physical acts) (citation omitted); *see also Wisconsin v. Yoder*, 406 U.S. 205, 209 (1972) (the First Amendment protects one's right to abstain from activities that would "endanger [a parent's] own salvation and that of their children").

65.     After learning that many vaccines have been researched, tested, and developed through the use of aborted fetal cell lines, and that several vaccines required under the CVL contain human genetic material derived from aborted pre-born children, the Perrys ceased vaccinating when K.P. was two years old. Plaintiffs cannot in good conscience knowingly inject K.P. with anything that would make them complicit in the sin of abortion. Plaintiffs believe abortion constitutes a taking of an innocent human life, relying on Proverbs 6:16-17 (instructing that God hates those who "shed innocent blood".). Accordingly, Plaintiffs believe that supporting abortion would potentially endanger their and K.P.'s souls.

14

66.     After thoughtful prayer and reflection, Plaintiffs also developed religious objections to vaccination based on the belief that they must not alter K.P.'s God-given natural immune system. Plaintiffs believe that human beings were created in God's image, according to God's perfect plan (even though physical imperfections exist). Based on the Bible passage Mark 2:17, which counsels that healing is to be directed towards those who are actually sick, Plaintiffs do not seek medical attention unless they or K.P. are sick, and additionally, only in cases where, after thought and prayer, they are certain their God-given immune systems are incapable of eliminating that sickness. To do otherwise would be to preemptively alter the immune system God designed and would demonstrate a lack of faith in God.

67.     While Plaintiffs are not opposed to all medication, they do not seek out medical intervention where no serious illness exists.  As such, for religious reasons, Plaintiffs do not initiate medical procedures preemptively, like vaccination, for K.P. In Plaintiffs' system of religious beliefs, preemptively altering God's perfect and unique design for K.P.'s immune system would violate God's plan for K.P.'s life.

### B.  Plaintiffs' Religious Beliefs and Practices are Substantially Burdened by the CVL

68.     Plaintiffs have been negatively impacted on multiple fronts by the decision to exercise their sincerely held religious beliefs in conflict with vaccination. K.P. has been categorically excluded from West Virginia's educational system, including the irrational and punitive exclusion of K.P. from pursuing her education at home, online, through the Virtual Academy.

69.     In or around May 2022, and as permitted by state law, Mrs. Perry enrolled K.P. in the Virtual Academy through the Upshur County School District. She did this because her cousin informed Mrs. Perry that the Upshur County School District did an exceptional job of keeping parents informed regarding Virtual Academy requirements and did an excellent job at facilitating

15

enrollment and administration of Virtual Academy requirements. The Virtual Academy enrollment process is very easy to navigate and is efficient.  In 2022, Plaintiffs were able to get K.P. enrolled in less than a week.

70.     From August of 2022 through January of 2024, K.P. excelled in learning in the Virtual Learning Academy.

71.     K.P. received high grades in English, Math, Science, History and Art. In the Virtual Academy, K.P. was enthusiastic about learning, and thrived in the structure and social interactions the Academy provided.

72.     K.P. enjoyed interacting with her peers virtually through the Virtual Academy. Daily interactions with her peers were an integral aspect of K.P.'s educational and social development.

73.     Mrs. Perry's husband is 100% disabled and receives Supplemental Security Income ("**SSI**") through the Social Security Administration. Mr. Perry was born prematurely and has experienced profound health complications throughout his life. He is 100% blind in one eye and has been diagnosed with a learning disability.

74.     While Mrs. Perry worked, Mr. Perry was able to seamlessly oversee K.P.'s education with the significant resources provided by Virtual Academy administrators.

75.     After K.P. had been enrolled and learning in the Virtual Academy for approximately 16 months, Mrs. Perry was contacted by Virtual Learning Coordinator for the Upshur County Schools, Stacy Marteney, sometime in December 2023. Ms. Marteney inquired regarding K.P.'s vaccination status, informing Mrs. Perry that K.P. had to receive the vaccines required under the CVL if she desired to continue her education in the Virtual Academy.

16

JA026

76. On or around December 27, 2023, Ms. Marteney followed up and asked Mrs. Perry if K.P. was up to date on her vaccines. Mrs. Perry replied that she cannot vaccinate K.P.

77. On January 3, 2024, Mrs. Perry was again contacted by Ms. Marteney regarding K.P.'s vaccination status, and when Mrs. Perry again confirmed that she could not vaccinate K.P. Ms. Marteney notified Mrs. Perry that K.P. would promptly be dis-enrolled from the Virtual Academy.

78. K.P. was permitted to finish out the week, and then her online virtual learning credentials were cancelled on or around January 5, 2024, leaving her with no access to her teachers, classmates, or curricula materials.

79. On April 1, 2024, Mrs. Perry inquired whether she could submit a religious exemption to the CVL to continue K.P.'s education through the Virtual Academy. On April 3, 2024, Ms. Marteney replied that "unfortunately there is still not a religious exemption available." *See* **Exhibit 7**, Denial of Religious Exemption.

80. K.P. must now be homeschooled, with little to no interaction with children of her age for her education.

81. This change has caused a significant decrease in K.P.'s enthusiasm for learning. K.P was thriving at the Virtual Academy, but her appetite for learning diminished once she was transitioned to full-time homeschool.

82. K.P no longer has any routine or structure in her day. While attending the Virtual Academy, K.P. would meet with her homeroom on Mondays and Fridays at 9:00 AM. After homeroom, K.P. would attend optional elective courses.

83. K.P.'s lessons targeted core subjects each day.

17

JA027

84.     On occasions where K.P. was unable to immediately grasp concepts, K.P. and Mr. Perry had access to a full range of support through the Virtual Academy to help K.P. grapple through and conquer the learning issues she confronted.

85.     K.P. earned straight A's while in the Virtual Academy.

86.     With the support system the Virtual Academy provided, Mr. Perry was able, despite his disabilities, to seamlessly guide K.P. through the virtual educational program. Without the support system the Virtual Academy provides, Mr. Perry has struggled to advance K.P.'s education at the same level K.P. was learning through the Virtual Academy.

87.     If West Virginia continues to prohibit religious exemptions to the Virtual Academy, the only remaining option for the Perrys to ensure K.P. receives an education is to homeschool. Because of the Perrys' unique situation, homeschooling is a less-than-optimal situation for K.P.'s learning needs.

88.     K.P. is unable to access the practical and social benefits of a typical education that her secular peers enjoy. In short, without a religious exemption, the Perrys have been deprived of the West Virginia's guarantee of a public education, unless they violate their sincerely held religious beliefs.

89.     West Virginia's refusal to allow K.P. to continue her education through the Virtual Academy is having and will have lifelong and negative impacts on K.P.

### C. Despite Being Categorically Excluded from Receiving an Education in West Virginia, K.P. Regularly Interacts with her Peers

90.     Notwithstanding the CVL, K.P regularly socializes with other children her age. K.P. interacts regularly with her West Virginia peers outside of school on a weekly basis (*e.g.,* at group church gatherings and at various other community activities).

JA028

91.    K.P frequently visits with her cousins, friends, and plays with and learns alongside children at Sunday school.

## II.    DEFENDANTS

92.    Defendant, Stacy Marteney ("**Ms. Marteney**") is the Virtual Learning Coordinator for the Upshur School District, the District through which Plaintiffs enrolled, and attempted to re-enroll, K.P. into the Virtual Academy.  Ms. Marteney is sued solely in her official capacity. Ms. Marteney is tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL against school-aged children desiring to attend the Virtual Academy, and she enforced the CVL against the Plaintiffs and excluded K.P. from the Virtual Academy.  She is located at 102 Smithfield St. Buckhannon, West Virginia, 26201.

93.    The Board of Education of the County of Upshur ("**Board**") is the duly empaneled school board for Upshur County, which pursuant to W. VA. CODE §§ 18-5-1, 18-5-5, 18-5-34, has authority and control over the school district, and, pursuant to state law, was responsible for enforcing the CVL against Plaintiffs, resulting in the exclusion of K.P. from school. The Board is located at 102 Smithfield St. Buckhannon, West Virginia, 26201.

94.    Christine Miller ("**Ms. Miller**") is the duly empaneled Superintendent of the Upshur County School District, being sued only in her official capacity as Superintendent, with the duties as outlined in W. VA. CODE § 18-4-10 to include enforcement of all policies and procedures by state law, including, as is relevant here, enforcement of the CVL against Plaintiffs and K.P. Ms. Miller is located at 102 Smithfield St. Buckhannon, West Virginia, 26201, and is sued solely in her official capacity.

95.    Defendant Dr. Mathew Christiansen ("**Dr. Christiansen**") is made party to this action in his official capacity as State Health Officer and Commissioner for the West Virginia Department of Health and Human Resources. Under West Virginia law, and specifically the CVL,

19

at W. VA. CODE § 16-3-4 (c), (d), (e), and (h), Dr. Christiansen is specifically tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL for school-aged children, including children wishing to enroll in the Virtual Academy, while simultaneously granting medical exemptions under the CVL to unvaccinated West Virginia schoolchildren. He is sued solely in his official capacity.

96.     Defendant, Doug Cipoletti ("**Mr. Cipoletti**") is the Executive Director of the Virtual Academy.[4] Mr. Cipoletti is tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL against school-aged children desiring to attend the Virtual Academy, including K.P. The West Virginia Virtual Academy is a tuition free online Public School offered to children grades K-12. While the Virtual Academy has a psychical location at 3508 Staunton Ave., 3rd Floor, Charleston, West Virginia, 25304, the Virtual Academy enforces the CVL against schoolchildren throughout the state, including in this judicial division and district, and was involved in enforcing the CVL generally resulting in the exclusion of K.P. He is sued solely in his official capacity.

## STATEMENT OF FACTS

**I. DEFENDANTS' CATEGORICAL "NO RELIGIOUS EXEMPTION POLICY" AND NON-ENFORCEMENT OF THE CVL.**

### A. CVL Requirements and Limitations of the Mandated Vaccines

97.     Under the CVL, every "child entering school or a state-regulated childcare center in this state must" receive certain vaccines. W. VA. CODE § 16-3-4 (b).

98.     In West Virginia, it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox

---

[4] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com/about-our-school/letter-from-our-head-of-school/ (last visited July 5, 2024).

[*i.e.*, varicella], hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough [i.e., pertussis]" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine." W. VA. CODE § 16-3-4 (c) and (e).

99.    No child may be "admitted or received in any of the schools of the state" unless they have received these vaccines. *Id.* at § 16-3-4 (c). And § 16-3-4 (d) requires school and childcare personnel to report to the commissioner (who is also the State Health Officer) any attempts to enroll unvaccinated children in schools.

100.    Many of these vaccines have been combined into single dose shots (e.g., the measles, mumps, and rubella ("**MMR**"), whereby multiple vaccinations are combined into one injection, and multiple vaccination are administered in a single dose.

101.    Most of the injections required under the CVL provide at best personal protection.

102.    For example, the tetanus, diphtheria, and pertussis vaccine ("**DTaP**" and/or "**Tdap**") does not prevent infection or transmission of the diseases it targets. This vaccine potentially provides only a level of personal protection by preventing a recipient from experiencing the symptoms of these infections.

103.    Tetanus is not even an infectious disease. As such, the tetanus vaccine does not prevent infection and transmission of a communicable disease, but rather can only provide personal protection for the recipient. *See* CDC Pink Book*, available at* https://www.cdc.gov/vaccines/pubs/pinkbook/tetanus.html#:~:text=Tetanus%20is%20not%20contagious%20from,is%20infectious%20but%20not%20contagious (stating "Tetanus is not contagious from person to person.") (Last visited July 5, 2024).

104.    Likewise, the pertussis vaccine provides only personal protection. *See e.g.,* https://pubmed.ncbi.nlm.nih.gov/31333640/ (stating "Natural infection evokes both mucosal and

21

systemic immune responses, while aPVs [acellular pertussis vaccine, the exclusive pertussis vaccine used in the United States] induce only a systemic immune response. … Mucosal immunity is essential to prevent colonization and transmission of B. pertussis organisms. Consequently, preventive measures such as aPVs that do not induce a valid mucosal response **can prevent disease but cannot avoid infection and transmission. … aPV pertussis vaccines do not prevent colonization. As such, they do not reduce the circulation of B. pertussis and do not exert any herd immunity effect**.") (Emphasis added) (last visited July 5, 2024).

105.    The same is true of the diphtheria vaccine—it is at best a personal protection device. *See e.g.,* https://pubmed.ncbi.nlm.nih.gov/5026197/ (Diphtheria vaccine only creates antibodies to a toxin released by the diphtheria bacteria and does not generate any antibodies to the diphtheria bacteria itself, hence "**Diphtheria toxoid helps prevent symptomatic disease but does not prevent the carrier state nor stop the spread of infection**.") (Emphasis added) (last visited July 5, 2024).

106.    The meningococcal vaccine also does not contribute to herd immunity but at best provides an undefined personal benefit to the vaccine recipient. "Rates of meningococcal disease have declined in the United States since the 1990s and remain low today. Much of the decline occurred before the routine use of MenACWY vaccines. … [D]ata suggest MenACWY vaccines have **provided protection to those vaccinated, but probably not to the larger, unvaccinated community (population or herd immunity**)." *See* CDC, *Meningococcal Vaccination: What Everyone Should Know*, *available at* https://www.cdc.gov/vaccines/vpd/mening/public/index.html (emphasis added) (last visited July 5, 2024).

22

107.    Contrary to the common conceptions, the currently mandated polio vaccine (and the only one available in the United States) also does not prevent infection and transmission of the targeted pathogen. It too is a personal protection device. That is because the "inactivated polio vaccine (IPV) is the only polio vaccine that has been given in the United States since 2000."[5] "IPV… protects people from polio **disease but does not stop transmission of the virus**." *See* CDC webpage, *Polio Disease and Poliovirus Containment, available at* https://www.cdc.gov/orr/polioviruscontainment/diseaseandvirus.htm, which links to the *CDC et al., Polio Global Eradication Initiative* webpage, *available at* https://polioeradication.org/polio-today/polio-prevention/the-vaccines/ipv/ which further explains: "IPV induces very low levels of immunity in the intestine. As a result, when a person immunized with IPV is infected with wild poliovirus, the virus can still multiply inside the intestines and be shed in the feces **… IPV does not stop transmission of the virus**." (Emphases added) (last visited July 5, 2024).

108.    Like COVID-19 vaccines, these vaccines are not designed to create, nor do they result in "herd immunity."

109.    Since these products reduce symptoms, but do not prevent infection and transmission, those vaccinated with these products are more likely to asymptomatically spread the pathogen due to a false sense of security and misunderstanding of the limitations of the injections.

110.    Further, hepatitis B is not transmitted in a school setting, as confirmed by federal health authorities. In response to a FOIA request, the CDC stated, "A search of our [CDC] records failed to reveal any documents" of "transmission of Hepatitis B in an elementary, middle or high school setting." *See* **Exhibit 5**, CDC FOIA Response Regarding Hep B Vaccine. This makes sense

---

[5] *See* CDC webpage, *Polio Vaccination*, *available at* https://www.cdc.gov/vaccines/vpd/polio/index.html (Last visited July 5, 2024).

since hepatitis B is not transmitted through activities that occur in a school setting. It is also worth noting that "almost all children 6 years and older and adults infected with the hepatitis B virus recover completely and do not develop chronic infection." *See* CDC, *Hepatitis B, available at* https://www.cdc.gov/hepatitis/hbv/index.htm. (Last visited July 5, 2024).

111.    Thus, four of the six injections[6] required under the CVL are incapable of preventing infection and transmission of target pathogens in the school setting and are, at best, personal protection devices.

112.    The only remaining vaccines required under the CVL are the MMR and varicella injections. K.P. has received the first dose of both these vaccines, before they Perrys learned of these injections illicit connections to abortion.

113.    The difference of protection stated by the CDC is negligible between one and two doses of the MMR vaccine. The CDC states that a single dose of the MMR K.P. received is 93% effective against the disease, as compared to 97% for two doses.[7]

114.    Further, for the varicella vaccine (i.e., the chickenpox), CDC states that a single dose of the varicella K.P. received is 100% effective against "severe varicella," and 82% effective at "preventing any form of varicella," while two doses are likewise 100% effective against "severe varicella," and 92% effective at "preventing all varicella."[8] The gains from additional injections are, therefore, marginal at best.

---

[6] Ten vaccines are required under the CVL, *see* W. VA. CODE § 16-3-4 (c) and (e), but because they are injected in combination vaccines, a total of six distinct products with multiple doses for several of the vaccines (e.g., MMR, DTaP, varicella, etc.) are required.

[7] *See CDC, About Measles, available at* https://www.cdc.gov/measles/vaccination.html (Last visited July 5, 2024).

[8] *See CDC, About the Varicella Vaccines, available at* https://www.cdc.gov/vaccines/vpd/varicella/hcp/about-vaccine.html (Last visited July 5, 2024).

24

115.    In addition, the varicella vaccine is a live virus vaccine, meaning there is, albeit modified, live chicken pox virus in each dose. Those vaccinated with this live virus can infect others with the chicken pox virus for up to six weeks after receipt of the live vaccine. This is why its package insert, approved by FDA, explains "that transmission of varicella vaccine virus (Oka/Merck) resulting in varicella infection including disseminated disease may occur between vaccine recipients (who develop or do not develop a varicella-like rash) and contacts susceptible to varicella including healthy as well as high-risk individuals" and that "[d]ue to concern for transmission of vaccine virus, vaccine recipients should attempt to avoid whenever possible close association with susceptible high-risk individuals for up to six weeks following vaccination" including "[i]mmunocomposed individuals [and] [p]reganant women … [and] [n]ewborn infants of mothers without documented history of varicella." *See* https://www.fda.gov/media/76008/download?attachment. (Last visited July 5, 2024). Nonetheless, Defendants do not exclude those vaccinated with this product from schools for six weeks after vaccination to prevent transmission.

### B. The Government Grants Medical Exemptions and Practical Exceptions Through Non-Enforcement of the CVL

116.    While West Virginia requires that unvaccinated children enrolled in school be reported to the Department of Health pursuant to W. VA. CODE § 16-3-4 (d), Defendants liberally allow unvaccinated children to remain in school.

117.    West Virginia allows unvaccinated children to remain enrolled in school and to attend in-person classes, provided they do not, like Plaintiffs, request a religious exemption before enrolling or re-enrolling. For example, in response to requests under the West Virginia Freedom of Information Act, W. VA. CODE § 29B-1-1, et seq., ("**WVFOIA**"), the Fayette County Board of Education responded that currently, in the 2023/2024 school year, 440 unvaccinated children were

25

enrolled in in-person classes for more than thirty days.[9] The Monongalia County School District reported 147 children out of compliance with the Compulsory Vaccination Law were enrolled in in-person classes for more than thirty days,[10] and the Upshur County School District—the district K.P. enrolled in the Virtual Academy, and the district in which her virtual education was administered—reported that 46 unvaccinated children who are out of compliance with the CVL were enrolled in in-person classes for more than thirty days.[11]

118.     These are just three examples of school districts who permit unvaccinated students to attend in-person classes. On information and belief, many more unvaccinated students are permitted to attend in-person classes while out of compliance with the CVL in school districts throughout the state.

119.     Official government records also indicate considerable non-compliance rates for West Virginia kindergarteners attending in-person classes. For example, according to CDC records for the 2022-2023 school year, as many 4.4% of West Virginia kindergarteners are out of compliance with the CVL. *See* CENTERS FOR DISEASE CONTROL, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten – United States, 2022-23 School Year*, available at https://www.cdc.gov/mmwr/volumes/72/wr/mm7245a2.htm#:~:text=National%20coverage%20remained%20near%2093,22%20school%20year%20(2.6%25) (detailing percentages of religious and medical exemption rates, along with non-compliance rates, for U.S. kindergarteners in the 2022-23 school year, and detailing a non-compliance rate in West Virginia of approximately 4.4%) (last visited July 5, 2024)).

---

[9] *See* **Exhibit 8**, Fayette County WVFOIA response.

[10] *See* **Exhibit 9**, Monongalia County WVFOIA response.

[11] *See* **Exhibit 10** Upshur County WVFOIA response.

26

JA036

120.    These involve instances of school districts and children that are willfully out of compliance with the CVL, yet the students are permitted to continue their educations in-person, while K.P. was ejected from the Virtual Academy after seeking a religious exemption.

121.    West Virginia's lackadaisical approach to its vaccination requirements in school settings is further demonstrated by the fact that teachers and others working in West Virginia's educational system are not subject to the vaccination requirements of the CVL. Many, if not most, teachers, administrators, and staff working in the West Virginia school system have never been required to receive the full battery of injections required by the CVL.

122.    This is because, as of 1986, when many of the adults in the school system were themselves in school, there were only three routine vaccines in the U.S. It was only after 1986, the year Congress gave pharmaceutical companies immunity for liability for injuries caused by childhood vaccines, that the explosion in the childhood vaccine schedule occurred. *See* 42 U.S.C. §§ 300aa-11. And on the tails of this liability protection, West Virginia first required the recombinant Hep-b vaccine (first licensed in 1986) for school; the varicella vaccine (first licensed in 1995); the pertussis vaccine (licensed in 2005); and conjugate meningococcal vaccine (first licensed in 2005).

123.    This means that most adults in the State, who comprise over 80% of the state's population,[12] were never subject to most of the State's school vaccine requirements.

124.    West Virginia also permits medical exemptions to its childhood vaccination requirements. While religious exemptions are prohibited, a child may be exempt from the

---

[12]    *See* UNITED STATES CENSUS BUREAU, QuickFacts, West Virginia, *available at* https://www.census.gov/quickfacts/fact/table/WV,US/PST045223 (last visited July 5, 2024)

27

requirements upon producing a certificate "granting the child . . . a[] [medical] exemption from the compulsory immunization requirements." W. VA. CODE § 16-3-4 (h).

125.    For example, in response to WVFOIA requests, the Harrison County School District reported that it had recently granted nine medical exemptions to the CVL,[13] the Monongalia County School District reported seven medical exemptions,[14] and the Upshur County School District reported two medical exemptions.[15]

126.    These are just three examples of school districts who grant medical exemptions to in-person students. On information and belief, many more unvaccinated students are permitted to attend in-person classes with medical exemptions, and the Virtual Academy also allows for medical exemptions.

### C. K.P. was Thriving at the West Virginia Virtual Academy, Where She Posed a Non-Existent Threat to Defendants' Infectious Disease Related Goals

127.    West Virginia's justification for the CVL is to mitigate against infectious disease, specifically amongst children in school settings.

128.    Because infectious diseases do not only spread in school settings, and impact adults and schoolchildren alike, the CVL can never credibly fulfill West Virginia's contagious disease mitigation goals.

129.    Even if the State's interest in vaccinating its citizens could somehow logically be limited exclusively to children in a formal school setting, allowing K.P. to access a religious exemption to the Virtual Academy—**where she does not interact in person with classmates**—

---

[13] *See* **Exhibit 11**, Harrison County WVFOIA response.

[14] *See* **Exhibit 9**, Monongalia County WVFOIA response.

[15] *See* **Exhibit 10**, Upshur County WVFOIA response.

JA038

does not remotely threaten Defendants' goals, and certainly not to the degree that medical exemptions do.

130.    The Virtual Academy is a tuition-free online public school offering virtual education to children from kindergarten through grade twelve.[16] The program is available for all West Virginia residents.[17]

131.    The Virtual Academy is administered through local school districts. Parents must enroll in virtual school through a county school district.

132.    Once enrolled, administrators from the sponsoring school district provide the family with credentials to access the program. Plaintiffs were provided enrollment credentials through representatives from the Upshur County School District.

133.    The Virtual Academy offers a flexible learning curriculum with core subjects in English, Science, Math, History and Art. The program allows for a customized educational experience for each child.

134.    For approximately 17 months, from August of 2022 to January of 2024, K.P. was enrolled in and thrived at the Virtual Academy without her vaccination status being an issue and without endangering the government's public health goals.

135.    The situation was ideal for Plaintiffs as Mrs. Perry is a working mother and is unable to personally homeschool K.P. full time, which, prior to the availability of the Virtual Academy, was the only educational option in West Virginia for children who remained unvaccinated for religious reasons.

---

[16] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com/ (last visited July 5, 2024).
[17] *Id.*

JA039

136.    Mr. Perry, who is 100% disabled, shepherded K.P. through Virtual Academy from home, with considerable assistance for Virtual Academy staff.

137.    All learning materials, books, and lesson plans are provided to the family free of charge, or at very low cost. This virtual learning program allows for flexible learning hours to fit the child's needs and schedule.

138.    Even though Virtual Academy students learn from home and are not required to interact in person with their virtual classmates, Virtual Academy students are subject to the CVL's requirements.

139.    Plaintiffs have requested that they be permitted to seek a religious exemption to the CVL so their child can continue her education.  Their request for a religious exemption and accommodation were rejected.

140.    However, the CVL and Defendants have made clear that medical exemptions are available for schoolchildren with secular reasons for declining vaccination, including those enrolled for in person learning as well as for Virtual Academy students.

### D. *West Virginia's Categorical Intolerance for Non-Vaccination for Religious Reasons, Even in Virtual Settings*

141.    West Virginia simply cannot tolerate non-vaccination for religious reasons.  The State is perfectly fine if children remain unvaccinated for medical reasons and attend in person school, or even if they are willfully non-compliant with the law (for any reason they choose) and attend school, provided they do not, like Plaintiffs, request a religious exemption to continue in school.

142.    However, from a disease prevention and risk perspective, there is no reason "why religion alone must bear the burden" of the State's push to mitigate against infectious disease. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544 (1993).

30

143.    As conclusive evidence of West Virginia's intolerance for non-vaccination for religious reasons, West Virginia Governor Jim Justice recently vetoed a bill that would have allowed for religious exemptions in virtual public schools, like the Virtual Academy.[18]

144.    The medical exemption option, however, remains intact and children unvaccinated for secular reasons are permitted to intermingle daily with their classmates at school.

145.    Further, while the State made the conscious choice to prohibit religious exemptions even in virtual settings, West Virginia continues in its relaxed enforcement of the CVL, allowing many hundreds of unvaccinated schoolchildren who are willfully noncompliant with the law to continue to attend classes in-person.

146.    Because of Governor Justice's veto, Plaintiffs specifically chose not to challenge the CVL under the recently enacted West Virginia Equal Protection for Religion Act, West Virginia Code § 35-1A-1 (2023) (the "**EPRA**"), which arguably contains protections that may overlap with the concrete protections the First Amendment affords.

147.    This is because, whatever protection EPRA may hypothetically provide, that theoretical shield for religious freedom in West Virginia is transient and passing, contingent on the shifting opinions of elected officials (like Governor Justice and a future legislature).

148.    Elected officials can just as easily rescind EPRA, and whatever religious freedoms it may protect.  And given Governor Justice's veto, it is clear that EPRA would not have been enacted if it included an option for a religious exemption to childhood vaccination.

149.    Thus, Plaintiffs seek the bedrock, unchanging protections only accessible under the First Amendment. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (observing

---

[18] *See* WV HB5105, *A Bill to Eliminate Vaccine Requirements for Public Virtual Schools*, https://www.billtrack50.com/billdetail/1687129 (last visited July 5, 2024).

31

that one's "right to . . . freedom of worship . . . and other fundamental rights may not be submitted

to vote; they depend on the outcome of no elections.").

### E.    Recent First Amendment Free Exercise Developments

150.    Directly applicable constitutional jurisprudence has fundamentally evolved to

require strict scrutiny review for situations virtually identical to the issues presented here.

151.    Religious exemptions have long been the norm when it comes to school vaccination

laws. Forty-five states (plus the District of Columbia) currently offer religious exemptions to their

school vaccination laws.[19]

152.    West Virginia is a radical outlier in prohibiting a religious exemption option. Only

five states do not currently allow for religious exemptions, and for most of them, this is a relatively

recent development.  California, Maine, Connecticut, and New York historically allowed religious

exemptions, but those options were recently removed by the legislatures of those states.[20]

---

[19] *See* Ala. Code § 16-30-3; Alaska Admin. Code tit. 7, § 57.550; Ariz. Rev. Stat. Ann. §§ 15-872(G), -873(A)(1); Ark. Code Ann. § 6-18-702(d)(4)(A); Colo. Rev. Stat. §§ 25-4-902, -903(b)(V); Del. Code Ann. tit. 14, § 131(a)(6); D.C. Code §§ 38-501, -506(1); Fla. Stat. § 1003.22(1); Ga. Code Ann. § 20-2-771(e); Haw. Rev. Stat. §§ 302A-1154, -1156(2); Idaho Code §§ 39-4801, -4802(2); 105 Ill. Comp. Stat. § 5/27-8.1(6); Ind. Code § 21-40-6; Iowa Code § 139A.8(4)(a)(2); Kan. Stat. Ann. § 72-6262(b)((2); Ky. Rev. Stat. Ann. § 214.034(2); La. Stat. Ann. §§ 17:170(E), 40:31.16(D); Md. Code Ann., Educ. § 7-403(b)(1); Mass. Gen Laws ch. 76, § 15; Mich. Comp. Laws §§ 333.9208, .9215(2); Minn. Stat. § 121A-15; Mo. Rev. Stat. §§ 167.181(3), 210.003; Mont. Code Ann. §§ 20-5-403, -405(1)(a); Neb. Rev. Stat. §§ 79-217, 221(1); Nev. Rev. Stat. §§ 392.435, .437; N.H. Rev. Stat. Ann. § 141-C:20-a, :20-c; N.J. Stat. Ann. § 26:1A-9.1; N.M. Stat. Ann. § 24-5-1, -3(A); N.C. Gen. Stat. §§ 130A-155, -157; N.D. Cent. Code § 23-07-17.1(3); Ohio Rev. Code Ann. § 3313.671(B)(4); Okla. Stat. tit. 70, §§ 1210.191, .192; Or. Rev. Stat. § 433.267(1)(c)(A); 28 Pa. Cons. Stat. §§ 23-83, -84; 16 R.I. Gen. Laws § 16-38-2(a); S.C. Code Ann. § 44-29-180(D); S.D. Codified Laws § 13-28-7.1; Tenn. Code Ann. § 49-6-5001(b)(2); Tex. Educ. Code Ann. § 38.001(c)(1)(B); Utah Code Ann. § 53G-9-303(3); Vt. Stat. Ann. tit. 18, §§ 1121, 1122(3)(A); Va. Code Ann. §§ 22.1-271.2(C), 32.1-46(D)(1); Wash. Rev. Code § 28A.210.080, .090(1)(c); Wis. Stat. § 252.04(3); Wyo. Stat. Ann. § 21-4-309(a). Mississippi now offers a religious exemption after a federal court issued a permanent injunction following a free exercise challenge requiring Mississippi to provide a religious exemption process. *See Bosarge v. Edney*, 669 F. Supp. 3d 598, 625 (S.D. Miss. 2023).

[20]    *See, e.g.,* Cal. Health & Safety Code § 120325 *et seq.* (religious exemption eliminated in 2016); N.Y. Pub. Health Law § 2164(1) (religious exemption removed in 2019); Conn. Gen. Stat. § 10-204a (religious exemption eliminated in 2021); Me. Stat. tit. 20-A, § 6355 (religious exemption eliminated in 2019). West Virginia is the only state that has never offered a religious exemption. W. Va. Code § 16-3-4.

153. More importantly, First Amendment jurisprudence has fundamentally evolved in recent years. There have been five Supreme Court cases that are particularly relevant to the First Amendment issues at hand, and those cases each in isolation dictate strict scrutiny review here.

154. Before *Emp't Div. v. Smith,* 494 U.S. 872 (1990), courts struggled with what level of judicial scrutiny to apply to free exercise claims. Because of the country's diversity of religious beliefs, almost every government regulation burdened, to some degree or another, a religious belief system. The *Smith* Court confronted this issue and held that laws that only "incidentally" burden religion expression ordinarily are not subject to strict scrutiny under the Free Exercise Clause, reasoning to do otherwise would be "courting anarchy." *Id.* at 888.

155. However, the *Smith* Court held that strict scrutiny would apply to regulations that either were not neutral (because they overtly targeted out religious observance for worse treatment), or did not apply generally to the population, containing no exceptions the law.

156. The *Smith* Court's animating rationale was that allowing religious exemptions to certain neutral and generally applicable laws "would be courting anarchy," *Smith*, 494 U.S. at 888, because such laws "could not function" in the face of religious exemptions, *United States v. Lee*, 455 U.S. 252, 260 (1982.

157. That is not the case here. Childhood vaccination schemes are clearly capable of smoothly functioning with exemption options, including for religious reasons.

158. Again, West Virginia permits many hundreds of unvaccinated children out of compliance with the CVL to remain in school, and it does not require the tens of thousands of adults working in the school system to comply with the CVL's requirements.

159. Consequently, the government has shown through action and inaction that its infectious disease related goals can be accomplished while allowing exceptions to the CVL.

160. Finally, the overwhelming majority of states have for decades recognized the compelling interest in respecting their citizens' religious freedoms and allow for a religious exemption option to childhood vaccination requirements, further demonstrating childhood vaccination requirements are more than capable of allowing for religious exemptions without generating the anarchy the *Smith* Court was so concerned about.

161. Here, the option for a religious exemption mechanism can be seamlessly implemented, like it has been in forty-five other states, without endangering ordered governance and preservation of the CVL.

162. The CVL also provokes strict scrutiny under *Smith's* progeny.[21]

163. The *Smith* Court held that strict scrutiny would apply to regulations that either were not neutral (because they targeted religious observance) or were not generally applicable. *Smith*, 494 U.S. at 881.

164. A couple of years later, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Court outlined the parameters of the neutrality and general applicability standards when examining a local ordinance that banned animal sacrifice, a practice of the Santeria faith. Because it appeared that the government had targeted religious observance for exclusion, and because the local government allowed similar secular conduct (absence of restrictions on how hunters were to dispose of an animal carcass), the Court applied strict scrutiny and struck the ordinance. *Lukumi*, 508 U.S. at 547.

165. More recently, the Supreme Court has protected Free Exercise rights in the face of state regulations related to infectious diseases. In *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), the

---

[21] Plaintiffs also believe *Smith* was wrongly decided and preserve the right to argue *Smith* should be overturned.

Supreme Court ruled that a law is not neutral and generally applicable, and thus invokes strict scrutiny review, if it treats "*any* comparable secular activity more favorably than religious exercise." *Id.* at 62 (emphasis in original). In *Tandon,* California regulations intended to slow the spread of COVID-19 limited religious gatherings but treated comparable secular gatherings – such as getting haircuts and retail shopping – more favorably. *Id.* at 63. The Court applied strict scrutiny and granted a preliminary injunction in favor of the religious plaintiffs. *Id.* at 64.

166.    The Court employed similar reasoning in *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020), holding that a New York regulation that prohibited religious gatherings but permitted similar secular gatherings violated the First Amendment where the secular and religious activities in question presented comparable contagion risks. *Id.* at 17.

167.    A couple of months after its *Tandon* ruling, the Supreme Court examined the issue of whether a regulation is generally applicable where it provides for secular exceptions that are unavailable to citizens with religious beliefs. In *Fulton v. City of Philadelphia*, 593 U.S. 522, 537, (2021), the Court—in a 9-0 decision—held that the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable" where that mechanism is unavailable to religious adherents. In deciding to apply strict scrutiny, the Court observed that the regulation in question had a procedure that was subject to individualized review and approval at the "sole discretion" of a government official. *Id.* at 537.

### F. West Virginia has Created a Discretionary Medical Exemption Process

168.    West Virginia has instituted an individualized discretionary exemption to the CVL that categorically preferences non-vaccination for secular reasons above non-vaccination for religious reasons.

35

169.    Students are categorically prohibited from seeking exemption from the required vaccines for religious reasons. However, students are permitted to seek a medical exemption from the required vaccines.

170.    Through the plain language of the relevant statute, West Virginia has reserved discretion to accept or deny medical exemptions.

171.    The statute dictates in relevant part that the health commissioner "is authorized to grant . . . exemptions to the compulsory immunization requirements . . . on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. VA. CODE § 16-3-4 (h).

172.    It offers no similar pathway for an exemption where the requirement substantially burdens a sincerely held religious belief.

173.    The medical exemption process includes even more individualized discretion than what may be initially apparent.

174.    Under the statutory scheme, there are multiple levels of discretionary review whereby government officials and private physicians are empowered to press the red light or green light on each medical exemption request, and at each level, the government prefers non-vaccination for secular reasons above non-vaccination for religious reasons.

175.    At the first level of review, the state has delegated private health care providers discretion to determine the variety of circumstances which are eligible for a medical exemption, and those which are not.

36

JA046

176.   Acting on behalf of the state, these physicians conduct an individualized assessment of each request for a medical exemption and have latitude to decide whether to certify the request, and then submit their opinion for medical exemption on a government form.[22]

177.   In practice, West Virginia physicians exercise broad discretion when deciding to grant or deny each medical exemption request. Different decisions can be reached, and are reached, depending on which physician evaluates the request.

178.   If and when the medical exemption form is signed by a physician, it is then forwarded to the State Immunization Officer who reviews each medical exemption request on a case-by-case basis. If the exemption is ultimately approved by the State Immunization Officer, the student is permitted to attend school without having received all of the mandated vaccines.

179.   If the Immunization Officer denies the medical exemption, the decision can be appealed to the State Health Officer, who reviews the appeal on a case-by-case basis and determines whether to uphold or reverse the State Immunization Officer's decision. *See* W. VA. CODE § 16-3-4 (h)(4); *see also* **Exhibit 6**, Medical Exemption Denial Reconsideration Form.

180.   In practice, government officials and physicians acting on behalf of the Government exercise individualized discretion as to whether to grant or deny each medical exemption request.

181.   The criteria by which medical exemptions are evaluated are not objective and are subject to the opinion of each government official who evaluates the exemption request. Different outcomes can be reached, and are reached, depending on who reviews the request.

182.   Even the implementing regulations for the medical exemption in West Virginia provide that Defendant Dr. Christiansen shall consider "evidence from medical sources, such as

---

[22] *See* **Exhibit 12**, West Virginia Medical Exemption Request Form.

medical history, opinions, and statements about treatment the child has received." W. Va. Code R. § 64-95-17.2.a.2.

183.    A similar exemption process is unavailable to citizens with religious objections to compulsory vaccination. For example, Plaintiffs requested that they be permitted to re-enroll K.P. in the Virtual Academy with a religious exemption, but they were rejected.[23]

184.    In case there were any doubt that religious exemptions shall not be allowed, while medical exemptions are permitted, the West Virginia Department of Health's webpage outlines the process for seeking and receiving a medical exemption but makes clear that religious exemption cannot be pursued because "West Virginia does not grant non-medical exemptions."

185.    While West Virginia will not entertain a religious exemption request and forbids those tasked with enforcing the CVL to consider granting one, the State grants many medical exemptions annually.

### G. West Virginia Permits Additional Comparable Secular Activity

186.    Defendants liberally allow for non-vaccination for secular reasons throughout the State, including in school settings.

187.    Again, Defendants allow for and do in fact grant many medical exemptions to the CVL.

188.    Defendants have granted many medical exemptions to students who attend classes in person and who interact with other students and staff significantly more frequently (indeed, every day of classroom instruction, year-round) than K.P. would as a student in the Virtual Academy.

---

[23] *See* **Exhibit 7**, Re-Enrollment and Religious Exemption Request.

38

189.    On belief, Defendants have also granted medical exemptions to the Virtual Academy.

190.    From a risk perspective, one online student with a medical exemption to the CVL poses the same risk to Defendants' goals as allowing Plaintiff a religious exemption – which is to say virtually no risk at all.

191.    From a risk perspective and following the government's logic, one in-person student with a medical exemption to the CVL poses a much greater risk to West Virginia's goals than allowing Plaintiffs a mechanism to pursue a religious exemption for K.P. to the Virtual Academy.

192.    Further, West Virginia does not strictly enforce its childhood vaccination policies and permit functional exemptions through non-enforcement of the CVL. In other words, as discussed *supra,* West Virginia presently permit many hundreds of students lacking one or more of the required vaccines to attend class in person, even though they are willfully non-compliant with the CVL.

193.    The government also permit teachers and staff who are not fully up to date with the required vaccines to roam freely throughout campuses across the state and intermingle with schoolchildren without showing proof of vaccination or even adhering to enhanced safety protocols.

194.    Even if the government's infectious disease related goals could logically be restricted to children, and exclusively in a school setting during school hours, West Virginia permits unvaccinated children to be educated in unlimited numbers in "learning pods," a school setting where children intermingle on a daily basis. Under W.V. Code § 18-8-1, the government permits unvaccinated children—whatever their reasons for declining vaccination—to be educated

39

in these learning pods. This too constitutes comparable activity under *Tandon*, and, under the government's logic, presents a considerably greater threat to West Virginia's public health goals than permitting K.P. to continue her education in the Virtual Academy with a religious exemption.

195.    Defendants also permit the public, including countless numbers of West Virginia citizens who remain unvaccinated or partially unvaccinated for any reason they choose, including secular reasons, to freely access school campuses throughout the state without vaccination-based entry restrictions.

196.    Defendants also permit unvaccinated members of the public to attend high transmissibility events in which there are large crowds gathered in close proximity, such as high school basketball and football games, without showing proof of vaccination, and then enter school campuses the next day, if desired.

197.    However, Defendants prohibit Plaintiffs from pursuing an education for K.P., even in virtual settings, based on their religious objections to the CVL.

198.    A single unvaccinated person or student on a West Virginia school campus poses a greater risk to Defendants' goals than permitting K.P. access to an online education through the Virtual Academy.

199.    Collectively, the aggregation of individual secular behaviors Defendants permit (e.g., medical exemptions, unvaccinated teachers and staff, lax enforcement of the CVL, unvaccinated children in learning pods, and unvaccinated members of the general public intermingling at high transmissibility events who then access school campuses unprohibited) pose an infinitely greater threat to any possible goals undergirding the CVL than permitting Plaintiffs' child—an online student—to access the State's educational benefits from her own home with a religious exemption to the CVL.

JA050

### H. The CVL is Amenable to Exemptions; there are Many Less Burdensome Alternatives; and the Law is Both Under- and Over-Inclusive Relative to Defendants' Infectious Disease Related Goals

200. Every state in the country has a mandatory vaccination policy for childhood education. However, the overwhelming majority of these states—forty-five—have a process for both religious and medical exemptions to compulsory vaccination requirements.

201. These states have demonstrated their goals undergirding vaccination requirements can be satisfied while simultaneously respecting students' religious freedoms.

202. In short, the CVL can be seamlessly implemented without endangering West Virginia's disease mitigation goals while also allowing for exceptions to the policy.

203. Universal vaccination is not the only disease prevention tactic that can be deployed. States with a religious exemption process deploy a variety of alternative tactics, such as quarantine in the event of an outbreak, or face masking, distancing, sanitation, and others. Notably, the states contiguous to West Virginia that allow for religious exemptions to childhood vaccination laws all implement the less restrictive alternative of quarantining, if an outbreak of an infectious disease were ever to occur.[24]

---

[24] *See*, *e.g.*, 28 Pa. Code § 27.77(e) (Pennsylvania: "Whenever one of the diseases … has been identified within a child care group setting, the [health] Department … may order the exclusion from the child care group setting …which is determined to be at high-risk of transmission of that disease, of an individual susceptible to that disease in accordance with public health standards …"); Kentucky Exemption Form ("In the event that the county health department or state health department declares an outbreak of a vaccine-preventable disease for which proof of immunity for a child cannot be provided, he or she may not be allowed to attend childcare or school for up to three (3) weeks, or until the risk period ends.") *available at* https://www.chfs.ky.gov/agencies/dph/dehp/imm/EPID230a.pdf; Md. Code Regs. 10.06.04.05(B) (Maryland: "The exemption allowed under … this regulation does not apply when the Secretary declares an emergency or epidemic of disease"); Oh. Rev. Code § 3313.671(C) (Ohio: "a school may deny admission to a pupil otherwise exempted from the chicken pox immunization requirement if … a chicken pox epidemic exists in the school's population. The denial of admission shall cease when the director notifies the principal … that the epidemic no longer exists"); 12 Va. Admin Code 5-110-80(A)(3) (Virginia: "Upon the identification of an outbreak, potential epidemic, or epidemic of a vaccine-preventable disease in a public or private school, the commissioner has the authority to require the exclusion from such school of all children who are not immunized against that disease.").

41

204. West Virginia does not even require any of these countermeasures for children with medical exemptions, or for unvaccinated teachers and staff working in the school system. Indeed, if vaccination is effective against transmission of disease, as West Virginia claims is the justification for the CVL, then a handful of religious exemptions for in-person students would present absolutely no risk to the remaining vaccinated students who attend school in person, particularly assuming as true Defendants position that the mandated vaccines work.

205. Plaintiffs will comply with any reasonable, less burdensome alternatives that would allow them to continue pursuing their child's online education.

206. Moreover, the CVL also fails to regulate enough conduct to satisfy West Virginia's goals. In short, the CVL is glaringly and substantially underinclusive relative to the objectives the government seeks to achieve.

207. For example, sporting events on West Virginia school campuses, graduation ceremonies, or any other student and/or community gatherings do not require proof of vaccination.

208. These mass gatherings pose a significantly greater risk to West Virginia's goals to mitigate against infectious disease spread than would permitting K.P. to pursue her online education with a process for obtaining a religious exemption.

209. Notwithstanding being ejected from the Virtual Academy, however, K.P. can attend sporting events, just as any other member of the public can and does. As such, the CVL does not mitigate against the purported risk of transmission on campuses, and therefore, it is severely underinclusive. This is true, even when engaging in the fiction that all the required vaccines are capable of preventing infection and transmission of the targeted pathogens, given that CDC and other public health authorities document breakthrough infections following receipt of several of the required vaccines.

210. The CVL is also underinclusive because it permits medical exemptions for students (both online and in person). The CVL is underinclusive relative to West Virginia's objectives because it permits unvaccinated online and in-person students possessing medical exemptions to receive an education throughout the state.

211. If a student with a medical exemption can safely attend in-person class every single school day of instruction, then K.P., an online student, can certainly complete her education with a religious exemption without endangering the government's goals.

212. The CVL is further substantially underinclusive because West Virginia does not require vaccines meant to protect from highly contagious viruses spread via respiratory secretions, such as COVID-19 and influenza, which are arguably more lethal and result in more hospitalizations every year than those diseases for which vaccines are required under the CVL.

213. In fact, West Virginia outright prohibits requiring COVID-19 vaccines as a condition of entering school. *See* W.V. Code §§ 16-3-4b, 16-3-4c.

214. The CVL is also overbroad because it captures more conduct than necessary to achieve its goals.

215. First, the CVL fails to include a reasonable religious exemption for the miniscule fraction of families who, like Plaintiffs, hold sincere religious beliefs in conflict with the CVL and who desire to enroll their children in the Virtual Academy.

216. Second, assuming the required vaccines provide the protection that Defendants claim and considering that the overwhelming majority of West Virginia families have vaccinated their children in compliance with the CVL, Defendants do not meaningfully advance their goals by forcing Plaintiffs to violate their sincerely held religious beliefs by injecting K.P. with the required vaccines as a condition of education. While the Government may have a compelling

interest in the abstract, that does not mean that it has one "in each marginal percentage point by which" it achieves its general goals. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011).

217. Third, the Policy is overbroad because many of the required vaccines, including pertussis, tetanus, diphtheria, polio, and meningococcal do not prevent transmission or infection of the diseases they target. *See supra,* §I.B. Rather, these vaccines merely provide a level of personal protection by potentially preventing recipients from experiencing the symptoms of these infections.

218. Fourth, K.P. has received doses of the vaccines required under the CVL. Thus, West Virginia can only, at best, point to miniscule gains to its disease mitigation goals by forcing K.P. to receive the few additional doses she lacks.

219. However, despite these realities, the government has completely destroyed the option for religious objections in the compulsory vaccination arena, including in the virtual school setting, a plainly overbroad application of its justification for requiring vaccination to mitigate the spread of infectious diseases.

## COUNT I

**42 U.S.C. § 1983**
**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT FREE EXERCISE RIGHTS**
**For Declaratory and Injunctive Relief (as applied challenge to the CVL)**

220. Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

221. The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." This clause has been incorporated against the states. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

JA054

222.    The Supreme Court recently reaffirmed that the First Amendment's Free Exercise Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) (quoting *Smith,* 494 U. S. at 877)).

223.    The Supreme Court has repeatedly recognized that "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877.

224.    Parents have the right to "direct the religious upbringing of their children" and "when the interests of parenthood are combined with a free exercise claim […] more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

225.    Courts should not inquire into the validity or plausibility of a person's beliefs; instead, the task is to determine whether "the beliefs professed [] are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1965).

226.    The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Emp't Sec. Div*., 450 U.S. 707, 715-16 (1981).

227.    Plaintiffs' sincerely held religious beliefs that prohibit them from vaccinating their minor child have been unconstitutionally burdened by the State of West Virginia. Plaintiffs'

45

attempts to maintain K.P.'s enrollment in the Virtual Academy with a religious exemption request were rejected.

228.    As such, West Virginia has pitted Plaintiffs' religious integrity against educating their child. West Virginia has created a system of public education whereby it guarantees an education to every student. *See, e.g., Pauley*, 162 W. Va. at 707 (holding that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in . . . the West Virginia Constitution, make education a fundamental, constitutional right in this State." *see also State v. Beaver*, No. 22-616, at *36 ("Both the State Constitution and [West Virginia courts] have established that education is a fundamental right").

229.    The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 142 S. Ct. 1987 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450 (1988)). "In particular, [the U.S. Supreme Court has] repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*

230.    Nevertheless, despite West Virginia's guarantee of a free public-school education, K.P. cannot obtain a formal education because of her parents' convictions, not in public school, private school, or even the Virtual Academy.

231.    However, West Virginia families with secular, medical motivations for declining compulsory immunization can be exempted from the CVL's requirements. Those exempt children are then free to attend class in person.

232.    Considering the foregoing, and directly on-point Supreme Court precedent, the CVL provokes and cannot survive strict scrutiny.

46

### *The CVL Triggers Strict Scrutiny under* <u>Smith</u>

233.    The CVL substantially burdens Plaintiffs' religious beliefs and practices, and the law triggers strict scrutiny under *Smith,* 494 U.S. at 888, because the State has shown the CVL is readily amenable to exceptions to the state's vaccination policy. The prohibition of a religious exemption option, despite the reality of a feasible exemption scheme, reveals the CVL's lack of neutrality and lack of general applicability under *Smith.* Because the CVL is readily amenable to a religious exemption option, the law triggers strict scrutiny.

234.    The State of West Virginia has made an unconstitutional value judgment that secular (*i.e.*, medical) motivations for opting out of compulsory immunization are permitted, but that religious motivations are not.

### *The CVL Clearly Triggers Strict Scrutiny on Additional Grounds under* <u>Smith's</u> *Progeny*

235.    Further, should the Court determine the CVL does not trigger strict scrutiny under *Smith* because the law is readily amenable to a religious exemption option, the CVL fails both the general applicability and neutrality tests under *Smith's* progeny.

236.    While West Virginia may have a general healthcare interest in promoting childhood immunization, the First Amendment's Free Exercise Clause prohibits the government from enacting non-neutral and non-generally applicable legislation unless it is narrowly tailored to a compelling government interest. *Lukumi*, 508 U.S. at 531.

237.    The CVL fails the general applicability test under *Fulton* because the medical exemption system provides for individualized discretionary review. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable . . . ." *Fulton,* 593 U.S. at 537.

238.    In such instances, the government may not refuse to extend the possibility for an exemption "to cases of religious hardship without compelling reason." *Id.* at 534 (cleaned up).

239.    Because its medical exemption process provides for discretionary review at multiple levels, West Virginia's CVL fails the general applicability test. West Virginia has instituted a system of customized review – delegated first to private physicians and second to the State Immunization Officer and the Health Officer – who at each level conduct individualized review of medical exemption requests.

240.    The CVL also fails the neutrality test because the government made a categorical choice to prohibit the option for religious exemptions in virtual settings and in private schools, but it made the deliberate choice to maintain the medical exemption option. On March 29, 2024, Governor Jim Justice vetoed a bill that would have allowed for religious exemptions in the Virtual Academy. Conclusively demonstrating its non-neutrality and animus towards any possibility of religious observance in the compelled vaccination arena, the government made the deliberate choice that non-vaccination for religious reasons, even in virtual learning settings, cannot be tolerated, whole continuing to allow for secular exemptions to the CVL for in-person students.

241.    The CVL also fails the general applicability and neutrality tests on alternative grounds because West Virginia treats non-vaccination for secular reasons more favorably than non-vaccination for religious reasons.

242.    Government regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat **any** comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62 (emphasis in original).

48

243.    Whether two activities are comparable for purposes of the free exercise clause depends on "the asserted government interest that justifies the regulation at issue." *Id.*

244.    Here, with regard to regulating the conduct of its secular and religious citizens, the government holds the same interest in mitigating against infectious disease in school settings. Further, the secular and religious activities at issue are not only comparable, but they are also exactly the same (non-vaccination).

245.    A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton,* 593 U.S. at 534 (cleaned up).

246.    Whatever interest West Virginia may have in promoting childhood vaccination, its interests are not so extraordinary as to prohibit an exemption for secular reasons, and hence can similarly provide an exemption for religious reasons, particularly for students who only attend online classes. Further, West Virginia liberally allows functional exemptions through non-enforcement of the CVL, and it does not prohibit unvaccinated children from visiting public libraries or museums, or from interacting with their peers in any other way. Nor does West Virginia require that teachers, staff members, or school visitors provide proof of vaccination. West Virginia also allows unvaccinated students to be educated in learning pods in unlimited numbers.

247.    These activities in which West Virginia permits non-vaccination for secular reasons, each in isolation pose a greater threat to its infectious disease-related goals than would permitting K.P. to be educated with a religious exemption. Collectively, these activities pose a dramatically greater threat under the *Tandon* framework and thus invoke strict scrutiny under the First Amendment on additional grounds.

JA059

*The CVL Infringes on Other Constitutionally Protected Rights and also Triggers Strict Scrutiny because it Implicates Hybrid Rights*

248.    In *Yoder*, 406 US at 234-35, the Supreme Court acknowledged that Free Exercise rights can overlap with and can be inherently intertwined with the right to make decisions regarding the upbringing of one's child as recognized in *Pierce v. Socy. of Sisters*, 268 U.S. 510 (1925). There, the Court reached this conclusion due to the Amish's "religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of … Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others." *Id.* at 235.

249.    In such circumstances, "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a reasonable relation to some purpose within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment" (i.e., requires the application of strict scrutiny). *Yoder*, 406 U.S. at 233. *See also Smith*, 494 U.S. at 881-81 (acknowledging hybrid rights that triggered strict scrutiny).

250.    Here, the CVL implicates Plaintiffs' right to free exercise as well as their right to free speech, to associate, and to regulate the upbringing and education of K.P. These provide independent reasons for applying strict scrutiny to the CVL in Plaintiffs' specific case.

*The CVL Fails Strict Scrutiny*

251.    For the reasons detailed throughout, West Virginia lacks a sufficiently compelling interest to enforce the CVL against Plaintiffs specifically.

252.    Whatever interests West Virginia may advance in support of its law, its interests are not so compelling as to prohibit secular exceptions. As applied to Plaintiffs, the government lacks a sufficiently compelling interest to restrict Plaintiffs' religious freedoms because this case

50

involves a student attending a course of instruction that occurs online in which the child is physically located in their own home.

253.    A law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited (e.g., here, granting medical exemptions for students physically attending school, permitting functional exemptions through lax enforcement, and by allowing adults out of compliance with the CVL to work in the educational system).

254.    Further, Defendants cannot rely on a broad policy goal, but must demonstrate a compelling interest in denying a religious exemption to K.P. specifically – a remote student who was enrolled in Virtual Academy for more than seventeen months before she was excluded.

255.    In reviewing refusal of a religious exemption, courts cannot "rely on 'broadly formulated interests'"; instead "courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton,* 593 U.S. at 541 (cleaned up).

256.    Thus, the "question, then, is not whether the [West Virginia] has a compelling interest in enforcing its" vaccination "policies generally, but whether it has such an interest in denying an exception to" Plaintiffs. *Id.*

257.    Even if West Virginia could substantiate a sufficiently compelling interest to enforce the CVL specifically against Plaintiffs and specifically to exclude K.P. from the Virtual Academy, the law still fails strict scrutiny.

258.    For the reasons detailed throughout, CVL Policy also is not narrowly tailored, is overinclusive, and substantially underinclusive, and therefore fails strict scrutiny on these additional grounds.

259.    West Virginia's CVL cannot withstand strict scrutiny because it is not narrowly tailored. In the context of government regulations targeting infectious disease, "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon*, 593 U.S. at 63. Where utilization of such less restrictive means is required, the government "may no more create an underinclusive statute, one that fails truly to promote its purported compelling interest, than it may create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal." *Lukumi,* 508 U.S. at 578.

260.    Regarding under-inclusivity, where the government permits secular activities, such as a medical exemption, "it must show that the religious exercise at issue is more dangerous." *Tandon*, 593 U.S. at 63.

261.    When a law is over-inclusive, its "broad scope . . . is unnecessary to serve the interest, and the statute fails for that reason." *Lukumi*, 508 U.S. at 578.

262.    West Virginia's CVL cannot withstand heightened scrutiny because it is both over-inclusive and under-inclusive relative to the state interests it purportedly attempts to achieve. Instead of regulating with the precision necessary to avoid conflict with its citizens' free exercise rights, West Virginia eliminated every possibility for religious observance in the mandatory vaccination arena.

263.    West Virginia's compulsory vaccination scheme is under-inclusive because it only applies to children in a school setting. The mandate does not apply to non-school attending children (who regularly interact with their peers) nor to adults in the state, who comprise over 80 percent of West Virginia's population.

52

264.    The CVL is also under-inclusive because children possessing a religious exemption would pose no greater threat than their secular peers with a medical exemption. Moreover, the immunization requirements do not apply to adults who are employed in West Virginia's school system, or to school visitors.

265.    Further, the existence of a religious exemption for attending school would have an immaterial impact in the number of individuals vaccinated in West Virginia. Nor would the existence of a religious exemption materially impact the overall percentage of vaccinated school children.

266.     Given that West Virginia boasts one of the highest vaccination rates in the country, allowing a religious exemption for a handful of students, just as secular medical exceptions are permitted, would constitute an actual attempt at narrow tailoring.

267.    Because West Virginia's CVL is simultaneously too narrow and too broad to fulfill the government interests it supposedly attempts to accomplish, and considering that forty-five other states have religious exemption options, the regulation lacks the narrow tailoring necessary to survive strict scrutiny review.

268.    Accordingly, the CVL fails strict scrutiny and, at least as applied to online students such as K.P., would fail even rational basis review.

269.    Therefore, as applied specifically to Plaintiffs, the CVL violates Plaintiffs' right to free exercise of religion.

### *Plaintiffs Have Suffered and Continue to Suffer Irreparable Harm*

270.    "The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

53

271.    Absent injunctive and declaratory relief against the CVL and injunctive relief against Defendants, Plaintiffs will have been and will continue to be harmed.

272.    Plaintiffs are entitled to a declaration that Defendants violated and continue to violate their First Amendment rights to free exercise of religion and an injunction against Defendants' actions as they relate to West Virginia's CVL.

## INJUNCTIVE RELIEF ALLEGATIONS

273.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

274.    Plaintiffs allege that, as applied, the CVL violates their First Amendment rights and her right to be free from unlawful statutes.

275.    Plaintiffs are being and will continue to be irreparably harmed unless this Court enjoins Defendants from enforcing the CVL against K.P.

276.    Plaintiffs have no plain, speedy, and adequate remedy at law to prevent Defendants from enforcing the CVL against K.P.

277.    If not enjoined by this Court, Defendants will continue to implement and enforce the CVL in violation of Plaintiffs' constitutional rights.

278.    Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

279.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

280.    Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights

and duties with respect to whether West Virginia's CVL, which allows for secular but not religious exemptions to the Virtual Academy, violates the United States Constitution.

281. The case is presently justiciable because the CVL and absence of any religious exemption to the same applies to Plaintiffs and K.P., who is currently harmed by being excluded from the Virtual Academy.

282. Declaratory relief is therefore appropriate to resolve this controversy.

## PRAYER FOR RELIEF

283. Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the CVL is unconstitutional as applied to Plaintiffs.

284. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, and 42 U.S.C. § 1983 it is appropriate and hereby requested that the Court issue preliminary and permanent injunctions prohibiting Defendants from enforcing the CVL against Plaintiffs, unless the government allows for religious exemption option for Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A. Declare the "no religious accommodation" policy to the CVL, as applied specifically to Plaintiffs, unconstitutional;

B. Issue a preliminary and permanent injunction prohibiting Defendants, their agents, servants, employees and any other persons acting on their behalf from enforcing W. VA. CODE § 16-3-4 against Plaintiffs, unless the government provides an option for Plaintiffs to request a religious exemption to the Virtual Academy;

55

C.      Declare that W. VA. CODE § 16-3-4 is unconstitutional as applied specifically to

Plaintiffs;

D.      Declare that W. VA. CODE § 16-3-4, as applied specifically to Plaintiffs, has

violated and continues to violate Plaintiffs' First Amendment right to free exercise

of religion;

E.      Grant Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and

any other applicable authority; and

F.      For any such other and further relief as the Court deems equitable and just under

the circumstances.

Dated:  July 5, 2024.                        Respectfully submitted,

JOHN H. BRYAN LAW

/s/ *John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
jhb@johnbryanlaw.com

SIRI & GLIMSTAD LLP

Aaron Siri, Attorney*
Elizabeth A. Brehm, Attorney*
Walker D. Moller, Attorney*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

56

Christopher Wiest, Attorney*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiff*

**pro hac vice* to be submitted

57

JA067

## VERIFICATION

I, Krystle Perry, a citizen of the United States and of West Virginia, have read the foregoing Complaint and know the contents thereof as to myself and my minor child, K.P., and that the facts therein that relate to me and K.P., are true to my knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on July 4, 2024, in Oak Hill, West Virginia.

_____
Krystle Perry

## VERIFICATION

I, Anthony Perry, a citizen of the United States and of West Virginia, have read the foregoing Complaint and know the contents thereof as to myself and my minor child, K.P., and that the facts therein that relate to me and K.P., are true to my knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on July 4, 2024, in Oak Hill, West Virginia.

Anthony Perry

✎JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

RECEIVED 7/05/2024    2:24-cv-18

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Krystle Perry and Anthony Perry, *individually and on behalf of their minor child K.P.*

**DEFENDANTS**

See attachment for Defendant information.

**(b)** County of Residence of First Listed Plaintiff    Fayette
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Upshur
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

John H. Bryan Law, 411 Main Street, P.O. Box 366
Union, West Virginia, 24983, (304) 772-4999; jhb@johnbryanlaw.com

Attorneys (If Known)

## II. BASIS OF JURISDICTION     (Place an "X" in One Box Only)

❏ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       (U.S. Government Not a Party)

❏ 2  U.S. Government
       Defendant

❏ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ❏ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | Alien Detainee | | ❏ 950 Constitutionality of |
| | Other | | ❏ 465 Other Immigration | | State Statutes |
| | ☒ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN     (Place an "X" in One Box Only)

☒ 1 Original
     Proceeding

❏ 2 Removed from
     State Court

❏ 3 Remanded from
     Appellate Court

❏ 4 Reinstated or
     Reopened

❏ 5 Transferred from
     another district
     (specify)

❏ 6 Multidistrict
     Litigation

❏ 7 Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
42 U.S.C. § 1983
Brief description of cause:
VIOLATION OF FIRST AMENDMENT FREE EXERCISE RIGHTS

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION**
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**    ❏ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

7/5/2024

SIGNATURE OF ATTORNEY OF RECORD

/s/ John H. Bryan

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

JA070

JS 44 Reverse  (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.        **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.       **Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

III.      **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.      **Nature of Suit**.  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

V.       **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

VI.      **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.           Example:        U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

VII.     **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases**.  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

JA071

Case 2:24-cv-00018-TSK   Document 1-2   Filed 07/05/24   Page 1 of 9   PageID #: 62

# EXHIBIT 1

# Proceedings

## of the

## Society

### for

# Experimental Biology and Medicine

INCLUDING THE FOLLOWING SECTIONS

| | |
|---|---|
| CLEVELAND, O. | NORTHERN CALIFORNIA |
| DISTRICT OF COLUMBIA | NORTHWEST |
| ILLINOIS | OHIO VALLEY |
| IOWA | ROCKY MOUNTAIN |
| MARYLAND | SOUTHERN |
| MICHIGAN | SOUTHERN CALIFORNIA |
| MINNESOTA | SOUTHEASTERN |
| MISSOURI | SOUTHWESTERN |
| NEW YORK | WESTERN NEW YORK |

WISCONSIN

May—Aug.-Sept., 1966  (inclusive)

### VOLUME 122

New York

5890-63-4

Society for Experimental Biology
+ Medicine

Proceedings
122
May – Sept
1966
QD
|
.S8

# CONTENTS

SCIENTIFIC PROCEEDINGS, VOLUME 122

Five hundred fiftieth issue, May, 1966 ............................................................ 1

Five hundred fifty-first issue, June, 1966 ........................................................ 313

Five hundred fifty-second issue, July, 1966 ..................................................... 627

Five hundred fifty-third issue, August-September, 1966 .................................... 941

Authors' Index ............................................................................................ 1299

Subject Index ............................................................................................. 1304

Printed by
THOMAS J. GRIFFITHS SONS, INC.
Utica, N. Y.

Proceedings of the Society for Experimental Biology and Medicine, Vol. 122, No. 4, Aug. Sept., 1966. Published monthly except September at 104 Liberty St., Utica, N. Y. Entered as second class matter, December 6, 1922 at P.O., Utica, N. Y. under Act of March 3, 1879. Subscription per year $17, single numbers $2.00. © 1966 by the Society for Experimental Biology and Medicine.

CELL STRAINS FROM ABORTED HUMAN FETUSES 11

5. ———, Pharmacol. Rev., 1956, v8, 175.

6. Dounce, A. L., Witter, R. F., Monty, K. J., Pate, S., Cottone, M. A., J. Biophys. Biochem. Cytol., 1955, v1, 139.

7. Schneider, W. C., Hogeboom, G. H., J. Biol. Chem., 1950, v183, 123.

8. Lowry, O. H., Rosebrough, N. J., Farr, A. L., Randall, R. J., ibid., 1951, v193, 265.

9. Bray, G. A., Analyt. Biochem., 1960, v1, 279.

10. Klotz, I. M., Walker, F. M., Pivan, R. B., J. Am. Chem. Soc., 1946, v68, 1486.

11. Sterling, K., Rosen, P., Tabachnick, M., J. Clin. Invest., 1962, v41, 1021.

12. Way, E. L., Adler, T. K., Pharmacol. Rev., 1960, v12, 383.

13. Sanner, J. H., Woods, L. A., J. Pharmacol. Exp. Ther., 1965, v148, 176.

Received January 3, 1966. P.S.E.B.M., 1966, v122.

## Cytological Virological and Chromosomal Studies of Cell Strains From Aborted Human Fetuses.* (31037)

ANDRÉ BOUÉ,[†] CLAUDE HANNOUN,[‡] JOELLE G. BOUÉ,[†] AND STANLEY A. PLOTKIN[¶]
(Introduced by David Kritchevsky)
*The Wistar Institute of Anatomy and Biology, Philadelphia, Pa.*

Spontaneous abortion, usually without obvious cause, is a frequent occurrence in human pregnancies. To test the hypothesis that viral infections may play a part in the development of spontaneous abortion, a technique was sought to obtain dividing cells from human embryos that might be carrying latent viruses. We used a method developed by Jensen *et al*, for studying mouse tissues, in which cells could be obtained readily from organ explants. In the course of this work we collected cytological and chromosomal data on human fibroblast cell strains.

*Materials and methods. Collection and preparation of specimens.* Embryos were obtained from 2 sources: (A) surgical abortions performed in Scandinavia for social and psychiatric reasons, and (B) spontaneous abortions that occurred at the Philadelphia General Hospital and the Hospital of the University of Pennsylvania. The surgically removed embryos were placed in antibiotics containing Hanks' solution and shipped to us by air at a temperature of approximately 0°C. The spontaneous abortions were refrigerated in plastic bags without solution or antibiotics until collected, usually within 12 hours. Only those embryos which were expected to have viable tissues were studied. Aside from the decomposed external appearance, one of the best indicators of the embryo's condition appeared to be the physical aspect of the liver. All assays performed on embryos with friable and discolored livers were discarded, because the cells failed to grow.

*Organ culture technique.* The organ culture technique described by Jensen *et al*(1) was used: a grid of stainless steel mesh‖ was enclosed in a small Petri dish containing 10 ml of double strength Eagle's Basal Medium in isotonic Earle's solution with 10% calf serum; a small disc of open mesh paper (tea bag paper)** was moistened in the medium and applied to the top of the grid. Fragments of organs were cut into pieces about one cubic mm with a surgical blade and placed directly on the tea bag paper without being washed. Two explants were placed on top of each paper; the volume of the individual explants did not exceed 2 cu mm. The

* This work was supported, in part, by USPHS research grant AI 01799 from Nat. Inst. of Allergy and Infect. Dis. and by The Joseph P. Kennedy, Jr. Foundation.

† Present address: Laboratoire de la S.E.S.E.P., Chateau de Longchamp, Bois de Boulogne, Paris 16.

‡ Chef de Laboratoire, Institut Pasteur, Paris.

¶ Joseph P. Kennedy, Jr. Foundation Scholar, Wistar Inst. of Anatomy and Biology.

‖ Joseph E. Frankle Co., Philadelphia, Pa.

** C. H. Dexter & Sons, Inc., Windsor Locks, Conn. (10-V-7-1/4).

12                    CELL STRAINS FROM ABORTED HUMAN FETUSES

cultures were incubated at 37°C in a $CO_2$ incubator and the medium changed once a week. Cells migrated from the cut surfaces of the explant and dropped to the bottom of the Petri dish, where they multiplied to form colonies and, in some cases, confluent cultures.

*Establishment of cell strains.* If the colonies became confluent and covered the entire surface of the Petri dish, a cell strain was established by trypsinizing the cells and subcultivating them, either in Petri dishes or in milk dilution bottles at a 1:2 split ratio.

During the first trypsinization, the grid was removed and placed in a second Petri dish and new colonies proliferated. After establishment of the cell strain, the technique used was the same as that of Hayflick(2) for cultivation of human diploid cell strains, whereby cultures were passaged approximately once a week with 2-fold subdivision.

*Cytologic studies.* Cytologic studies were conducted either on the colonies of cells that developed on the surface of the Petri dish or on established cell strains. Preparations stained with May-Grünwald-Giemsa were obtained by placing coverslips on the floor of the Petri dish under the grid bearing the organ culture or under passaged cells.

*Chromosomal technique.* This technique was derived from Lejeune(3). All the chromosomal studies were done on coverslips placed on the floor of the Petri dish under the grid or in Leighton tubes or on Petri dishes inoculated with resuspended cells after the cell strain had been established.

The cells were pretreated with colchicine by adding one drop of a stock solution of "Colcemide" (Ciba) containing 25 $\mu$g/ml to 5 ml of supernatant medium with a syringe and 24-gauge needle. The culture was incubated at 37°C for 3½ hours. The coverslip was transferred, face up, to a Petri dish that contained a hypotonic solution and was kept at 37°C for 35 minutes.

The hypotonic solution was a mixture of one part calf serum, 10 parts distilled water, and sufficient hyaluronidase ("Widase," Wyeth) to give 2.5 USP units per ml of the mixture.

The concentration of serum in the hypo-

tonic solution varied, depending on the density of the cells on the coverslip. When the density of the cells was high, the concentration of serum was lowered.

After hypotonic treatment, the coverslips were removed and put into a new Petri dish with the fixative and left for 45 minutes at room temperature.

The fixative consisted of 3 parts chloroform, one part acetic acid, and 6 parts absolute ethyl alcohol. The coverslips were then air dried and placed in a 1 N HCl solution at 60°C for 7 minutes so that the cytoplasm could be hydrolyzed. The coverslips were washed thoroughly in buffered water and stained with Giemsa solution diluted 1 to 10.

*Results.* These studies were performed from March to July, 1962, when 36 embryos were used, and again from November, 1963 to May, 1964, with 40 embryos.

*Growth of cells from organ cultures.* Each Petri dish was examined at least once a week with an inverted microscope. The time interval between the start of the organ culture and the formation of the first colonies of a few cells growing on the bottom of the Petri dish differed greatly from one embryo to another. In some cases, the colonies started at the end of the first week, while in other cases, they started only after 3 to 4 weeks of incubation. Most colonies grew well and after 3 weeks measured several millimeters in diameter.

The criterion of success of a culture was whether or not cell colonies developed after one month on the bottom of the Petri dish that contained the tissue-bearing grid. Cell growth from at least one tissue failed to occur only in 14 out of 76 aborted embryos: 8 from Scandinavia, 4 from PGH and 2 from HUP.

In the first series, the last 7 out of 26 embryos received from Scandinavia did not give viable cultures. The non-viability of cultures was probably due to the high external temperature during their shipment in July. Of the 12 received from HUP, 2 were lost by contamination and 2 failed to grow. Successful cultures, however, were obtained from 25 embryos (6 from the HUP and 19 from Finland).

Of the 40 aborted fetuses studied between

CELL STRAINS FROM ABORTED HUMAN FETUSES    13

### TABLE I. Cell Growth Under Organ Cultures.

| Organ | Embryos studied from Nov. '63 to May '64 | | | | | Embryos studied Mar. to July '62 | Total |
|---|---|---|---|---|---|---|---|
| | No. of embryos studied | Confluent cultures | Cell colonies | No growth | Successful* | Successful | |
| Pituitary | 21 | 15 | 4 | 2 | 19/21 | 25/27 | 44/48 |
| Lung | 30 | 27 | | 3 | 27/30 | 12/15 | 39/45 |
| Skin | 30 | 25 | | 4 | 26/30 | 8/8 | 34/38 |
| Kidney | 14 | 10 | 4 | | 14/14 | 6/7 | 20/22 |
| Spleen | 12 | 3 | 8 | 1 | 11/12 | 4/7 | 15/19 |
| Thymus | 15 | 11 | 2 | 2 | 13/15 | 2/2 | 15/17 |
| Heart | 8 | | 1 | 7 | 1/8 | 1/5 | 2/13 |
| Intestine | 8 | 1 | 4 | 3 | 5/8 | 0/4 | 5/12 |
| Liver | 7 | | 6 | 1 | 6/7 | 0/4 | 6/11 |
| Thyroid | 5 | 5 | | | 5/5 | 2/3 | 7/8 |
| Salivary glands | | | | | | 5/5 | 5/5 |
| Adrenals | | | | | | 2/5 | 2/5 |
| Pharyngeal mucosa | 2 | 2 | | | 2/2 | | 2/2 |
| Whole embryo | 1 | 1 | | | | 1/1 | 2/2 |
| Cornea | | | | | | 1/1 | 1/1 |
| Meningea | | | | | | 1/1 | 1/1 |
| Tongue | | | | | | 1/1 | 1/1 |

* Denominator: No. of embryo studied; numerator: No. of cultures with successful growth.

November, 1963, and May, 1964, 13 were sent from Scandinavia, 20 came from PGH, and 7 from HUP. Successful cultures were obtained from 12, 16 and 7 embryos, respectively. Table I presents the results of organ cultures initiated with tissues from 60 embryos (31 from Scandinavia, 16 from PGH, and 13 from HUP). At least one organ culture from this group was successful.

There is a distinction between confluent culture and cell colonies: in the former case, the cultures came to confluence and could then be used to establish a cell strain, while in the latter case, only discrete colonies formed.

From these results it appears that, with the exception of heart organ cultures, most preparations resulted in cell growth on the glass. It was usually possible to obtain confluent cultures from such tissues as skin, lung, pituitary, kidney, thymus, thyroid, and pharyngeal mucosa.

The extremely low proportion of bacterial and fungal contaminations (2 of 76) in these organ cultures was noteworthy.

Establishment of cell strains. Table II summarizes the results of attempts to establish cell strains from the confluent cultures developed under the grids. While cell strains were easily established from skin, lung, pharyngeal mucosa and pituitary, it was difficult to establish strains from intestine, thymus and thyroid.

All the cell strains were composed of fibroblast-like cells. With skin, lung and pharyngeal mucosa organ cultures, the cells under the grid were already predominantly fibroblastic; in the case of other organ cultures such as pituitary, thymus and thyroid the cultures at first appeared to be epithelial, but after the first trypsinizations became fibroblastic.

All of the cell strains had the previously described characteristics(2) for human diploid cell strains.

Virological studies. Two types of speci-

### TABLE II. Establishment of Cell Strains.

| Organ | No. of embryos studied | Culture sucessful for: | | Culture unsuccessful at 1st split |
|---|---|---|---|---|
| | | More than 4 splits 1:2 | Fewer than 4 splits 1:2 | |
| Skin | 16 | 15 | 1 | |
| Lung | 12 | 10 | 2 | |
| Kidney | 5 | | 4 | 1 |
| Pituitary | 5 | 3 | 1 | 1 |
| Pharyngeal mucosa | 4 | 4 | | |
| Intestine | 4 | 1 | | 3 |
| Liver | 3 | | | 3 |
| Thymus | 3 | 1 | 2 | |
| Thyroid | 3 | 1 | 2 | |
| Whole embryo | 1 | 1 | | |

JA077

14                    CELL STRAINS FROM ABORTED HUMAN FETUSES

mens were tested in an attempt to isolate viruses from embryos. The test systems used in both types were primary vervet monkey kidney, primary human amnion, and human diploid cells (the WI-38 lung strain)(2).

In an attempt to detect latent viruses, the first type of specimen used was obtained from the cell cultures that became cell strains. No cytopathic effects were seen in any of the cells continuously cultured for periods ranging from one to six months. Tissue culture fluids obtained from cell strains cultured for 2 to 4 weeks were inoculated undiluted onto monolayers of the 3 tissue culture test systems. The test systems were maintained under Eagle's medium and 2% calf serum for 3 weeks before being discarded.

Suspension of cells derived from organ cultures were inoculated onto green monkey kidney cell monolayers, a technique described by Gerber and Kirschstein(4) for the transfer of cell-associated virus. All of these inoculations were negative.

The second type of specimen was the supernatant fluids from cultures which failed to grow. One might consider that the failure to establish a cell strain was due to a cytopathic effect. Tissue culture fluids were harvested over several weeks from organ cultures prepared from 5 embryos which yielded no cell growth from any culture. Inoculation of these fluids onto the test systems showed no evidence of cytopathogenicity.

When explants from a particular embryo gave both successful and unsuccessful cultures, the tissue culture fluids from unsuccessful explants were also tested for the presence of virus. Once more all attempts were negative. It is important to note that failure to grow cells from explants occurred in the same proportion in embryos from surgical abortions as in embryos obtained from spontaneous abortions.

We prepared organ cultures from 3 tonsils to test the sensitivity of the organ culture techniques for isolation of latent viruses when no cells grew from the explant. No cells grew in any of these cultures on the bottom of the Petri dish; however, in one case, 2 weeks after the beginning of the cultures, an adenovirus was recovered by passage on a sensitive



FIG. 1. Multinucleated giant cells seen in explant culture from a spontaneous abortion.

cell system of the medium harvested.

*Cytological studies.* Multinucleated cells were observed in many of the organ cultures, including explants from spontaneous and surgical abortions. Typical giant cells are illustrated in Fig. 1. Pituitary explants, in particular, gave rise to multinucleated cells, but when the cells were seen, their presence was noted in other cultures from the same embryo. Several days after the beginning of the culture, numerous giant-like cells containing 3 to 20 nuclei appeared. They were usually observed for the first time about the 12th day, but occasionally appeared before the seventh or as late as the 25th day of culture. The formation of multinucleated cells did not, in the majority of cases, prevent the eventual outgrowth of fibroblasts and development of a diploid strain. In pituitary cultures, the following sequence of events was observed: small colonies of epithelial-like cells appeared below the fragments, and later degenerated, giving way to a population of fibroblasts. As mentioned above, the fluids harvested from these cultures were tested on different cell systems with negative results. Some of the supernatant fluids were also inoculated into animals—such as baby mice by intraperitoneal and intracerebral routes, and baby hamsters by subcutaneous and intraperitoneal routes—without the isolation of a transmissible agent.

*Chromosomal studies.* Chromosomal study of cell cultures from 18 embryos of 2 to 4 months gestation was undertaken. Of these 18 embryos, all of which were obtained during the second time period of this work, 12

CELL STRAINS FROM ABORTED HUMAN FETUSES                    15

were male and 6 female. Four out of the 18 were surgically aborted, and the rest were obtained from spontaneous abortions.

All of the cell strains were diploid with a normal karyotype of 46 chromosomes. In 2 cases, both spontaneous abortions, chromosomal breaks were observed. In a male embryo, 24 of 79 metaphases analyzed (30%), had true breaks or gaps of one chromatid or of the two chromatids. The distribution of these breaks was of a random type. In a female embryo, which was one of twins, breaks were observed in 11 of 49 metaphases or 22%. The other twin, a male, had a normal karyotype. In 5 cells these breaks were on chromosome 3, at the same region in one or both chromatids, while in 3 other cells a constriction was observed at the same region.

In the remainder of cell strains, the percentage of gaps was below 10%.

*Discussion.* In this study it has been demonstrated that it is possible to derive cell strains from organ explants of human tissues, using the simple method described by Jensen *et al.* This method could be useful when dealing with small amounts of tissue such as fetal organs. The strains derived seem to be similar in behavior to the human diploid fibroblast cell strains obtained from minced tissues by Hayflick and Moorhead.

It seems important to have techniques that permit the establishment of cell strains from different organs. Recent studies have shown that human diploid cell strains vary in their sensitivity to viruses. For example, we have shown(5) that the effects of rubella virus infection are related to the organ from which these cell strains were initiated. Recently Behbehani *et al*(6) found that cell strains derived from human atheromatous lesions seem to be particularly susceptible to rhinoviruses.

The failure to isolate viruses from the spontaneously aborted fetuses must of course be qualified by the fact that only cytopathogenic agents would have been detected. However, insofar as the results are negative, some support should be given to the view that human diploid cell strains are normally free of extraneous viruses, and they are, therefore, advantageous for the fabrication of vaccines and for studies on chronic viral infection in human cells.

The negative results do not entirely exclude the possibility that viral infection plays a role in spontaneous abortion because the abortion might be due to a secondary effect of viral infection of the mother that has occurred without passage of the virus to the embryo itself.

No abnormality of the karyotype was observed among the 18 embryos studied. The only aberration found was due to breakages in 30% and 22% of cells of two of them. These results were in accordance with the results of Makino *et al*(7), who found only 2 aberrations out of 135 embryos obtained from therapeutic abortions: one aberration was D Trisomic, and in the other, the cells were found to contain a high incidence of chromosome breakage.

Chromosomal aberrations were found in spontaneous abortions by Carr(8), Clendenin (9), Szulmann(10), Hall(11) and Thiede (12), but in each case, where chromosomal abnormalities were described, the specimen was pathologic and consisted of a degenerating embryo or of an empty sac without a trace of fetal tissue—the so-called blighted ovum. Moreover, these pathologic specimens led to abortion which occurred early in pregnancy, or before the third month. In our study, most of the specimens were obtained from abortions that occurred in the third month or later, and which produced normally developed embryos.

*Summary.* An organ culture technique was used to investigate the possibility that latent viruses are present in spontaneously aborted human fetuses. All attempts to isolate virus from 74 human embryos were negative. In the course of these studies, numerous cell strains were derived from human tissue, and cytological features of these cells are described. Multinucleated giant cells were frequently found, but chromosomal aberration in this material was infrequent.

1. Jensen, F. C., Gwatkin, R. B. L., Biggers, J. D., Exp. Cell Res., 1964, v34, 440.

2. Hayflick, L., Moorhead, P. S., ibid., 1961, v25, 585.

3. Lejeune, M. J., Turpin, R., Gautier, M., Rev. Fr. Etud. Clin. Biol., 1960, v5, 406.

4. Gerber, P., Kirschstein, R. L., Virology, 1962, v18, 582.

5. Boué, A., Plotkin, S. A., Boué, J. G., Arch. Ges. Virus, 1965, v16, 443.

6. Behbehani, A. M., Melnick, J. L., DeBakey, M. E., Proc. Soc. Exp. Biol. and Med., 1965, v118, 759.

7. Makino, S., Kikuchi, Y., Sasaki, M. S., Sasaki, M., Yoshida, M., Chromosoma (Berl) 1962, v13, 148.

8. Carr, D. H., Lancet, 1963, v2, 603.

9. Clendenin, T. M., Benirschke, K., Lab. Invest., 1963, v12, 1281.

10. Szulman, A. E., New England J. Med., 1965, v272, 811.

11. Hall, B., Källén, B., Lancet, 1964, v1, 110.

12. Thiede, H. A., Salm, S. B., Am. J. Obs. and Gynecol., 1964, v90, 205.

Received January 24, 1966. P.S.E.B.M., 1966, v122.

## Activation of Factors XII (Hageman) and XI (PTA) by Skin Contact.* (31038)

H. L. NOSSEL (Introduced by L. R. Wasserman)

*Department of Hematology, Mount Sinai Hospital, New York City*

Blood coagulation can be initiated *in vitro* by contact with a foreign surface such as glass which activates Factors XII (Hageman) and XI (PTA)(1). Most known activating surfaces do not occur in the body and it is unknown whether similar reactions initiate *in vivo* coagulation. Recently stearic acid(2-6), uric acid(7) collagen and elastin(8) which are found *in vivo* have been shown to activate the Hageman and PTA factors. Evidence is presented below that blood contact with unbroken human skin results in accelerated clotting due to activation of the Hageman and PTA factors.

*Materials and methods.* Platelet-poor plasma was prepared without contact with glass or similar surfaces as previously described(6). Plasma deficient in Factors VIII, IX, XI or XII was obtained from patients with congenital deficiency of these factors. Celite exhausted plasma deficient only in Factors XII and XI was prepared by treating normal plasma with 20 mg celite per ml as previously described(6). Cephalin prepared as previously described(9) was used in a 1/100 dilution.

Coagulation was carried out in $10 \times 75$ mm glass tubes coated with siliclad (Clay-Adams). 0.1 volumes of plasma and cephalin were added to a silicone treated tube. The tube was inverted over an area of skin which had been carefully cleaned with ether, alcohol and then distilled water and the plasma-cephalin mixture was incubated in contact with the cutaneous surface for a variable time period. The tube was turned upright, 0.1 ml 0.025 M $CaCl_2$ was added and the tube re-inverted over the same cutaneous site so that the clotting mixture was again in contact with the skin surface. The time required to form a solid clot was measured from the time calcium was added. In the control experiments exactly the same procedure was carried out except that parafilm (Marathon, Wisconsin) was interposed between the clotting mixture and the skin surface during both the incubation and clotting periods. Each clotting time was recorded as the average of those obtained in 3 tubes.

*Results.* Incubation of normal plasma in contact with a cutaneous surface resulted in progressive shortening of the clotting time (Fig. 1). Most of the acceleration of clotting occurred during the first minute of incubation and after 5 minutes incubation an almost maximal effect was noted. Skin surfaces in various sites exerted different degrees of clot promoting activity—the palmar surface of the hands and the skin of the face were particularly active. Prior cleansing of the skin with distilled water, ether or alcohol did not appear to affect the clot-promoting activity. When plasma samples from patients with congeni-

* This study was supported in part by Grant HE-08631 from Nat. Inst. Health, USPHS.

Case 2:24-cv-00018-TSK   Document 1-3   Filed 07/05/24   Page 1 of 18   PageID #: 71

# EXHIBIT 2

Page 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND
FAMILY DIVISION
- - -

LORI MATHESON,              :
f/k/a LORI ANN SCHMITT,  :
          Plaintiff,     :
                          :
   vs.                    :       CASE NO.
                          :       2015-831539-DM
MICHAEL SCHMITT,          :
          Defendant.     :


VIDEOTAPED DEPOSITION OF STANLEY A. PLOTKIN, M.D.
New Hope, Pennsylvania
January 11, 2018

Reported by:
Maureen Broderick, RPR
JOB NO. 135522

Page 2

January 11, 2018

8:30 a.m.

Videotape deposition of STANLEY A. PLOTKIN, M.D., taken at the Golden Plough Inn, 5883 Lower York Road, New Hope, Pennsylvania, before Maureen E. Broderick, Registered Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.

Page 3

APPEARANCES

SIRI GLIMSTAD

Attorneys for Plaintiff

        200 Park Avenue

        New York, NY 10166

BY:  AARON SIRI, ESQ.

          and

MICHAEL W. REEDS

        1038 E. West Maple

        Walled Lake, MI 48390

BY:  AMY RUBY, ESQ.


(Via Telephone)

KARLSTROM COONEY

Attorneys for Defendant

        6480 Citation Drive

        Clarkston, MI 48346

BY:  LAURA NIEUSMA, ESQ.


ALSO PRESENT:  Tom Leibman, Videographer

Page 10

Stanley Plotkin, M.D.

MS. NIEUSMA:  I'm going to ask that everybody speak up.  You're all coming across a little soft other than Maureen.  She's doing fine.

VIDEO OPERATOR:  This is the start of media labeled number one of the video-recorded deposition of Dr. Stanley Plotkin in the matter of Lori Matheson, formerly known as Lori Ann Schmitt, versus Michael Schmitt, filed in the State of Michigan, Circuit Court, County of Oakland, Family Division.

This deposition is being held at 5833 Lower York Road in New Hope, Pennsylvania, on January 11, 2018.  My name is Tom Liebman, and I'm the legal video specialist for the TSG Reporting, Incorporated, headquartered at 747 Third Avenue in New York City.  The court reporter is Maureen Broderick, in association with TSG Reporting.

Counsel, please introduce yourselves for the record.

MR. SIRI:  Aaron Siri, co-counsel on behalf of plaintiff.

MS. RUBY:  Amy Ruby, on behalf --

Page 11

Stanley Plotkin, M.D.

co-counsel on behalf of plaintiff.

MS. NIEUSMA:  Laura Nieusma, counsel for defendant, Michael Schmitt.

VIDEO OPERATOR:  The court reporter will now swear in the witness.

- - -

STANLEY PLOTKIN, M.D., having been first duly sworn to tell the truth, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. SIRI:

Q    Good morning, Dr. Plotkin.

MS. RUBY:  Can we just make a record under this...

I would just like to clarify that this is being recorded by a video deposition pursuant to MCR 2.315.

BY MR. SIRI:

Q    Good morning.  Can you please state your full name for the record.

A    Stanley A. Plotkin.

Page 322

Stanley Plotkin, M.D.

continue.

MS. NIEUSMA:  All right.

MR. SIRI:  Thank you.

MS. RUBY:  Ms. Nieusma, if you want to rejoin the conversation, obviously you can dial back in.

MS. NIEUSMA:  Yeah.  I'm just going to leave you guys on speaker in my office and do this in the conference room and I'll be back.

MS. RUBY:  Okay.

BY MR. SIRI:

Q    Do any vaccines on the childhood vaccine schedule contain MRC-5 human diploid cells?

A    Yes.

Q    What are these?

A    Rubella, varicella, hepatitis A.

Q    What are MRC-5 cells?

A    They are human fibroblast cell strain.

Q    And how are they created?

A    They were created by taking fetal tissue and, from a particular fetus that was aborted by maternal choice.  And the cells, so-called fibroblast cells were cultivated from that tissue. The fibroblast cells replicate for about 50 passages

Page 323

                    Stanley Plotkin, M.D.

and then die.

    Q    So MRC-5 cells are cultured cell lines
from aborted fetal tissue?

    A    They're not cell lines.

    Q    What are they?

    A    They're cell strains cultivated from an
aborted fetus, yes.

    Q    So cell strains from an aborted fetus?

    A    Yes.  Yeah.  They're not immortal.

    Q    They live for five generations and then
they die?

    A    About 50 generations.

    Q    About 50 generations and then they die?

    A    Yes.

    Q    And then how is more MRC-5 created?

    A    Well, a seed stock is made of early
passage cells so that one can go back to the seed
stock, which is, let's say, at the, more or less the
eighth passage and make new cells at the 20th
passage and use those to make the vaccine.

    Q    Okay.  So these are, these cell strains
are human cells?

    A    Yes.

    Q    Do any vaccines on the childhood vaccine

Page 324

Stanley Plotkin, M.D.

schedule contain WI-38 human diploid lung fibroblast?

A    Well, they used to, but I don't think anything is made in those cells anymore.  They have been replaced by MRC-5.

Q    So you're not aware of any vaccine that has in its final formulation WI-38 human diploid lung fibroblasts?

A    As I said, at one point in the past, RA 27/3, for example, rubella vaccine, was grown in WI-38.  But the supply is insufficient, so MRC-5 is now used.

Q    And these, and WI-38 was created from an aborted fetus?

A    Yes.

Q    They took the lung tissue from the aborted fetus?

A    Yes.

Q    And from that they'd grown this cell line, correct?

A    Yes.  Cell strain.

Q    Cell strain.

        Is this cell line immortal?

A    No.

Stanley Plotkin, M.D.

vaccines, how many fetuses have

been part of that work?

"A.   My own personal work?

Two.")

BY MR. SIRI:

Q    So I'm going to ask that question again. In your work related to vaccines, how many fetuses were involved in that work?

A    There were only two fetuses involved in making vaccines.  When fetal strains of, fibroblast strains were first developed, I was involved in that work trying to characterize those cells; but they were not used to make vaccines.

Q    Wasn't the purpose of this study to help develop a human cell line or to support the use of human cell lines in the creation of vaccines?

A    The idea was to study the cell strains from fetuses to determine whether or not they could be used to make vaccines.

Q    So this was related to your work?

A    Well, yes, in a sense --

Q    To vaccines, correct?

A    Yes.  It was preparatory.

Q    So this study involved 74 fetuses,

Page 343

Stanley Plotkin, M.D.

correct?

A    I don't remember exactly how many.

Q    If you turn to page 12 of the study.

A    Seventy-six.

Q    Seventy-six.  And these fetuses were all three months or older when aborted, correct?

A    Yes.

Q    And these were all normally developed fetuses, correct?

A    Yes.

Q    Okay.  These included fetuses that were aborted for social and psychiatric reasons, correct?

A    Correct.

Q    What organs did you harvest from these fetuses?

A    Well, I didn't personally harvest any, but a whole range of tissues were harvested by co-workers.

Q    And these pieces were then cut up into little pieces, right?

A    Yes.

Q    And they were cultured?

A    Yes.

Q    Some of the pieces of the fetuses were

Page 344

Stanley Plotkin, M.D.

pituitary gland that were chopped up into pieces

to --

     A     Mm-hmm.

     Q     Included the lung of the fetuses?

     A     Yes.

     Q     Included the skin?

     A     Yes.

     Q     Kidney?

     A     Yes.

     Q     Spleen?

     A     Yes.

     Q     Heart?

     A     Yes.

     Q     Tongue?

     A     I don't recall, but probably yes.

     Q     So I just want to make sure I understand.
In your entire career -- this was just one study.
So I'm going to ask you again, in your entire
career, how many fetuses have you worked with
approximately?

     A     Well, I don't remember the exact number,
but quite a few when we were studying them
originally before we decided to use them to make
vaccines.

Page 345

Stanley Plotkin, M.D.

Q    Do you have any sense?  I mean, this one study had 76.  How many other studies did you have that you used aborted fetuses for?

A    I don't remember how many.

Q    You're aware, are you aware that the, one of the objections to vaccination by the plaintiff in this case is the inclusion of aborted fetal tissue in the development of vaccines and the fact that it's actually part of the ingredients of vaccines?

A    Yeah, I'm aware of those objections.  The Catholic church has actually issued a document on that which says that individuals who need the vaccine should receive the vaccines, regardless of the fact, and that I think it implies that I am the individual who will go to hell because of the use of aborted tissues, which I am glad to do.

Q    Do you know if the mother's Catholic?

A    I have no idea.

Q    Okay.

A    But she should consult her priest.

Q    If she has a -- if she's, in fact, Christian, I guess, right?

In any event, so we have 76 in this study.  Would you approximate it's been a few

Stanley Plotkin, M.D.

hundred fetuses?

A    Oh, no, I don't think it was that many. Probably not many more than in this paper.

And I should stipulate that we had nothing to do with the cause of the abortion.

Q    Some of these were for psychiatric institutions, correct?

A    Actually, all I can say is that the fetuses that I personally worked with actually came from Sweden, from a Swedish co-worker.  And so I, in no case, was able to determine what exactly the reason for the abortion was.

Q    I'm just asking you, some of the fetuses that you did use did come from abortions from people who were in psychiatric institutions, correct?

A    I don't know that.  What I'm telling you is that I got them from a co-worker; and if it's stated in the paper, it's true.  But, otherwise, I do not know.

Q    So if it's in the paper, you don't contest it, right?

A    I don't contest it, no.

Q    Okay.  Have you ever used orphans to study an experimental vaccine?

Page 347

Stanley Plotkin, M.D.

A    Yes.

Q    Have you ever used the mentally handicapped to study an experimental vaccine?

A    I don't recollect ever doing studies in mentally handicapped individuals.  At the time in the 1960s, it was not an uncommon practice.

Q    So you're saying -- I'm not clear on your answer.  I'm sorry.  Have you ever used mentally handicapped to study an experimental vaccine?

A    What I'm saying is I don't recall specifically having done that, but that in the 1960s, it was not unusual to do that.  And I wouldn't deny that I may have done so.

(Discussion off the stenographic record.)

BY MR. SIRI:

Q    I'm going to read you a sentence from what what's been previously marked as --

MS. RUBY:  No, that wasn't.

BY MR. SIRI:

Q    -- Exhibit 7.

MS. RUBY:  That's not what got marked as Exhibit 7.  That got -- the task force was seven.

Page 401

Stanley Plotkin, M.D.

MS. NIEUSMA:  All right.

VIDEO OPERATOR:  This ends disc five.  It concludes the deposition of Dr. Stanley Plotkin.  We are going off the record.  The time is 18:43.

COURT REPORTER:  Ms. Nieusma, do you need a copy of today's transcript?

MS. NIEUSMA:  I do not.

COURT REPORTER:  Is the witness going to read and sign?

MS. NIEUSMA:  He certainly can.  It's generally not something we do around here.  But he can do it if anybody wants him to.

(Discussion off the record.)

MR. SIRI:  I'll talk to you after.

(Witness excused.)

(Deposition concluded at 6:42 p.m.)

_____

Witness Signature

Page 402

C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA    :

                                :

COUNTY OF PHILADELPHIA          :

I, MAUREEN BRODERICK, Registered Professional Reporter - Notary Public, within and for the Commonwealth of Pennsylvania, do hereby certify that the proceedings, evidence, and objections noted are contained fully and accurately in the notes taken by me of the preceding deposition, and that this copy is a correct transcript of the same.

_____

MAUREEN BRODERICK

Registered Professional

Reporter - Notary Public

Dated: January 16th, 2018

USCA4 Appeal: 24-2132    Doc: 16    Filed: 01/06/2025    Pg: 102 of 608

Case 2:24-cv-00018-TSK   Document 1-3   Filed 07/05/24   Page 18 of 18  PageID #: 88



# EXHIBIT 3

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use M-M-R II safely and effectively. See full prescribing information for M-M-R II.**

**M-M-R® II (Measles, Mumps, and Rubella Virus Vaccine Live)**
**Suspension for subcutaneous injection**
**Initial U.S. Approval: 1978**

----------------------------INDICATIONS AND USAGE----------------------------
M-M-R II is a vaccine indicated for active immunization for the prevention of measles, mumps, and rubella in individuals 12 months of age and older. (1)

----------------------- DOSAGE AND ADMINISTRATION-----------------------
Administer a 0.5-mL dose of M-M-R II subcutaneously. (2.1)
- The first dose is administered at 12 to 15 months of age. (2.1)
- The second dose is administered at 4 to 6 years of age. (2.1)

-----------------------DOSAGE FORMS AND STRENGTHS -----------------------
Suspension for injection (0.5-mL dose) supplied as a lyophilized vaccine to be reconstituted using accompanying sterile diluent. (3)

----------------------------- CONTRAINDICATIONS -----------------------------
- Hypersensitivity to any component of the vaccine. (4.1)
- Immunosuppression. (4.2)
- Moderate or severe febrile illness. (4.3)
- Active untreated tuberculosis. (4.4)
- Pregnancy. (4.5, 8.1)

------------------------ WARNINGS AND PRECAUTIONS ------------------------
- Use caution when administering M-M-R II to individuals with a history of febrile seizures. (5.1)

- Use caution when administering M-M-R II to individuals with anaphylaxis or immediate hypersensitivity following egg ingestion. (5.2)
- Use caution when administering M-M-R II to individuals with a history of thrombocytopenia. (5.3)
- Immune Globulins (IG) and other blood products should not be given concurrently with M-M-R II. (5.4, 7.2)

-------------------------------ADVERSE REACTIONS-------------------------------

See full prescribing information for adverse reactions occurring during clinical trials or the post-marketing period. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., at 1-877-888-4231 or VAERS at 1-800-822-7967 or www.vaers.hhs.gov.**

--------------------------------DRUG INTERACTIONS --------------------------------

- Administration of immune globulins and other blood products concurrently with M-M-R II vaccine may interfere with the expected immune response. (7.2)
- M-M-R II vaccination may result in a temporary depression of purified protein derivative (PPD) tuberculin skin sensitivity. (7.3)

------------------------ USE IN SPECIFIC POPULATIONS------------------------
- Pregnancy: Do not administer M-M-R II to females who are pregnant. Pregnancy should be avoided for 1 month following vaccination with M-M-R II. (4.5, 8.1, 17)

**See 17 for PATIENT COUNSELING INFORMATION and FDA approved patient labeling.**

**Revised: 06/2020**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
   2.1    Dose and Schedule
   2.2    Preparation and Administration
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
   4.1    Hypersensitivity
   4.2    Immunosuppression
   4.3    Moderate or Severe Febrile Illness
   4.4    Active Untreated Tuberculosis
   4.5    Pregnancy
**5    WARNINGS AND PRECAUTIONS**
   5.1    Febrile Seizure
   5.2    Hypersensitivity to Eggs
   5.3    Thrombocytopenia
   5.4    Immune Globulins and Transfusions
**6    ADVERSE REACTIONS**
**7    DRUG INTERACTIONS**
   7.1    Corticosteroids and Immunosuppressive Drugs
   7.2    Immune Globulins and Transfusions
   7.3    Tuberculin Skin Testing
   7.4    Use with Other Live Viral Vaccines
**8    USE IN SPECIFIC POPULATIONS**
   8.1    Pregnancy
   8.2    Lactation
   8.4    Pediatric Use
   8.5    Geriatric Use
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
   12.1    Mechanism of Action
   12.6    Persistence of Antibody Responses After Vaccination
**13    NONCLINICAL TOXICOLOGY**
   13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
**14    CLINICAL STUDIES**
   14.1    Clinical Efficacy
   14.2    Immunogenicity
**15    REFERENCES**
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

**1      INDICATIONS AND USAGE**

M-M-R® II is a vaccine indicated for active immunization for the prevention of measles, mumps, and rubella in individuals 12 months of age and older.

**2      DOSAGE AND ADMINISTRATION**

**For subcutaneous use only.**

**2.1    Dose and Schedule**

Each 0.5 mL dose is administered subcutaneously.

The first dose is administered at 12 to 15 months of age. A second dose is administered at 4 to 6 years of age.

The second dose may be administered prior to 4 years of age, provided that there is a minimum interval of one month between the doses of measles, mumps and rubella virus vaccine, live {1-2}.

Children who received an initial dose of measles, mumps and rubella vaccine prior to their first birthday should receive additional doses of vaccine at 12-15 months of age and at 4-6 years of age to complete the vaccination series *[see Clinical Studies (14.2)]*.

For post-exposure prophylaxis for measles, administer a dose of M-M-R II vaccine within 72 hours after exposure.

**2.2    Preparation and Administration**

Use a sterile syringe free of preservatives, antiseptics, and detergents for each injection and/or reconstitution of the vaccine because these substances may inactivate the live virus vaccine. To reconstitute, use only the diluent supplied with the vaccine since it is free of preservatives or other antiviral substances which might inactivate the vaccine.

Withdraw the entire volume of the supplied diluent from its vial and inject into lyophilized vaccine vial. Agitate to dissolve completely. Discard if the lyophilized vaccine cannot be dissolved.

Withdraw the entire volume of the reconstituted vaccine and inject subcutaneously into the outer aspect of the upper arm (deltoid region) or into the higher anterolateral area of the thigh.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. Visually inspect the vaccine before and after reconstitution prior to administration. Before reconstitution, the lyophilized vaccine is a light yellow compact crystalline plug, when reconstituted, is a clear yellow liquid. Discard if particulate matter or discoloration are observed in the reconstituted vaccine.

To minimize loss of potency, administer M-M-R II as soon as possible after reconstitution. If not used immediately, the reconstituted vaccine may be stored between 36°F to 46°F (2°C to 8°C), protected from light, for up to 8 hours. Discard reconstituted vaccine if it is not used within 8 hours.

**3      DOSAGE FORMS AND STRENGTHS**

M-M-R II vaccine is a suspension for injection supplied as a single dose vial of lyophilized vaccine to be reconstituted using the accompanying sterile diluent *[see Dosage and Administration (2.2) and How Supplied/Storage and Handling (16)]*. A single dose after reconstitution is 0.5 mL.

**4      CONTRAINDICATIONS**

**4.1    Hypersensitivity**

Do not administer M-M-R II vaccine to individuals with a history of hypersensitivity to any component of the vaccine (including gelatin) {3} or who have experienced a hypersensitivity reaction following administration of a previous dose of M-M-R II vaccine or any other measles, mumps and rubella-containing vaccine. Do not administer M-M-R II vaccine to individuals with a history of anaphylaxis to neomycin *[see Description (11)]*.

**4.2    Immunosuppression**

Do not administer M-M-R II vaccine to individuals who are immunodeficient or immunosuppressed due to disease or medical therapy. Measles inclusion body encephalitis {4} (MIBE), pneumonitis {5} and death as a direct consequence of disseminated measles vaccine virus infection have been reported in

2

immunocompromised individuals inadvertently vaccinated with measles-containing vaccine. In this population, disseminated mumps and rubella vaccine virus infection have also been reported.

Do not administer M-M-R II to individuals with a family history of congenital or hereditary immunodeficiency, until the immune competence of the potential vaccine recipient is demonstrated.

### 4.3   Moderate or Severe Febrile Illness

Do not administer M-M-R II vaccine to individuals with an active febrile illness with fever >101.3°F (>38.5°C).

### 4.4   Active Untreated Tuberculosis

Do not administer M-M-R II vaccine to individuals with active untreated tuberculosis (TB).

### 4.5   Pregnancy

Do not administer M-M-R II to individuals who are pregnant or who are planning on becoming pregnant within the next month *[see Use in Specific Populations (8.1) and Patient Counseling Information (17)]*.

## 5      WARNINGS AND PRECAUTIONS

### 5.1   Febrile Seizure

There is a risk of fever and associated febrile seizure in the first 2 weeks following immunization with M-M-R II vaccine. For children who have experienced a previous febrile seizure (from any cause) and those with a family history of febrile seizures there is a small increase in risk of febrile seizure following receipt of M-M-R II vaccine *[see Adverse Reactions (6)]*.

### 5.2   Hypersensitivity to Eggs

Individuals with a history of anaphylactic, anaphylactoid, or other immediate reactions (e.g., hives, swelling of the mouth and throat, difficulty breathing, hypotension, or shock) subsequent to egg ingestion may be at an enhanced risk of immediate-type hypersensitivity reactions after receiving M-M-R II vaccine .The potential risks and known benefits should be evaluated before considering vaccination in these individuals.

### 5.3   Thrombocytopenia

Transient thrombocytopenia has been reported within 4-6 weeks following vaccination with measles, mumps and rubella vaccine. Carefully evaluate the potential risk and benefit of vaccination in children with thrombocytopenia or in those who experienced thrombocytopenia after vaccination with a previous dose of measles, mumps, and rubella vaccine {6-8} *[see Adverse Reactions (6)]*.

### 5.4   Immune Globulins and Transfusions

Immune Globulins (IG) and other blood products should not be given concurrently with M-M-R II *[see Drug Interactions (7.2)]*. These products may contain antibodies that interfere with vaccine virus replication and decrease the expected immune response.

The ACIP has specific recommendations for intervals between administration of antibody containing products and live virus vaccines.

## 6      ADVERSE REACTIONS

The following adverse reactions include those identified during clinical trials or reported during post-approval use of M-M-R II vaccine or its individual components.

*Body as a Whole*

Panniculitis; atypical measles; fever; syncope; headache; dizziness; malaise; irritability.

*Cardiovascular System*

Vasculitis.

*Digestive System*

Pancreatitis; diarrhea; vomiting; parotitis; nausea.

*Hematologic and Lymphatic Systems*

Thrombocytopenia; purpura; regional lymphadenopathy; leukocytosis.

*Immune System*

Anaphylaxis, anaphylactoid reactions, angioedema (including peripheral or facial edema) and bronchial spasm.

*Musculoskeletal System*

Arthritis; arthralgia; myalgia.

*Nervous System*
Encephalitis; encephalopathy; measles inclusion body encephalitis (MIBE) subacute sclerosing panencephalitis (SSPE); Guillain-Barré Syndrome (GBS); acute disseminated encephalomyelitis (ADEM); transverse myelitis; febrile convulsions; afebrile convulsions or seizures; ataxia; polyneuritis; polyneuropathy; ocular palsies; paresthesia.

*Respiratory System*
Pneumonia; pneumonitis; sore throat; cough; rhinitis.

*Skin*
Stevens-Johnson syndrome; acute hemorrhagic edema of infancy; Henoch-Schönlein purpura; erythema multiforme; urticaria; rash; measles-like rash; pruritus; injection site reactions (pain, erythema, swelling and vesiculation).

*Special Senses — Ear*
Nerve deafness; otitis media.

*Special Senses — Eye*
Retinitis; optic neuritis; papillitis; conjunctivitis.

*Urogenital System*
Epididymitis; orchitis.

## 7    DRUG INTERACTIONS

### 7.1    Corticosteroids and Immunosuppressive Drugs
M-M-R II vaccine should not be administered to individuals receiving immunosuppressive therapy, including high dose corticosteroids. Vaccination with M-M-R II vaccine can result in disseminated disease due to measles vaccine in individuals on immunosuppressive drugs *[see Contraindications (4.2)]*.

### 7.2    Immune Globulins and Transfusions
Administration of immune globulins and other blood products concurrently with M-M-R II vaccine may interfere with the expected immune response {9-11} *[see Warnings and Precautions (5.4)]*. The ACIP has specific recommendations for intervals between administration of antibody containing products and live virus vaccines.

### 7.3    Tuberculin Skin Testing
It has been reported that live attenuated measles, mumps and rubella virus vaccines given individually may result in a temporary depression of tuberculin skin sensitivity. Therefore, if a tuberculin skin test with tuberculin purified protein derivative (PPD) is to be done, it should be administered before, simultaneously with, or at least 4 to 6 weeks after vaccination with M-M-R II vaccine.

### 7.4    Use with Other Live Viral Vaccines
M-M-R II vaccine can be administered concurrently with other live viral vaccines. If not given concurrently, M-M-R II vaccine should be given one month before or one month after administration of other live viral vaccines to avoid potential for immune interference.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1    Pregnancy
Risk Summary
M-M-R II vaccine is contraindicated for use in pregnant women because infection during pregnancy with the wild-type viruses has been associated with maternal and fetal adverse outcomes.

Increased rates of spontaneous abortion, stillbirth, premature delivery and congenital defects have been observed following infection with wild-type measles during pregnancy. {12,13} Wild-type mumps infection during the first trimester of pregnancy may increase the rate of spontaneous abortion.

Infection with wild-type rubella during pregnancy can lead to miscarriage or stillbirth. If rubella infection occurs during the first trimester of pregnancy, it can result in severe congenital defects, Congenital Rubella Syndrome (CRS). Congenital rubella syndrome in the infant includes but is not limited to eye manifestations (cataracts, glaucoma, retinitis), congenital heart defects, hearing loss, microcephaly, and intellectual disabilities. M-M-R II vaccine contains live attenuated measles, mumps and rubella viruses. It is not known whether M-M-R II vaccine can cause fetal harm when administered to pregnant woman. There are no adequate and well-controlled studies of M-M-R II vaccine administration to pregnant women.

All pregnancies have a risk of birth defect, loss or other adverse outcomes. In the US general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4% and 15% to 20%, respectively.

Available data suggest the rates of major birth defects and miscarriage in women who received M-M-R II vaccine within 30 days prior to pregnancy or during pregnancy are consistent with estimated background rates *(see Data)*.

Data

*Human Data*

A cumulative assessment of post-marketing reports for M-M-R II vaccine from licensure 01 April 1978 through 31 December 2018, identified 796 reports of inadvertent administration of M-M-R II vaccine occurring 30 days before or at any time during pregnancy with known pregnancy outcomes. Of the prospectively followed pregnancies for whom the timing of M-M-R II vaccination was known, 425 women received M-M-R II vaccine during the 30 days prior to conception through the second trimester. The outcomes for these 425 prospectively followed pregnancies included 16 infants with major birth defects, 4 cases of fetal death and 50 cases of miscarriage. No abnormalities compatible with congenital rubella syndrome have been identified in patients who received M-M-R II vaccine. Rubella vaccine viruses can cross the placenta, leading to asymptomatic infection of the fetus. Mumps vaccine virus has also been shown to infect the placenta {14}, but there is no evidence that it causes congenital malformations or disease in the fetus or infant .

The CDC established the Vaccine in Pregnancy registry (1971-1989) of women who had received rubella vaccines within 3 months before or after conception. Data on 1221 inadvertently vaccinated pregnant women demonstrated no evidence of an increase in fetal abnormalities or cases of Congenital Rubella Syndrome (CRS) in the enrolled women {15}.

**8.2   Lactation**

Risk Summary

It is not known whether measles or mumps vaccine virus is secreted in human milk. Studies have shown that lactating postpartum women vaccinated with live attenuated rubella vaccine may secrete the virus in breast milk and transmit it to breast-fed infants.{16,17} In the breast-fed infants with serological evidence of rubella virus vaccine strain antibodies, none exhibited severe disease; however, one exhibited mild clinical illness typical of acquired rubella.{18,19}

The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for M-M-R II, and any potential adverse effects on the breastfed child from M-M-R II or from the underlying maternal condition. For preventive vaccines, the underlying maternal condition is susceptibility to disease prevented by the vaccine.

**8.4   Pediatric Use**

M-M-R II vaccine is not approved for individuals less than 12 months of age. Safety and effectiveness of measles vaccine in infants below the age of 6 months have not been established *[see Clinical Studies (14)]*. Safety and effectiveness of mumps and rubella vaccine in infants less than 12 months of age have not been established.

**8.5   Geriatric Use**

Clinical studies of M-M-R II did not include sufficient numbers of seronegative subjects aged 65 and over to determine whether they respond differently from younger subjects.

**11   Description**

M-M-R II vaccine is a sterile lyophilized preparation of (1) Measles Virus Vaccine Live, an attenuated line of measles virus, derived from Enders' attenuated Edmonston strain and propagated in chick embryo cell culture; (2) Mumps Virus Vaccine Live, the Jeryl Lynn™ (B level) strain of mumps virus propagated in chick embryo cell culture; and (3) Rubella Virus Vaccine Live, the Wistar RA 27/3 strain of live attenuated rubella virus propagated in WI-38 human diploid lung fibroblasts. {20,21} The cells, virus pools, recombinant human serum albumin and fetal bovine serum used in manufacturing are tested and determined to be free of adventitious agents.

After reconstitution, each 0.5 mL dose contains not less than 3.0 $\log_{10}$ TCID$_{50}$ (tissue culture infectious doses) of measles virus; 4.1 $\log_{10}$ TCID$_{50}$ of mumps virus; and 3.0 $\log_{10}$ TCID$_{50}$ of rubella virus.

Each dose is calculated to contain sorbitol (14.5 mg), sucrose (1.9 mg), hydrolyzed gelatin (14.5 mg), recombinant human albumin (≤0.3 mg), fetal bovine serum (<1 ppm), approximately 25 mcg of neomycin and other buffer and media ingredients. The product contains no preservative.

## 12    CLINICAL PHARMACOLOGY

### 12.1   Mechanism of Action

M-M-R II vaccination induces antibodies to measles, mumps, and rubella associated with protection which can be measured by neutralization assays, hemagglutination-inhibition (HI) assays, or enzyme linked immunosorbent assay (ELISA) tests. Results from efficacy studies or effectiveness studies that were previously conducted for the component vaccines of M-M-R II were used to define levels of serum antibodies that correlated with protection against measles, mumps, and rubella *[see Clinical Studies (14)].*

### 12.6   Persistence of Antibody Responses After Vaccination

Neutralizing and ELISA antibodies to measles, mumps, and rubella viruses are still detectable in 95-100%, 74-91%, and 90-100% of individuals respectively, 11 to 13 years after primary vaccination. {22-28}

## 13    NONCLINICAL TOXICOLOGY

### 13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility

M-M-R II vaccine has not been evaluated for carcinogenic or mutagenic potential or impairment of fertility.

## 14    CLINICAL STUDIES

### 14.1   Clinical Efficacy

Efficacy of measles, mumps, and rubella vaccines was established in a series of double-blind controlled trials. {29-34} These studies also established that seroconversion in response to vaccination against measles, mumps and rubella paralleled protection. {35-38}

### 14.2   Immunogenicity

Clinical studies enrolling 284 triple seronegative children, 11 months to 7 years of age, demonstrated that M-M-R II vaccine is immunogenic. In these studies, a single injection of the vaccine induced measles HI antibodies in 95%, mumps neutralizing antibodies in 96%, and rubella HI antibodies in 99% of susceptible individuals.

A study of 6-month-old and 15-month-old infants born to mothers vaccinated with a measles vaccine in childhood, demonstrated that, following infant and toddler vaccination with Measles Virus Vaccine, Live (previously US-licensed, manufactured by Merck), 74% of the 6-month-old infants developed detectable neutralizing antibody titers while 100% of the 15-month-old infants vaccinated with Measles Virus Vaccine, Live or M-M-R II vaccine developed neutralizing antibodies {39}. When the 6-month-old infants of immunized mothers were revaccinated at 15 months with M-M-R II vaccine, they developed antibody titers similar to those of toddlers who were vaccinated previously at 15-months of age.

## 15    REFERENCES

1. General Recommendations on Immunization, Recommendations of the Advisory Committee on Immunization Practices, MMWR 43(RR-1): 1-38, January 28, 1994.

2. Measles, Mumps, and Rubella — Vaccine Use and Strategies for Elimination of Measles, Rubella, and Congenital Rubella Syndrome and Control of Mumps: Recommendations of the Advisory Committee on Immunization Practices (ACIP), MMWR 47(RR-8): May 22, 1998.

3. Kelso, J.M.; Jones, R.T.; Yunginger, J.W.: Anaphylaxis to measles, mumps, and rubella vaccine mediated by IgE to gelatin, J. Allergy Clin. Immunol. 91: 867-872, 1993.

4. Bitnum, A.; et al: Measles Inclusion Body Encephalitis Caused by the Vaccine Strain of Measles Virus. Clin. Infect. Dis. 29: 855-861, 1999.

5. Angel, J.B.; et al: Vaccine Associated Measles Pneumonitis in an Adult with AIDS. Annals of Internal Medicine, 129: 104-106, 1998.

6. Cecinati V, et al. Vaccine administration and the development of immune thrombocytopenic purpura in children. Human Vaccines & Immunotherapeutics 9:5, 2013.

7. Mantadakis E, Farmaki E, Buchanan GR. Thrombocytopenic Purpura after Measles-Mumps-Rubella Vaccination: A Systematic Review of the Literature and Guidance for Management. J Ped 156(4): 2010.

8. Andrews N, Stowe J, Miller E, Svanstrom H, Johansen K, Bonhoeffer J, et al. A collaborative approach to investigating the risk of thrombocytopenic purpura after measles-mumps-rubella vaccination in England and Denmark. Vaccine. 2012;30:3042-6.

9. Rubella Prevention: Recommendation of the Immunization Practices Advisory Committee (ACIP), MMWR 39(RR-15): 1-18, November 23, 1990.

JA105

10. Peter, G.; et al (eds): Report of the Committee on Infectious Diseases, Twenty-fourth Edition, American Academy of Pediatrics, 344-357, 1997.

11. Measles Prevention: Recommendations of the Immunization Practices Advisory Committee (ACIP), MMWR 38(S-9): 5-22, December 29, 1989.

12. Eberhart-Phillips, J.E.; et al: Measles in pregnancy: a descriptive study of 58 cases. Obstetrics and Gynecology, 82(5): 797-801, November 1993.

13. Jespersen, C.S.; et al: Measles as a cause of fetal defects: A retrospective study of ten measles epidemics in Greenland. Acta Paediatr Scand. 66: 367-372, May 1977.

14. Yamauchi T, Wilson C, Geme JW Jr. Transmission of live, attenuated mumps virus to the human placenta. N Engl J Med. 1974;290(13):710-712.

15. Rubella Vaccination during Pregnancy —United States, 1971-1988. JAMA. 1989;261(23):3374–3383.

16. Losonsky, G.A.; Fishaut, J.M.; Strussenber, J.; Ogra, P.L.: Effect of immunization against rubella on lactation products. II. Maternal-neonatal interactions, J. Infect. Dis. 145: 661-666, 1982.

17. Losonsky, G.A.; Fishaut, J.M.; Strussenber, J.; Ogra, P.L.: Effect of immunization against rubella on lactation products. I. Development and characterization of specific immunologic reactivity in breast milk, J. Infect. Dis. 145: 654-660, 1982.

18. Landes, R.D.; Bass, J.W.; Millunchick, E.W.; Oetgen, W.J.: Neonatal rubella following postpartum maternal immunization, J. Pediatr. 97: 465-467, 1980.

19. Lerman, S.J.: Neonatal rubella following postpartum maternal immunization, J. Pediatr. 98: 668, 1981. (Letter)

20. Plotkin, S.A.; Cornfeld, D.; Ingalls, T.H.: Studies of immunization with living rubella virus: Trials in children with a strain cultured from an aborted fetus, Am. J. Dis. Child. 110: 381-389, 1965.

21. Plotkin, S.A.; Farquhar, J.; Katz, M.; Ingalls, T.H.: A new attenuated rubella virus grown in human fibroblasts: Evidence for reduced nasopharyngeal excretion, Am. J. Epidemiol. 86: 468-477, 1967.

22. Weibel, R.E.; Carlson, A.J.; Villarejos, V.M.; Buynak, E.B.; McLean, A.A.; Hilleman, M.R.: Clinical and Laboratory Studies of Combined Live Measles, Mumps, and Rubella Vaccines Using the RA 27/3 Rubella Virus, Proc. Soc. Exp. Biol. Med. 165: 323-326, 1980.

23. Watson, J.C.; Pearson, J.S.; Erdman, D.D.; et al: An Evaluation of Measles Revaccination Among School-Entry Age Children, 31st Interscience Conference on Antimicrobial Agents and Chemotherapy, Abstract #268, 143, 1991.

24. Unpublished data from the files of Merck Research Laboratories.

25. Davidkin, I.; Jokinen, S.; Broman, M. et al.: Persistence of Measles, Mumps, and Rubella Antibodies in an MMR-Vaccinated Cohort: A 20-Year Follow-up, JID 197:950–6, April 2008.

26. LeBaron, W.; Beeler J.; Sullivan, B.; et al.: Persistence of Measles Antibodies After 2 Doses of Measles Vaccine in a Postelimination Environment, Arch Pediatr Adolesc Med. 161:294-301, March 2007.

27. LeBaron, C.; Forghani, B.; Beck, C. et al.: Persistence of Mumps Antibodies after 2 Doses of Measles-Mumps-Rubella Vaccine, JID 199:552–60, February 2009.

28. LeBaron, W.; Forghani, B.; Matter, L. et al.: Persistence of Rubella Antibodies after 2 Doses of Measles-Mumps-Rubella Vaccine, JID 200:888–99, September 2009.

29. Hilleman, M.R.; Buynak, E.B.; Weibel, R.E.; et al: Development and Evaluation of the Moraten Measles Virus Vaccine, JAMA 206(3): 587-590, 1968.

30. Weibel, R.E.; Stokes, J.; Buynak, E.B.; et al: Live, Attenuated Mumps Virus Vaccine 3. Clinical and Serologic Aspects in a Field Evaluation, N. Engl. J. Med. 276: 245-251, 1967.

31. Hilleman, M.R.; Weibel, R.E.; Buynak, E.B.; et al: Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation, N. Engl. J. Med. 276: 252-258, 1967.

32. Cutts, F.T.; Henderson, R.H.; Clements, C.J.; et al: Principles of measles control, Bull WHO 69(1): 1-7, 1991.

33. Weibel, R.E.; Buynak, E.B.; Stokes, J.; et al: Evaluation Of Live Attenuated Mumps Virus Vaccine, Strain Jeryl Lynn, First International Conference on Vaccines Against Viral and Rickettsial Diseases of Man, World Health Organization, No. 147, May 1967.

34. Leibhaber, H.; Ingalls, T.H.; LeBouvier, G.L.; et al: Vaccination With RA 27/3 Rubella Vaccine, Am. J. Dis. Child. 123: 133-136, February 1972.

35. Rosen, L.: Hemagglutination and Hemagglutination-Inhibition with Measles Virus, Virology 13: 139-141, January 1961.

36. Brown, G.C.; et al: Fluorescent-Antibody Marker for Vaccine-Induced Rubella Antibodies, Infection and Immunity 2(4): 360-363, 1970.

37. Buynak, E.B.; et al: Live Attenuated Mumps Virus Vaccine 1. Vaccine Development, Proceedings of the Society for Experimental Biology and Medicine, 123: 768-775, 1966.

38. Hilleman M.R., Studies of Live Attenuated Measles Virus Vaccine in Man: II. Appraisal of Efficacy. Amer. J. of Public Health, 52(2):44-56, 1962.

39. Johnson, C.E.; et al: Measles Vaccine Immunogenicity in 6- Versus 15-Month-Old Infants Born to Mothers in the Measles Vaccine Era, Pediatrics, 93(6): 939-943, 1994.

## 16    HOW SUPPLIED/STORAGE AND HANDLING

No. 4681 — M-M-R II vaccine is supplied as follows:
(1) a box of 10 single-dose vials of lyophilized vaccine (package A), NDC 0006-4681-00
(2) a box of 10 vials of diluent (package B)
Exposure to light may inactivate the vaccine viruses.
Before reconstitution, refrigerate the lyophilized vaccine at 36°F to 46°F, (2°C to 8°C).
Store accompanying diluent in the refrigerator with the lyophilized vaccine or separately at room temperature (68° to 77°F, 20° to 25°C). **Do not freeze the diluent**.
Administer M-M-R II vaccine as soon as possible after reconstitution. If not administered immediately, reconstituted vaccine may be stored between 36°F to 46°F (2°C to 8°C), protected from light, for up to 8 hours. Discard reconstituted vaccine if it is not used within 8 hours.
**For information regarding the product or questions regarding storage conditions, call 1-800-MERCK-90 (1-800-637-2590).**

## 17    PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Patient Package Insert).

Discuss the following with the patient:
- Provide the required vaccine information to the patient, parent, or guardian.
- Inform the patient, parent, or guardian of the benefits and risks associated with vaccination.
- Question the patient, parent, or guardian about reactions to a previous dose of M-M-R II vaccine or other measles-, mumps-, or rubella-containing vaccines.
- Question females of reproductive potential regarding the possibility of pregnancy. Inform female patients to avoid pregnancy for 1 month following vaccination *[see Contraindications (4.5) and Use in Specific Populations (8.1)]*.
- Inform the patient, parent, or guardian that vaccination with M-M-R II may not offer 100% protection from measles, mumps, and rubella infection.
- Instruct patients, parents, or guardians to report any adverse reactions to their health-care provider. The U.S. Department of Health and Human Services has established a Vaccine Adverse Event Reporting System (VAERS) to accept all reports of suspected adverse events after the administration of any vaccine, including but not limited to the reporting of events required by the National Childhood Vaccine Injury Act of 1986. For information or a copy of the vaccine reporting form, call the VAERS toll-free number at 1-800-822-7967, or report online at https://www.vaers.hhs.gov.

Distributed by: Merck Sharp & Dohme Corp., a subsidiary of
**MERCK & CO., INC.,** Whitehouse Station, NJ 08889, USA

For patent information: www.merck.com/product/patent/home.html

Copyright © 1978-2020 Merck Sharp & Dohme Corp., a subsidiary of **Merck & Co., Inc.**
All rights reserved.

uspi-v205c-i-2006r009

JA107

# EXHIBIT 4

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use VARIVAX safely and effectively. See full prescribing information for VARIVAX.**

**VARIVAX®**
**Varicella Virus Vaccine Live**
**Suspension for subcutaneous injection**
**Initial U.S. Approval: 1995**

---------------------------INDICATIONS AND USAGE---------------------------
VARIVAX is a vaccine indicated for active immunization for the prevention of varicella in individuals 12 months of age and older. (1)

---------------------- DOSAGE AND ADMINISTRATION ----------------------
Each dose is approximately 0.5 mL after reconstitution and is administered by subcutaneous injection. (2.1)
*Children (12 months to 12 years of age)*
- If a second dose is administered, there should be a minimum interval of 3 months between doses. (2.1)

*Adolescents (≥13 years of age) and Adults*
- Two doses, to be administered a minimum of 4 weeks apart. (2.1)

--------------------DOSAGE FORMS AND STRENGTHS --------------------
Suspension for injection (approximately 0.5-mL dose) supplied as a lyophilized vaccine to be reconstituted using the accompanying sterile diluent. (2.2, 3, 16)

------------------------------CONTRAINDICATIONS------------------------------
- History of severe allergic reaction to any component of the vaccine (including neomycin and gelatin) or to a previous dose of varicella vaccine. (4.1)
- Primary or acquired immunodeficiency states. (4.2)
- Any febrile illness or active infection, including untreated tuberculosis. (4.3)
- Pregnancy. (4.4, 8.1, 17)

---------------------- WARNINGS AND PRECAUTIONS----------------------
- Evaluate individuals for immune competence prior to administration of VARIVAX if there is a family history of congenital or hereditary immunodeficiency. (5.2)
- Avoid contact with high-risk individuals susceptible to varicella because of possible transmission of varicella vaccine virus. (5.4)

- Defer vaccination for at least 5 months following blood or plasma transfusions, or administration of immune globulins (IG). (5.5, 7.2)
- Avoid use of salicylates for 6 weeks following administration of VARIVAX to children and adolescents. (5.6, 7.1)

----------------------------- ADVERSE REACTIONS -----------------------------
- Frequently reported (≥10%) adverse reactions in children ages 1 to 12 years include:
  - fever ≥102.0°F (38.9°C) oral: 14.7%
  - injection-site complaints: 19.3% (6.1)
- Frequently reported (≥10%) adverse reactions in adolescents and adults ages 13 years and older include:
  - fever ≥100.0°F (37.8°C) oral: 10.2%
  - injection-site complaints: 24.4% (6.1)
- Other reported adverse reactions in all age groups include:
  - varicella-like rash (injection site)
  - varicella-like rash (generalized) (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., at 1-877-888-4231 or VAERS at 1-800-822-7967 or www.vaers.hhs.gov.**

------------------------------DRUG INTERACTIONS------------------------------
- Reye syndrome has been reported in children and adolescents following the use of salicylates during wild-type varicella infection. (5.6, 7.1)
- Passively acquired antibodies from blood, plasma, or immunoglobulin potentially may inhibit the response to varicella vaccination. (5.5, 7.2)
- Tuberculin skin testing may be performed before VARIVAX is administered or on the same day, or six weeks following vaccination with VARIVAX. (7.3)

---------------------- USE IN SPECIFIC POPULATIONS ----------------------
Pregnancy: Do not administer VARIVAX to females who are pregnant. Pregnancy should be avoided for 3 months following vaccination with VARIVAX. (4.4, 8.1, 17)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 02/2017**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1  INDICATIONS AND USAGE**
**2  DOSAGE AND ADMINISTRATION**
  2.1  Recommended Dose and Schedule
  2.2  Reconstitution Instructions
**3  DOSAGE FORMS AND STRENGTHS**
**4  CONTRAINDICATIONS**
  4.1  Severe Allergic Reaction
  4.2  Immunosuppression
  4.3  Concurrent Illness
  4.4  Pregnancy
**5  WARNINGS AND PRECAUTIONS**
  5.1  Management of Allergic Reactions
  5.2  Family History of Immunodeficiency
  5.3  Use in HIV-Infected Individuals
  5.4  Risk of Vaccine Virus Transmission
  5.5  Immune Globulins and Transfusions
  5.6  Salicylate Therapy
**6  ADVERSE REACTIONS**
  6.1  Clinical Trials Experience
  6.2  Post-Marketing Experience
**7  DRUG INTERACTIONS**
  7.1  Salicylates
  7.2  Immune Globulins and Transfusions
  7.3  Tuberculin Skin Testing
**8  USE IN SPECIFIC POPULATIONS**
  8.1  Pregnancy
  8.2  Lactation
  8.4  Pediatric Use
  8.5  Geriatric Use
**11  DESCRIPTION**
**12  CLINICAL PHARMACOLOGY**
  12.1  Mechanism of Action
  12.2  Pharmacodynamics
  12.4  Duration of Protection
**14  CLINICAL STUDIES**
  14.1  Clinical Efficacy
  14.2  Immunogenicity
  14.3  Persistence of Immune Response
  14.4  Studies with Other Vaccines
**15  REFERENCES**
**16  HOW SUPPLIED/STORAGE AND HANDLING**
**17  PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

---

**FULL PRESCRIBING INFORMATION**

**1    INDICATIONS AND USAGE**

VARIVAX® is a vaccine indicated for active immunization for the prevention of varicella in individuals 12 months of age and older.

## 2    DOSAGE AND ADMINISTRATION

**Subcutaneous administration only**

### 2.1    Recommended Dose and Schedule

VARIVAX is administered as an approximately 0.5-mL dose by subcutaneous injection into the outer aspect of the upper arm (deltoid region) or the anterolateral thigh.

Do not administer this product intravascularly or intramuscularly.

*Children (12 months to 12 years of age)*

If a second dose is administered, there should be a minimum interval of 3 months between doses *[see Clinical Studies (14.1)]*.

*Adolescents (≥13 years of age) and Adults*

Two doses of vaccine, to be administered with a minimum interval of 4 weeks between doses *[see Clinical Studies (14.1)]*.

### 2.2    Reconstitution Instructions

When reconstituting the vaccine, use only the sterile diluent supplied with VARIVAX. The sterile diluent does not contain preservatives or other anti-viral substances which might inactivate the vaccine virus.

Use a sterile syringe free of preservatives, antiseptics, and detergents for each reconstitution and injection of VARIVAX because these substances may inactivate the vaccine virus.

To reconstitute the vaccine, first withdraw the total volume of provided sterile diluent into a syringe. Inject all of the withdrawn diluent into the vial of lyophilized vaccine and gently agitate to mix thoroughly. Withdraw the entire contents into the syringe and inject the total volume (approximately 0.5 mL) of reconstituted vaccine subcutaneously. VARIVAX, when reconstituted, is a clear, colorless to pale yellow liquid.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. Do not use the product if particulates are present or if it appears discolored.

To minimize loss of potency, administer VARIVAX immediately after reconstitution. Discard if reconstituted vaccine is not used within 30 minutes.

Do not freeze reconstituted vaccine.

Do not combine VARIVAX with any other vaccine through reconstitution or mixing.

## 3    DOSAGE FORMS AND STRENGTHS

VARIVAX is a suspension for injection supplied as a single-dose vial of lyophilized vaccine to be reconstituted using the accompanying sterile diluent *[see Dosage and Administration (2.2) and How Supplied/Storage and Handling (16)]*. A single dose after reconstitution is approximately 0.5 mL.

## 4    CONTRAINDICATIONS

### 4.1    Severe Allergic Reaction

Do not administer VARIVAX to individuals with a history of anaphylactic or severe allergic reaction to any component of the vaccine (including neomycin and gelatin) or to a previous dose of a varicella-containing vaccine.

### 4.2    Immunosuppression

Do not administer VARIVAX to immunosuppressed or immunodeficient individuals, including those with a history of primary or acquired immunodeficiency states, leukemia, lymphoma or other malignant neoplasms affecting the bone marrow or lymphatic system, AIDS, or other clinical manifestations of infection with human immunodeficiency virus (HIV).

Do not administer VARIVAX to individuals receiving immunosuppressive therapy, including individuals receiving immunosuppressive doses of corticosteroids.

VARIVAX is a live, attenuated varicella-zoster vaccine (VZV) and may cause an extensive vaccine-associated rash or disseminated disease in individuals who are immunosuppressed or immunodeficient.

### 4.3   Concurrent Illness

Do not administer VARIVAX to individuals with any febrile illness. Do not administer VARIVAX to individuals with active, untreated tuberculosis.

### 4.4   Pregnancy

Do not administer VARIVAX to individuals who are pregnant because the effects of the vaccine on fetal development are unknown. Wild-type varicella (natural infection) is known to sometimes cause fetal harm. If vaccination of postpubertal females is undertaken, pregnancy should be avoided for three months following vaccination *[see Use in Specific Populations (8.1) and Patient Counseling Information (17)]*.

## 5    WARNINGS AND PRECAUTIONS

### 5.1   Management of Allergic Reactions

Adequate treatment provisions, including epinephrine injection (1:1000), should be available for immediate use should anaphylaxis occur.

### 5.2   Family History of Immunodeficiency

Vaccination should be deferred in patients with a family history of congenital or hereditary immunodeficiency until the patient's immune status has been evaluated and the patient has been found to be immunocompetent.

### 5.3   Use in HIV-Infected Individuals

The Advisory Committee for Immunization Practices (ACIP) has recommendations on the use of varicella vaccine in HIV-infected individuals.

### 5.4   Risk of Vaccine Virus Transmission

Post-marketing experience suggests that transmission of vaccine virus may occur rarely between healthy vaccinees who develop a varicella-like rash and healthy susceptible contacts. Transmission of vaccine virus from a mother who did not develop a varicella-like rash to her newborn infant has been reported.

Due to the concern for transmission of vaccine virus, vaccine recipients should attempt to avoid whenever possible close association with susceptible high-risk individuals for up to six weeks following vaccination with VARIVAX. Susceptible high-risk individuals include:

- Immunocompromised individuals;
- Pregnant women without documented history of varicella or laboratory evidence of prior infection;
- Newborn infants of mothers without documented history of varicella or laboratory evidence of prior infection and all newborn infants born at <28 weeks gestation regardless of maternal varicella immunity.

### 5.5   Immune Globulins and Transfusions

Immunoglobulins should not be given concomitantly with VARIVAX. Vaccination should be deferred for at least 5 months following blood or plasma transfusions, or administration of immune globulin(s) {1}.

Following administration of VARIVAX, immune globulin(s) should not be given for 2 months thereafter unless its use outweighs the benefits of vaccination {1}. *[See Drug Interactions (7.2).]*

### 5.6   Salicylate Therapy

Avoid use of salicylates (aspirin) or salicylate-containing products in children and adolescents 12 months through 17 years of age for six weeks following vaccination with VARIVAX because of the association of Reye syndrome with aspirin therapy and wild-type varicella infection. *[See Drug Interactions (7.1).]*

## 6    ADVERSE REACTIONS

### 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a vaccine cannot be directly compared to rates in the clinical trials of another vaccine and may not reflect the rates observed in clinical practice. Vaccine-related adverse reactions reported during clinical trials were assessed by the study investigators to be possibly, probably, or definitely vaccine-related and are summarized below.

In clinical trials {2-9}, VARIVAX was administered to over 11,000 healthy children, adolescents, and adults.

JA111

In a double-blind, placebo-controlled study among 914 healthy children and adolescents who were serologically confirmed to be susceptible to varicella, the only adverse reactions that occurred at a significantly (p<0.05) greater rate in vaccine recipients than in placebo recipients were pain and redness at the injection site {2}.

*Children 1 to 12 Years of Age*
*One-Dose Regimen in Children*

In clinical trials involving healthy children monitored for up to 42 days after a single dose of VARIVAX, the frequency of fever, injection-site complaints, or rashes were reported as shown in Table 1:

**Table 1: Fever, Local Reactions, and Rashes (%) in Children 1 to 12 Years of Age 0 to 42 Days After Receipt of a Single Dose of VARIVAX**

| Reaction | N | % Experiencing Reaction | Peak Occurrence During Postvaccination Days |
|---|---|---|---|
| Fever ≥102.0°F (38.9°C) Oral | 8824 | 14.7% | 0 to 42 |
| Injection-site complaints (pain/soreness, swelling and/or erythema, rash, pruritus, hematoma, induration, stiffness) | 8913 | 19.3% | 0 to 2 |
| Varicella-like rash (injection site) Median number of lesions | 8913 | 3.4% 2 | 8 to 19 |
| Varicella-like rash (generalized) Median number of lesions | 8913 | 3.8% 5 | 5 to 26 |

In addition, adverse events occurring at a rate of ≥1% are listed in decreasing order of frequency: upper respiratory illness, cough, irritability/nervousness, fatigue, disturbed sleep, diarrhea, loss of appetite, vomiting, otitis, diaper rash/contact rash, headache, teething, malaise, abdominal pain, other rash, nausea, eye complaints, chills, lymphadenopathy, myalgia, lower respiratory illness, allergic reactions (including allergic rash, hives), stiff neck, heat rash/prickly heat, arthralgia, eczema/dry skin/dermatitis, constipation, itching.

Pneumonitis has been reported rarely (<1%) in children vaccinated with VARIVAX.

Febrile seizures have occurred at a rate of <0.1% in children vaccinated with VARIVAX.

Clinical safety of refrigerator-stable VARIVAX (n=635) was compared with that of the licensed frozen formulation of VARIVAX (n=323) for 42 days postvaccination in U.S. children 12 to 23 months of age. The safety profiles were comparable for the two different formulations. Pain/tenderness/soreness (24.8 to 28.9%) and erythema (18.4 to 21.0%) were the most commonly reported local reactions. The most common systemic adverse events (reported by ≥10% of subjects in one or more treatment groups, irrespective of causal relationship to vaccination) were: fever ≥102.0°F, oral equivalent (27.0 to 29.2%), upper respiratory infection (26.9 to 29.7%), otitis media (12.0 to 14.1%), cough (11.0 to 15.1%), rhinorrhea (8.7 to 10.6%), and irritability (6.5 to 11.9%). Six subjects reported serious adverse events.

*Two-Dose Regimen in Children*

Nine hundred eighty-one (981) subjects in a clinical trial received 2 doses of VARIVAX 3 months apart and were actively followed for 42 days after each dose. The 2-dose regimen of varicella vaccine had a safety profile comparable to that of the 1-dose regimen. The overall incidence of injection-site clinical complaints (primarily erythema and swelling) observed in the first 4 days following vaccination was 25.4% Postdose 2 and 21.7% Postdose 1, whereas the overall incidence of systemic clinical complaints in the 42-day follow-up period was lower Postdose 2 (66.3%) than Postdose 1 (85.8%).

*Adolescents (13 Years of Age and Older) and Adults*

In clinical trials involving healthy adolescents and adults, the majority of whom received two doses of VARIVAX and were monitored for up to 42 days after any dose, the frequencies of fever, injection-site complaints, or rashes are shown in Table 2.

**Table 2: Fever, Local Reactions, and Rashes (%) in Adolescents and Adults 0 to 42 Days After Receipt of VARIVAX**

| Reaction | N | % Post Dose 1 | Peak Occurrence in Postvaccination Days | N | % Post Dose 2 | Peak Occurrence in Postvaccination Days |
|---|---|---|---|---|---|---|
| Fever ≥100.0°F (37.8°C) Oral | 1584 | 10.2% | 14 to 27 | 956 | 9.5% | 0 to 42 |
| Injection-site complaints (soreness, erythema, swelling, rash, pruritus, pyrexia, hematoma, induration, numbness) | 1606 | 24.4% | 0 to 2 | 955 | 32.5% | 0 to 2 |
| Varicella-like rash (injection site) | 1606 | 3.1% | 6 to 20 | 955 | 1% | 0 to 6 |
| Median number of lesions | | 2 | | | 2 | |
| Varicella-like rash (generalized) | 1606 | 5.5% | 7 to 21 | 955 | 0.9% | 0 to 23 |
| Median number of lesions | | 5 | | | 5.5 | |

In addition, adverse events reported at a rate of ≥1% are listed in decreasing order of frequency: upper respiratory illness, headache, fatigue, cough, myalgia, disturbed sleep, nausea, malaise, diarrhea, stiff neck, irritability/nervousness, lymphadenopathy, chills, eye complaints, abdominal pain, loss of appetite, arthralgia, otitis, itching, vomiting, other rashes, constipation, lower respiratory illness, allergic reactions (including allergic rash, hives), contact rash, cold/canker sore.

**6.2   Post-Marketing Experience**

Broad use of VARIVAX could reveal adverse events not observed in clinical trials.

The following additional adverse events, regardless of causality, have been reported during post-marketing use of VARIVAX:

*Body as a Whole*

Anaphylaxis (including anaphylactic shock) and related phenomena such as angioneurotic edema, facial edema, and peripheral edema.

*Eye Disorders*

Necrotizing retinitis (in immunocompromised individuals).

*Hemic and Lymphatic System*

Aplastic anemia; thrombocytopenia (including idiopathic thrombocytopenic purpura (ITP)).

*Infections and Infestations*

Varicella (vaccine strain).

*Nervous/Psychiatric*

Encephalitis; cerebrovascular accident; transverse myelitis; Guillain-Barré syndrome; Bell's palsy; ataxia; non-febrile seizures; aseptic meningitis; dizziness; paresthesia.

*Respiratory*

Pharyngitis; pneumonia/pneumonitis.

*Skin*

Stevens-Johnson syndrome; erythema multiforme; Henoch-Schönlein purpura; secondary bacterial infections of skin and soft tissue, including impetigo and cellulitis; herpes zoster.

## 7     DRUG INTERACTIONS

**7.1   Salicylates**

No cases of Reye syndrome have been observed following vaccination with VARIVAX. Vaccine recipients should avoid use of salicylates for 6 weeks after vaccination with VARIVAX, as Reye syndrome has been reported following the use of salicylates during wild-type varicella infection *[see Warnings and Precautions (5.6)]*.

**7.2   Immune Globulins and Transfusions**

Blood, plasma, and immune globulins contain antibodies that may interfere with vaccine virus replication and decrease the immune response to VARIVAX. Vaccination should be deferred for at least 5 months following blood or plasma transfusions, or administration of immune globulin(s) {1}.

Following administration of VARIVAX, immune globulin(s) should not be given for 2 months thereafter unless its use outweighs the benefits of vaccination {1}. *[See Warnings and Precautions (5.5).]*

JA113

### 7.3    Tuberculin Skin Testing

Tuberculin skin testing, with tuberculin purified protein derivative (PPD), may be performed before VARIVAX is administered or on the same day, or at least 4 weeks following vaccination with VARIVAX, as other live virus vaccines may cause a temporary depression of tuberculin skin test sensitivity leading to false negative results.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1    Pregnancy
Risk Summary

VARIVAX is contraindicated for use in pregnant women because the vaccine contains live, attenuated varicella virus, and it is known that wild-type varicella virus, if acquired during pregnancy, can cause congenital varicella syndrome [see Contraindications (4.4) and Patient Counseling Information (17)]. No increased risk for miscarriage, major birth defect or congenital varicella syndrome was observed in a pregnancy exposure registry that monitored outcomes after inadvertent use. There are no relevant animal data.

All pregnancies have a risk of birth defect, loss, or other adverse outcomes. In the US general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4%, and 15% to 20%, respectively.

Human Data

A pregnancy exposure registry was maintained from 1995 to 2013 to monitor pregnancy and fetal outcomes following inadvertent administration of VARIVAX. The registry prospectively enrolled 1522 women who received a dose of VARIVAX during pregnancy or within three months prior to conception. After excluding elective terminations (n=60), ectopic pregnancies (n=1) and those lost to follow-up (n=556), there were 905 pregnancies with known outcomes. Of these 905 pregnancies, 271 (30%) were in women who were vaccinated within the three months prior to conception. Miscarriage was reported for 10% of pregnancies (95/905), and major birth defects were reported for 2.6% of live born infants (21/819). These rates of assessed outcomes were consistent with estimated background rates. None of the women who received VARIVAX vaccine delivered infants with abnormalities consistent with congenital varicella syndrome.

### 8.2    Lactation
Risk Summary

It is not known whether varicella vaccine virus is excreted in human milk. The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for VARIVAX, and any potential adverse effects on the breastfed child from VARIVAX or from the underlying maternal condition. For preventive vaccines, the underlying maternal condition is susceptibility to disease prevented by the vaccine.

### 8.4    Pediatric Use

No clinical data are available on safety or efficacy of VARIVAX in children less than 12 months of age.

### 8.5    Geriatric Use

Clinical studies of VARIVAX did not include sufficient numbers of seronegative subjects aged 65 and over to determine whether they respond differently from younger subjects.

## 11    DESCRIPTION

VARIVAX [Varicella Virus Vaccine Live] is a preparation of the Oka/Merck strain of live, attenuated varicella virus. The virus was initially obtained from a child with wild-type varicella, then introduced into human embryonic lung cell cultures, adapted to and propagated in embryonic guinea pig cell cultures and finally propagated in human diploid cell cultures (WI-38). Further passage of the virus for varicella vaccine was performed at Merck Research Laboratories (MRL) in human diploid cell cultures (MRC-5) that were free of adventitious agents. This live, attenuated varicella vaccine is a lyophilized preparation containing sucrose, phosphate, glutamate, processed gelatin, and urea as stabilizers.

Refrigerator-stable VARIVAX, when reconstituted as directed, is a sterile preparation for subcutaneous injection. Each approximately 0.5-mL dose contains a minimum of 1350 plaque-forming units (PFU) of Oka/Merck varicella virus when reconstituted and stored at room temperature for a maximum of 30 minutes. Each 0.5-mL dose also contains approximately 18 mg of sucrose, 8.9 mg hydrolyzed gelatin, 3.6 mg of urea, 2.3 mg of sodium chloride, 0.36 mg of monosodium L-glutamate, 0.33 mg of sodium

6

JA114

phosphate dibasic, 57 mcg of potassium phosphate monobasic, and 57 mcg of potassium chloride. The product also contains residual components of MRC-5 cells including DNA and protein and trace quantities of neomycin and bovine calf serum from MRC-5 culture media. The product contains no preservative.

## 12   CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

VARIVAX induces both cell-mediated and humoral immune responses to varicella-zoster virus. The relative contributions of humoral immunity and cell-mediated immunity to protection from varicella are unknown.

### 12.2  Pharmacodynamics

*Transmission*

In the placebo-controlled efficacy trial, transmission of vaccine virus was assessed in household settings (during the 8-week postvaccination period) in 416 susceptible placebo recipients who were household contacts of 445 vaccine recipients. Of the 416 placebo recipients, three developed varicella and seroconverted, nine reported a varicella-like rash and did not seroconvert, and six had no rash but seroconverted. If vaccine virus transmission occurred, it did so at a very low rate and possibly without recognizable clinical disease in contacts. These cases may represent either wild-type varicella from community contacts or a low incidence of transmission of vaccine virus from vaccinated contacts *[see Warnings and Precautions (5.4)]* {2,12}. Post-marketing experience suggests that transmission of vaccine virus may occur rarely between healthy vaccinees who develop a varicella-like rash and healthy susceptible contacts. Transmission of vaccine virus from a mother who did not develop a varicella-like rash to her newborn infant has also been reported.

*Herpes Zoster*

Overall, 9454 healthy children (12 months to 12 years of age) and 1648 adolescents and adults (13 years of age and older) have been vaccinated with VARIVAX in clinical trials. Eight cases of herpes zoster have been reported in children during 42,556 person-years of follow-up in clinical trials, resulting in a calculated incidence of at least 18.8 cases per 100,000 person-years. The completeness of this reporting has not been determined. One case of herpes zoster has been reported in the adolescent and adult age group during 5410 person-years of follow-up in clinical trials, resulting in a calculated incidence of 18.5 cases per 100,000 person-years. All 9 cases were mild and without sequelae. Two cultures (one child and one adult) obtained from vesicles were positive for wild-type VZV as confirmed by restriction endonuclease analysis {13}. The long-term effect of VARIVAX on the incidence of herpes zoster, particularly in those vaccinees exposed to wild-type varicella, is unknown at present.

In children, the reported rate of herpes zoster in vaccine recipients appears not to exceed that previously determined in a population-based study of healthy children who had experienced wild-type varicella {14}. The incidence of herpes zoster in adults who have had wild-type varicella infection is higher than that in children.

### 12.4  Duration of Protection

The duration of protection of VARIVAX is unknown; however, long-term efficacy studies have demonstrated continued protection up to 10 years after vaccination {15} *[see Clinical Studies (14.1)]*. A boost in antibody levels has been observed in vaccinees following exposure to wild-type varicella which could account for the apparent long-term protection after vaccination in these studies.

## 14   CLINICAL STUDIES

### 14.1  Clinical Efficacy

The protective efficacy of VARIVAX was established by: (1) a placebo-controlled, double-blind clinical trial, (2) comparing varicella rates in vaccinees versus historical controls, and (3) assessing protection from disease following household exposure.

*Clinical Data in Children*

*One-Dose Regimen in Children*

Although no placebo-controlled trial was carried out with refrigerator-stable VARIVAX, a placebo-controlled trial was conducted using a prior formulation containing 17,000 PFU per dose {2,16}. In this trial, a single dose of VARIVAX protected 96 to 100% of children against varicella over a two-year period. The study enrolled healthy individuals 1 to 14 years of age (n=491 vaccine, n=465 placebo). In the first year, 8.5% of placebo recipients contracted varicella, while no vaccine recipient did, for a calculated

7

JA115

protection rate of 100% during the first varicella season. In the second year, when only a subset of individuals agreed to remain in the blinded study (n=163 vaccine, n=161 placebo), 96% protective efficacy was calculated for the vaccine group as compared to placebo.

In early clinical trials, a total of 4240 children 1 to 12 years of age received 1000 to 1625 PFU of attenuated virus per dose of VARIVAX and have been followed for up to nine years post single-dose vaccination. In this group there was considerable variation in varicella rates among studies and study sites, and much of the reported data were acquired by passive follow-up. It was observed that 0.3 to 3.8% of vaccinees per year reported varicella (called breakthrough cases). This represents an approximate 83% (95% confidence interval [CI], 82%, 84%) decrease from the age-adjusted expected incidence rates in susceptible subjects over this same period {14}. In those who developed breakthrough varicella postvaccination, the majority experienced mild disease (median of the maximum number of lesions <50). In one study, a total of 47% (27/58) of breakthrough cases had <50 lesions compared with 8% (7/92) in unvaccinated individuals, and 7% (4/58) of breakthrough cases had >300 lesions compared with 50% (46/92) in unvaccinated individuals {17}.

Among a subset of vaccinees who were actively followed in these early trials for up to nine years postvaccination, 179 individuals had household exposure to varicella. There were no reports of breakthrough varicella in 84% (150/179) of exposed children, while 16% (29/179) reported a mild form of varicella (38% [11/29] of the cases with a maximum total number of <50 lesions; no individuals with >300 lesions). This represents an 81% reduction in the expected number of varicella cases utilizing the historical attack rate of 87% following household exposure to varicella in unvaccinated individuals in the calculation of efficacy.

In later clinical trials, a total of 1114 children 1 to 12 years of age received 2900 to 9000 PFU of attenuated virus per dose of VARIVAX and have been actively followed for up to 10 years post single-dose vaccination. It was observed that 0.2% to 2.3% of vaccinees per year reported breakthrough varicella for up to 10 years post single-dose vaccination. This represents an estimated efficacy of 94% (95% CI, 93%, 96%), compared with the age-adjusted expected incidence rates in susceptible subjects over the same period {2,14,18}. In those who developed breakthrough varicella postvaccination, the majority experienced mild disease, with the median of the maximum total number of lesions <50. The severity of reported breakthrough varicella, as measured by number of lesions and maximum temperature, appeared not to increase with time since vaccination.

Among a subset of vaccinees who were actively followed in these later trials for up to 10 years postvaccination, 95 individuals were exposed to an unvaccinated individual with wild-type varicella in a household setting. There were no reports of breakthrough varicella in 92% (87/95) of exposed children, while 8% (8/95) reported a mild form of varicella (maximum total number of lesions <50; observed range, 10 to 34). This represents an estimated efficacy of 90% (95% CI, 82%, 96%) based on the historical attack rate of 87% following household exposure to varicella in unvaccinated individuals in the calculation of efficacy.

*Two-Dose Regimen in Children*

In a clinical trial, a total of 2216 children 12 months to 12 years of age with a negative history of varicella were randomized to receive either 1 dose of VARIVAX (n=1114) or 2 doses of VARIVAX (n=1102) given 3 months apart. Subjects were actively followed for varicella, any varicella-like illness, or herpes zoster and any exposures to varicella or herpes zoster on an annual basis for 10 years after vaccination. Persistence of VZV antibody was measured annually for 9 years. Most cases of varicella reported in recipients of 1 dose or 2 doses of vaccine were mild {15}. The estimated vaccine efficacy for the 10-year observation period was 94% for 1 dose and 98% for 2 doses (p<0.001). This translates to a 3.4-fold lower risk of developing varicella >42 days postvaccination during the 10-year observation period in children who received 2 doses than in those who received 1 dose (2.2% vs. 7.5%, respectively).

<u>*Clinical Data in Adolescents and Adults*</u>

*Two-Dose Regimen in Adolescents and Adults*

In early clinical trials, a total of 796 adolescents and adults received 905 to 1230 PFU of attenuated virus per dose of VARIVAX and have been followed for up to six years following 2-dose vaccination. A total of 50 clinical varicella cases were reported >42 days following 2-dose vaccination. Based on passive follow-up, the annual varicella breakthrough event rate ranged from <0.1 to 1.9%. The median of the maximum total number of lesions ranged from 15 to 42 per year.

Although no placebo-controlled trial was carried out in adolescents and adults, the protective efficacy of VARIVAX was determined by evaluation of protection when vaccinees received 2 doses of VARIVAX 4

or 8 weeks apart and were subsequently exposed to varicella in a household setting. Among the subset of vaccinees who were actively followed in these early trials for up to six years, 76 individuals had household exposure to varicella. There were no reports of breakthrough varicella in 83% (63/76) of exposed vaccinees, while 17% (13/76) reported a mild form of varicella. Among 13 vaccinated individuals who developed breakthrough varicella after a household exposure, 62% (8/13) of the cases reported maximum total number of lesions <50, while no individual reported >75 lesions. The attack rate of unvaccinated adults exposed to a single contact in a household has not been previously studied. Utilizing the previously reported historical attack rate of 87% for wild-type varicella following household exposure to varicella among unvaccinated children in the calculation of efficacy, this represents an approximate 80% reduction in the expected number of cases in the household setting.

In later clinical trials, a total of 220 adolescents and adults received 3315 to 9000 PFU of attenuated virus per dose of VARIVAX and have been actively followed for up to six years following 2-dose vaccination. A total of 3 clinical varicella cases were reported >42 days following 2-dose vaccination. Two cases reported <50 lesions and none reported >75. The annual varicella breakthrough event rate ranged from 0 to 1.2%. Among the subset of vaccinees who were actively followed in these later trials for up to five years, 16 individuals were exposed to an unvaccinated individual with wild-type varicella in a household setting. There were no reports of breakthrough varicella among the exposed vaccinees.

There are insufficient data to assess the rate of protective efficacy of VARIVAX against the serious complications of varicella in adults (*e.g.*, encephalitis, hepatitis, pneumonitis) and during pregnancy (congenital varicella syndrome).

## 14.2 Immunogenicity

In clinical trials, varicella antibodies have been evaluated following vaccination with formulations of VARIVAX containing attenuated virus ranging from 1000 to 50,000 PFU per dose in healthy individuals ranging from 12 months to 55 years of age {2,9}.

*One-Dose Regimen in Children*

In prelicensure efficacy studies, seroconversion was observed in 97% of vaccinees at approximately 4 to 6 weeks postvaccination in 6889 susceptible children 12 months to 12 years of age. Titers ≥5 gpELISA units/mL were induced in approximately 76% of children vaccinated with a single dose of vaccine at 1000 to 17,000 PFU per dose. Rates of breakthrough disease were significantly lower among children with VZV antibody titers ≥5 gpELISA units/mL compared with children with titers <5 gpELISA units/mL.

Immunogenicity of refrigerator-stable VARIVAX (6550 PFU per dose, n=320 and 28,400 PFU per dose, n=315) was compared with that of the licensed frozen formulation of VARIVAX (9189 PFU per dose, n=323) in a double-blind, randomized, multicenter study in U.S. children 12 to 23 months of age, all of whom received M-M-R II concomitantly. The per-protocol analysis included all subjects with prevaccination varicella antibody titers <1.25 gpELISA units (n=267 to 276 per group); the antibody responses were comparable across the 3 treatment groups, with 6-week postvaccination varicella antibody titers ≥5 gpELISA units in 93.3%, 93.8%, and 95.1% of subjects, respectively.

*Two-Dose Regimen in Children*

In a multicenter study, 2216 healthy children 12 months to 12 years of age received either 1 dose of VARIVAX or 2 doses administered 3 months apart. The immunogenicity results are shown in Table 3.

**Table 3: Summary of VZV Antibody Responses at 6 Weeks Postdose 1 and 6 Weeks Postdose 2 in Initially Seronegative Children 12 Months to 12 Years of Age (Vaccinations 3 Months Apart)**

| | VARIVAX 1-Dose Regimen (N=1114) | VARIVAX 2-Dose Regimen (3 months apart) (N=1102) | |
|---|---|---|---|
| | 6 Weeks Postvaccination (n=892) | 6 Weeks Postdose 1 (n=851) | 6 Weeks Postdose 2 (n=769) |
| Seroconversion Rate | 98.9% | 99.5% | 99.9% |
| Percent with VZV Antibody Titer ≥5 gpELISA units/mL | 84.9% | 87.3% | 99.5% |
| Geometric mean titers in gpELISA units/mL (95% CI) | 12.0 (11.2, 12.8) | 12.8 (11.9, 13.7) | 141.5 (132.3, 151.3) |

N = Number of subjects vaccinated.
n = Number of subjects included in immunogenicity analysis.

The results from this study and other studies in which a second dose of VARIVAX was administered 3 to 6 years after the initial dose demonstrate significant boosting of the VZV antibodies with a second

dose. VZV antibody levels after 2 doses given 3 to 6 years apart are comparable to those obtained when the 2 doses are given 3 months apart.

*Two-Dose Regimen in Adolescents and Adults*

In a multicenter study involving susceptible adolescents and adults 13 years of age and older, 2 doses of VARIVAX administered 4 to 8 weeks apart induced a seroconversion rate of approximately 75% in 539 individuals 4 weeks after the first dose and of 99% in 479 individuals 4 weeks after the second dose. The average antibody response in vaccinees who received the second dose 8 weeks after the first dose was higher than that in vaccinees who received the second dose 4 weeks after the first dose. In another multicenter study involving adolescents and adults, 2 doses of VARIVAX administered 8 weeks apart induced a seroconversion rate of 94% in 142 individuals 6 weeks after the first dose and 99% in 122 individuals 6 weeks after the second dose.

**14.3  Persistence of Immune Response**

*One-Dose Regimen in Children*

In clinical studies involving healthy children who received 1 dose of vaccine, detectable VZV antibodies were present in 99.0% (3886/3926) at 1 year, 99.3% (1555/1566) at 2 years, 98.6% (1106/1122) at 3 years, 99.4% (1168/1175) at 4 years, 99.2% (737/743) at 5 years, 100% (142/142) at 6 years, 97.4% (38/39) at 7 years, 100% (34/34) at 8 years, and 100% (16/16) at 10 years postvaccination.

*Two-Dose Regimen in Children*

In recipients of 1 dose of VARIVAX over 9 years of follow-up, the geometric mean titers (GMTs) and the percent of subjects with VZV antibody titers $\geq$5 gpELISA units/mL generally increased. The GMTs and percent of subjects with VZV antibody titers $\geq$5 gpELISA units/mL in the 2-dose recipients were higher than those in the 1-dose recipients for the first year of follow-up and generally comparable thereafter. The cumulative rate of VZV antibody persistence with both regimens remained very high at year 9 (99.0% for the 1-dose group and 98.8% for the 2-dose group).

*Two-Dose Regimen in Adolescents and Adults*

In clinical studies involving healthy adolescents and adults who received 2 doses of vaccine, detectable VZV antibodies were present in 97.9% (568/580) at 1 year, 97.1% (34/35) at 2 years, 100% (144/144) at 3 years, 97.0% (98/101) at 4 years, 97.4% (76/78) at 5 years, and 100% (34/34) at 6 years postvaccination.

A boost in antibody levels has been observed in vaccinees following exposure to wild-type varicella, which could account for the apparent long-term persistence of antibody levels in these studies.

**14.4  Studies with Other Vaccines**

*Concomitant Administration with M-M-R II*

In combined clinical studies involving 1080 children 12 to 36 months of age, 653 received VARIVAX and M-M-R II concomitantly at separate injection sites and 427 received the vaccines six weeks apart. Seroconversion rates and antibody levels to measles, mumps, rubella, and varicella were comparable between the two groups at approximately six weeks postvaccination.

*Concomitant Administration with Diphtheria and Tetanus Toxoids and Acellular Pertussis Vaccine Adsorbed (DTaP) and Oral Poliovirus Vaccine (OPV)*

In a clinical study involving 318 children 12 months to 42 months of age, 160 received an investigational varicella-containing vaccine (a formulation combining measles, mumps, rubella, and varicella in one syringe) concomitantly with booster doses of DTaP and OPV (no longer licensed in the United States). The comparator group of 144 children received M-M-R II concomitantly with booster doses of DTaP and OPV followed by VARIVAX six weeks later. At six weeks postvaccination, seroconversion rates for measles, mumps, rubella, and VZV and the percentage of vaccinees whose titers were boosted for diphtheria, tetanus, pertussis, and polio were comparable between the two groups. Anti-VZV levels were decreased when the investigational vaccine containing varicella was administered concomitantly with DTaP {19}. No clinically significant differences were noted in adverse reactions between the two groups.

*Concomitant Administration with PedvaxHIB®*

In a clinical study involving 307 children 12 to 18 months of age, 150 received an investigational varicella-containing vaccine (a formulation combining measles, mumps, rubella, and varicella in one syringe) concomitantly with a booster dose of PedvaxHIB [Haemophilus b Conjugate Vaccine (Meningococcal Protein Conjugate)], while 130 received M-M-R II concomitantly with a booster dose of PedvaxHIB followed by VARIVAX 6 weeks later. At six weeks postvaccination, seroconversion rates for measles, mumps, rubella, and VZV, and GMTs for PedvaxHIB were comparable between the two groups.

Anti-VZV levels were decreased when the investigational vaccine containing varicella was administered concomitantly with PedvaxHIB {20}. No clinically significant differences in adverse reactions were seen between the two groups.

*Concomitant Administration with M-M-R II and COMVAX*

In a clinical study involving 822 children 12 to 15 months of age, 410 received COMVAX, M-M-R II, and VARIVAX concomitantly at separate injection sites, and 412 received COMVAX followed by M-M-R II and VARIVAX given concomitantly at separate injection sites, 6 weeks later. At 6 weeks postvaccination, the immune responses for the subjects who received the concomitant doses of COMVAX, M-M-R II, and VARIVAX were similar to those of the subjects who received COMVAX followed 6 weeks later by M-M-R II and VARIVAX with respect to all antigens administered. There were no clinically important differences in reaction rates when the three vaccines were administered concomitantly versus six weeks apart.

## 15   REFERENCES

1. CDC: General Recommendations on Immunization: Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR. 55(No. RR-15): 1-47, 2006.

2. Weibel, R.E.; et al.: Live Attenuated Varicella Virus Vaccine. Efficacy Trial in Healthy Children. N Engl J Med. 310(22): 1409-1415, 1984.

3. Arbeter, A.M.; et al.: Varicella Vaccine Trials in Healthy Children. A Summary of Comparative and Follow-up Studies. Am J Dis Child. 138: 434-438, 1984.

4. Weibel, R.E.; et al.: Live Oka/Merck Varicella Vaccine in Healthy Children. Further Clinical and Laboratory Assessment. JAMA. 254(17): 2435-2439, 1985.

5. Chartrand, D.M.; et al.: New Varicella Vaccine Production Lots in Healthy Children and Adolescents. Abstracts of the 1988 Inter-Science Conference Antimicrobial Agents and Chemotherapy: 237(Abstract #731).

6. Johnson, C.E.; et al.: Live Attenuated Varicella Vaccine in Healthy 12- to 24-Month-Old Children. Pediatrics. 81(4): 512-518, 1988.

7. Gershon, A.A.; et al.: Immunization of Healthy Adults with Live Attenuated Varicella Vaccine. J Infect Dis. 158(1): 132-137, 1988.

8. Gershon, A.A.; et al.: Live Attenuated Varicella Vaccine: Protection in Healthy Adults Compared with Leukemic Children. J Infect Dis. 161: 661-666, 1990.

9. White, C.J.; et al.: Varicella Vaccine (VARIVAX) in Healthy Children and Adolescents: Results From Clinical Trials, 1987 to 1989. Pediatrics. 87(5): 604-610, 1991.

10. Rynn L, Cragan J, Correa A. Update on Overall Prevalence of Major Birth Defects Atlanta, 1978-2005. CDC MMWR. 57(01): 1-5, January 11, 2008.

11. American College of Obstetricians and Gynecologists Frequently Asked Questions:  Miscarriage and Molar Pregnancy, 2011.

12. Galea, S.; et al.: The Safety Profile of Varicella Vaccine: A 10-Year Review. J Infect Dis. 197(S2): 165-169, 2008.

13. Hammerschlag, M.R.; et al.: Herpes Zoster in an Adult Recipient of Live Attenuated Varicella Vaccine. J Infect Dis. 160(3): 535-537, 1989.

14. Guess, H.A.; et al.: Population-Based Studies of Varicella Complications. Pediatrics. 78(suppl): 723-727, 1986.

15. Kuter, B.J.; et al.: Ten Year Follow-up of Healthy Children who Received One or Two Injections of Varicella Vaccine. Pediatr Infect Dis J. 23: 132-37, 2004.

16. Kuter, B.J.; et al.: Oka/Merck Varicella Vaccine in Healthy Children: Final Report of a 2-Year Efficacy Study and 7-Year Follow-up Studies. Vaccine. 9: 643-647, 1991.

17. Bernstein, H.H.; et al.: Clinical Survey of Natural Varicella Compared with Breakthrough Varicella After Immunization with Live Attenuated Oka/Merck Varicella Vaccine. Pediatrics. 92(6): 833-837, 1993.

18. Wharton, M.: The Epidemiology of Varicella-zoster Virus Infections. Infect Dis Clin North Am. 10(3):571-581, 1996.

19. White, C.J. et al.: Measles, Mumps, Rubella, and Varicella Combination Vaccine: Safety and Immunogenicity Alone and in Combination with Other Vaccines Given to Children. Clin Infect Dis. 24(5): 925-931, 1997.

20. Reuman, P.D.; et al.: Safety and Immunogenicity of Concurrent Administration of Measles-Mumps-Rubella-Varicella Vaccine and PedvaxHIB® Vaccines in Healthy Children Twelve to Eighteen Months Old. Pediatr Infect Dis J. 16(7): 662-667, 1997.

## 16    HOW SUPPLIED/STORAGE AND HANDLING

No. 4979/4309 — Refrigerator-stable VARIVAX is supplied as follows:
(1) a single-dose vial of lyophilized vaccine (package A), NDC 0006-4979-00
(2) a box of 10 vials of diluent (package B).
No. 4055/4309 — Refrigerator-stable VARIVAX is supplied as follows:
(1) a box of 10 single-dose vials of lyophilized vaccine (package A), NDC 0006-4055-00
(2) a box of 10 vials of diluent (package B).

*Storage*
*Vaccine Vial*

During shipment, maintain the vaccine at a temperature of 2° to 8°C or colder (36° to 46°F or colder).

Before reconstitution, refrigerator-stable VARIVAX has a shelf-life of 24 months when refrigerated at 2° to 8°C or colder (36° to 46°F or colder). The vaccine may also be stored in a freezer; if subsequently transferred to a refrigerator, **THE VACCINE SHOULD NOT BE REFROZEN**.

Before reconstitution, protect from light.

**DISCARD IF RECONSTITUTED VACCINE IS NOT USED WITHIN 30 MINUTES.**
*Diluent Vial*

The vial of diluent should be stored separately at room temperature (20° to 25°C, 68° to 77°F), or in the refrigerator.

**For further product information, call 1-800-9-VARIVAX (1-800-982-7482).**

## 17    PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Patient Information).
Discuss the following with the patient:

- Question the patient, parent, or guardian about reactions to previous vaccines.
- Provide a copy of the patient information (PPI) located at the end of this insert and discuss any questions or concerns.
- Inform patient, parent, or guardian that vaccination with VARIVAX may not result in protection of all healthy, susceptible children, adolescents, and adults.
- Inform female patients to avoid pregnancy for three months following vaccination.
- Inform patient, parent, or guardian of the benefits and risks of VARIVAX.
- Instruct patient, parent, or guardian to report any adverse reactions or any symptoms of concern to their healthcare professional.

The U.S. Department of Health and Human Services has established a Vaccine Adverse Event Reporting System (VAERS) to accept all reports of suspected adverse events after the administration of any vaccine. For information or a copy of the vaccine reporting form, call the VAERS toll-free number at 1-800-822-7967, or report online at http://www.vaers.hhs.gov.

Dist. by: Merck Sharp & Dohme Corp., a subsidiary of
**MERCK & CO., INC.,** Whitehouse Station, NJ 08889, USA

For patent information: www.merck.com/product/patent/home.html

Copyright © 2013-2017 Merck Sharp & Dohme Corp., a subsidiary of **Merck & Co., Inc.**
All rights reserved.

uspi-v210-i-ref-1702r911

13

# EXHIBIT 5



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**                                   Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30333

November 30, 2020

Elizabeth Brehm
Siri & Glimstad
200 Park Ave, 17th Floor
New York, NY 10166
Via email: foia@sirillp.com

Dear Ms. Brehm:

This letter is in response to your Centers for Disease Control and Prevention and Agency for Toxic Substances and Disease Registry (CDC/ATSDR) Freedom of Information Act (FOIA) request of November 9, 2020, for 'documentation sufficient to reflect any case(s) of transmission of Hepatitis B in an elementary, middle, or high school setting.'

A search of our records failed to reveal any documents pertaining to your request.

You may contact our FOIA Public Liaison at 770-488-6277 for any further assistance and to discuss any aspect of your request.  Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Deputy Agency Chief FOIA Officer, Office of the Assistant Secretary for Public Affairs, U.S. Department of Health and Human Services, Hubert H. Humphrey Building, 200 Independence Avenue, Suite 729H, Washington, D.C.  20201. You may also transmit your appeal via email to FOIARequest@psc.hhs.gov. Please mark both your appeal letter and envelope "FOIA Appeal." Your appeal must be postmarked or electronically transmitted by February 28, 2021.

Sincerely,

Roger Andoh
CDC/ATSDR FOIA Officer
Office of the Chief Operating Officer
(770) 488-6399
Fax: (404) 235-1852

#21-00200-FOIA

# EXHIBIT 6

# Request for Review of
# Denied Medical Exemption Request

Date:_____

Parent Name:_____

Address: _____    E-mail Address: _____

City:_____State:_____Zip:_____    Phone:_____

Child's Name: _____    Date of Birth:_____/_____/_____

Child's Age: _____    County of School: _____

Date of Immunization Health Officer Exemption Request Denial:_____

Below: Please explain what you feel the State Health Officer should consider as the basis for reversing the decision of the Immunization Health Officer.  (Attach additional information as necessary)

Parent Signature: _____    Date:_____
                        (May be typed for E-mail)

**May be sent by**    **Mail:  West Virginia Department of Health and Human Resources**
                **Bureau for Public Health**
                **Attention: State Health Officer**
                **350 Capitol Street Room 702, Charleston, WV 25301**

or          **Fax:    (304)-558-1035**

or          **E-mail:** vaccineexemption@wv.gov

JA125

# EXHIBIT 7

**rom:** Stacy Marteney █████████████
**Sent:** Tuesday, April 2, 2024 8:59:27 AM
**To:** Krystle Perry <████████████████████
**Subject:** Re: vaccinations

Unfortunately, there is still not a religious exemption available.

Stacy Marteney, NBCT

Virtual Learning Coordinator

Upshur County Schools

████████ext ███

Book a meeting: <u>Book time with Stacy Marteney</u>

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.If you are not the named addressee, you should not disseminate, distribute or copy this email and you are hereby notified that disclosing, copying, distributing or taking any action in regard to the contents of this information is strictly prohibited.If you have received this email in error, please notifythe sender immediately and delete this email from your system.*

JA127

[Book time to meet with me](#)

---

**From:** Krystle Perry <███████████████████>
**Sent:** Monday, April 1, 2024 3:41 PM
**To:** Stacy Marteney <s██████████████>
**Subject:** Re: vaccinations

Can we do a religious exemption for Kendall Perry to attend virtual school?

Get [Outlook for iOS](#)

---

**From:** Stacy Marteney <s██████████████s>
**Sent:** Wednesday, January 3, 2024 2:06:12 PM
**To:** Krystle Perry <███████████████████>
**Subject:** Re: vaccinations

yes

Stacy Marteney, NBCT

Virtual Learning Coordinator

Upshur County Schools

304-472-5480 ext 1029

Book a meeting: [Book time with Stacy Marteney](#)

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.If you are not the named addressee, you should not disseminate, distribute or copy this email and you are hereby notified that disclosing, copying, distributing or taking any action in regard to the contents of this information is strictly prohibited.If you*

JA128

*have received this email in error, please notifythe sender immediately and delete this email from your system.*

 Book time to meet with me

---

**From:** Krystle Perry <███████████████████>
**Sent:** Wednesday, January 3, 2024 2:02 PM
**To:** Stacy Marteney <██████████████s>
**Subject:** Re: vaccinations

[EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the sender and know the content is safe.

Will you be in the office at 3?

Get Outlook for iOS

---

**From:** Stacy Marteney <smartene@k12.wv.us>
**Sent:** Wednesday, January 3, 2024 10:40:24 AM
**To:** Krystle Perry <AnthonysGirl8161@hotmail.com>
**Subject:** vaccinations

JA129

Following up on our phone call: Kendall needs her Dtap, polio, MMR, and Varicella.  Please let me know by Monday what you decide.

Stacy Marteney, NBCT

Virtual Learning Coordinator

Upshur County Schools

 ext ▮▮

▮▮ a meeting: Book time with Stacy Marteney

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.If you are not the named addressee, you should not disseminate, distribute or copy this email and you are hereby notified that disclosing, copying, distributing or taking any action in regard to the contents of this information is strictly prohibited.If you have received this email in error, please notifythe sender immediately and delete this email from your system.*

JA130

# EXHIBIT 8



# Fayette County Board of Education

111 Fayette Avenue
Fayetteville, West Virginia 25840
304-574-1176

April 11, 2024

Aaron Siri
745 5th Ave Suite 500
New York, NY 10151

Dear Aaron Siri,

My office received your request pursuant to the West Virginia Freedom of Information Act on Friday April 5, 2024. Per your request, the information is as follows:

1) Total Number of students currently enrolled is 5382
2) The total number of students currently enrolled in and using the West Virginia Virtual Academy cannot be answered by Fayette County Schools. West Virginia Virtual Academy is a charter school not part of Fayette County.
3) The number of currently enrolled students who have been enrolled for more than 30 days and who do not have all required vaccinations -440
4) The number of currently enrolled students who have been granted a medical exemption to any required vaccination- 1
5) The number of currently enrolled students who have been granted a religious exemption to any required vaccination-none
6) The number of students who have been excluded from school based on their vaccination status due to an outbreak of any infectious disease from 2018-2019 to the present- none

Should you need additional information, please contact my office.

Sincerely,

Mr. Gary Hough
Superintendent

JA132

# EXHIBIT 9

**From:** Jennifer Caradine ███████████████
**Sent:** Friday, April 26, 2024 12:57 PM
**To:** S&G Information Request Staff ███████████
**Subject:** Unvaccinated Students (IR#10010ZF)

> You don't often get email from jscaradine@k12.wv.us. Learn why this is important

Mr. Siri,

This message is in response to your April 5, 2024 request.

(1) the total number of currently enrolled students - **Please see the attachment entitled Question 1**;

(2) the total number of students currently enrolled in and using the West Virginia Virtual Academy powered by K12 - **Please see the attachment entitled Question 2**;

(3) the number of currently enrolled students who have been enrolled for more than 30 days, and who do not have all required vaccinations - **Please see the attachment entitled Questions 3 and 4**;

(4) the number of currently enrolled students who have been granted a medical exemption to any required vaccination - **Please see the attachment entitled Questions 3 and 4**;

(5) the number of currently enrolled students who have been granted a religious exemption to any required vaccination - **zero**;

(6) the number of students who have been excluded from school based on their vaccination status due to an outbreak of any infectious disease. Please provide this data for the 2018-2019 school year through the present date. - **zero.**

As you may know, I am required to inform you that if you believe that the Monongalia County Board of Education has wrongfully responded to your request, you may have a right to seek injunctive or declaratory relief in the Circuit Court of Monongalia County pursuant to the provisions set forth in W. Va. Code § 29B-1-3.

Thank you,

JA134

Jennifer S. Caradine

Legal Counsel, Monongalia County Schools

1751 Earl L Core Rd, Morgantown, WV  26505



|  | Totals |
|---|---|
| Brookhaven Elementary School | 544 |
| Ridgedale Elementary School | 553 |
| Daybrook Early Headstart Center | 112 |
| North Elementary School | 587 |
| Suncrest Elementary School | 566 |
| Cheat Lake Elementary School | 779 |
| Mountainview Elementary School | 664 |
| Mason Dixon Elementary | 298 |
| Skyview Elementary School | 423 |
| Mylan Park Elementary School | 452 |
| Eastwood Elementary School | 663 |
| Mountaineer Middle School | 608 |
| Westwood Middle School | 323 |
| South Middle School | 775 |
| Suncrest Middle School | 498 |
| Clay-Battelle High School | 342 |
| Morgantown High School | 1811 |
| University High School | 1356 |

JA136

## Enrollment Trend

| Filter Criteria: | | | |
|---|---|---|---|
| School Year | 2023-2024 | District/County | [All Districts] |
| School | (105) - West Virginia Virtual Academy | | |



Total of 2 row(s) with 10000 Row Limit

| School Year | Total |
|---|---|
| 2022-2023 | 406 |
| 2023-2024 | 936 |

JA137

| | Total # of current students who have **been enrolled for 30 days**, who **do not have all required immunizations** | Total # of current students who have a **medical exemption for any required immunization.** |
|---|---|---|
| **Total** | **147** | **7** |

JA138

# EXHIBIT 10

**From:** Sarah Wills ▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, April 16, 2024 11:45 AM
**To:** S&G Information Request Staff ▮▮▮▮▮▮▮▮▮▮
**Cc:** Christine Miller ▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Fw: FOIA Request - IR#10010ZZ

Dear Sir or Madam,

Please find our answers below for the attached FOIA request.  If you need anything else, please let us know.

For each and every Upshur County Schools public school, please provide records sufficient to show:

(1) the total number of currently enrolled students:    3.669

(2) the total number of students currently enrolled in and using the West Virginia Virtual Academy powered by K12:         1

(3) the number of currently enrolled students who have been enrolled for more than 30 days, and who do not have all required vaccinations:         46

(4) the number of currently enrolled students who have been granted a medical exemption to any required vaccination:        2

(5) the number of currently enrolled students who have been granted a religious exemption to any required vaccination:    0

(6) the number of students who have been excluded from school based on their vaccination status due to an outbreak of any infectious disease. Please provide this data for the 2018-2019 school year through the present date:         0

Thank you,

Sarah Wills

JA140

Treasurer/CSBO

Upshur County Board of Education

102 Smithfield Street

Buckhannon, WV 26201

# EXHIBIT 11



# HARRISON COUNTY SCHOOLS

445 WEST MAIN STREET
POST OFFICE BOX 1370
CLARKSBURG, WEST VIRGINIA 26302-1370
(304) 326-7300
FAX (304) 326-7384

**BOARD OF EDUCATION**
GARY M. HAMRICK, *President*
FRANK DEVONO, JR., *Vice President*
DOUGLAS K. HOGUE, *Member*
MARY FRANCES SMITH, *Member*
WILLIAM T. TUCKER, *Member*

DORA L. STUTLER
*Superintendent*

### WEST VIRGINIA FREEDOM OF INFORMATION ACT REQUEST

**VIA EMAIL**

April 10, 2024

Aaron Siri, Esquire
foia@sirillp.com

Re: *Unvaccinated Students (IR#10010R)*

Dear Aaron Siri:

Please allow this letter to serve as a response to your request for information under the West Virginia Freedom of Information Act ("WV FOIA") which was received by the Harrison County Board of Education (the "Board") on April 7, 2024.

**For each and every Harrison County Schools public school, please provide records sufficient to show:**

(1) the total number of currently enrolled students; 9,559

(2) the total number of students currently enrolled in and using the West Virginia Virtual Academy powered by K12; please contact the West Virginia Virtual Academy, do not have this information.

(3) the number of currently enrolled students who have been enrolled for more than 30 days, and who do not have all required vaccinations;
22 students total= 9 on medical exemptions and 13 on provisional enrollment with catch up vaccine schedule

(4) the number of currently enrolled students who have been granted a medical exemption to any required vaccination;
9 students with medical exemption from state health officer

(5) the number of currently enrolled students who have been granted a religious exemption to any required vaccination;
0 students with religious exemption- WV law does not allow religious exemptions.

*Harrison County Schools...where all are leaders and all are learners!*

JA144

6) the number of students who have been excluded from school based on their vaccination status due to an outbreak of any infectious disease. Please provide this data for the 2018-2019 school year through the present date.
0 students

Sincerely,

Dora L. Stutler
Superintendent
Harrison County Schools

# EXHIBIT 12

**STATE OF WEST VIRGINIA**
## DEPARTMENT OF HEALTH AND HUMAN RESOURCES
**Bureau for Public Health**

Bill J. Crouch
Cabinet Secretary

**Office of Epidemiology and Prevention Services**

Ayne Amjad, MD, MPH
Commissioner & State Health Officer

## REQUEST FOR MEDICAL EXEMPTION FROM COMPULSORY IMMUNIZATION FORM
(Incomplete or non-legible forms will be returned)

| | |
|---|---|
| Name of Student: | Birth Date: |
| Parent/Guardian: | Phone Number: |
| Address of Student: | |
| Name of School and County: | |
| School Nurse and Contact Information: | |
| Healthcare Provider Requesting Exemption: | |
| Address and Phone Number of Healthcare Provider: | |

Select the immunizations for which the exemption is requested:

New school entry:

- ☐ Diphtheria
- ☐ Tetanus
- ☐ Pertussis
- ☐ Polio

- ☐ Measles
- ☐ Mumps
- ☐ Rubella
- ☐ MMR

- ☐ Varicella
- ☐ Hepatitis B

7th Grade:
- ☐ Tdap Booster
- ☐ Meningococcal

12th Grade:
- ☐ Tdap Booster
- ☐ Meningococcal

Is the requested exemption:
- ☐ Permanent
- ☐ Temporary
  - o Expected duration: _____

*** Continued on Page 2 ***

350 Capitol Street, Room 125 • Charleston, West Virginia 25301 • dhhr.wv.gov

JA146

Request For Medical Exemption From Compulsory Immunization Form
Page 2

Why does this child need an immunization exemption? If the request is based on a previous reaction, please attach medical records. If the child is on immunosuppressive medication, please include relevant diagnosis and duration of therapy.

_____

_____

_____

_____

_____

Is there further information you feel is relevant to this request?

_____

_____

_____

_____

_____

Are the vaccinations documented in this child's record in the West Virginia Statewide Immunization Information System (WVSIIS) complete?
☐ Yes
☐ No*
☐ Unsure*
*If No or Unsure, please include a copy of the child's immunization record with this request.

Requesting Healthcare Provider (Print Name) _____

Signature     _____

Date          _____

Rev. 10.18.2022

JA147

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.*<br><br><br><br>*Plaintiffs,*<br><br>Against<br><br>STACEY MARTENEY *in her official capacity as the Virtual School Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; AND DOUG CIPOLETTI *in his official capacity as Executive Director of the West Virginia Virtual School Academy*<br><br>*Defendants* | Civil Action No.: 2:24-cv-00018-TSK |

PLAINTIFFS' MOTION FOR PRELIMNARY INJUNCTION AND EXPEDITED CONSIDERATION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Krystle and Anthony Perry

("**Plaintiffs**"), by and through their attorneys, respectfully move this Court for a preliminary

injunction enjoining Defendants from enforcing the mandatory vaccination requirements of W.

VA. CODE § 16-3-4 ("**the Compulsory Vaccination Law**") without providing for a religious

1

JA148

exemption option for their eight-year-old child, K.P., to attend school remotely in the West Virginia Virtual Academy.

For 17 months, from August of 2022 through January of 2024, K.P. was educated in West Virginia's Virtual Academy, a "tuition-free online public school" available to all West Virginia residents.[1] Plaintiffs have already previously enrolled K.P. in the Virtual Academy, and were able to do very quickly, in less than a week. *See* ECF 1, ¶ 69. The 2024/2025 school year at the Virtual Academy begins on August 19, 2024. *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com/academic-calendar/. Accordingly, should the Court enjoin the Compulsory Vaccination Law's enforcement against K.P. on or before August 16, 2024, it is very realistic that K.P. will be able to seamlessly re-enroll and continue her online education soon thereafter.

The issuance of a preliminary injunction is warranted because, as set forth in Plaintiffs' accompanying Memorandum of Law: (1) Plaintiffs are likely to succeed on the merits of their claim that the Compulsory Vaccination Law, as applied specifically to K.P.'s situation, violates the First Amendment; (2) Plaintiffs will suffer irreparable harm if the Compulsory Vaccination is continued to be enforced; (3) an injunction would cause no harm to others; and (4) the public interest will be served by injunctive relief.

For the reasons set forth in the accompanying Memorandum of Law, Plaintiffs respectfully request that this Court GRANT their motion for a preliminary injunction. Plaintiffs request a hearing and believe it would be helpful to the Court when considering the issues raised by the motion. Under Local Rule 7.02, briefing should be concluded within twenty-one days after service

---

[1] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com. Courts may take judicial notice of information contained in official government websites under Rule 201 of the Federal Rules of Evidence. *See, e.g., Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

of the summons, complaint, and this Motion for Preliminary Injunction, unless otherwise ordered by the Court.

Plaintiffs respectfully request that, should this Court grant preliminary injunctive relief, the Court exercise its discretion to waive the Federal Rule of Civil Procedure 65(c) security requirement.

Finally, Plaintiffs petition the Court set a hearing date, if the Court deems necessary, as soon as possible after the conclusion of briefing. Plaintiffs seek an expedited ruling because they desire to re-enroll their child in the Virtual Academy as soon as practicable, before further constitutional and practical harms accrue.  Plaintiffs attempted to enroll their child with a religious exemption in the Virtual Academy, were rejected, and have been forced to homeschool their child. This has presented many obstacles in Plaintiffs' specific situation (Plaintiff Krystle Perry, who is the sole provider for the family, works full-time, and Plaintiff Anthony Perry is 100% disabled). Consequently, homeschooling is less than optimal.

Plaintiffs therefore respectfully request that this Court resolve this Motion for Preliminary Injunction and Expedited Consideration by August 16, 2024, or as soon thereafter as practicable, so all parties can adjust their plans to the Court's order.

Dated: July 11, 2024                    Respectfully submitted by,


/s/ *John H. Bryan*

John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

JA150

SIRI & GLIMSTAD LLP
Aaron Siri, Esq.*
Elizabeth A. Brehm, Esq.*
Walker D. Moller*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

Christopher Wiest*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*


\**pro hac vice* requests pending

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record. I also certify that a correct copy of the foregoing, along with a copy of the summons and Complaint, will be served as soon as possible on each of the named Defendants at the following:

Stacy Marteney,
Coordinator of the Upshur County Virtual School
Upshur County Schools
102 Smithfield St.
Buckhannon, WV 26201

Christine Miller,
Superintendent, Upshur County School District
Upshur County Schools
102 Smithfield St.
Buckhannon, WV 26201

The Board of Education of the County of Upshur
Upshur County Schools
102 Smithfield St.
Buckhannon, WV 26201

Doug Cipoletti, Executive Director
West Virginia Virtual Academy
3508 Staunton Avenue, 3rd Floor
Charleston, WV 25304

Dr. Matthew Christiansen, Commissioner
West Virginia Department of Health and Human Services
Office of the Secretary
One Capital Square, Suite 100 East
Charleston, WV 25301

The summons' returns will reflect the date(s) of such service of this pleading. I certify under penalty of perjury that the foregoing is true and correct.

Dated this 11th day of July, 2024     */s/ John H. Bryan*

John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

5
JA152

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.*<br><br><br>*Plaintiffs,*<br><br>Against<br><br>STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; AND DOUG CIPOLETTI *in his official capacity as Executive Director of the West Virginia Virtual School Academy*<br><br>*Defendants* | Civil Action No.: 2:24-cv-00018-TSK |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR PRELIMINARY INJUNCTION**

JA153

## INTRODUCTION

Can the State of West Virginia exclude Plaintiffs Krystle and Anthony Perry's unvaccinated child from attending virtual school because they possess sincere religious reasons for declining compelled vaccination, while allowing unvaccinated children possessing medical exemptions to attend school in-person? Supreme Court precedent in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) and *Tandon v. Newsom*, 593 U.S. 61 (2021) makes clear that the answer to this question is a resounding "no."

Plaintiffs have profound religious objections to injecting their eight-year-old child, K.P., with the vaccinations required under W.Va. Code § 16-3-4 (c) and (e) ("the **Compulsory Vaccination Law**" or the "**CVL**"). Plaintiffs recently requested that K.P. be able to continue her education, as she had done without issue for the previous 17 months, in the West Virginia Virtual Academy (the "**Virtual Academy**") with a religious exemption. Their request was rejected.

However, West Virginia has enacted a secular medical exemption option, and it grants many medical exemptions to the CVL throughout the state. *See* W. VA. CODE § 16-3-4. And the government allows non-vaccination for secular reasons in a multitude of scenarios that pose dramatically greater threats to the CVL's purported disease prevention goals than allowing K.P. to learn remotely with a religious exemption. Because these policies clearly violate the First Amendment under *Fulton* and *Tandon,* Plaintiffs respectfully request that the CVL be enjoined as to them and their child's enrollment in the Virtual Academy on or before August 16, 2024.

## STATEMENT OF FACTS

### A. Background and Recent Developments Related to the CVL

In West Virginia, it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox [*i.e.*, varicella], hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and

1

whooping cough" and "[n]o person shall be allowed to enter school without" these vaccines. W. VA. CODE § 16-3-4 (c) and (e). However, the State provides a discretionary medical exemption to the same requirement. *Id.* at § 16-3-4 (h). While the State permits discretionary medical exemptions to the CVL, religious exemptions are not permitted. *See* ECF 1 Verified Complaint, ¶ 79 (detailing Defendants' rejection of Plaintiffs' religious exemption request for virtual school).[1]

### B. Plaintiffs' Sincerely Held Beliefs Preclude Vaccination

Plaintiffs maintain profound religious objections to injecting their eight-year-old child, K.P., with vaccinations required under the CVL based, in part, on their understanding that the mandatory vaccines were designed, developed, and produced using fetal cells extracted from aborted pre-born children. *See* ECF 1, ¶¶ 58-65.

Fetal cell research in the development and production of childhood vaccines is well-documented.[2] For example, in sworn testimony, Dr. Stanley Plotkin—who is commonly referred to as the "Godfather" of childhood vaccines—candidly admitted he worked with chopped up pituitary glands, kidneys, spleens, and hearts of 76 healthy normally developing babies, whose mutilated bodies were utilized in furtherance of his vaccine research. *See* ECF 1-3, PageID# 80-82, (Excerpts of Deposition of Dr. Stanley Plotkin, Jan. 11, 2018).

Additionally, many of the required vaccines contain genetic material derived from aborted fetuses—materials that would be injected directly into K.P.'s body were Plaintiffs to comply with

---

[1] West Virginia's categorical intolerance for non-vaccination for religious reasons, but allowance for non-vaccination for secular reasons, was recently further cemented. On March 27, 2024, West Virginia Governor Jim Justice vetoed a bill that would have allowed for religious exemptions in virtual public schools. *See* ASSOCIATED PRESS, *Governor vetoes bill that would have loosened school vaccine policies*, *available at* https://apnews.com/article/west-virginia-vaccinations-bill-veto-jim-justice-b43a3a98b605c16be380f9a8088f017d

[2] *See, e.g.,* ECF 1-2, THE WISTAR INSTITUTE OF ANATOMY AND BIOLOGY, *Cytological Virological and Chromosomal Studies of Cell Strains from Aborted Human Fetuses* (May 1966); *see also* deposition video, wherein Dr. Plotkin discusses this study, *available at* https://www.sirillp.com/plotkin-abortion/

2

the CVL. *See, e.g.,* ECF 1-4, PageID# 94, Food and Drug Administration ("**FDA**") Package Insert for M-M-R II Vaccine, (stating the Measles, Mumps, and Rubella ("**MMR**") vaccine contains strains of "human diploid lung fibroblasts" cultured from a fetal cell line); *see also* ECF 1-5, PageID# 104, FDA Package Insert for VARIVAX vaccine (stating the varicella vaccine was propagated in "human diploid cell cultures" and "contains residual components of [a fetal cell line] including DNA and protein").

Plaintiffs possess additional religious objections to vaccination based on the belief that they must not preemptively alter K.P.'s God-given natural immune system. ECF 1, ¶¶ 66-67. Relying on Mark 2:17, Plaintiffs do not seek medical attention for themselves or K.P. unless absolutely necessary (in cases where someone is actually sick) because to preemptively alter the immune system "God designed" would demonstrate "a lack of faith in God." *Id.* at ¶ 66. In declining the vaccines required under the CVL, Plaintiffs seek to not "perform[] … physical acts,'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022), that will "endanger their own salvation and that of their [child]". *Wisconsin v. Yoder*, 406 U.S. 205, 209 (1972); *see also* ECF 1, ¶¶ 58-65.

### C. Plaintiffs' Religious Beliefs are Substantially Burdened by the CVL

West Virginia courts have recognized public education is "a fundamental, constitutional right in this State." *Pauley v. Kelly*, 162 W. Va. 672, 707 (W. Va. 1979); *see also State v. Beaver*, 2022 W. Va. LEXIS 700, at *36 (same). Where a state constitution recognizes the right to public education, a child's right to an education in that state is protected by the Due Process Clause of the Fourteenth Amendment. *See Goss v. Lopez,* 419 U.S. 565, 574 (1975).

Plaintiffs face potential criminal prosecution should they fail to educate K.P. *See* W. Va. Code § 18-8-2. For more than 17 months—from August of 2022 to January of 2024—K.P. was educated by the West Virginia Virtual Academy, a robust online learning program created by statute in W.Va. Code §18-2E-9 in which K.P. was not in a classroom with other children. *See*

3

JA156

ECF 1, ¶¶ 69-72, 134-135. This program is a "tuition-free online public school" available to all West Virginia residents.[3] However, in December of 2023, Mrs. Perry was contacted by a Virtual Learning Coordinator for the Upshur County Schools, Defendant Stacy Marteney ("**Ms. Marteney**"), who inquired regarding K.P.'s vaccination status and informed Mrs. Perry that K.P. had to receive the full battery of vaccines required under the CVL if she desired to continue her virtual education. *Id.* at ¶¶ 75-77. In response, Mrs. Perry inquired whether she could submit a religious exemption; Ms. Marteney replied that "unfortunately there is still not a religious exemption available." *Id.* at ¶ 79*; see also* ECF 1-8, Religious Exemption Request and Denial. K.P. was ejected from the Virtual Academy for non-compliance with the CVL. *Id.* at ¶¶ 77-80.[4]

K.P.'s expulsion from the Virtual Academy is having, and will continue to inflict, serious negative consequences on the Perrys. *See generally id.* at ¶¶ 80-89. Plaintiff Anthony Perry was born prematurely and has experienced lifelong health complications. *Id.* at ¶¶ 6, 73. He is 100% blind in one eye and has been diagnosed with a learning disability. *Id.* at ¶ 73. Despite these obstacles, Mr. Perry was able to shepherd K.P. through Virtual Academy from home, relying heavily on the teaching provided by Virtual Academy staff. *Id.* at ¶¶ 6, 74. As a working mother, Mrs. Perry is unable to homeschool K.P. full-time; Mr. Perry is now homeschooling K.P., while Mrs. Perry tries her very best to help after she finishes work, causing an irregular learning schedule for K.P. *Id.* at ¶¶ 6, 80-87. K.P. has lost interest in her schooling, her education has been negatively impacted, and is deprived of important interactions with her peers. *Id.* at ¶¶ 70-72, 80-82.

---

[3] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com. Courts may take judicial notice of information contained in official government websites under Rule 201 of the Federal Rules of Evidence. *See, e.g., Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

[4] The 2024/2025 school year at the Virtual Academy begins on August 19, 2024. *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com/academic-calendar/.

### D. Profound Limitations and Misconceptions Regarding the Pharmaceutical Products at Issue

Most of the vaccines required under the CVL—including the pertussis, tetanus, diphtheria, polio, and meningitis vaccines—do not prevent infection and transmission, but rather operate to provide, at best, an undefined level of personal protection by preventing recipients from experiencing the symptoms of the target pathogens. *See id.* at ¶¶ 98-111 (citing judicially noticeable sources, detailing that many vaccines required under the CVL are personal protection devices). These products may reduce symptoms if the recipient is infected, but they are not capable of preventing that person from becoming infected and transmitting the target pathogen. *See id.* at ¶¶ 101-111 Like COVID-19 vaccines, they are not designed to create, nor do they result in herd immunity. *Id.* at ¶ 108.

Another vaccine required under the CVL—HepB—targets a disease not transmitted in a school setting. *See id.* at ¶110; *see also* ECF 1-6, (in response to FOIA request, CDC states that "A search of our [CDC] records failed to reveal any documents" of "transmission of Hepatitis B in an elementary, middle or high school setting.").

The only remaining vaccines required under the CVL are the MMR and varicella vaccines. K.P. has received the first dose of both these vaccines. *Id.* at ¶¶ 112-115; *see also* Exhibit 1, K.P. Vaccination Records. The difference of claimed protection by the CDC is negligible between one and two doses of the MMR vaccine. The CDC states that a single dose of the MMR is "93% effective" against the disease, as compared to 97% for two doses.[5] Further, for the varicella (chickenpox) vaccine, CDC states that a single dose of the varicella is 100% effective against "severe varicella," and 82% effective at "preventing any form of varicella," while two doses are

---

[5] *See* CDC webpage, *About Measles, available at* https://www.cdc.gov/measles/vaccination.html

5

100% effective against "severe varicella," and 92% effective at "preventing all varicella."[6] And even if K.P. did not already possess 93% protection against measles and 100% protection against severe chickenpox, excluding K.P. from the Virtual Academy will not change the level of vaccination in the community or meaningfully threaten the CVL's objectives. After learning of the MMR and varicella vaccines' connections to abortion, Plaintiffs will not ever inject K.P. with a second dose of these vaccines, regardless of whether Defendants continue enforcement of their irrational policy of prohibiting K.P. from learning virtually. *See* ECF 1, ¶¶ 57-65.

### E.  West Virginia's Discretionary Medical Exemption Process

West Virginia has instituted a discretionary exemption to the Compulsory Vaccination Law that benefits families with medical objections to compelled vaccination but prohibits families with religious objections from seeking an exemption for religious reasons.

The statute dictates in relevant part that the health commissioner "is authorized to grant . . . exemptions to the compulsory immunization requirements . . . on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. VA. CODE § 16-3-4 (h). It offers no similar pathway for an exemption where the requirement substantially burdens a sincerely held religious belief.

At the first level of the medical exemption process, the state has delegated private health care providers discretion to determine the variety of circumstances which are eligible for a medical exemption, and those which are not.[7] If and when the medical exemption form is signed by a physician, it is then forwarded to the state's Immunization Officer for personalized review. *See* Exhibit 2, Dr. Alvin Moss Declaration, ¶¶ 5-12. If the exemption is approved, that student is

---

[6]     *See*    CDC    webpage,    *About    Varicella    Vaccines,    available    at* https://www.cdc.gov/vaccines/vpd/varicella/hcp/about-vaccine.html

[7] *See* ECF 1-13, Medical Exemption Request Form.

permitted to attend school without having received all of the mandated vaccines. If the Immunization Officer denies the medical exemption, the decision can be appealed to the State Health Officer, who reviews the appeal on a case-by-case basis and determines whether to uphold or reverse the State Immunization Officer's decision. *See* W. VA. CODE § 16-3-4 (h)(4).[8]

In practice, there is significant individualized discretion in this process. Dr. Alvin Moss, a West Virginia physician, has evaluated schoolchildren and determined their health conditions qualify them for a medical exemption under West Virginia Code § 16-3-4(h), while he has evaluated other children and determined they were ineligible for a medical exemption. *See* Exhibit 2, ¶¶ 12-17. Dr. Moss further details the inherent case-by-case discretion associated with evaluating these requests. *Id.* at ¶¶ 8-12. The criteria by which medical exemptions are evaluated are not objective and are subject to the opinion of each government official who evaluates the exemption request and differing outcomes can and are reached depending on the evaluator of the request. *Id.* Even the implementing regulations for the medical exemption provide for consideration of "evidence from medical sources, such as medical history, opinions, and statements about treatment the child has received." W. Va. Code R. § 64-95-17.2.a.2.

A similar exemption process is unavailable to citizens with religious objections to compulsory vaccination.

**LEGAL STANDARD**

The movant seeking a preliminary injunction must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the

---

[8] *See also* ECF 1-7, Denial of Medical Exemption Appeal Form.

injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir. 1977).

Mandatory injunctions are commonplace where constitutional rights were violated. *See, e.g., Faulkner v. Jones*, 10 F.3d 226, 234 (4th Cir. 1993) (upholding district court's grant of mandatory injunction for Fourteenth Amendment violations); *Joyner v. Forsyth Cnty.*, 653 F.3d 341, 355 (4th Cir. 2011) (same for First Amendment violation); *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 348 (4th Cir. 2021) (reversing and remanding denial of a mandatory injunction for violation of the Fourth Amendment); *See also Ctr. for Individual Freedom, Inc. v. Ireland*, 613 F. Supp. 2d 777, 781 (S.D. W. Va. 2009) (mandatory injunction for violations of the First Amendment); *Pruitt v. Wilder*, 840 F. Supp. 414 (E.D. Va. 1994) (same)).

## ARGUMENT

## I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

"The Free Exercise Clause commits government itself to religious tolerance," and a law that is not neutral or generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-532 (1993). Strict judicial scrutiny applies if the law in question is not generally applicable, or if it lacks neutrality. *Kennedy*, 597 U.S. at 525.

Strict scrutiny applies on four separate and distinct grounds:

First, the CVL is not generally applicable under *Fulton*, 593 U.S at 537, because it contains a "mechanism" for individualized secular exemptions but does not permit for a similar religious exemption option. *Id.*

Second, the CVL also is neither neutral nor generally applicable under *Tandon,* 593 U.S. at 62, because it treats secular conduct (non-vaccination for secular reasons) more favorably than "comparable" religious conduct (non-vaccination for religious reasons). This is magnified by the

8

JA161

fact that K.P. seeks to be educated virtually with a religious exemption. The government liberally allows unvaccinated persons to intermingle throughout the state, including children and adults on school campuses. This poses an exponentially greater threat to the state's objectives than the religious exercise at issue—a religious exemption for virtual school. *See id.* (explaining that whether religious and secular conduct are "comparable" in the infectious disease context depends on "the risks [the] activities pose, not the reasons why" the activities are carried out).

Third, the CVL also triggers strict scrutiny under *Employment Division v. Smith*, 494 U.S. 872 (1990) because the CVL is amenable to a workable exemption option (and especially for virtual school). When applying rational basis to a free exercise challenge to a criminal drug law, the *Smith* Court was intensely concerned about the specter of permitting a religious veto to every law of general application, reasoning that to allow such an option would be "courting anarchy". *Id.* at 888. That is not the case here. Where the government institutes exceptions, *Smith's* animating rationales vanish. Allowing a religious exemption option where the government already permits a variety of exceptions, like here, would not allow religious objectors to a duly enacted law "from doing . . . what no other [citizen] may do." *Smith*, 494 U.S. at 880 (cleaned up).

Fourth, Plaintiffs' constitutional right to bring up their child consistent with their religious beliefs, and fundamental right to educate K.P. while maintaining their religious integrity, invoke "hybrid rights" under *Smith*, 494 U.S. at 881-882, also triggering strict scrutiny.

The CVL cannot survive strict scrutiny for two independent reasons:

First, the government lacks a sufficiently "compelling interest" to prohibit K.P. from learning virtually with a religious exemption, demonstrated by the medical exemptions the state grants, and its material non-enforcement of the CVL statewide. *Lukumi*, 508 U.S. at 547.

9

JA162

Second, the CVL fails strict scrutiny on alternative grounds because the law is not narrowly tailored, meaning the government can achieve its infectious disease related goals through means "less restrictive" of Plaintiffs' First Amendment rights. *Fulton*, 593 U.S. at 541.

### A.  The CVL is Not Generally Applicable Under *Fulton*

The CVL fails the general applicability test because West Virginia's medical exemption system invites "the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (cleaned up). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason." *Id.* (cleaned up).

West Virginia maintains a system of customized review for secular medical exemptions. In flagrant violation of the First Amendment under *Fulton*, an analogous exemption scheme is unavailable to Plaintiffs, who possess religious objections to mandatory vaccination. At the first level of discretionary review, private physicians deputized by the state possess wide latitude to reject or certify each child's medical exemption request. *See* W. VA. CODE § 16-3-4 (h)(1); *see also* ECF 1-13, Physician Certification Form. At the second level of personalized review, assuming the physician certifies the request, the State Immunization Officer has authority to approve or deny the physician's decision. W. VA. CODE § 16-3-4 § 16-3-4 (h)(2). At the final level, the State Health Officer is authorized to uphold or reverse the State Immunization Officer's decision. *Id.* at § 16-3-4 (h)(4); *see also* ECF 1-7, Denial of Medical Exemption Appeal Form.

In practice, medical exemption requests are individually assessed, and the evaluating physician exercises extraordinary discretion when accepting or denying each request. *See* Exhibit 2, ¶¶ 5-17. However, Defendants categorically rejected Plaintiffs' request for a religious exemption. *See* ECF 1, ¶ 79; *see also* ECF 1-8 (religious exemption denial).

10

JA163

The government's unconstitutional bias is woven into the fabric of the CVL because the state maintains a scheme whereby officials can grant individualized exceptions for secular reasons, while prohibiting citizens from even pursuing a religious exemption. In the compulsory vaccination arena, several circuit courts have held this type of discrimination and preference for secular activity over religious observance invokes strict scrutiny. *See, e.g., Dahl v. Bd. of Trs. of Western Mich. Univ.*, 15 F.4th 728, 733-734 (6th Cir. 2021)*; Doe v. Bd. of Regents of the Univ. of Colo.*, __F.4th__, 2024 U.S. App. LEXIS 11190 (10th Cir. May 7, 2024); *see also Bosarge v. Edney*, 669 F. Supp. 3d 598, 617 (S.D. Miss. 2023) (enjoining Mississippi's childhood vaccination law under *Fulton* because state enacted a medical exemption scheme, while religious exemptions were prohibited); *see also Fraternal Order of Police v. Newark*, 170 F.3d 359 (3d Cir. 1999) (applying strict scrutiny to police department's no facial hair policy where medical exemptions were allowed, religious exemptions were categorically banned).

### B.   The CVL is Neither Neutral Nor Generally Applicable Under <u>Tandon</u>

A law also is not generally applicable if it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the government interests purportedly justifying the regulation. *Lukumi*, 508 U.S. at 542. In the context of regulations intended to mitigate against infectious disease, the Supreme Court was crystal clear in *Tandon* that government actions lack general applicability <u>and</u> neutrality, provoking "strict scrutiny under the Free Exercise Clause, whenever they treat ***any*** comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62 (emphasis in original).

When assessing whether religious and secular conduct is comparable in the infectious disease context, courts are "concerned with the risks [the] activities pose, not the reasons why" the activities are carried out. *See Tandon*, 593 U.S. at 62; *see also Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 17 (2020) (asking whether secular activities either "have contributed to the spread of

11

JA164

COVID–19" or "could" have presented similar risks as the prohibited religious activity). Thus, whether two activities are "comparable" for purposes of the Free Exercise Clause "must be judged against the government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62.

West Virginia's stated justification for the CVL is to ensure a "cost-effective means of disease prevention." W. VA. CODE § 16-3-5.[9] Where the government permits secular exceptions to a policy seeking to curtail the spread of infectious diseases, it is the burden of the government to "show that the religious exercise at issue is more dangerous" than the secular activity the government permits. *Tandon*, 593 U.S. at 63.

Defendants can never make this showing. Despite claiming an interest in preventing transmission of infectious diseases in school settings, the state continues to permit secular exceptions to vaccination—including for in-person attendance—while barring Plaintiffs, whose motivations for non-vaccination are religious, from educating their child virtually. Using government's logic about the risk of non-vaccination, a child possessing a medical exemption who attends school in person poses a dramatically greater risk than would allowing K.P. to continue her education in the Virtual Academy with a religious exemption.[10] Critically, West Virginia has granted medical exemptions for students attending in-person classes for the 2023/24 school year. *See* ECF 1, ¶¶ 124-126; *see also* ECF Nos. 1-9, 1-10, 1-11, and 1-12 (school district confirmations

---

[9] To the extent the West Virginia attempts to devise new justifications for the CVL during the course of this litigation, such justifications are nothing more than "post hoc rationalizations" the government cannot legitimately rely upon now. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The government's justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the" differences between comparator groups at issue).

[10] Again, four of the six mandated vaccines do not prevent infection and transmission and are for personal protection alone. *See* ECF 1, ¶¶ 101-111. Whatever risk-based interest the state claims is constrained to the two vaccines actually capable of stopping infection and transmission. Otherwise, the government could mandate any medical procedure it deems beneficial to the recipient, and K.P. has received doses of the two remaining vaccines that are capable of preventing infection and transmission. *Id.* at ¶¶ 112-115.

12

that medical exemptions have been recently granted). This plainly treats at least some "comparable secular activity more favorably" than the religious exercise at issue. *Tandon*, 593 U.S. at 62.

The riskiness of non-vaccination does not differ depending on its motivation. A student who is not vaccinated for secular reasons does not "pose a lesser risk of transmission than [K.P.'s] proposed religious exercise" – a religious exemption in virtual school. *Id*. at 63. Strict scrutiny is triggered for this reason alone.[11]

Irrespective of the comparable secular activity allowed through granting many medical exemptions, strict scrutiny is provoked under *Tandon* for additional reasons. The government permits non-vaccination in a kaleidoscope of situations that, each in isolation, present a considerably greater risk to the state's goals than the religious exercise at issue.

*First*, West Virginia permits many hundreds of unvaccinated children to continue their education, despite non-compliance with the CVL, and these children intermingle with their peers. *See* ECF 1, ¶¶ 116-120. For example, in the Fayette County Board of Education alone, 440 unvaccinated children were enrolled in in-person classes for more than 30 days this past school year. *See* ECF 1-9. The Upshur County School District—the district through which K.P. enrolled in the Virtual Academy, and the school district in which her virtual education was administered— reported that 46 unvaccinated children out of compliance with the CVL were allowed to attend in-person classes. *See* ECF 1-11. From a risk perspective, a single child out of compliance with the CVL attending school in person presents an exponentially greater threat to the state's public health goals than would allowing K.P. an option to seek a religious exemption for virtual school.

---

[11] As detailed throughout, Plaintiffs maintain that the CVL triggers strict scrutiny on multiple fronts. Considering the manifest irrationality of enforcing the CVL against K.P. with respect to the Virtual Academy, the CVL also cannot survive rational basis review. *See Plyler v. Doe*, 457 U.S. 202, 226 (1982) (holding Texas law prohibiting children of undocumented immigrants from attending school failed rational basis review, reasoning it is against the state's interest to cultivate a population of "illiterate persons").

*Second*, West Virginia permits adults working in the school system—teachers, administrators, lunchroom staff, bus drivers, etc.—to completely disregard the CVL's requirements. Most adults have never been required to receive the full menu of vaccines required under the CVL. *See* ECF 1, ¶¶ 121-123. These adults interact with schoolchildren every day. In the context of regulations seeking to minimize the spread of infectious disease, comparability is concerned with the risks posed, not "the reasons why" individuals engage in those activities. *Tandon*, 593 U.S. at 62. The presence of one unvaccinated adult physically present at school poses a significantly greater threat than the religious exercise the government prohibits.

*Third*, the state does not place restrictions on unvaccinated children or adults outside of school settings, or outside of school hours. One child or teacher attending a West Virginia Mountaineers' basketball game, where vaccination status is not required for entry, who returns to school the next morning, or an unvaccinated child or adult attending a school event—under the state's logic—likewise constitutes "comparable" activity under *Tandon. See id.* at 63 (applying strict scrutiny after observing COVID-19 spreads just as easily at hair salons as at church).

*Fourth*, even if infectious disease related goals could logically be restricted to children, and exclusively in a school setting during school hours, West Virginia also permits unvaccinated children to be educated in unlimited numbers in "learning pods," a school setting where children intermingle on a daily basis. Under W.V. CODE § 18-8-1, the government permits unvaccinated children—whatever their reasons for declining vaccination—to be educated in these learning pods.

In isolation, any one of these non-vaccination scenarios the government allows fatally undermines every possible objective undergirding the CVL. Collectively, the aggregation of individual behaviors the government allows present an infinitely greater risk to West Virginia's

14

JA167

purported objectives in mitigating against infectious diseases than would allowing K.P to pursue a religious exemption to learn from her own home.

Accordingly, considering the foregoing, it is clear the government has made an unconstitutional value judgment that secular motivations for opting out of vaccination are perfectly acceptable, but that religious reasons will not be tolerated under any circumstances. *See Tandon*, 593 U.S. at 64 (holding that the government cannot "assume the worst when people [exercise their religion] but assume the best when people [engage in secular activities]") (cleaned up)).

### C. The CVL Triggers Strict Scrutiny Under <u>Smith</u>

The CVL also triggers strict scrutiny because it is readily amenable to a workable exemption option without generating the "anarchy" the *Smith* Court was so concerned about. *Smith*, 494 U.S. at 888. Along with every other state in the country, West Virginia has shown its compulsory childhood vaccination policies can be seamlessly implemented with exemption options.

When instituting the general applicability/neutrality pathway to strict scrutiny for free exercise claims, the Supreme Court in *Smith* emphasized that the criminal drug law at issue in that case was *not* amenable to workable religious exemptions. To permit such exceptions to the law would be "to permit every citizen to become a law unto himself." *Smith*, 494 U.S. at 879 (cleaned up). Such a state of affairs would be unworkable and "would be courting anarchy." *Id.* at 888.

Subsequent rulings in *Tandon* and *Roman Catholic Diocese,* 592 U.S. 14, flow naturally from the *Smith* Court's animating rationales, and, like here, involved regulatory efforts to mitigate against communicable diseases. In both of those cases, by allowing for practical exceptions to its regulatory objectives, the government simultaneously revealed its non-neutrality and its lack of a compelling justification for prohibiting religious exercise. Thus, strict scrutiny applied.

West Virginia's childhood vaccination scheme is amenable to workable religious exemptions, unlike in *Smith* where the Supreme Court applied rational basis to the free exercise

15

JA168

challenge to a criminal law prohibiting the use of peyote. The Court in *Smith* relied in large part on its prior opinion in *United States v. Lee*, 455 U.S. 252, where it had denied an Amish man a religious "exemption from collection and payment of Social Security taxes." *Smith*, 494 U.S. at 880. As the Court explained in *Lee*, "the tax system could not function" if religious exemptions of the sort the Amish claimant sought were permitted. *Lee*, 455 U.S. at 260. Such religious exemptions to "the comprehensive social security system" would be unworkable and "difficult to accommodate." *Id.* at 259-60.

That is not true of the CVL. Unlike the Supreme Court's view of the unworkability of exemptions to the criminal drug law in *Smith* and the social security tax law in *Lee*, religious exemptions to the CVL are more than feasible. West Virginia has permitted medical exemptions for many decades, permits adults working in the school system to be exempt, and allows functional exemptions across the state through non-enforcement of the law. Those exceptions to the CVL have not prevented the school vaccination requirement from "function[ing]." *Lee*, 455 U.S. at 260.

The experience of virtually every other state in the country further confirms that school vaccination laws are readily amenable to religious exemptions. Historically, Mississippi and West Virginia were the only states that refused to offer a religious exemption to their school vaccination laws. *See* ECF 1, ¶¶ 150-152. Today, 45 states and the District of Columbia provide religious exemptions to their childhood vaccination requirements. *See id.* at ¶ 151, fn. 19.

In this way, the CVL parallels the compulsory secondary education law in *Yoder*. There, the Court emphasized that such laws were a "relatively recent development." 406 U.S. at 226. Just 60 years prior, "the educational requirements of almost all of the States were satisfied by completion of the elementary grades." *Id.* Because the Amish had successfully functioned against this backdrop "for a period approaching almost three centuries," the Court required "a more

16

JA169

particularized showing from the State … to justify the severe interference with religious freedom" that refusal of an exemption would cause. *Id.* at 226–27. In other words, *Yoder* applied strict scrutiny after observing that religious exceptions to childhood education law at issue were feasible, reasoning that mandatory education past eighth grade was a relatively new development.

In sum, the CVL violates the foundational neutrality and general applicability tenants announced in *Smith* because the government has shown through action and inaction that a religious exemption option is more than feasible. The government simply will not tolerate a religious practice it disfavors under any circumstances—but permits non-vaccination for secular reasons in a multitude of risker scenarios—conclusively exposing its non-neutrality.[12]

### D. The Statute Triggers Strict Scrutiny Review on Alternative Grounds Because Hybrid Rights are at Issue

Even if the CVL were somehow both generally applicable and neutral, it would nonetheless be subject to strict scrutiny because Plaintiffs' claim fits squarely within the hybrid-rights framework the Supreme Court applied in *Yoder*. In *Yoder*, the Court there held that Wisconsin's mandatory secondary education law "impinge[d]" on both the rights "specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children." 406 U.S. at 214. And the Court explained that "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Id.* at 233 (cleaned up); *see also Smith*, 494 U.S. at 881-81 (acknowledging hybrid rights that

---

[12] *See supra,* fn. 1 (detailing Governor Justice's recent veto of bill that would allow for religious exemptions in the Virtual Academy); *see also Lukumi*, 508 U.S. at 531 (holding that "neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied.").

17

triggered strict scrutiny). The Supreme Court since *Yoder* has reaffirmed that there is a particular class of free-exercise claims that exist here fall outside the *Smith* framework and are subject to strict scrutiny. *See City of Boerne v. Flores*, 521 U.S. 507, 514 (1997); *Smith*, 494 U.S. at 881-82.

### E.  *The CVL Cannot Survive Strict Scrutiny*

A law burdening religious exercise "that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546 (cleaned up). In the context of regulations targeting infectious disease, strict scrutiny "is not watered down"; it "really means what it says." *Tandon*, 593 U.S. at 65 (cleaned up). Such regulations can survive strict scrutiny only where: (1) they advance "interests of the highest order" and (2) are "narrowly tailored to achieve those interests." *Lukumi*, 508 U.S. at 546. Failure to satisfy either requirement renders the law unconstitutional. *Id.*

When it comes to evaluating the government's asserted interests, strict scrutiny demands a "precise analysis." *Fulton*, 593 U.S. at 541. The state may not "rely on 'broadly formulated interests,'" but rather must "'scrutinize[] the asserted harm of granting *specific exemptions to particular* religious claimants.'" *Id.* (emphasis added) (cleaned up). As such, the relevant question here "is not whether the [state] has a compelling interest in enforcing [the CVL] generally, but whether it has such an interest in denying an exception" to K.P. *specifically*. *Id.*

As applied to K.P., the CVL fails strict scrutiny because the West Virginia lacks a sufficiently compelling interest to prohibit a religious exemption option for the Virtual Academy. The CVL fails strict scrutiny on additional grounds because it is not narrowly tailored. Less restrictive means—such as quarantining, which de facto occurs in virtual school—plainly exist.

### 1.  <u>West Virginia's interests are not sufficiently "compelling"</u>

Whatever interest West Virginia has in attempting to mitigate against infectious diseases, it did not cause it to eliminate secular exemptions to its mandatory vaccination scheme. A law

18

JA171

"cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547.

In the context of compulsory vaccination requirements, courts across the country have found the asserted interest to be insufficiently compelling where the government grants secular exceptions to mandatory vaccination policies. *See, e.g. U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 352 (5th Cir. 2022) (explaining that the Navy's decision to grant medical exemptions to its COVID-19 vaccination policy, while treating religious exemptions less favorably, was a "telltale sign that the government's interest in enacting a liberty-restraining pronouncement [was] not in fact compelling"); *Doster v. Kendall*, 54 F. 4th 398, 423 (6th Cir. 2022) (same with regard to Air Force's vaccination mandate). These decisions are consistent with the Supreme Court's reasoning that, where the government permits secular conduct that endangers its public health goals, it cannot then credibly assert a compelling interest in regulating similar religious activity. *See, e.g., Lukumi*, 508 U.S. at 542-546 (holding that a city's ban on animal sacrifice for religious reasons but corresponding allowance of other activities similarly endangering public health contradicted its purportedly "compelling" interest in safe animal disposal practices).

Further, Defendants must also show not only that there is a compelling interest in the abstract, but they must also demonstrate that the compelling interest is applicable *to the person. Fulton*, 593 U.S. at 541. West Virginia can never meet this standard in K.P.'s case. Again, a child with a medical exemption who attends school in person poses a significantly greater threat to the government's objectives than a virtual student with a religious exemption.

In addition, K.P has already received many of the required vaccines, and even if she had not, most of the vaccines do not prevent infection and transmission of the target pathogen. For those possessing that requisite capacity—the MMR and varicella injections—K.P. received doses

of both before her parents learned those vaccines possessed illicit connections to abortion. Critically, the CDC confirms K.P. has acquired very strong levels of protection through receiving doses of these shots.[13] Hence, as applied to K.P., Defendants are, at best, chasing fractional gains to their public health goals, casually sacrificing First Amendment freedoms in the process. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011) (holding that while the government may have a compelling interest in the abstract, that does not mean that it has one "in each marginal percentage point by which" it achieves its general objectives). And any minuscule gains achieved through enforcing the law against K.P. are rendered meaningless when considered alongside the government's relaxed approach to enforcing the CVL, allowing many hundreds of unvaccinated students to continue their education in-person. *See* ECF 1, ¶¶ 116-119.

In short, West Virginia does not possess an "interest of the highest order" to ban K.P. from learning from home with a religious exemption. *Lukumi*, 508 U.S. at 547. Even if this was not a case about a virtual student, the government has repeatedly demonstrated through action and inaction that its interests are not sufficiently compelling for the purposes of extinguishing First Amendment freedoms. The CVL fails strict scrutiny for this reason alone.

### 2. **The regulation is not narrowly tailored**

The CVL cannot withstand strict scrutiny on alternative grounds because the state can achieve its public health goals through means "less restrictive" of Plaintiffs' First Amendment rights. *Tandon*, 593 U.S. at 63. Given that 45 other states have religious or philosophical exemption

---

[13] *See CDC, About Measles, available at* https://www.cdc.gov/measles/vaccination.html (the CDC states that a single dose of the MMR vaccine K.P. received is 93% effective against the disease, as compared to 97% for two doses); *see also See CDC, About the Varicella Vaccines, available at* https://www.cdc.gov/vaccines/vpd/varicella/hcp/about-vaccine.html (stating that a single dose of the varicella vaccine K.P. received is 100% effective against "severe varicella," and 82% effective at "preventing any form of varicella," while two doses are likewise 100% effective against "severe varicella," and 92% effective at "preventing all varicella.").

20

options to vaccination requirements, less restrictive options plainly exist and can be easily implemented.  West Virginia just refuses to employ these measures.

Moreover, where, as here, utilization of less restrictive means is required, the government "may no more create an underinclusive statute, one that fails truly to promote its purported compelling interest, than it may create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal." *Lukumi*, 508 U.S. at 578. The CVL cannot withstand heightened scrutiny because it is both over-inclusive and under-inclusive relative to the government objectives it purportedly attempts to achieve.

The CVL is glaringly underinclusive for four primary reasons:

*First*, the CVL only applies in only one of many settings where transmission may occur: schools. The CVL does not require vaccination for children (or anyone else, for that matter) to participate in any number of other gatherings in other places where they may congregate or interact—such as attending West Virginia Mountaineers' basketball game, participation in youth wrestling leagues, attending Sunday school, or reporting for jury duty.

*Second*, the CVL only applies to one group of people who may transmit in schools: children. The CVL does not require vaccination for any of the other people who congregate and interact with those children in schools every day—such as teachers, administrators, aides, and lunchroom staff. Notably, very high numbers of adults in the state, who comprise over 80% of West Virginia's population,[14] have never been required to inject the full menu vaccines required under the CVL. This is because vaccination schedule expanded significantly after 1986—when a sizeable proportion of present-day adults were still children or were already adults—after

---

[14] *See* UNITED STATES CENSUS BUREAU, *QuickFacts, West Virginia, available at* https://www.census.gov/quickfacts/fact/table/WV,US/PST045223

21

pharmaceutical companies were extended blanket liability protection from harms caused by vaccines. *See* ECF 1, ¶¶ 121-123. These adults are exempt from the CVL. It is only students must "endanger their own salvation" through compelled vaccination. *Yoder*, 406 U.S. at 209. This limited coverage compounds the CVL's many other underinclusivity problems.

*Third*, even if the State's infectious disease related goals could somehow logically be restricted to children, and exclusively in a school setting during school hours, West Virginia permits unvaccinated children to be educated under W.V. CODE § 18-8-1, in unlimited numbers in "learning pods," a school setting where children intermingle during school hours.

*Fourth*, the CVL—on its face and as applied by Defendants—allows for many exceptions, further exposing the regulation's pronounced underinclusivity. The CVL still permits medical exemptions to its vaccination requirements, and many medical exemptions are granted. And the state also takes a very relaxed enforcement approach (other than against parents with religious objections to vaccination), allowing many hundreds of children—as a practical matter through non-enforcement—to discard the CVL's requirements. *See* ECF 1, ¶¶ 116-119.

The CVL is also overbroad. When a law is over-inclusive, its "broad scope . . . is unnecessary to serve the interest, and the statute fails [strict scrutiny] for that reason." *Lukumi*, 508 U.S. at 578. As applied to K.P., the CVL is overbroad for three primary reasons:

*First*, less burdensome means of preventing transmission are plainly available, and the government can allow a religious exemption option for virtual education while still accomplishing its disease prevention goals. Surrounding states deal with an outbreak, if one were to ever occur, by permitting the health department to exclude unvaccinated children from school for a limited time, which is significantly less restrictive than prohibiting them from accessing an education altogether. *See* ECF 1, ¶¶ 203, at fn. 24 (detailing quarantine protocols in surrounding states).

Notably, K.P. is already adhering to the less restrictive option deployed in surrounding states—through learning from home, she has self-quarantined. Further, the government can credibly claim that the pharmaceutical products it has mandated, and its prohibition of religious exemptions, are primarily responsible for the state's successes in the disease mitigation arena. There has been no significant outbreak, notwithstanding the government's material non-enforcement of the CVL, the medical exemptions it grants, the reality that unvaccinated children intermingle outside of school (e.g., at Sunday school, *see* ECF 1, ¶¶ 90-91), and fact that most adults—who engage in every high transmission activity imaginable statewide—have never been required to comply with the CVL.

*Second*, by requiring many vaccines incapable of preventing infection and transmission, the CVL is plainly overbroad relative to its objective to prevent infection and transmission in school settings. Moreover, for the vaccines that may curtail the spread of infectious disease (the MMR and varicella injections) K.P. has received doses of each and, according to the CDC, therefore possesses a very high levels of protection.[15] And if the pharmaceutical products at issue are truly effective, as Defendants must contend, West Virginia schoolchildren who have received the vaccines required by the CVL are protected against those diseases.[16]

*Third*, there is no evidence that sweeping K.P. and other virtual students under the coverage of the CVL will materially advance the state's infectious disease-related goals. Notably, there has not been a significant outbreak of the infectious diseases targeted by the CVL in the state, and especially not ones attributable to unvaccinated virtual students. *See Roman Catholic Diocese*, 592 U.S. at 18 (finding COVID-19 regulation failed strict scrutiny where "there [was] no evidence that

---

[15] *See supra,* fn. 13.

[16] The CDC estimates between 96.5 and 98 percent West Virginia kindergarteners have received the vaccines required under the CVL. *See* CDC, *Vaccination Cover with Selected Vaccines, available at* https://www.cdc.gov/mmwr/volumes/72/wr/mm7202a2.htm (detailing vaccination rates in West Virginia).

23

the applicants have contributed to the spread of COVID-19"). Even if there were a recent outbreak, or something beyond a hypothetical threat of one, virtual students like K.P. have pre-quarantined.

In short, there are less restrictive means available that would allow the government to advance its infectious disease related objectives and simultaneously preserve Plaintiffs' constitutional rights. There is no reason "why religion alone must bear the burden" of the State's push to mitigate against communicable disease. *Lukumi*, 508 U.S. at 544. Because the CVL provokes and cannot withstand strict scrutiny review, Plaintiffs are "likely to prevail" on the merits of their First Amendment claim. *Blackwelder*, 550 F.2d at 193.

## II. THE REMAINING PRELIMINARY INJUNCTION ELEMENTS FAVOR INJUNCTIVE RELIEF

### A. Plaintiffs Have Suffered and Continue to Suffer Irreparable Injuries

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That extends to the loss of "free exercise rights 'for even minimal periods of time.'" *Tandon*, 593 U.S. at 64 (cleaned up). And Fourth Circuit cases likewise establish that irreparable harm flows from the loss of constitutional rights. *See, e.g., Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190-191 (4th Cir. 2013); *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 254-255 (4th Cir. 2003).

The violation of Plaintiffs' First Amendment rights alone constitutes irreparable injury as a matter of law. *Tandon*, 593 U.S. at 64. However, Plaintiffs have been irreparably harmed on additional fronts. K.P. has been categorically evicted from the State's educational system, even though West Virginia's Constitution combined with the Fourteenth Amendment guarantees a free public-school education. *See, e.g., Pauley*, 162 W. Va. at 707; *see also Goss,* 419 U.S. at 574.

Plaintiffs are now subject to criminal prosecution under W. Va. Code § 18-8-2 should they fail to educate K.P. Further, Plaintiffs have endured significant practical hardships for upholding

24

JA177

their religious convictions. Plaintiffs have been forced to homeschool K.P., which presents serious obstacles due to Mrs. Perry's work schedule, her status as the sole provider for their family, and Mr. Perry's impairment. *See* ECF 1, ¶¶ 71-74, 135-139. Considering these factors, Plaintiffs' injuries—past, ongoing, and imminent—cannot be remedied by a later-issued court order.

> **B.    The Balance of Harms and the Public Interest in Protecting Civil Liberties Weigh in Favor of Injunctive Relief**

The balance of harms and public interest preliminary injunction factors likewise strongly favor an injunction. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). An injunction will not disserve the public interest where it will prevent constitutional deprivations. *See Newson*, 354 F.3d at 261 (explaining that "upholding constitutional rights serves the public interest"). Similarly, West Virginia will in no way be "harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011).

West Virigina simply cannot demonstrate that the public interest requires Plaintiffs to discard their religious convictions, and their constitutional rights, so K.P. can access a formal education through virtual school. The government cannot credibly argue the public interest and balancing of harms requires that the state compound the constitutional and practical harms should Plaintiffs maintain their religious beliefs.

## CONCLUSION

Plaintiffs possess clear entitlement to preliminary injunctive relief. Accordingly, Plaintiffs respectfully request this Court to grant their motion for a narrow preliminary injunction against the Compulsory Vaccination Law and its application to K.P., to require by August 16, 2024, or as soon to that date as practicable, that she be permitted to continue her studies in the Virtual Academy. A proposed order is attached as "Exhibit 3."

25

JA178

Dated: July 11, 2024

Respectfully submitted,

JOHN H. BRYAN LAW

/s/ *John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

SIRI & GLIMSTAD LLP

Aaron Siri, Esq.*
Elizabeth A. Brehm, Esq.*
Walker D. Moller*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

Christopher Wiest*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*

**Pro hac vice* requests pending

26

JA179

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record. I also certify that a correct copy of the foregoing, along with a copy of the summons and Complaint, will be served as soon as possible on each of the named Defendants at the following:

Stacy Marteney
Coordinator of the Upshur County Virtual School
Upshur County Schools
102 Smithfield St.
Buckhannon, WV 26201

Christine Miller
Superintendent
Upshur County School District
Upshur County Schools
102 Smithfield St.
Buckhannon, WV 26201

The Board of Education of the County of Upshur
Upshur County Schools
102 Smithfield St.
Buckhannon, WV 26201

Doug Cipoletti
Executive Director
West Virginia Virtual Academy
3508 Staunton Avenue, 3rd Floor
Charleston, WV 25304

Dr. Matthew Christiansen
Commissioner
West Virginia Department of Health and Human Services
Office of the Secretary
One Capital Square, Suite 100 East
Charleston, WV 25301

The summons' returns will reflect the date(s) of such service of this pleading. I certify under penalty of perjury that the foregoing is true and correct.

Dated this 11th day of July, 2024

/s/ John H. Bryan
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

27

# EXHIBIT 1

USCA4 Appeal: 24-2132    Doc: 16    Filed: 01/06/2025    Pg: 186 of 608

**Patient**

| | |
|---|---|
| Name: | K▮▮▮▮▮ |
| Date of Birth: | 04/04/2016 |
| Guardian: | |

| | |
|---|---|
| SIIS Patient ID: | ▮▮▮▮ |
| Age: | 8 yrs |
| Organization Level Status: | Inactive |

## Vaccination Summary
Vaccinations outside the ACIP schedule are marked with an X'.

| Vaccine | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| DTaP/DTP/Td | 06/06/2016<br>9 weeks | 08/09/2016<br>4 months | 11/02/2016<br>6 months | 04/13/2018<br>24 months | | | | |
| OPV/IPV | 06/06/2016<br>9 weeks | 08/09/2016<br>4 months | 11/02/2016<br>6 months | | | | | |
| MMR | 10/06/2017<br>18 months | | | | | | | |
| Hib | 06/06/2016<br>9 weeks | 08/09/2016<br>4 months | 11/02/2016<br>6 months | 06/23/2017<br>14 months | | | | |
| Hep A | 06/23/2017<br>14 months | 04/13/2018<br>24 months | | | | | | |
| Hep B - 3 Dose | 04/17/2016<br>1 week | 05/18/2016<br>6 weeks | 12/07/2016<br>8 months | | | | | |
| Varicella | 10/06/2017<br>18 months | | | | | | | |
| Rotavirus | 06/06/2016<br>9 weeks | 08/09/2016<br>4 months | 11/02/2016<br>6 months | | | | | |
| Influenza | 11/02/2016<br>6 months | 12/07/2016<br>8 months | | | | | | |
| Pneumo (PCV) | 06/06/2016<br>9 weeks | 08/09/2016<br>4 months | 11/02/2016<br>6 months | 06/23/2017<br>14 months | | | | |

## Invalid Vaccinations

| Invalid Vaccinations | Date | Reason |
|---|---|---|
| | | |

## Vaccination Forecast
The forecast automatically switches to the catch-up schedule when a patient is behind schedule.

| Vaccine Group | Forecasted Dose | Recommended Date | Minimum Valid Date | Overdue Date | Status |
|---|---|---|---|---|---|
| FLU | 3 | 07/01/2017 | 07/01/2017 | 07/28/2017 | Past Due |
| MMR | 2 | 04/04/2020 | 11/03/2017 | 05/01/2023 | Past Due |
| POLIO | 4 | 04/04/2020 | 04/04/2020 | 04/04/2023 | Past Due |
| VARICELLA | 2 | 04/04/2020 | 12/29/2017 | 05/01/2023 | Past Due |
| Coronavirus (SARS-CoV-2)(COVID-19) | 1 | 12/12/2020 | 12/12/2020 | 01/08/2021 | Past Due |
| Tdap | 5 | 04/04/2023 | 04/04/2023 | 04/04/2023 | Past Due |
| HPV | 1 | 04/04/2027 | 04/04/2025 | 05/01/2029 | Not Yet Due |
| MENINGOCOCCAL | 1 | 04/04/2027 | 04/04/2027 | 05/01/2029 | Not Yet Due |
| MENINGOCOCCAL B, OMV | 1 | 04/04/2032 | 04/04/2026 | 05/04/2032 | Not Yet Due |
| MENINGOCOCCAL B, RECOMBINANT | 1 | 04/04/2032 | 04/04/2026 | 05/04/2032 | Not Yet Due |

✕   Hi. Need any help?



JA182

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.* <br><br> *Plaintiffs,* <br><br> Against <br><br> STACEY MARTENEY *in her official capacity as the Virtual School Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District;* DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health;* AND DOUG CIPOLETTI *in his official capacity as Executive Director of the West Virginia Virtual School Academy* <br><br> *Defendants* | Civil Action No.: _____ |

## DECLARATION OF DR. ALVIN H. MOSS

Pursuant to 28 U.S.C. §1746, the undersigned, Alvin H. Moss, M.D., makes the following declaration, under penalty of perjury under the laws of the United States of America, that the facts contained herein are true and correct to the best of my knowledge and belief and that such facts are made based on my personal knowledge:

1. My name is Dr. Alvin H. Moss.

1

JA184

2.    I am the Director of the West Virginia University Center ("WVU") for Health Ethics and Law at the West Virginia University Health Sciences Center in Morgantown, West Virginia.

3.    I hold an appointment as a Professor of Internal Medicine in the Divisions of Nephrology and Geriatrics & Palliative Medicine in the School of Medicine at WVU. I earned a Bachelor of Arts degree and graduated *magna cum laude* from Harvard University in Cambridge, Massachusetts, and a Doctorate of Medicine (M.D.) degree from the University of Pennsylvania School of Medicine in Philadelphia, Pennsylvania.

4.    I trained in Internal Medicine at the University of North Carolina School of Medicine/North Carolina Memorial Hospital in Chapel Hill, North Carolina, and completed a fellowship in Nephrology at the University of Colorado School of Medicine in Denver, Colorado. I completed a fellowship in clinical medical ethics at the MacLean Center for Clinical Medical Ethics of the University of Chicago. I am board-certified in Internal Medicine, Nephrology, and Hospice and Palliative Medicine by the American Board of Internal Medicine.  I have published over 170 articles and 20 book chapters in the peer-reviewed literature. I have co-edited a medical textbook published by Oxford University Press. I was the course director for the required course in medical ethics at West Virginia University School of Medicine for 25 years. As part of this course, every year I taught pediatric ethics. My professional responsibilities in academic medicine include patient care, teaching, research, and administration. I serve on the editorial boards of two medical specialty journals. I have served as a reviewer for high-impact medical journals such as the *New England Journal of Medicine*, *JAMA*, and the *Annals of Internal Medicine*. I am currently serving as a member of a Data and Safety Monitoring Board for a National Institute of Health-funded study. As a practicing physician who cares for patients with chronic kidney disease and

2

JA185

those who have received kidney transplants, I prescribe vaccines for my patients who choose to receive them after an informed consent discussion. My opinions are my own and are based on 49 years' experience of practicing medicine, conducting research, and studying the medical literature. They are not those of my employer.

5.      I am very familiar with the vaccination requirements of W. VA. CODE § 16-3-4 (the "Compulsory Vaccination Law").

6.      I have evaluated many children who are potentially eligible for medical exemptions under the Compulsory Vaccination Law.

7.      I have signed medical exemption requests for several West Virginia schoolchildren after evaluating their specific circumstances and evaluating them per the medical exemption requirements outlined in W. VA. CODE § 16-3-4(h) and the statute's implementing regulations.

8.      I have evaluated other children and determined they are not eligible for a medical exemption per the requirements W. VA. CODE § 16-3-4(h) and the statute's implementing regulations. In my professional medical opinion, these children were ineligible for a medical exemption, so I declined to sign an exemption request form on their behalf.

9.      A child can be medically exempt from the required vaccinations if they possess a "contraindication" or a "precaution", as defined under the Compulsory Vaccination Law's implementing regulations. *See* W. Va. Code R. § 64-95-2. Whether a precaution or a contraindication exists is contingent on the opinions of physicians and government officials who review the request for a medical exemption.

10.      Under the implementing regulations, a contraindication is defined as "a medical condition which renders an immunization improper for a particular individual." *Id.* The rules advise physicians evaluating patients for potential medical exemption requests to "refer to"

3

JA186

statements written and published by the Advisory Committee on Immunization Practices ("ACIP") as Recommendations of the Immunization Practices Advisory Committee and in Vaccine Information Statements ("VIS") from the Centers for Disease Control and Prevention ("CDC"). Physicians are not required to strictly follow these guidelines when evaluating a child for a possible medical exemption. In my experience, the term "contraindication" is open to interpretation, requiring individualized physician judgment. It is not a black or white definition independent of the physician's subjective opinion of what constitutes whether a vaccine is "improper for a particular individual" under W. Va. Code R. § 64-95-2. Based on their clinical experience and understanding of the medical literature, physicians vary on the importance they assign to different factors used to evaluate whether a vaccine would be "improper for a particular individual" and therefore whether a contraindication is present.

11.     The Compulsory Vaccination Law's implementing regulations define a vaccine "precaution" as "a condition defined under the current standards of immunization practice that might increase the chance or severity of an adverse vaccine reaction or compromise the ability of the vaccine to produce immunity." The term "precaution" is also open to interpretation and requires individualized and subjective physician judgment. In short, it is not a black or white issue free from subjective opinion. Again, different physicians evaluating the same potential medical exemption request can come to different conclusions regarding whether a "precaution" is present.

12.     As evidence of the subjective and case-by-case nature of West Virginia's medical exemption process, medical exemptions are recommended by physicians but then the professional medical opinions of West Virginia physicians are at times overruled by the opinions of the State Immunization Officer or other government officials who review the medical exemption request.

4

JA187

13.    For example, in one case, I evaluated a 16-year-old boy and determined based on his medical condition that he possessed several "contraindications" per W. VA. CODE § 16-3-4(h) and the statute's implementing regulations because he possessed medical conditions which rendered an "immunization improper" for him under W. Va. Code R. § 64-95-2. Accordingly, I signed a medical exemption form on the child's behalf, recommending that he be exempt from receiving certain vaccines.  As part of the exemption recommendation, I provided the child's relevant medical history, his family's relevant medical history, and other evidence from relevant medical sources per the requirements of W. Va. Code R. § 64-95-17. The State Immunization Officer individually reviewed his medical exemption request, overruled my professional medical opinion, utilized his own subjective determination, and denied the medical exemption request.

14.    In contrast, in another case, I evaluated an 18-year-old boy and determined that vaccination with the meningococcal vaccine was contraindicated for him per the definition of contraindication in W. VA. CODE § 16-3-4(h) and the statute's implementing regulations. Accordingly, I signed his medical exemption request, recommending that he be granted a medical exemption because I had determined that "immunization was improper" for him under W. Va. Code R. § 64-95-2. The State Immunization Officer reviewed his medical exemption request, exercised independent judgment, and granted the exemption. Of note, this boy had not previously received the meningococcal vaccine and therefore *did not* possess a contraindication under the recognized contraindications and precautions described in the statements of the ACIP as Recommendations of the Immunization Practices Advisory Committee and in VIS from the CDC. In other words, while the Immunization Officer referred to ACIP, VIS, and CDC recommendations regarding contraindications in the letter granting the medical exemption, the Immunization Officer

5

exercised independent judgment and determined a contraindication outside of the guidance of the ACIP, VIS, and CDC recommendations existed, and then approved the medical exemption.

15. In another case, I evaluated an 18-year-old girl for a potential exemption to the meningococcal vaccine, which under West Virginia she was required to receive prior to entry into 12th grade. I determined that because of her medical condition, this vaccination was contraindicated and signed her medical exemption request. Her exemption request was denied by the State Immunization Office. She appealed the denial to the State Health Officer, who affirmed the denial. She then appealed the State Health Officer's denial, the hearing for the appeal was postponed several times, and she was able to complete the school year and graduate while the process was unfolding. She remained in school without receiving the meningococcal vaccine and graduated while her exemption request denial was being appealed.

16. Similarly, in another case, at the request of the patient and his parents, I evaluated an 18-year-old boy who had a history of multiple severe adverse events from prior vaccinations, including the development of a chronic disabling condition. I evaluated his conditions to determine whether I thought a medical exemption from meningococcal vaccination was in his best interest. The State Immunization Officer and on appeal the State Health Officer had denied his request for a medical exemption, stating that "there was insufficient medical evidence to conclude that a meningococcal vaccination is contraindicated or that exemption is in his best interests." The parents requested a hearing to appeal the State Health Officer denial of the medical exemption request. At their direction, I wrote a letter to the administrative law judge who was to conduct the hearing and reported that in my opinion the State Health Officer erred in his denial because he failed to consider the very clear evidence of the unfavorable balance of benefit to risk of meningococcal conjugate vaccination for the patient, especially given the patient's prior history of

6

adverse vaccine reactions with significant health consequences. Because, in my professional opinion, the potential harms of the vaccine far outweighed the benefits, I concluded that it clearly was not in the patient's best interests to receive the meningococcal vaccine. The hearing for the appeal was postponed several times, and the student completed the school year and graduated while his appeal was pending. After graduation, the denial became moot.

17.     In my experience, medical exemptions are granted or denied based on several levels of individualized discretionary review. West Virginia physicians evaluating potential medical exemption requests by patients possess the personal latitude when determining whether a "contraindication" or a "precaution" is present and consequently whether a child is eligible for a medical exemption. Once the medical exemption is signed by a physician in any particular case, the State Immunization Officer possesses substantial latitude when determining whether to approve or deny the medical exemption. If, in the State Immunization Officer's personal opinion, the medical exemption request does not sufficiently substantiate a "contraindication" or a "precaution", the Immunization Officer is empowered to deny the request. That decision can be appealed to the State Health Officer, who can overturn the State Immunization Officer's decision if, in the State Health Officer's opinion, the Immunization Officer's decision was incorrect. That can then be appealed to court under a standard of review that is highly deferential to the State Health Officer's opinion.

7

JA190

Pursuant to 28 U.S.C. §1746, I declare under penalties of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge and belief and that such facts are made based on my personal knowledge.

Executed on: July 2, 2024.

Alvin H. Moss, M.D.

8

JA191

Case 2:24-cv-00018-TSK   Document 8-3   Filed 07/11/24   Page 1 of 4  PageID #: 196

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and ANTHONY
PERRY, *individually and on behalf of their
minor child K.P.*


*Plaintiffs,*

Against

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
of EDUCATION of the COUNTY of
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR.
MATTHEW CHRISTIANSEN, *in his official
capacities as the State Health Officer and
Commissioner of the Bureau of Public Health*;
AND DOUG CIPOLETTI *in his official
capacity as Executive Director of the West
Virginia Virtual School Academy*

*Defendants*

Civil Action No.: 2:24-cv-00018-TSK

**ORDER**

The Court finds that Plaintiffs have demonstrated (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993).

1

JA193

More specifically, Plaintiffs have demonstrated a clear entitlement to relief and are likely to prevail on the merits in demonstrating that W. VA. CODE § 16-3-4 ("**the Compulsory Vaccination Law**") is unconstitutional as applied to them.  Plaintiffs have shown that the Compulsory Vaccination Law substantially burdens their religious beliefs and practices.  The law is unconstitutional as applied to their eight-year-old child, K.P., who sought and was denied a religious exemption to the law in order to continue her education in the Virtual Academy, a "tuition-free online public school" available to all West Virginia residents.[1]

The Compulsory Vaccination Law is neither neutral nor generally applicable because it permits individualized secular medical exemptions while denying any mechanism to obtain a religious exemption.  *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021).  It is thus subject to strict scrutiny, which cannot be met here because the government affords secular medical exemptions, and yet West Virginia has not made the required showing that measures "less restrictive" of the First Amendment activity could not address its interest in reducing the spread of [disease]."  *Tandon v. Newsom*, 593 U.S. 61, 63 (2021).  Where, as here, Defendants provide secular exemptions to their requirements, they "must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Id.*  Defendants have failed to do so here as applied to K.P., an attendee of a virtual school.

Plaintiffs have also demonstrated irreparable harm.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  That extends to the loss of "free exercise rights 'for even minimal periods of time.'"  *Tandon*, 593 U.S. at 64.  Here, the violation of Plaintiffs' First Amendment Free Exercise rights alone constitutes irreparable injury as a matter of law. *Id*. *See*

---

[1] *See* WEST VIRGINIA VIRTUAL ACADEMY, *available at* https://wvva.k12.com

*also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190-191 (4th Cir. 2013); *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 254-255 (4th Cir. 2003).

The balance of harms and public interest preliminary injunction factors likewise strongly favor an injunction. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). An injunction will not disserve the public interest where it will prevent constitutional deprivations. *See Newsom*, 354 F.3d at 261. Similarly, West Virginia will in no way be "harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011).

Therefore, pursuant to Fed. R. Civ. P. 65(d), Defendants and their officers, agents, servants, and employees, and anyone acting in active concert or participation with them (collectively hereinafter, "**the Enjoined Parties**"), are hereby PRELIMINARILY ENJOINED as follows:

> Effective August 16, 2024, the Enjoined Parties shall be enjoined from enforcing the Compulsory Vaccination Law against Plaintiffs, unless Defendants provide an option for requesting a religious exemption that is meaningfully processed.   K.P. shall not be prevented from enrolling in the Virtual Academy due to her unvaccinated status.

IT IS SO ORDERED:

_____

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.*<br><br><br><br>*Plaintiffs,*<br><br>Against<br><br>STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; AND DOUG CIPOLETTI *in his official capacity as Executive Director of the West Virginia Virtual School Academy*<br><br>*Defendants* | Civil Action No.: 2:24-cv-00018-TSK |

## DEFENDANT DOUG CIPOLETTI AND PLAINTIFFS' JOINT MOTION FOR AGREED ORDER

Plaintiffs Krystle and Anthony Perry ("Plaintiffs"), through counsel, and Defendant Doug Cipoletti, in his official capacity, through counsel, file this joint motion for an agreed order. Plaintiffs and Defendant Doug Cipoletti respectfully move the Court for the following:

1. Defendant Doug Cipoletti shall be dismissed from the case and replaced by new defendant "Bryan Hoylman, in his official capacity as Chair of the Board of Directors of Mountain

JA196

State Learning Solutions, Inc., d/b/a West Virginia Virtual Academy" ("Defendant Bryan Hoylman");

2.      Defendant Bryan Hoylman has accepted service in his official capacity;

3.      By further stipulation, the case caption shall be amended to reflect these changes;

4.      New Defendant Bryan Hoylman will be bound, to the extent such a judgment entered hereafter actually applies to him in his role as the Chair of the Board of the West Virginia Virtual Academy, by the judgment or mandate that ultimately becomes final in this proceeding, whether it is entered by this District Court or subsequently entered by an appellate court;

5.      Defendant Bryan Hoylman will not be required to, and will not, file an Answer or other responsive pleading, or otherwise participate in the defense of Plaintiffs' claims, including participation in any discovery that may occur, except as the District Court may hereafter require; and

6.      Defendant Bryan Hoylman shall not be liable to Plaintiffs for any "prevailing party" attorney fees or costs that may be awarded in this matter; nothing in this paragraph shall constitute a waiver of such fees or costs against the State of West Virginia, the West Virginia Department of Health and Human Resources, the West Virginia Bureau of Public Health, or any other named defendant.


[signatures of counsel on following page]

[continued from preceding page]

Dated:  July 25, 2024

Respectfully submitted,

<table>
<tr>
<td>

**/s/ John H. Bryan**
John H. Bryan
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

*Attorney for Plaintiffs*

</td>
<td>

**/s/ Lindsay M. Stollings**
Lindsay M. Stollings
West Virginia Bar No. 13923
Jonathon C. Stanley *(admission pending)*
West Virginia Bar No. 13470
Robinson & McElwee PLLC
700 Virginia Street East, Suite 400
Charleston, WV 25301
t: 304.347.8341
f: 304.344.9566
lindsay.stollings@ramlaw.com
jcs@ramlaw.com

*Attorneys for Defendant Doug Cipoletti and new Defendant Bryan Hoylman in his official capacity as Chair of the Board of Directors of Mountain State Learning Solutions, Inc., d/b/a/ West Virginia Virtual Academy*

</td>
</tr>
</table>

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record. I certify under penalty of perjury that the foregoing is true and correct.

Dated this 25th day of July, 2024.

/s/ *John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

      Plaintiffs,

v.

                                         CIVIL ACTION NO. 2:24-cv-18

                                         JUDGE KLEEH

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and DOUG CIPOLETTI
*in his official capacity as Executive Director of the
West Virginia Virtual School Academy*,

      Defendants.

**DEFENDANTS THE BOARD OF EDUCATION OF THE COUNTY OF UPSHUR,
STACY MARTENEY AND CHRISTINE MILLER'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED CONSIDERATION**

        Defendants Stacey Marteney, in her official capacity as the Virtual Learning

Coordinator of the Upshur County Virtual School, The Board of Education of Upshur County, and

Christine Miller, in her official capacity as Superintendent of the Upshur County School District,

(collectively, "Defendants"), hereby respond in opposition to *Plaintiffs' Motion for Preliminary

Injunction and Expedited Consideration*. [Doc. 7].

JA200

## INTRODUCTION

The statute at issue requires that West Virginia students be immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough. *See* W. Va. Code § 16-3-4(b)-(c) (hereinafter, the "Statute"). The Statute provides one form of exception: a medical exemption granted "upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine." *Id*. at § 16-3-4(h). Plaintiffs' Motion should be denied for several independent reasons. However, the Court need not look any further than the fact that this Statute has already survived near-identical constitutional challenges. *See Workman v. Mingo County Bd. of Educ.*, 419 F. App'x 348 (4th Cir. Mar. 22, 2011), *affirming* Mem. Op. and Order, Doc. 126, No. 2:09-cv-00325 (S.D.W. Va. Nov. 3, 2009) (rejecting federal Free Exercise, Equal Protection, and Due Process challenges to § 16-3-4); *D.J. v. Mercer County Bd. of Educ.*, No. 13-0237, 2013 WL 6152363 (W. Va. Nov. 22, 2013 (unpublished) (rejecting state Due Process and Equal Protection challenges to § 16-3-4). For this reason, and for the reasons set forth more fully below, the Motion should be denied.[1]

## BACKGROUND

Since 1937, in the midst of smallpox and diphtheria outbreaks, the State of West Virginia has required that school children be immunized against certain communicable diseases. *See* W. Va. Code § 16-3-4 (1937). The Statute has been revised over the years to reflect immunizations against other communicable diseases which have become available. For nearly the last century, the State of West Virginia has recognized only one type of exemption to the mandatory vaccination of school children: a medical exemption. *See id.* There is not evidence

---

[1] By responding to this Motion, Defendants do not waive any defenses or objections of any kind.

that this law is (or was at any time) motivated by any religious animus. The Statute has survived multiple constitutional challenges by individuals who oppose immunization on religious or conscientious grounds. *See Workman*, 419 F. App'x 348; *D.J.*, 2013 WL 6152363.

## FACTS

Following the COVID-19 pandemic, the Upshur County Board of Education recognized a need to offer a virtual educational platform to West Virginia students. Accordingly, it adopted such a program.

Upshur County Virtual School is a computer-based, virtual learning option that was started in 2021. *Upshur County Schools Launches Virtual Learning Option* press release, available at https://www.upshurschools.com/o/ucvs/article/545480. Stacy Marteney ("Ms. Marteney") serves as the Virtual Learning Coordinator for Upshur County Virtual School. *Id.* Enrollment in Upshur County Virtual School is offered to families statewide, with some limitations. *Id.* Students who are enrolled in Upshur County Virtual School are registered with the Upshur County Schools District. *Id.* In addition, students who are enrolled in Upshur County Virtual School have access to extracurricular activities, clubs, and student organizations offered by Upshur County Schools. *Id.* Also, Upshur County Virtual School students are required to be in-person in Upshur County Schools for state-mandated testing.

K.P. had been enrolled in Upshur County Virtual School[2] since 2022. She attended first grade virtually in 2022-2023 and was enrolled for virtual attendance in second grade for the

---

[2] Plaintiffs erroneously state in their Motion that K.P. was enrolled in the West Virginia Virtual Academy ("WVVA"). *See* https://wvva.k12.com/ While similar, WVVA is an online virtual school that is separate and distinct from the Upshur County Virtual School. Upshur County Virtual School is operated by the Upshur County Board of Education, WVVA is not.

3

2023-2024 academic year.  K.P. had lived with her family in Oak Hill, West Virginia, during the time she was enrolled in Upshur County Virtual School.

As part of the enrollment process in Upshur County Virtual Schools, parents or guardians are required to complete an Enrollment Packet annually, which they can fill out in hard copy or online.  With the Enrollment Packet, parents are provided with an Upshur County Schools Immunization Consent Form.   The Immunization Consent Form provides parents with the following information regarding mandatory vaccinations:

> <u>West Virginia law requires parents to show proof that their children have received certain vaccinations before being admitted to school</u>.  WV Code § 16-3-4 plus two legislative rules give clear guidance on which vaccination and how many doses are required for school entry.   Those rules are: Reportable Diseases, Events, and Conditions, 64 C.S.R. 7, and Immunization Requirements and Recommendations for New School Enterers, 64 C.S.R. 95.

*Id.* (emphasis added).

The Enrollment Packet for K.P. for the 2023-2024 academic year was completed online.  While the parents of K.P. were provided with the Immunization Consent Form on which they would have provided the information as to which mandatory vaccinations K.P. had received, they did not complete and return that form.  K.P. was enrolled[3] and began second grade in Upshur County Virtual School in the 2023-2024 academic year.  K.P. was "assigned" to Rock Cave Elementary School, but this assignment was in name only, given that K.P. only attended school virtually via online computer participation.

---

[3] By law, students are permitted to be provisionally enrolled so that the student's immunization may be completed while missing a minimum amount of school.  W. Va. Code § 16-3-4(e).

On December 18, 2023, the West Virginia Department of Education ("WVDE") issued an update to Superintendents advising about various topics pertinent to public education. A copy of the December 18, 2023 WVDE Superintendents' Update ("WVDE Guidance") is attached hereto as **Exhibit 1.** The WVDE Guidance included a section entitled "Virtual School Students Immunization Requirements," providing as follows:

> Students enrolled in public schools as full-time virtual students are required to be fully immunized according to W. Va. Code § 16-3-4 exactly as they would be when enrolling for in-person instruction. Please review the enrollment records of your full time virtual students and work with your administrators and school nurses to correct any non-compliant enrollment occurrences.

*Id.* The WVDE Guidance was provided to Ms. Marteney by the Superintendent of Upshur County Schools, Christine Miller ("Superintendent Miller").

Ms. Marteney relied on the school nurses to provide her with information regarding the vaccinations of students. In their role to monitor and ensure compliance with vaccination requirements, school nurses have access to WVSIIS containing the vaccination information of students. Upon receiving the WVDE Guidance, Ms. Marteney began checking for the compliance with vaccination requirements of Upshur County Virtual School's students. Ms. Marteney started verifying the vaccination compliance of its virtual high school students and worked backwards to the virtual elementary school students. On January 2, 2024, Ms. Marteney sent an email to various school nurses employed by Upshur County Schools, asking them to advise her of students who

5

were missing required vaccinations.[4]    School nurse Lori Jestice responded identifying four mandatory vaccines which K.P. was missing.

On January 2, 2024, Ms. Marteney began reaching out to the parents and guardians of students of Upshur County Virtual School who were missing required vaccinations.   On Wednesday, January 3, 2024, Ms. Marteney spoke with Plaintiff Krystle Perry, the mother of K.P., concerning the need for the missing vaccinations.  Plaintiff indicated to Ms. Marteney that she did not want to vaccinate K.P. but requested time to consider the issue of vaccinations.  *Id.*  Plaintiff indicated that she needed time to discuss it with her husband and to decide what to do.  *Id.* Understanding both the importance the WVDE had placed on the required vaccinations of virtual students and of allowing families time to evaluate the issue, Ms. Marteney allowed Plaintiff to take the matter under consideration for a reasonable time before deciding.  *Id.*  Ms. Marteney told Plaintiff that she could have until the following week to decide.  *Id.*  On January 3, 2024, Ms. Marteney sent an email to Plaintiff memorializing their phone conversation and stating, "[f]ollowing up on our phone call: [K.P.] needs her DTaP, Polio, MMR, and Varicella.  Please let me know by Monday what you decide."[5]  *Id.*

During the pendency of a decision related to K.P.'s vaccinations, Ms. Marteney met with Superintendent Miller and another administrator, Jody Johnson, to discuss the issue.  **Exhibit 2**.  Superintendent Miller directed, and the group agreed, that Upshur County Schools was

---

[4] K.P. completed first grade as a student of Upshur County Virtual Schools during the 2022-2023 academic year.  While Defendants did not have K.P.'s vaccination records "in hand" at the time of her enrollment, K.P. was permitted to provisionally enroll so that she would not be deprived of valuable time in school due to a temporary lack in records.  Ms. Marteney did not become aware until January 2024 that K.P. lacked the required vaccinations.

[5] Defendants note that Ms. Marteney's email contained a link, "Book time with Stacy," whereby the email recipient could schedule a meeting with Ms. Marteney, if desired.

6

obligated to follow the recently issued WVDE Guidance, which was based upon the current law on required vaccinations.[6]

On Monday, January 8, 2024, Ms. Marteney circled back with Plaintiff as to any update Plaintiff may have regarding a possible religious exemption to the vaccination requirements. In addition, Ms. Marteney confirmed with Plaintiff the Board's duty to follow the current law and WVDE Guidance and to see if Plaintiff had reached a decision related to K.P. On January 10, 2024, Ms. Marteney communicated again with Plaintiff to advise her she would need to update K.P.'s vaccinations or she would not be permitted to continue enrollment in the virtual program. **Exhibit 2**. Plaintiff asked for further time to consider the matter, which was provided. **Exhibit 2**. On January 16, 2024, nearly two weeks after their initial conversation, Plaintiff indicated to Ms. Marteney that there were no plans to vaccinate K.P., and that K.P. would be returning to homeschooling in Fayette County. **Exhibit 2**. During the January 16, 2024 conversation, Plaintiff shared with Ms. Marteney that she didn't agree with the vaccination requirements, but that she understood there was nothing that Ms. Marteney could do. **Exhibit 2**. Plaintiff did not allege that she believed the Board was discriminating against her based on her religion. **Exhibit 2.** K.P. participated in Upshur County Virtual School until she withdrew on or around January 16, 2024. **Exhibit 2**.

On or around February 2, 2024, a Charge of Religious Discrimination was filed in the WV Human Rights Commission by Krystle Perry on behalf of her minor child, K.P. On May 10, 2024, Plaintiff, through her then counsel, requested withdrawal of the Complaint. The case was then dismissed by the Commission. The present case was subsequently filed on July 5, 2024.

---

[6] West Virginia Code § 16-3-4.

## STANDARD OF LAW

"The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a).  Absent sufficient notice, the court may issue a temporary restraining order not to exceed fourteen days in length.  *See id.* at 65(b).  The party seeking a preliminary injunction must establish all four factors: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.  *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir. 1977).

## ARGUMENT

### A.    Plaintiffs are unlikely to succeed on the merits.

1.    **Plaintiffs are unlikely to succeed on the merits in this case, since the Court, under the Pullman doctrine of abstention should exercise its discretion to stay from the case, where constitutional considerations are at play, when state court proceedings can resolve the issue.**

In the absence of any showing that "methods for securing a definitive ruling in the state courts cannot be pursued with full protection of the constitutional claim, the district court should exercise its wise discretion by staying its hands." *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501(1941).  In the present case, there has been no such showing by Plaintiffs. Furthermore, there *are* sufficient avenues to secure a definitive ruling in the Courts of West Virginia, as the Court and all counsel in the case are aware.

The Pullman doctrine has recently been utilized in an almost identical case with identical issues filed by some, or all, of these same counsel for the Plaintiffs.  In that case, U.S.

8

District Judge John Preston Bailey abstained from ruling on the case, in order to allow the state law issues to be decided by the state courts themselves. (**Exhibit 3**). Counsel for Defendants The Board of Education of the County of Upshur, Stacy Marteney and Christine Miller believe that Judge Bailey's reasoning was sound and that the law necessitates the same results here in the present case.

### 2.    The Statute is subject to rational basis review.

A court will sustain a "religiously neutral and generally applicable law [that] incidentally burdens free exercise rights" if it is "rationally related to a legitimate government interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021)(affirming the denial of a preliminary injunction because petitioners were unlikely to succeed on the merits of their claim that Maine's mandatory vaccination law for healthcare workers, which did not offer a religious or philosophical exemption, violated the Free Exercise Clause).

### a.    The Statute is neutral.

For purposes of the Free Exercise Clause of the First Amendment, a neutral law of general applicability need not be justified by a compelling governmental interest, even if the law has the incidental effect of burdening religious practice. *See Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (and prescribes) conduct that his religion prescribes (or proscribes). *Smith at 879*. (internal quotation marks and citations omitted). A neutral law is one that does not target religious beliefs or have as

9

its object to infringe upon or restrict practices because of their religious motivation. *Church of Lukimi Babalu Aye., Inc. v. Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217 (1993).

In determining whether a law impermissibly targets religion, the Court must "begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id*. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id*. Even if a law is facially neutral, it may still be found to be a violation of the Free Exercise clause if it results in the "covert suppression of particular religious beliefs." *See Bowen v. Roy*, 476 U.S. 693, 703, 106 S. Ct. 2147, 2154, 90 L. Ed. 2d 735 (1986). Furthermore, official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. *Lukumi*, 508 U.S. at 534.

The law challenged by Plaintiffs here is neutral. The purpose of the law is to protect the health and safety of West Virginia school children and the communities to which they live in. *See* W. Va. Code § 16-3-5. Plaintiffs' Motion does not set forth any argument that the law was motivated by any religious animus. As such, the law is neutral.

        **b.**        **The Statute is generally applicable.**

To be generally applicable, a law may not selectively burden religiously motivated conduct while exempting conduct that is comparable and secularly motivated. *See Lukumi*, 508 U.S. at 543. Further, a law is not generally applicable if it "invite[s]" the government to consider the particular reasons for a person's conduct by providing a "mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 141 S. Ct. 1868, 1877 (2021) (quoting *Smith*, 494 U.S. at 884). Under that rule, if a state reserves the authority to "grant

10

exemptions based on the circumstances underlying each application," it must provide a compelling reason to exclude "religious hardship" from its scheme. *Id.* (quoting *Smith*, 494 U.S. at 884). A law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* (citing *Lukumi*, 508 U.S. at 542-46).

Plaintiffs argue that West Virginia Code § 16-3-4(h) allows for a "mechanism for individualized exemptions" in violation of *Fulton*. However, Plaintiffs' reliance on *Fulton* is misplaced. In *Fulton*, the Supreme Court applied strict scrutiny to a City of Philadelphia non-discrimination contract provision that provided a city official the ability to grant exemptions in his or her **sole discretion**, which rendered the law not generally applicable. *See Fulton*, 141 S.C. at 1878-79. That is not the case here as Plaintiffs contend. Instead, Section (h) provides for a discrete category of people to whom the vaccine requirement **does not apply**—that is—those who provide a certificate from a "licensed physician stating that the physical condition of the child is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine. W. Va. Code § 16-3-4(h)(1). It is not disputed that West Virginia's interest in W. Va. Code § 16-3-4 is to protect the health and safety of West Virginia schoolchildren and the communities to which they live. *See* W. Va. Code § 16-3-5. Contrary to Plaintiffs' claims, the medical exemptions provided for in Section (h) exist to **advance** the State's interest in the health and safety of its schoolchildren (by allowing those with sufficient medical evidence that immunization is contraindicated to be exempt from the vaccination requirement)—not undermine it. On the other hand, the religious exemption to which the Plaintiffs seek would do the opposite by undermining the State's interest as set forth in W. Va. Code § 16-3-5.

11

Plaintiffs further argue that "[i]n the compulsory vaccination arena, several circuit courts have held this type[7] of discrimination and preference for secular activity over religious observance invokes strict scrutiny."  Plaintiffs' Motion at 11.  In support of this argument, Plaintiffs rely on inapposite authority and lean heavily on one decision from the Southern District Court of Mississippi that did not engage with any issue in dispute in this case.[8]  More importantly, Plaintiffs omit the overwhelming nearly unanimous consensus, including the 4th Circuit, which have found that there are no constitutional defects in a state's school vaccination mandate on account of the absence or repeal of a religious exemption.  *See* e.g.  *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015) (per curiam); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 352-54 (4th Cir. 2011) (unpublished disposition); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1085-89 (S.D. Cal. 2016); *Love v. State Dep't of Educ.*, 29 Cal.App.5th 980, 240 Cal. Rptr. 3d 861, 868 (2018); *F.F. ex rel. Y.F. v. State*, 194 A.D.3d 80, 143 N.Y.S.3d 734, 742 (3d Dep't 2021), *cert. denied sub nom. F.F. ex rel. Y.F. v. New York*, ––– U.S. ––––, 142 S. Ct. 2738, 212 L.Ed.2d 797 (2022);  *Miller v. McDonald*, No. 1:23-CV-00484 EAW, 2024 WL 1040777 (W.D.N.Y. Mar. 11, 2024); *Royce v. Bonta*, No. 3:23-CV-02012-H-BLM, 2024 WL 1269485 (S.D. Cal. Mar. 25, 2024).

Plaintiffs' reliance on *Tandon* is also similarly misplaced.  Plaintiffs argue that the State's medical exemption under Section (h) undermines the purpose of the law because it allows students who are unvaccinated to enter the schools.  [*See* Doc. 8 at 12-13.]  However, in *Tandon*,

---

[7] "This type" apparently meaning West Virginia's statutory scheme under W. Va. Code § 16-3-4.

[8] The Mississippi Attorney General did not defend the vaccine mandate as written.  *See Bosarge v. Edney*, No. 1:22-dv-233, 2023 WL 2998484 (S.D. Miss. Apr. 18, 2023).  Instead, the Attorney General conceded at the outset that the state's immunization law would not survive strict scrutiny and argued that Mississippi's Religious Freedom Restoration Act created a backdoor religious exemption where none existed on the face of the vaccine mandate. *See id*.  The District Court concluded that neither the facts nor the law supported the Attorney General's argument and granted the injunction with little analysis in light of the limited dispute between the parties.

the Supreme Court concluded that the petitioners were likely to succeed on their Free Exercise challenge to California's restrictions on the number of households that could gather for in-home religious worship. *Tandon v. Newsom*, 141 S. Ct. 1294 (2021). The Court held that "California's [COVID prevention measure] contains myriad exceptions and accommodations for comparable [secular] activities, thus requiring the application of strict scrutiny." *Tandon*, 141 S. Ct. at 1297. The Statute contains no such aimless discretionary exemptions.

Contrary to Plaintiffs' arguments, the Statute's medical exemption and Plaintiffs' sought-after religious exemption are not "comparable" for purposes of the Free Exercise Clause. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interests that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. "Comparability is concerned with the risks various activities pose." *Id.*

Plaintiffs provide no evidence (or compelling legal authority) to support their arguments that medical and religious exemptions are comparable. Evidence from comparable cases shows that far more students seek religious exemption than medical exemption from mandatory vaccination laws. *See We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 154 (2d Cir. 2023), cert. denied sub nom. *We the Patriots USA v. CT Early Childhood Dev.,* No. 23-643, 2024 WL 3089546 (U.S. June 24, 2024). Put another way, Plaintiffs have failed to establish that the medical and religious exemptions pose comparable health risks. In fact, the CDC data cited in Plaintiffs' Motion shows that West Virginia (and other states with similar legislation) have high rates of pre-Kindergarten vaccine compliance. [*See* Doc. 8 at n.16.] Unsurprisingly, West Virginia and states with similar legislation generally outperform states that recognize religious exemptions with respect to immunization rates for vaccine-preventable diseases. [*See id.*]

Nor is a medical exemption comparable with a religious exception in terms of the government interests. The Statute's medical exemption serves the State's interest "to maintain our children's health and well-being" in a way that a religious exemption does not. *See* W. Va. Code § 16-3-5(a); *see also Mills*, 16 F.4th at 31 ("[C]arving out an exception for those people to whom [a] physical health risk applies further [state] interests in a way that carving out an exception for religious objectors would not."), *cert. denied* 142 S. Ct. 17 (2021); *We the Patriots USA*, 579 F. Supp. 3d at 309 ("the decision to exempt individuals from the vaccine requirement for medical reasons does not undermine [the state's] interest, as [the state] would not be protecting the health and safety of schoolchildren if it required these children to undergo medically contradicted treatment."). It was for these reasons that the Second Circuit upheld an identical statutory scheme and reasoned that "medical exemptions are not comparable to religious exemptions." *See We The Patriots USA, Inc*., 76 F.4th 130, 155 (2d. Cir. 2023).

The Supreme Court has never held that a single objective exemption—let alone one based on the medical condition of the individual—renders a rule not generally applicable. The Statute affords government physicians, the Immunization Officer and the State Health Officer, no unfettered discretion to grant or deny exemptions. The existence of a verified medical exemption does not render the Statute not generally applicable. *See id*. The Statute is generally applicable requiring rational basis review—which the Statute easily survives.[9]

---

[9] Plaintiffs also argue that the Statute invokes "hybrid rights" which give rise to independent grounds to impose strict scrutiny. [*See* Doc. 8 at 17-18.] Plaintiffs cite to dicta which the Fourth Circuit has refused to apply. [*See id.*] Again, the Fourth Circuit has already rejected challenges to the Statute under the federal Due Process and Equal Protection Clauses. *See Workman*, 49 F. App'x at 354-356 ("[T]he Supreme Court has consistently recognized that a state may constitutionally require school children to be vaccinated."). Moreover, courts have rejected hybrid rights arguments in similar circumstances. *See We the Patriots USA*, 579 F. Supp. 3d. at 309-10 (rejecting hybrid rights statute in upholding Connecticut's mandatory vaccination law). Plaintiffs are unlikely to succeed with their hybrid rights argument for strict scrutiny review.

14

### 2.    Even if strict scrutiny applies, the Statute is Constitutional.

#### a.    The State has a compelling interest.

Both the Fourth Circuit and the West Virginia Supreme Court of Appeals have held that it does not matter what scrutiny applies: the Statute is Constitutional.  *See Workman*, 419 F. App'x at 353 ("[E]ven assuming for the sake of argument that strict scrutiny applies… West Virginia's vaccination laws withstand such scrutiny."); *D.J.*, 2013 WL 6152363, *4 (upholding the Statute under West Virginia strict scrutiny in a due process and equal protection challenge).

The Statute serves a compelling state interest.  *See Workman*, 419 F. App'x at 353 ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."); *D.J.*, 2013 WL 6152363, *4 ("[T]he protection of the health and safety of the public is one of the most important roles of the State.").  As the Legislature has found, "[i]mmunization of children at an early age serves as a preventative measure… and is essential to maintain our children's health and well-being." W. Va. Code § 16-3-5(a).

Plaintiffs deny that the Statute serves a compelling state interest for two reasons.  First, Plaintiffs claim that "secular exemptions to its mandatory vaccination scheme" undermine the importance of the state's claimed interest.  [Doc. 8 at 18.]  As explained above, the medical exemption does not undermine the state's health interest—it *furthers* that interest.  [*See supra* at 4.]  Indeed, the absence of a medical exemption for a government-mandated healthcare procedure intended to protect citizens' health would be villainous, and possibly criminal.  The absence of a medical exemption would undermine and disserve the interests of the state and the purpose of the Statute.

15

Second, Plaintiffs argue that West Virginia does not have a compelling interest in mandating vaccination of K.P. because K.P. is not attending in person. *See* Doc. 8 at 19 ("Again, a child with a medical exemption who attends school in person poses a significantly greater threat to the government's objectives than a virtual student with a religious exemption."). Plaintiffs' focus on the risk of transmission ignores other elements of the interest of the State in enacting the mandatory vaccination scheme. The Statute is clear in that the purpose of the immunization requirement is to serve "as a preventative measure… and is essential to maintain our children's health and well-being." W. Va. Code § 16-3-5(a). Plaintiffs' singular focus on the fact that K.P. will not be around other children in a virtual learning environment does not somehow render the State's interest in maintaining the health and well-being of *all* children in the education system, including Plaintiff K.P. Furthermore, Plaintiffs' assumption that children in virtual learning environments will not be around other children is not necessarily accurate. The State of West Virginia requires standardized testing of all students from third grade through twelfth grade, which is given annually. (§18-2E-5 and Participation Guidelines for West Virginia State Assessments 2023/2024[10]) Students involved in virtual learning are required to appear for the state required testing whenever it is given. Additionally, children who are in virtual learning situations are permitted to engage in the school's organized sports. As such, if such a student were to join the basketball team, the track team, the cross-country team, etc. they would be around other children.

### b.    The Statute is narrowly tailored.

The Statute is also narrowly tailored to achieve that interest. "Immunization *at an early age* serves as a preventative measure… and is essential to maintain our children's health and

---

[10]    https://dynamiclearningmaps.org/sites/default/files/documents/StateBonusItems/West_Virginia_2023-2024_Participation_Guidelines_for_State_Assessments_Final.pdf-

well-being." W. Va. Code § 16-3-5-(a) (emphasis added). The Statute is narrowly tailored to provide exceptions for verified medical reasons, but nothing else.

Plaintiffs argue that the Statute is not narrowly tailored because the majority of states recognize religious exemptions, which according to Plaintiffs' reasoning, proves a narrowly tailored solution must exist. [*See* Doc. 8 at 20-21.] But in recent years, the United States has seen outbreaks of communicable diseases that the CDC had previously deemed eliminated. [*See Assessing Measles Outbreak Risk in the United States,* CENTERS FOR DISEASE CONTROL AND PREVENTION, available at https://www.cdc.gov/ncird/whats-new/measles-outbreak-risk-in-us.html]. In response to outbreaks of previously eliminated communicable diseases, several states legislatively removed their religious exemptions. [*See supra* at 4.] Given West Virginia's high rates of vaccine compliance, the State is appropriately and demonstrably tailored to address these health risks. Plaintiffs also claim that the statute is underinclusive because it does not apply to adults, non-school attending children, and provides for medical exemptions. [*See* Doc. 8 at 22.] However, in comparing school attending children to adults, Plaintiffs ignore the State's interest and purposes in early-age immunization. *See* W. Va. Code § 16-3-5(a). In comparing school attending children to non-school attending children, Plaintiffs cite no data to support their assertion that this jeopardizes the State's present tailoring of its policy. Moreover, epidemiologists, not lawyers, are in the best position to testify and demonstrate to the Court, with objective evidence, the flaws in Plaintiffs' layperson comparisons—militating against a sudden preliminary injunction.

For these reasons, and for the reasons the Fourth Circuit and the West Virginia Supreme Court of Appeals have already found, the Statute survives strict scrutiny, and Plaintiffs have little (if any) likelihood of success on the merits of their claims.

17

**B.    Other factors weigh against issuing the injunction**

Because Plaintiffs do not have a likelihood of success on the merits, this Court need not address the remaining factors. But those factors do not favor Plaintiffs, either.

**1.    Plaintiffs have not shown irreparable harm.**

Plaintiffs' claim to irreparable harm, again, leans heavily on the alleged deprivation of constitutionally protected rights. [*See* Doc. 8 at 24-25.] As explained above, this is unpersuasive. Further, a delay in making a constitutional challenge "undercuts any assertion of urgency and irreparable harm." *Whitlow*, 203 F. Supp. 3d at 1091. While denying an injunction of a substantially similar vaccine mandate in California (which also lacks a religious exemption), the Court in *Whitlow* held that a one-year delay in challenging the statute undermined plaintiffs' claim of urgency and irreparable injury. Doubly so here: this Statute has been in effect since 1937 and has survived Free Exercise scrutiny for the last decade. The very nature of this longstanding, repeatedly-upheld state law tends to show that it does not pose irreparable or urgent injury.

The unique facts with respect to these Plaintiffs do not evidence irreparable, immediate or urgent injury either. Plaintiffs' allegations that they have been "forced to homeschool K.P." which presents "obstacles due to Ms. Perry's work schedule, her status as the sole provider for their family, and Mr. Perry's impairment" do not rise to the level of irreparable harm. [*See* Doc. 8 at 24.] Accordingly, Plaintiffs have not satisfied their burden of persuasion to satisfy this element of an injunction.

Furthermore, Upshur County Virtual School is not Plaintiffs' only option for virtual schooling. There is also the West Virginia Virtual School Academy, which Plaintiffs have

18

JA217

incorrectly identified as the virtual school K.P. had been attending prior to being told that she could no longer attend if not fully vaccinated[11], as well as various private virtual schools around the country.  For example:  Liberty University On-line Academy (https://www.liberty.edu/lp/online-academy/middle/?acode=D02490&subid=virtual%20middle%20school&tfn=8779475548&kwid=43700041721998483&g_kw_id=kwd-1415414055&platform=google&account_id=8045669874&campaign_id=1547318794&ad_group_id=61774472147&device=c&g_location=9010741&cq_net=g&cq_plt=gp&network=g&extension=&gad_source=1&gclid=EAIaIQobChMIza3G7sPEhwMVZzQIBR3puxZ7EAAYAyAAEgIMaPD_BwE&gclsrc=aw.ds ); K12 Private Academy ( https://go.k12academy.com/private/k12-private-academy/?st=icadgen30&product=icademy&lead_source_detail=nonbr&leadsource=paid_sem&utm_campaign=SC-Generic-EM&utm_content=&utm_initiative=new_private_pay&utm_medium=cpc&utm_source=Google+Adwords&utm_term=private+academy+online&utm_vendor=Google&phys_loc=9010741&act_id=6493153624&ad_group=Academy+Online&adgrp_id=168552683721&camp_id=21474824841&int_loc=&keyword_match=e&keyword=&kw_id=kwd-349166360390&cust_id=548-013-2195&gad_source=1&gclid=EAIaIQobChMIza3G7sPEhwMVZzQIBR3puxZ7EAAYAiAAEgLqXvD_BwE&gclsrc=aw.ds&adobe_mc=MCMID%3D20536228828134577322736180696621530947 );    Ignite   Learning   Academy   (   https://ignitelearningacademy.com/about/why-ila/?utm_source=Kreativewebworks&utm_medium=cpc&utm_campaign=PPCIgniteLearningAcademyNational&utm_id=4482284&scid=4638303&cid=4580236&tc=EAIaIQobChMIza3G7sP

---

[11] K.P. had actually been participating in the Upshur County Virtual School, not the West Virginia Virtual School Academy.  These are two separate entities, operated by different entities.

EhwMVZzQIBR3puxZ7EAAYBCAAEgLoifD_BwE&rl_key=897bc1d29626ba002069ae49201 e6d56&kw=1012941&pub_cr_id=697748044270&dynamic_proxy=1&primary_serv=ignitelearn ingacademy.com&device=c&network=g&targetid=kwd-91266915&loc_physical_ms=9010741&rl_retarget=1&rl_track_landing_pages=1 );  American Virtual Academy ( https://americanvirtualacademy.com/ )

### 2.    The public interest weighs against this injunction.

Plaintiffs also fail to establish that the public interest favors the injunction. Plaintiffs generally argue that their constitutionally protected rights have been infringed, therefore tipping the public interest in their favor.  [*See* Doc. 8.]  But the Supreme Court has "rejected the claim that the individual liberty guaranteed by the Constitution overcame the State's judgment that mandatory vaccination was in the interest of the population as a whole."  *Phillips*, 775 F.3d at 542.

The public interest lies strongly in favor of the prevention of contagious diseases. *See, e.g., Mills*, 566 F. Supp. 3d at 58.  And the public interest does not just extend generally to preventing disease, but also to ensuring that vaccines "reach more children" thereby "promot[ing] higher rates of vaccination coverage" [*State Vaccination Requirements*, CENTERS FOR DISEASE CONTROL AND PREVENTION, available at https://www.cdc.gov/vaccines/imz-managers/laws/state-reqs.html (last visited July 25, 2024)].  According to the CDC, "[s]tudies have shown that vaccine exemptions tend to cluster geographically," and that clustering non-immunization poses a threat to existing herd immunity for diseases that are vaccine-preventable. [*See id.*]  The public has a strong interest in reducing the rates of vaccine-preventable diseases like those addressed by the Statute.

20

**CONCLUSION**

For these reasons, *Plaintiffs' Motion for Preliminary Injunction and Expedited Consideration* should be denied.

*/s/ Robert J. Kent*

Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, West Virginia  26102
(304) 420-5504
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, West Virginia  26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

Counsel for Defendants The Board of
Education of the County of Upshur, Stacy
Marteney and Christine Miller

16993815.1

21

JA220

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

      Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and DOUG CIPOLETTI
*in his official capacity as Executive Director of the
West Virginia Virtual School Academy*,

      Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE KLEEH

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:

      John H. Bryan, Esquire

      Aaron Siri, Esquire

      Elizabeth A. Brehm, Esquire

      Walker D. Moller, Esquire

      Christopher Wiest, Esquire

                      */s/ Robert J. Kent*
                      Robert J. Kent

22

16993815.1

JA221

**From:** West Virginia Department of Education <info.wvde@k12.wv.us>
**Date:** December 18, 2023 at 5:59:59 AM EST
**To:** Christine Miller <cemiller@k12.wv.us>
**Subject: Superintendent's Update - December 18, 2023**
**Reply-To:** West Virginia Department of Education <info.wvde@k12.wv.us>

[EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the sender and know the content is safe.



*December 18, 2023*

# Superintendent's Update



EXHIBIT
1

JA222



# *Keeping ConnectED:*
# *Holiday Special*

In this week's Keeping ConnectED, celebrate the holidays as we celebrate award-winning educators. State Superintendent of Schools Michele Blatt hosts the Excellence in Education Holiday Special and catches up with the outgoing and incoming Teacher of the Year.

# *This week with Unite with Numeracy*



The next featured educator in our Unite with Numeracy Educator series is 2023 Milken Educator Janna Hamrick from Rock Branch Elementary in Putnam County. She utilizes Mathematical Habit of Mind 8, "look for and express regularity in repeated reasoning," in her classroom.

Click here to learn more about Unite with Numeracy.

JA224

## *What's New?*

**SAFETY TRAINING:** Superintendents and school administrators are invited to participate in a "Responding to and Investigating Bomb Threats and Swatting Hoaxes" training, presented and hosted by the FBI Boston and Massachusetts State Police. This event will be held on Wednesday, January 11, 2024, at 9 a.m., 11 a.m., 2 p.m., and 4 p.m. These will be virtual events. Click here for more information and to register for training.

**GROW YOUR OWN PUBLICATION:** The West Virginia Board of Education (WVBE) and the West Virginia Department of Education (WVDE) are committed to expanding the number of high-quality educators and leaders by elevating educator preparation, recruitment, and retention. West Virginia Grow Your Own and West Virginia Grow Your Own Apprenticeship to Teaching offer recruitment and retention strategies to support county school systems. Click here to read the Fall 2023 West Virginia Grow Your Own publication.

**NEW WORLD LANGUAGE AND ASL TEACHERS LISTSERV:** A new email ListServ has been created for world language and ASL teachers throughout the state. The WVDE will share information such as educational opportunities, state policy changes, or information about language learning through this ListServ. Communications may also include news about cultural programs and travel opportunities, teacher and student scholarships, or applications for the Seal of Biliteracy. Teachers may join the new ListServ by emailing Julie Morris, Coordinator for the Offices of Student Enrichment and CTE Middle School.

JA225

**VIRTUAL SCHOOL STUDENTS IMMUNIZATION REQUIREMENTS:** Students enrolled in public schools as full-time virtual students are required to be fully immunized according to W. Va. Code 16-3-4 exactly as they would be when enrolling for in-person instruction. Please review the enrollment records of your full-time virtual students and work with your administrators and school nurses to correct any non-compliant enrollment occurrences.

**INVEST 2024:** The WVDE is excited to announce that the INVEST conference will return for the Summer of 2024! The Charleston INVEST Conference will be held on June 24– 27, 2024, at the Charleston Coliseum and Convention Center and the Morgantown INVEST Conference will be held on July 22 – 25, 2024, at the Waterfront by Marriott. Elementary teachers will attend all 3 days to receive professional learning in reading/language arts, mathematics, science, and social studies. Secondary teachers will attend 2 days for their specific content areas. Dr. Weston Kieschnick will be the keynote speaker at each location. The Thursday of each conference week will be reserved for the second Science of Reading implementation team training with Dr. Jennifer Dale, recertification courses for selected CTE teachers, and Parent-Community Involvement training with Nancy Cline. The WVDE will be providing lodging and granting counties $300 per teacher who attends. Mileage costs will be the responsibility of the county. If you have any questions, please email Jonah Adkins or Joey Wiseman. Please watch for more information regarding registration and the number of participants each county will be allowed to send.

**PROVIDING IEP/504 ACCOMMODATIONS:** Click here to find instructions about the documentation necessary for the provision of IEP/504 accommodations,

5

JA226

including WVDE Policy 2419 and Methods of Delivery of Accommodations.

**WEST VIRGINIA ATTENDANCE COLLABORATIVE CONFERENCE:** The West Virginia Attendance Collaborative (WVAC) Conference will be held on January 18-19, 2024, at Waterfront Resort in Morgantown, West Virginia. Jessica Sprick from Safe and Civil Schools will support districts in creating action plans for attendance. Two sessions will be offered this year, in January and in May. Details and registration information will be shared with county attendance directors. If you have questions please email Stacey Losh.

**ESSER YEAR 4 DATA COLLECTION**: The Office of the Elementary and Secondary Education Act (ESEA) Programs is creating the ESSER Year 4 Data Reporting district-specific Excel workbook which will include auto-populated data collected from the last three years of ESSER data collection. Click here for more information.

**SAMPLE NARRATIVE WRITING PROMPTS AND RUBRICS**: Sample narrative writing prompts and new narrative writing rubrics are now available for teachers to use in their classrooms. The prompts and the rubrics are available in the Writing Resources Channel on the WV PEAKS Team site. To access these resources, educators must be members of the WV PEAKS Team. Click here for information on how to join WV PEAKS. For questions, please email Dr. Vaughn G. Rhudy or call 304-558-2546.

**WEST VIRGINIA SCHOOL COUNSELOR OF THE YEAR**: Nominations are now open for the 2024 West Virginia School Counselor(s) of the Year. Nominations will

JA227

close on January 5, 2024. Click here for more information about the award and nomination instructions.

---



## *Reminders*

- Monthly West Virginia Board of Education meeting is **January 10, 2024.**

- Arts Alive Poster Submissions are due by January 26, 2024.

- Click here to purchase discounted WVU Basketball tickets for their matchup with Bringham Young University on Saturday, February 3, 2024.

---

JA228

## *Important Dates*



- **December 18, 2023:** Agenda items are due for the **January 10, 2024, West Virginia Board of Education meeting.** Send items to Deputy Superintendent Sonya White or call 304-558-2681.



## Holiday Hams

Bethlehem Elementary School students in Ohio County entertained the audience with silly songs during their Winter Music Concert.





*Copyright © 2023 West Virginia Department of Education*

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

## STATEMENT OF STACY MARTENEY

1. I am presently employed by the Upshur County Board of Education (the "Board"), have been employed by the Board for approximately 25 years, and was employed by the Board at all times relevant to the allegations in the Complaint of Krystle Perry on behalf of her daughter, K.P., to the West Virginia Human Rights Commission.

2. My position is presently the Virtual Learning Coordinator.

3. At all times relevant to the allegations in the Complaint of Ms. Perry I served as the Virtual Learning Coordinator.

4. In my role, I worked with students and parents who wished to enroll in the Upshur County Virtual School and while they participated in virtual schooling.

5. For the 2023-2024 school year, the parents of K.P. completed the Enrollment Packet for Upshur County Virtual School online.

6. The parents of K.P. were provided with the Upshur County Schools Immunization Consent Form that contained information on mandatory vaccination.

7. On or around December 8, 2023, I received the Superintendents' Update from the WVDE ("WVDE Guidance") that contained guidance on mandatory vaccinations.

8. The WVDE Guidance emphasized the importance of mandatory vaccinations of virtual school students and stated that virtual students should be fully immunized "exactly as they would be when enrolling for in-person instruction."

9. An investigation was undertaken concerning the mandatory vaccinations of students enrolled in the Upshur County Virtual School.

10. I affirm the following facts related to the investigation and my communications with Ms. Perry regarding the need for the mandatory vaccinations of K.P.:

1



EXHIBIT 2

11. On Tuesday, January 2, 2024, I learned that K.P. was missing required vaccinations of DTaP, Polio, MMR, and Varicella.

12. On Wednesday, January 3, 2024, I talked with Ms. Perry about the need for K.P.'s required vaccinations. I recall that she indicated that she did not want to vaccinate K.P. but that she asked for time to discuss it with her husband before they reached a decision.

13. I agreed and asked that she let me know their decision the following week.

14. In addition, on Wednesday, January 3, 2024, I emailed to Ms. Perry the types of mandatory vaccinations that K.P. was missing.

15. Also, on Wednesday, January 3, 2024, Ms. Perry called me back to let me know that she believed the West Virginia Legislature would be voting the following Monday regarding a religious exemption to the vaccination requirements.

16. I spoke with Superintendent Miller and another administrator, Jody Johnson, about K.P. and the mandatory vaccinations. We agreed that the Board had to follow the current law and policy in place.

17. On Monday, January 8, 2024, I checked back with Ms. Perry to see if she had an update on the religious exemption. I also let her know that we had to follow the current law as we found it.

18. On Wednesday, January 10, 2024, I spoke with Ms. Perry again and emphasized that K.P. would need to obtain the required vaccinations or she would not be allowed to stay in the Upshur County Virtual School. She again asked for time to decide what to do, which was provided.

19. On Tuesday, January 16, 2024, I talked to Ms. Perry and she indicated that K.P. would return to homeschooling in Fayette County. Ms. Perry did tell me that she did not agree with mandatory vaccinations but that she understood there was nothing I could do. She did not tell

2

me that she believed she was being discriminated against based on her religion. I let her know that if the Legislature permitted a religious exemption in the future or they decided to vaccinate K.P. that K.P. could be re-enrolled.

20. On January 16, 2024, K.P. withdrew from Upshur County Virtual School.

21. Of the 292 students currently enrolled in the Upshur County Virtual School, only two withdrew from school rather than receive the mandatory vaccinations.

Stacy Marteney

16638693.1

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

WEST VIRGINIA PARENTS FOR
RELIGIOUS FREEDOM, PASTOR CHRIS FIGARETTI,
and **JUDD UHL,**

        Plaintiffs,

      v.

**CIVIL ACTION NO. 5:23-CV-158**
Judge Bailey

**DR. MATTHEW CHRISTIANSEN,**
in his official capacities as the State
Health Officer and Commissioner of the
Bureau of Public Health,

        Defendant.

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND FOR PERMANENT INJUNCTION AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pending before this Court is plaintiffs' Motion for Summary Judgment [Doc. 48] and accompanying Memorandum in Support [Doc. 49], filed May 31, 2023. On June 30, 2023, defendant filed a Cross-Motion for Summary Judgment [Doc. 52] and accompanying Response in Opposition and Memorandum in Support [Doc. 53]. Plaintiffs filed a Response in Opposition to defendant's Cross-Motion and Reply in Support [Doc. 61] on

1

EXHIBIT
3

July 23, 2023. Defendant filed a Reply [Doc. 64] on July 26, 2023.[1] Accordingly, this matter is ripe for adjudication. For the reasons contained herein, plaintiffs' Motion will be denied, and defendant's Cross-Motion will be granted.

## BACKGROUND

This case involves a First Amendment challenge to W.Va. Code § 16-3-4, in which the State of West Virginia has enacted a secular medical exemption option to its mandatory vaccination requirements for children attending schools throughout the state ("the Compulsory Vaccination Law").

## I.    The Law at Issue

Since 2015, the Compulsory Vaccination Law has provided that "[n]o child or person may be admitted or received in any of the schools of the state or a state-regulated child care center" unless the child has been immunized against the following diseases: chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus, and whooping cough. W.Va. Code § 16-3-4(c). Section 16-3-4 provides a single exemption from this requirement for individuals who cannot safely receive specific vaccines.[2]

Under this framework, an individual seeking a vaccine exemption for a child may submit a request for an exemption "accompanied by the certification of a licensed physician stating that the physical condition of the child is such that immunization is

---

[1]Additionally, this Court has considered the amicus curiae briefing filed by the Attorney General of West Virginia [Doc. 46] and The Center for Rural Health Development, Inc. [Doc. 54].

[2]This exemption process is guided by § 16-3-4(h) and its supporting regulations, which are found at West Virginia Code of State Rules § 64-95-1, *et seq.*

2

contraindicated or there exists a specific precaution to a particular vaccine." W.Va. Code § 16-3-4(h)(1). Next, the State's Immunization Officer–a licensed physician who is appointed by the Commissioner–reviews the evidence obtained by the physician and determines if there is "sufficient medical evidence that an immunization is contraindicated or there exists a specific precaution to a particular vaccine." W.Va. Code R. § 64-95-17.4; § 64-95-16. The terms "contraindicated" and "precaution" are narrowly defined by statute.[3] If the Immunization Officer determines that there is sufficient evidence that an immunization is contraindicated or a particular precaution exists, an exemption will be granted. If not, a request for exemption is denied.

Under the statute, any denial by the Immunization Officer may be appealed to the State's Health Officer. W.Va. Code § 16-3-4(h)(4). At this stage, the state's rules permit the child's parent or guardian to submit additional evidence to support a contraindication or precaution warranting exemption. W.Va. Code R. § 64-95-17.8.d. The State Health Officer then reviews all the evidence and makes a determination regarding whether a contraindication or precaution has been substantiated "based on the preponderance of the evidence." W.Va. Code R. § 64-95-17.8(e). Finally, West Virginia Code § 16-3-4(h)(5)

---

[3]More specifically, the statute defines "contraindication" as "a medical condition which renders an immunization improper for a particular individual." W.Va. Code R. § 64-95-2.4. The recognized contraindications for each vaccine are provided by the Advisory Committee on Immunization Practices from the Centers for Disease Control and Prevention.

A "precaution" is defined as "a condition defined under the current standards of immunization practice that might increase the chance or severity of an adverse vaccine reaction or compromise the ability of the vaccine to produce immunity." W.Va. Code R. § 64-95-2.10. Those defined conditions are similarly provided by the Centers for Disease Control and Prevention.

3

provides that the determination of the State Health Officer "is subject to a right of appeal" under West Virginia's Administrative Procedures Act.

## II.   The Parties

Plaintiff Pastor Chris Figaretti and plaintiff Judd Uhl are both members of plaintiff West Virginia Parents for Religious Freedom ("PRF").[4]  Both plaintiffs Figaretti and Uhl possess deeply held religious beliefs they claim prohibit them from vaccinating their children. [Doc. 1 at ¶¶ 25–30 & ¶¶ 41-45].[5]  According to plaintiffs, these strong religious beliefs create an insurmountable conflict with the Compulsory Vaccination Law because their children are categorically excluded from West Virginia's educational system based solely on their decision to refrain from vaccination.  *See* [Doc. 49 at 2–3].

Defendant Dr. Matthew Christiansen is West Virginia's State Health Officer as identified in the foregoing statutory scheme.

## III.   The Procedural Posture

On April 26, 2023, plaintiffs commenced this constitutional challenge of the Compulsory Vaccination law by pleading a single cause of action–violation of plaintiffs' free exercise rights under the First Amendment.  *See* [Doc. 1].  Two days later, plaintiffs filed a Motion for Preliminary Injunction and Expedited Consideration.  *See* [Doc. 4].  Following

---

[4]Plaintiff PRF was formed to advocate on behalf of parents whose unvaccinated children are excluded from the State of West Virginia's educational system.  Plaintiff PRF is a West Virginia, statewide, non-profit organization, established under West Virginia law and composed of parents and other citizens whose purpose is to seek and/or obtain, either through legislative change, or litigation, the establishment of a religious exemption process to vaccination requirements for schools and daycares, or the recognition by law of such exemptions.  *See* [Doc. 1 at ¶¶ 20–22].

[5]The sincerity of plaintiffs' deeply held religious beliefs is not contested by the parties.

4

a hearing on May 10, 2023, this Court denied plaintiffs' Motion seeking injunctive relief by finding no present threat of irreparable injury to plaintiffs. In so doing, this Court also issued a summary judgment briefing schedule to the parties.

### A. Plaintiffs' Arguments

Plaintiffs assert a variety of arguments in support of their contention that the Compulsory Vaccination Law violates the Free Exercise Clause of the First Amendment. More specifically, they argue that the Compulsory Vaccination Law fails the general applicability and neutrality tests thereby invoking strict scrutiny review. [Doc. 49 at 10]. In support, plaintiffs aver that the Compulsory Vaccination Law is not generally applicable because it allows for individualized discretionary review of medical exemptions, but not religious exemptions; the Compulsory Vaccination Law is neither neutral nor generally applicable because it treats secular conduct "more favorably" than "comparable" religious exercise; and the Compulsory Vaccination Law triggers strict scrutiny on alternative grounds because it infringes on constitutionally protected "hybrid" rights. [Id. at 10–17]. Based on these arguments, plaintiffs assert that the Compulsory Vaccination Law cannot survive strict scrutiny review because the state's interests are not sufficiently compelling and the Compulsory Vaccination Law is not narrowly tailored. As such, the Compulsory Vaccination Law is unconstitutional according to plaintiffs.

### B. Defendant's Arguments

Defendant contends he is entitled to summary judgment on several independent grounds. First, defendant avers that this Court should abstain under *Railroad Commision of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). [Doc. 53 at 9–10]. Next, defendant

5

argues that plaintiffs' sought after injunction of the Compulsory Vaccination Law will not provide the relief plaintiffs seek because they have failed to sue the proper state officer(s) under ***Ex parte Young***, 209 U.S. 123 (1908), thereby depriving plaintiffs of Article III standing due to lack of redressability. [Id. at 11–14]. Further, defendant asserts that the Compulsory Vaccination Law is subject only to rational basis review, which the Law withstands. [Id. at 14–26]. Finally, and alternatively, defendant contends that even if the Compulsory Vaccination Law is subject to strict scrutiny review, the Law would satisfy that highest standard as well. [Id. at 27–30].

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ***Id.*** "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any

6

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted). Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

When cross-motions for summary judgment are before a district court, as here, the same standards of review are applied. *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983). Each motion must be considered individually on its own merits, and

7

the facts relevant to each must be viewed in the light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion. *Rossignol*, 316 F.3d at 523 (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

## II.    The Free Exercise Clause of the First Amendment

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. The "free exercise" component of the First Amendment applies to states through the Fourteenth Amendment, rendering "the legislatures of the states as incompetent as Congress to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Moreover, the Supreme Court of the United States has informed that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1876 (2021) (internal quotations omitted). In considering whether a plaintiff's rights under the Free Exercise Clause are infringed, a court must determine whether the plaintiff's religious exercise has been burdened and whether the burden the government has imposed is constitutionally permissible. *Id*. A plaintiff bears the burden of showing an infringement of his or her rights under the Free Exercise Clause; if such burden is met, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored

8

consistent with the demands of [the Supreme Court of the United States'] case law." ***Kennedy v. Bremerton Sch. Dist.***, 142 S.Ct. 2407, 2421 (2022).

To establish a free exercise violation, a plaintiff may show that " a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Id*. at 2422 (internal quotation omitted). If a plaintiff makes this showing, then there is a First Amendment violation unless the Government satisfies "strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id*. (internal quotation omitted).

In determining whether a law is neutral or generally applicable, "[a] law is not generally applicable if it invites the government to consider the particular reason for a person's conduct by providing a mechanism for individualized exemptions." ***Fulton***, 141 S.Ct. at 1877 (internal quotation omitted). A law also fails to be generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. A policy is not neutral if it is "specifically directed at religious practice," meaning that it either "discriminates on its face" or "religious exercise is otherwise its object." ***Bremerton***, 142 S.Ct. at 2422 (internal quotations omitted). "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Id*.

<u>**DISCUSSION**</u>

While this Court appreciates the extensive briefing by the parties as to the merits of this case, it is abundantly clear, based on a consideration of the posture of this case and applicable law, that pertinent abstention doctrine militates against this Court's consideration

9

JA243

of the merits as presented. Abstention doctrines counsel that in certain circumstances federal courts should refuse to decide cases that are properly within their subject matter jurisdiction, "because of 'scrupulous regard for the rightful independence of state governments' and for the smooth working of the federal judiciary." *Railroad Commission of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). "*Pullman* abstention *requires* federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification might serve to avoid a federal constitutional ruling." *Nivens v. Gilchrist*, 44 F.3d 237, 245 (4th Cir. 2006); *Pullman*, 312 U.S. at 500. Abstention under *Pullman* is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959). As noted by Senior United States District Judge John T. Copenhaver, Jr., while abstention is "the exception, not the rule[,]" there are nevertheless "carefully defined . . . areas in which . . . abstention is permissible." *West Virginia Citizens Defense League, Inc. v. City of Charleston*, 2012 WL 4320983, at *11 (S.D. W.Va. Sept. 20, 2012) (Copenhaver, Jr., J.) (citation omitted) (finding this Court's Order in favor of abstention in *West Virginia Citizens Defense League, Inc. v. City of Martinsburg*, 2011 WL 4074684 (N.D. W.Va. Sept. 13, 2011), *aff'd,* 483 F.App'x 838 (4th Cir. 2012) to be the appropriate course in suits implicating both federal claims and unadjudicated state claims that may obviate the need for a federal ruling).

It appears to this Court that this standard is patently satisfied here in consideration of the State of West Virginia's recent enactment of the Equal Protection for Religion Act,

10

West Virginia Code § 25-1A-1 (2023) ("the EPRA"), which provides that state action, such as the Compulsory Immunization Law at issue, cannot "substantially burden a person's exercise of religion" unless such action can withstand strict scrutiny. W.Va. Code § 35-1A-1(a)(1).

Further, the State of West Virginia—who has taken plaintiffs' side—has stated that the EPRA is "directly relevant to the issues raised" by plaintiffs' complaint. *See* [Doc. 46 at 6]. *See Sonda v. W. Virginia Oil & Gas Conservation Comm'n*, 2022 WL 17819635, at *3 (N.D. W.Va. Dec. 1, 2022) (abstaining under *Pullman* where West Virginia state law "is directly germane to the issues presented in this case") (Bailey, J.). According to the argument here by the State of West Virginia, because the EPRA "requires governmental interests be furthered with the least restrictive means so as to not burden a person's exercise of religion," this Court should require defendant to "develop and implement" a religious exemption. [Doc. 46 at 6–7].

But in this federal constitutional challenge, the most hotly contested issue for decision posed to this Court is whether strict scrutiny applies under federal law. However, the State of West Virginia has concluded that the newly enacted EPRA already expressly requires strict scrutiny for the same challenge raised here. However, such a challenge has not been posed to the West Virginia state courts for adjudication. Because EPRA may moot, or at minimum present the question in this case in a different posture, *Pullman* overwhelmingly compels that the state courts of West Virginia should be "afforded a reasonable opportunity to pass upon" the new enactment. *AFA Distributing Co., Inc. v. Pearl Brewing Co.*, 470 F.2d 1210, 1213 (4th Cir. 1973) ("[N]o principle has found more

11

consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them.") (quoting *Harrison v. NAACP*, 360 U.S. 167, 176 (1959)).

Plaintiffs' arguments against *Pullman* abstention do little to persuade this Court, especially when plaintiffs admit that there is a "separate [West Virginia state statute], with separate rights" that has the potential to resolve this issue without this Court having to render an opinion on a substantial federal constitutional question. [Doc. 61 at 10]. As such, principles of State sovereignty, comity under the federalist system, and the policy considerations articulated in *Pullman* weigh heavily against this Court retaining jurisdiction without "afford[ing] a reasonable opportunity to pass upon" the new enactment to the state courts. See *AFA Distributing Co., Inc.*, 470 F.2d at 1213.[6][7]

---

[6]Contrary to plaintiffs' position, abstention in this case would not "create a state court exhaustion requirement for § 1983 claims." [Doc. 61 at 12]. As identified by defendant, most cases filed under § 1983 do not pose the complicated, contested, and novel issue that is presented here. In most instances, the level of constitutional scrutiny applicable to a First Amendment claim is clear, but this case requires this Court to determine what level of scrutiny applies to a state statute that provides a single, apparently well-delineated exemption that purports to further the State of West Virginia's stated purposes. Accordingly, *Pullman* abstention here is limited to the circumstances of this case, which overwhelmingly merit it.

[7]This Court declines to follow the rationale applied in *Bosarge v. Edney*, 2023 U.S. Dist. LEXIS 67439 (S.D. Miss. Apr. 18, 2023) (granting preliminary injunction relating to state's vaccination scheme) as cited in plaintiff's briefing. Here, the arguments presented by the parties directly implicate the management and oversight of West Virginia's educational system, which is of paramount importance to the interests of the State. Accordingly, the state courts must have an opportunity to examine these issues first in order to maintain comity.

12

In finding that **Pullman** operates by necessitating this Court's abstention[8], this Court is cognizant of the Supreme Court of the United States' holding in **England v. La. Bd. of Med. Examiners**, which instructed that federal courts should retain jurisdiction over the underlying case, but stay the proceedings so that state courts can rule on the state law question. 375 U.S. 411, 416 (1964). If the state courts fail to resolve the issue articulated in this case, however, the parties may then return to this Court for a ruling on the constitutional issue. *See Nivens*, 444 F.3d at 245–46.

## CONCLUSION

For the reasons stated above, this Court will **ABSTAIN** from ruling on the substantive issues presented by this case. The Clerk is **DIRECTED** to **STAY** this matter until such time that the claims addressed herein are presented to the state courts of West Virginia. In the event that the state courts do not resolve this case, plaintiffs will be permitted to seek a ruling on the federal issues presented in this Court.

Accordingly, plaintiffs' Motion for Summary Judgment [**Doc. 48**] is **DENIED WITHOUT PREJUDICE**. Defendant's Cross-Motion for Summary Judgment [**Doc. 52**] is **GRANTED IN PART**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

---

[8]In so finding, this Court declines, at present, to examine the merits of plaintiffs' substantive arguments.

13

**DATED**: August **2**, 2023.

JOHN PRESTON BAILEY
**UNITED STATES DISTRICT JUDGE**

14

**UNITED STATED DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**KRYSTLE PERRY, and ANTHONY**
**PERRY,** *individually and on behalf of their*
*minor child K.P.,*

      **Plaintiffs,**

**v.**                                                                    **Case No.: 2:24-cv-18**
                                                                            **Chief Judge Kleeh**

**STACY MARTENEY,** *in her official*
*capacity as the Virtual Learning*
*Coordinator of the Upshur County Virtual*
*School, et al.,*

      **Defendants.**

## DEFENDANT DR. MATTHEW CHRISTIANSEN'S MOTION FOR STAY

For the reasons set forth in the accompanying memorandum of law, Defendant Dr. Matthew Christiansen hereby moves to stay these proceedings under *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941), or, alternatively, pending resolution of an appeal currently before the U.S. Court of Appeals for the Fourth Circuit on the same issue, *see West Virginia Parents for Religious Freedom v. Matthew Christiansen et al.*, No. 23-1887 (4th Cir.).

Respectfully submitted,

**DR. MATTHEW CHRISTIANSEN**

By Counsel:

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
Maureen F. Gleason (WVSB #14452)
SPECIAL ASSISTANT ATTORNEYS GENERAL
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*

JA249

304-982-8056 *fax*
mhissam@hfdrlaw.com
zritchie@hfdrlaw.com
mgleason@hfdrlaw.com

Steven R. Compton (WVSB #6562)
*Deputy Attorney General*
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430

*Counsel for Defendant Dr. Matthew
Christiansen, in his official capacity*

## UNITED STATED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KRYSTLE PERRY, and ANTHONY PERRY,** *individually and on behalf of their minor child K.P.,*

     **Plaintiffs,**

**v.**

                                    **Case No.: 2:24-cv-18**
                                    **Chief Judge Kleeh**

**STACY MARTENEY,** *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School, et al.,*

     **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Michael B. Hissam         
Michael B. Hissam (WVSB #11526)

UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY, and ANTHONY
PERRY, *individually and on behalf of their
minor child K.P.*,

      Plaintiffs,

v.

STACY MARTENEY, *in her official
capacity as the Virtual Learning
Coordinator of the Upshur County Virtual
School, et al.*,

      Defendants.

                               Case No.: 2:24-cv-18
                               Chief Judge Kleeh

## DEFENDANT DR. MATTHEW CHRISTIANSEN'S COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY

This is the second case filed in this District by the same Plaintiffs' counsel seeking the same relief as before: a novel and unprecedented federal constitutional decision that invalidates West Virginia's longstanding vaccine requirement for public schoolchildren. When faced with the first such lawsuit, the Honorable Judge John Preston Bailey correctly recognized that the doctrine of *Pullman* abstention required a stay because the West Virginia Legislature's recently enacted Equal Protection for Religion Act "may moot, or at minimum present the question in this case in a different posture[.]" *W. Va. Parents for Religious Freedom v. Christiansen*, 685 F. Supp. 3d 371, 378–79 (N.D.W. Va. 2023). According to Judge Bailey, "*Pullman* overwhelmingly compels that the state courts of West Virginia should be 'afforded a reasonable opportunity to pass upon' the new enactment." *Id*. (quoting *AFA Distributing Co., Inc. v. Pearl Brewing Co.*, 470 F.2d 1210, 1213 (4th Cir. 1973)). Judge Bailey therefore stayed the case.

This Court should follow Judge Bailey's well-reasoned decision, or at minimum, stay the case pending resolution of the appeal from that order in the Fourth Circuit (oral argument is scheduled for September 25). Even if this Court decides to address the novel First Amendment question now, for the reasons explained below, Plaintiffs' arguments fail on the merits. And so, Plaintiffs are not entitled to a preliminary injunction because they are unlikely to succeed with their claim and the balance of the equities does not favor them. This Court should therefore deny Plaintiffs' motion for preliminary injunction and stay the case under the *Pullman* doctrine to provide the Plaintiffs the opportunity to present their challenge to the state courts. *See R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941).

## BACKGROUND

Plaintiffs Krystle Perry and Anthony Perry are parents of an eight-year-old child, K.P. According to the Complaint, the Perrys enrolled K.P. into the West Virginia Virtual Academy through the Upshur County School District. The West Virginia Virtual Academy is a tuition-free, primarily online school operating pursuant to W. Va. Code § 18-2E-9. The Perrys allege that in 2024, the Virtual Academy contacted them about K.P.'s vaccination status, and would not allow K.P. to re-enroll in the school because she was not fully vaccinated.[1] The Perrys requested a religious exemption, and were informed that West Virginia's vaccine law does not contain an exemption for religious belief.

Plaintiffs allege that because the vaccine law does not allow religious exemptions from vaccine requirements, it violates their First Amendment right to freely exercise their religion. Plaintiffs bring this challenge as applied to their situation only, asserting that because virtual

---

[1] K.P. has received some vaccines, but the Perrys explain that they stopped vaccinating K.P. at the age of two, after they learned of the use of fetal cells in researching and developing certain vaccines.

academy students are primarily online students, allowing a religious exemption for virtual students would not undermine the State's interest in protecting West Virginia's schoolchildren.

This is not the first lawsuit challenging the constitutionality of West Virginia's vaccine laws filed in the Northern District of West Virginia. In 2023, a group called West Virginia Parents for Religious Freedom filed suit alleging the lack of a religious exemption in West Virginia's vaccine law violates parents' First Amendment right to freely exercise their religion. *Parents for Religious Freedom*, No. 5:23-cv-158 (N.D.W. Va.). The case was assigned to the Honorable John Preston Bailey. As in this case, *Parents for Religious Freedom* plaintiffs requested a preliminary injunction.

Also in 2023, the West Virginia Legislature passed the Equal Protection for Religion Act ("EPRA"). W. Va. Code § 35-1A-1. EPRA provides that State action, including any action by the State or its political subdivisions, may not "substantially burden a person's exercise of religion" unless that burden is essential to a compelling governmental interest and is the "least restrictive means" of furthering that interest. § 35-1A-1(a)(1). The law also creates a cause of action for any person "whose exercise of religion has been substantially burdened, or is likely to be substantially burdened, in violation of this article. . . ." *Id*., § 35–1A–1(b)(1). EPRA took effect May 29, 2023— at which point the Court in *Parents for Religious Freedom* would be deciding plaintiffs' preliminary injunction motion.

The State of West Virginia filed an amicus brief in support of Plaintiffs' request for a preliminary injunction. *W. Va. Parents for Religious Freedom v. Christiansen*, No. 5:23-cv-158, ECF No. 46 (hereinafter "*Parents for Religious Freedom*"). The State argued therein that EPRA is "directly relevant" to the issues raised in the lawsuit. *Id.* at 6. The State went further to argue that because of EPRA's requirements, the court "should mandate that the Defendants develop and

implement a process to allow for families to apply for a religious exemption to mandatory immunizations." *Id.* at 6–7.

The court denied the motion for preliminary injunction, and shortly thereafter the parties each moved for summary judgment. Defendant Christiansen, in his cross-motion for summary judgment asked the court—in light of the State's amicus filing—to abstain under *Pullman* and to stay the case to allow the plaintiffs to present the controlling state law question to the state courts. Christiansen argued that because the State has declared that EPRA's text requires the application of strict scrutiny to the vaccine law—thus resolving the contentious question regarding the requisite level of scrutiny to be applied—the court's opinion would be "little more than an advisory opinion." *Parents for Religious Freedom*, No. 5:23-cv-158, ECF No. 53 at 10.

In light of the State's position regarding EPRA, the court exercised its discretion under *Pullman* to abstain from prematurely deciding a constitutional question. As Judge Bailey reasoned, the "scrupulous regard for the rightful independence of state governments and for the smooth working of the federal judiciary," demanded abstention in this case. *Parents for Religious Freedom*, 685 F. Supp. 3d at 378. The most "hotly contested" issue to be decided is the correct level of scrutiny to apply. *Id*. But because the "State of West Virginia has concluded that the newly enacted EPRA already expressly requires strict scrutiny for the same challenge raised here," a state-law challenge would either moot the plaintiffs' claim or at least put it in a different posture. *Id*. Because EPRA "has the potential to resolve this issue without this Court having to render an opinion on a substantial federal constitutional question," the court abstained from ruling on the substantive issues and stayed the matter until the clams could be presented to the state courts. *Id.* at 379.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and its "principal function . . . is to maintain the status quo." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017). To obtain a preliminary injunction, Plaintiffs must clearly demonstrate the presence of *all* four factors: (1) that they are "likely to succeed on the merits"; (2) "irreparable harm" is "likely" "in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018). The last two factors "merge" when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 436 (2009).

Here, Plaintiffs fail to establish a likelihood of success for two major reasons. *First*, there is no likelihood of success on the merits of their claim because this court should abstain under the *Pullman* doctrine—just as Judge Bailey recently did in the nearly identical challenge brought by the same counsel representing the plaintiff in this case. *See Pullman*, 312 U.S. 496. *Second*, West Virginia's vaccine law survives any level of scrutiny on the merits of the Free Exercise challenge. Because Plaintiffs cannot clearly show all four of the preliminary injunction elements, no preliminary injunction can issue. And because this case presents novel issues of state law that should be decided in the first instance by state courts, Defendants move for a stay of proceedings under *Pullman* to allow Plaintiffs to bring the state law issues before the state courts. Plaintiffs appealed Judge Bailey's order, and that appeal is scheduled to be heard on September 25, 2024.[2]

---

[2] *West Virginia Parents for Religious Freedom v. Matthew Christiansen et al.*, No. 23-1887 (4th Cir.).

I.      **This Court should abstain from rendering a decision under *Pullman* and stay the proceedings to provide the state courts an opportunity to pass on novel issues of state law.**

The *Pullman* abstention doctrine is predicated on the twin aims of avoiding premature and unnecessary constitutional decisions and of protecting the delicate balance of power between the states and the federal government. Abstention under *Pullman* is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959). Where abstention can avoid "needless friction with state policies," a stay is appropriate to allow the state courts to decide the issue. *Pullman*, 312 U.S. at 500.

As explained previously, the Honorable John Preston Bailey has exercised his discretion under *Pullman* and abstained from rendering a decision in an earlier case presenting the same issue of law. In *Parents for Religious Freedom,* Judge Bailey abstained after considering the State's position that EPRA answers the contentious question of the level of scrutiny applicable to West Virginia's vaccine law, and in "scrupulous regard for the rightful independence of state governments and for the smooth working of the federal judiciary." 685 F. Supp. 3d at 378 (quoting *Pullman*, 312 U.S. at 501). Because the same state law question is present in this case, the "principles of state sovereignty and comity under the federalist system" demand abstention here just as in *Parents for Religious Freedom*. *Id.* at 379.

At the very least, the Court should stay this case until the Fourth Circuit has had the chance to rule on the issue of abstention in *Parents for Religious Freedom*. The primary issue in that appeal is whether the District Court abused its discretion in abstaining under *Pullman*. There is no principled reason for this Court to create an intra-district split on the issue of abstention, particularly as the Fourth Circuit is now poised to decide the issue. Every sound reason warrants

this Court staying its hand—either by adopting Judge Bailey's reasoning and conclusion or, at minimum, staying this case pending the Fourth Circuit's review of that order.

**II.      Even in the absence of state law issues justifying *Pullman* abstention, Plaintiffs have not established a likelihood of success of the merits of their claim.**

Plaintiffs argue that because W. Va. Code § 16–3–4 does not contain a religious exemption, it violates their right to the free exercise of religion under the First Amendment. But Plaintiffs are unlikely to succeed on the merits of that claim. As the Fourth Circuit has already held, the challenged provisions of the West Virginia immunization law at issue here do not violate the Free Exercise Clause, *even if strict scrutiny applied. See Workman v. Mingo Cnty. Bd. of Educ.*, 419 Fed. App. 348, 353 (4th Cir. 2011) (holding that West Virginia's "wish to prevent the spread of communicable diseases clearly constitutes a compelling interest").

The First Amendment, applicable to the states through the Fourteenth Amendment, "declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); U.S. Const. amend. I. It "embraces two concepts": the "freedom to believe" and the "freedom to act." *Cantwell*, 310 U.S. at 303. While the freedom to believe is "absolute," the freedom to act "cannot be." *Id*. at 304. As Justice Scalia explained for the Supreme Court, "the right of free exercise *does not* relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990) (citations omitted). The law at issue here should thus be upheld under rational basis review.

Over a century ago, the Supreme Court in *Jacobson v. Massachusetts* rejected a Fourteenth Amendment challenge to Massachusetts's mandatory vaccination law. 197 U.S. 11, 12 (1905). While *Jacobson* did not address the First Amendment, which had not yet been applied to the states,

7

the Supreme Court concluded that the law "did not invade[] any right secured by the Federal Constitution." *Jacobson*, 197 U.S. at 38. The Supreme Court later instructed that *Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176 (1922). Thereafter, when the Supreme Court was called to decide if a child labor law violated the First Amendment in *Prince v. Massachusetts*, it considered the limitations of the rights of religion and parenthood, and explained that a parent could not "claim freedom from compulsory vaccination for the child more than for himself on religious grounds." 321 U.S. 158, 166 (1944) (citing *Jacobson*, 197 U.S. at 25). These cases remain good law, and only the Supreme Court itself may overturn them; it has not done so.

In this backdrop, federal courts have overwhelmingly rejected free exercise challenges to mandatory school vaccination laws. *See, e.g., Workman*, 419 Fed. App. at 353 (concluding that "the West Virginia statute requiring vaccinations as a condition of admission to school does not unconstitutionally infringe on [the plaintiff's] right to free exercise") *cert. denied* 555 U.S. 1036 (2011); *Whitlow v. Cal. Dep't of Educ.*, 203 F. Supp. 3d 1079, 1085–87 (S.D. Cal. 2016) (denying a motion for a preliminary injunction because the parents challenging a bill that repealed a religious exemption to the State's vaccination requirement for new school children were unlikely to succeed on the merits of their claim that the bill violated the Free Exercise Clause, among others); *Phillips v. City of New York*, 775 F.3d 538, 543 (2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.") *cert. denied* 577 U.S. 822 (2015); *McCarthy v. Boozman*, 212 F. Supp. 2d 945, 948 (W.D. Ark. 2002) ("The constitutional right to freely practice one's religion does not provide an exemption for parents seeking to avoid compulsory immunization for their school-age children."); *Sherr v. Northport-East Northport Union Free Sch. Dis.*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987) ("[I]t has been settled law for many

years that claims of religious freedom must give way in the face of the compelling interest of society in fighting the spread of contagious disease through mandatory inoculation programs.").

What is more, the efforts in several states to *repeal* previously granted religious exemptions to their compulsory immunization laws have each survived Free Exercise challenges. *See, e.g.*, *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 156 (2d Cir. 2023); *Brown v. Smith*, 24 Cal. App. 5th 1135, 1145, 235 Cal. Rptr. 3d 218, 225 (2018); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016); *F.F. v. State*, 194 A.D.3d 80, 88, 143 N.Y.S.3d 734, 742, *appeal dismissed, leave to appeal denied,* 37 N.Y.3d 1040, 176 N.E.3d 304 (2021), and *cert. denied,* 142 S. Ct. 2738, 212 L. Ed. 2d 797 (2022).

## A. West Virginia Code § 16–3–4, which is not subject to strict scrutiny because it is a neutral law of general applicability, survives rational basis review.

To be sure, recent Supreme Court cases make clear that, when considering public health, "the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 20 (2020). But "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, (1993); *see also Workman*, 419 Fed. App. at 353-54. Instead, a court will sustain a "religiously neutral and generally applicable law [that] incidentally burdens free exercise rights" if it is "rationally related to a legitimate government interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021) (affirming the denial of a preliminary injunction because petitioners were unlikely to succeed on the merits of their claim that Maine's mandatory vaccination law for healthcare workers, which did not offer a religious or philosophical exemption, violated the Free Exercise clause). Plaintiffs contend that Supreme Court cases from recent terms compel the conclusion that

West Virginia Code § 16–3–4 is not "generally applicable" after *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) and *Tandon v. Newsom*, 593 U.S. 61 (2021). They are incorrect.

### i.   The law is neutral and generally applicable.

The challenged immunization law here is neutral. A law is neutral when it does not target religion or religious practices. *Fulton*, 593 U.S at 533 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). By its terms, W. Va. Code § 16–3–4 does not target religion or "single out [religion] for especially harsh treatment." *Roman Catholic Diocese*, 592 U.S. at 17. Instead, the law requires all students to receive common vaccinations, exempting those with medical conditions that render vaccination dangerous. The Legislature identified that the purpose of this law is to protect community health, and Plaintiffs make no showing that this interest is pretextual or somehow unwarranted. As such, the law is neutral.

A law is generally applicable if it treats similar conduct similarly, regardless of its religious nature. *See Tandon*, 593 U.S. at 62. The Supreme Court has explained that a law is not generally applicable in two circumstances. *First*, a law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. *Second*, if a law provides "a mechanism for individualized exemptions," that "invites the government to consider the particular reasons for a person's conduct," then it is not generally applicable. *Id.* It must be emphasized, however, that "*[N]o case of the Supreme Court holds that a single objective exemption renders a rule not generally applicable.*" *Does 1-6*, 16 F.4th at 30 (emphasis added). That statement remains true today. Indeed, the Supreme Court held in *Smith* that a law criminalizing controlled substance possession was

10

JA261

deemed generally applicable even though it contained an exception for substances prescribed for medical purposes. *Smith*, 494 U.S. at 874, 878-82.

**ii.    The law does not allow comparable secular activities.**

West Virginia's vaccine law does not treat secular activity more favorably than religious activity. Plaintiffs' reliance on *Tandon* does not lead to a different conclusion. In *Tandon*, the Supreme Court concluded that because California had banned gatherings for at-home worship without also banning secular activities that posed a comparable risk of COVID-19 transmission, like going to hair salons, the Court should have enjoined the California law. 593 U.S. at 63. Notably, the Supreme Court did not make a one-to-one comparison of the transmission risk posed by an individual worshiper and, for example, an individual grocery shopper. Rather, the Court looked at the risk posed by groups. As the Supreme Court reasoned, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* at 62.

Here, the state has an undeniable interest in protecting the health of West Virginia's schoolchildren. Medical exemptions *further* this interest by ensuring that children are not harmed by vaccines that are contraindicated. *See Does 1-6*, 16 F.4th at 31 (concluding that a medical exemption to a vaccine mandate for healthcare workers would not undermine Maine's interests in protecting the health of healthcare professionals, those who cannot be vaccinated, and of all Mainers because "providing healthcare workers with medically contraindicated vaccines would threaten the health of those workers and thus compromise both their own health and their ability to provide care"). Indeed, the risk that attending school poses to a child who cannot medically be vaccinated increases as the number of vaccinated individuals decreases.

West Virginia has chosen to protect the safety of schoolchildren by requiring all students who may be safely vaccinated to be vaccinated, and this same interest is not served by an overarching religious exemption that, epidemiologically speaking, jeopardizes the community immunity.

### iii.   The law does not allow for discretionary exemptions.

Certainly, general applicability may be absent when a law provides "a mechanism for individualized exemptions," because it creates the risk that administrators will use their discretion to effectively create exemptions on a case-by-case basis, exempting individuals from complying with the law for secular reasons, but not religious reasons. *Smith*, 494 U.S. at 884 (citations omitted). In *Smith*, the Court considered an exemption that was granted for "good cause" as an example of such "individualized exception." 494 U.S. at 884. Similarly, in *Fulton*, a city official was able to create exemptions in his or her "sole discretion," which was violative of the general applicability framework. *Fulton*, 593 U.S. at 523.

West Virginia Code § 16–3–4(h) does not have a "mechanism for individualized exemptions." *Smith*, 494 U.S. at 884. The law, instead, provides for an objectively defined category of people to whom the vaccine requirement does not apply and requires a certificate from "a licensed physician stating that the physical condition of the child is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. Va. Code § 16–3–4(h)(1). The child either meets the criteria, or they do not. As noted previously: "[N]o case of the Supreme Court holds that a single objective exemption renders a rule not generally applicable." *Does 1-6*, 16 F.4th at 30. The existence of a medical exemption thus does not render the law not generally applicable.

**B.  Even if strict scrutiny applies, the law is narrowly tailored to serve a compelling interest.**

To survive strict scrutiny, a government policy must advance "interests of the highest order" and be "narrowly tailored to achieve those interests." *Lukumi Babalu*, 508 U.S. at 546. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

West Virginia's interest in protecting the health and well-being of school children and in preventing the spread of communicable diseases "clearly constitutes a compelling interest." *Workman*, 419 Fed. App. at 353; *Does 1-6*, 16 F.4th at 32 ("Few interests are more compelling than protecting public health against a deadly virus."); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (same). Indeed, West Virginia's highest court has held that "the protection of the health and safety of the public is one of the most important roles of the state." *D.J. v. Mercer Cnty. Bd. of Educ.*, No. 13-0237, 2013 WL 6152363, at *4 (W. Va. Nov. 22, 2013) (finding that the State had a compelling interest in requiring proof of vaccinations as a prerequisite to attending the State's public schools). Thus, if the State can show that granting a religious exemption to a program would undermine its ability to achieve its compelling interests, then the law will survive strict scrutiny. *See Gonzalez v. O Centro Espirita Beneficiente Uniao de Vegetal*, 546 U.S. 418, 435 (2006).

Here, West Virginia has a compelling interest in protecting its school-aged children from vaccine-preventable, deadly diseases. And allowing religious exemptions would significantly undermine that goal. The record in this case demonstrates that allowing broad exemptions to vaccination laws leads to higher rates of unvaccinated children, which drastically undermines the State's goal. West Virginia currently enjoys a vaccination rate that allows it to benefit from what is called "herd" or "community immunity." Herd immunity occurs when vaccination or immunity

rates are high enough that an infectious disease is unable to spread throughout the community. West Virginia has achieved those vaccination rates in schoolchildren. But any decrease in the vaccinations threatens the State's herd immunity.

Plaintiffs argue that the fact that neighboring States allow for broad exemptions to compulsory immunization laws demonstrates that less restrictive options exist. But the evidence belies that assertion. Other States with less restrictive vaccination laws have lost (or never gained) herd immunity and have suffered outbreaks of preventable diseases. Indeed, for that very reason, several states have *repealed* the religious exemption in their own compulsory vaccination laws— a process that has been overwhelmingly approved by the relevant courts. *See We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.,* 76 F.4th 130, 156 (2d Cir. 2023); *Brown v. Smith*, 24 Cal. App. 5th 1135, 1145, 235 Cal. Rptr. 3d 218, 225 (2018); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016); *F.F. v. State*, 194 A.D.3d 80, 88, 143 N.Y.S.3d 734, 742, *appeal dismissed, leave to appeal denied,* 37 N.Y.3d 1040, 176 N.E.3d 304 (2021), and *cert. denied,* 142 S. Ct. 2738, 212 L. Ed. 2d 797 (2022).

### i.   W. Va. Code § 16–3–4 is not underinclusive or overbroad.

Plaintiffs claim that West Virginia's compulsory immunization law is underinclusive because it does not require all children in the state to be vaccinated, and because it does not apply to adult teachers or school employees. Again, allowing medical exemptions does not undermine the State's goal in protecting its children from communicable and vaccine-preventable disease. Rather, it protects children for whom vaccines are contraindicated, while nonmedical exemptions pose an additional risk of harm to those children who cannot safely be vaccinated. Keeping the exemption availability narrow allows West Virginia to maintain its high vaccination levels and protect those children for whom vaccines are contraindicated.

Next, Plaintiffs rely on the fact that West Virginia does not mandate vaccination as a prerequisite for children participating in voluntary organized activities. But this argument misses the point. Schools are the only place in our society where children, in general, are *required* to gather in close proximity, in relatively large groups, for long periods of time, and for most of the year. In other words, schools are the only place where contact with other children is *unavoidable*. Children are not required to play sports, go to restaurants or stores, or visit libraries, or even attend "learning pods."

Declining to require immunization for all children residing in the State is one way in which West Virginia has narrowly tailored its vaccination policy, while still furthering its interest in protecting the health and safety of its school-aged children. Moreover, by limiting the vaccine mandate to school-aged children—the individuals in our society with the weakest immune systems and who statistically evince the highest rates of virus transmission—the State has further endeavored to narrowly tailor its public health laws.

**C. This statute does not present a "hybrid rights" situation.**

Finally, Plaintiffs argue that the West Virginia immunization requirement presents a "hybrid-rights situation" under *Smith*, which would forestall the application of rational basis review. It does not. In *Smith*, the Supreme Court noted that the neutral, general applicability framework may be inappropriate for certain "hybrid situation[s]" where a Free Exercise Clause challenge is brought "in conjunction with other constitutional protections," such as the rights of parents. 494 U.S. at 881-82. Plaintiffs maintain that they have established a "hybrid right" because their Free Exercise Clause challenge is brought in conjunction with their constitutionally protected parental rights claim, so the Court should apply strict scrutiny. The "hybrid rights" language in *Smith*, however, has been recognized as dicta by multiple courts. *See Combs v. Homer–Center School Dist.*, 540 F.3d 231, 244–47 (3rd Cir. 2008) (concluding exception was dicta); *see also*

*Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003). And neither this Court nor the Fourth Circuit has ever applied the hybrid rights theory.

**III.     Plaintiffs cannot clearly establish irreparable harm.**

Plaintiffs' claim of irreparable harm leans heavily on their assertion that their constitutional right to freely exercise their religion has been violated. Because, as explained above, West Virginia's vaccine law is subject to—and survives—rational basis review, there is no constitutional violation. Thus, Plaintiffs have not, and cannot, show irreparable harm.

**IV.     The balance of the equities favors upholding state law.**

The balance of the equities here also favors upholding state law. Not only has the Fourth Circuit recognized the compelling public interest supporting West Virginia's immunization laws, but the democratically elected lawmakers of our State—public representatives—have done so directly and emphatically: The "early immunization for preventable diseases represents one of the most cost-effective means of disease prevention," and "[i]mmunization of children at an early age serves as a preventive measure both in time and money and is essential to maintain our children's health and well-being." W. Va. Code § 16–3–5(a). Our nation's historic experience with polio, for example—and the essential importance of vaccinations to combat and practically eradicate that devastating disease—demonstrates the critical importance of a rigorous and careful system to halt the spread of communicable diseases in our communities, including our schools, through immunization. *See Workman v. Mingo Cnty. Bd. of Educ.*, 419 Fed. App. 348, 353 (4th Cir. 2011) (holding that West Virginia's "wish to prevent the spread of communicable diseases clearly constitutes a compelling interest").

Absent a stay, this Court should allow the challenged law to remain in effect while this case proceeds in the ordinary course.

## CONCLUSION

This Court should follow Judge Bailey's lead and abstain from rendering a decision, staying the proceeding in accordance with *Pullman*. In the event the Court decides not to abstain, it should at least stay these proceedings until the Fourth Circuit has ruled on the abstention issue in *Parents for Religious Freedom*. The Court should further deny Plaintiffs' motion for a preliminary injunction because they have not shown a likelihood of success on the merits of their claim. Accordingly, Plaintiffs' motion for a preliminary injunction should be denied, and Defendant Dr. Christiansen's cross-motion for a stay should be granted.

Respectfully submitted,

**DR. MATTHEW CHRISTIANSEN**

By Counsel:

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
Maureen F. Gleason (WVSB #14452)
*SPECIAL ASSISTANT ATTORNEYS GENERAL*
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
zritchie@hfdrlaw.com
mgleason@hfdrlaw.com

Steven R. Compton (WVSB #6562)
*Deputy Attorney General*
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430

*Counsel for Dr. Matthew Christiansen, in his official capacity*

UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY, and ANTHONY
PERRY, *individually and on behalf of their
minor child K.P.*,

      Plaintiffs,

v.                              **Case No.: 2:24-cv-18**
                                      **Chief Judge Kleeh**

STACY MARTENEY, *in her official
capacity as the Virtual Learning
Coordinator of the Upshur County Virtual
School, et al.*,

      Defendants.

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)

18
JA269

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

        Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and DOUG CIPOLETTI
*in his official capacity as Executive Director of the
West Virginia Virtual School Academy*,

        Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE THOMAS S. KLEEH

**12(b) MOTION TO DISMISS OF DEFENDANTS THE BOARD OF EDUCATION OF
THE COUNTY OF UPSHUR, STACY MARTENEY AND CHRISTINE MILLER**

COME NOW Defendants The Board of Education of the County of Upshur; Stacy

Marteney, in her official capacity; and Christine Miller, in her official capacity (collectively, the

"Upshur School Board Parties"), by counsel, pursuant to Rule 12(b)(7) and Rule 19 of the Federal

Rules of Civil Procedure, and hereby move this Honorable Court for dismissal of the Complaint

filed by Plaintiffs Krystle Perry and Anthony Perry for failure to join necessary and  indispensable

parties to this civil action.  In the alternative, the Upshur School Board Parties, pursuant to Rule

12(b)(6), move for dismissal for failure to state a claim against the Upshur School Board Parties

upon which relief may be granted.

This is an action for injunctive relief and declaratory judgment in which Plaintiffs allege that West Virginia Code § 16-3-4, regarding the compulsory immunization of school children, violates the United States Constitution.  As more fully stated in the accompanying Memorandum of Law, the State Superintendent of Schools (the "State Superintendent") and the West Virginia Department of Education ("WVDE") are statutorily charged with the governance of West Virginia's public schools, *including its virtual schools*, and have an undeniable interest relating to the subject matter of this civil action.  Moreover, the WVDE and State Superintendent are so situated that disposing of the civil action in their absence will prejudice the WVDE and the State Superintendent, due to the risk of inconsistent interpretation and enforcement by county boards of education of the relevant state law related to compulsory immunization.  In addition, Plaintiffs have an adequate remedy at law if this action were dismissed under Rule 12(b)(7).  Both a federal statute and a federal rule of civil procedure expressly contemplate a constitutional challenge to a state statute without suit against state officials in their official capacities.[1]

In the alternative, the School Board Parties, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, move for dismissal of the Complaint for failure to state a claim against the School Board Parties upon which relief may be granted.  As discussed more fully in the accompanying Memorandum of Law, the School Board Parties lack statutory authority to contravene the guidance and directives of the West Virginia Department of Education ("WVDE") and the State Superintendent of Schools (the "State Superintendent") related to the compulsory immunization of virtual school students.  Because the School Board Parties can only provide

---

[1] *See Lutter v. JNESO*, 86 F.4th 111, 128 (3d Cir. 2023) (citing 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(a)).

incomplete relief and lack the plenary power to interpret and enforce the relevant state law, Plaintiffs' claim fails to state a claim against them upon which relief can be granted.

WHEREFORE, in accordance with the foregoing and as more fully set forth in the accompanying Memorandum of Law, Defendants The Board of Education of the County of Upshur, Stacy Marteney and Christine Miller move this Honorable Court to dismiss Plaintiffs' Complaint for failure to join necessary and indispensable parties or, in the alternative, for failure to state a claim against the School Board Parties upon which relief may be granted.

/s/ Robert J. Kent
Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, West Virginia  26102
(304) 420-5504
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, West Virginia  26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

Counsel for Defendants The Board of
Education of the County of Upshur, Stacy
Marteney, in her official capacity and
Christine Miller, in her official capacity

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, individually and
on behalf of their minor child K.P.,

      Plaintiffs,

v.

STACY MARTENEY in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School; THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, in her
official capacity as Superintendent of the
Upshur County School District; DR. MATTHEW
CHRISTIANSEN, in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health; and DOUG CIPOLETTI
in his official capacity as Executive Director of the
West Virginia Virtual School Academy,

      Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE THOMAS S. KLEEH

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel

of record.

*/s/ Robert J. Kent*
Robert J. Kent

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

       Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and DOUG CIPOLETTI
*in his official capacity as Executive Director of the
West Virginia Virtual School Academy*,

       Defendants.

       CIVIL ACTION NO. 2:24-cv-18
       JUDGE THOMAS S. KLEEH


**MEMORANDUM OF LAW IN SUPPORT OF 12(b) MOTION TO DISMISS OF
DEFENDANTS THE BOARD OF EDUCATION OF THE COUNTY OF UPSHUR,
<u>STACY MARTENEY AND CHRISTINE MILLER</u>**

Defendants The Board of Education of the County of Upshur (the "Board"); Stacy

Marteney, in her official capacity as the Virtual Learning Coordinator of the Upshur County

Virtual School ("Ms. Marteney"); and Christine Miller, in her official capacity as Superintendent

of the Upshur County District (the "County Superintendent") (collectively, the "School Board

Parties"), pursuant to Rule 12(b)(7) and Rule 19 of the Federal Rules of Civil Procedure, move

this Court to dismiss Plaintiffs' Complaint for failure to join necessary and indispensable parties.

In the alternative, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the School

Board Parties move to dismiss Plaintiffs' Complaint for failure to state a claim against the School Board Parties upon which relief can be granted.

Plaintiffs' Complaint must be dismissed for two reasons: (1) Plaintiffs failed to join necessary and indispensable parties to this action and (2) Plaintiffs failed to state a claim against the School Board Parties upon which relief may be granted. The School Board Parties, by counsel, hereby state as follows in support of their Motion to Dismiss:

## I.    STATEMENT OF FACTS

On or around July 5, 2024, Plaintiffs filed the instant civil action, individually and on behalf of their minor child, K.P., against the School Board Parties; Dr. Matthew Christiansen, as the State Health Officer and Commissioner of the Bureau of Public Health, and Mr. Doug Cipoletti, as Executive Director of the West Virginia Virtual Academy.[1]  *See generally* Compl.

From August 2022 through January 2024, K.P., Plaintiffs' minor daughter, was enrolled in an online learning program but was not physically present in a classroom with other children.[2]  Compl. ¶¶ 2 and 70.  K.P. was enrolled in [Upshur County Virtual School] for approximately 16 months.  Compl. ¶ 75.

Regarding the compulsory immunization of school children, West Virginia Code § 16-3-4 prohibits K.P. from attending school in West Virginia unless she receives all the vaccines required under the statute.  Compl. ¶ 1.  In West Virginia, it is unlawful for any child to attend

---

[1] Plaintiffs' Complaint references the West Virginia Virtual Academy and the West Virginia Virtual School Academy.  For the Court's reference, the official name is the "West Virginia Virtual Academy," and for purposes of this Motion, the Upshur School Board Parties will refer to it by its official name.  Furthermore, the Upshur School Board Parties affirmatively assert that Mr. Cipoletti appears to have been named in error, as he is the Executive Director of the West Virginia Virtual Academy which differs from the **Upshur County Virtual School** that K.P. actually attended.

[2] The Complaint erroneously states that K.P. was enrolled in West Virginia Virtual Academy.  In point of fact, K.P. was enrolled in the Upshur County Virtual School, which is a distinct virtual learning option provided by Upshur County Schools and which virtual school is unrelated to the West Virginia Virtual Academy.

"*any of the schools of the state* or a state-regulated childcare center until he or she has been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine."  Compl. ¶ 18 (emphasis added).  *See also* W. Va. Code § 16-3-4.  Likewise, no child may be "admitted or received in *any of the schools of the state*" unless they have received the required vaccinations.  Compl.  ¶ 99 (emphasis added).  *See also* W. Va. Code § 16-3-4.  K.P. is unvaccinated.  Compl. ¶ 6.  Plaintiffs allege that they possess deeply held religious beliefs that forbid them from vaccinating K.P.  Compl. ¶ 11.

On December 18, 2023, the Superintendent of the WVDE sent the Superintendent's Update, which included a directive to the county school boards across the state, informing them that all full-time virtual students were "required to be fully immunized according to W. Va. Code § 16-3-4 exactly as they would be when enrolling for in-person instruction" and that the school boards were to "review the enrollment records of [their] full-time virtual students and… correct any non-compliance enrollment occurrences." **Exhibit A**.

Following the receipt of the Superintendent's Update, in December 2023, Stacey Marteney ("Ms. Marteney") of the Board contacted Mrs. Perry regarding K.P.'s vaccination status and informed her that K.P. was required by law to receive required vaccinations if she desired to continue her education at [Upshur County Virtual School].  Compl. ¶ 75.  On or around December 27, Ms. Marteney followed up with Mrs. Perry regarding K.P.'s vaccination status.  Compl. ¶ 76.  Mrs. Perry reiterated that K.P. was not vaccinated and would not be vaccinated.  *See generally* Compl.  In January 2024, K.P. withdrew from [Upshur County Virtual School] because she elected not to receive the required vaccinations due to religious beliefs.  *Id*.

West Virginia's Governor, Jim Justice, recently vetoed a bill that would have allowed for religious exemptions in virtual public schools. Compl. ¶ 143. Currently, the only exemption to the compulsory immunization of school children is a limited medical exemption. Compl. ¶¶ 144 and 170. *See also* W. Va. Code § 16-3-4. Plaintiffs seek a declaration by this court related to the constitutionality of West Virginia Code § 16-3-4, specifically the lack of religious exemption thereto. *Id.* Plaintiffs allege violations of their First Amendment Free Exercise Rights. Compl., Count I. Additionally, Plaintiffs seek to enjoin the Board from implementing and enforcing West Virginia Code § 16-3-4. Compl., Injunctive Relief Allegations.

## II.     LEGAL AUTHORITY

### A.     *The Motion to Dismiss Standard*

Federal Rule of Civil Procedure 12 provides the mechanism for motions to dismiss thereunder. Federal Rule 12(b)(7) provides that a party may move for dismissal when a "necessary" party has not been joined as required under Federal Rule of Civil Procedure 19. A Court's analysis of a Rule 12(b)(7) motion is a two-step inquiry. First, the Court must determine whether the party is "necessary" to a proceeding because of its relationship to the matter under Rule 19(a). *Owens-Ill., Inc. v. Meade*, 186 F.3d 435, 400 (4th Cir. 1999). Federal Rule of Civil Procedure 19(a) sets forth those persons that are to be joined "if feasible," including a person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction, if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties, or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect that interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

If the missing party is "necessary" but cannot be joined under Rule 19(a), then a court must analyze "whether the proceeding can continue in [that party's] absence, or whether it is indispensable pursuant to Rule 19(b) and the action must be dismissed." *Owens*, 186 F.3d at 440.

In order to determine whether a party is indispensable, Rule 19 provides that a court should consider the following factors:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:
(A) protective provisions in the judgment;
(B) shaping the relief; or
(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b)(1)-(4).

Federal Rule of Civil Procedure 12(b)(6) provides the mechanism to dismiss on the basis that the plaintiff has failed to state a claim upon which relief can be granted. In order to survive a motion to dismiss for failure to state a claim, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). The purpose of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits

5

of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d at 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)).  Thus, when considering a motion to dismiss, a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).  However, a complaint must be more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678. 129 S.Ct. 1937.

> **B.**    ***The Powers and Duties of the State Superintendent of Schools***

In West Virginia, the State Superintendent is statutorily charged with the general supervision of public schools.  West Virginia Code § 18-3-3 states:

> The State Superintendent of Schools ***shall have general supervision of the free schools of the state, and shall be the chief executive officer of the state Board of Education***. He shall be charged with the ***general supervision of all county and city superintendents of free schools and of county and district boards of education within the state***, except as provided in article nine, chapter six of this code. He shall prescribe the forms and cause to be prepared and printed all blanks necessary ***for carrying out the details of the school system of the state, and of the rules of the state Board of Education, so as to secure the uniform operation of the same throughout the state***. In respect to general school statistics, such forms and blanks shall conform as nearly as may be to the forms and blanks recommended by the United States bureau of education.  The state superintendent shall also cause such forms and blanks to be forwarded to all school officers and other persons whose duty or right it is to use them.

W. Va. Code § 18-3-3 (emphasis added).

The State Superintendent of Schools is also statutorily charged with the maintenance of the WVDE; the Code provides that "***the state Superintendent of Schools shall maintain a Department of Education***…" W. Va. Code § 18-3-9 (emphasis added).

In addition, the State Superintendent of Schools is authorized to interpret the school laws of the state and the rules of the State Board of Education (W. Va. Code § 18-3-6) and has the authority to institute processes to enforce West Virginia school laws. *See* W. Va. Code § 18-3-4.[3] Finally, the State Superintendent is authorized to "exercise such other powers and discharge such other duties" as assigned to him or her by the Legislature and by the State Board of Education. W. Va. Code § 18-3-10.

### C.    The Limitations of the County Board's Authority

As a statutory corporation, a county school board has only those powers that are expressly granted by state law or which arise by necessary implication from expressly granted powers. *See, e.g., Shinn v. Bd. of Educ.*, 39 W. Va. 498, 20 A.E. 604 (1894) ("The board of education of a school district is a corporation created by statute with functions of a public nature expressly given and no other; and it can exercise no power not expressly conferred or fairly arising from necessary implication, and in no other mode than that prescribed or authorized by statute."); *Honaker v. Bd. of Educ,* 42 W. Va. 170, 24 S.E. 544 (1896). The Supreme Court of Appeals of West Virginia ("WVSCA") has affirmed that, regarding boards of education, "the rule of law applies of strict construction and a consequent limitation of the rights which may be exercised by them and the duties which they can legally perform." *Herald v. Bd. of Educ.*, 65 W. Va. 765, 65 S.E. 102 (1909).

Historically and currently, a board of education is a "creature of statute" with no powers other than those expressly given to it or that arise by necessary implication. *See, e.g., State v. Rouzer*, 127 W. Va. 392, 32 S.E.2d 865 (1945); *Dooley v. Board of Education*, 80 W. Va. 648,

---

[3] W. Va. Code § 18-3-4 specifically provides that the State Superintendent of Schools "***shall cause to be instituted such…processes as may be necessary properly to enforce and give effect to any…general or special laws pertaining to the school system*** of the state, or any part thereof, or of any rule or direction of the state Board of Education made in conformity with its powers and duties") (emphasis added).

93 S.E. 766 (1917). Accordingly, the Board may only act in the mode prescribed or authorized by statute. *Id.* Moreover, the Board is a political subdivision of the State of West Virginia, maintains a corporate character, and is charged with the control and management of the schools and the district pursuant to West Virginia Code §§ 18-5-1, 18-5-5, and 18-5-13. In sum, the Board must operate under a very regimented and detailed set of state school laws in its mission to serve and educate its students.

> **D.      Duty of the County Superintendent of Schools**

The county superintendent of schools has statutory duties enumerated by the West Virginia Legislature. Specifically, a county superintendent shall:

> (1) *Act as the chief executive officer of the county board* as may be delineated in his or her contract or other written agreement with the county board, and, *under the direction of the state board*, *execute all its education policies*;
>
> *****
>
> (10) Exercise all other authority granted by this chapter or required by the county board or state board; and
>
> *****

W. Va. Code § 18-4-10.

> **E.      Compulsory Immunization**

With respect to compulsory immunization of school children, West Virginia Code § 16-3-4 provides:

> (a) Whenever a resident birth occurs, the commissioner shall promptly provide parents of the newborn child with information on immunizations mandated by this state or required for admission to a public, private and parochial school in this state or a state-regulated child care center.
>
> (b) Except as hereinafter provided, a child entering school or a state-regulated child care center in this state must be immunized against

8

JA281

chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough.

(c) *No child or person may be admitted or received in any of the schools of the state or a state-regulated child care center until he or she has been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio,, rubella, tetanus and whooping cough* or produces a certificate from the commissioner granting the child or person an exemption from the compulsory immunization requirements of this section.

(d) Any school or state-regulated child care center personnel having information concerning any person who attempts to be enrolled in a school or state-regulated child care center without having been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough shall report the names of all such persons to the commissioner.

(e) Persons may be provisionally enrolled under minimum criteria established by the commissioner so that the person's immunization may be completed while missing a minimum amount of school. No person shall be allowed to enter school without at least one dose of each required vaccine.

(f) County health departments shall furnish the biologicals for this immunization for children of parents or guardians who attest that they cannot afford or otherwise access vaccines elsewhere.

(g) Health officers and physicians who provide vaccinations must present the person vaccinated with a certificate free of charge showing that they have been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough, or he or she may give the certificate to any person or child whom he or she knows to have been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough.

(h) The commissioner is authorized to grant, renew, condition, deny, suspend or revoke exemptions to the compulsory immunization requirements of this section, on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine.

(1) A request for an exemption to the compulsory immunization requirements of this section must be accompanied by the certification of a licensed physician stating that the physical

condition of the child is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine.

(2) The commissioner is authorized to appoint and employ an Immunization Officer to make determinations on request for an exemption to the compulsory immunization requirements of this section, on a statewide basis, and delegate to the Immunization Officer the authority granted to the commissioner by this subsection.

(3) A person appointed and employed as the Immunization Officer must be a physician licensed under the laws of this state to practice medicine.

(4) The Immunization Officer's decision on a request for an exemption to the compulsory immunization requirements of this section may be appealed to the State Health Officer.

(5) The final determination of the State Health Officer is subject to a right of appeal pursuant to the provisions of article five, chapter twenty-nine a of this code.

(i) A physician who provides any person with a false certificate of immunization against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio,, rubella, tetanus and whooping cough is guilty of a misdemeanor and, upon conviction, shall be fined not less than $25 nor more than $100.

W. Va. Code § 16-3-4 (emphasis added).

Effective September 14, 2015, the State Board of Education promulgated a legislative rule related to "Health Promotion and Disease Prevention," known as Policy 2423. 126 C.S.R. 51. Specifically, this legislative rule includes provisions related to statewide immunization tracking, health promotion through up-to-date immunizations, disease prevention measures through immunizations, and required vaccinations for students. *See* 126 C.S.R. 51 at §§ 4.23, 5.1, 6.1, 6.2, 6.3, 6.4, 7.1.

### III.    ARGUMENT

The gravamen of Plaintiffs' Complaint is that West Virginia Code § 16-3-4 is in violation of the United States Constitution, specifically that it does not contain a religious

exemption to compulsory immunization.  However, Plaintiffs' Complaint must be dismissed for two reasons: (1) Plaintiffs failed to join necessary and indispensable parties to this action and (2) Plaintiffs failed to state a claim against the School Board Parties upon which relief may be granted.

### A.    *Plaintiffs' failure to name necessary and indispensable parties requires dismissal.*

Plaintiffs' failure to join the State Superintendent and the WVDE is fatal to their action as it relates to the Upshur School Board Parties.  As the parties charged with the general governance of West Virginia's public schools, including the interpretation and enforcement of state laws that impact public schools, both the State Superintendent and the WVDE are required parties.  Together, the State Superintendent and the WVDE controlled the interpretation of the state law at issue, issued guidance to the County Superintendent on same, and enforced the law as it impacted West Virginia's public schools.  Although joinder of the State Superintendent and the WVDE is not feasible, the non-parties are indispensable to Plaintiffs' action.  Accordingly, this civil action must be dismissed.

### i.    Extrinsic evidence demonstrates that the State Superintendent and the WVDE possess an unequivocal interest in the compulsory immunization of virtual school students, within the meaning of Rule 19(a).

When considering a 12(b)(7) motion, the Court "may consider evidence presented outside of the pleadings." *Marina One, Inc. v. Jones*, 22 F.Supp.3d 604, 607 (E.D. Va. 2014), (citing *R-Delight Holding LLC v. Anders*, 246 F.R.D. 496, 499 (D. Md.2007)).  A crucial item the Court should consider is the December 18, 2023 Superintendent's Update sent via email by the WVDE to the County Superintendent.  A copy of the State Superintendent's Update is attached hereto as **Exhibit A.**  The Superintendent's Update contained, at page 5, the following directive

related to the compulsory immunization of *all* West Virginia public school children, *including virtual students*:

> Students enrolled in public schools as *full-time virtual students are required to be fully immunized according to W. Va. Code 16-3-4 exactly as they would be when enrolling for in-person instruction*. Please review the enrollment records of your full-time virtual students and work with your administrators and school nurses to *correct any non-compliant enrollment occurrences*.

Ex. A (emphasis added).

This Exhibit clearly establishes the State Superintendent's and the WVDE's interest in the matter of virtual school students' compulsory immunization and the duty placed on county boards of education to correct non-compliance with the statute and the Upshur County Board of Education relied upon this directive.

> **ii.      The State Superintendent and the WVDE are Necessary Parties Within the Meaning of Rule 19(a).**

Here, the State Superintendent and the WVDE are necessary parties because they have a statutory duty of general governance of West Virginia's public schools.  The State Superintendent is charged with enforcement of the allegedly unconstitutional compulsory immunization law that affects West Virginia's public schools.  W. Va. Code § 18-3-4.  Specifically, the State Superintendent of Schools "shall cause to be instituted such…processes as may be necessary to properly enforce and give effect to any…general or special laws pertaining to the school system of the state, or any part thereof, or of any rule or direction of the state Board of Education made in conformity with its powers and duties." *Id.*   In fact, the State Superintendent did cause to be instituted a process by which West Virginia Code § 16-3-4 was enforced and gave effect to the same, in the form of the Superintendent's Update.  Because the State Superintendent

12
JA285

maintains[4] the WVDE, the Superintendent's Update may properly be attributed to both. Although omitted entirely from the Complaint, the very basis for the instant litigation was the Superintendent's Update emphasizing the ***mandatory immunization of virtual school students*** and the directive to "correct any non-compliant enrollment occurrences." *See* Ex. A. The Superintendent's Update and the statutory duties of the State Superintendent and the WVDE establish their interest in the subject of this litigation and demonstrate they are "necessary" parties for purposes of Rule 19(a)(1)(B).

Accordingly, in the State Superintendent and the WVDE's absence, this Court cannot accord complete relief among existing parties. Fed. R. Civ. P. 19(a)(1)(A). Indeed, if Plaintiffs were to obtain the relief they seek, it would divest the State Superintendent and the WVDE of their interest in the compulsory immunization of school children, specifically virtual school students. It would also cause the Upshur School Board Parties to take action that is contrary to directives they have received from the State Superintendent, who supervises the county school boards. As a practical matter, permitting the litigation to continue without the State Superintendent and the WVDE, impedes their ability to protect their unequivocal interest. Fed. R. Civ. P. 19(a)(1)(B)(i).

The State Superintendent and the WVDE have a clear and unequivocal interest in the compulsory immunization of school children which is the subject of the instant litigation. Fed. R. Civ. P. 19(a). Compellingly, the State Superintendent is charged by statute with the "general supervision" of West Virginia's public schools; thus, the State Superintendent is the true party at interest and "necessary" for purposes of the instant litigation. W. Va. Code § 18-3-3. Conversely, the Upshur School Board Parties have little to no control over the interpretation and enforcement

---

[4] *See* W. Va. Code § 18-3-9.

of West Virginia Code 16-3-4.[5]  The Upshur School Board Parties are obligated to follow the directives of the State Superintendent due to the State Superintendent's supervisory powers. Consequently, the absence of the State Superintendent and the WVDE leaves the Upshur School Board Parties subject to a substantial risk of incurring inconsistent obligations because of the State Superintendent and the WVDE's interest.  Fed. R. Civ. P. 19(a)(1)(B)(ii).  By failing to join the State Superintendent and the WVDE, Plaintiffs subject the Upshur School Board Parties and arguably themselves to incomplete relief, because the interpretation, guidance, and enforcement of the statute at issue are governed by the State Superintendent and the WVDE.

While "necessary," joinder of the State Superintendent and the WVDE is likely frustrated by state sovereign immunity, the Eleventh Amendment to the U.S. Constitution, and/or a probable determination that the State Superintendent and the WVDE are "arms of the state."  The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state."  U.S. Const. Amend. XI. "The Supreme Court has interpreted the amendment to also *apply to a suit by a citizen of a state against that state*."  *W. Va. Oil & Gas Ass'n v. Wooten*, 631 F.Supp.2d 788 (S.D.W.Va. 2008) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)) (emphasis added).  The Eleventh Amendment prohibits naming an arm of the state as a defendant. *See Westinghouse Elec. Corp. v. W. Va. Dep't of Highways*, 845 F.2d 468, 469 (4th Cir.1988)

---

[5] The Upshur School Board Parties emphasize that what control and/or discretion a county board may typically have was greatly reduced at time of K.P.'s withdrawal from Upshur County Virtual School.  On or around June 2023, the WVDE assumed complete control of Upshur County Schools.  In other words, the WVDE, *not the Upshur School Board Parties,* had heightened control over the interpretation and enforcement of compulsory immunization of virtual school students in Upshur County.

14

Furthermore, "Constitutional provisions target state action, not individual officers."[6] However, there are exceptions to the Eleventh Amendment that allow a plaintiff to bring a civil action against a state in federal court, one such exception being the *Ex parte Young* exception. Nevertheless, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the **enforcement** of the act[.]" *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. 441; *Univ. of Pittsburgh Med. Ctr. v. Walker*, Civil Action No. 2:06–0890, 2007 WL 1575060, *4 (S.D.W.Va. May 30, 2007) (emphasis added). Moreover, a **general** authority to enforce the laws of a state is not a close enough relation. *Waste Mgmt. Holdings*, 252 F.3d 316, 331, 52 ERC 1818 (4th Cir. 2001).[7] Here, the true parties at interest, the WVDE and the State Superintendent, have plenary power to enforce the state laws that impact the public schools. While they are "necessary" parties for purposes of Rule 19(a), the State Superintendent and the WVDE cannot be joined to the instant action.

### iii. The State Superintendent and the WVDE are Indispensable Parties Within the Meaning of Rule 19(b).

If the missing party is "necessary" but cannot be joined under Rule 19(a), then a court must analyze "whether the proceeding can continue in [that party's] absence, or whether it is indispensable pursuant to Rule 19(b) and the action must be dismissed." *Owens*, 186 F.3d at

---

[6] *See* Nick Daum, *Section 1983, Statutes, and Sovereign Immunity*, Yale L. J., https://openyls.law.yale.edu/bitstream/handle/20.500.13051/9439/19_112YaleLJ353_November2002_.pdf

[7] At most, the Upshur School Board Parties have a general authority to enforce the laws of the state, but the relation is not close enough. Accordingly, the Upshur School Board Parties maintain that the *Ex parte Young* exception to the Eleventh Amendment sovereign immunity does not apply and that they are not the proper parties to the instant suit. The mere fact that the Upshur School Board Parties have a general duty to enforce state law does not make them proper defendants in the instant action attacking the constitutionality of West Virginia Code § 16-3-4.

440.  All four of the Rule19(b) factors favor a finding that the State Superintendent and the WVDE are indispensable parties.[8]

With respect to the first 19(b) factor, judgement rendered in the State Superintendent and the WVDE's absence will prejudice the State Superintendent whose duty it is to interpret laws affecting the public schools and to ensure uniform enforcement of and compliance with the same.  Moreover, a judgment rendered in the State Superintendent and the WVDE's absence will prejudice the Upshur School Board Parties by creating an inconsistent obligation with respect to other boards of education.

The second 19(b) factor is "whether a court can tailor relief to lessen or avoid the prejudice to the absent person or to those already parties." *Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.,* 210 F.3d 246, 253 (4th Cir. 2000).  Here, it is hard to fathom how the Court could tailor any relief to lessen or avoid prejudice, because in order to reach a judgment on the merits this Court would need to address ‒ or bypass ‒ the issue of the State Superintendent and the WVDE's general governance of the public schools and their interest in compulsory immunization.  Moreover, this Court cannot lessen the burden on the public school coffers; the Upshur School Board Parties are unduly prejudiced by having to expend taxpayer funds in defense of this action.

---

[8] In order to determine whether the State Superintendent and the WVDE are indispensable, Rule 19 provides that a court should consider the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> > (A) protective provisions in the judgment;
> > (B) shaping the relief; or
> > (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b)(1)-(4).

"The third factor is whether a judgment without the absent [party] will be adequate." *Id.* Any judgment the Court might render in the State Superintendent and the WVDE's absence would be worse than inadequate, it would strip them of their statutory authority to govern the public schools, as vested by the West Virginia Legislature.

The fourth factor of Rule 19(b) is "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." *Id.* Both a federal statute and a Federal Rule of Civil Procedure contemplate determination of the constitutionality of a state statute **without** litigation involving state officials. *See* 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(a). Here, Plaintiffs have a fully adequate remedy, to file a notice of constitutional question and serve the notice on the state attorney general under Rule 5.1 of the Federal Rules of Civil Procedure. Moreover, it is permissible to challenge the constitutionality of a state statute without suing state officials in their official capacities. *See e.g., Lutter v. JNESO*, 86 F.4th 111, 117 Fed. R. Serv. 3d 305 (3rd Cir. 2023)(citing 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(a)). Public policy resoundingly favors this alternate remedy, as it prevents the Upshur School Board Parties from needlessly expending public school dollars in defense of this action.

Accordingly, the State Superintendent and the WVDE are "indispensable" parties within the meaning of Rule 19(b). While necessary and indispensable parties, joinder is not feasible because of state sovereign immunity, the Eleventh Amendment to the U.S. Constitution, and/or the determination that they are "arms of the state." Accordingly, this civil action should be dismissed.

17

**B.**    ***Plaintiffs' failure to state a claim against the Upshur School Board Parties upon which relief can be granted provides alternative grounds for dismissal.***

In the alternative, the Upshur School Board Parties move for dismissal based on Plaintiffs' failure to state a claim against the Upshur School Board Parties upon which relief may be granted.  Plaintiffs seek to enjoin the Upshur School Board Parties, despite the fact that it is the State Superintendent who is charged with the "general supervision" of the public schools and who serves as the chief executive officer of the state Board of Education.  W. Va. Code § 18-3-3.  Here, ***the WVDE, as maintained by the State Superintendent,*** issued the directive related to the correction of any "non-compliant enrollment occurrences" as the process by which to enforce and give effect to West Virginia Code § 16-3-4.  Thus, it is the WVDE and the State Superintendent who can afford the relief that Plaintiffs seek.

As noted above, the Board has only such power as is expressly conferred upon it and those powers that arise by necessary implication.  *See, e.g., State v. Rouzer*, 127 W. Va. 392, 32 S.E.2d 865 (1945); *Dooley v. Board of Education*, 80 W. Va. 648, 93 S.E. 766 (1917).  Likewise, the County Superintendent is duty-bound to comply with state law and the directives of the State Superintendent of Schools and the WVDE.  W. Va. Code § 18-4-10.  As an employee of the Board, Ms. Marteney must follow the directive of her employer and comply with state law.  Individually and collectively, the Upshur School Board Parties have no statutory authority to circumvent state law and/or a directive by the State Superintendent and the WVDE.

Here, Plaintiffs seek to enjoin the enforcement of an allegedly unconstitutional state law but failed to name the party who can effect such relief, namely the State Superintendent and the WVDE.  Taking all factual allegations in the Complaint as true and drawing all reasonable inferences in favor of the Plaintiffs, the Upshur School Board Parties simply do not have the

statutory authority to provide Plaintiffs with the relief they seek.  Assuming, *arguendo*, that Plaintiffs are entitled to injunctive relief, they have not sought relief from the proper party.  Therefore, specifically as to the Upshur School Board Parties, Plaintiffs have failed to state a claim upon which relief may be granted.  Therefore, dismissal is appropriate under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## IV.    CONCLUSION

This actions seeks to have the Court render a judgment based on the constitutionality of West Virginia Code § 16-3-4 and/or to enjoin its enforcement.  However, West Virginia law provides that the State Superintendent and the WVDE are the true parties in interest because of their duties of general governance of the public schools.  As a matter of fundamental fairness, the State Superintendent and the WVDE's statutory authority cannot be usurped.  Under the mandates of Rule 12(b)(7) and Rule 19, this action must be dismissed because the State Superintendent and the WVDE are necessary and indispensable parties that cannot be joined.  In the alternative, pursuant to Rule 12(b)(6), Plaintiffs' Complaint should be dismissed for failure to state a claim against the Upshur School Board Parties since it not the Upshur School Board Parties who can provide the relief sought.

*/s/ Robert J. Kent*
Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, West Virginia  26102
(304) 420-5504
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, West Virginia  26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

Counsel for Defendants The Board of
Education of the County of Upshur, Stacy
Marteney, in her official capcity and
Christine Miller, in her official capacity

20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, individually and
on behalf of their minor child K.P.,

      Plaintiffs,

v.

STACY MARTENEY in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School; THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, in her
official capacity as Superintendent of the
Upshur County School District; DR. MATTHEW
CHRISTIANSEN, in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health; and DOUG CIPOLETTI
in his official capacity as Executive Director of the
West Virginia Virtual School Academy,

      Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE THOMAS S. KLEEH

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel

of record.

                             */s/ Robert J. Kent*
                             Robert J. Kent

21

17011190.1

**From:** West Virginia Department of Education <info.wvde@k12.wv.us>
**Date:** December 18, 2023 at 5:59:59 AM EST
**To:** Christine Miller <cemiller@k12.wv.us>
**Subject: Superintendent's Update - December 18, 2023**
**Reply-To:** West Virginia Department of Education <info.wvde@k12.wv.us>

[EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the sender and know the content is safe.



*December 18, 2023*

# Superintendent's Update



EXHIBIT

A

JA295



## *Keeping ConnectED:*
## *Holiday Special*

In this week's Keeping ConnectED, celebrate the holidays as we celebrate award-winning educators. State Superintendent of Schools Michele Blatt hosts the Excellence in Education Holiday Special and catches up with the outgoing and incoming Teacher of the Year.

# *This week with Unite with Numeracy*



The next featured educator in our Unite with Numeracy Educator series is 2023 Milken Educator Janna Hamrick from Rock Branch Elementary in Putnam County. She utilizes Mathematical Habit of Mind 8, "look for and express regularity in repeated reasoning," in her classroom.

Click here to learn more about Unite with Numeracy.

# *What's New?*

**SAFETY TRAINING:** Superintendents and school administrators are invited to participate in a "Responding to and Investigating Bomb Threats and Swatting Hoaxes" training, presented and hosted by the FBI Boston and Massachusetts State Police. This event will be held on Wednesday, January 11, 2024, at 9 a.m., 11 a.m., 2 p.m., and 4 p.m. These will be virtual events. Click here for more information and to register for training.

**GROW YOUR OWN PUBLICATION:** The West Virginia Board of Education (WVBE) and the West Virginia Department of Education (WVDE) are committed to expanding the number of high-quality educators and leaders by elevating educator preparation, recruitment, and retention. West Virginia Grow Your Own and West Virginia Grow Your Own Apprenticeship to Teaching offer recruitment and retention strategies to support county school systems. Click here to read the Fall 2023 West Virginia Grow Your Own publication.

**NEW WORLD LANGUAGE AND ASL TEACHERS LISTSERV:** A new email ListServ has been created for world language and ASL teachers throughout the state. The WVDE will share information such as educational opportunities, state policy changes, or information about language learning through this ListServ. Communications may also include news about cultural programs and travel opportunities, teacher and student scholarships, or applications for the Seal of Biliteracy. Teachers may join the new ListServ by emailing Julie Morris, Coordinator for the Offices of Student Enrichment and CTE Middle School.

**VIRTUAL SCHOOL STUDENTS IMMUNIZATION REQUIREMENTS:** Students enrolled in public schools as full-time virtual students are required to be fully immunized according to W. Va. Code 16-3-4 exactly as they would be when enrolling for in-person instruction. Please review the enrollment records of your full-time virtual students and work with your administrators and school nurses to correct any non-compliant enrollment occurrences.

**INVEST 2024:** The WVDE is excited to announce that the INVEST conference will return for the Summer of 2024! The Charleston INVEST Conference will be held on June 24– 27, 2024, at the Charleston Coliseum and Convention Center and the Morgantown INVEST Conference will be held on July 22 – 25, 2024, at the Waterfront by Marriott. Elementary teachers will attend all 3 days to receive professional learning in reading/language arts, mathematics, science, and social studies. Secondary teachers will attend 2 days for their specific content areas. Dr. Weston Kieschnick will be the keynote speaker at each location. The Thursday of each conference week will be reserved for the second Science of Reading implementation team training with Dr. Jennifer Dale, recertification courses for selected CTE teachers, and Parent-Community Involvement training with Nancy Cline. The WVDE will be providing lodging and granting counties $300 per teacher who attends. Mileage costs will be the responsibility of the county. If you have any questions, please email Jonah Adkins or Joey Wiseman. Please watch for more information regarding registration and the number of participants each county will be allowed to send.

**PROVIDING IEP/504 ACCOMMODATIONS:** Click here to find instructions about the documentation necessary for the provision of IEP/504 accommodations,

including WVDE Policy 2419 and Methods of Delivery of Accommodations.

**WEST VIRGINIA ATTENDANCE COLLABORATIVE CONFERENCE:** The West Virginia Attendance Collaborative (WVAC) Conference will be held on January 18-19, 2024, at Waterfront Resort in Morgantown, West Virginia. Jessica Sprick from Safe and Civil Schools will support districts in creating action plans for attendance. Two sessions will be offered this year, in January and in May. Details and registration information will be shared with county attendance directors. If you have questions please email Stacey Losh.

**ESSER YEAR 4 DATA COLLECTION**: The Office of the Elementary and Secondary Education Act (ESEA) Programs is creating the ESSER Year 4 Data Reporting district-specific Excel workbook which will include auto-populated data collected from the last three years of ESSER data collection. Click here for more information.

**SAMPLE NARRATIVE WRITING PROMPTS AND RUBRICS**: Sample narrative writing prompts and new narrative writing rubrics are now available for teachers to use in their classrooms. The prompts and the rubrics are available in the Writing Resources Channel on the WV PEAKS Team site. To access these resources, educators must be members of the WV PEAKS Team. Click here for information on how to join WV PEAKS. For questions, please email Dr. Vaughn G. Rhudy or call 304-558-2546.

**WEST VIRGINIA SCHOOL COUNSELOR OF THE YEAR**: Nominations are now open for the 2024 West Virginia School Counselor(s) of the Year. Nominations will

close on January 5, 2024. Click here for more information about the award and nomination instructions.



## *Reminders*

- Monthly West Virginia Board of Education meeting is **January 10, 2024.**

- Arts Alive Poster Submissions are due by January 26, 2024.

- Click here to purchase discounted WVU Basketball tickets for their matchup with Bringham Young University on Saturday, February 3, 2024.

## *Important Dates*



- **December 18, 2023:** Agenda items are due for the **January 10, 2024, West Virginia Board of Education meeting.** Send items to Deputy Superintendent Sonya White or call 304-558-2681.



## Holiday Hams

Bethlehem Elementary School students in Ohio County entertained the audience with silly songs during their Winter Music Concert.





*Copyright © 2023 West Virginia Department of Education*

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.*, <br><br><br> Plaintiffs, <br><br> Against <br><br> STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; and BRYAN HOYLMAN *in his official capacity as Chair of the West Virginia Virtual Academy*, <br><br> Defendants. | Civil Action No.: 2:24-cv-00018-TSK |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION TO DEFEDANTS' MOTION TO ABSTAIN OR, ALTERNATIVELY, TO STAY UNDER *PULLMAN***

JA305

## INTRODUCTION

This is an "as applied" First Amendment Free Exercise claim brought by the parents of eight-year-old K.P. who seeks a religious exemption to West Virginia's compulsory vaccination law, W.VA. CODE § 16-3-4 (the "**CVL**"), so that K.P. may continue her online education.

Defendant Dr. Matthew Christiansen begins by mischaracterizing Plaintiffs' claim. Dr. Christiansen asserts that if the Court were to grant Plaintiffs relief, such a ruling would "invalidate[] West Virginia's longstanding vaccine requirement for public schoolchildren." ECF 23, Christiansen Br., at 1. This is false. Plaintiffs seek a religious exemption only for *their child* to attend *virtual school*. If granted, relief would extend only to K.P. and would not foreclose West Virginia's ability to enforce the CVL against every other child in the state. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (highlighting than in "[a]n 'as applied' challenge", the claim is that "the operation of a statute is unconstitutional in a particular case" whereas a facial challenge seeks to invalidate the challenged law in every application).

Next, Defendants Stacy Marteney, Christine Miller, and the Board of Education of the County of Upshur (collectively, the "**Upshur Defendants**") and Dr. Christiansen argue strict scrutiny should not apply, relying heavily on ancient cases like *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) and *Prince v. Massachusetts*, 321 U.S. 158 (1944) for the general proposition that the government is authorized to compel vaccination on its citizens. However, those cases did not involve First Amendment Free Exercise claims, and Plaintiffs do not challenge the government's general ability to compel vaccination.[1]

---

[1] Notably, *Jacobson* has been relied upon to justify some of the most repugnant laws the Nation has ever encountered. *See Buck v. Bell,* 274 U.S. 200, 208 (1927) (relying on *Jacobsen* to uphold forced sterilization law, reasoning that "the principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes" of "imbeciles") (citing *Jacobson,* 197 U. S. 11)).

1

JA306

Defendants also rely on *Workman v. Mingo County Bd. of Educ.*, 419 F. App'x 348 (4th Cir. Mar. 22, 2011), an unpublished decision that is not binding on this Court, and a case that did not argue or present for decision any of the material issues presented here. *See Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 338 (4th Cir. 2009) (unpublished decisions are not binding precedent). *Workman* was decided more than a decade before controlling and directly on point Supreme Court precedent in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) and *Tandon v. Newsom*, 593 U.S. 61 (2021).

The CVL triggers strict scrutiny on multiple fronts and the standards controlling this case were set forth in *Tandon* and *Fulton* just three years ago. *Fulton* dictates strict scrutiny here because the CVL contains a mechanism to seek medical exemptions but has no commensurate process to seek religious exemptions. Additionally, strict scrutiny applies under *Tandon* because West Virginia treats non-vaccination for secular reasons – in much riskier situations – more favorably than non-vaccination for the religious exercise at issue (a religious exemption for a student to attend virtual school). Like almost all regulations subjected to strict scrutiny, the CVL fails the test. *See Tandon*, 593 U.S. 61, 65 (2021) (holding that in the context of regulations seeking to counteract infectious disease, strict scrutiny "is not watered down; it really means what it says.").

Perhaps understanding that the CVL is flagrantly unconstitutional as applied to K.P., Defendants then attempt to delay a ruling under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), asking the Court to send K.P. on a lengthy and costly journey to the state court system to assert an analogous – but separate and distinct – state law claim that she expressly has not brought and will never bring, all while the constitutional harms continue to accrue. Defendants never address that Plaintiffs declined to bring such a claim because Plaintiffs understand that relief

2

available in that forum under the state law Defendants prefer would be transient and passing, subject to the shifting opinions of elected officials. *See* ECF 1 ¶¶ 146-149.

Defendants' request to have this Court abstain or, alternatively, stay the case under *Pullman* should also be rejected. In *Sonda v. W. Va. Oil & Gas Conservation Comm'n*, 92 F.4th 213 (4th Cir. 2024), the Fourth Circuit recently rejected virtually identical *Pullman* arguments made by Defendants here, reversing the district court's *Pullman* stay order after observing the settled maxim that "a federal court, whose jurisdiction has been invoked, *must* exercise that jurisdiction and address the matter before it." *Id.* at 219 (emphasis in original).

For these reasons and the reasons more fully detailed below, Plaintiffs respectfully request that the Court: (1) deny in its entirety Defendants' Motion to Abstain, or Alternatively, Stay under *Pullman*; and (2) grant their Motion for Preliminary Injunction on or before August 16, 2024, so K.P. can re-enroll in the Upshur County Virtual Academy as soon as practicable.[2]

## **ARGUMENT**

Defendants fail to meaningfully address that this is an "as applied" challenge seeking constitutional relief specifically and only for K.P. who has received most all vaccines required by the CVL, was enrolled in virtual school for more than seventeen months, and she seeks a limited religious exemption to continue her online education. The CVL is unconstitutional in K.P.'s case.

Defendants argue in response the slippery slope that may arise: if K.P. is granted an exemption, others may be as well. This is just another iteration of the bureaucrats' favorite excuse, repeatedly rejected by the Supreme Court: "[i]f I make an exception for you, I'll have to make one for everybody, so no exceptions." *Gonzales v. Centro Espirita Beneficente Uniao do Vegetal*, 546

---

[2] Plaintiffs mistakenly believed that the Upshur County Virtual School – which K.P. was enrolled in from August of 2022 through January of 2024 – was a subcomponent of the West Virginia Virtual Academy run by Defendant Hoylman.

U.S. 418, 436 (2006); *Holt v. Hobbs*, 574 U.S. 352, 368 (2015) (rejecting such arguments as they are nothing more than "formulation[s] of the classic rejoinder of bureaucrats throughout history").

Plaintiffs are entitled to strict scrutiny for each of the following reasons: the CVL (1) is not generally applicable under *Fulton*; (2) is neither neutral nor generally applicable under *Tandon*; (3) is amenable to religious exemptions, triggering strict scrutiny under *Smith*; and (4) involves a hybrid-rights claim recognized by the Supreme Court in *Yoder*. *See* § I.A-D.

The CVL cannot survive strict scrutiny for two independent reasons: (1) Defendants failed to demonstrate a sufficiently compelling state interest to prohibit K.P. from furthering her virtual education; and (2) there are alternatives less burdensome to religious freedoms available. Thus, Plaintiffs are substantially likely to prevail on the merits of their First Amendment claim. *See* § II.A-B. The remaining preliminary injunction factors collapse into the first – likelihood of success on the merits – and, thus, Plaintiffs are entitled to injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). *See* § III.

Finally, Defendants' invitation to abstain, or alternatively, stay the case under *Pullman* should be rejected. There is no ambiguous state law claim presented by Plaintiffs to the Court for decision, a perquisite for *Pullman* to even potentially apply. The only state law at issue is the CVL, and it unambiguously permits medical exemptions but not religious exemptions. *See Sonda*, 92 F.4th 215 (holding district court abused its discretion in abstaining under *Pullman* where the relevant state law claim had never been "presented for decision" in federal court). *See* § IV.

## I.   THE CVL TRIGGERS STRICT SCRUTINY ON MULTIPLE FRONTS

### A.  The CVL Fails the General Applicability Test under *Fulton*.

The Supreme Court recently emphasized that a law is not generally applicable if it "provid[es] 'a mechanism for individualized exemptions'" but does not allow for religious

exemptions. *Fulton*, 593 U.S. at 533 (cleaned up). The concern held by the Court is that, in such a scheme, the government will determine that secular reasons for opting out of law are "worthy of solicitude," and, in a biased manner, conclude that religious reasons are not. *Id.* at 537.

The government's unconstitutional bias is woven into the fabric of the CVL: it institutes a scheme to seek individualized medical exemptions, but categorically bars a similar religious exemption for virtual school. Given that the state has a scheme for "individualized [medical] exemptions," *see* ECF Nos. 1-9, 1-10, 1-11, and 1-12 (detailing medical exemptions granted statewide), it violates *Fulton* by prohibiting religious exemptions. *See* ECF 1-8 (denial of Plaintiffs' religious exemption request). Defendants nonetheless attempt to escape *Fulton*'s reach for two reasons, both of which lack merit.

*First*, Defendants assert the CVL does not contain a "mechanism for individualized exemptions," ostensibly because medical exemptions are granted to an "objectively defined category of people". ECF 23, Christiansen Br., at 12; ECF 21, Upshur Br., at 11. However, *Smith* and *Fulton's* holdings are directed at the mere specter of unconstitutional partiality against religious conduct, not whether an exemption scheme contains objective criteria by which each is examined on a case-by-case basis.[3] *Emp't Div. v. Smith*, 494 U.S. 872, 884-86 (1990).

Defendants' "objectively defined" criteria theory finds no support in Supreme Court precedents. In *Lukumi*, for example, the animal slaughter laws were subject to objectively defined secular exemptions, such as the "slaughter of animals for food, eradication of insects and pests, and euthanasia." 508 U.S. at 537. Yet the Supreme Court still found the laws to be not neutral and not generally applicable and, therefore, subject to strict scrutiny. *Id.* at 542*; see also Fraternal*

---

[3] For example, if the West Virginia Department of Health instituted a policy that stated *only* African American males (objective criteria) may apply for employment, without affirmatively stating "Caucasians females may not apply," such a policy would invoke virtually identical constitutional concerns as exist here.

*Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.) (law subject to categorical "medical" and "undercover investigation" exemptions not neutral and generally applicable where religious exemptions prohibited). *Fulton* makes clear that if a law "'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" it is not generally applicable. 593 U.S. at 534. It makes no difference whether the discretion is cabined by criteria, objective or not.

Again, what the First Amendment is concerned with is not how discretionary an exemption is, but rather whether the scheme allows for *"*the prospect of the government's deciding that secular motivations are more important than religious motivations." *Fraternal Ord. of Police*, 170 F.3d at 365; *see also Fulton*, 593 U.S. at 537. This concern can be present whether the exemption is phrased objectively or subjectively and, in fact, is magnified when the government grants a secular-based exemption to an entire category of claimants using objective terms, while categorically prohibiting religious exemptions. *See Lukumi,* 508 U.S. at 542 ("All laws are selective to some extent, but *categories* of selection are of paramount concern when a law has the incidental effect of burdening religious practice." (emphasis added)); *Fraternal Ord. of Police*, 170 F.3d at 365 (unconstitutionality is "only further implicated . . . when the government . . . actually creates a categorical exemption" for secular reasons but prohibits them for religious reasons).

*Second*, Defendants claim the CVL passes *Fulton's* general applicability test supposedly because government officials possess no real discretion to grant or deny medical exemptions. *See* ECF 23, Christiansen Br., at 12 (contending that a child "either meets the criteria [for a medical exemption], or they do not"). This claim is not only legally irrelevant if true, but also contrary to the only evidence of record. Dr. Alvin Moss, a West Virginia physician intimately familiar with the CVL and its medical exemption process, details how medical exemptions are subject to case-

by-case discretionary review. *See* ECF 8-2 ¶¶ 8-12. As conclusive evidence of the discretionary nature of the exemption scheme, officials who evaluate exemption requests (after the physician applies his or her own subjective judgment) often overturn the physician's determination. *Id.* ¶¶ 12-17. Differing outcomes can be reached, and are reached, depending on who evaluates the request. *Id.* By definition, this is the type of discretionary scheme falling within *Fulton's* ambit.

### B.  The CVL Triggers Strict Scrutiny Under *Tandon.*

The CVL is neither neutral nor generally applicable because it treats secular activity more favorably than the religious exercise at issue: nonvaccination in virtual school. The Supreme Court recently reiterated that a law flunks *both* the general applicability and neutrality tests when the government "treat[s] *any* comparable secular activity more favorably than" the religious exercise the government prohibits. *Tandon*, 593 U.S. at 62 (emphasis in original).

The CVL falls squarely within this category. It bans a religious exemption option for online school, yet liberally permits nonvaccination for secular reasons in the in-person and online school settings. It treats the very same activity (nonvaccination) more favorably when undertaken for secular reasons (and in riskier scenarios) than when undertaken for religious reasons. Therefore, as applied to K.P., the CVL is neither neutral nor generally applicable under *Tandon*. Defendants resist *Tandon*'s application for two primary reasons, both meritless.

*First*, Defendants strain to redefine, in a moving-target fashion, the government's interest undergirding the CVL. This is because the official state interest defines what constitutes "comparable" activity – and whether strict scrutiny applies – under *Tandon*. 593 U.S. at 62. The statute itself defines the government's justifications for the CVL as "disease prevention." W. VA. CODE § 16-3-5. Medical exemptions pose at least an equal threat to the government's stated disease prevention goals than a religious exemption for virtual school. To combat this, Defendants

assert the government interest for the CVL is *actually* a hyper-generalized interest in "protecting the health of West Virginia's schoolchildren," ECF 23, Christiansen Br. at 11; this is a necessary manipulation for Defendants to then argue that medical exemptions "*further* this [general public health] interest by ensuring that children are not harmed by vaccines." *Id.* (emphasis in original). To the extent the CVL is generically about public health, disease prevention – not avoiding vaccine injury – is the public health goal specifically articulated in the statute. Defendants cannot play fast and loose with their asserted state interest; they are limited to the interest expressed in the statute.

Moreover, this newly devised "avoidance of vaccine injury" public health justification is at war with the government's stated "disease prevention" goal. Defendants do not contest that a single unvaccinated medically exempt child endangers the state's disease mitigation efforts more than would allowing K.P. to learn virtually. Simply put, it is obvious Defendants manufacture a *post-hoc* "public health/vaccine harm" government interest to evade strict scrutiny. *See Rockland Cnty. Dep't of Health*, 53 F.4th 29, 41-42 (2d Cir. 2022) (in the context of disease prevention regulations that differentiate between religious and secular conduct, observing that the First Amendment's "general-applicability test embraces a purposivist approach that is vulnerable to manipulation and arbitrariness," and warning against government attempts to evade strict scrutiny by framing the state interest in hyper-generalized terms, such as the promotion of "public health—so that an exception would rarely undermine" such an interest) (Park, J., concurring).

Additionally, if protecting medically vulnerable children and ensuring children are not injured by vaccines is the real goal of the CVL, religious exemptions for virtual school would not endanger that objective. For *Tandon's* comparability analysis, the government bears the burden to "show that the religious exercise at issue is more dangerous" than the activity the government permits, *relative to the asserted state interest*. *Tandon*, 593 U.S. at 63. Obviously, a religious

exemption for online school would not place schoolchildren at risk of vaccine injury. Moreover, as a practical matter, it is impossible for a child to show a requisite "contraindication" for a medical exemption unless he has first been injured by a vaccine. Under Defendants' reasoning, the CVL fatally undermines itself.

Finally, regardless of what state interest Defendants advance – whether it is a general public health/avoidance of vaccine harm, disease prevention, or any other justification – the state interest in all events is both fatally overbroad, and under-inclusive. It goes further than necessary because the CVL applies even to those who enroll online or virtually and have no interactions with others. It is equally under-inclusive because it applies only to children enrolled in West Virginia schools, but not to those enrolled in homeschooling programs or residents forced to pursue education through programs across state lines (e.g., enrolling in a private school in any of the surrounding states that permit religious exemptions). And, of course, a child who is not vaccinated because of medical reasons, under any justification asserted by Defendants, poses just as much risk as one who is not vaccinated because of religious objections.

*Second*, Defendants argue medical exemptions are not comparable to the religious exemption K.P. seeks because more children may theoretically seek religious exemptions, including for in-person school. *See* ECF 21, Upshur Br. at 13 (arguing that "comparable cases shows that far more students seek religious exemption than medical exemption from mandatory vaccination laws); *see also* ECF 23, Christiansen Br. at 11 (arguing *Tandon* comparability should be assessed by "the risk posed by groups"). In other words, in this as applied challenge, Defendants want the Court to compare the aggregate risk of <u>all</u> hypothetical religious exemptions against the risk of the medical exemptions the state actually grants. But even if Supreme Court precedent supported this aggregation approach (it does not), the risk must be aggregated in the sense that it

9

JA314

is applied to other virtual students. And Defendants are deafeningly silent on the risk an online student (or even thousands of online students) pose to other students – the risk is virtually non-existent relative to the nonvaccination scenarios that *are* allowed.

In all events, the Supreme Court's Free Exercise jurisprudence does not support Defendants' aggregated risk approach. For example, in *Roman Catholic Diocese,* the Court considered whether certain regulations treated "houses of worship [] more harshly than comparable secular facilities." 592 U.S. at 16. Its analysis proceeded to compare the disease-related risks of attending "a worship service" versus shopping in "a large store." *Id.* at 17. Because the law permitted "hundreds of people" to shop while restricting "more than 10 or 25 people" in a church, the law was not neutral and generally applicable. *Id.* at 17-18. The Court did not go on to compare the total number of churches to the total number of stores or the total number of churchgoers to the total number of shoppers. *Accord Tandon*, 593 U.S. at 63. This more granular approach makes sense; a government has no more license to discriminate against a popular religion than a less popular one.

Further, Defendants' aggregation argument ignores that this is an "as applied" challenge. This distinction matters. *See Citizens United*, 558 U.S. at 331 (highlighting that in "[a]n 'as applied' challenge," the claim is that "the operation of a statute is unconstitutional in a particular case" whereas a facial challenge challenges the law as unconstitutional in every application). Because this is an as-applied challenge about a religious exemption in virtual school, Defendants' reliance on *We The Patriots*, 76 F.4th 130, *Workman*, 419 F. App'x at 353, and related authorities is misplaced. None of the cases Defendants rely upon involved an "as applied" challenge related to virtual school, and *We The Patriots* confronted a facial challenge to Connecticut's childhood vaccination law in *all* its applications. Because this case involves the religious exercise of a single virtual student, the Court should assess the risk posed by a religious exemption for one online

10

JA315

student. *See Tandon*, 593 U.S. at 63 (looking not to all at-home religious exercise but the specific "*applicants'* proposed religious exercise at home"); *cf. Yoder*, 406 U.S. at 221 (looking to the risk "that would flow from recognizing the *claimed Amish exemption*" (emphasis added)).

Defendants' argument is apparently that one's right to First Amendment freedoms is contingent on the total number of others who may hypothetically attempt to exercise their free exercise rights in the future. Defendants cite no authority for this proposition, and cannot, because their argument is nothing more than a "formulation of the classic rejoinder of bureaucrats throughout history" that if one religious exception is permitted, too many citizens may exercise their constitutional rights, so no exemptions. *Holt*, 574 U.S. at 368. Consistent with the Supreme Court's rejection of Defendants' argument, courts regularly award "as applied" relief in free-exercise challenges. *See, e.g.*, *Kane v. De Blasio*, 19 F.4th 152, 158-59 (2d Cir. 2021) (awarding injunction to fifteen teachers and administrators in "as applied" First Amendment challenge).

Even if the Court utilizes Defendants' aggregated risk approach, the CVL would still invoke strict scrutiny. In fact, the aggregate risk approach strongly favors Plaintiffs. Defendants do not contest that: (1) unvaccinated adults working in the schools constitute comparable activity under *Tandon;* (2) most adults in working in the school system likely have not received the vaccines required under the CVL; ECF 1 ¶¶ 122-123; and (3) many hundreds of unvaccinated children are permitted to pursue their education (in-person) while willfully non-compliant with the CVL, *see id.* ¶¶ 116-120 (detailing material non-compliance rates). Defendants also do not meaningfully contest that medical exemptions and learning pods constitute comparable activity, *id.* ¶ 41, or that allowing unvaccinated children and adults to intermingle unprohibited throughout the state, including on school campuses, endangers the state's interests much more than a religious exemption for virtual school, and therefore likewise constitutes the type of comparable activity

JA316

that triggers strict scrutiny under *Tandon.* Collectively, the aggregation of non-vaccination scenarios permitted pose an exponentially greater threat than would allowing a religious exemption for online school, which Defendants also do not dispute. *See* ECF 8, at pp. 14-15.

### C.  The CVL is Amenable to a Workable Religious Exemption Option.

Strict scrutiny separately applies under *Smith* and progeny because (as Defendants do not contest) the CVL is readily amenable to a workable religious exemption for online school. *See* ECF 8 at 15-16.

One of the primary reasons the *Smith* Court applied rational basis review was that the drug law at hand was *not* amenable to religious exemptions. As the Court explained, allowing religious exemptions to the drug law would be "courting anarchy." 494 U.S. at 888. That unworkability meant that the Court could not "afford the luxury of deeming *presumptively invalid,* as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order." *Id.* Accordingly, the Court applied rational basis review rather than strict scrutiny.

Unlike the criminal drug law in *Smith* that religious objectors sought to avoid, religious exemptions are more than feasible here. Forty-five states have for years offered religious exemptions to childhood vaccination requirements without generating anarchy. And the fact that West Virginia allows medical exemptions, and functional exemptions through non-enforcement of the law, further underscores that a workable religious exemption could easily be implemented.

### D.  The CVL Implicates Recognized Hybrid Rights Under *Yoder* and Progeny.

Strict scrutiny also applies because this case involves the same type of hybrid rights that provoked strict scrutiny in *Yoder*. 406 U.S. at 233. Years after *Yoder*, when instituting the general applicability/neutrality avenue to strict scrutiny for First Amendment claims, the *Smith* Court highlighted that a law that *is* neutral and generally applicable can nonetheless provoke strict

scrutiny where the free exercise claim is combined with parental rights to "direct the education of their children" consistent with their religious convictions. *Smith,* 494 U.S. at 881. Defendants assert one primary, and unpersuasive, argument for why hybrid rights cannot apply here.

Defendants propose that this Court should not allow a hybrid rights claim to advance because other courts, in factually distinguishable circumstances, have held the *Smith* Court's analysis of hybrid rights was "dicta." ECF 23, Christiansen Br. at 15 (citing *Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003); *see also* ECF 21, Upshur Br. at 14, fn. 9 (citing *We the Patriots USA*, 579 F. Supp. 3d. at 309-10). However, the individuals in *Yoder*, like here, advanced a hybrid rights theory consisting of a free exercise claim overlapping with parental rights to raise and educate their children consistent with their religious beliefs, and strict scrutiny applied. The *Yoder* Court's holding is not dictum. *See Yoder*, 406 U.S. at 233 ("[T]he interests of parenthood are combined with a free exercise claim."). And the *Smith* Court did not eliminate a hybrid rights avenue but went out of its way to acknowledge that the hybrid rights theory was set forth in *Yoder. See Smith,* 494 U.S. at 881. Further, years after *Smith,* the Supreme Court reaffirmed that there is a particular class of free-exercise claims that trigger strict scrutiny outside the *Smith* framework. *See City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) (*Yoder* "implicated not only the right to the free exercise of religion but also the right of parents to control their children's education.").

This language in *Smith* and *Flores* is not dicta, and *Yoder's* holding stands. Moreover, the Fourth Circuit has never held that the *Smith* and *Flores'* Courts' discussion of *Yoder* and hybrid rights was dicta in the circumstances present here. District courts should defer to Supreme Court rulings rather than rely upon the out-of-circuit authority Defendants rely on in *We the Patriots USA*, 579 F. Supp. 3d. at 309-10, and *Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003). *See, e.g.*, *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) ("Inferior courts owe more

13

fidelity to the opinions of the Supreme Court than the Second Circuit showed in *Leebaert*.").

Because the CVL invokes strict scrutiny on a multitude of separate and distinct grounds – under

*Fulton, Tandon, Smith,* and *Yoder* – it must survive strict scrutiny, which it cannot.

## II. THE CVL CANNOT WITHSTAND STRICT SCRUTINY

A law that either is not neutral or lacks general applicability will survive strict scrutiny

"only in rare cases." *Carson v. Makin*, 596 U.S. 767, 781 (2022). Defendants possess the burden

of demonstrating that they possess an interest of the "highest order" relative to K.P. and must also

show that they cannot accomplish their purportedly compelling objectives through means "less

restrictive" of K.P.'s constitutional rights (e.g., through quarantining, enhanced safety protocols,

or online education). *Lukumi*, 508 U.S. at 547; *see also McCullen v. Coakley*, 573 U.S. 464, 495

(2014) (outlining the government's burden to explore and identify less restrictive alternatives).

A law cannot be regarded as protecting an interest "of the highest order" when it permits

activity at least as purportedly risky as the religious exercise it prohibits. *Lukumi*, 508 U.S. at 547.

Further, Defendants cannot rely on broadly formulated government objectives, but must

demonstrate their purported compelling interest is satisfied with respect to K.P. *See Fulton*, 593

U.S. at 541 (the question "is not whether the [Government] has a compelling interest in enforcing

its [vaccination mandate] generally, but whether it has such an interest in denying an exception"

from that requirement to K.P. specifically). The CVL fails strict scrutiny because Defendants have

not demonstrated a sufficiently compelling interest, and, separately, because the CVL lacks narrow

tailoring.

### A. Defendants Failed to Demonstrate a Sufficiently "Compelling Interest."

It is clear universal vaccination is not a public health imperative because West Virginia

allows for nonvaccination for secular reasons in almost every circumstance imaginable, including

in schools. West Virginia's material non-enforcement of the CVL statewide – relative to students

14

JA319

physically present in school – further demonstrates that the government lacks a sufficiently compelling interest to prohibit K.P. from learning virtually.

Defendants advance five arguments for why the government possesses "an interest of the highest order" to expel K.P. from online school, none of which survive even elementary scrutiny.

*First,* Defendants rely on non-binding precedent predating *Tandon* and *Fulton* to advance the broad proposition that "preventing communicable diseases clearly constitutes a compelling interest." ECF 23, Christiansen Br. at 13; *see also* ECF 21, Upshur Br. at 15 (both citing *Workman*, 419 F. App'x at 353 and *D.J.*, 2013 WL 6152363, *4)). Neither *Workman* nor *D.J.* is binding on this Court. And even if these cases could be relied upon for the general proposition that the government has a compelling "disease prevention" interest in the abstract, neither case addressed specifically whether the government has a compelling interest in banning a child who has received most of the vaccines required by the CVL from learning virtually. Defendants must demonstrate a compelling interest specific to K.P., *Fulton*, 593 U.S. at 541, which they do not even attempt to do, and can never do, because the government allows exceptions to its vaccination requirement for in-person classes. *See, e.g., Mast v. Fillmore Cnty.*, 141 S. Ct. 2430, 2432 (2021) (stating that where a state permits exceptions to a public health policy, it "must offer a compelling explanation why the same flexibility extended to others cannot be extended" to the specific religious plaintiffs at issue) (Gorsuch, J., concurring). For these reasons, Defendants' reliance on *Diocese of Brooklyn*, 592 U.S. at 18, *We The Patriots*, 76 F.4th 13, and similar cases is misplaced because those cases either were not "as applied" challenges, or they did not confront the issue of a religious exemption for virtual school. In any event, the regulation in *Diocese of Brooklyn* failed strict scrutiny.

*Second,* Defendants abandon their "disease prevention" government interest and again argue the real goal of the CVL is to ensure medically vulnerable children are protected and not

injured by vaccines. ECF 21, Upshur Br. at 15 (arguing the "absence of a medical exemption . . . would be villainous, and possibly criminal."). However, while this goal is certainly laudable and compelling in the abstract, it is irrelevant to the salient issues here: whether ensuring that children are not vaccine-injured is a compelling interest *relative to prohibiting a religious exemption for virtual students*. Even under Defendants' logic, K.P. poses no threat to these medically vulnerable children, and Defendants offer no evidence that she does. A religious exemption for online education would not endanger the state's objective to protect medically exempt children. In any event, this goal makes no sense – mandating vaccination via the CVL is the primary reason most vaccine injured children in West Virginia have been harmed and require a medical exemption in the first place.

*Third*, Defendant Christiansen argues allowing a "broad" religious exemption would endanger "community immunity," while medical exemptions or allowing teachers and staff to be exempt from the CVL somehow do not. ECF 23, Christiansen Br. at 14. This argument fails for four reasons: (1) even under Defendants' logic, granting medical exemptions, enacting learning pods, and allowing unvaccinated staff in schools endangers so-called herd immunity to a greater degree than would allowing K.P. to learn virtually; (2) West Virginia has no idea if it has reached this supposed herd immunity; most adults, which comprise 80% of the state's population, have never been required to receive the vaccines required by the CVL; (3) K.P. has received most of the vaccines required by the CVL, and in so doing has advanced – not threatened – Dr. Christiansen's push for herd immunity; and (4) banning K.P. from virtual school will never impact the government's pursuit of marginal herd immunity percentage gains because, for religious reasons, after learning of the vaccines' illicit connections to abortion, Plaintiffs will never inject K.P. with these pharmaceutical products.

16

JA321

*Fourth*, entirely divorced from the "disease prevention" justification, the Upshur Defendants argue that requiring personal protection for K.P. is a sufficiently compelling interest. ECF 21, Upshur Br. at 16 (arguing government has a compelling interest in "maintaining the health and well-being of *all* children in the education system, including Plaintiff K.P." (emphasis in original)). In other words, knowing Plaintiffs willingly decline any potential personal protection afforded by vaccination so that they can preserve their religious integrity, the government nonetheless callously asserts it has a compelling interest in forcing K.P. to endanger her soul because the government believes that is best for her "health and well-being." *See* ECF 1 ¶ 65 and *Yoder*, 406 U.S. at 209. Requiring a medical procedure on personal protection grounds is not a compelling state interest in such circumstances. Forcing a medical procedure on the unwilling "for their own good" is no longer appropriate for any sort of state interest in this country. *See Buck v. Bell*, 274 U.S. 200, 208 (1927); *cf. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990).

*Fifth,* the Upshur Defendants argue there is a compelling interest in suppressing the religious exercise at issue because K.P. may have to take a test in person once "annually" as part of virtual learning and that she would be permitted to engage in school's organized sports. ECF 21, Upshur Br. at 16. This is not a compelling state interest. K.P. does not play sports. Regarding the possibility for in-person testing, less restrictive means exist (such as online testing or having K.P. test and demonstrate she is not infected with, nor has been exposed to, any disease targeted by the CVL prior to entering school). In any event West Virginia has already conclusively demonstrated unvaccinated children can intermingle in every scenario imaginable, *see* ECF 1 ¶¶ 90-91 (describing K.P.'s social activities outside of virtual school), including many hundreds of unvaccinated children who take tests and interact daily at school without even adhering to the enhanced safety protocols Plaintiffs would be willing to utilize. *See* ECF 1 ¶¶ 116-126; *see also*

17

JA322

ECF Nos. 1-9 through 1-12 (detailing material non-enforcement of the CVL for in-person students and medical exemptions granted for students attending in-person classes).

In short, Defendants fail to demonstrate an "interest of the highest order" for disallowing *any* type of religious exemption, and especially not in the context of virtual school. The CVL fails strict scrutiny for this reason alone.

## B.  The CVL Lacks Narrow Tailoring.

Defendants also bear the burden to show that CVL is narrowly tailored and that less restrictive means do not exist. *See McCullen*, 573 U.S. at 495. Defendants fail to even address several of Plaintiffs' narrow tailoring arguments and do not attempt to counteract many of the less restrictive options Plaintiffs have offered.

Defendants do not respond to Plaintiffs' argument that virtual school is a less restrictive alternative. *See* ECF 8 at 18 (Plaintiffs highlighting that "less restrictive means—such as quarantining, which de facto occurs in virtual school—plainly exist"). Defendants also do not address Plaintiffs' argument that the CVL is overbroad because it requires vaccines incapable of preventing infection and transmission, and so it fails strict scrutiny for that reason alone. *See* ECF 8, at 24. Defendants also do not meaningfully address that the CVL is glaringly underinclusive on multiple fronts and fails strict scrutiny on that alternative ground. *Id.* at 21-22.

Finally, Defendants fail to explain how it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 466; *see also Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) (holding that a regulation fails strict scrutiny where the government never tried or considered less restrictive alternatives). Defendants nonetheless advance three primary reasons why the CVL is supposedly narrowly tailored. None are persuasive.

18
JA323

*First*, Defendant Christiansen argues that allowing only medical exemptions is not underinclusive but is rather a narrowly tailored solution to his desire to "maintain [] high vaccination levels and protect those children for whom vaccines are contraindicated". ECF 23, Christiansen Br. at 14; *see also id.* (not requiring vaccines for medically exempt children "is one way in which West Virginia has narrowly tailored its vaccination policy" to its public health goal). But allowing a religious exemption for a virtual student has nothing to do with safeguarding medically exempt children from being further injured by vaccines. Narrow tailoring requires examining less restrictive alternatives *to the religious exercise at issue*, not restating the government's (contradictory) state interests and arguing the current vaccination scheme is narrowly tailored to *medical exemptions*. And ensuring "high vaccination levels" is not a less restrictive alternative – forcing K.P. to endanger her own salvation in exchange for a quality education is the most restrictive option conceivable.

*Second,* Defendant Christiansen proposes another red herring argument, contending the CVL is somehow narrowly tailored and is not underinclusive because schools are the only place people are "required to gather in close proximity." ECF 23, Christiansen Br. at 15. K.P. is not attempting to gather in close proximity to others. She seeks the less burdensome alternative of attending virtual school – that is the entire point of this lawsuit. Moreover, infectious diseases spread just as easily through discretionary activities (e.g., at a haircutting salon) as in scenarios where persons are "required" to gather (e.g., jury duty). *See Tandon*, 593 U.S. at 62 (observing infectious disease spreads just as easily at hair salons as at church).

*Third,* Defendants argue that the fact that forty-five states allow religious exemptions is somehow irrelevant to the narrow tailoring analysis because there have been "outbreaks of communicable diseases that the CDC had previously deemed eliminated" in states that previously

19

JA324

had religious exemptions. ECF 21, Upshur Br. at 17; ECF 23, Christiansen Br. at 14. In other words, West Virginia's "no religious exemption" policy for virtual school is somehow a narrowly tailored solution to its objective to protect against "health risks" because of the hypothetical threat of infectious disease outbreaks. This argument fails for many reasons:

- Defendants do not claim outbreaks in other states were attributable to religious virtual students. *See Catholic Diocese,* 592 U.S. at 18 (finding COVID-19 regulation failed strict scrutiny where "there [was] no evidence that the applicants [and religious exercise at issue] contributed to the spread of COVID-19").

- The argument ignores that there have been communicable disease outbreaks in states *after* they removed their religious exemption. For instance, after California repealed its religious exemption in 2015, there were several measles outbreaks in California, and none were attributable to religious virtual students (or, for that matter, to any persons unvaccinated for religious reasons).[4]

- West Virginia's no religious exemption scheme is not a narrowly tailored solution to its "disease prevention" or supposed "herd immunity" objectives because, *inter alia*, the CVL requires vaccines Defendants do not dispute are incapable of preventing infection and transmission*, see* ECF 1 ¶¶ 101-111,[5] and because K.P. has already received doses

---

[4]  *See* California Department of Public Health, Immunization Branch, *available at* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/measles.aspx (describing measles outbreaks in California after the religious exemption was repealed in 2015).

[5]  Because these are judicially noticeable sources compiled by epidemiologists, pediatricians, and virologists, the Upshur Defendants' arguments that "epidemiologists, not lawyers, are in the best position" to inform the Court regarding whether narrowly tailored solutions exist fails. CDC-sponsored epidemiologists have provided ample judicially noticeable sources for why prohibiting children from learning virtually makes no sense. And in any event, expert testimony is completely unnecessary. Laypersons are perfectly capable of assessing any infectious disease related risks between unvaccinated children in virtual school and unvaccinated children and adults physically present at school.

20

of the vaccines capable of preventing transmission and infection; CDC confirms very high levels of protection from those doses, which Defendants also do not dispute. *See* ECF 1 ¶¶ 112-114.

Narrow tailoring requires the government to demonstrate that a policy is the least restrictive means of achieving its objective, and the government has a duty to explore such alternatives and implement them where available. *McCullen*, 573 U.S. at 495. It is not enough for the government simply to contend that its "chosen route was easier." *Id.* Defendants have not satisfied its burdens, and the CVL fails strict scrutiny on these additional grounds.

## III.    THE REMAINING PRELIMINARY INJUNCTION FACTORS TIP CONCLUSIVELY IN PLAINTIFFS' FAVOR

The remaining preliminary injunction factors collapse into a single inquiry: whether a First Amendment violation has occurred. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) (irreparable prong element satisfied as a matter of law where First Amendment violation shown); *see also Nken*, 556 U.S. at 435 (balancing of harms and public interest elements tip conclusively in harmed party's favor where First Amendment violation demonstrated).

For the reasons detailed throughout, the CVL is unconstitutional in this specific case because it triggers and cannot survive strict scrutiny. K.P. has already been denied a public school education, and her parents are subject to criminal prosecution if they fail to educate her. Thus, the constitutional violations – and attendant irreparable harms – have already transpired and continue to accrue. Nonetheless, the Upshur Defendants argue irreparable harms are lacking because K.P. is "homeschooling" and, therefore, the past, ongoing, and imminent constitutional violations can be ignored. ECF 23, Upshur Br. at 18. The Supreme Court disagrees. *See Tandon,* 593 U.S. at 64 (holding the loss of "free exercise rights for even minimal periods of time" unquestionably constitutes irreparable harm) (cleaned up)).

The Upshur Defendants also argue irreparable harm is somehow lacking because K.P. waited too long to challenge the CVL (less than a semester after she was ejected from online education), and because she could attempt to enroll in the West Virginia Virtual Academy (which equally prohibits her enrollment under the CVL). The Upshur Defendants further suggest irreparable harms cannot be substantiated because there are "various private virtual schools around the country" through which K.P. may be able to pursue an online education. ECF 23, Upshur Br. at 19. However, Plaintiffs have no desire to enroll K.P. in an out-of-state private, tuition-based private school. K.P.'s father is 100% disabled, and her mother is the sole provider for the family. Further, K.P. was thriving in the Upshur County Virtual Academy – its staff are exceptional, and their expertise enabled K.P.'s father to seamlessly shepherd K.P. through her online education, where she thrived and made straight A's. *See* ECF 1 ¶¶ 85, 134-136. And in all events, the Supreme Court rejects Defendants' argument that Plaintiffs can just obtain the education and benefit elsewhere. *See Trinity Lutheran Church of Columbia, Inc. v. Come*r, 582 U.S. 449, 458 (2017) ("this Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion.").

Additionally, the Upshur County Virtual Academy is accredited through the state's public school educational system, and there is no indication the other virtual academies Defendants propose allow religious exemptions and/or are accredited. Finally, West Virginia's state constitution, combined with the Fourteenth Amendment, guarantees K.P. access to a free public-school education of her choice, which has been denied here. *See Pauley v. Kelly*, 162 W. Va. 672, 707 (W. Va. 1979); *see also Goss v. Lopez*, 419 U.S. 565, 574 (1975).

Because Plaintiffs have demonstrated First Amendment violations, Defendants' generic arguments that the public policy and balancing of harms elements tip in their favor are meritless.

Whatever infectious disease related goals the state may possess, West Virginia has no latitude to pursue those objectives in an unconstitutional manner. *See Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (emphasizing that "upholding constitutional rights serves the public interest"); *see also Legend Night Club v. Miller,* 637 F.3d 291, 302-03 (4th Cir. 2011) (holding the government will "in no way be harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions").

## IV.    DEFENDANTS' *PULLMAN* ARGUMENTS ARE MERITLESS

Abdication of federal jurisdiction is highly disfavored. *Deakins v. Monaghan,* 484 U.S. 193, 203 (1988). Nonetheless, Defendants invite the Court to abstain or alternatively stay the case under *Pullman*, 312 U.S. at 500.  ECF 22. In so doing, Defendants graft a state law claim – that Plaintiffs specifically chose not to assert – onto Plaintiffs' sole First Amendment claim. *See* ECF 1 ¶¶ 146-149 (in verified Complaint, Plaintiffs' explaining why they did not invoke a state law claim and have pursued relief exclusively under the First Amendment). Defendants press the Court to defer adjudicating the clear ongoing violation of Plaintiffs' First Amendment rights and send them to state court under a statute and claim that Plaintiffs never asserted and have no intention to invoke, the West Virginia Equal Protection for Religion Act, W. Va. Code §35-1A-1 ("**EPRA**").

The Court should decline Defendants' invitation to abdicate federal jurisdiction for three separate and distinct reasons: (1) there has been no ambiguous state law actually "presented for decision" in this Court; (2) abstaining under *Pullman* would improperly create a state law exhaustion requirement for constitutional claims brought under 42 U.S.C. § 1983; and (3) Plaintiffs' First Amendment rights have clearly been violated – there is no reason to further exacerbate the constitutional harms through abstaining or staying the case under *Pullman*.

**A. Abstaining or Staying the Case Under *Pullman* Would Be Inappropriate Because There Is No Ambiguous State Law That Has Been "Presented for Decision".**

Defendants suggest a newly enacted state law – EPRA – <u>may</u> provide Plaintiffs an alternative form of relief if they elected to pursue a claim under that law in state court (though Defendants never assert EPRA would actually provide alternative relief, indicating they would also oppose relief under EPRA). However, an EPRA claim has never been and never will be "presented for decision" in this Court.

The *Pullman* abstention doctrine applies only where: "there is (1) an unclear issue of state law *presented for decision* (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Sonda*, 92 F.4th at 219 (citing *Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (en banc) (emphasis added)).

For *Pullman* to apply, the Fourth Circuit requires relief actually be sought under an ambiguous state law provision. This requirement makes perfect sense. If, as has occurred here, all a government defendant seeking to avoid federal jurisdiction must do is point to a state law it unilaterally defines as potentially relevant to the federal claim asserted, federal jurisdiction could be defeated in every case. The government would possess unrestricted license to scour the West Virginia Code in search of a state law it deems relevant to the constitutional claim presented and thus defeat federal jurisdiction by grafting whatever state law it discovers onto the federal claim.

There is absolutely no limiting principle on Defendants' *Pullman* proposition. Courts have recognized this danger and uniformly hold abstention under *Pullman* is the extraordinary "exception, not the rule." *Cox v. Plan. Dist. I Cmty. Mental Health & Mental Retardation Servs. Bd.*, 669 F.2d 940, 942 (4th Cir. 1982). Accordingly, that is why *Pullman* abstention should not even be contemplated unless there is an "unclear issue of state law" that has actually been "presented for decision." *Wise,* 978 F.3d at 101; *see also Sonda*, 92 F.4th at 219 (holding that the

24

JA329

Honorable John Preston Bailey abused his discretion in issuing a *Pullman* stay order, surrendering federal jurisdiction over exclusively federal claims).

The abstention standards set forth by the Fourth Circuit in *Wise* and *Sonda* fit comfortably under the abstention framework the Supreme Court outlined years ago in *Pullman*, 312 U.S. 496. In *Pullman*, the plaintiffs lodged a federal constitutional claim in a federal district court, alongside a claim that the challenged state regulation was "unauthorized by Texas law." *Id.* at 498. As such, the plaintiffs: (1) had asserted a claim under *both* the Constitution and a state law; and (2) there was a state forum with jurisdiction over the state law claims that had already been asserted prior to the institution of the action in federal court. *Id.* Neither element is present here.

In this case, unlike in *Pullman*, and identical to *Sonda*, there was no state law claim presented for decision. There also is not an ambiguous state law at issue. The only state law at issue is the CVL, and that law is clear – no religious exemptions can be permitted in any circumstances, while medical exemptions are allowed. It is well settled that "*Pullman* does not command district courts to abstain simply to permit state review of an unambiguous statute." *City of Houston v. Hill*, 482 U.S. 451, 469 (1987).  The CVL has been interpreted for decades to prohibit religious exemptions, including when Defendant Marteney denied Plaintiffs' religious exemption request. A state court interpretation of the unambiguous CVL will not aid this court in resolving Plaintiffs' First Amendment claim. *See Wohl v. Keene*, 476 F.2d 171, 174 (4th Cir. 1973) (holding abstention is improper where nothing is ambiguous about the challenged statute).

And a claim under EPRA – the only law Defendants assert is unclear – has not been presented to the Court, and never will be. Finding ambiguity of a state law actually presented for decision is a prerequisite for the second portion of the abstention analysis – whether the resolution of that "unclear state law" may "moot or present in a different posture the federal constitutional

issue." *Wise*, 978 F.3d at 10. The Court need not even examine the second element of the *Pullman* test, because the first element has plainly not been satisfied.

Defendants point to no authority suggesting a district court can defer resolving an exclusively federal claim in favor of a state law claim that has never been presented to the federal court. Not only does no such authority exist, the Fourth Circuit recently held that a district court abuses its discretion under *Pullman* if it defers ruling on exclusively federal claims pending resolution of a hypothetical state court decision. *See Sonda*, 92 F.4th at 215 (finding district court abused its discretion by staying the federal claims presented because the district court stayed federal jurisdiction "pending the outcome of a state court action that the plaintiffs *may* file.") (emphasis in original). That is exactly what Defendants ask the Court to do here. *See also Bosarge et al. v. Edney*., No. 1:22-cv-233-HSO-BWR, 2023 U.S. Dist. LEXIS 209672 (S.D. Miss. Mar. 9, 2023) (in an exclusively First Amendment challenge to Mississippi's childhood vaccination law, rejecting government's *Pullman* petition because there was no state law claim presented).

**B. Abstaining Under *Pullman* Would Be Improper As It Would Create a State Court Exhaustion Requirement For All § 1983 Claims in West Virginia.**

Should the Court abstain under *Pullman*, such a ruling would also improperly create a state court exhaustion requirement in West Virginia to any 42 U.S.C. § 1983 claim brought under the First Amendment. *See Steffel v. Thompson*, 415 U.S. 452, 472- 73 (1974) ("when federal claims are premised on 42 U.S.C. § 1983 . . . we have not required exhaustion of state judicial . . . remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights."); *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019) ("[T]he settled rule is that exhaustion of state remedies is not a prerequisite to an action under [42 U. S. C.] § 1983").

The Supreme Court has made clear it abhors state laws or schemes that have the effect of insulating state actors from the reach of 42 U.S.C. § 1983. *Id.; see also Haywood v. Drown*, 556

U.S. 729 (2009) (a state "may not shut the courthouse door to federal claims that it considers at odds with its local policy."). Application of *Pullman* here improperly creates a judicial requirement that every Free Exercise claim brought in federal court challenging a state law must first be adjudicated in state court under EPRA, a scenario that should not be countenanced. Such a system creates indefinite delays in obtaining constitutional relief, while irreparable First Amendment harm accrues indefinitely. *See Elrod*, 427 U.S. at 373 (1976) (holding that First Amendment violations for even minimal periods constitutes irreparable harm).

Moreover, the Supreme Court has cautioned against Defendants' suggested approach because it "would convert abstention from the exception into the general rule," which would then effectively nullify the ability for West Virginia federal courts to adjudicate First Amendment Free Exercise claims. *Examining Board of Engineers, Architects and Surveyors v. Otero*, 426 U.S. 572, 598 (1976); *see also Stultz v. VA DMV*, 185 F. Supp. 3d 890 (W.D. VA. 2015) ("abstention from the exercise of federal jurisdiction is the exception, not the rule."). The danger of converting abstention into the general rule is even more concerning in that it would "force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings [which] might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota,* 389 U.S. 241, 252 (1967). In sum, this Court should reject Defendants' request for a *Pullman* stay because it would have the effect of making the assertion and completion of a state court EPRA action a de facto exhaustion requirement for any Free Exercise claim in West Virginia.

**C. *Pullman* Abstention Would Also Be Improper Because the CVL Plainly Violates the First Amendment.**

*Pullman* is improperly invoked where the challenged regulation is clearly unconstitutional; in such cases, there is no need to defer to a state court interpretation *See Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 756 (1986). Federal courts need not defer to state courts

27

JA332

and delay adjudication of a state law that clearly violates the Constitution, which makes sense as federal courts are particularly well-suited – indeed, constitutionally directed – to resolve alleged First Amendment violations. *See, e.g., City of Houston,* 482 U.S. at 467-68; *Harman v. Forsennius,* 380 U.S. 528, 535 (1965).

The abuse of *Pullman* generates unnecessary costs and delays, which only prolong and further exacerbate the underlying constitutional harm. *See Abstention Doctrine Today*, 125 U. Pa. L. Rev. 590, 602 (1977) (discussing "whether delay is not sometimes the aim of the abstention procedure"); *see also Fitts v. Kolb*, 779 F. Supp. 1502, 1504 (D.S.C. 1991) ("… a federal court should be particularly hesitant in abstaining in cases involving First Amendment violations"). Here, staying the case or forcing Plaintiffs into the state court system on a claim they never asserted and do not intend to advance, concerning a statute that Defendants have never even claimed would require acceptance and issuance of religious exemptions, when Plaintiffs' First Amendment Free Exercise rights are clearly and plainly being violated, reflects a use of *Pullman* that various courts and other judicial scholars have sternly warned against. *See, e.g., England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 425 (1964) ("some litigants have long purses. Many, however, can hardly afford one lawsuit, let alone two. Shuttling the parties between state and federal tribunal [by abstaining under *Pullman*] is a sure way of defeating the ends of justice") (Douglas, J., concurring).

For the reasons detailed throughout, the CVL plainly violates the First Amendment. This constitutional claim is properly before this Court. Plaintiffs, therefore, respectfully request that the Court deny Defendants' Motion to Abstain, or Alternatively Stay under *Pullman* [ECF 22], and resolve their First Amendment claims as soon as practicable so K.P. can continue her online education. Staying the case pending resolution of *West Virginia Parents for Religious Freedom v. Matthew Christiansen et al.*, No. 23-1887 (4th Cir.) would be to indefinitely stay K.P.'s access to

28

JA333

a quality education, intensifying the First Amendment harms that have already transpired. *See Fitts*, 779 F. Supp. at 1512 (holding that even "in situations where the traditional criteria for *Pullman* abstention have been met," courts may nonetheless decline to abstain "when the resulting delay might significantly undermine fundamental constitutional guarantees").

## CONCLUSION

Defendants' Motion to Stay should be denied in its entirety. Plaintiffs respectfully request that their Motion for Preliminary Injunction be granted. A revised Proposed Order has been attached as Exhibit A.

Dated: August 2, 2024                                        Respectfully submitted,


SIRI & GLIMSTAD LLP                          JOHN H. BRYAN LAW

Aaron Siri, Attorney*                              */s/ John H. Bryan*
Elizabeth A. Brehm, Attorney*               John H. Bryan, Attorney
Walker D. Moller, Attorney*                  West Virginia Bar No. 102159
745 Fifth Avenue, Suite 500                   411 Main Street
New York, NY 10151                             P.O. Box 366
Tel: (212) 532-1091                               Union, WV 24983
Fax: (646) 417-5967                              Tel: (304) 772-4999
aaron@sirillp.com                                 Fax: (304) 772-4998
ebrehm@sirillp.com                              jhb@johnbryanlaw.com
wmoller@sirillp.com

Christopher Wiest, Attorney*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*

    *Pro hac vice*

29
JA334

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record.

Dated this 2nd day of August, 2024.

/s/ *John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, WV 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

JA335

Case 2:24-cv-00018-TSK   Document 32-1   Filed 08/02/24   Page 1 of 4  PageID #: 409

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.*,<br><br><br>Plaintiffs,<br><br>Against<br><br>STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; AND BRYAN HOYLMAN *in his official capacity as Chair of the West Virginia Virtual Academy*,<br><br>Defendants. | Civil Action No.: 2:24-cv-00018-TSK |

## ORDER

The Court finds that Plaintiffs have demonstrated (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993).

1

More specifically, Plaintiffs have demonstrated a clear entitlement to relief and are likely to prevail on the merits in demonstrating that W. VA. CODE § 16-3-4 ("**the Compulsory Vaccination Law**") is unconstitutional as applied to them. Plaintiffs have shown that the Compulsory Vaccination Law substantially burdens their religious beliefs and practices. The law is unconstitutional as applied to their eight-year-old child, K.P., who sought and was denied a religious exemption to the law in order to continue her education in the Upshur County Virtual School.

The Compulsory Vaccination Law is neither neutral nor generally applicable because it permits individualized secular medical exemptions while denying any mechanism to obtain a religious exemption. *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021). It is thus subject to strict scrutiny, which cannot be met here because the government affords secular medical exemptions, and yet West Virginia has not made the required showing that measures "less restrictive" of the First Amendment activity could not address its interest in reducing the spread of [disease]." *Tandon v. Newsom*, 593 U.S. 61, 63 (2021). Where, as here, Defendants provide secular exemptions to their requirements, they "must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Id.* Defendants have failed to do so here as applied to K.P., an attendee of a virtual school.

Plaintiffs have also demonstrated irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That extends to the loss of "free exercise rights 'for even minimal periods of time.'" *Tandon*, 593 U.S. at 64. Here, the violation of Plaintiffs' First Amendment Free Exercise rights alone constitutes irreparable injury as a matter of law. *Id*. *See*

2

JA338

*also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190-191 (4th Cir. 2013); *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 254-255 (4th Cir. 2003).

The balance of harms and public interest preliminary injunction factors likewise strongly favor an injunction. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). An injunction will not disserve the public interest where it will prevent constitutional deprivations. *See Newsom*, 354 F.3d at 261. Similarly, West Virginia will in no way be "harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011).

Therefore, pursuant to Fed. R. Civ. P. 65(d), Defendants and their officers, agents, servants, and employees, and anyone acting in active concert or participation with them (collectively hereinafter, "**the Enjoined Parties**"), are hereby PRELIMINARILY ENJOINED as follows:

> Effective August 16, 2024, the Enjoined Parties shall be enjoined from enforcing W. VA. CODE § 16-3-4 against Plaintiffs, unless the government provides an option for Plaintiffs to request a religious exemption to the Upsher County Virtual School.

IT IS SO ORDERED:

_____

3

**IN THE UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**KRYSTLE PERRY, and ANTHONY
PERRY,** *individually and on behalf of their
minor child K.P.,*

      **Petitioners,**

**v.**

                                      **Case No.: 2:24-cv-18
Chief Judge Kleeh**

**STACY MARTENEY,** *in her official capacity
as the Virtual Learning
Coordinator of the Upshur County Virtual
School, et al.,*

      **Defendants.**

**REPLY IN SUPPORT OF DEFENDANT DR. MATTHEW CHRISTIANSEN'S
<u>MOTION FOR STAY</u>**

      Plaintiffs have asked this Court to make a novel and unprecedented Constitutional ruling where a state law may moot that issue—or at least place the present case in a different posture. Indeed, when faced with the same question, the Honorable Judge John Preston Bailey exercised his discretion under *Pullman* to abstain in order to provide the state courts an "opportunity to pass upon" the novel state law question. *W. Va. Parents for Religious Freedom v. Christiansen*, 685 F. Supp. 3d 371, 378–79 (N.D.W. Va. 2023). Plaintiffs nonetheless ask this Court to contravene Judge Bailey's well-reasoned opinion and, with no regard for the well-established doctrine of Constitutional avoidance, conclude that West Virginia's vaccine law violates the First Amendment to the United States Constitution.

      This Court should follow Judge Bailey's decision and stay this case under the *Pullman* doctrine to provide the Plaintiffs the opportunity to present their challenge to the state courts. *See*

*R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941). At a minimum, this Court should stay the case pending the Fourth Circuit's ruling on Judge Bailey's abstention in *Parents for Religious Freedom*, which is scheduled for oral argument on September 25.[1]

### ARGUMENT

The Fourth Circuit has made clear: "*Pullman* abstention *requires* federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification *might* serve to avoid a federal constitutional ruling." *Nivens v. Gilchrist*, 444 F.3d 237, 245 (4th Cir. 2006) (emphases added). This case squarely falls within that definition. As the State itself has explained: EPRA is "directly relevant" to the issue of the level of scrutiny to apply to the State's vaccination law. Because EPRA "might serve to avoid a federal constitutional ruling" in this case, *Nivens*, 444 F.3d at 245, *Pullman* compels that the state courts of West Virginia be "afforded a reasonable opportunity to pass upon" the new enactment. *AFA Distributing Co, Inc. v. Pearl Brewing Co.*, 470 F.2d 1210 (4th Cir. 1973).

Indeed, Federal courts operate under the "well established principle" of constitutional avoidance. *Escambia Cnty. v. McMillan*, 466 US. 48, 51 (1984) (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, (1936) (Brandeis, J., concurring)). That is, "the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Id.* And for this reason, "[a]ppeals from the highest court of a state challenging its decision of a question under the Federal Constitution are frequently dismissed because the judgment can be sustained on an independent state ground." *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring).

---

[1] If this Court decides to move forward in this matter, Plaintiffs likewise fail on the merits of their claim. Dr. Christiansen adopts his merits argument, as set forth more fully in his Response in Opposition to Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support of Motion for Stay. ECF No. 23. Dr. Christiansen limits this Reply to his support for his Motion for Stay.

In addition to the longstanding principles of constitutional avoidance, federal courts must also account for federalism concerns. Indeed, "[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies. . .." *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500 (1941). After all, our system of dual sovereignty requires us to be "more sensitive to the diverse needs of a heterogeneous society[,] . . . allows for more innovation and experimentation in government[,] and makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). The "delicate issues of federal-state relationships" are readily apparent in lawsuits seeking injunctive relief "against those in charge of an executive branch of an agency of state or local governments." *Rizzo v. Goode*, 423 U.S. 362, 380 (1976).

Abstention under *Pullman* is appropriate "in cases presenting a federal constitutional issue which *might* be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959) (emphasis added). West Virginia's enactment of EPRA satisfies that requirement. The most "hotly contested" issue in front of this Court is the applicable level of scrutiny to apply. *See W. Va. Parents for Religious Freedom v. Christiansen*, 685 F. Supp. 3d 371, 378 (S.D. W. Va. Aug. 2, 2023). The application of EPRA to West Virginia's vaccine law would resolve that issue. Abstention would allow this Court to avoid unnecessary friction with state policy, and to act in accord with the Supreme Court's long-standing principle of constitutional avoidance.

Plaintiffs' reliance on *Sonda v. W. Va. Oil & Gas Comm'n* is unavailing. 92 F.4th 213 (4th Cir. 2024). In *Sonda*, the Fourth Circuit concluded that the district court had abused its discretion by abstaining from rendering a decision without explaining "how state law implicated the resolution of the plaintiffs' federal claims" or providing any "guidance as to which state constitutional provision the court had in mind or why abstention would help in the resolution of

3
JA342

the federal constitutional issues." *Sonda*, 92 F.4th at 219. Here, it is clear how state law implicates the resolution of Plaintiffs' federal claims, and which state law provisions are applicable. Therefore, *Sonda* does not preclude this Court abstaining under *Pullman*.[2]

Finally, Plaintiffs' argument that abstention here would effectively create a state law exhaustion requirement for § 1983 claims is equally unpersuasive. ECF No. 32 at 26–27. As Judge Bailey explained, the vast majority of claims brought under § 1983 "do not pose the complicated, contested, and novel issue that is presented here." *Parents for Religious Freedom*, 685 F. Supp. 3d at 379 n.6. In most instances, the level of constitutional scrutiny applicable to a First Amendment claim is clear, but this case requires the Court to determine what level of scrutiny applies to a state statute that provides a single, well-delineated exemption that furthers the State's stated purposes. In short, the exercise of *Pullman* abstention here would be limited to the circumstances of this case, which plainly merit it. Because resolution in state court under undeniably relevant state law (EPRA) standards "might" relieve this Court of the obligation to make an unprecedented federal constitutional ruling in this case, *Pullman* abstention is clearly appropriate. *Nivens*, 444 F.3d at 245.

In the alternative, this Court should stay this matter pending a decision by the Fourth Circuit in *West Virginia Parents for Religious Freedom v. Christiansen*, No. 23-1887 (4th Cir.). Judge Bailey has concluded that abstention is proper in a case involving *these exact same issues*—whether West Virginia's vaccine law is subject to strict scrutiny or rational basis review. If the Fourth Circuit upholds Judge Bailey's decision, this Court would be in the position of making a Constitutional ruling with a looming state court lawsuit that could moot this

---

[2] Also at issue in *Sonda* was whether a *Pullman* abstention was a sufficiently final order to convey jurisdiction to the appellate court under 28 U.S.C. § 1291. The Fourth Circuit concluded that it did have final order jurisdiction because the *Pullman* abstention placed the parties effectively out of *federal* court, despite the fact that Plaintiffs *may* file their claims is state court. *Sonda*, 92 F.4th at 218.

controversy entirely (or at least put it in a different posture). In the event that the Fourth Circuit reverses Judge Bailey's decision, *Parents for Religious Freedom* would be remanded to Judge Bailey for a decision on the Constitutional issue—and two judges in this District would be presented with nearly identical issues, and risk making contradictory Constitutional rulings. This Court should avoid both scenarios.

Respectfully submitted,

*/s/ Michael B. Hissam*
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
*Special Assistant Attorneys General*

HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*

Steven R. Compton (WVSB #6562)
*Deputy Attorney General*
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430

**IN THE UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**KRYSTLE PERRY, and ANTHONY
PERRY,** *individually and on behalf of their
minor child K.P.,*

       **Petitioners,**

**v.**

                                                **Case No.: 2:24-cv-18**
                                                **Chief Judge Kleeh**

**STACY MARTENEY,** *in her official capacity
as the Virtual Learning
Coordinator of the Upshur County Virtual
School, et al.,*

       **Defendants.**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 9th, 2024, I electronically filed the foregoing *Reply in Support of Defendant Dr. Matthew Christiansen's Motion for Stay* with the Clerk of this Court via the CM/ECF filing system which will send electronic notification of such filing to counsel of record.

*/s/ Michael B. Hissam*
Michale B. Hissam, Esq. (WVSB #11526)

JA345

1

```
                  IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
                            AT CLARKSBURG

------------------------------x
KRYSTLE PERRY and ANTHONY      :
PERRY, individually and on     :
behalf of their minor child    :
K.P.,                          :
                               :
      Plaintiffs,              :
                               : CIVIL ACTION NUMBER:
   vs.                         : 2:24-CV-18
                               :
STACY MARTENEY, in her         :
official capacity as the       :
Virtual Learning Coordinator   :
of the Upshur County Virtual   :
School; THE BOARD OF EDUCATION:
OF THE COUNTY OF UPSHUR;        :
CHRISTINE MILLER, in her       :
official capacity as           :
Superintendent of the Upshur   :
County School District;        :
DR. MATTHEW CHRISTIANSEN, in   :
his official capacities as the:
State Health Officer and       :
Commissioner of the Bureau of  :
Public Health; and BRYAN       :
HOYLMAN, in his official       :
capacity as Chair of the West  :
Virginia Virtual Academy,      :
                               :
      Defendants.              :
------------------------------x
```

Proceedings had in the motions hearing of the above-styled action on August 12, 2024, before the Honorable Thomas S. Kleeh, Chief District Judge.

                              - - -

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

APPEARANCES:

FOR THE PLAINTIFFS:
    Christopher D. Wiest, Esq.
    50 E. Rivercenter Boulevard, Suite 1280
    Covington, KY 41011
    chris@cwiestlaw.com

    Aaron Siri, Esq.
    Siri & Glimstad LLP
    745 Fifth Avenue, Suite 500
    New York, NY 10151
    aaron@sirillp.com

    Walker D. Moller, Esq.
    Siri & Glimstad LLP
    1005 Congress Avenue, Suite 925-C36
    Austin, TX 78701
    wmoller@sirillp.com

    John H. Bryan, Esq.
    John H. Bryan, Attorneys at Law
    P.O. Box 366
    Union, WV 24983
    jhb@johnbryanlaw.com

FOR STACY MARTENEY, THE BOARD OF EDUCATION OF THE COUNTY OF
UPSHUR, AND CHRISTINE MILLER:
    Ryan Moore, Esq.
    Bowles Rice, LLP
    501 Avery Street
    Parkersburg, WV 26101
    rmoore@bowlesrice.com

    Leigh Anne Wilson, Esq.
    Bowles Rice, LLP
    125 Granville Square, Suite 400
    Morgantown, WV 26501
    lwilson@bowlesrice.com

FOR DR. MATTHEW CHRISTIANSEN:
    Michael B. Hissam, Esq.
    Jonathan Zak Ritchie, Esq.
    Maureen F. Gleason, Esq.
    Hissam Forman Donovan Ritchie LLP
    P.O. Box 3983
    Charleston, WV 25339
    mhissam@hfdrlaw.com
    zritchie@hfdrlaw.com
    mgleason@hfdrlaw.com

Rachel Kocher, RPR/CRR
500 West Pike Street, Clarksburg, WV 26301
(304) 623-7179

JA347

3

Monday, August 12, 2024, 9:21 AM

- - -

THE COURT:  Madam Clerk, would you be kind enough to call our next case, please.

THE CLERK:  This is the matter of Krystle Perry and Anthony Perry, Plaintiffs, versus Stacy Marteney, et al., Defendants; Civil Action Number 2:24-CV-18.

Will counsel please note your appearance for the record.

MR. WIEST:  Good morning, Your Honor.  Chris Wiest, Aaron Siri, and our local counsel, John Bryan, and Walker Moller are here for the plaintiffs.  The plaintiffs are also in attendance today.

THE COURT:  All right.  Good morning, counsel. Good morning, everyone.

MR. BRYAN:  Good morning, Your Honor.

MR. HISSAM:  Good morning, Your Honor.  Mike Hissam and Zak Ritchie on behalf of Dr. Matthew Christiansen.

THE COURT:  Good morning.

MR. MOORE:  Good morning, Your Honor.  Ryan Moore and Leigh Anne Wilson on behalf of the Upshur County Board of Education, Stacy Marteney, Christine Miller.

THE COURT:  All right.  Good morning, everyone.  The Court convened this for a hearing on plaintiffs' preliminary injunction motion.

I wanted to do things in a particular order, because

that's how my brain flows, with apologies.  There is the motion to dismiss with respect to lack of indispensable parties.  I believe that's from the Upshur defendants.  Correct?

MR. MOORE:  That's correct, Your Honor.

THE COURT:  All right.  Counsel, go ahead.  Let's start there.  Why are the state defendants indispensable?

MR. MOORE:  Well, Your Honor, the reality is, is that the state is the entity that set the directives for the board that the -- that set the whole thing in motion, Your Honor. The reality is that, as the local county board of education, we are essentially bound by the state's directives as far as the vaccination issue, Your Honor.  And without the state being a party to this case, we're not really sure how Your Honor could fashion relief for the plaintiffs in this case when it's the state that clearly sets the directives and we are the ones that are simply following those.

THE COURT:  Counsel, tell me about the parallel virtual school programs.  I know there's the West Virginia Virtual Academy.  Correct?

MR. MOORE:  That's correct.

THE COURT:  Okay.  And that is administered by the State Department of Education?

MS. WILSON:  That's its own entity that's separate from the Upshur County Virtual School.

THE COURT:  Right.  And that's the import of my

question, counsel, is Upshur County has a separate virtual education program.  Correct?

MS. WILSON:  Correct.

MR. MOORE:  That's correct.

THE COURT:  And that's the minor -- that is the program the minor plaintiff participated in; correct?

MR. MOORE:  That's correct.

THE COURT:  All right.  Plaintiffs' counsel, is that accurate?

MR. WIEST:  That is -- that is correct, Your Honor.

THE COURT:  All right.  So the West Virginia Virtual Academy, as that phrase is used referring to the program administered by the State Department of Education, that's not in issue here.

MR. WIEST:  It is not.

THE COURT:  All right.  We're only talking about the program operated and offered by the Upshur County BOE.  And that's the only program the minor plaintiff has ever participated in.

MR. WIEST:  That's correct.  And that's the minor -- from a redressability standpoint, that's the only program the plaintiff desires to be re-enrolled in.

THE COURT:  Okay.  All right.  Considering that, counsel, why are the state -- I won't say defendants, because they're not named -- but the state entities you've identified

as potentially indispensable, how does -- how are they indispensable in light of the fact that this program is operated separately by the Upshur County --

I'm certainly mindful the state law is applicable across the board, obviously, and the State Department of Ed and State Superintendent have authority over the individual county boards. But I'm struggling to get there. If you can build the bridge for me, we can talk about it further. But I'm struggling to get there.

MR. MOORE: Your Honor, I think that the --

Yeah. So obviously they are different entities, Your Honor. But the reality is, is that as the local board of education, we're still bound by the directives that the state sets. I don't see how really the state could be -- as for the local board, Your Honor, how we could provide the relief that's being requested by the plaintiffs as far as being readmitted to the school when we're bound by the state's directives.

THE COURT: What if this Court declares the state directive as it applies to this individual plaintiff unconstitutional?

MR. MOORE: Well, I think that brings in the other issue as to whether or not the state should be a party to this case. Clearly they have an interest in the case as they've provided the directives for the court --

THE COURT: Sure.

MR. MOORE:  -- for the counties.

THE COURT:  But they're not here.

MR. MOORE:  You're right.  Right.

THE COURT:  They have not asked to intervene or appear.  The Attorney General is not here; correct?

MR. MOORE:  Correct.  And that's why we filed our motion, Your Honor.

THE COURT:  Okay.  No.  Understood.  Understood.

MR. MOORE:  Okay.

THE COURT:  And I understand the import of the argument.  But I think it's been clarified in the papers we're down to an as-applied challenge.  Correct?  There is no facial challenge to 16-3-4.

I spent all weekend reading it.  I can't believe I couldn't remember the cite.  16-3-4.

There's no facial challenge at this point from the plaintiffs; correct?

MR. WIEST:  That's correct, Your Honor.

THE COURT:  It is as applied to this singular minor plaintiff.

MR. WIEST:  That's exactly right.

THE COURT:  Okay.  All right.

Go ahead, Counsel.  I'm sorry.

MR. MOORE:  Your Honor, I think, you know, I -- I'm not sure that I can really articulate it any differently.  I

think that the state has an interest in this case; that we are not able to provide the relief that the plaintiff is actually seeking in that we are bound by the directives of the state.

And the reality is that the Upshur County Board of Education is really being controlled by the state anyway. And so to have them not as a party to the case, it really does not make sense us being able to craft the relief that the plaintiffs are ultimately seeking.

THE COURT: Given our state's history with county BOEs and the State Department of Ed assuming control, I want to make sure we're clear on this. Because this was certainly an issue in the *Workman* case that Judge Goodwin had to decide and the Fourth Circuit had to decide.

The Upshur County Board of Education and school system is not under the control of the State Department of Education at this point in time, is it?

MS. WILSON: It is.

MR. MOORE: It is, Your Honor.

THE COURT: By mechanism of?

MS. WILSON: The State Board of Education took control due to a -- due to a separate financing -- like an auditing issue. So it's under complete control of the State Board.

THE COURT: And when did that occur?

MS. WILSON: 2023, I believe.

THE COURT:  Why hasn't anyone mentioned that until now?

MR. MOORE:  Well, it's mentioned in our briefing, Your Honor.

THE COURT:  Is anyone from the State Board here given that Upshur County is under their control?

MR. MOORE:  Not to my knowledge, Your Honor.

MS. WILSON:  No.

THE COURT:  Okay.  And it's a financial issue?

MS. WILSON:  Yes.  That was what precipitated the State Board takeover.

THE COURT:  Okay.  Was related to financial audit results.

MS. WILSON:  Uh-huh.  Correct.

THE COURT:  Anything to do with test scores?

MS. WILSON:  Not to my knowledge.

THE COURT:  Student performance?

MS. WILSON:  Not to my knowledge.

THE COURT:  Compliance with curriculum minimums, things of that nature?  Anything on the educational front, I guess is the import of my question.

MS. WILSON:  I don't think that was the reason for the investigation.  But when the state does take over, it takes complete control over every facet.

THE COURT:  Sure.  Okay.  All right.

Counsel, thoughts on the motion to dismiss for failure to join an indispensable party at this point?

MR. WIEST:  Your Honor, we've not briefed it, obviously.

THE COURT:  Right.

MR. WIEST:  We're in process in briefing it.  I would observe a couple of things, though.  Notice was provided in this case to the Attorney General, as required by law.

THE COURT:  When was that?

MR. WIEST:  That's in our proof of service, and that was filed in this case as well, Your Honor.  I know it's in the service returns.  It's on the docket.  I don't have that date exactly.

THE COURT:  Give me one second.  I'll find it.

Sorry.  PACER is no better for those of us on this side than counsel.  It takes many, many steps to get there.

MR. WIEST:  Oh.  Your Honor, I am --

THE COURT:  Yes.

MR. WIEST:  I am being told by my cocounsel that I'm not sure we did file an actual return of that, but that they were informed and provided a copy of the case.  The Attorney General of West Virginia was.

THE COURT:  Okay.  When was that sent?

MR. WIEST:  The day after the claim was filed in this case, Your Honor, that was done.

THE COURT:  Okay.  So the complaint was filed back on July 5th.

MR. WIEST:  So July 6th.

THE COURT:  July 6th, which would have been a Saturday.  So the 8th.

MR. WIEST:  The following Monday.

THE COURT:  Okay.  July 8th.

MR. WIEST:  Yes, Your Honor.

THE COURT:  And what exactly was provided to the Attorney General's office?

MR. WIEST:  The complaint and the exhibits to the complaint were all provided to the Attorney General's office.

THE COURT:  All right.  Can I ask counsel to file whatever was sent to the Attorney General's office today --

MR. WIEST:  We will do that.

THE COURT:  -- so that our record is complete on that front.

Has there been any notice provided by any party to the State Department of Education or the State Superintendent?

MR. WIEST:  Yeah.  Your Honor, I -- we were not aware that there was this control issue.  I don't know if the board, in fulfilling their duties, you know, if they're going to be -- they're subject to some legal requirement, if Upshur County gave them notice or not.  We've got some legal arguments on that front too.  I don't know if they've informed them in any

12

way.

THE COURT:  Okay.

MR. MOORE:  Your Honor, we've simply just had informal discussions with counsel for the --

THE COURT:  Counsel for the State Department of Ed?

MR. MOORE:  Right.

THE COURT:  So they're aware of this ongoing --

MR. MOORE:  They're aware generally.  That's all I can say.

THE COURT:  Okay.  All right.  Okay.

MR. WIEST:  Your Honor, as a legal perspective, FRCP 65(d)(2)(C) provides that if this Court enters an injunctive order, obviously Upshur County is able to implement it, because it's a federal court order -- under the Supremacy Clause -- and it would run to anyone who is acting in concert with them, which would include the State Board in this case.

It sounds like the State Board actually has notice in this case.  The State Board has elected not to intervene.

And in *McGee versus Cole*, which was a Southern District of West Virginia case, 66 F. Supp. 3d at 747 --

THE COURT:  Can you read just a little slower, Counsel.

MR. WIEST:  Sorry, Your Honor.

THE COURT:  That's all right.

MR. HISSAM:  *McGee versus Cole*, 66 F. Supp. 3d 747,

it looks like 755, the Southern District of West Virginia recognized that -- and rejected an argument that every conceivable government official should have been named, observing that, quote, "defendants cannot require that plaintiffs join every possible party when the parties sued are sufficient to award requested relief."

Here we have a program that is administered by Upshur County School Board. It may be subject to state control, but the school board is making the hiring decisions; the school board is implementing these state requirements; the school board has sufficient authority, if this Court orders it, to enroll the plaintiff back in its virtual academy.

Your Honor, I've got another case. It's an out-of-circuit case. But I've litigated this issue in the Sixth Circuit, and I've got published authority from the Sixth Circuit that holds the same thing: We don't need to sue every single person that touches an issue if we have sufficient parties before the Court to afford relief. Here we do. And that case is *Russell versus Lundergan-Grimes*, 784 F.3d 1037. The relevant citation is from pages 1047 to 1049. That's a 2015 Sixth Circuit case.

So we don't need everyone. We have enough. And I don't think -- I've not heard Upshur County argue that if this Court orders them under a federal court order, an injunction, to re-enroll the plaintiff in this virtual academy, that they are somehow unable to do so. They are able to implement this

Court's order, and that's all that needs to be done in terms of relief in this case; including, frankly, you know, implementing the order.

I -- the school board itself has not been dissolved.  It is still a legal entity.  It has some -- claiming some control, perhaps subject to state board oversight, over its operations. It can implement the Court's order.  And that's all we need it to do for injunctive relief.

THE COURT:  Okay.  When did the state board assume control in Upshur County?  What specific date?

MR. MOORE:  Your Honor, I know -- I don't know the specific date, but I do know that it was around June of 2023.

THE COURT:  Of 2023?

When did the minor plaintiff first start in virtual education through the Upshur County program?  Was it before or after that date?

MR. WIEST:  Your Honor, August of 2022.  It was before that date.

THE COURT:  Okay.  And that was her second grade?

MR. WIEST:  Kindergarten she enrolled.

THE COURT:  Okay.  Virtually.

MR. WIEST:  Yes.

THE COURT:  And then kindergarten and first grade were both virtually.

MR. WIEST:  Correct.

THE COURT:  Okay.

MR. WIEST:  And then part of --

THE COURT:  Second.

MR. WIEST:  -- second grade.

THE COURT:  Right.  And then intervening in that is the state assuming control of the Upshur County Board; is that correct?

MR. MOORE:  That's correct.

THE COURT:  All right.  But the virtual program, independent of the state's virtual academy, continues to be offered and operated by the Upshur County Board; is that correct?

MS. WILSON:  Correct.

MR. MOORE:  That's correct, Your Honor.

THE COURT:  Okay.  Is there -- and you'll have to forgive me for trying to play catch-up on this particular issue.  The virtual academy, I realize there's one offered at the state level.  Is there authorization, either state law or code of state regulations, permitting individual counties to offer an alternative virtual program to that?

I guess what -- under what authority did Upshur County start their own virtual academy?

MR. MOORE:  I mean, I don't know the answer to that specifically.  I do know that, obviously, there were multiple academies that were started in response to the COVID crisis.

16

THE COURT:  Right.

MR. MOORE:  So I don't know specifically the answer to that question, Your Honor.

THE COURT:  Okay.  All right.  Yeah, I couldn't find it myself.  I was -- do we know of any other counties other than Upshur that offer a similar program?

MR. MOORE:  Not that we're aware of, Your Honor.

THE COURT:  Okay.  Mr. Hissam, are you aware of any? I recognize your client is a little afield from the educational spectrum, but...

MR. HISSAM:  I am not, Your Honor.

THE COURT:  Okay.  Plaintiffs' counsel, any idea if any other of West Virginia's 55 counties offer a similar program independent from the state's?

MR. WIEST:  I believe that there's a couple.  I think there are a couple, Your Honor, we think, that are out there. But it's not every county.  And there are a few others that are doing this.  We -- I think there has been an authority by the West Virginia Legislature to do this at the local level.

THE COURT:  Okay.  All right.  We'll continue to dig into that.

Mr. Hissam, do you have any thoughts on this indispensable party issue, sir?

MR. HISSAM:  No, sir.

THE COURT:  Okay.  All right.  Anything else on that

motion at this point, counsel?

MR. MOORE:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Anything else in response from the plaintiffs?

MR. WIEST:  No, Your Honor.  And if you'd like us to, we can get a brief on quicker than normal.  We were intending to file that in ordinary course; but if you need something sooner, we will brief that quicker --

THE COURT:  Okay.

MR. WIEST:  -- if the Court needs us to.

THE COURT:  All right.  I'll think about that while we keep talking.

Mr. Hissam, tell me about *Pullman*.

MR. HISSAM:  Yes, Your Honor.

THE COURT:  Other than Judge Bailey did it, so I should do the same.

MR. HISSAM:  Yeah.  There's been a little bit of a history on this, Your Honor, starting with the *Sonda* case. Mr. Ritchie and I were both counsel of record in that case as well.  And then, obviously, what I'm now calling the *Parents for Religious Freedom* case --

THE COURT:  Which is the Judge Bailey --

MR. HISSAM:  The Judge Bailey --

THE COURT:  -- case addressing the same statute.

MR. HISSAM:  Correct.  And involving the same

Rachel  Kocher,  RPR/CRR
500  West  Pike  Street,  Clarksburg,  WV  26301
(304)  623-7179

JA362

counsel, at least plaintiffs' counsel and us for Dr. Christiansen, Your Honor.

And it was very different from the *Sonda* case. And just to give a little bit of background -- this is laid out in our reply brief.

THE COURT: Uh-huh.

MR. HISSAM: But I realize we filed it on a Friday afternoon before a Monday morning hearing.

In the *Sonda* case, Judge Bailey invoked *Pullman* on his own. And the issue, as I understand the Fourth Circuit opinion in *Sonda*, which Mr. Ritchie argued, is that there was a precursor issue that was far more important to the Oil and Gas Commission in *Sonda*, which was that there were no state law claims, because there were no claims, period, because there was no standing. That is primarily what had been briefed.

Rather than addressing that, Judge Bailey invoked *Pullman*. And we took an appeal from that, and the Fourth Circuit, Judge Neimeyer writing, agreed. And on remand, that was, in fact, the case. After subsequent briefing, Judge Bailey determined that there was no standing, and the case was dismissed.

Dr. Christiansen's case, the *Parents for Religious Freedom* case, was very different. Because we had the State of West Virginia -- we were obviously representing Dr. Christiansen as special assistant attorney generals. But on the other side of the Attorney General's Office we had the Attorney General's

Office invoking the new state statute and saying two things, Your Honor, that were quite --

THE COURT:  That's a unique situation.

MR. HISSAM:  Very unique.

-- but two things that were quite important in that brief in the *Parents for Religious Freedom* case, was, one, that strict scrutiny was going to apply under the new statute; and two, that it would invalidate the program -- the current program.

And obviously that didn't -- we don't know the answer to that, because Judge Bailey stayed the case.  And now we're set to argue it in Richmond on September 25.

That is the exact same issue here.  We have a state statute that purports to apply a level of scrutiny, and we have at least some component of the state in a related case, the Attorney General's Office through Ms. Krivonyak, taking the position that that is the appropriate standard of scrutiny and that it would likely invalidate -- it would -- it would lead to the result that the plaintiffs seek here.

THE COURT:  Is that the same here in light of the Fourth Circuit in *Workman* finding the state has a compelling interest underlying this particular statute, 16-3-4?

MR. HISSAM:  Well, the *Workman* case, Your Honor, of course, was without the backdrop of the new state statute.  So it didn't exist at the time of *Workman*.

THE COURT: Right.

MR. HISSAM: And so nobody has --

THE COURT: Oh, the EPRA.

MR. HISSAM: Yeah. I'm sorry.

THE COURT: Okay.

MR. HISSAM: When I say state statute in this discussion --

THE COURT: Yeah.

MR. HISSAM: -- I'm talking about the EPRA.

THE COURT: Right. Okay.

MR. HISSAM: And oddly enough, when we were in front of Judge Bailey last May and the statute had not taken effect yet, it was within days of taking effect. Now it's clearly in effect. It's in effect.

And so the Fourth Circuit has not had the opportunity to pass on this current state of play, of what is the impact of the state statute, particularly in light of the Attorney General's position in the last case. Again, it's going to be argued on September 25th. And I think given the weight of the issues, I would expect the Fourth Circuit to move expeditiously. But until we have that guidance, we're not going to know. And there's no question the plaintiffs have the option of pursuing that state court claim in state court.

THE COURT: Right.

MR. HISSAM: They haven't done so. They can do so --

THE COURT: Does the EPRA provide an independent cause of action, though?

MR. HISSAM: Yes. And attorney fees judgment, Mr. Ritchie tells me.

I've not -- nobody has litigated that claim that I know of. I obviously don't keep track of all 55 counties. But I don't know of this group of plaintiffs' counsel, certainly, litigating that claim in state court.

It's just -- it's very different from *Sonda* where -- the other issue in *Sonda* was not only the sua sponte nature of it, but that there was -- and two, to us, the fact that there was no standing for any claims to be brought, which was the ultimate outcome; but three, there was a significant amount of murkiness about what the state law claims or issues were. There was a reference to the state constitution, but no one was really sure what the state law claims were.

That is not the case here. And it's not the case as clearly laid out in Judge Bailey's opinion in *Parents for Religious Freedom*. We all know what the state issue is. We don't have to guess about it. It's laid out on the docket in his case at 46, where the AG's office filed that brief. We all know that there is a state statute which purports to apply a distinct level of scrutiny --

THE COURT: Uh-huh.

MR. HISSAM: -- which is the hotly contested issue in

this case; and we know that the AG's office at least -- that the AG's office takes the position that it invalidates the current regime. And so that's a very important issue. It's --

THE COURT: Solely because strict scrutiny applies.

MR. HISSAM: Correct. Correct.

So that is the ultimate issue. We believe that the appropriate course would be for this Court to invoke *Pullman* abstention; at the minimum, stay pending the Fourth Circuit's resolution in *Parents for Religious Freedom*.

THE COURT: Okay. So -- but *Pullman* abstention remains a discretionary call for the Court to make; right?

MR. HISSAM: Of course.

THE COURT: Is there any -- is there -- and forgive me. Given the other materials I had to plow through this weekend, I did not get through the briefing that's pending before the Fourth Circuit.

But is there any argument before that court that somehow, in this particular situation, it would be an abuse of discretion to not abstain under *Pullman*?

MR. HISSAM: That's certainly the plaintiffs' position, yes. That -- I mean, that case was fully briefed. And their position is that, yes, the -- Judge Bailey must plow ahead with the federal claims.

THE COURT: Sure. But is there any argument before the Fourth Circuit presently that this Court would have to

abstain under *Pullman* given the statutes are the same here?  I think the facts are quite, quite different, obviously.  But is there any suggestion that somehow the Fourth Circuit is going to find -- not that I'm asking everyone to look through their crystal ball.  But any plausible belief that the Fourth Circuit is going to establish some type of mandatory abstention?

MR. HISSAM:  I don't believe so, Your Honor.  We've certainly never briefed *Pullman* in that way, because that's not the way in which --

THE COURT:  Right.

MR. HISSAM:  -- the Supreme Court of the United States talks about it.

We do expect and feel quite strongly, obviously, that the Fourth Circuit is going to affirm Judge Bailey.  And therefore, there is going to be an affirmed abstention order that emanates from Richmond.

THE COURT:  Okay.  Does your client have Eleventh Amendment immunity?

MR. HISSAM:  Certainly, Your Honor.  There is obviously --

THE COURT:  You don't have to say yes, but --

MR. HISSAM:  I mean, there's an exception for declaratory injunctive relief.  But I think every state actor has immunity subject to those exceptions.

THE COURT:  Okay.  But is your client necessary to

the injunctive relief sought here?

MR. HISSAM:  Ah.

THE COURT:  Well, that's a softball for a Monday morning, Mr. Hissam.

MR. HISSAM:  Yeah.  Yeah.  I'm sorry, Your Honor.  I was being too academic.

I was just thinking that -- while this discussion was unfolding that I didn't take part in, I was just thinking that if -- I think, if I heard plaintiffs' counsel correctly, there was only one party against whom the injunction need issue, and it's not us.  But that was just my reaction.  And I understand that that's not the tenor of our briefs.

THE COURT:  Okay.

MR. HISSAM:  But I do agree with that softball question and hope that I've hit it out of the park, Your Honor.

THE COURT:  We'll see.

Counsel.

MR. WIEST:  Your Honor, let me address, I guess, first the Eleventh Amendment issue.  Because I think that's easier.

*Pullman* -- or I'm sorry.  *Ex parte Young* obviously creates an exception.  For prospective injunctive relief it only requires than an official have sufficient connection with a challenged statute to be a proper party in federal court.

Dr. Christiansen does.  He administers the exemption

scheme statewide.  We actually briefed that case extensively in the Bailey matter.  It's not been briefed here yet.

THE COURT:  But those are -- as everyone is certainly well familiar, we're only talking about medical exemptions under the current form of the statute.

MR. WIEST:  That's correct.  Those are the only ones provided.

THE COURT:  And there is no suggestion, and I'm assuming no plan, to seek a medical exemption on behalf of the minor plaintiff in this case.

MR. WIEST:  Correct.

THE COURT:  This is solely religious objections to the mandatory vaccination scheme in West Virginia.

MR. WIEST:  Correct.

Your Honor --

THE COURT:  So is Dr. Christiansen, then, absolutely necessary in terms of the injunctive relief?

MR. WIEST:  I'm not sure that I would characterize him as absolutely necessary.  We think that he is an appropriate and proper party under *Ex parte Young*; that he has sufficient connection with the statute; that having a state official enjoined may be helpful for a variety of reasons, including the fact that Dr. Christiansen enforces the exemption scheme generally and enforces the statute generally, including against local boards.  And so having him as a party to the

injunction ensures, for instance, that his office, notwithstanding an injunction, may not go after the local board for not strictly complying with the state's vaccination requirement, the challenged statute.

THE COURT:  What remedy would the state entity, Dr. Christiansen's office, have if this Court orders enrollment of the minor plaintiff in Upshur County's virtual schooling program?  I mean, they've already been taken over by the State BOE.

MR. WIEST:  Right.

THE COURT:  I guess I'm struggling to figure out what else could be done to Upshur County's board at this point.

MR. WIEST:  Your Honor, Dr. Christiansen does have enforcement powers under the vaccination scheme.  I suppose he could do that, federal court order notwithstanding, which could create other sort of issues.  I wouldn't expect that, of course.  That would be a bold move on his part to do that, notwithstanding the federal court order.  But technically, you know, he has the power under statute to do that.  So that's why we thought he has sufficient connection to be a proper party under *Young* and be a proper party to the injunction.

THE COURT:  Okay.  What remedial authority would Dr. Christiansen have?

MR. HISSAM:  I will preface this, Your Honor, with I'm not sure about the full remit of Dr. Christiansen's

authorities, because I just haven't studied that issue that closely. But it certainly sounds to me like we are discussing hypothetical future actions and not something that could lay a record for present injunctive relief against Dr. Christiansen.

THE COURT: Okay. Counsel aware of any remedial authority Dr. Christiansen would have if the Upshur County Board were to fail to comply with 16-3-4? I mean, I know -- and I know the statute and, of course, the state regs speak in terms of "shall," putting the exemption process aside. But at the end of the day, if the Board were to ignore findings, as you go through the process of reviewing medical exemptions, is there anything that Dr. Christiansen can do or order of the Upshur County Board?

MR. MOORE: Your Honor, I'm not aware of that at this time.

THE COURT: I couldn't find anything in my review of the regulatory scheme. At least, anyway, the statute certainly doesn't provide any authority on behalf -- and I want to make sure I get Dr. Christiansen's agency right -- State Health Officer and Commissioner of the Bureau of Public Health; that that entity alone could order closure of the Upshur County Schools or order it under the direction or authority of the State Board, anything like that.

MR. HISSAM: I certainly am not aware of that authority. I don't want to -- again, I don't want to close

off, because I just haven't studied that angle.  But I certainly -- I don't anticipate that.  And I think that would be highly unusual, but also hasn't happened.

THE COURT:  Okay.  Let's talk about the EPRA a little bit more.  So it codifies strict scrutiny for -- I shouldn't say First Amendment challenges.  But it codifies strict scrutiny in state law for challenges of state law based on freedom of religious exercise.

Is that a fair summation, Mr. Hissam?

MR. HISSAM:  Yes, Your Honor.

THE COURT:  Okay.  And then it also creates some avenue to challenge and provides for, I think -- I think Mr. Ritchie is correct.  There's the ability to award attorney's fees, but I don't think there's any provision for other damages.

MR. HISSAM:  That's right, Your Honor.  And I think it's -- it entitles you to go to a state court and obtain injunctive relief.

THE COURT:  Okay.  What, then, is ambiguous about the EPRA such that *Pullman* would apply here?  Because that's a necessary prerequisite under the *Pullman* factors; right?  There has to be an ambiguity in state law that the state court should be given first opportunity to resolve and address.

MR. HISSAM:  Yeah.  I don't think it's -- I agree with you, Your Honor, that it's clear.  It's that that avenue

of relief which keeps federal courts out of the business of administering state law schemes hasn't been pursued.

THE COURT: Right.

MR. HISSAM: And I think this is where -- and I don't want to speak for Judge Bailey, but I think this is where he --

THE COURT: Nor I.

MR. HISSAM: Sure. Of course.

-- where he was headed in *Sonda*. But there just wasn't that clear identification of what that state law claim is.

Here it is. I can easily imagine -- and I'm frankly perplexed as to why it hasn't happened -- that even this group of very fine lawyers on the other side of this aisle would go to a state court judge in any of the 55 counties and bring a statewide class action, I would imagine, and invoke this state statute.

I understand they can't do so in federal court. And they actually -- we actually had this discussion before the Judge Bailey hearing as to whether or not they were going to invoke it. And they were -- very quickly and correctly told me that they couldn't do so here.

But to go to a state court, invoke that relief, have a state court apply that, and then be done. At least be done until the State Supreme Court weighs in or what have you.

But it's not -- it's a little bit unusual, Your Honor, in that I don't think it's that there's some ambiguity as to what

the EPRA means.  It's that that relief is available.  And if that happens, if the state court passes on that -- right, wrong, or indifferent -- then it will change the posture of this case, likely moot it, and likely make it so that it never occurs.  And that's where I understand the principles behind *Pullman* and *Ashwander*.  Those were a constitutional avoidance, the respect of a separate sovereign.  That's where I understand those jurisdictional principles to lie.

THE COURT:  Okay.  What of plaintiffs' argument that this question basically makes -- or imposes an exhaustion requirement before you can bring a 1983 claim?

MR. HISSAM:  I don't think it's the case, Your Honor. Now, obviously, it's highly unusual that we have a -- such a clear state court pronouncement -- or state law pronouncement, I should say.

THE COURT:  Right.

MR. HISSAM:  But it's certainly not some blanket rule.  It's still an exercise of discretion on the part of the state judge.  But I just -- I don't think that we've had such a clear -- such a scenario where there is a state court remedy that's readily identifiable and available and plaintiffs have just declined to use it.

THE COURT:  Why should this Court make them use all -- exhaust all the bullets in the holster, so to speak?

MR. HISSAM:  I think, again, Your Honor, it goes back

to the principles behind *Pullman* and cases like *Ashwander*. It's the idea that these federal courts are courts of limited jurisdiction.

THE COURT: Absolutely.

MR. HISSAM: And that there are -- that when state law issues can resolve a matter, that should be our -- in the federal courts, that should be our first preference; that if there's a state law matter that can be resolved that avoids applying the United States Constitution via Section 1983, that that should be the preference.

THE COURT: The State Supreme Court of Appeals rightfully is fond of noting that state constitution and state law can provide expanded protection above and beyond the bare minimum floor the federal constitution provides, though; correct?

MR. HISSAM: Of course.

THE COURT: Is there any reading of the EPRA to indicate that that's the case here?

MR. HISSAM: I think the EPRA, as I understand it, is essentially a state law embodiment of federal RFRA, the Religious Freedom Restoration Act. But of course it applies to state -- the state constitution applies in state court.

And Your Honor, your guess is as good as mine as to what a state circuit court judge or the state supreme court may decide about the state constitution. I do know that this is a very

32

hot topic among the courts.  Mr. Ritchie and I recently heard Chief Judge Sutton from the Sixth Circuit speak quite eloquently about how civil rights lawyers, including these fine gentlemen, should pursue state court remedies and pursue state constitutional remedies because many states do have more expansive constitutions.

I can't predict that, Your Honor.  I certainly don't have a crystal ball that allows me to predict what the five justices do in Charleston.  But I think that is the appropriate course for a federal court finding to jurisdiction.

THE COURT:  Okay.  Counsel, your thoughts on *Pullman* and the EPRA at this point?

MR. MOORE:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Counsel.

MR. WIEST:  Your Honor, let me begin here.  With respect to what Judge Bailey did in *Parents for Freedom*, I think you've hit the issues.  First of all, Judge Bailey relied on *Sonda*.  We know *Sonda* has been overturned.

You've appropriately identified that this is discretionary.  But there is nothing that's ambiguous about either the EPRA or the compulsory vaccination law.  It's unambiguous.

And what I find very, very curious in the defendants' papers is they don't say, "Oh, if they just pursue an EPRA claim in state court, I concede that they win."

In fact, what they say is, "They need to go to state court. And then we're going to fight it there, and they may not win. And then they can go fight again at the West Virginia Supreme Court."

And so we've got this sort of, You've got to go to state court where we can fight you in a forum that we would prefer to fight you in, and yet we've got a constitutional claim.

And I would point the Court -- we filed some supplemental authority on Friday -- to some observations by the Fourth Circuit. In fact, I think I'm going to probably do a 28(j) letter in the Fourth Circuit case because I didn't -- we didn't find this before, but it's right on point. In *Educational Services versus Maryland State Board for Higher Education*, 710 F.2d 170, it's a 1983 Fourth Circuit case where the Fourth Circuit said it's error to apply *Pullman* where, quote, "the only state law questions suggested as unclear by the Board are ones either not in issue or, in effect, duplicative of the constitutional claims alleged by Havis," which was the plaintiff in that case.

So what the Fourth Circuit is saying is if you've got a state court remedy and it's duplicative of your federal remedy, it is inappropriate to apply *Pullman*. In fact, it is error to do so. That's what they're claiming here. And that's error according to the Fourth Circuit.

The Fourth Circuit went on in that *Educational Services*

case to talk about the fact that the defendants were not, in fact, conceding that the state court claims would in fact cause the plaintiffs to prevail, just as these defendants don't.  In fact, what the Fourth Circuit was talking about in that case was defendants said, "You've got to go fight in state court. And maybe you'll win, and maybe you don't."  And that's not good enough for *Pullman*.  And frankly which is the case here, where we've got clear and unambiguous statutes that are at issue.

So I don't know, frankly, how the defendants can possibly overcome the *Educational Services* case.  It seems to be on all fours with this case.

And then I look at the language in *Sonda*, where the Fourth Circuit took issue -- and this is at 92 F.4th 213, at 215, where the Fourth Circuit says, quote, "The Court also ordered that the proceeding on the federal constitutional claims be stayed pending the outcome of a state court action that the plaintiffs may file."  And "may" was emphasized by the Fourth Circuit for a reason.  Because there was nothing unam- -- nothing ambiguous there, which is a requirement, and there was nothing presented for decision.  And just as there's nothing presented for decision here.

We will never bring an EPRA claim.  Why?  Well, we're concerned about -- that the state courts may water down strict scrutiny.  Because, frankly, I've got a case in Kentucky where

they did exactly that with Kentucky RFRA, where our state courts watered that down, where the Sixth Circuit has taken a very, very different front.  And frankly, so has the United States Supreme Court.  And where it's subject to legislative modification:  You win; and then next thing you know, they're modifying, you know, the EPRA to take away the remedy.

There's no doubt the medical exemptions are going to remain, all of the salient underinclusivity is going to remain.  We chose the federal remedy.  We elected our remedies.  We are never going to state court to present a claim.  We don't intend to.  There's nothing that's ever going to be presented for decision, not in this case, and it would be inappropriate in our view to apply *Pullman*.

THE COURT:  Okay.  Mr. Hissam.

MR. HISSAM:  Well, yes, Your Honor, starting with the point of we don't say that they win in state court with EPRA.  Dr. Christiansen does not have that power.  Dr. Christiansen does not, under West Virginia law, decide whether or not statutes or programs are constitutional or unconstitutional.  And I -- just to be clear, I do not represent the state.  I represent Dr. Christiansen and only Dr. Christiansen in this case.  The -- so that's the answer to the sort of what happened; you know, why we're not instead going that far in our brief.

Your Honor, we definitely disagree about the import of the

*Sonda* decision.  I read Judge Niemeyer's opinion -- and again, we briefed it.  I read Judge Niemeyer's opinion as saying that there was a precursor issue that Judge Bailey hadn't decided.

THE COURT:  It was a jurisdictional issue.

MR. HISSAM:  Subject matter jurisdiction.

THE COURT:  Right.

MR. HISSAM:  Quite clearly.  And that is, in fact, what happened.

THE COURT:  In an effort to follow Judge Niemeyer's clear direction, that's why my first question to you, Mr. Hissam, was "Does your client have Eleventh Amendment immunity?"  Because I think we're going to have to revisit that question with Upshur County being under the control of the State Board, because that is a significant issue in the *Workman* decision.  But go ahead.

MR. HISSAM:  Yeah.  That is very fair, Your Honor. And I think we would all be well to heed Judge Niemeyer's guidance.

The -- so -- so we just read *Sonda* differently because of that.  And I've already -- I'm not going to repeat myself. I've already spoken about the murkiness of the state law claims.

The answer that counsel just provided as to why they have not -- and I now know never will -- bring an EPRA claim, it sounds to me, Your Honor, like something that I thought perhaps

was not ambiguous may in fact be.  If there is some uncertainty as to how state courts in West Virginia, as opposed to Kentucky -- state courts in West Virginia will apply this new enactment to this situation, then that is -- counsel has just talked themselves into the very ambiguity that *Pullman* abstention is designed to address.  If he thinks that a state court will water down strict scrutiny to be something less than fully satisfied, then we have ambiguity.

And the idea of legislative enactment --

THE COURT:  The courts creating ambiguity in what some would consider unambiguous statutory language is certainly not an unforeseen novelty.

MR. HISSAM:  Very well.

THE COURT:  Okay.  All right.

MR. HISSAM:  And the --

THE COURT:  I'm not sure that's your -- I'm not sure that's your winning swing on that one, Mr. Hissam.

MR. HISSAM:  Perhaps not.

There's certainly, though -- to me, I also don't think that's the winning swing for plaintiffs either.  Because that's just -- that seems to be speculative as to why they don't pursue an EPRA claim.

State -- my experience has been, Your Honor, that trial courts with jurisdiction in the Commonwealth of Kentucky are quite different than here.

38

Legislative modification, Your Honor, is true of everything: federal or state.  As we all know from the last legislative session and the veto process, everything we do here --

THE COURT:  Right.  We'll get there.

MR. HISSAM:  -- is subject to change.  I don't think that that is a basis for not invoking *Pullman* abstention.

THE COURT:  But the Supreme Court, in what I'll call the wave of COVID cases, was also very clear that changes to either -- primarily regulatory or executive orders does not moot the constitutional challenges.  Right?

MR. HISSAM:  I think that's correct, Your Honor.

THE COURT:  Okay.  All right.

MR. HISSAM:  But I just -- I don't think that the idea of legislative modification -- and I'm not sure whether they even meant to the vaccine program or to the EPRA itself. I don't think that's a -- I don't know of that in the case law to be a basis for refusing to avoid -- to invoke *Pullman* abstention or ba- -- or even a discretionary factor for not invoking *Pullman* abstention.

So as I heard counsel's comments, Your Honor, we still have a state court remedy that's available.  I certainly agree that we need to sort out the issues of subject matter jurisdiction.

THE COURT:  Right.

MR. HISSAM:  But we have state court remedy that's open and available.  And Dr. Christiansen, at least, does not believe that the two reasons offered as to why it's not being pursued are available.

THE COURT:  Okay.  All right.  Does the Upshur County Board believe it is entitled to Eleventh Amendment immunity in light of the State Board takeover?

My read on the Eleventh Amendment is it would deprive this court of subject matter jurisdiction.  Now, I'm not trying to make your argument for you, but I'm giving you the floor to try and make one.

MR. MOORE:  I mean, Your Honor, we wouldn't -- we would contest that.  You know, I think there are similarities, of course, between Dr. Christiansen and the Upshur County Board of Education, especially with the -- or the other clients, too: Stacy Marteney and Christine Miller in their official capacities.  So I wouldn't really have anything to add to that, Your Honor.

THE COURT:  Okay.  Counsel?

MR. WIEST:  Your Honor, I will end with where I began.  There's no damages that are sought in this case. There's no money damages.  This is a claim for prospective injunctive relief.  Upshur County has sufficient connection with the statute claiming under *Ex parte Young*.  It's an exception to Eleventh Amendment immunity.  It's well

recognized.

Even if, for some reason, the local board becomes a state actor because of the control issue in *Workman*, it doesn't matter because it's only prospective injunctive relief and the *Ex parte Young* exception is going to apply.

THE COURT: Okay. Any disagreement with that?

MS. WILSON: Your Honor, I think in our -- I think in our briefing about the State Superintendent and the Department of Education, we do think that Eleventh Amendment applies to them and the county boards by extension.

THE COURT: Okay. No. I think the State Board and State Superintendent -- I don't want to speculate. I think there are significant Eleventh Amendment issues that we would be discussing and this Court would have to decide.

I think it's a somewhat different conversation, as you note, counsel, the by-extension argument. But I think it's one we're going to have to have. But I guess that --

Let me reword my question a little bit. Is *Ex parte Young* sufficient -- does *Ex parte Young* apply such in this case this Court would still have jurisdiction even if the Upshur County Board would be considered a state actor by virtue of the State Board assuming control of Upshur County's operations?

You want time to think about that one, don't you?

MS. WILSON: Yes, I do.

THE COURT: Okay. All right. Okay. Motion granted.

All right.  Let's take a break for a moment.  And then we'll reconvene.

For folks who aren't familiar with our layout, if you go out those double doors in the back, to the right, around the corner, are restrooms.  And counsel, there are two conference rooms across the hall, one to the left and one to the right. You're free to use those if you need to huddle there.

But let's take ten for now, and then we'll come back and get into the substance of the preliminary injunction motion.

(Recess taken from 10:08 to 10:32 AM.)

THE COURT:  All right.  Counsel, I granted your motion to continue on *Ex parte Young*.  Would you like to invoke your continuance still?

MS. WILSON:  I'm sorry.  Could you repeat that for me?

THE COURT:  Sure.  Any thoughts at this point on whether *Ex parte Young* would abrogate Eleventh Amendment immunity in this particular case given the relief sought by the plaintiffs?

MR. MOORE:  I mean, I think it really comes back to, Your Honor, that the state -- you know, the state is -- as the West Virginia Department of Education is maintained by -- or with the state Superintendent, they are charged with, obviously, the general supervision of the schools.  And really, I mean, I guess, by extension, Your Honor, the county boards

are required and duty bound to follow the guidance that's provided by the state.

As to that specific issue, Your Honor, I don't know if I have a position as to it right now, but I would appreciate the opportunity to brief it. But that's really all I can say at this point.

THE COURT: Okay. Let's talk about *Ex parte Young*. Looking at the complaint, there is the request for fees and costs under Section 1988. Does that have any impact on the *Ex parte Young* analysis?

MR. WIEST: It does not, Your Honor. I know that I briefed this. The case is on the tip of my tongue. The U.S. Supreme Court has already ruled that the -- there is no immunity for fees and costs; that if injunctive relief is ordered, of course, there is no immunity for it. I can get you that case quickly. I briefed it a ton. It just -- it's on the top of my head.

THE COURT: We've talked about a lot of cases. That's going to continue. Okay. All right. I'll find that. I think I know the answer. I think you're right, Counsel.

And the reason I continue to harp on this *Ex parte Young* issue, it obviously is -- first and foremost, I think it's determinative as to whether this court has subject matter jurisdiction, which it must have.

As Mr. Hissam, I think, started, this court, of course, is

one of limited jurisdiction.  It is also a significant issue, I think -- it wasn't discussed at length in the *Sonda* decision from the Fourth Circuit, but it was the takeaway point at the end from Judge Niemeyer, was the first step the Court has to do is assess whether it has jurisdiction to start with.  And there's at least enough sprinkled across the record at this point.  This Court obviously has to ensure it has jurisdiction on its own.  But there's enough references here that raise concern in light of the *Workman* case.

And I realize *Workman* is now 13 years old.  I think at this point the Fourth Circuit decision is 13 years old.  Judge Goodwin's decision is even older.  Goodness, that was in November of '09.

Because the Eleventh Amendment issue with respect to county boards and county BOE employees sued in their official capacity while under control of the state board, Judge Goodwin addressed that at some length in analysis in his opinion.  And that was one of the grounds upon which he granted summary judgment for the defendants in that case's challenge to 16-3-4.  Not all the defendants, but some of them; in particular, the Mingo County Board itself.

That issue was not addressed substantively by the Fourth Circuit.  Instead, it focused on whether or not there was a compelling state interest in mandating vaccines on the basis of the state's interest and desire to prevent the spread of

contagious disease, and then waved off the question of immunity and how it applied in light of the fact that it found that the constitutional claims failed.  Some might say that's cart before the horse, but that's where the Fourth Circuit was.

So I cannot sit here and say there is a definitive assessment of this particular issue.  And again, I grew up in the southern district before I was fortunate enough to get here.  And state takeover of county boards was all the rage in Mingo County, as Judge Goodwin had to deal with in that case, and other counties.

But counsel, any cases you're aware -- district court, Fourth Circuit, or otherwise -- that might address this issue other than *Workman*?

MR. MOORE:  Not right now, Your Honor.

THE COURT:  Okay.  Counsel, did you find any in your --

Hold on, Mr. Hissam.

MR. WIEST:  I haven't, Your Honor.  Obviously, we have actually pulled -- we found the order, the takeover order.

THE COURT:  Uh-huh.

MR. WIEST:  I think we'd like to file it.  Because it's not clear to us what is -- you know, what -- and it may be, Your Honor, that we just dismiss the board entity.  Because we've got the superintendent.  Plainly, *Ex parte Young* applies. We've got the individual actors in their official capacities.

So maybe we just go that route and avoid this issue altogether. We've got sufficient injunctive relief against those actors. The superintendent can implement an injunctive relief order. That may be the cleaner way to deal with this versus are they a state actor or are they not within the scope of this takeover order.

THE COURT:  Yeah.  I've not read the order -- and I'm assuming that's what we would call it -- from the state board either.  And frankly, our on-the-fly efforts to dig into that are really just sort of the news headlines dealing with, as counsel noted, financial concerns; particularly, COVID relief funds.

MR. WIEST:  Right.

THE COURT:  Okay.  I'm sorry, Mr. Hissam.  You had a thought.

MR. HISSAM:  Yes, Your Honor.  Mr. Ritchie raised a very important point at the break, which is that our briefing in the *Parents for Religious Freedom* Fourth Circuit appeal does raise a second issue, which is the application of *Ex parte Young* to Dr. Christiansen.

And if -- I suspect if he learns at 8:30 that morning that he's drawn Judge Niemeyer, they may in fact start there.  I have also spent some time studying the prayer for relief and complaint in this case and do have concerns about the application of each of those things to Dr. Christiansen and

would like the opportunity to brief that.

THE COURT:  Okay.  All right.  I'm going to put a pin in all of that.

Let me ask at this point -- let's transition to the motion for preliminary injunction.  But let me ask first:  Is there any evidence that plaintiffs believe the Court needs to receive and consider above and beyond what's contained in the papers?

MR. WIEST:  Your Honor, our perspective -- and I'd want to hear the defendants' answer to that same question, because that may affect it.

THE COURT:  I'll ask them, but you get to go first.

MR. WIEST:  Right.  Absent the defendants putting on additional evidence, we do not intend to put on any additional evidence.

THE COURT:  Okay.  Counsel on behalf of the Upshur defendants, any evidence you believe the Court needs to receive and consider with respect to the request for injunctive relief?

MR. MOORE:  No, Your Honor.

THE COURT:  Okay.  Mr. Hissam?  Mr. Ritchie?

MR. HISSAM:  No, Your Honor.

THE COURT:  Okay.  All right.  With that out of the way, counsel, go ahead on the injunction motion.

MR. WIEST:  Yes, Your Honor.

This is a preliminary injunction motion.  And I want to begin by noting something that this Court asked earlier.  This

is an as-applied challenge to a single student, K.P., and her parents.  And so it's a very, very narrow challenge.  It's not a facial challenge.  We're not seeking in this case to undue the entire compulsory vaccination law.

And this is about a plaintiff, Your Honor, who was a straight-A student attending virtual school.  She has received most of the vaccines on the schedule.  She's got religious objections.  Her parents have religious objections.  When they learned of connections to aborted fetal tissue in certain of these vaccines, they said no more.  And I don't think at this point there's any contestation about sincerity.

The reason I think it's important to note this is an as-applied challenge is we believe that that affects the analysis of how this case is handled.  We've got an obligation to show for a preliminary injunction likeliness for success on the merits, irreparable harm, balance of the equities, and the public interest.

But in First Amendment cases -- and I know the Court knows this -- fundamentally, these cases all tend to collapse on an assessment of likelihood of success on the merits.  Because if you'll chilling her free exercise rights, that is irreparable harm.  There's Fourth Circuit case law -- it's been cited in our papers -- that balance of the equities and the injunction being in the public interest also favor the plaintiff if she shows that there's an ongoing constitutional violation.  So

really everything collapses on this analysis of is there a likelihood of success on the merits.

There are -- and I think we get there in four different ways demonstrating strict scrutiny.  It's not generally applicable under *Fulton* because of the discretionary exemption scheme.  And I do want to talk about --

THE COURT:  Let's stop there.  I do want to talk about that one.

MR. WIEST:  Yeah.

THE COURT:  Does the fact the statute provides any exemption mechanism render the statute itself not generally applicable?

MR. WIEST:  That is our position.  And not only is that our position, that is our reading of *Fulton*.  We think that's the U.S. Supreme Court's position.

There's language in *Fulton* that talks about if there's individualized exemptions -- if there's a scheme for individualized exemptions, it's not generally applicable.  And I'm looking specifically at 593 U.S. 522, at 533, where the Supreme Court says, "A law is not generally applicable if it," quote, "invites the government to consider the particular reasons for a person's conduct by providing," quote, "a mechanism for individualized exemptions."

And we know in part -- and I think the defendants have sort of muddied the waters a little bit suggesting that, well,

these are objective versus subjective and that makes a difference.  That, we believe, is a misreading of *Fulton.*

And I'd look, for instance, at the language of the Supreme Court at 537, where they say, quote, "The creation of a formal mechanism for granting exemptions renders a policy not generally applicable, regardless whether any exemptions have been given, because it," quote, "invites the government to decide whether reasons for not complying with the policy are worthy of solicitude."

And then they go on as an afterthought.  They say, "here at the Commissioner's sole discretion."

Said another way, that sole discretion isn't driving the determination of whether or not there's individualized exemptions.  The creation of a formal mechanism is what's driving that determination.  And here, plainly, there are medical exemptions.

And frankly, Your Honor, if you look -- you know, I know we're going to talk about underinclusivity in a minute.  We've got an underinclusivity problem as well under *Tandon*.  But, you know, the Supreme Court talks -- you know, makes that language and then says, as an afterthought, here it's sole discretion. That doesn't matter for whether there is individualized exemptions.  And so --

THE COURT:  Why not?  Because the exemption mechanisms are quite, quite different between *Fulton*, which, as

you noted, Counsel, the --

And forgive me.  I can't remember if it's a regulation from the City of Philadelphia or an ordinance or whatever label it may have there.

-- the decision was committed to the sole discretion of an executive officer, a singular executive officer.  Here it's a more convoluted but detailed assessment that has to be undertaken when there's a request for a medical exemption.

MR. WIEST:  Your Honor, I think when we start to look at -- and this gets into all of the Supreme Court First Amendment jurisprudence.

When we look at *Fulton*, it doesn't talk about -- well, it does talk about it being at the sole discretion.  But again, I am looking at the specific language at 537.  It's enough that there is a formal mechanism for granting exemptions.  In fact, the Supreme Court says the creation of a formal mechanism for granting exemptions renders a policy not generally applicable. It doesn't say they have to be objective criteria, subjective criteria.  If the government is able to make an exception to a scheme for, in this case, secular reasons, medical exemptions, that demonstrates that the government is making a value judgment about a policy and why it can be excepted for secular reasons.

And what the Supreme Court is saying in *Fulton* is:  No. If you're going to allow any exceptions, then you cannot

discriminate against religious practice. You've got to allow religious practice to also be exempt if it's sincere.

THE COURT: Uh-huh.

MR. WIEST: And so that's our reading of it. And I think it's a fair reading. Because the Supreme Court doesn't condition -- and again, I'm looking right at 534 of *Fulton* -- it doesn't condition it on being objective/subjective. It says as an afterthought it's sole discretion. But it says the creation of a formal mechanism for granting exemptions renders a policy not generally applicable. That's the language.

THE COURT: All right. Let's put a pin in there.

Counsel, why is he wrong?

MR. MOORE: Your Honor, I think to prevent duplication.

Mr. Hissam.

MR. HISSAM: Oh. Sure. Yeah.

THE COURT: Okay. Mr. Hissam. I'm sorry.

MR. HISSAM: Your Honor, because *Fulton* discussed a mechanism for entirely discretionary exemptions. And as Your Honor laid out, there is nothing discretionary about the medical exemption.

THE COURT: I wouldn't characterize what I said as "nothing discretionary." But go ahead. We're going to circle back to that. Go ahead.

MR. HISSAM: Sure.

The medical exemption is quite clearly laid out in the statute and in the state rules.  It is not -- it is mandatory if that procedure is satisfied.  It is not discretionary for Dr. Christiansen to take a medical exemptee applicant who follows the procedure in the code -- and by code I mean the West Virginia Code and Code of State Rules --

THE COURT:  Uh-huh.

MR. HISSAM:  -- and then say, "I'm going to exercise my discretion to not grant this."  Or if -- on the contrary, if someone doesn't follow the procedure, to exercise his discretion to grant it.

That is not the mechanism for entirely discretionary exemptions that is described in *Fulton*.

THE COURT:  Okay.  I, fortunately, no longer do practice law.  You all do.  It's called practice for a reason. Medicine is the same way.  You practice medicine.  It strikes me the reason there are layers or levels below Dr. Christiansen, before that ultimate decision-making authority vests with him, that there's room for disagreement in terms of whether a particular vaccine or a particular number of doses of a vaccine are contraindicated or not advisable for a particular student.

How does that play into -- assuming your interpretation of *Fulton* is correct, Mr. Hissam, play into this Court's assessment here, if the determinative question is whether

there's any discretion involved at all?

MR. HISSAM:  It's still -- as I understand the Court's question, Your Honor, it would be that perhaps different physicians may have different opinions.

THE COURT:  Right.

MR. HISSAM:  But that's not discretion by a state actor.  That's not discretion by Dr. Christiansen being exercised.

If a physician presents -- as we understand the process and the historical record as well, by the way, if a -- if the steps are followed in the regulatory scheme, it is granted.  And while I certainly understand the Court's point, it's not the kind of individualized discretion acted upon by a state actor.

THE COURT:  Okay.  But the process is started if a practicing physician submits the -- I believe it's called a Request for Exemption.  And I apologize.  I'm scrolling through the state regs now.  Give me one second.

Yeah.  Physician must complete a Request for Medical Exemption from Compulsory Immunization.  There's a form on the DHHR website, or whatever the DHHR is called now; right?  And that then goes to the immunization officer.  That's a level beneath Dr. Christiansen, though; correct?

MR. HISSAM:  Yes.

THE COURT:  Okay.  Do we know who the -- well,

honestly, it doesn't matter in this case.  We're talking about a religious exemption.

And then if the immunization officer's decision is to the dissatisfaction of the applicant, they can take an appeal, for lack of better term, from that to Dr. Christiansen; correct?

MR. HISSAM:  Correct.

THE COURT:  Okay.  And of course, there are all manner of issues.  There may be temporary exemptions, permanent exemptions, and all the rest.  And it's written like you would expect state regs to be written --

MR. HISSAM:  Well, of course, Your Honor.

THE COURT:  -- at this -- at this juncture.

Convince me, Mr. Hissam, that the regs invest no discretion in either the immunization officer or ultimately Dr. Christiansen, then.

MR. HISSAM:  Because if the medical basis which is -- what is required of that is laid out in the code -- contraindicated or there's a precaution to a particular vaccine, as is the magic terminology, if that is to be presented, then the exemption is to be granted.

It's not, "I've seen that, and I don't think that that's sufficient," or Dr. Christiansen saying otherwise.  And that is just not -- that is the standard for receiving it, and that's the process that's followed.

THE COURT:  Okay.  There's a word that's used

repeatedly throughout the exemption procedures of -- it's 64 C.S.R. 95. But the exemption sections are primarily 64-95-17. They use the word "medical opinion" or "opinions" repeatedly.

MR. HISSAM: Of course, Your Honor. I've --

THE COURT: And that word screams at me, in all candor, off the page.

And again, I'm not -- it's not sole discretion like *Fulton* was; right? And sometimes the Supreme Court just gets easier language to deal with, and then --

MR. HISSAM: Of course.

THE COURT: -- here we are dealing with this. But it does seem there -- and it would almost have to given the practice of medicine and the evolution of the practice of medicine.

I mean, let's just speak frankly; right? All the cases we're now talking about post-*Jacobson* and post-*Price* on government authority to mandate vaccines or impose certain restrictions on activity among the citizenry based on public health interests -- and we're going to talk about this in a moment too -- strikes me as also having evolved in light of COVID. Right?

Let's go back to when we started with COVID vaccines to where we are now. The science evolves. That's the nature of science. It is not absolute. It evolves over time. And the

use of the word "opinions" -- "medical opinions" in these regs I think is, one, appropriate, but also telling. Because those issues do change over time. And I think reasonable medical minds -- I am not one of those, neither reasonable nor medical. But those can evolve over time as studies continue: efficacy studies, safety studies, and all the rest.

Am I reading too much into the phrase "medical opinions"?

THE COURT: MR. HISSAM: I don't think you are, Your Honor, necessarily. It's just that I've always understood the way that the program has operated, both in the black and white of the code and also in reality, is that that medical opinion is exercised by the doctor --

THE COURT: Right.

MR. HISSAM: By the family physician, pediatrician, whichever it may be.

-- and not something that Dr. Christiansen is studying the developing, late-breaking medical material and exercising that discretion, Your Honor.

THE COURT: Okay. All right.

MR. HISSAM: I will say that part of -- one of the things that has been at issue in these cases and not been developed is the sort of history of that actual implementation. I obviously have access to my client, and we've investigated some of this to some extent. But what we're -- what we've always been dealing with in these cases is what the code says

in black and white.  And there isn't a developed record as to exactly how many times a -- the appeal was successful or statistics on those sort of things.  I don't have those at my fingertips, Your Honor.

THE COURT:  Right.

MR. HISSAM:  Just in full candor.

THE COURT:  No.  And I wouldn't expect you to.  But I also wouldn't expect the process to be a rubber stamp.  I would expect, given the nature of the process -- again, that's in the state regs -- involving appeals and the rest that there are going to be disagreements at some point.  I don't know how prevalent those are or how common they are.  And I'm not convinced that that is a dispositive factor.

But clearly, the drafters of the state rule anticipated disagreement on these medical exemption questions.

So it's Dr. Christiansen's position that the inclusion of a medical exemption to 16-3-4's compulsory vaccination requirement does not in and of itself render the statute not generally applicable.

MR. HISSAM:  Correct.

THE COURT:  And that is because it is different from *Fulton*'s language where the City of Philadelphia invested sole discretion with no guidance, no guardrails on the foster care placement issue in that case.

MR. HISSAM:  Correct.  It would be -- our analogue

would be, if this were like *Fulton*, that there would just be something, let's say, in the code generally referred to as a medical exemption, and it's just Dr. Christiansen.

THE COURT:  Right.

MR. HISSAM:  Period.

THE COURT:  Okay.  All right.  Upshur County have anything to add on that issue?

MR. HISSAM:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Counsel?

MR. WIEST:  Your Honor, a couple of points.

I want to begin with the West Virginia Code.  This is not -- and this is 18 -- I'm sorry.  West Virginia Code 16-3-4, subsection (h).  It's an "is authorized to grant" exemptions. It's not a "shall grant."

And then I look at the regulations, and I look at medical opinions.  We are dealing with opinions -- differences of opinions that ultimately boil down to the opinions of Dr. Christiansen at the end of the opinion process.  And so we are looking at a level of discretion.

And then I look at the record.  And specifically we've got a declaration from a West Virginia physician who has written these medical exemptions -- it's at Document 8-2 -- Dr. Moss, in which he says, "I write these.  Sometimes they get granted; sometimes they don't.  They're totally discretionary."  And the defendants have not put on any contrary evidence that his

testimony is not actually the case.  So that, at this point, is unrebutted, that there is a discretionary, subjective process that's involved here.  And it's unrebutted on this factual record.

THE COURT:  Okay.  All right.  Let's fast-forward to what I think the issue is.

The Fourth Circuit in *Workman* identified 16-3-4 as having at its core a compelling state interest.  Why should this Court ignore that unpublished opinion?  Is there any reason other than it's unpublished?  I will note it does have three names of Fourth Circuit judges on it, even though it's characterized as unpublished.

MR. WIEST:  Your Honor, I understand that position. Let me begin here.  It is unpublished.  But I think you previously identified the salient issue.  I mean, it used to be, prior to COVID, that the government got to come into court and say, "We've got an interest in disease control," and courts generally said, "Okay.  That's good enough for us."  We know that that's no longer the case.  We know that the Supreme Court, for instance, has issued --

By the way, I know we just talked about the exemption scheme in *Fulton*.  But we've got the *Tandon* decision out of the U.S. Supreme Court as well.  And I would submit that even had *Workman* been published, that you would need to follow *Tandon* versus a prior decision that predated it --

THE COURT:  Right.

MR. WIEST:  -- because of the intervening Supreme Court precedent.  And when we look at *Tandon,* that was a disease control case.  Right?  It was about COVID restrictions.  It was about comparability, all of which are at issue here.  And *Tandon* -- and I know he briefed this at issue -- compels a strict scrutiny analysis.

And the government in *Tandon* said let's -- we're arguing all this.  And the Supreme Court said, It is not enough for you just to say you've got compelling interest in disease control.  If you're making exemptions for some people for secular reasons, you've got to show that granting religious accommodations is more dangerous.  That's what the Supreme Court said in *Tandon*.

We've got no proof of that here, that it's, quote, "more dangerous."  And the comparability -- and I know we get into comparability in the briefing with the defendants.  And they suggest, well, geez, the sky might fall.  If you grant, you know, this plaintiff one, there might be a dozen others.

Obviously, the Supreme Court has rejected that in a whole line of cases, the classic rejoinder of bureaucrats as "If I give you one, I -- you know, I have to give everybody one, so no exemptions."

But the comparability analysis that *Tandon* talks about is to the applicant's proposed religious exercise.  The applicant

here, the religious exercise that they've got to show is that somehow -- and I've scoured their briefing to look for any evidence that they've put on that any disease can be spread through the internet. Because we're looking at a homeschool student. And the record is sparse and, in fact, absent on that.

They've got to show that this -- that K.P. poses a risk sitting at home attending virtual school that is not comparable to medical exemptions that they, in fact, grant. They can't do that. Plainly, a single student attending in person, if you accept that someone being unvaccinated poses a risk, is going to -- to others, is going to pose more risk to others than a student sitting in the confines of her own home. And so just from a *Tandon* comparability standpoint, this fails as applied to this plaintiff. And again, we're here on an as-applied challenge.

And so I look at the language in *Tandon* and I say, even had *Workman* been published, *Tandon* is intervening U.S. Supreme Court precedent this Court has to follow.

THE COURT: Okay. Well, jumbled in there -- "jumbled" is not the right word. I'm sorry, Counsel. That was an unfair word choice.

In the midst of your comments is what I think the issue is. At the end of the day, I tend to agree under *Fulton* that this is not a generally applicable statute. And if that's the

case, then strict scrutiny applies. The Fourth Circuit has found a compelling state interest as an underpinning to 16-3-4. That is one of the reasons why they affirmed Judge Goodwin's order in the *Workman* case, granted it's unpublished.

One thing that was not addressed, however, in the Fourth Circuit opinion in *Workman* was: Is 16-3-4 narrowly tailored? My sort of law school class question I have, that frankly I've been waiting all weekend and this morning to finally get to. We've got *Jacobson*. We've got *Price.* Those are the -- really the only cases district courts had to deal with at the start of the pandemic and the restrictions that the government entities were imposing. And there does not appear to be any indication that the narrowly tailored prong of strict scrutiny comes into play under those cases.

But we since have had, I'll say, Supreme Court activity. I know some of them took the form of orders on emergency injunctive motions. There's Justice Gorsuch's oft-cited statement in connection -- and I can't remember which one it is. I'm assuming, but I'm not positive, it's a California case. But there was a lot of Supreme Court activity dealing with what I'll call the *Jacobson* premise in the COVID era.

Does this Court have to consider the narrowly tailored prong? Because I'll be equally candid with you, counsel. I'm not inclined to ignore *Workman* finding there's a compelling state interest underlying 16-3-4. Whether that opinion is

63

unpublished or not, this Court is duty bound to follow precedent of the Fourth Circuit.

I know the Rules of Appellate Procedure indicate that is not considered precedential.  But I would be foolish and I think derelict in my duty to take a different tact given the detailed analysis of Judge Wynn, Judge Agee, and I can't -- and pardon me.  I can't remember who the third judge on *Workman* was.

But that has been established, which I think, again, today leaves the question of narrowly tailored, assuming this Court has to consider it.  Do I?

MR. WIEST:  Your Honor, two points that I would make. If you determine that the statute is not generally applicable and strict scrutiny applies, the Supreme Court compels --

And by the way, I think we are prepared to concede that there is a generalized state interest in, for instance, disease control being -- being prevented.  The issue, though, is in *Fulton* that's not enough.  *Fulton* commands that they have to show -- defendants have to show a specific state interest in denying an exemption to this plaintiff.  That's the compelling interest that they've got to do.

*Workman* never addressed that.  And frankly, I think it was partially the way it was litigated.  Frankly, there's been a seat change, if we exercise jurisprudence, following and in the era of COVID, cases like *Fulton* and *Tandon*.  So the compelling

interest that they've got to show is that they -- you know, that there's an interest in denying it to this particular plaintiff.

And then I turn to -- and Your Honor, in light of that, right, we're dealing with an online student that has received most of the vaccination schedule.  So what is the compelling interest to denying this plaintiff an exemption?  That's what they've got to show.  I don't think they've even come close to doing that.

In fact, they never even mentioned in their papers this plaintiff and her circumstance.  It's all about we've got this generalized interest, and the sky is going to fall; because if she gets an exemption, everybody is going to get an exemption.  And that is not enough, not in light of the language of *Holt*, in light of, you know, the "If we deny you an exemption, everybody -- so no exemptions."  *Gonzales.*

The Supreme Court says if we're at strict scrutiny, they absolutely fail.  And their papers do not even mention a compelling interest denying this plaintiff an exemption.

And then we get to narrowly tailored.  And they fail there too.  Again, I'm looking right at language in *Tandon*: "Where" -- quote, "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even where the same precautions are applied."

And then the Supreme Court goes on in a couple of paragraphs later: "Second, the Ninth Circuit did not conclude that those activities pose a lesser risk of transmission than" -- and this is emphasized -- "applicants' proposed religious exercise at home."

Well, that's their burden. And they fail to meet it here just as the defendants failed to meet it in *Tandon.* We do not succeed under -- they don't succeed under strict scrutiny. They've got the burden of showing narrow tailor, and they don't even come close when we're dealing with an online student who's received most of the scheduled vaccinations. And so I think the case becomes very, very clear. Once we're at strict scrutiny, they lose.

THE COURT: Okay. Mr. Hissam?

MR. HISSAM: Your Honor, we, of course, don't believe that strict scrutiny applies. But setting that aside, I will admit, Your Honor, I had not thought about before the issue of *Jacobson* not including the narrowly tailored component. That --

THE COURT: And that's on the fly. Don't hold me to that. It may be part of the analysis. I'm -- it's been a while since I read *Jacobson* cover to cover. I say that only because in *Workman* that was not assessed. And *Workman* cites to and relies extensively upon *Jacobson.*

And just the recesses of my mind: As this court, as many

were, were dealing with issues at the outset of the pandemic, that *Jacobson* was an exceptional way to handle challenges to the state's authority to promulgate rules and restrictions in times of medical emergency or pandemics. But don't hold me to my effort to quote *Jacobson.* I base that largely upon *Workman*, which did not address the question of narrowly tailored.

MR. HISSAM: Yes, Your Honor. And I -- that is certainly an interesting issue to me. I just, in full candor, wanted to admit that that's not something our mind had been focused around but, certainly, we'll look at going forward from here.

We certainly think that *Workman*, as Your Honor just mentioned, is an important data point. Judge Agee and Judge Wynn are still with the court and hearing cases. The other judge was Senior -- I think a sitting district judge, Judge Duffy.

THE COURT: That's right.

MR. HISSAM: That was by designation.

THE COURT: That's right.

MR. HISSAM: Certainly, a very interesting data point. And as we note in the brief, Your Honor, I think -- and consistent with other recent case law from around the country, including states that have repealed religious exemptions in light of outbreaks --

THE COURT: Right.

MR. HISSAM:  And those --

THE COURT:  How many states have done that?

MR. HISSAM:  I don't know that I have the total list, Your Honor, because --

THE COURT:  But it's a handful based on the string cite y'all provided --

MR. HISSAM:  Yeah.

THE COURT:  -- in there.  And I ask given plaintiffs' argument that there are --

Is it 45 states that provide a religious exemption to their compulsory vaccine statutes?

MR. WIEST:  Yes, Your Honor.  There -- and I think we're at --

THE COURT:  Is that still the current number?

MR. WIEST:  Forty- -- well, it -- it was 46.  Now it's 45.  Because there was a decision in Mississippi that invalidated --

THE COURT:  Right.

MR. WIEST:  -- their --

Right.  And so there's effectively today --

MR. SIRI:  Forty-four and --

MR. WIEST:  Yeah.  Oh, it was 44.  That's correct. There's effectively 45 states that have an accommodated religious practice.

THE COURT:  Okay.  All right.  Understood.

I'm sorry, Mr. Hissam.  I didn't mean to interrupt.  I've got multiple pages of notes, so I'm just sort of --

MR. HISSAM:  Sure.

THE COURT:  -- interrupting on the fly.

MR. HISSAM:  And Your Honor, I mean, I think that that's something that in upcoming legislative sessions could be subject to further change.  I mean, this is a moving --

THE COURT:  That's on my list of questions.  We'll get to --

MR. HISSAM:  Okay.

THE COURT:  -- legislative history as well.  I'm sorry.  Go ahead.

MR. HISSAM:  Yeah.  This is certainly a developing field.

Your Honor, the -- to switch to assuming that narrowly tailored is an element of the strict scrutiny.  We've laid out in our brief that the interest in tailoring is that exemptions certainly eat away at the ba- -- the need to serve the compelling state interest of herd immunity.  I can't -- it's always difficult in these cases to try to say, well, this narrowly tailoring of a program that is designed to cover all 55 counties and all students in public schools in West Virginia is applied to this student as such, because that's just simply not the way it works.  You know, certainly not for Dr. Christiansen and for the legislative drafters and the

drafters of the Code of state Rules.  It's not the case that the minor plaintiff was, you know, the subject of the -- of the exemption regime.  The exemption regime is drawn in a way that would make sense and be workable and is drawn in a way to make exemptions be limited to the medical exemptions that we've already discussed and we don't need to rehash here.

We believe that that is narrowly tailored, Your Honor, but, again, with the full caveat that we don't believe strict scrutiny applies.

THE COURT:  Right.

MR. HISSAM:  And I would like the opportunity to further address the narrowly tailored, please, meaning in terms of I just have not thought about whether or not that is an element of -- assuming strict scrutiny applies here.

THE COURT:  Okay.  No.  Understood.

MR. MOORE:  Your Honor, the only thing I have to add to that is in relation to the point that the minor -- the plaintiff minor is not going to be at all around any other students.  The reality is that as a student of the board she would be entitled to participate in sports.

THE COURT:  Sure.

MR. MOORE:  She would be required to take part in required standardized testing, which would be in person.  So it's a little different than simply just we're at home, and we're never going to be around anybody else.  The reality is

that's really not the case, and there are definitely circumstances where they would be around other students.

THE COURT:  Okay.  Well, let's talk about one of those, that being the mandatory testing.  It's my -- the minor plaintiff is set to start third grade?  Is that correct?  And my apologies, everyone in the back, that I don't have the --

MR. WIEST:  Yes, Your Honor.  Third grade.

THE COURT:  Getting ready to start the third grade.  I should know this.  Mandatory state testing.  When is the first one lobbed at our statewide students?

MR. MOORE:  Your Honor, I believe it is third grade.

THE COURT:  That's what I thought.  I thought it was third grade.

Do those have to be administered in person?

MR. MOORE:  My understanding is that they are required to be in person.  But I don't have the specific authority in front of me right now.

THE COURT:  Okay.  Are those -- it's been a while since I've been in third grade.  I would assume things have changed.  Are those administered via iPad or Chromebook?  Are they handwritten tests?  Anyone know?  Anyone taken one lately?

MR. MOORE:  Your Honor, I don't know the answer to that.

THE COURT:  Okay.  Mr. Hissam, Mr. Ritchie, you got any idea?

MR. HISSAM:  Not officially, Your Honor.  I believe my middle school students in Wood County take iPaded exams.  But I don't know, Your Honor.

THE COURT:  I've got recent recall of --

MR. WIEST:  And Your Honor, we've got --

THE COURT:  -- a rising senior --

I'm sorry.

-- a rising senior and a rising eighth grader.  And I know they're online, for lack of better term.  I'm sorry.

MR. WIEST:  And I was going to say we've got one of our state legislators in the audience who just informed me that, in fact, they are conducted online.

THE COURT:  Okay.  All right.

MR. WIEST:  And so they could be even done in a separate classroom if that was really a concern.

THE COURT:  All right.  Well, I have no interest in rewriting this legislative scheme.  I realize if the Court grants an injunction, that may be actually what I have to undertake.  But I have no real interest in that.

But the import of my question is on the narrowly tailored prong, assuming it is one we need to consider.  We're well past the days where we were handed bubble sheets and Number 2 pencils and make sure you fill in the bubble completely and dark enough that the computer scanner could read it.

Okay.  And the third grade standardized test, I assume --

but correct me if I'm wrong -- that's administered toward the end of the academic year?

MR. MOORE:  That's correct.

THE COURT:  Okay.  All right.  And that is the first state-mandated test.

MR. MOORE:  Yes, that's correct.

THE COURT:  Okay.  All right.  Any thoughts from Upshur County with respect to this issue of has this Court's job changed from *Jacobson* to, again, what I'll call the flurry of Supreme Court activity during and post-pandemic?

MR. MOORE:  Your Honor, I don't think I have anything to add to the discussion at this point.

THE COURT:  Okay.  All right.

MR. WIEST:  Your Honor, may we --

THE COURT:  Yes.

MR. WIEST:  -- be heard briefly on that?  Just quickly, obviously.

THE COURT:  Yes.

MR. WIEST:  The *Jacobson* case applied Fourteenth Amendment substantive due process.

THE COURT:  Correct.

MR. WIEST:  It did not deal with fundamental right. In fact, it was later than *Jacobson* that talked about, hey, if the constitution requires something, then the outcome may be different.

I had the privilege of doing one of the early COVID cases that ended up being cited by the Supreme Court in *Tandon*, out of the Sixth Circuit.  And again, *Jacobson* was not dealing with First Amendment free exercise.  It was not.  In fact, the nature of a fundamental right was never mentioned.  They were dealing with what we typically know as rational basis, substantive due process.

THE COURT:  Right.

MR. WIEST:  And so we believe, for that reason alone, *Jacobson* isn't appositive to this case.

THE COURT:  Let me ask this question on the issue of compelling state interest.  But I do think there's some overlap, again, at this point assuming narrowly tailored is part of our discussion as well.

The medical exemption that's in 16-3-4, I think there's a strong argument that that undercuts the compelling state interest if the compelling state interest is prevention of spread of contagious disease and, as you put it, Mr. Hissam, development of herd immunity.

How does that inform the Court's decision here?

MR. HISSAM:  Your Honor, I can only say that given how it is laid out in the regulatory regime that it was designed to be a narrow exemption.  It was -- it was not a broader philosophical objection or anything like that that would have allowed broader schemes.  And I know that

Dr. Christiansen and his underlying staff would say that in West Virginia, unlike the 44 or 45 other states, it's been quite effective.

And there are -- there is data on this, because we have seen it in our neighbors that do have broader exemption regimes, including the state of Ohio where there have been outbreaks of things that frankly do not exist here and -- or do not exist at that level here. And so that -- as a matter of design. But also, the state would maintain -- Dr. Christiansen would maintain as a matter of practical effect, which we are now able to look at with data and data from surrounding states, it has been a quite narrow exemption.

THE COURT: Okay. Counsel?

MR. WIEST: Your Honor, the strict scrutiny analysis -- and again, I'm right back to *Tandon* -- they have to demonstrate not just, "Geez, if we open up to all religious exemptions, we have a problem."

It's compare it to -- and again, I'm just reading -- "the applicants' proposed religious exercise at home." That's language I lifted right out of *Tandon*. That's the comparability that they've got to show.

That analysis is contained nowhere in their papers for a reason. Because if she is at home attending virtual school, even if you've got, quote, "a narrow number of medical exemptions" -- and we've demonstrated that there's hundreds of

them across the state in our papers -- those are going to pose more risk from a disease control standpoint, if you assume that the unvaccinated pose a risk, than a plaintiff sitting in the comfort of her living room taking online classes.

THE COURT:  But that also assumes the minor plaintiff here never leaves her house or is never in the school building or on school grounds ever.

MR. WIEST:  Well, and all of that assumes, Your Honor, that the plaintiff is not otherwise out in the community generally, which they don't --

THE COURT:  Right.

MR. WIEST:  -- prohibit her from being.  Right?  She can go and attend sports leagues.  She can attend church service.  She can do all kinds of things that the state does not prohibit her from doing, which equally undermines their interest if we want to shelter her away from society because she's some kind of risk.  And yet they allow all of that.  And so we've got that underinclusivity problem as well.  Which under *Tandon* you've got to compare all of those things to what the plaintiff is proposing to do, which is taking online classes here.

THE COURT:  Okay.  Upshur County, do you have any thoughts on that issue?

MR. MOORE:  Well, Your Honor, I think that the way that the exemption works is that it's not just that it's

disease prevention; right?  It's -- the exemption is provided to further the state's interest to provide safety for all the students.

Obviously, if there was a student that was contraindicated to a vaccine, it would be harmful to give them the vaccine. And it's evident at school; right?  And so I think the -- I think we're getting a little bit academic, I guess, here with comparing *Tandon* versus what we have here.  Because *Tandon* is a little bit different in the sense that, you know, the church services that are at home versus the other activities that are outside, obviously, we don't dispute that the minor plaintiff can go out in the community.  It's really about the fact that the purpose of the statute is to not harm the students.  And the prime exemption to the statute is to not harm students that are contraindicated.  I don't think that that -- the fact that there is an exemption for the medical purposes somehow makes the statute not narrowly tailored to serve that end.

THE COURT:  Okay.  I've hinted at it a couple times. I do want to talk about it.

So the legislature passed a bill, I believe in the 2024 session, that would have addressed this issue.  It obviously wasn't solely addressed at dealing with virtual academy students and the compulsory vaccine mandate.  At least that's what the Governor's veto message indicated.  I've got a couple questions on that front.  I assume I know the answers, but I'll

let everybody offer their thoughts.

Does the legislature's passage of that bill, even though it was ultimately vetoed by the Governor -- I don't believe there was any action taken to override the veto -- should the Court consider that as whether or not the current evolution of 16-3-4 is narrowly tailored?

I'll start with plaintiffs' counsel.  You're owed a softball since I gave Mr. Hissam one earlier.

MR. WIEST:  Your Honor, we always appreciate the softballs.

I think you could, because the legislature obviously has recognized -- although the Governor has vetoed it, so it's not law.

THE COURT:  Right.

MR. WIEST:  And it may have, you know, somewhat limited purpose in that way because it hasn't gone through the full process.  But the majority of both houses of the Kentucky Legis- -- or I'm sorry -- the West Virginia Legislature have recognized that --

THE COURT:  Read the coffee mug, sir.

MR. WIEST:  Sorry, Your Honor.

THE COURT:  It's all right.

MR. WIEST:  I'll get used to it --

THE COURT:  It's all right.

MR. WIEST:  -- being right next door.

But obviously, both houses of the West Virginia Legislature have recognized that there really isn't a need to do this to online students.

And if I may, Your Honor, I did want to briefly address what I call the compelling interest whack-a-mole that the defendants have in terms of it being about harm to -- preventing harm to other students.  You know, West Virginia freely allows homeschool students and learning pods to be unvaccinated, and yet they will not allow this virtual student to be unvaccinated.  I continue to scratch my head in terms of underinclusivity on that front.

But I do think you can consider the fact that the legislature thought it was unnecessary as part of your analysis.

THE COURT:  Okay.  Mr. Hissam?

MR. HISSAM:  Your Honor, I'll start with, when in doubt, to read the instruction manual.  The Constitution of West Virginia makes it quite clear how legislative enactment is enacted.

THE COURT:  Yeah.

MR. HISSAM:  So that would be our position, of course.

THE COURT:  Okay.  No.  Understood.

Upshur County have any thoughts on that?

MR. MOORE:  Nothing further, Your Honor.

USCA4 Appeal: 24-2132   Doc: 16   Filed: 01/06/2025   Pg: 428 of 608

THE COURT:  Okay.  Well, that dovetails into another question I had.  Because it seems this kerfuffle was initiated via that December of 2023 email from the state Superintendent.  Because the minor plaintiff here had already enrolled and participated in Upshur County's virtual academy without -- strikes me as without issue or without question.  Then there's this email from the state Superintendent that I assume went to all 55 counties.  And that's when folks started double-checking on vaccination status.

What -- if anybody knows, what changed?  Why was that missive sent, and why was it -- why did it need addressed at that point?  I'll start with Upshur County.

MR. MOORE:  Are you asking why the state sent that directive to the --

THE COURT:  Yeah.  What changed that prompted that?  Because 16-3-4 didn't change.  I mean, it's been in its current formulation for decades now, I believe.  Nothing is different about that.  I think the most recent iteration of the regula- -- state regs implementing 16-3-4 and, in particular, the exemption process were last approved by the legislature in 2015.  So why, eight years later, is this such a hot-button issue?

MR. MOORE:  Well, I think because -- and, you know, obviously I can't speak for why the state did what they did.  But I think, you know, since COVID, obviously, things changed a

lot. There was a lot of things that got moved online. I'm sure that there was a period of time that maybe the state considered that they needed to double-check to make sure that everybody was complying with the statute, even though that times have changed and things are online now a lot more than they used to be.

As far as the specifics of why the state felt it was necessary to do that now, I honestly don't know.

THE COURT: Okay. Ms. Hissam, any thoughts on --

MR. HISSAM: I don't know, Your Honor.

THE COURT: Okay. Plaintiffs' counsel, any --

MR. WIEST: No idea, Your Honor.

THE COURT: Okay. All right. I was just curious as to what changed. There does not appear to be any change in law, whether that's statute or implementing regulation or otherwise.

Let me ask this question. Upshur County, I'll start with y'all. Plaintiffs' counsel's point about homeschool students and learning pod students not being subject to vaccination -- compulsory vaccination requirements, why should virtual students be treated differently?

MR. MOORE: Your Honor, I think just because of the fact that we are a county board, we're still subject to the State Superintendent and the guidance that's being provided by them. You know, obviously, I don't know the specifics of what

maybe a homeschooler would be able to do in different counties. But the reality is, I mean, this whole discussion I think kind of comes back to the fact that the state really needs to be involved in this. I think they need to be a party.

THE COURT: That's a good effort. That was a good try.

MR. MOORE: I just -- I don't know what else I can say, Your Honor. But I think that it's a necessary discussion for them to be having.

THE COURT: That was a good effort at a hook. Okay. Noted.

All right. Counsel, thoughts on why we're drawing a distinction between homeschool and learning pod students compared to virtual students?

MR. HISSAM: Your Honor, I don't know for sure, but I suspect that learning pods were just not contemplated at the time of enactment. I will admit that I'm not real familiar with the concept. I've got an idea from just familiarity with COVID pods, quarantine pods. But I just don't think that at the time -- I mean, as you mention, we're talking eight years ago since somebody was tinkering with the regime -- regulatory regime.

THE COURT: Yeah.

MR. HISSAM: I don't think it was contemplated.

THE COURT: Counsel? That's another softball. I've

got to come up with one for the defendants.  But comments on the distinction state law currently draws between homeschool or learning pod students compared to virtual academy students.

MR. WIEST:  Your Honor, we would submit that they're substantially similar; that that's yet another secular exception to the regime that creates all kinds of both underinclusivity and, frankly, you know, problems under *Fulton* as well.

And there is no justification.  They are substantially similar, particularly when you look at this from either -- or any of the state interests that the defendants have asserted to try and justify this regime, especially as apply to this online student.

THE COURT:  Okay.  All right.  Let's take another ten-minute or so intermission, and then we'll try to wrap up for the day.  Thank y'all.  We'll be at ease for a few.

(Recess taken from 11:27 to 11:48 AM.)

THE COURT:  Just clearing up -- I know we've -- I've created sort of a to-do list for everybody as we've gone along.

Counsel, if you could today file the notice that was submitted to I assume the Attorney General of the state of West Virginia and then also, if you have it, the -- I don't know if it's an order or what it is, but the State Board assuming control of the Upshur County Board.

MR. WIEST:  And Your Honor, I did talk with defense

counsel on the break.  We are prepared to dismiss and stipulate to the dismissal of only the Upshur County Board defendant without prejudice.  Obviously, we'll keep the Superintendent in her official capacity as well as Ms. Marteney in her official capacity.  And then I think we will then completely obviate the Eleventh Amendment issue as to the agency at issue here.  So -- and they agree --

THE COURT:  Maybe.  But if the State Superintendent remains in official capacity, my concern here is whether we have subject matter jurisdiction as an initial threshold issue. Because I think it would be foolhardy for the Court to ignore what *Sonda* says, which again is there must be jurisdiction; then you get to the question of abstention.

And I -- the parties can do what they come to agree or whatever the plaintiffs want to do.  You-all are the masters of your complaint, of course.  But if anyone from Upshur County remains as a defendant in official capacity -- and maybe even an unofficial, personal capacity -- I think that issue still lingers.

And here is my plan at this point.  If, again, counsel could file those two things: the notice to the Attorney General and the state of West Virginia about this suit and the challenge to 16-3-4 and then, also, the -- and we'll drop an order sort of outlining all this as well -- again, I'm not sure whether it's an administrative order or what the magic document

is.

Do you guys know, Upshur County, what the magic operative document is from the state office?

MS. WILSON: It's an order of some type.

MR. MOORE: Yeah. It's just an order.

THE COURT: Okay. We'll call it an administrative order.

But if you have access to that, if you simp- -- if you wouldn't mind filing both of those things. Just file them so our record is complete and also so that the Court has easy access to them. I'd appreciate that.

Given our discussion and I think some, I'll say, loose ends at this point on the question of subject matter jurisdiction, by close of business, which I define as 5:00, on Thursday of this week, the 15th, the party -- each party is required to submit additional briefing to the Court on this question of Eleventh Amendment immunity, particularly as it pertains to the Upshur County defendants.

That would include and subsume into it this question of is Upshur County now a state government actor given the takeover by the State Board of Education? I would commend to everyone's reading Judge Goodwin's opinion on that. Give me one second. It's Docket Entry 126 in the *Workman* case, which is Case Number 2:09-CV-325. 2:09-CV-325. It's Docket Entry 126. It's Judge Goodwin's Memorandum, Opinion, and Order in the *Workman* case.

And then also, of course, the Fourth Circuit's decision in *Workman*, which touches on -- but I think it's a fair statement to say without exhaustive analysis of -- the Eleventh Amendment issue.

In light of *Sonda,* I think this Court needs to be mindful of ensuring that it has subject matter jurisdiction. I don't think *Sonda* broke new ground there. But it's, of course, been recently reiterated in this district that that's the first and foremost issue that we have to decide.

Coupled with that is application of *Ex parte Young.* I am fairly comfortable that I've got a firm grasp on that case's exception to Eleventh Amendment immunity applying here. But in light of Upshur County's need to fully address that, Thursday at 5:00 -- Thursday the 15th by 5:00 we need the parties' full thoughts on all of those issues.

Anyone have any questions on that mandatory briefing assignment before I foolishly make an offer to everyone? Any questions on the Court's mandatory briefing assignment?

MR. WIEST: Not from plaintiffs, Your Honor.

THE COURT: Okay. Mr. Hissam?

MR. HISSAM: No, Your Honor.

THE COURT: All right.

MR. MOORE: No, Your Honor.

THE COURT: Okay. All right. We've covered a lot of things today in a very, following my direction, sort of

scattershot way.  So I will foolishly open the door.  If anyone would like to submit any additional briefing on any of the issues we've covered today, you are free to do so by the same deadline, 5:00 on Thursday the 15th.

I would consider the record closed in terms of factual development.  We have affidavits and other things that have been submitted for the Court's consideration.  The parties have declined the Court's invitation to present any additional evidence here this morning.  So if you have additional argument, you may do so in writing by that deadline.  But do not consider the door open to additional factual development at this point.  If you believe there is additional factual development necessary, you should ask for leave of the court to do so at this point.

I think it would be imprudent to rule on the request for injunctive relief at this point given the issues surrounding certainly, at a minimum, plausible question about subject matter jurisdiction.

I set the 5:00 deadline on Thursday to keep this matter as on track as possible.  I'm certainly mindful of the first day of school.  In the plaintiffs' papers they indicate virtual school may start on the 15th.  Is that correct?  15th or 16th?

MR. WIEST:  Your Honor, it is -- I had this in my papers.  It looks like it starts on the 19th, and we asked

for relief by the 16th to allow her to enroll.

THE COURT: Okay. So it starts on Monday. Okay. No. Understood. We will not have a ruling on that by the 16th. We will be working on these issues as well as considering the parties' additional submissions. I cannot promise a ruling by the 19th, with my apologies, but we will get an order out as quickly as we can, mindful of the issue with the first day of school.

But no injunction issues from the bench today. Let me be clear about that. But we will rule on all of the issues as quickly as we can after we receive all the parties' additional briefing and other filings. But any ruling the Court would make without assuring itself of subject matter jurisdiction isn't worth the paper it's written on, in all candor, and would simply delay the process over that threshold issue. And so I think this is the most prudent way to proceed at this point. And then we'll be on the clock after that.

Anything else from plaintiffs' counsel at this point?

MR. WIEST: Not today, Your Honor. Thank you.

THE COURT: No. Thank you.

Mr. Hissam? Mr. Ritchie?

MR. HISSAM: No, Your Honor.

THE COURT: All right. Counsel?

MR. MOORE: No, Your Honor. Thank you.

THE COURT: Okay. We'll enter an order setting that

briefing schedule with direction to plaintiffs' counsel to file those additional two items. We'll look forward to receiving everyone's additional submissions by close of business on Thursday the 15th. And we'll stand -- otherwise stand adjourned pending further order of the Court. Thank you all very much.

(Proceedings concluded at 11:57 AM.)

CERTIFICATE


    I, Rachel Kocher, a Registered Professional Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action as reported by me stenographically, all to the best of my skill and ability.

    I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

    Given under my hand this 13th day of August 2024.


*Rachel Kocher*
_____
Rachel Kocher, RPR/CRR

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.* <br><br><br> *Plaintiffs,* <br><br> Against <br><br> STACEY MARTENEY *in her official capacity as the Virtual School Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District;* DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health;* AND BRYAN HOYLMAN, *in his official capacity as Chair of the Board of Directors of Mountain State Learning Solutions, Inc. d/b/a West Virginia Virtual Academy* <br><br> *Defendants.* | Civil Action No.: 2:24-cv-00018-TSK |

**PLAINTIFFS' SUPPLEMENTAL BRIEFING REGARDING _EX PARTE YOUNG_ EXCEPTION TO ELEVENTH AMENDMENT IMMUNITY AND OTHER ISSUES**

Following the August 12, 2024 hearing, the Court directed the parties to brief the issues of possible Eleventh Amendment immunity as to the Upshur County Defendants and invited briefing on any other issue raised during the hearing. (Dkt. 39.) Thus, Plaintiffs herein provide supplemental brief arguments concerning (1) potential Eleventh Amendment immunity; (2) standing and the Court's subject matter jurisdiction; (3) whether the government possesses a sufficiently "compelling" interest to enforce the statute against Plaintiffs; and (4) for argument's

1

sake, whether the West Virginia Equal Protection for Religion Act, W. Va. Code §35-1A-1 ("**EPRA**") is sufficiently "ambiguous" to trigger potential abstention under *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496 (1941).

## I.    ELEVENTH AMENDMENT IMMUNITY/*EX PARTE YOUNG*

In June 2023, West Virginia's Board of Education ("**WVBE**") entered an order whereby the WVBE took control and oversight over certain aspects of Upshur County schools. (ECF 40-2.)[1] This order, made pursuant to West Virginia Code section 18-2e-5(p)(4)(C), significantly limited the power of the Upshur County Board and delegated authority to the Deputy State Superintendent. Similarly, in *Workman v. Mingo County Schs*, 667 F. Supp. 2d 679 (S.D. W. Va 2009), the district court held that nearly identical action by the WVBE rendered the local school board an "arm" of the state. In an earlier order, the Court had observed that the plaintiff's claims "were not asserted against a state official, but rather asserted against" a state agency itself which

---

[1] This Order included the following:

5. *That the authority of the Upshur County Board of Education shall be limited in areas that compromise the delivery of a thorough and efficient education to its students as designated by the WVBE by rule, which may include delegating decision-making authority regarding these matters to the Deputy State Superintendent or her designee;*

6. *That the WVBE declare the Office of the County Superintendent of Upshur County Schools to be vacant at the end of the business day at 4:00 pm on June 14, 2023, and that any existing contracts be voided, as necessary;*

7. *That the WVBE appoint Stephen L. Wotring to be the interim Superintendent of Upshur County Schools starting June 15, 2023, and ending at the close of business June 30, 2023, at a salary to be determined by the Deputy State Superintendent or her designee;*

8. *That the WVBE grant the Deputy State Superintendent or her designee the authority to hire a county superintendent to replace the interim appointment and set his/her salary;*

12. *That the WVBE limit the authority of the Upshur County Board of Education as to finances, personnel, federal programs, and any other areas designated by the WVBE by rule and delegate decision-making authority to the Deputy State Superintendent or her designee regarding those matters;*

presents an *Ex parte Young* problem. *Workman v. Mingo Cnty. Schs*, No. 2:09-cv-00325, 2009 U.S. Dist. LEXIS 154020, at *7 (S.D. W. Va. May 27, 2009).

Recognizing this issue and in an effort to avoid it in the instant matter, at the recent hearing, Plaintiffs moved for, and Defendants did not object to, the dismissal of the Upshur County Board of Education, without prejudice, as a Defendant. (*See* Tr. Doc. 41, at pp. 82-83.)[2]

If the Court effects the parties' agreed dismissal of the Upshur County Board of Education as a Defendant that was agreed to on the record (*see* Tr. Doc. 41, at pp. 82-83), that leaves only Defendants Ms. Marteney and Superintendent Miller as Upshur County Defendants in their official capacities. If, for argument's sake, the Court assumes that these remaining official capacity Upshur County Defendants *do* have Eleventh Amendment immunity, the Court would still reach the same ultimate conclusion: the Court possesses jurisdiction over Plaintiffs' First Amendment claim because of the *Ex parte Young* exception to Eleventh Amendment immunity.

---

[2] Despite the *Workman* cases, there is a significant argument that this action by the WVBE did *not* render the Upshur County Board of Education an arm of the state. The analysis in *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 280 (1977), reached the opposite result. There, even where an Ohio school board was one of many boards around the state (as is true here in West Virginia) and received money from the state or had policies set by the state board of education, the Court found this *did not* render it an arm of the state because the board had local taxing powers and the power to issue bonds and, therefore, it more closely resembled a subdivision than an arm of the state. *Id.*

Further, in *Cash v. Granville County School Board of Education*, 242 F.3d 219, 221, 223-24 (4th Cir. 2001), the Fourth Circuit laid out the factors courts should consider in determining whether state entities are an arm of the state and therefore entitled to Eleventh Amendment immunity. The "most salient factor" is whether a judgment against the governmental entity would be paid from the state's treasury. *Id.* at 223 (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994)). Courts also consider: (1) the extent of the state's control over the entity; (2) "the scope of the entity's concerns—whether local or statewide—with which the entity is involved;" and (3) "the manner in which State law treats the entity." *Id.* at 224. After consideration of those factors, the *Cash* court held that the North Carolina county school board was more like a municipality than an arm of the state. *Id.* The "most salient" factor outlined in *Cash* further supports the notion that Eleventh Amendment immunity does not apply here to the Upshur Defendants because a judgment would not be paid from the state treasury. *See Gray v. Laws*, 51 F.3d 426 (4th Cir. 1995) (determining that looking at who is to pay any judgment is largely dispositive of the state versus local actor question). Here, any judgment against the Upshur County Defendants would be paid by Upshur County schools.

3

JA437

While the Eleventh Amendment technically bars a person from suing a state or its agency to seek injunctive relief, *see Cory v. White*, 457 U.S. 85, 91 (1982) ("Thus, the Eleventh Amendment by its terms clearly applies to a suit seeking an injunction"), a plaintiff *may* bring the suit against a state officer in his or her official capacity seeking prospective injunctive relief, thereby effecting the same result. *Seminole Tribe v. Florida*, 517 U.S. 44, 71 n. 14 (1996) ("An individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law.").

The very distinction that Plaintiffs make here was explained by Judge Goodwin in his first decision in *Workman*, 2009 U.S. Dist. LEXIS 154020 – that under *Ex parte Young,* a suit against the school board itself (if, for argument's sake, it is a state rather than local actor) is different than an action against Defendants Miller and Marteney in their official capacities. Judge Goodwin further explained that:

> Although the private plaintiffs in this case are primarily seeking equitable injunctive relief, the *Ex parte Young* exception does not permit this suit against DHHR because the plaintiffs' claims are not asserted against a state official, but rather are asserted against DHHR itself. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993); *Valero Terrestrial v. McCoy*, 36 F. Supp.2d 724, 746-47 (N.D. W. Va. 1997), *vacated on other grounds by Valero Terrestrial Corp. v. Paige*, 211 F.3d 112 (4th Cir. 2000). The Eleventh Amendment protects the state and arms of the state from suit in federal court. Agencies of the state are arms of the state and, therefore, the Eleventh Amendment bars suits against them. *See, e.g., Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 101 S. Ct. 1032, 67 L. Ed. 2d 132 (1981); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 65 S. Ct. 347, 89 L. Ed. 389 (1945); *Westinghouse Elec. Corp.*, 845 F.2d at 469.

*Id.* at *6-*7.

However, while the Eleventh Amendment bars suits against state agencies and "arms of the state," the exception born out of *Ex parte Young*, 209 U.S. 123, 130-131 (1908) permits suits

for prospective declaratory and injunctive relief against state (or local) *officers* who enforce or have a sufficient connection with a statute regarding its enforcement. Otherwise, there would be no practical way to stop enforcement of unconstitutional regulations. "*Young'*s applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Papasan v. Allain*, 478 U.S. 265, 277 (1986); *Griffin v. Cnty. School Bd. of Prince Edward Cnty.*, 377 U.S. 218, 228 (1964) (acknowledging that "suits against state and county officials" to enjoin unconstitutional action are permitted under *Ex parte Young*). In such cases, citizens can bring suits against a state officer, in his official capacity, where he has a "special relation" to the challenged act. *Id.* at 157. *See, also, Quern v. Jordan*, 440 U.S. 332, 346-49 (1979); *Edelman v. Jordan*, 415 U.S. 651, 665-69 (1974).

To meet the "special relation" requirement, the challenged official must have "proximity to and responsibility for the challenged state action," thus ensuring "that a federal injunction will be effective with respect to the underlying claim." *South Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324, 332-33 (4th Cir. 2008). This test does not require that the challenged statute specify the official's role, but where there are express obligations, the officer's duty is made clearer. *See Ex parte Young*, 209 U.S. at 157. Ultimately, the "important and material fact" is that "the state officer, by virtue of his office, has **some** connection with the enforcement of the act." *Id* (emphasis added).[3]

---

[3] During the hearing, the Court inquired about the request for attorneys' fees and costs under 42 U.S.C. 1988 and the Eleventh Amendment. The United States Supreme Court has held that the Eleventh Amendment does not bar such claims. *Maher v. Gagne*, 448 U.S. 122 (1980); *Hutto v. Finney*, 437 U.S. 678 (1978).

A.     The *Ex Parte Young* Exception to Sovereign Immunity Applies with Respect to Defendants Superintendent Miller and Ms. Marteney

Defendant Superintendent Christine Miller ("**Superintendent Miller**") is the duly empaneled Superintendent of the Upshur County School District and is being sued only in her official capacity as Superintendent. Her duties are outlined in W. VA. CODE § 18-4-10 and include enforcement of all policies and procedures by state law, including, as is relevant here, enforcement of the Compulsory Vaccination Law (the "**CVL**") against Plaintiffs and K.P. (Ver. Compl., Dkt. 1 ¶ 94). As noted, Superintendent Miller was appointed by the State Department of Education, and is subject, at present, to their oversight rather than that of the local board. (*See* ECF 40-2.) Among other things, statutory authority renders Superintendent Miller the "chief executive officer" of the board, and "under the direction of the state board, execute all its education policies." W. VA. CODE § 18-4-10(1) and "(10) Exercise all other authority granted by this chapter or required by the county board or state board." *Id.*

Defendant Stacy Marteney (**"Ms. Marteney"**) is the Virtual Learning Coordinator for the Upshur School District, the District through which Plaintiffs enrolled, and attempted to re-enroll, K.P. into the Upshur County Virtual Academy (the "**Virtual Academ**y"). *Id.* ¶ 92. Ms. Marteney is sued solely in her official capacity. *Id.* Ms. Marteney is tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL against school-aged children desiring to attend the Virtual Academy, and she enforced the CVL against the Plaintiffs and excluded K.P. from the Virtual Academy. *Id.* In fact, as the Complaint makes clear, Ms. Marteney was primarily responsible for the constitutional violations alleged as she denied Plaintiffs' religious exemption request, and she was at the tip of the spear when enforcing the CVL's unconstitutional requirements against Plaintiffs. *Id.* ¶¶ 75-79.

6

JA440

Moreover, W.V. Code §16-3-4(c) and (d), a portion of the CVL, places the onus partially on schools and school districts to enforce the CVL. Those sections provide:

> (c) No child or person may be admitted or received in any of the schools of the state or a state-regulated child care center until he or she has been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio,, rubella, tetanus and whooping cough or produces a certificate from the commissioner granting the child or person an exemption from the compulsory immunization requirements of this section.

and:

> (d) Any school or state-regulated child care center personnel having information concerning any person who attempts to be enrolled in a school or state-regulated child care center without having been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough shall report the names of all such persons to the commissioner.

*Id.*

Plainly, both Superintendent Miller and Ms. Marteney have the requisite degree of "some connection" with the CVL. *See Limehouse*, 549 F.3d 324, 332-33; *see also Bostic v. Schaefer*, 760 F.3d 352, 371 (4th Cir. 2014) (holding that circuit court clerk bore the requisite connection to the enforcement of state marriage laws because the plaintiffs could trace the denial of their rights to the clerk's role in enforcing the allegedly unconstitutional law).

In *Workman*, 667 F. Supp. 2d 679, 688, Judge Goodwin determined that the local Superintendent was not immune under the Eleventh Amendment under the *Ex Parte Young* exception and had the requisite degree of connection. That is the case here as well.

Separately, we anticipate that Superintendent Miller and Ms. Marteney may argue that Plaintiffs should have sued more people. After all, they argued that Plaintiffs should have sued the State Board of Education. Of course, the State Board of Education enjoys Eleventh Amendment immunity as a party, so that argument fails. *Cory*, 457 U.S. 85, 91. But more to the point, an injunction that runs to Defendants Marteney, Miller, and Dr. Christensen, and those acting in

7

JA441

concert with them under FRCP 65(d)(2), is sufficient to permit K.P.'s re-enrollment in virtual school after seeking a religious exemption through a process that comports with *Fulton's* requirements. *See Fulton v. City of Philadelphia,* 593 U.S. 522, 533 (2021) (holding that a regulation is not generally applicable if it "provid[es] 'a mechanism for individualized [secular] exemptions'" but does not allow for a commensurate religious exemption process).

At the end of the day, however, the fact that other officials may also be involved in the statutory enforcement does not prohibit standing or the issuance of injunctive relief against the Commissioner or the other remaining Defendants. *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047-1049 (6th Cir. 2015) (officials who may also be involved in enforcing a statute are not necessary if the parties named enforce or have a connection to the challenged law and the ability to effect relief). That is especially the case because FRCP 65(d)(2) permits injunctions to run not only to "officers, agents, servants, employees, and attorneys," but also to "other persons who are in active concert or participation," with those persons. In the same way, in *McGee v. Cole*, 66 F. Supp. 3d 747, 755 (S.D. W.Va. 2014), the Court rejected a similar argument that additional officials should have been named, observing that "defendants cannot require that plaintiffs join every possible party, when the parties sued are sufficient to award the requested relief." So too here.

**B.    The *Ex Parte Young* Exception Also Applies to Defendant Dr. Christensen**

Here, there are a myriad of statutory duties that establish that Dr. Christensen, the Public Health Commissioner, has sufficient statutory duties to connect him to the challenged law. First, under W.V. Code §16-3-4(d), persons who attempt to enroll in schools in contravention of the immunization requirement are required to be reported to Dr. Christiansen. Second, he is authorized to permit medical exemptions to the requirements under W.V. Code §16-3-4(h), but religious exemptions are prohibited, which is the critical issue rendering the CVL unconstitutional as

8

JA442

applied to Plaintiffs. Third, the Commissioner is empowered to detain and arrest persons who violate W.V. Code §16-3-4, pursuant to W.V. Code §16-3-1. He similarly is *specifically* charged with enforcement of all West Virginia public health laws, to include W.V. Code §16-3-4, pursuant to W.V. Code § 16-1-6(2) and (5). To that end, the Commissioner has promulgated regulations, an entire series of them in fact, that include express statements about his enforcement of the foregoing provisions. *See* W. Va. CSR § 64-95-1 ("The Commissioner has the authority to provide information or guidance to the public regarding the agency's interpretations, policy or opinions **upon the law enforced or administered by the Commissioner**. W. Va. Code §29A-1-2. … the rule will provide the public with information and clearly define the requirements and recommendations for immunizations for all children enrolled in a public, private, or parochial school in this state, or a state-regulated child care center.") (Emphasis added); *see also* W. Va. CSR § 64-95-14 ("A child who is delinquent for any required vaccination, or who has exceeded the provisional enrollment period, will be considered not to be in compliance with the law and this rule, and will be suspended from attending school until the appropriate vaccine(s) or laboratory evidence is received and the records are amended.").

The Commissioner has put out on his website explicit statements about what the law requires, including about the law's lack of religious exemption.[4]

Given issued regulations, an entire website devoted towards compliance with the statute by this Defendant, and a statutory mandate to enforce the challenged law, the Commissioner

---

[4] *See* https://oeps.wv.gov/immunizations/Pages/immunization_Requirements.aspx (explaining that "West Virginia law does not allow for non-medical exemptions for school entry") (last accessed 8/15/2024).

*See also* https://oeps.wv.gov/aboutus/Pages/default.aspx (last accessed 8/15/2024); ("The Office of Epidemiology and Prevention Services (OEPS) is a part of the West Virginia Department of Health and Human Resources Bureau for Public Health. … The mission of the West Virginia Division of Immunization Services (DIS) is to prevent and control vaccine-preventable diseases among children, adolescents and adults of West Virginia.").

clearly has the proximity and responsibility necessary to establish "some connection" with the challenged statute. *Ex parte Young*, 209 U.S. at 157; *see also, Bostic*, 760 F.3d at 371 (holding that circuit court clerk bore the requisite connection to the enforcement of state marriage laws because the plaintiffs could trace the violation of their constitutional rights to the clerk's role in enforcing the challenged law). *See Griffin v. Cnty. School Bd. of Prince Edward Cnty.*, 377 U.S. 218, 228 (1964) (acknowledging that "suits against state and county officials" to enjoin unconstitutional action are permitted under *Ex parte Young*).

This Court has jurisdiction over Plaintiffs' First Amendment claim through Defendants Ms. Marteney, Superintendent Miller, and Dr. Christiansen, who plainly meet the *Ex parte Young* exception to immunity for the prospective injunctive relief claims in this case.

## II. PLAINTIFFS HAVE STANDING AND THIS COURT POSSESSES SUBJECT MATTER JURISDICTION

It is anticipated that Defendants may argue Plaintiffs lack standing on grounds they have purportedly failed to show redressability as there is no defendant to this action that can redress the constitutional harms, or perhaps that an injunction will not reach every possible enforcer of the challenged statute.

Article III standing is comprised of three elements: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) an injury that will likely be redressed by a favorable decision. *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992). For this analysis, *only one* plaintiff needs standing. *See Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023). And a plaintiff need not wait until a government official initiates adverse action to have standing to sue to protect his First Amendment rights. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974). A plaintiff alleges sufficient injury in a pre-enforcement suit if she alleges (1) "intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and (2) there exists a credible threat of prosecution thereunder." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018).

Here, of course, Plaintiffs plead (and proved through verifications) that they have sincerely held religious beliefs that are substantially burdened by the Compulsory Vaccination Law; that they have suffered, and continue to suffer, constitutional violations, coercion, and various burdens including the disenrollment of K.P. from virtual school; and that obtaining an injunction would redress their injuries. (Ver. Compl., ECF 1 ¶¶ 1-6, 52-89, 270-282.) This is sufficient for standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Carter v. Fleming*, 879 F.3d 132, 138-140 (4th Cir. 2018).

Plainly, Plaintiffs have suffered an injury in fact: they are unable to continue to enroll their child (and K.P. is unable to continue to enroll) in the Virtual Academy due to the challenged law and Defendants' enforcement of the CVL against Plaintiffs. And there is plainly a causal connection between the injury and the conduct complained of. This Court can issue a prohibitory injunction to enjoin the Defendants—and those acting in concert with them under FRCP 65(d)(2)—from enforcing W.V. Code §16-3-4 against Plaintiffs to permit a religious exemption process by which K.P. can seek to continue to enroll in the Virtual Academy. *See Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) (appropriate to enjoin enforcement of unconstitutional statute).

Defendants have suggested that the State Board of Education, or others, should be added to this suit, but at the end of the day, the Supremacy Clause, and 42 U.S.C. § 1983, permits this Court wide leeway to fashion equitable relief. *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("discretion is necessarily broad"); *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ("court[s] ha[ve] broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs"). Said another way, Plaintiffs have standing and have sued enough

11

proper parties – namely those parties who can effect the continued enrollment of K.P. in her virtual program after duly considering her religious exemption request.

This Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 1343(a). This action arises under the First Amendment to the United States Constitution. And, having demonstrated both standing and application of the *Ex parte Young* exception to any Eleventh immunity arguments, this Court has jurisdiction to enter the requested relief.

## III.   ADDITIONAL ARGUMENT CONCERNING WHETHER THE GOVERNMENT POSSESSES A SUFFICIENTLY "COMPELLING" INTEREST TO ENFORCE THE STATUTE AGAINST PLAINTIFFS

This Court raised the issue in the hearing regarding the observation in *Workman v. Mingo County Bd. of Educ.*, 419 Fed. Appx. 348 (4th Cir. 2011) that "the state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest." *Id.* at \*353. *Workman* appears to have proceeded on the basis that the law at issue was neutral and generally applicable (neither of which is discussed in the opinion). In all events, *Fulton,* 593 U.S. 522, makes clear that the *Workman* court's analysis of compelling interest was improper. This Court should follow recent Supreme Court precedent from *Fulton* rather than a more than a decade old, non-binding precedent in *Workman.*

That is because government interests were, improperly according to *Fulton*, discussed in *Workman* at "a high level of generality." *Fulton*, 593 U.S. 522, 541. "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id., citing O Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U. S., 418, 431 (2006). "The question, then, is not whether the [Defendants] ha[ve] a compelling interest in enforcing its [vaccination] policies generally, but whether [they] ha[ve] such an interest in denying an exception to [Plaintiffs]." *Fulton*, 593 U.S. 522, 541.

After *Fulton*, this principle was reiterated by the Supreme Court, and has been scrupulously followed by lower courts. *See, e.g., Mast v. Fillmore Cnty*., 141 S. Ct. 2430, 2432 (2021) (Gorsuch, J., concurring) (emphasizing that where a state permits exceptions to a public health policy, it "must offer a compelling explanation why the same flexibility extended to others cannot be extended to" the plaintiff seeking a religious exemption under the First Amendment). On remand, the Minnesota Court of Appeals carefully followed Justice Gorsuch's directives. *See Mast v. Cnty. of Fillmore*, No. A22-1534, 2023 Minn. App., LEXIS 235, at *4 (Mn. Ct. App., July 10, 2023) (holding wastewater regulation failed strict scrutiny after finding the government's asserted public health goals lacked a "compelling state interest *specific*" to the Amish plaintiffs at issue) (emphasis added)).

As noted in prior briefing and at the preliminary injunction hearing, Defendants have never articulated why denying an exemption to Plaintiffs would actually advance a compelling state interest, or how the state has a compelling state interest in enforcing the CVL against a virtual student who has received most all of the required vaccines.[5]

## IV.    ADDITIONAL ARGUMENT CONCERNING *PULLMAN* ABSTENTION

For abstention to apply under *Pullman*, 312 U.S. at 500, there must be an ambiguous state law actually at issue in the litigation that has been "presented for decision". *Wise v. Circosta*, 978

---

[5] *See* Plaintiffs' Brief in Support of Preliminary Injunction, Dkt. 8, at 6 ("Most of the vaccines required under the CVL—including the pertussis, tetanus, diphtheria, polio, and meningitis vaccines—do not prevent infection and transmission, but rather operate to provide, at best, an undefined level of personal protection by preventing recipients from experiencing the symptoms of the target pathogens… Another vaccine required under the CVL—HepB—targets a disease not transmitted in a school setting") and at 13, n. 10 ("Again, four of the six mandated vaccines do not prevent infection and transmission and are for personal protection alone. See ECF 1, ¶¶ 101-111. Whatever risk-based interest the state claims is constrained to the two vaccines actually capable of stopping infection and transmission. Otherwise, the government could mandate any medical procedure it deems beneficial to the recipient, and K.P. has received doses of the two remaining vaccines that are capable of preventing infection and transmission. Id. at ¶¶ 112-115.").

F.3d 93, 101 (4th Cir. 2020) (en banc). In prior briefing, Plaintiffs focused on the CVL's lack of ambiguity as the only state law at issue in this case, which forecloses the option for *Pullman* abstention under *Wise.* However, the Court identified that EPRA has been raised by Defendants. (*See* Tr. Doc. 41, at pp. 28-31.) Even assuming for arguments' sake that EPRA was presented for decision (which it was not and never will be), this does not provide a foundation for abstention under *Pullman*.

Like the CVL, EPRA likewise is not ambiguous. In fact, Defendants assert it unambiguously allows for an alternative remedy to the First Amendment relief Plaintiffs seek. *Id.* at 28-29. Regardless, even if EPRA were somehow ambiguous (it is not), that would be of no event for the *Pullman* inquiry. For *Pullman* to potentially apply, an EPRA claim would have to have been "presented for decision" in this Court. *Wise*, 978 F.3d at 101; *see also Sonda v. W. Va. Oil & Gas Conservation Comm'n*, 92 F.4th 213, 215 (4th Cir. 2024). At best, EPRA provides another path to a remedy. But the Fourth Circuit has made clear in *Educational Servs. v. Maryland State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) that *Pullman* is not properly invoked where the state statute at issue merely "in effect duplicative of the constitutional claims alleged by" a Plaintiff. Again, Plaintiffs did not present for decision an EPRA claim in this Court, or in state court, and never will, as they understand that any relief potentially available under that state law would be transient and passing, subject to the shifting opinions of elected officials. (*See* ECF 1 ¶¶ 146-149.) Instead, Plaintiffs elected to pursue relief exclusively under the First Amendment, recognizing that their "right to . . . freedom of worship . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

JA448

Dated: August 15, 2024

Respectfully submitted,

JOHN H. BRYAN LAW

/s/ *John H. Bryan*

John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

SIRI & GLIMSTAD LLP

Aaron Siri, Esq.*
Elizabeth A. Brehm, Esq.*
Walker D. Moller*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (888) 747-4529
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

Christopher Wiest*
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*

*\*Pro hac vice*

JA449

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record.

Dated this 15th day of August, 2024.

/s/ *John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

        Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc.,
d/b/a West Virginia Virtual Academy*,

        Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE THOMAS S. KLEEH


**SUPPLEMENTAL BRIEF IN SUPPORT OF THE 11TH AMENDMENT IMMUNITY OF
DEFENDANTS STACEY MARTENEY, THE BOARD OF EDUCATION OF THE
COUNTY OF UPSHUR, AND CHRISTINE MILLER**

        Pursuant to this Court's recent Order dated August 12, 2024, Defendants The Board of

Education of the County of Upshur; Stacey Marteney ("Ms. Marteney"), in her official capacity as

Virtual Learning Coordinator of the Upshur County Virtual School; and Christine Miller

("Superintendent Miller"), in her official capacity as Superintendent of Upshur County Schools

(collectively, the " Upshur School Board Parties") assert that the Upshur School Board Parties

were merely "arms of the state" at the time of Plaintiff K.P.'s withdrawal from Upshur County

JA451

Virtual School in January 2024.  Moreover, the Upshur School Board Parties lacked enforcement authority and a "special relation" to the statute at issue; therefore, the *Ex Parte Young* exception to sovereign immunity does not apply.  Accordingly, the Upshur School Board Parties assert that they are entitled to 11th Amendment Immunity from suit.

### *Relevant Facts*

On June 14, 2023, the West Virginia Board of Education (the "State Board") authorized an immediate intervention of the Upshur County School system. *See* Exhibit 1, June 14, 2023 Minutes of the West Virginia Board of Education.[1]  As a result of the Special Circumstance Review[2], it was the recommendation of the West Virginia Department of Education (WVDE) that extraordinary circumstances existed in the county that constituted major impediments to the provision of education programs and services for students, and that the Upshur County school system be issued Non-approval status.  It was further recommended that since these extraordinary circumstances had been documented and existed, delaying the intervention by the State Board into Upshur County Schools for any period of time would not have been in the best interest of the students and staff in Upshur County in accordance with West Virginia § 18-2E-5."  *Id.*  The State Board made findings related to preliminary investigations and broadly delegated the county's statutory authority to the State Board.  *Id.  See also* W. Va. Code § 18-2E-5.  Among the State Board's findings was that "the authority of the Upshur County Board of Education *shall be limited in areas that compromise the delivery of a thorough and efficient education to its students as designated by the WVBE…*"  *Id*. at 6, finding no. 5.  (emphasis added).  In addition, the State

---

[1] On Monday, August 12, Plaintiff filed a Notice of Filings of Subsequent Documents of materials including Exhibit B to their filing, which is a press statement released by the WVDE, as opposed to an administrative order or the June 14, 2023 State Board minutes evidencing the State Board's unanimous vote approving former State Superintendent Roach's 18 enumerated recommendations related to Upshur County Schools (attached here as Exhibit 1)

[2] *See* Exhibit 2, the June 2023 Special Circumstance On-Site Review Report.

Board appointed Stephen L. Wotring as interim Superintendent and granted the Deputy State Superintendent the authority to hire a county superintendent to replace the interim. *Id.* Pertinent to the instant action, the State Board "*limited the authority of the Upshur County Board of Education as to finances, personnel, federal programs and any other areas designated by the WVBE…*" *Id.* at 6, finding no. 12 (emphasis added). Resultingly, on June 14, 2023, the State Board commenced its immediate intervention. *Id; See also* Exhibit 3, Affidavit of Jeffrey Kelley. In January 2024, subsequent to the State Board's takeover, K.P. withdrew from [Upshur County Virtual School] because she elected not to receive the required vaccinations due to religious beliefs. *Id*. *See generally* Compl.

### *Legal Authority*

**A.    The Eleventh Amendment provides immunity to the state for civil actions by a citizen against the state.**

The Eleventh Amendment states that: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. This amendment prohibits federal suits by a citizen of a state against that state. *Hans v. Louisiana*, 134 U.S. 1, 10 (1890). Under the Eleventh Amendment, plaintiffs are precluded from naming an arm of the state as a defendant. *See, e.g., Westinghouse Elec. Corp. v. W. Va. Dep't of Highways*, 845 F.2d 468, 469 (4th Cir. 1988) ("[A] claim against the West Virginia Department of Highways is, for Eleventh Amendment purposes, properly considered one against the state itself"). Eleventh Amendment immunity is jurisdictional in nature. U.S. Const. Amend. XI. *See also Suarez Corp. Indus. v. McGraw*, 202 F. 3d 676 (4th Cir. February 2, 2000). Specifically, the Eleventh Amendment is a jurisdictional limitation on the power of the federal courts. *See Westinghouse*, 845 F.2d at 469 (Where the 4th Circuit affirmed the district court's

holding that the claim was barred by the Eleventh Amendment and, therefore, dismissed the action for lack of subject matter jurisdiction).

Furthermore, "Constitutional provisions target state action, not individual officers."[3] However, there are exceptions to the Eleventh Amendment that allow a plaintiff to bring a civil action against a state in federal court, one such exception being the *Ex parte Young* exception. Nevertheless, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the ***enforcement*** of the act[.]" *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. 441; *Univ. of Pittsburgh Med. Ctr. v. Walker*, Civil Action No. 2:06–0890, 2007 WL 1575060, *4 (S.D.W.Va. May 30, 2007) (emphasis added). Further, "*Ex parte Young* requires a '***special relation***' between the state officer and the challenged statute to avoid the Eleventh Amendment's bar." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331, 52 ERC 1818 (4th Cir. 2001) (emphasis added). Specifically, a ***general*** authority to enforce the laws of a state is not a close enough relation. *Id.* (emphasis added).

### B.    The State Board Maintains Statutory Authority to Intervene in the County School Systems.

As provided in West Virginia Code Section 18-2E-5, the West Virginia Board of Education (the "State Board") maintains authority to intervene in the county school system as follows:

> (l) School system approval. -- The state board annually shall review the information submitted for each school system from the system of education performance measures and issue to each county board an approval status in compliance with federal law and established by state board rule.
>
> (m) Nonapproval for extraordinary circumstances.

---

[3] *See* Nick Daum, *Section 1983, Statutes, and Sovereign Immunity*, Yale L. J., https://openyls.law.yale.edu/bitstream/handle/20.500.13051/9439/19_112YaleLJ353_November2002_.pdf (last accessed on August 12, 2024).

(1) The state board shall establish and adopt additional standards to identify school systems in which the program may be nonapproved and *the state board may issue nonapproval status whenever extraordinary circumstances exist as defined by the state board*.

(2) When extraordinary circumstances exist, but do not rise to the level of immediate intervention as described in subsection (n) of this section, the state board may declare a state of emergency in the school system and shall direct designees to provide recommendations within sixty days of appointment for correcting the extraordinary circumstances. When the state board approves the recommendations, they shall be communicated to the county board. If progress in correcting the extraordinary circumstances, as determined by the state board, is not made within six months from the time the county board receives the recommendations*, the state board shall intervene in the operation of the school system to cause improvements to be made that will provide assurances that a thorough and efficient system of schools will be provided*. This intervention may include, but is not limited to, the following:

(A) *Limiting the authority of the county board in areas that compromise the delivery of a thorough and efficient education to its students* as designated by the state board by rule, which may include *delegating decision-making authority regarding these matters to the state superintendent* who may:

(B) Declare that the office of the county superintendent is vacant;

(C) Declare that the positions of personnel who serve at the will and pleasure of the county superintendent as provided in section one, article two, chapter eighteen-a of this code, are vacant, subject to application and reemployment;

(D) *Fill the declared vacancies [including the county superintendent] during the period of intervention*; and

(E) *Take any direct action necessary* to correct the extraordinary circumstance.

(n) Notwithstanding any other provision of this section, *the state board may intervene immediately in the operation of the county school system with all the powers, duties and responsibilities contained in subsection (m) of this section*, if the state board finds any of the following:

5
JA455

(1) A county board fails to act on a statutory obligation which would interrupt the day-to-day operations of the school system;

(2) That the conditions precedent to intervention exist as provided in this section; and that delaying intervention for any period of time would not be in the best interests of the students of the county school system; or

(3) That the conditions precedent to intervention exist as provided in this section and that the state board had previously intervened in the operation of the same school system and had concluded that intervention within the preceding five years.

W. Va. Code § 18-2E-5(l)-(n) (emphasis added).

## C.   The Eleventh Amendment entitles a County Board of Education under State Board intervention to immunity.

The United States District Court for the Southern District of West Virginia determined, on two separate occasions, that when the State Board intervenes in the school system pursuant to West Virginia Code Section 18-2E-5, the county board becomes an "arm of the state" for purposes of immunity.[4]   In the first instance, similar to the case at bar, a mother filed suit in federal court related to the denial of a religious exemption from compulsory public school immunization. *Workman v. Mingo County Schools*, 667 F. Supp. 2d 679 (S.D.W.Va. 2009).  Chief Judge Goodwin found that the county school board was entitled to state immunity under the Eleventh Amendment to the United States Constitution.  *Id.*  In its order, the *Workman Court* agreed and determined the immunity of the county board by analyzing the *Cash* factors to conclude that the county board of education under state intervention is an "arm of the state," as follows:

> The Fourth Circuit has enumerated a list of factors to determine whether an entity is an arm of the state. *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219 (4th Cir. 2001).

---

[4] *See Workman v. Mingo County Schools,* 667 F. Supp. 2d 679 (S.D.W.Va. 2009); *B.E. v. Mount Hope High School,* No. 2:11-CV-00679, 2012 WL 3580190 (S.D.W.Va. August 17, 2012) (memorandum decision).

While emphasizing that the most important factor "is whether a judgment against the governmental entity would have to be paid from the State's treasury," this factor is not necessarily dispositive:

To examine the nature of the entity and its relationship with the State, we keep the State treasury factor in the calculus and look to three additional factors:

*(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys;*

*(2) the scope of the entity's concerns—whether local or statewide—with which the entity is involved; and*

*(3) the manner in which State law treats the entity. Under this "sovereign dignity" inquiry, a court must, in the end, determine whether the governmental entity is so connected to the State that the legal action against the entity would ... amount to "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."*
....

With respect to the first *Cash* factor, the "degree of control that the State exercises over the entity" is immense; the "degree of autonomy from the State that the entity enjoys" is negligible. For example, the statute empowers the State Board to "[l]imit the authority of the county superintendent and county board" in "any ... area[ ] designated by the [S]tate [B]oard." W.Va. Code § 18-2E-5(p)(4)(C)(i).[5]

The second *Cash* factor, "the scope of the entity's concerns," is arguably more ambiguous; while the focus of the Mingo Board remains education in Mingo County, its takeover was conducted pursuant to a "process for improving education ... to provide assurances that ... high quality standards are, at a minimum, being met and that a thorough and efficient system of schools is being provided for all West Virginia public school students." W. Va. Code § 18-2E-5(a)(4).

But the *third Cash factor strongly suggests that the Mingo Board is an arm of the state*. A consideration of "the manner in which State law treats the entity" reveals that the *Mingo Board, after the takeover, has little to no rights of autonomy and self-control*. Instead*, the State Board is empowered to manage the schools* in Mingo County and accordingly control the Mingo Board. State law

---

[5] In its current iteration, this statutory guidance is located in West Virginia Code Section 18-2E-5(m)(2)(A).

subjects the Mingo Board to the State Board's authority in seemingly all spheres.

***The State Board is an arm of the state of West Virginia and protected under the Eleventh Amendment. Because the State Board now effectively controls the Mingo Board, the plaintiff's claims against the Mingo Board are constitutionally barred***. The Mingo Board's Motion for Summary Judgment is GRANTED.

*Workman*, 667 F. Supp. 2d at 686-687 (emphasis added).

In sum, the *Workman Court* found that the county board of education was entitled to the State's Eleventh Amendment immunity protection due to the intervention of the State Board in the operation of the county school district. *See Id. generally.* Judge Goodwin reasoned the State Board's intervention significantly limited the power of the county board and delegated authority to the State Superintendent such that the county board had little to no right of authority and self-control. *Id. See also W. Va. Bd. of Educ. v. Croaff*, No. 16-0532, 2017 WL 2172009 (May 17, 2017).

In the second instance, the United States District Court for the Southern District of West Virginia again determined that a county board of education was an "arm of the state" by virtue of State Board intervention and entitled to immunity pursuant to the Eleventh Amendment of the federal constitution. *B.E. v. Mount Hope High School,* No. 2:11-CV-00679, 2012 WL 3580190 (S.D.W.Va. August 17, 2012) (memorandum decision). In *B.E.*, the Plaintiff brought state law claims of negligent supervision, negligence, willful, wanton, and reckless conduct, intentional infliction of emotional distress, and negligent infliction of emotional distress. In seeking to avoid dismissal of claims on the basis of Eleventh Amendment immunity, plaintiffs contested the "extent and nature of the 'degree of control' that West Virginia exercised over the board." *Id.* at * 3. Relying on *Workman*, the *B.E.* Court ultimately found that, "[w]hen a county board of education is taken over by the state board of education pursuant to West Virginia Code § 18-2E-5, the county

board of education becomes an arm of the state and is entitled to the Eleventh Amendment immunity afforded to the state." *Id.* The Court reasoned that West Virginia Code Section 18-2E-5 granted the State Board such "broad powers" that application of the *Cash* factors led to the determination that a county board was, indeed, an arm of the state. *Id.* The Court summarized its findings as follows: "[I]n this case, the State Board took over the Fayette County Board, and thus the Fayette County Board is entitled to Eleventh Amendment immunity." *Id.* In *B.E.*, the Court dismissed the aforementioned claims based on the county board's Eleventh Amendment immunity resulting from the State Board's intervention.

Likewise, the Supreme Court of Appeals of the State of West Virginia ("WVSCA") has affirmatively recognized that State Board intervention pursuant to West Virginia Code Section 18-2E-5 entitles a county board to Eleventh Amendment immunity. The WVSCA has recognized that West Virginia Code Section 18-2E-5 "provides for the process of improving education, establishing education standards, conducting statewide assessments, requiring accountability measures, creating audit systems, establishing school accreditation levels, assigning school system approval levels, and intervening to correct low performance." *Goodwin v. Bd. of Educ. of Fayette Co.*, 242 W. Va. 322, 835 S.E.2d 566 (2019) (affirmatively citing *W. Va. Bd. of Educ. v. Croaff*, No. 16-0532, 2017 WL 2172009, at *1 (W. Va. May 17, 2017)). Moreover, the WVSCA was persuaded by the reasoning of the *Workman* and *B.E.* courts when it undertook a similar immunity analysis, albeit the determination of "state actor" for qualified immunity purposes. *See Id. generally.*

Resultingly, the *Goodwin* Court held that "[a] determination of whether a county board of education is entitled to assert qualified immunity as a state actor in a civil action, after the West Virginia Board of Education has intervened in the county school system pursuant to W. Va. Code

9
JA459

§ 18-2E-5 [2017], will depend upon the degree of control the West Virginia Board of Education exercises over the county's school system." *Goodwin*, 242 W. Va. at Syl. Pt. 2. The WVSCA held that "as a matter of first impression, [a] county board of education was a state actor" for immunity purposes. *See Id. generally.* Relying on Chief Judge Goodwin's reasoning in *Workman*, the WVSCA found two facts dispositive in determining that the county board was a state actor for immunity purposes: (1) that the State Board "exercised extensive, almost complete, control over the county board's school system" and (2) that the State Board imposed extensive restrictions on the country board. *Id.* at 329, 573.

**D.      State immunity under the Eleventh Amendment extends to "arms of the state" including to state agents and state officials.**

"Even though the language of the Eleventh Amendment preserves sovereign immunity of only the *States* of the Union, it is settled that this protection extends also to "state agents and state instrumentalities," or stated otherwise, to "arms of the State" and State officials." *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. March 1, 2001) (emphasis in the original) (cleaned up).

*Argument*

**A.      The Upshur School Board Parties are properly considered "arms of the state" and are entitled to Eleventh Amendment immunity.**

The relevant legal authority, including persuasive authority from this Court's sister Southern District Court, urges that the Upshur School Board Parties are "arms of the state" and thereby entitled to the immunity afforded by the Eleventh Amendment. In determining whether the county board, its employee (Ms. Marteney), and its superintendent appointed by the State Board ("Ms. Miller") are "arms of the state," it is necessary to consider the factors elucidated in *Cash*. *Cash*, 242 F. 3d at 223-24.

> "To examine the nature of the entity and its relationship with the State, we keep the State treasury factor in the calculus and look to three additional factors:
>
> (1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys;
>
> (2) the scope of the entity's concerns—whether local or statewide—with which the entity is involved; and
>
> (3) the manner in which State law treats the entity. *Id.* (internal citations omitted). "[A] court must, in the end, determine whether the governmental entity is so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.""

*Id.* (internal citations omitted).

Historically and currently, a board of education is a "creature of statute" with no powers other than those expressly given to it or that arise by necessary implication. *See, e.g., State v. Rouzer*, 127 W. Va. 392, 32 S.E.2d 865 (1945); *Dooley v. Board of Education*, 80 W. Va. 648, 93 S.E. 766 (1917). Accordingly, the county board may only act in the mode prescribed or authorized by statute. *Id.* Typically, a county board is liable in its corporate capacity for all claims legally existing against it. W. Va. Code § 18-5-5. In addition, county boards of education and public schools are financed primarily by the West Virginia Public School Support Plan, as codified in West Virginia Code Section 18-9A-1, et seq., as well as federal funds. Here, however, the State Board's intervention in Upshur County Schools authorizes the State Board to control the expenditure of funds towards the payment of any judgment against the Upshur School Board Parties. Moreover, the State Board **specifically** limited the county board's authority as to its finances.

11
JA461

Although not seeking damages, Plaintiffs seek attorneys' fees and costs under 42 U.S.C. § 1983. Furthermore, while such award for attorneys' fees against a county board of education would come from the county board's treasury, the county boards do receive state aid during the year with the intent of helping them run their school systems.  However, for the most part these funds are unrestricted. As such, theoretically, some of the state aid might end up being utilized to pay a judgment.  Therefore, although it is not certain whether the state's treasury will be affected by any judgment for attorneys' fees and costs against the Upshur School Board Parties, it appears likely.[6] However, even if the state treasury is not affected (which is unlikely), that factor is not dispositive. Indeed, through examination of the remaining *Cash* factors and keeping the state treasury factor "in calculus," it is evident that this civil action nevertheless "impinge[s] upon the sovereign dignity of …[the] State within our federal system."  *Cash*, 242 F. 3d at 225.

The first *Cash* factor addresses the degree of control that the State has over the county board and the corresponding degree of autonomy exercised by the State Board.  At the time of K.P.'s withdrawal from Upshur County Virtual School, the State Board was empowered through its intervention to manage the schools in Upshur County.  Through its intervention, the State Board broadly delegated the county board's statutory authority to the State Board.    *See* Exhibit 1; *See also* W. Va. Code § 18-2E-5.  As noted by the *Workman* Court, "[t]he powers enumerated in the statute are impressive.  Yet the State Board's powers exceed even these, since the statute itself declares that the State Board's intervention need not be limited to the listed powers."  *Workman*, 667 F. Supp. 2d at 687.

Here, among the State Board's directives was that "the authority of the Upshur County Board of Education shall be limited in areas that compromise the delivery of a thorough and

---

[6] The Upshur School Board Parties observe that the Board of Risk & Insurance Management ("BRIM"), that procures liability insurance on behalf of the state, declined coverage of the instant matter.

efficient education to its students as designed by the WVBE…" *Id.* (emphasis added). The State Board "limited the authority of the Upshur County Board of Education as to ***finances***, personnel, federal programs and ***any other areas designated by the WVBE***…" *Id.* (emphasis added). Here, as in *Workman*, the state school laws subjected the Upshur County Board of Education to the State Board's authority in "seemingly all spheres." *Workman*, 667 F. Supp. 2d at 686-687. At all times relevant to the Complaint, the State Board effectively controlled the Upshur Board.

Moreover, through its intervention, the State Board was empowered to appoint the interim Superintendent[7] and granted the Deputy State Superintendent the authority to hire a county superintendent to replace the interim. *See* Ex. 1. Ms. Miller, acting as the State Board-appointed superintendent, as well as Ms. Marteney, as an employee of State Board-controlled district, were subject to the near-total control of the State Board. Therefore, for purposes of the first *Cash* factor, the degree of control that the State exercises over the Upshur School Board Parties is immense and the degree of autonomy from the State that the Upshur School Board Parties enjoy is negligible. *Cash*, 242 F. 3d at 224.

The second *Cash* factor directs consideration of whether the School Board is involved with local or statewide concerns. Here, the record evidence relevant to this factor clearly points to the State Board's concern with statewide education generally. While the State Board was concerned specifically with resolving issues with the "provision of education programs and services for students" in Upshur County, the State Board has an overarching and ever-present duty imposed by the West Virginia Constitution for the "general supervision" of the public schools of the state. W. Va. Const. Art. 12 § 2. While its concerns included the local concerns of Upshur County, the State Board intervened in Upshur County largely pursuant to its statewide concern in education and its

---

[7] The State Board appointed Stephen L. Wotring for a limited time period and later Ms. Miller, named here as a defendant in her official capacity.

duty of general supervision of the state's public schools.  Therefore, consideration of the second *Cash* factor directs this Court to find that the Upshur School Board Parties were "arms of the state" at all times relevant to the Complaint.

The third *Cash* factor, "the manner in which State law treats the entity," demonstrates that the Upshur School Board Parties are indeed "arms of the state."  Here, as in *Workman*, the Upshur School Board Parties have "little to no rights of autonomy and self-control."  *Workman*, 667 F. Supp. 2d 687.  On the contrary, pursuant to its June 14, 2023 intervention, the State Board is the entity empowered to manage Upshur County Schools and, consequently, to control the Upshur Board, Ms. Miller, and Ms. Marteney, respectively.

Ms. Miller was appointed by the State Board as superintendent of Upshur Schools to manage Upshur Schools during the State Board's intervention.  Ms. Marteney was merely an employee of the State Board-controlled county.  Accordingly, Ms. Miller and Ms. Marteney are rightly considered "arms of the state."  Moreover, "[l]ocal officers, depending on the particular circumstances, may be entitled to Eleventh Amendment protection as agents of the state." *Workman*, 667 F. Supp. 2d at 688 (internal citation omitted).  The Supreme Court of the United States has further guided that a suit against a governmental officer "in his official capacity" is the same as a suit "against the entity of which the officer is an agent." *McMillian v. Monroe Co., Ala.*, 520 U.S. 781, 117 S. Ct. 1734 (1997) (cleaned up).  Here, Ms. Miller and Ms. Marteney were both agents of the State Board, given its intervention and near total control of Upshur Schools.  As the Upshur Board should enjoy Eleventh Amendment immunity from this civil suit, so, too, should Ms. Miller and Ms. Marteney, as agents and "arms of the state."

Under the Eleventh Amendment, plaintiffs are precluded from naming an arm of the state as a defendant. *See Westinghouse*, 845 F.2d at 469-470. ("The West Virginia Constitution contains

no provision subjecting the state to suit in federal court. Indeed, the state constitution specifically provides that "[t]he State of West Virginia shall never be made defendant in any court of law or equity..."). In sum and in consideration of all *Cash* factors, the Upshur School Board Parties are properly considered "arms of the state" during the relevant time period. Accordingly, the Upshur School Board Parties are entitled to Eleventh Amendment immunity.

> **B.     The "*Ex parte Young* doctrine" does not apply to enjoin the Upshur School Board Parties because they lacked enforcement authority and had no "special relation" to     the statute at issue.**

"*Ex parte Young* doctrine" allows private citizens, in proper cases, to petition a federal court to enjoin state officials in their official capacities from engaging in future conduct that would violate the United States Constitution or a federal statute. *Franks v. Ross*, 313 F.3d 184, 54 Fed. R. Serv. 3d 811 (4th Cir. December 4, 2002). Nevertheless, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act[.]" *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. 441; *Univ. of Pittsburgh Med. Ctr. v. Walker*, Civil Action No. 2:06–0890, 2007 WL 1575060, *4 (S.D.W.Va. May 30, 2007) (emphasis added). Otherwise, a plaintiff "is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Id.* The Fourth Circuit Court of Appeals has further explained that "*Ex parte Young* requires a 'special relation' between the state officer and the challenged statute to avoid the Eleventh Amendment's bar." *Waste Mgmt. Holdings*, 252 F.3d at 331. Moreover, a *general* authority to enforce the laws of a state is not a close enough relation. *Id.*

At most, the Upshur School Board Parties have only a general authority to enforce the laws of the state, but the relation is not close enough. Accordingly, the Upshur School Board Parties maintain that the *Ex parte Young* exception to the Eleventh Amendment sovereign immunity does

not apply and that they are not the proper parties to the instant suit. The mere fact that the Upshur School Board Parties have a general duty to enforce state law does not make them proper defendants in the instant action. Moreover, what general authority the School Board Parties had to enforce the allegedly unconstitutional statute was completed usurped by the State Board's intervention.

Here, Ms. Miller, the state-appointed superintendent, and Ms. Marteney, an employee, are properly considered "arms of the state" given the State Board intervention. Further, the Upshur School Board Parties had no "special relation" to the statute at issue, as required by *Ex parte Young* to constitute an exception to Eleventh Amendment immunity. The compulsory immunization statute at issue is located in the West Virginia State Code under Chapter 16, entitled "Public Health." It is *not* a school law under Chapter 18, Education, or Chapter 18A, School Personnel.

While the Upshur School Board Parties may have had a general duty to enforce this Public Health law, it is certain that they did not have a "special relation" to the statute at issue or its enforcement. Ms. Marteney is the Virtual Learning Coordinator for Upshur County Schools. Neither she nor Ms. Miller are medical professionals, nor do their positions generally include duties related to public health. As such, they have no "special relation" to the enforcement of Public Health laws that affect the public schools. Ms. Marteney's relation to the compulsory immunization statute was incidental, as she was merely attempting to comply with the immunization guidance[8] of the WVDE as it related to virtual students. Accordingly, Ms. Miller and Ms. Marteney's relation to the statute at issue is too attenuated for the *Ex parte Young* exception to Eleventh Amendment immunity to apply. Stated differently, "[t]he mere fact that [an official] is under a general duty to enforce state laws does not make him a proper defendant in

---

[8] That guidance is attached as Exhibit A to the Upshur School Board Parties' 12(b) Motion to Dismiss [Doc. 29].

JA466

every action attacking the constitutionality of a state statute." *Waste Mgmt. Holdings*, 252 F.3d at 331.

Here, Plaintiffs have named the Upshur School Board Parties as parties under the guise of their "official capacity."  However, due to the State Board's intervention, the only authority enforced during the subject time frame of January 2024 was the State enforcing its own authority. In *Workman*, Chief Justice Goodwin found that Mr. Dwight Dials, the county superintendent, was an "agent of the state" and entitled to the same Eleventh Amendment protections as the State Superintendent of Schools.  Similar to Mr. Dials, Ms. Miller was "hired by a state officer, to enact state policy."  Thus, as in *Workman*, Ms. Miller should be considered an agent of the state and entitled to Eleventh Amendment protections.  Likewise, Ms. Marteney, as an employee of the State Board-controlled county, had little to no autonomy regarding the enforcement of the law at issue. On the contrary, Ms. Marteney merely "enact[ed] state policy."  In actuality and in contravention of the "*Ex parte Young* doctrine," Plaintiffs have merely named the Upshur School Board Parties as representatives of the State, thereby attempting to make the State a party in Trojan-horse fashion.

### *Conclusion*

In conclusion, the Upshur School Board Parties assert that they are entitled to Eleventh Amendment immunity from this suit and that the *Ex parte Young* exception does not apply. Accordingly, the Upshur School Board Parties respectfully request that this honorable Court find that they are immune from the instant action under the Eleventh Amendment and that it dismiss them for lack of subject matter jurisdiction.

/s/ Robert J. Kent
Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, West Virginia 26102
(304) 420-5504
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

Counsel for Defendants The Board of
Education of the County of Upshur, Stacy
Marteney, in her official capacity and
Christine Miller, in her official capacity

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, individually and
on behalf of their minor child K.P.,

      Plaintiffs,

v.

STACY MARTENEY in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School; THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, in her
official capacity as Superintendent of the
Upshur County School District; DR. MATTHEW
CHRISTIANSEN, in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health; and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc.,
d/b/a West Virginia Virtual Academy*,

      Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE THOMAS S. KLEEH

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2024, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

counsel of record.

                                   */s/ Robert J. Kent*
                                   Robert J. Kent

19

17035432.1

**MINUTES**
**WEST VIRGINIA BOARD OF EDUCATION**
**Capitol Building 6, Suite 600**
**1900 Kanawha Boulevard, East**
**Charleston, West Virginia**
**June 14, 2023**

**I.**                                               **Call to Order**

Following the welcome and Pledge of Allegiance, President L. Paul Hardesty called the meeting of the West Virginia Board of Education (WVBE) to order at 9:00 a.m. on June 14, 2023, in Capitol Building 6, Suite 600, 1900 Kanawha Boulevard, East, Charleston, West Virginia.

The following members were present: President Hardesty, Vice President Nancy J. White, Robert W. Dunlevy, Victor L. Gabriel (via remote), F. Scott Rotruck, Daniel D. Snavely, Christopher A. Stansbury (via remote), Debra K. Sullivan, and James S. Wilson (via remote) and ex officio David L. Roach, State Superintendent of Schools. Member absent was ex officio Sarah Armstrong Tucker, Chancellor, West Virginia Higher Education Policy Commission and West Virginia Council for Community and Technical College Education.

**II.**                                           **Approval of Agenda**

President Hardesty requested that *New Business* items *A. Amendment - Kanawha County 2020-2030 Comprehensive Educational Facilities Plan (CEFP), B. Closure of Marmet Elementary School (Kanawha County), C. Closure of Grandview Elementary School (Kanawha County), and D. Closure of George C. Weimer Elementary School (Kanawha County)*, be moved to follow delegations and called for a motion to approve the adjusted agenda. Ms. White moved, and Mr. Rotruck seconded, that the adjusted agenda be approved. Upon the call for the question, the motion was carried unanimously.

**III.**                                             **Recognition**

The Board recognized Sherrard Middle School (Marshall County) as the 2023 History Bowl Champion.

**IV.**                                             **Delegations**

Mr. Dale Lee, President, West Virginia Education Association, addressed the Board regarding the HOPE scholarship and number of out of state schools receiving West Virginia taxpayer dollars and the Frontline hiring initiative. Mr. Fred Albert, President, AFT-West Virginia, addressed the Board regarding Ready. Read. Write. West Virginia. and concerns regarding artificial intelligence accountability.

**V.**                           **Amendment - Kanawha County 2020-2030**
**Comprehensive Educational Facilities Plan (CEFP)**

Mr. Micah Whitlow, Director, WVDE Office of School Facilities, and Dr. Thomas E. Williams Jr., Superintendent, Kanawha County Schools, presented for the Board's consideration, an amendment to the Kanawha County 2020-2030 CEFP to include a change in the county's

EXHIBIT
1

JA470

project priority list and the following closures and consolidations: 1) Marmet Elementary School proposed for closure and consolidation into the existing Chesapeake Elementary School; 2) Grandview Elementary School proposed for closure and consolidation into Edgewood Elementary School and Mary C. Snow West Side Elementary School; and 3) George C. Weimer Elementary School proposed for closure and consolidation into Alban Elementary School and Bridgeview Elementary School. These closures and consolidations were approved by the Kanawha County Board of Education and are proposed to occur at the end of the 2023-2024 school year.

Following discussion, Mr. Dunlevy moved, and Dr. Snavely seconded, that the Kanawha County Board of Education's request to amend their 2020-2030 CEFP be approved. Upon the call for the question the motion was carried unanimously. (Copy appended to Official Minutes, Attachment H.)

**VI.          Closure of Marmet Elementary School (Kanawha County)**

Mr. Whitlow and Dr. Williams presented the closure of Marmet Elementary School and its consolidation into Chesapeake Elementary School for the Board's consideration. This closure is not contingent upon any other actions and it is proposed to occur at the end of the 2023-2024 school year. The consolidation of these schools will enable Kanawha County Schools to operate their schools more efficiently. In consideration of this closure applicable West Virginia Board of Education policies were reviewed and followed. Documents were available for public inspection for the required amount of time and a closure hearing was held for Marmet Elementary School on May 2, 2023. A hearing for the receiving school, Chesapeake Elementary School, was held on May 2, 2023. The Kanawha County Board of Education voted to approve this closure and consolidation at their Board meeting at the conclusion of the hearings on May 2, 2023.

Following discussion, Mr. Rotruck moved, and Ms. White seconded, that the closure of Marmet Elementary School and its consolidation into Chesapeake Elementary School be approved. Upon the call for the question the motion was carried unanimously. (Copy appended to Official Minutes, Attachment I.)

**VII.         Closure of Grandview Elementary School (Kanawha County)**

Mr. Whitlow and Dr. Williams presented the closure of Grandview Elementary School and its consolidation into Edgewood Elementary School and Mary C. Snow West Side Elementary School for the Board's consideration. This closure is not contingent upon any other actions and is proposed to occur at the end of the 2023-2024 school year. The consolidation of these schools will enable Kanawha County Schools to operate their schools more efficiently. In consideration of this closure applicable West Virginia Board of Education policies were reviewed and followed. Documents were available for public inspection for the required amount of time and a closure hearing was held for Grandview Elementary School on May 3, 2023. Hearings for the receiving schools, Edgewood Elementary School and Mary C. Snow West Side Elementary School, were held on May 3, 2023. The Kanawha County Board of Education voted to approve this closure and consolidation at their Board meeting at the conclusion of the hearings on May 3, 2023.

Following discussion, Mr. Dunlevy moved, and Ms. White seconded, that the closure of Grandview Elementary and its consolidation into Edgewood Elementary and Mary C. Snow West Side Elementary Schools be approved. Upon the call for the question the motion was carried unanimously. (Copy appended to Official Minutes, Attachment J.)

- 3 -

**VIII.        Closure of George C. Weimer Elementary School (Kanawha County)**

Mr. Whitlow and Dr. Williams presented the closure of George C. Weimer Elementary School and its consolidation into Alban Elementary School and Bridgeview Elementary School for the Board's consideration. This closure is not contingent upon any other actions and it is proposed to occur at the end of the 2023-2024 school year. The consolidation of these schools will enable Kanawha County Schools to operate their schools more efficiently. In consideration of this closure applicable West Virginia Board of Education policies were reviewed and followed. Documents were available for public inspection for the required amount of time and a closure hearing was held for George C. Weimer Elementary School on May 4, 2023. Hearings for the receiving schools, Alban Elementary School and Bridgeview Elementary School, were held on May 4, 2023.  The Kanawha County Board of Education voted to approve this closure and consolidation at their Board meeting at the conclusion of the hearings on May 4, 2023. Dr. Wilson joined the meeting.

Following discussion, Mrs. Sullivan moved, and Mr. Dunlevy seconded, that the closure of George C. Weimer Elementary School and its consolidation into Alban Elementary School and Bridgeview Elementary School be approved.  Upon the call for the question the motion was carried unanimously. (Copy appended to Official Minutes, Attachment K.)

**IX.                              School Safety Update**

Mr. Jonah Adkins, Director, WVDE Office of PK-12 Academic Support, provided an update regarding school safety, thanked Homeland Security for the close relationship education enjoys with Homeland Security, spoke to the number of Prevention Resource Officers (PROs) in schools, and funding for PRO positions.  Also in attendance for the presentation was Mr. Rob Cunningham, Deputy Cabinet Secretary, West Virginia Department of Homeland Security.

**X.                                  Consent Agenda**

President Hardesty called for a motion to approve the Consent Agenda.  Dr. Snavely moved, and Mrs. Sullivan seconded, that the Consent Agenda be approved.  Upon the call for the question the motion was carried unanimously. (Copies appended to Official Minutes, Attachments A through G.)

- Approved the May 10, 2023, WVBE minutes (Attachment A)

- Received WVDE personnel matters  (Attachment B)

- Approved Monongalia County Schools' request for a limited waiver, for school year 2023-2024, of Policy 4321.1, Standards for Child Nutrition, to implement the a la carte pilot project at University High School, with the provision of selling federally compliant, USDA-approved Smart Snacks during the student lunch periods and directed that: 1) all beverages sold as part of this pilot project adhere to the WVBE requirement of being free from caffeine and non-nutritive sweeteners; 2) the Monongalia County Board of Education comply with all state and federal regulations and procurement standards; and 3) the Monongalia

- 4 -

County Board of Education work with the WVDE Office of Child Nutrition on reporting and technical assistance needs (Attachment C)

- Accepted the EPPRB's recommendation of approval of Marshall University's addition of a Clinical Teacher of Record Program with Webster County (Attachment D)

- Approved 2023 summer school programs  (Attachments E-1 and E-2)

- Received 2023-2024 County School Calendars
   Link to School Calendars: https://wvde.us/summary-of-county-calendar-dates/
   Link to Graduation Dates: https://wvde.us/west-virginia-high-school-graduation-dates/

- Approved Policy 5202, Minimum Requirements for the Licensure of Professional/Paraprofessional Personnel and Advanced Salary Classifications, effective 30 days from filing  (Attachments F-1 and F-2)

- Received an update from the West Virginia Schools for the Deaf and the Blind (Attachment G).

## XI.        Upshur County Schools Special Circumstance Review Report

President Hardesty requested Superintendent Roach provide a brief overview of the timeline culminating in the Upshur County review.  Discussion ensued regarding the Local Educational Agency Elementary and Secondary School Emergency Relief Fund Monitoring Report, accountability timeline, and process.

Mr. Jeffrey Kelley (distributed information), Accountability Officer, WVDE Office of Accountability and Assessment, presented the Upshur County Schools Special Circumstance Review Report for the Board's consideration.  At the direction of the State Superintendent of Schools, a Special Circumstance Review was conducted of Upshur County Schools in the areas of Operation of Federal Programs, Financial Indicators and Purchasing Procedures, and other concerns that were revealed during the course of the review.  Discussion ensued regarding the report and how it may evolve over time. (Copy appended to Official Minutes, Attachment M.)

## XII.                                    Break

President Hardesty called for a break at 10:55 a.m.

## XIII.                                 Call to Order

President Hardesty called the meeting back to order at 11:06 a.m.

## XIV.    Upshur County Schools Special Circumstance Review Report (Continued)
## Executive Session

Discussion continued regarding the report, next steps, and action recommended as a result of the current review.

- 5 -

Following Mr. Kelley's presentation President Hardesty requested a motion to enter into executive session. Ms. White moved, and Mr. Rotruck seconded, that the Board enter into executive session as provided in in W. Va. Code §6-9A-4(b)(2)(A) [personnel exception] and/or §6-9A-4(b)(6) [privacy exception]. Upon the call for the question the motion was unanimously carried; the Board moved into executive session at 11:20 a.m.

### XV.   Upshur County Schools Special Circumstance Review Report
### Return from Executive Session

President Hardesty announced the Board had returned from executive session at 12:54 p.m. with no action taken and announced that due to information recently presented, action regarding this item will be moved to later in the agenda.

### XVI.   WVBE Personnel Matters, Inclusive of Annual Evaluation of the State Superintendent of Schools, WVBE Attorney, and WVBE Secretary, and Litigation Update in B.P.J. by her next friend and mother, Heather Jackson v. WVBE, et al. Executive Session

President Hardesty called for a motion to enter into executive session. Ms. White moved, and Mr. Dunlevy seconded, that the Board enter in executive session for WVBE personnel and/or legal matters as provided in W. Va. Code §6-9A-4(b)(2)(A) [personnel exception] and/or §6-9A-4 [matters involving attorney-client privilege per *Peters v. County Commission*, 205 W. Va. 481 (1999)]. Upon the call for the question the motion was unanimously carried; the Board moved into executive session at 12:56 p.m.

### XVII.   WVBE Personnel Matters, Inclusive of Annual Evaluation of the State Superintendent of Schools, WVBE Attorney, and WVBE Secretary, and Litigation Update in B.P.J. by her next friend and mother, Heather Jackson v. WVBE, et al. Return from Executive Session

President Hardesty announced the Board had returned from executive session at 3:11 p.m. with no action taken and called for action regarding the Upshur County Schools Special Circumstance Review Report to be taken up.

### XVIII.   Upshur County Schools Special Circumstance Review Report (Continued)

President Hardesty called on Superintendent Roach to provide a recommendation regarding the Upshur County Schools Special Circumstance Review Report.

Superintendent Roach stated, "As a result of the Special Circumstance Review, it is the recommendation of the West Virginia Department of Education (WVDE) that extraordinary circumstances exist in the county that constitute major impediments to the provision of education programs and services for students, and that the Upshur County school system be issued Nonapproval status. It is further recommended that since these extraordinary circumstances have been documented and currently exist, delaying the intervention by the West Virginia Board of Education (WVBE) into Upshur County schools for any period of time would not be in the best interest of the students and staff in Upshur County in accordance with W. Va. Code §18-2E-5.

- 6 -

**WHEREFORE,** Based upon the Department's and State Superintendent's recommendation and the report from the Office of Accountability and Assessment, the WVBE finds the following:

Extraordinary circumstances exist in the Upshur County School system;

1) That Nonapproval status shall be assigned to Upshur County Schools;

2) That there is a state of emergency in Upshur County Schools regarding the information presented in the report;

3) That the conditions precedent to WVBE intervention in a county school system exist and delaying the intervention would not be in the best interests of the students or the staff of Upshur County Schools;

4) That the county board failed to act on a statutory obligation which interrupted the day-to-day operations of the school system;

5) That the authority of the Upshur County Board of Education shall be limited in areas that compromise the delivery of a thorough and efficient education to its students as designated by the WVBE by rule, which may include delegating decision-making authority regarding these matters to the Deputy State Superintendent or her designee;

6) That the WVBE declare the Office of the County Superintendent of Upshur County Schools to be vacant at the end of the business day at 4:00 p.m. on June 14, 2023, and that any existing contracts be voided, as necessary;

7) That the WVBE appoint Stephen L. Wotring to be the interim Superintendent of Upshur County Schools starting June 15, 2023, and ending at the close of business June 30, 2023, at a salary to be determined by the Deputy State Superintendent or her designee;

8) That the WVBE grant the Deputy State Superintendent or her designee the authority to hire a county superintendent to replace the interim appointment and set his/her salary;

9) That the WVBE declare the positions of personnel who serve at the will and pleasure of the county superintendent of Upshur County Schools to be vacant at the end of the business day at 4:00 p.m. on June 14, 2023, and that any existing contracts be voided, as necessary;

10) That the WVBE delegate to the Deputy State Superintendent or her designee the authority to fill positions of administrators and principals with individuals determined by the Deputy State Superintendent or her designee to be the most qualified for the positions;

11) That the WVBE grant the Deputy State Superintendent or her designee the authority to take action necessary to correct the extraordinary circumstances;

12) That the WVBE limit the authority of the Upshur County Board of Education as to finances, personnel, federal programs, and any other areas designated by the WVBE by rule and delegate decision-making authority to the Deputy State Superintendent or her designee regarding those matters;

JA475

13) That the WVBE delegate to the Deputy State Superintendent or her designee the authority to conduct hearings on personnel matters, the referral of investigations to other agencies and the authority to appoint a designee for the limited purpose of conducting hearings while reserving to the Deputy State Superintendent the authority to render the resulting decision, if needed;

14) That the WVBE limit the authority of Upshur County Board of Education as to the ability to conduct real estate transactions and delegate to the Deputy State Superintendent or her designee the authority to act in lieu of the Upshur County Board of Education in a transfer, sale, purchase, or other transaction regarding real estate;

15) That the WVBE delegate to the Deputy State Superintendent or her designee the authority to replace administrators and principals in low performing schools and to transfer them to alternate professional positions within the county at her discretion;

16) That the WVBE delegate to the Deputy State Superintendent or her designee the authority to fill positions of administrators and principals with individuals determined by the Deputy State Superintendent to be the most qualified for the positions;

17) That the WVBE direct the interim and future Upshur County Superintendents and the Deputy State Superintendent, after consultation with the Upshur County Board of Education, to jointly develop and present to the State Board at a future meeting a set of standards and/or a strategic plan that must be implemented in order for the Upshur County Board of Education to regain control of the school system; and

18) That the WVBE direct the interim and future Upshur County Superintendents to provide written and/or oral progress reports to the WVBE as requested."

President Hardesty called for a motion regarding the State Superintendent's recommendations. Ms. White moved, and Dr. Snavely seconded, that the recommendations be approved. Upon the call for the question the motion was carried unanimously.

XIX.                                    **WVDE Reports**

Superintendent Roach, assisted by Ms. Christy Day, Director, WVDE Communications Office, provided a brief update regarding the literacy and numeracy initiatives.

XX.            **WVBE Personnel Matters, Inclusive of Annual Evaluation
of the State Superintendent of Schools, WVBE Attorney,
and WVBE Secretary, and Litigation Update in
B.P.J. by her next friend and mother, Heather Jackson v. WVBE, et al.
Executive Session**

President Hardesty called for a motion to enter into executive session to complete employee personnel evaluations. Ms. White moved, and Mrs. Sullivan seconded, that the Board enter in executive session for WVBE personnel and/or legal matters as provided in W. Va. Code §6-9A-4(b)(2)(A) [personnel exception] and/or §6-9A-4 [matters involving attorney-client privilege per *Peters v. County Commission*, 205 W. Va. 481 (1999)]. Upon the call for the question the motion was unanimously carried; the Board moved into executive session at 3:20 p.m.

- 8 -

**XXI.**      **WVBE Personnel Matters, Inclusive of Annual Evaluation of the State Superintendent of Schools, WVBE Attorney, and WVBE Secretary, and Litigation Update in B.P.J. by her next friend and mother, Heather Jackson v. WVBE, et al. Return from Executive Session**

President Hardesty announced the Board had returned from executive session at 3:38 p.m. with no action taken and called on Ms. White to announce the result of the State Superintendent's evaluation. Ms. White announced, in accordance with W. Va. Code §18-3-1, that the State Superintendent received a satisfactory evaluation.

President Hardesty called for a motion to approve the Board's personnel attachment. Mr. Rotruck moved, and Dr. Snavely seconded, that the personnel attachment be approved. Upon the call for the question the motion was carried unanimously. (Copy appended to Official Minutes, Attachment L.)

**XXII.**      **WVBE Member Updates and Requests for Information**

Mrs. Sullivan attended several events and worked on several WVBE policies. Mr. Rotruck participated in a number of education related events. Mr. Dunlevy attended several meetings of the WVSSAC and plans to attend a Superintendent's meeting later this month.

**XXIII.**      **Future Meetings**

President Hardesty announced that the next regular meeting of the WVBE will be held July 12, 2023, at 9:00 a.m., in Charleston, West Virginia.

**XXIV.**      **Adjourn**

President Hardesty called for a motion to adjourn. Mr. Rotruck moved, and Mr. Dunlevy seconded, that the meeting be adjourned. Upon the call for the question the meeting was adjourned at 3:41 p.m.

Minutes approved by the Board on July 12, 2023.

_____
**L. Paul Hardesty, President**

_____
**Nancy J. White, Vice President**

Minutes were recorded by
Virginia M. Harris
Secretary to the Board
WVBEMinutes6/14//23

JA477

# SPECIAL CIRCUMSTANCE

## ON-SITE REVIEW REPORT

**Upshur County**

June 2023



**Office of Accountability & Assessment**

EXHIBIT
2

JA478



**West Virginia Board of Education**
**2022-2023**

**L. Paul Hardesty**, President
**Nancy J. White**, Vice President
**F. Scott Rotruck**, Financial Officer

**Robert W. Dunlevy**, Member
**Victor L. Gabriel**, Member
**Daniel D. Snavely, M.D.**, Member
**Christopher A. Stansbury, O.D.**, Member
**Debra K. Sullivan**, Member
**James S. Wilson, D.D.S.**, Member

**Sarah Armstrong Tucker, Ph.D.,** Ex Officio
Chancellor
West Virginia Higher Education Policy Commission
West Virginia Council for Community and Technical College Education

**David L. Roach,** Ex Officio
State Superintendent of Schools
West Virginia Department of Education

# Table of Contents

Introduction........................................................................................................................................................2

Onsite Review Team Members..........................................................................................................................2

Background ......................................................................................................................................................3

Focus Area 1: Operation of Federal Programs ..............................................................................................6

Focus Area 2: Financial Indicators and Purchasing Procedures.................................................................8

# Introduction

The West Virginia Department of Education (WVDE) Office of Federal Programs conducted a routine monitoring of Upshur County in December of 2022. This resulted in a report of findings which was completed February 10, 2023. Per Federal Program protocols, counties are provided 60 days to respond to findings; establishing Upshur County's deadline for response as May 8, 2023. The State Superintendent of Schools notified the Office of Accountability the week of May 8, 2023, of his intent to commence a Special Circumstance Review of Upshur County Schools. This put into motion planning phases inclusive of team members from the Offices of Accountability, Federal Programs, and Finance. The team began its Special Circumstance Review of Upshur County Schools on May 22, 2023. The review process, consisting of interviews and document review, is being conducted as outlined in West Virginia Board of Education (WVBE) Policy 2322: West Virginia System of Support and Accountability.

The review team compiled the information gathered thus far during the onsite review. This report will be presented to the West Virginia Board of Education (WVBE) at the June 2023 meeting. The Review is on-going.

# Onsite Review Team Members

Uriah Cummings, Director, School Finance, WVDE
Matthew Hicks, Director, Office of Accountability, WVDE
Mami Itamochi, Coordinator, ESEA Programs, WVDE
Jeff Kelley, Accountability Officer, WVDE
Elizabeth McCoy, Coordinator, ESEA Programs, WVDE
Laura Pauley, Director, ESEA Programs, WVDE

# Background

Upshur County Schools consists of seven elementary schools, one middle school, one high school, and one technical center serving a student population of approximately 3,759 students. Figures 1 and 2 illustrate county proficiency data for English language arts and mathematics for school years 2015-2022. Proficiency data is not available for SY 2019-2020 due to the COVID-19 National Emergency.

*Figure 1*



*Figure 2*



On February 10, 2023, a report outlining the routine monitoring of Federal Programs yielded concerns regarding Upshur County School's use of ESSER (Elementary and Secondary School Emergency Relief) funding. This significant funding was allocated in three funding packages. The CARES (Coronavirus Aid, Relief, and Economic Security) Act was passed in March 2020 and was distributed in two portions: ESSER I and the Governor's Emergency Education Relief (GEER) Fund. The CRRSA (Coronavirus Response and Relief Supplemental Appropriations Act) passed in December 2020. The portion of this funding specifically for education is referred to as ESSER II. The American Rescue Plan (ARP) passed in March 2021 and included a portion reserved for education known as ARP ESSER, or ESSER III. Figure 3 below summarizes the three funding phases and their approved uses.

*Figure 3*

| | CARES/ESSER I<br>March 2020 | CRRSA/ESSER II<br>December 2020 | ARP/ESSER III<br>March 2021 |
|---|---|---|---|
| Funding for Nationwide K-12 Education | $13.2 billion | $54.3 billion | $123 billion |
| Obligation Deadline | September 2022 | September 2023 | September 2024 |
| Funding Allocated to West Virginia | $102,616,779 | $353,260,088 | $793,503,190 |
| Funding Allocated to Upshur County Schools | $1,184,896 | $4,615,749 | $10,411,578 |
| Uses | · Summer learning<br>· Providing mental health services<br>· Educational technology including hardware and software<br>· Activities to address the unique needs of various subgroups, including students with disabilities, English learners, as well as students experiencing homelessness, low income, or in foster care;<br>· Preparedness and continuity of services | Same as CARES, plus:<br>· Activities to address learning loss.<br>· Preparing schools for reopening<br>· Projects to improve air quality in school buildings | |

In addition to the federal programs monitoring report, the WVDE received a letter written on behalf of a concerned citizens group dated March 28, 2023. The letter requested a "complete and forensic audit" of the finances of Upshur County Schools, specifically with regard to federal funding. In response to these concerns regarding the use of federal funding, WVDE personnel monitored additional information regarding financial indicators and purchasing procedures at the Upshur County Schools' central office.

*NOTE: The extensive amount of information the Team collected during the on-site review process necessitates a thorough and detailed analysis to generate a comprehensive report of all findings, recommendations, and corrective actions. The contents of this preliminary report represent the substantiated findings available as of the June 2023 WVBE meeting. Additional updates will be provided to the WVBE as information becomes available.*

5

# Focus Area 1: Operation of Federal Programs

## 1. The LEA only spends funds for allowable activities (2 C.F.R 200.302, 200.430)

**Procedures Conducted:**

A sampling of financial records (representing less than 1% of total transactions covering four fiscal years) was reviewed to check for allowable costs.

**Noncompliance(s):**

- The Team identified 12 instances of contracts that included food and beverage charges for staff retreats for Stonewall Resort totaling $49,260. Food and beverage expenses for conferences are not an allowable expenditure with Federal funding. Overnight accommodation was provided for staff at Stonewall Resort, which is 25 miles from the board office. This would not be considered a reasonable and necessary cost to the federal award. No sign-in sheets or meeting agendas were provided to support the need to have retreats at Stonewall Resort.

- The Team noted 14 contracts that appeared to include food and beverage charges for staff retreats at CJ Maggie's, a local restaurant, totaling $21,834.29. The food and beverage charges were confirmed through staff interviews. Food and beverage expenses for conferences are not an allowable expenditure with Federal Funding. One sign-in sheet was provided, and no meeting agendas or room rental agreements were provided to support the need to have retreats at this location.

- The Team discovered an instance of a contract for a staff retreat at a bed and breakfast in Buckhannon totaling $1,415.94. Overnight accommodation was provided at the bed and breakfast, which is located six miles from the board office. This would not be considered a reasonable and necessary cost to the federal award. No supporting documentation was provided to support the usage of the bed & breakfast.

- Two instances of food being provided for school events that included staff were noted totaling $810. Food and beverage expenses for staff or meetings of the general public are not an allowable expenditure. No sign-in sheets or agendas were provided to support these events.

- The Team found one instance of the P-Card being used to purchase Sheetz gas cards totaling $100 which were charged to Title I. No documentation was provided to support the purchase of the gas cards.

- Several areas of noncompliance occurred related to the 2021 Model Schools Conference charged to Title II. A purchase order (PO) was created in the amount of $34,000, but the district continued to modify the purchase and add individuals to the registration after the PO was approved. The actual cost totaled $38,000. The registration list included an individual that does not appear to be an Upshur County employee. Additionally, the registration list included individuals who, based upon their job titles, should not have attended a Model Schools conference being paid for with Title II funds. A charter bus appears to have been reserved for travel to the Model Schools Conference but was later cancelled. As a result, the district paid a $250 cancellation fee, which is a violation of WVBE Policy 8200.

6

- The Team noted several areas of noncompliance related to travel expenditures. Upshur County Schools does not have a sufficient travel policy. In the absence of a travel policy, GSA (General Services Administration) travel procedures and policies are to be followed when expending federal funds. There were several instances where individuals received reimbursement for meals on single-day travel, potentially creating taxable compensation to the employees being reimbursed. In one instance, an individual submitted mileage reimbursement for 8 different days, but was paid for nine days. There were many instances where there was not out of county travel and/or professional leave forms provided (even though the county has a policy requiring them). Further, individuals were reimbursed for daily meals exceeding the amount allowable by the GSA.

- The Team noted instances of a significant amount of federal funding being used to pay for Out of Calendar Days for employees with contracts of 240 days up to executive level employees with 261 day contracts. These payments were paid at rates substantially higher than the individual's normal daily rates. These payments were not board approved and were not supported by records showing actual time worked. In the case of the three 261 day employees, they were already being paid under their normal contract to work those days and received additional federal compensation totaling $75,100. Charges to federal awards for salaries must be based upon records that accurately reflect the work performed and must be supported by a system of internal controls which provide reasonable assurance that the charges are accurate, allowable and properly allocated. These expenditures would not be an allowable use of funds under the federal award.

### 2. The LEA has a system of internal controls (2 C.F.R. 200.303)

***Noncompliance(s):***
- During testing, the team noted several instances of overrides in internal controls. There were seven instances where purchases with federal funds were not approved by the Federal Program Director. We noted nine instances where an "approved" stamp was used in the place of an authorizing signature. In addition, there were two instances where purchase orders were completed after the invoice date.

### 3. The LEA maintains written standards of conduct covering conflicts of interest (2 C.F.R 200.303)

***Noncompliance(s):***
- The district does not have a policy covering conflicts of interest. They do have a Policy of Fiscal Administration, but the policy does not address conflicts of interest.

# Focus Area 2: Financial Indicators and Purchasing Procedures

*1. Insufficient local policies and procedures – On the first day of on-site review, the finance review team requested copies of the following local policies and/or procedures: Purchasing/procurement, travel, P-Cards/credit cards, and overtime/extracurricular/supplemental compensation. Additional policies requested after the beginning of the on-site review included: leave and attendance/personal leave incentive policies. During review of the policies provided by district staff, the following areas of noncompliance were identified:*

- **No P-Card/credit card policy –** The district did not provide, and the finance review team could not locate online a local policy that governs the use of the county's P-Card and other credit cards. Section 1.3 of the West Virginia State Auditor's Office (WVSAO) Purchasing Card Policies and Procedures manual requires local spending units to develop and document appropriate internal control procedures to ensure proper program oversight, compliance with P-Card Policies and Procedures and that P-Card usage is consistent with the WVSAO manual. Furthermore, Section 27 of West Virginia Board of Education (WVBE) Policy 8200, Purchasing Policies and Procedures Manual for Local Educational Agencies, states, "an LEA may establish by board policy a credit card program as an alternative payment method when making purchases of commodities and services, or for the payment of authorized travel expenses." In the absence of a local policy, an LEA does not have authority to operate a credit card program.

- **Insufficient travel policy –** The district's travel policy is included as a single paragraph within Upshur County Schools (UCS) Policy 8006, Salary Schedules and Other Compensation. No separate travel policy was provided by the district or could be located online by the review team. During review of the travel section of UCS Policy 8006, the policy was deemed to be insufficient as it does not provide for an appropriate level of consistent internal controls and procedures. Specifically, the policy does not address areas such as out-of-state travel, General Services Administration (GSA) per diem reimbursement limits, transportation other than by personal vehicle, Internal Revenue Service (IRS) reimbursement limits, reimbursement of registration fees, required supporting documentation when filing a claim for reimbursement, timing of authorization before travel, analysis of reasonable rate of employee attendance when more than one employee seeks to attend a training opportunity, etc. Furthermore, the review team reviewed evidence of the use of district P-Cards/credit cards for payment of travel expenses. However, the travel policy does not address such methods of payment for travel expenses.

- **Insufficient purchasing/procurement policy –** During review of UCS Policy 8001, Policy of Fiscal Administration, the policy was deemed to be insufficient as it does not provide for an appropriate level of consistent internal controls. UCS Policy 8001 states that the Board shall adhere to the purchasing procedures contained in WVBE Policy 8200. UCS Policy 8001 provides for stricter approval authority levels than those contained within WVBE Policy 8200. However, UCS Policy 8001 addresses no other purchasing procedures. While it is deemed appropriate for the Board to follow WVBE Policy 8200, WVBE Policy 8200 only establishes the minimum system of purchasing rules and regulations that are to be followed by a county board of education. WVBE Policy 8200 encourages districts to develop local policies, practices and procedures that supplement the provisions of WVBE Policy 8200 (§126-202-3.3). Furthermore, the policy does not include elements required by WVBE Policy 8200, Purchasing Policies and Procedures Manual

---

8

for Local Education Agencies." Specifically, section 28.2.1 of WVBE Policy 8200 requires LEAs to establish by local board policy the procedures to be followed in the case of an emergency at the local level that has not been declared an emergency by the Governor." UCS Policy 8001 does not include procedures for local emergencies and no separate policy addressing local emergencies was provided by district staff or could be located online by the review team.

• **Insufficient leave policy –** During review of UCS Policy 5006, Employee Absence/Leave, the policy was deemed to be insufficient as it does not address all types of leave currently provided to various groups of employees throughout the district. Specifically, the policy does not address the following areas:

  » ***Annual/vacation leave –*** the policy does not address which employees or groups of employees are eligible to receive annual/vacation leave, the rate at which such leave is accrued, whether such days accumulate with or without limit, and whether such days are payable to the employee upon separation of service and at what rate.

  » ***Outside the school environment (OSE) days –*** the policy does not address OSE days, six of which are required to be included in the minimum 200-day employment calendar under WVBE Policy 3234, School Calendar.

  » ***Out-of-calendar (OC) days –*** the policy does not address OC days, which are defined in WVBE Policy 3234 as "a nonpaid day that is not included as part of the minimum employment term."

• **Personal leave incentive program inconsistent with authorizing statute –** UCS Policy 5026, Personal Leave Incentive Program, is not consistent with W. Va. Code §18A-4-10a, which states, "County boards of education are authorized to pay to their employees or to defined groups thereof, for the purpose of reducing absenteeism, a bonus at the end of an employment term for each unused day of personal leave accumulated by the employee during that employment term." Under UCS Policy 5026, employees are eligible for a $400 bonus if they use three or less personal leave days (sick leave) each year, or if they accumulate a balance of personal leave days (sick leave) in relation to their years of service in accordance with a table provided in the policy. Given that UCS Policy provides a lump sum payment of $400, rather than a bonus for each unused day of personal leave accumulated, USC Policy 5026 is deemed to be inconsistent with W. Va. Code §18A-4-10a.

• **Insufficient salary/compensation policy –** UCS Policy 8006, Salary Schedules and Other Compensation, does not address the positions of superintendent, assistant superintendent, and treasurer. Policy 8006 should, at a minimum, address contract lengths, how salaries are to be determined, and types of leave available to these employees. Policy 8006 addresses those topics for other employees and groups of employees within the district.

### 2. Employment of unlicensed/uncertified staff – During the initial review, the review team became aware of two instances in which the district employed individuals who did not hold and did not apply for licenses/certificates from the West Virginia Department of Education. Furthermore, one of those instances appears to involve nepotism.

- **Treasurer –** The UCS Treasurer does not hold and has not applied for the appropriate certification from the WVDE. *WVBE Policy 5202, Minimum Requirements for the Licensure of Professional/Paraprofessional Personnel and Advanced Salary Classifications*, provides for a mechanism by which school districts can ensure they are hiring qualified professionals for their finance office. Although not required by statute or WVBE Policy 5202, the West Virginia Department of Education encourages districts to employ treasurers who satisfy the Professional Business Official Certificate requirements contained within WVBE Policy 5202.

- **Summer Learning Academy Teacher –** During interviews with central office staff, the review team became aware of the hiring of the then superintendent's immediate family member as a summer learning academy teacher at Washington District Elementary. The board minutes from the April 19, 2022, board meeting reflect that employment of summer professionals was subject to appropriate certifications and background checks. WVDE certification records indicate that the superintendent's immediate family member has not held any certificate or license issued by WVDE. Furthermore, central office interviews reported that this person had not completed an undergraduate degree at the time of the hire and was not seeking a degree in education.

### 3. Compensation provided to employees without board approval – During the review of payroll records, the review team discovered numerous instances of compensation being provided to district employees without board approval.

- Payment of additional summer wages beyond what was approved by the board.

- On July 26, 2021, the district provided additional wages related to the 2021 Summer Learning Academy that were not approved by the board. Communications provided to the review team show that some summer school staff were upset because they believed their summer pay was not sufficient, as they claimed they were promised a specific amount of "take home" or net pay rather than the gross daily rate that was previously approved by the board. At least one board member was aware of the complaints, but at no point did the board vote to retroactively provide additional compensation to summer school employees. This payment was funded with federal stimulus funds.

- **Payout of out-of-calendar (OC) days –** On June 28, 2022, the district provided additional compensation to various employees as a payout of OC days. There was no board approval provided by the district for these payments. Furthermore, WVBE Policy 3234, School Calendar, defines an out-of-calendar day as "a nonpaid day that is not included as a part of the minimum employment term." Therefore, no county employee has a right to payment for such days. Such payments effectively increase employee contract lengths without the approval of the board. During interviews, district staff communicated that this compensation was for days worked during the summer because of the COVID-19 pandemic. However, no payroll logs, supervisor approvals, or timesheets were provided by the district to support that claim.

10

- **Payment of additional compensation to the superintendent –** At various points throughout the superintendent's tenure, the district paid the superintendent amounts which were not authorized by the board within the superintendent's contract or by amendment to the contract. Each superintendent contract includes language stating that the "written contract embodies the whole agreement between the Board and the Superintendent. There are no inducements, promises, terms, conditions, or obligations made or entered into by either the Board or the Superintendent other than contained herein." The contracts further state that "no modification or waiver of this contract or of any covenant, condition, or provision of this contract shall be valid unless in writing and duly executed both by the Superintendent and on behalf of the Board." The district provided no documentation showing that the board and the superintendent had agreed to any contract modification that would have authorized additional compensation above what was already included in the original contracts. Below is a summary of additional gross compensation provided to the superintendent outside of the approved contract:

  » *Payment of attendance incentive bonuses –* during each year of the superintendent's contract, the district provided the superintendent with attendance incentive bonuses. For each year beginning in FY2019 and ending in FY2022, the district provided the superintendent with a $400 bonus, which is tied to the attendance incentive bonus addressed in USC Policy 5026. Furthermore, for each year beginning in FY2020 and ending in FY2022, the district provided the superintendent with a $500 bonus, which is tied to the teacher's attendance incentive bonus authorized under W. Va. Code §18A-4-10(c). The superintendent does not qualify as a classroom teacher and is not entitled to such a bonus. There is no local policy authorizing such payment to non-teaching positions. Furthermore, the superintendent's contract does not include a provision for any type of bonus. Therefore, both bonuses are deemed to be unauthorized. Unauthorized bonuses paid to the superintendent totaled $3,100 between FY2019 and the end of FY2022.

  » *Payment of a stipend to attend a book study –* On December 30, 2020, the district provided the superintendent with a $70 stipend for attending a book study. The superintendent's contracts are annual in nature and are developed to compensate the superintendent for all duties necessary to serve as county superintendent. As previously discussed, the contracts also explicitly state that the written contract embodies the full agreement between the superintendent and the board. Therefore, no additional compensation, other than what is contemplated within the written contract or amendments thereto, are deemed to be authorized by the board.

  » *Payout of unused leave days –* While the superintendent's contracts for FY2022 and FY2023 include a provision to be paid out for unused vacation days at the superintendent's current daily rate, there were numerous instances of leave payouts which did not comply with the contract.

    1. *On June 28, 2021, the district provided additional compensation to the superintendent totaling $11,365. This compensation was described on the check stub as 20 days of vacation at a daily rate of $568.25. However, the superintendent's contract for FY2021 did not authorize any payout of unused vacation days and the daily rate used for this payment was significantly higher than the superintendent's true daily rate of $413.79. Furthermore, this payment was funded with federal stimulus funds.*

11

JA490

2. *On July 15, 2021, the district provided additional compensation to the superintendent totaling $17,379.18. This compensation was described on the check stub as a payout of 42 vacation days at a daily rate of $413.79. This payment is deemed to be unauthorized as her FY2022 contract only allowed for payout of unused vacation "not to exceed 10 days at her current rate of pay." Note that an additional 10 days of vacation were paid out to the superintendent on June 30, 2022, but at an incorrect daily rate, which resulted in an overpayment of $153.20.*

3. *On July 26, 2021, the district provided additional compensation to the superintendent totaling $2,045.80. This payment represented the additional summer school wages paid by the district to Summer Learning Academy staff that were not approved by the board. This payment was also funded with federal stimulus funds.*

4. *On June 28, 2022, the district provided additional compensation to the superintendent totaling $13,410.80. This compensation was described on the pay stub as 20 "OC Days" at a daily rate of $670.54. The "OC Days" description on the pay stub refers to out-of-calendar days to which the superintendent is not entitled. As defined in WVBE Policy 3234, out-of-calendar days are nonpaid days which are not included as part of an employee's minimum contract. OC days are tracked by districts to ensure employees with less than a 261-day contract are not taking off more days than they are entitled to. The superintendent is contracted for the full fiscal year covered by the board-approved contract. Therefore, there are no available days in the superintendent's employment calendar which can be designated as unpaid. Furthermore, the rate used to payout these unauthorized "OC days" is significantly higher than the superintendent FY2022 daily rate of $429.12.*

5. *In June 2022, the superintendent's FY2022 contracted salary was arbitrarily increased by $4,000. The superintendent's contracted salary for FY2022 was $112,000. However, the district increased it to $116,000, resulting in an overpayment of $4,000 during the month of June 2022.*

- **Misrepresentation of superintendent compensation –** The review team requested copies of the district's financial statement publication, which is required under W. Va. Code §18-9-3a. For FY2020, FY2021, and FY2022, the district underreported the superintendent's compensation in those publications by $899.99; $12,335; and $37,763.45, respectively.

- **Progression of employee leave balances –** During the review of payroll records, the review team discovered multiple instances of the district paying out unused leave days without making appropriate reductions to employee leave balances. As a result, some employees may have overstated leave balances. Specifically, it was noted that at least 52 days of vacation leave payout to the superintendent were not removed from the superintendent's available balance. Additional procedures are needed to determine the full scope of this issue.

12

## 4. Areas of Further/Incomplete Testing – General Finance

- **Travel –** The review team has selected a sample of general travel-related expenditures. However, testing was not yet completed at the time of this report.

- **Purchasing and procurement –** The review team has selected a sample of general purchasing/ procurement transactions. However, testing was not complete at the time of this report.

- **P-Card/credit cards –** The review team has selected a sample of P-Card/credit card transactions. However, testing was not complete at the time of this report.

- **Excess levy –** The review team has selected a sample of expenditures charged to the excess levy. However, testing was not complete at the time of this report. Furthermore, the review team is in the process of analyzing the levy calls for appropriateness.

- **Payroll –** The review team has selected a sample of payroll transactions. However, testing of those transactions was not complete at the time of this report. Furthermore, while the review team completed an analysis of the district superintendent's compensation, similar procedures are pending for other district-level administrators. The review team has also selected a sample of extra-duty compensation. However, testing was not complete at the time of this report.

- **Additional review of district-level administration contracts –** While the review team conducted reviews of the superintendent's contract provisions, the district has not yet provided copies of contracts for other district-level administrators such as the assistant superintendent and treasurer. Once those documents are received, the team will review them for appropriateness.

- **Local policies –** During review of UCS Policy 5026, Personal Leave Incentive Program, it was discovered that the policy requires annual renewal by the board after a review of available budget balances and the effectiveness of the policy. The review team has requested from the district board minutes signifying renewal of the policy. However, the district has not yet provided such support.

13

JA492



David L. Roach
West Virginia Superintendent of Schools

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

        Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* et al.

        Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE KLEEH

**AFFIDAVIT OF JEFFREY KELLEY**

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, TO-WIT:

I, Jeffrey Kelley, having been duly sworn and cautioned, do hereby state as follows:

1.    I am employed by the West Virginia Department of Education (WVDE) and currently serve as the Assistant Superintendent, District & School Accountability. Prior to this role, I served as the Officer of Educational Accountability.

2.    In the Spring of 2023, while I was serving as the Officer of Education Accountability, the State Superintendent of Schools directed that I conduct a Special Circumstance Review of Upshur County Schools in the areas of Operation of Federal Programs and Financial Indicators and Purchasing Procedures.

3.    On June 14, 2023, the West Virginia Board of Education (WVBE) met in a board meeting to discuss, among other things, the findings of the Special Circumstance Review

**EXHIBIT**
**3**

JA494

Report. *See* June 2023 Special Circumstance On-Site Review Report, which is a true and accurate copy of the same, and is attached as Exhibit 2 to *Supplemental Brief in Support of the 11th Amendment Immunity of Defendants Stacey Marteney, The Board of Education of the County of Upshur, and Christine Miller.*

4.      During that board meeting, I, Jeffrey Kelley, presented on the Upshur County Schools Special Circumstance Review Report for the WVBE's consideration.

5.      Article XII, Section 2 of the Constitution of West Virginia and W. Va. Code §18-2E-5 provides authority to the state to intervene in the operation of a local school system.

6.      During the June 14, 2023, board meeting, the WVDE and the State Superintendent recommended that extraordinary circumstances exist in Upshur County and that intervention by the West Virginia Board of Education (WVBE) into Upshur County Schools was necessary pursuant to W. Va. Code §18-2E-5. *See* June 14, 2023 Minutes of the West Virginia Board of Education, which is a true and accurate copy of the same, and is attached as Exhibit 1 to *Supplemental Brief in Support of the 11th Amendment Immunity of Defendants Stacey Marteney, The Board of Education of the County of Upshur, and Christine Miller.*

7.      The WVBE went on to make the following additional findings, in pertinent part:

a)  That the "authority of the Upshur County Board of Education shall be limited in areas that compromise the delivery of a thorough and efficient education to its students as designated by the WVBE by rule, which may include delegating decision-making authority regarding these matters to the Deputy State Superintendent or her designee." *Id.* at 6. As a matter of

JA495

fact, the decision-making authority regarding those matters was so delegated to the Deputy State Superintendent.

b) That the Office of the County Superintendent of Upshur County Schools was to be vacated by the end of the day on June 14, 2023 and that Stephen L. Wotring was to be appointed to be the interim Superintendent of Upshur County Schools starting June 15, 2023. *Id.*

c) That the Upshur County Board of Education was to be limited as to finances, personnel, federal programs, and any other areas designated by the WVBE by rule and delegate decision-making authority to the Deputy State Superintendent or her designee regarding those matters. *Id.*

d) That the Upshur County Board of Education was to be limited as to the ability to conduct real estate transactions and delegate to the Deputy State Superintendent or her designee the authority to act in lieu of the Upshur County Board of Education in a transfer, sale, purchase, or other transaction regarding real estate. *Id.*

e) That the "WVBE direct the interim and future Upshur County Superintendents and the Deputy State Superintendent, after consultation with the Upshur County Board of Education, to jointly develop and present to the State Board at a future meeting a set of standards and/or a strategic plan that must be implemented in order for the Upshur County Board of Education to regain control of the school system." *Id.*

8. As of the date of this affidavit, the WVBE retains control of Upshur County Schools.

JA496

9.    Accordingly, and due to the extraordinary circumstances, the Upshur County Schools have very limited autonomy to make decisions without prior approval of the WVBE. Additionally, the Upshur County Board of Education does not have any voting powers.

10.    For purposes of clarity, on Monday, August 12, Plaintiffs filed a Notice of Filings of Subsequent Documents that mistakenly identified as an "administrative order to intervene in the Upshur County School System", but which was actually a press release of the WVDE regarding the Upshur County Schools intervention. Such intervention was determined by the West Virginia Board of Education at its meeting of June 14, 2023, as indicated by the minutes of such meeting and discussed above and attached as Exhibit 1.

Further Affiant sayeth naught.

Jeffrey Kelley

Taken, subscribed, and sworn to before me this _15th_ day of August, 2024.

My commission expires _October 11, 2025_



Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Marlene A. Price
WV Dept. of Education
Bldg. 6, Rm. 362 Capitol Complex
Charleston WV 25305
My Commission Expires October 11, 2025

17041297.1

17041297.1

JA497

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| KRYSTLE PERRY and ANTHONY PERRY, *individually and on behalf of their minor child K.P.*,<br><br><br>*Plaintiffs,*<br><br>Against<br><br>STACY MARTENEY *in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School;* THE BOARD of EDUCATION of the COUNTY of UPSHUR; CHRISTINE MILLER, *in her official capacity as Superintendent of the Upshur County School District*; DR. MATTHEW CHRISTIANSEN, *in his official capacities as the State Health Officer and Commissioner of the Bureau of Public Health*; and BRYAN HOYLMAN *in his official capacity as Chair of the West Virginia Virtual Academy*,<br><br>*Defendants.* | Civil Action No.: 2:24-cv-00018-TSK |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO UPSHUR COUNTY DEFENDANTS'**
**MOTIONS TO DISMISS**

Defendants the Board of Education of the County of Upshur (the "**Board**"); Stacy Marteney, in her official capacity as the Virtual Learning Coordinator of the Upshur County Virtual School ("**Ms. Marteney**"); and Christine Miller, in her official capacity as Superintendent of the Upshur County District (the "**Superintendent Miller**") (collectively, the "**Upshur Defendants**") argue Plaintiffs' First Amendment claim should be dismissed for two reasons: (1) Plaintiffs did not join necessary and indispensable parties to this action per Fed.R.Civ.P 12(b)(7) and Rule 19; and (2) a direct overlay of the first argument, but asserted under Fed.R.Civ.P 12(b)(6).

1

JA498

Specifically, the Upshur Defendants contend Plaintiffs have failed to join the West Virginia Department of Education ("**WVDE**") and the State Superintendent of Education (the "**State Superintendent**") and argue that constitutional relief cannot be effectuated with adding them to the suit. On the other hand, the Upshur Defendants also argue that both the WVDE and the State Superintendent enjoy Eleventh Amendment immunity and therefore "cannot be joined to the instant action." (ECF 30 at 15.)

Plaintiffs anticipated the possibility of this gamesmanship. Understanding that WVDE would appropriately invoke Eleventh Amendment immunity, Plaintiffs elected to file suit against the chief enforcers of West Virginia Code § 16-3-4 (the "**Compulsory Vaccination Law**" or the "**CVL**"), who undeniably possess the requisite "some connection" to the CVL to invoke the *Ex parte Young* exception to Eleventh Amendment immunity. *See Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014) (holding that a Circuit Court clerk who was tasked with "granting and denying applications for marriage licenses" possessed the "requisite connection" to the challenged statute to invoke the *Ex parte Young* exception).

Critically, the primary enforcers of the CVL have been named, and injunctive relief as to them and those acting in active concert with them will effectuate the complete Constitutional relief. Federal Rule of Civil Procedure 65(d)(2) authorizes federal courts broad discretion in effecting injunctive relief against not only the named parties, but also those who act in "active concert or participation" with the enjoined parties. Fed.R.Civ.P. 65(d)(2); *see also K.C. v. Shipman*, 716 F.3d 107, 113 (4th Cir. 2013) (explaining that injunctive relief under Fed.R.Civ.P. 65(d)(2) flows to all "agents" and those who act in concert with the enjoined parties). Accordingly, an injunction against Ms. Marteney, Superintendent Miller, and Dr. Christiansen "will directly redress the injury complained of in this case," *McGee v. Cole*, 66 F. Supp. 3d 747, 752 (S.D. W. Va. 2014), which

here is the rejection of Plaintiffs' religious exemption request to the CVL, while officials grant secular exemptions to the CVL.

For these reasons and the reasons more fully detailed below, the Motions to Dismiss under Rule 12(b)(7) and 12(b)(6) should be denied.

### <u>BACKGROUND</u>

Plaintiffs' eight-year-old child, K.P., was enrolled in the Upshur County Virtual Academy for 17 months, from August of 2022 to January of 2024. (ECF 1 ¶ 134.) Defendant Supervisor Miller is the duly empaneled Superintendent of the Upshur County School District and directs Defendant Marteney's actions, including enrollment and dis-enrollment of students in the Virtual Academy. *Id.* ¶ 94. In December 2023, Defendant Marteney, the Virtual Learning Coordinator for the Upshur School District, informed Plaintiffs that K.P. would be ejected from the Virtual Academy if she did not receive all vaccines required under the CVL. *Id.* ¶ 75.

Plaintiffs thereafter requested a religious exemption for K.P. so she could continue her education in the Virtual Academy, and they were rejected by Defendant Ms. Marteney. *Id.* ¶ 183; *see also* ECF 1-7 (denial of Plaintiffs' religious exemption request).

In their verified Complaint, Plaintiffs allege, and submit competent evidence via their verifications, that Defendant Marteney is "tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of the CVL against school-aged children desiring to attend the Virtual Academy, and she enforced the CVL against the Plaintiffs and excluded K.P. from the Virtual Academy" after Plaintiffs requested a religious exemption. *Id.* ¶ 92. Defendant Supervisor Miller is also tasked, under W. VA. CODE § 18-4-10, with implementing and enforcing all procedures of state law, including enforcing the CVL against K.P., which necessarily extended to oversight of the denial of her religious exemption request and disenrollment from the Virtual Academy. *Id.* ¶ 94.

3

Finally, Defendant Dr. Christiansen is tasked with enforcing, and does enforce, the mandatory immunization requirements of the CVL for school-aged children, including children wishing to enroll in the Virtual Academy, while simultaneously granting medical exemptions under the CVL to unvaccinated West Virginia schoolchildren. *Id.* ¶ 95. As such, these Defendants are the actual enforcers of the unconstitutional provisions of the CVL and are intimately connected to the challenged statute.

Neither the Upshur Defendants nor Dr. Christiansen—not in their pleadings or in the preliminary injunction hearing—have credibly rebutted the allegations in the verified Complaint that Ms. Marteney, Superintendent Miller, and Dr. Christiansen have extensive connections to the unconstitutional enforcement of the CVL.

<u>**ARGUMENT**</u>

**I.    THE STATE SUPERINTENDENT AND THE WVDE ARE NEITHER "NECESSARY" NOR "INDISPENSABLE" PARTIES**

The Upshur Defendants argue for dismissal on grounds that the WVDE and the State Superintendent *must* be added to this action under Rule 19 because they are necessary and indispensable parties, but on the other hand simultaneously contend they *cannot* be added to this action because they enjoy Eleventh Amendment immunity. (ECF 30 at 11.) The Court should reject this gamesmanship.

Dismissal based on non-joinder is highly disfavored. *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 441 (4th Cir. 1999) ("Courts are loath to dismiss cases based on nonjoinder of a party..."). Therefore, before dismissing, courts conduct an in-depth, two-step inquiry to assure non-joinder is in fact fatal to the claim. First, courts consider whether a party is necessary "because of its relationship to the matter under consideration." *Id.* at 440. Next, "[i]f a party is necessary, it will be ordered into the action." *Id.* Only when a party *cannot* be joined will the court "determine

4
JA501

whether the proceeding can continue in its absence, or whether it is indispensable pursuant to Fed.R.Civ.P 19(b) and the action must be dismissed." *Id.*

The WVDE and the State Superintendent are not "necessary" parties. This is because, under Fed.R.Civ. P. 19(a)(1)(A), the Court can afford "complete" injunctive relief among the existing parties pursuant to Rule 65(d). Nor are they necessary parties under 19(a)(1)(B) as whatever interest they may possess will not be impeded by nonjoinder, and there is no risk of inconsistent obligations regarding parties already in this suit if the WVDE and the State Superintendent are not joined.

Finally, even if these parties were somehow necessary parties, they are not "indispensable parties" under Rule 19(b) because, again, Rule 65(d) gives the Court broad discretion to craft adequate injunctive relief in their absence. Further, these absent parties will not be prejudiced if not joined. However, Plaintiffs will be severely prejudiced should the court dismiss this case pursuant to Rule 12(b)(7) as there would be no adequate remedy to resolve the past, ongoing, and imminent First Amendment violations at issue.

**A.    The WVDE and the State Superintendent Are Not "Necessary" Parties**

A party is not necessary if "complete relief" can be afforded in the party's absence. *Uncommon Sense 1 LLC v. MHI RJ Aviation, Inc.*, No. 1:24-CV-19, 2024 U.S. Dist. LEXIS 87063, at *11 (N.D.W. Va. May 14, 2024). "Complete relief" under Rule 19(a)(1)(A) for the First Amendment violations at issue can be effectuated here without joining the WVDE and the State Superintendent of Education. Further, the Supreme Court has explained that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Thus, they are not "suit[s] against the official personally, for the real party in interest is the entity." *Id.* at 166. Here, the Superintendent is acting under the authority and agent of the State Board due to the takeover of

the local district. And her inclusion in her official capacity is sufficient to impute their interests in all events.

### 1.      *"Complete Relief" Can Be Effectuated Without Absent Parties*

Under Rule 19(a)(1)(A), a party is "necessary" if in that person's absence the court cannot accord "complete relief" among existing parties. Fed. R. Civ. P. 19(a)(1)(A). "The burden of proof rests on the party raising the defense [of failure to join a necessary party] . . . to show that the person who was not joined is needed for a just adjudication." *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005) (cleaned up).

"Complete relief" refers to "relief as between the persons already parties, not as between a party and the absent person whose joinder is sought. . . ." *Uncommon Sense 1 LLC*, 2024 U.S. Dist. LEXIS 87063, at *11 (citing *United States v. Arlington*, 669 F.2d 925, 929 (4th Cir. 1982)).

Complete relief can certainly be effectuated here between Plaintiffs and the named Defendants without adding every conceivable party that may have a connection to the challenged statute. In *McGee*, 66 F. Supp. 3d at 755, Judge Chambers rejected a similar argument that every possible enforcer of the allegedly unconstitutional statute had to be named, observing that "defendants cannot require that plaintiffs join every possible party, when the parties sued are sufficient to award the requested relief." *Id.*

The WVDE and the State Superintendent need not be joined as parties to the suit to obtain the relief Plaintiffs seek, particularly considering wide-reaching relief is available under Rule 65(d)(2) and will flow to every party with even an arguable hand in the constitutional violations at issue, regardless of whether they are a litigant in this suit. Federal Rule of Civil Procedure 65(d)(2) authorizes federal courts broad discretion in effecting injunctive relief against not only the named parties, but also those who act in "active concert or participation" with the enjoined parties. *See* Fed.R.Civ.P. 65(d)(2); *see also K.C. v. Shipman*, 716 F.3d 107, 113 (4th Cir. 2013) (explaining

6

that injunctive relief under Fed.R.Civ.P. 65(d)(2) flows to all "agents" and those who act in "concert" with the enjoined parties). Accordingly, an injunction against named Defendants Ms. Marteney, Superintendent Miller, and Dr. Christiansen "will directly redress the injury complained of in this case," namely, the rejection of Plaintiffs' religious exemption request to the CVL while the Department of Health simultaneously grants medical exemptions. *McGee*, 66 F. Supp. 3d at 52.[1]

If, as Plaintiffs have requested in their Complaint, the Court enjoins the named Defendants and those acting in concert with Defendants "from enforcing W. VA. CODE § 16-3-4 against Plaintiffs, unless the government provides an option for Plaintiffs to request a religious exemption to the Virtual Academy" (ECF 1 at 55), Plaintiffs would obtain complete relief against the existing parties to the suit, and that relief would be sufficient to remedy the constitutional violations alleged. *See Dixon v. Edwards*, 290 F.3d 699, 713 (4th Cir. 2002) (holding that a party was not necessary where the "injunction entered by the district court in fact gave [the plaintiff] complete relief.").

Plaintiffs requested as applied relief specifically against the official capacity Defendants related to the Upshur County Virtual Academy because that is the virtual school where Plaintiffs enrolled their daughter, the school they wish to re-enroll her in, and the school at which local staff denied K.P.'s religious exemption request. The Virtual Academy is where the First Amendment violations occurred and Virtual Academy officials, alongside Dr. Christiansen and those under his control, are who actually violated the First Amendment. *See Bostic*, 760 F.3d at 371, n.3 (holding that a Circuit Court clerk who denied applications for marriage licenses for same-sex

---

[1] Rule 65(d)(2) requires notice of injunctive relief to unnamed parties who act in concert with enjoined parties. Should the Court provide injunctive relief, it can also order that notice be provided to all parties who act in concert with Ms. Marteney, Superintendent Miller, and Dr. Christiansen, including but not limited to the West Virginia Bureau of Public Health, the WVDE, the State Superintendent of Education, and the Upshur County School Board.

couples possessed the "requisite connection" to the challenged statute to invoke the *Ex parte Young* exception).

The Upshur Defendants' assertion that complete relief cannot be provided without the WVDE and the State Superintendent as parties to the suit is unpersuasive. The crux of the argument is that the WVDE and the State Superintendent are tasked generally with "interpreting" and "enforcing" the laws touching on public schools, including the CVL, and that they consequently have an "interest" in this litigation. (*See* ECF 30 at 14.) By extension, the Upshur Defendants then imply they will potentially be subject to "incurring inconsistent obligations" if the Court grants injunctive relief, and the WVDE and the State Superintendent then interpret the CVL contrary to the Court's directives and require them to violate a federal court order.

In that scenario, according to the Upshur Defendants, Plaintiffs would obtain "incomplete relief." *Id.*  But these arguments do not address that this Court can effectuate complete relief under Rule 65(d) in the WVDE and the State Superintendent's absence, and they further misapprehend that Article III courts—not bureaucrats—are tasked with evaluating the constitutionality of the challenged statute, and likewise are uniquely empowered to forever end Constitutional violations. Nor do Defendants credibly demonstrate that the state board or Superintendent would disregard a federal court order and would actually be audacious enough to order the local Defendants to disregard a federal court order. *Nelson v. Warner*, 446 F. Supp. 3d 119, 126 (WVSD 2020) (observing that existing parties were sufficient to afford relief, and concluding the possibility that additional parties would defy a federal court and a constitutional adjudication to create liabilities for themselves as defying reason). Were they to attempt to do so, then they could be added to the action in their respective official capacities.

Other courts have held that inclusion of sufficient officials to effect relief satisfies the Rule 19 requirements of joining necessary parties, even if perhaps other parties have some interest in the matter – rejecting the contentions of Defendants here. *Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 784-785 (VAWD 2023) (holding that inclusion of sufficient officials in their official capacities to afford relief meets the necessary party requirement); *see also Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1180 (9th Cir. 2012). Further, the Supreme Court has explained that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Thus, they are not "suit[s] against the official personally, for the real party in interest is the entity." *Id.* at 166. Here, the Superintendent is acting under the authority and agent of the State Board due to the takeover of the local district. And her inclusion in her official capacity is sufficient to impute their interests in all events. Moreover, the State Board and State Superintendent are unable to merely replace Superintendent Miller to avoid the requirements of an injunction, because the official capacity suit against her and any injunction entered against her in her official capacity will flow to any successor in office. Fed.R.Civ.P. 25(d).

In *Stanley v. Darlington County Sch. Dist.*, 84 F.3d 707 (4th Cir. 1996), a case involving desegregation, the Court of Appeals found that joinder of the state board, notwithstanding their generalized supervision over local school districts, was not necessary under Rule 19. That was because the inclusion of the local officials who engaged in segregation was sufficient to accomplish the desegregation injunctive relief orders entered by the court. So too here. In fact, *Stanley* forecloses the very arguments Defendants make here. The Circuit Court echoed and articulated the argument by the federal government that the state board was not necessary because "the [School] District has failed to provide a single example of how the State has impeded the

9

JA506

district's compliance with the court's order and federal law since 1970." *Id.* at 714. And the court found no error by not forcing the Plaintiffs to include the state board because it was not necessary to afford relief.

Again, in *Robertson v. Jackson*, 972 F.2d 529 (4th Cir. 1992), the official primarily responsible for enforcement of the challenged action argued that other officials should be made a party. However, the Fourth Circuit found no error in not joining the additional officials to the action because the official before the Court was sufficient to effect the relief ordered. *Id.* at 535. And the Fourth Circuit observed that, in terms of compliance with a remedial order, "no evidence has been presented to suggest he cannot do so with the authority he enjoys under Virginia law." *Id.* "The potentiality that the Commissioner may, at some future time, be unable to cause a particular local agency to comply with federal requirements does not relieve him of his responsibility under federal law to attempt fully to ensure compliance." *Id.*

In terms of joinder of the State Board, the Fourth Circuit in *Jackson* observed that "[w]e do not address the question of whether we should refuse to entertain the claim of necessary parties, because we do not believe that either the State Board or the local agencies are parties that must be joined to grant complete relief." *Id.* at 536. And to that end, "[t]he district court's order, requiring the Commissioner to bring about full compliance with federal timely processing and program access requirements, cannot be considered either 'partial' or 'hollow' relief." *Id.*, *citing* Fed. R. Civ. P. 19(a)(1) advisory committee's note; and 3A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice, P 19.071[1] (2d ed. 1991) (joinder is not necessary "where, although certain forms of relief are unavailable due to a party's absence, meaningful relief can still be provided"). "Neither the State Board nor the local agencies has been shown to be an impediment to the achievement of full compliance with the federal regulations." *Id.*

The analysis in *Robertson* is equally applicable here. There is no evidence that inclusion of the State Board of Education, or of the State Superintendent, is necessary to effect remedial relief. Enjoining Ms. Miller, Ms. Marteney, and Dr. Christensen is sufficient to effect K.P.'s re-enrollment. And Defendants do not credibly argue otherwise because they cannot. *See Luce v. Lexington Cnty. Health Servs. Dist*, 2023 U.S. Dist. LEXIS 226628 (SCD 2023) (determining that state official was not a necessary party and inclusion of local officials was sufficient).

At the end of the day, the Supremacy Clause (U.S. Const. amend. §1, clause 2) and 42 U.S.C. §1983 permit courts wide leeway to fashion equitable relief. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("discretion is necessarily broad"); *see also N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ("court[s] ha[ve] broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs"). Notably, Plaintiffs have also requested in their complaint that the Court issue "any such other and further relief as the Court deems equitable and just under the circumstances." (ECF 1 at 56.) Here, the Court can render complete relief without the WVDE and the State Superintendent, and, as such, they are not necessary parties.

### 2. The Interests of Absent Parties Will Not Be Prejudiced, and There Is No Risk of Existing Parties Incurring "Inconsistent Obligations"

Rule 19(a)(1)(B) provides that a party may also be "necessary" if:

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

> (i)   as a practical matter impair or impede the person's ability to protect the interest; or

> (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. Fed. R. Civ. P. 19(a)(1)(B).

11

Neither factor is met here. It is hard to conceive how the WVDE and the State Superintendent's ability to "protect their interests" would as a practical matter be impeded where the Upshur Defendants claim they *cannot* be added to the suit because they enjoy Eleventh Amendment immunity. They have no interest in this suit, other than hyper-generalized "supervision" of public-school districts, and, according to the Upshur Defendants, they also lack the requisite connection to the CVL under *Ex parte Young*. (ECF 30 at 18.) As an aside, Plaintiffs are doubtful that these state entities have sufficient connection to enforcement the CVL.

That is because West Virginia Code § 16-3-4(b), (c), and (d) are directed, from an enforcement perspective, at the local school systems themselves. And West Virginia Code § 16-3-4(d) and (h) are directed at Dr. Christensen, who equally has powers under West Virginia Code § 16-3-1 to enforce the provisions of West Virginia Code § 16-3-4. Yet the State Board of Education and the State Superintendent are notoriously absent from these provisions. Rather, the state board is provided generalized supervision over schools of the state. West Virginia Code § 18-2-5. That is not enough on its own to qualify them as amenable to *Ex parte Young* prospective injunctive relief. *See Doyle v. Hogan*, 1 F.4th 249 (4th Cir. 2021) (general authority of supervision over enforcer of challenged law is not enough). Of course, if in the face of a contrary court order, the State Board of Education or State Superintendent elected to direct the Upshur Defendants to specifically enforce the CVL against Plaintiffs, did so themselves (which seems highly unlikely), threatened to do so, or disregarded a federal court order to enroll K.P., that would then render them amenable to suit under *Young*. *Id.* at 255. But there is no evidence that they have done so or are threatening to do so, and Defendants offer no such evidence. And such an argument in a similar context has been described as defying reason. *Nelson*, 446 F. Supp. 3d 119, 126.

12

Moreover, the CVL either is or is not constitutional as applied to Plaintiffs regardless of whether the WVDE and the State Superintendent are party to this suit. As such, the Upshur Defendants' argument that these parties supposedly maintain powers to interpret, issue guidance, and generally enforce state law, including the CVL, is irrelevant. It is within this Article III Court's province to "interpret" the constitutionality of the CVL, and that is all that matters in this case. And the Upshur Defendants, along with Dr. Christiansen, are vigorously defending the constitutionality of the CVL through qualified legal counsel.

The Upshur Defendants are also not in danger of "incurring inconsistent obligations" under Rule 19(a)(1)(B)(ii) if the Court grants injunctive relief, unless the WVDE and the State Superintendent would somehow decide to direct the Upshur Defendants to disregard the federal court order, with notice of it (potentially incurring the penalties of criminal or civil contempt as a party acting in concert with them). If that seems far-fetched, it is because it is. *Nelson*, 446 F. Supp. 3d 119, 126 (describing an equivalent scenario as defying reason). Again, Defendants offer no evidence that this is a probable outcome. Because this is an as applied challenge, relief will only extend to the Virtual Academy and the existing Defendants (Ms. Miller, Ms. Marteney, and Dr. Christensen) are sufficient to direct such relief.

Therefore, considering these factors, the WVDE and the State Superintendent are not necessary parties under any subdivision of Rule 19(a). Regardless, should the Court determine they are necessary parties, the Court can seamlessly order that they be added to the litigation without dismissing the case in its entirety. *See Owens-Illinois*, 186 F.3d at 441.

**B.**    **The WVDE and the State Superintendent Are Not "Indispensable" Parties**

Even if the WVDE and the State Superintendent were necessary parties, they are not indispensable parties that would prompt dismissal. The Rule 19(b) analysis regarding whether a party is "indispensable" is not mechanical; "rather it is conducted in light of the equities of the

13

particular case at bar." *Schlumberger Indus., Inc. v. Nat'l Sur. Corp.,* 36 F.3d 1274, 1287 (4th Cir. 1994); *see also Owens-Ill., Inc. v. Meade*, 186 F.3d 435, 441 (4th Cir. 1999) ("Courts are loath to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will *certainly* result") (emphasis added)).

In determining whether a party is indispensable, courts evaluate four factors: (1) to what extent a judgment rendered in these parties' absence might be prejudicial to the WVDE and the State Superintendent or those who are already parties to the suit; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the these parties' absence will be "adequate"; and (4) whether Plaintiffs will have an "adequate remedy" if the action is dismissed for nonjoinder. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 552 (4th Cir. 2006) (quoting Fed. R. Civ. P. 19(b)). Every factor tips strongly in Plaintiffs' favor.

*First*, the WVDE and the State Superintendent will not be prejudiced if they are not joined, nor will any named Defendant. Again, these parties would not be prejudiced by nonjoinder considering the Upshur Defendants strenuously contend the WVDE and the State Superintendent enjoy sovereign immunity and cannot be joined. Moreover, again, the CVL either is or is not constitutional as applied to Plaintiffs regardless of whether these parties are joined, and their presence in this litigation would not materially impact the constitutional analysis one way or another. And the Upshur Defendants, along with Dr. Christiansen, are vigorously defending the constitutionality of the CVL, adequately preserving whatever interests WVDE and the State Superintendent may have.

The Upshur Defendants also argue a "judgment rendered in the State Superintendent and the WVDE's absence will prejudice the Upshur School Board Parties by creating an inconsistent

14

JA511

obligation with respect to other boards of education." (ECF 30 at 16.) Again, this is an as applied challenge specifically directed at the Upshur County Virtual Academy, and there is no danger for inconsistent obligations, provided the government actors at issue conform to the Court's ultimate order, whatever it may be.

*Second*, the Court can tailor relief as to avoid prejudice to these absent parties. If the Court denies injunctive relief, absent parties obviously will not be prejudiced, and, likewise, they will not be prejudiced if the Court grants injunctive relief against an unconstitutional statute. *See Newsom v. Albemarle Cty. Sch. Bd.,* 354 F.3d 249, 261 (4th Cir. 2003) (emphasizing that "upholding constitutional rights serves the public interest")*; see also Legend Night Club v. Miller,* 637 F.3d 291, 302-03 (4th Cir. 2011) (holding the government will "in no way be harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions"). Whatever ruling this Court issues, the relief or absence of relief will undoubtedly be appropriately tailored to address the First Amendment issues presented.

The Court should also reject the Upshur Defendants' argument that they are "unduly prejudiced by having to expend taxpayer funds in defense of this action." (ECF 30 at 16.) If that were the standard, the government—who extracts its finances from the public it serves—could cry prejudice every time it enforces an unconstitutional statute and then has to defend itself with funds it obtained from the very citizens whose rights it violated.

*Third*, injunctive relief will be "adequate" without the WVDE and the State Superintendent. Again, a party is not indispensable where injunctive relief can be effectuated against non-joined parties who act "in active concert or participation" with the enjoined parties pursuant to Fed.R.Civ.P. 65(d)(2). *See TechINT Sols. Grp., LLC v. Sasnett*, No. 5:18-cv-00037, 2019 U.S. Dist. LEXIS 100997, at *12 (W.D. Va. June 17, 2019) (finding that an absent party was

15

not indispensable in part because injunctive relief could be obtained against absent parties under Fed.R.Civ.P 65(d)(2)). Injunctive relief against Defendants Ms. Marteney, Superintendent Miller, and Dr. Christiansen—who under *Ex parte Young* do not enjoy immunity—will be adequate as it will flow to every actor who participates in enforcing the CVL in an unconstitutional manner. *See Papasan v. Allain*, 478 U.S. 265, 277 (1986) (holding that "*Young's* applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States."). *See also Robertson*, 972 F.2d 529 (existing official sufficient to afford relief); *Stanley*, 84 F.3d 707 (same).

The Upshur Defendants' argument that injunctive relief here would be "inadequate" because it would strip the WVDE and the State Superintendent of their "statutory authority to govern the public schools" is nonsensical. It appears the Upshur Defendants are arguing that injunctive relief would not be adequate because it would eliminate these other parties' ability to interpret and apply the CVL in an unconstitutional manner. But that conduct is exactly what Plaintiffs have asked the Court to enjoin, and is the type of behavior Fed.R.Civ.P 65(d)(2) allows the Court to reach. Accordingly, the injunctive relief sought would afford an adequate remedy.

*Fourth*, Plaintiffs would be stripped of an adequate remedy if this action were dismissed for nonjoinder. The Upshur Defendants assert that Plaintiffs must pursue an alternative remedy to the First Amendment violations alleged through seeking an advisory opinion from the West Virginia Attorney General. (ECF 30 at 17.) However, an advisory opinion is not an adequate remedy to the past, ongoing, and imminent First Amendment violations at issue. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) (holding the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This Court, not the

Attorney General, is the only entity empowered—indeed, constitutionally directed—to put an end to constitutional violations.

In sum, the Upshur Defendants have failed to demonstrate that a single Rule 19(b) factor weighs in their favor. And they have likewise failed to demonstrate that the WVDE and the State Superintendent are "necessary" parties Rule 19(a). As such, the Motion to Dismiss under Rule 12(b)(7) and Rule 19 should be denied in its entirety.

## II.    DEFENDANTS' 12(B)(6) ARGUMENTS ARE MERITLESS

The Upshur Defendants' arguments for dismissal under Rule 12(b)(6) are coextensive of their arguments that nonjoinder of necessary parties demands dismissal under Rule 12(b)(7). More specifically, they argue that Plaintiffs have not stated a First Amendment claim upon which relief can be granted for failure "to name the party who can effect such relief, namely the State Superintendent and the WVDE." (ECF 30 at 18.) Therefore, for the same reasons Upshur Defendants' arguments under Rule 12(b)(7) fail, *supra* §§ I.A-B, their 12(b)(6) arguments are also meritless.

Injunctive relief against named Defendants Ms. Marteney, Superintendent Miller, and Dr. Christiansen will be adequate as such relief can be extended under Rule 65(d)(2) to every individual or entity who acts in concert with these Defendants, including the State Superintendent and the WVDE, if necessary.

### CONCLUSION

The Motions to Dismiss under Rule 12(b)(7) and Rule 12(b)(6) should be dismissed in their entirety.

Dated: August 16, 2024

Respectfully submitted,

JOHN H. BRYAN LAW

 /s/ John H. Bryan
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

SIRI & GLIMSTAD LLP

Aaron Siri, Esq.*
Elizabeth A. Brehm, Esq.*
Walker D. Moller*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (888) 747-4529
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

Christopher Wiest*
50 East Rivercenter Blvd., Suite 1280
Covington, KY 41011
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com
*Attorneys for Plaintiffs*

*Pro hac vice*

18

JA515

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record.

Dated this 16th day of August, 2024.

*/s/ John H. Bryan*
John H. Bryan, Attorney
West Virginia Bar No. 102159
411 Main Street
P.O. Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

JA516

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

        Plaintiffs,

v.                                                                              CIVIL ACTION NO. 2:24-cv-18
                                                     JUDGE KLEEH

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc.,
d/b/a West Virginia Virtual Academy*,

        Defendants.


**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS
THE BOARD OF EDUCATION OF THE COUNTY OF UPSHUR,
STACY MARTENEY, AND CHRISTINE MILLER[1]**

---

[1] The instant Reply necessarily addresses both *Plaintiffs' Response in Opposition to Upshur County Defendants' Motion to Dismiss* (Plaintiffs' Response) **and** Dr. Christiansen's Response in Opposition to Upshur County Defendants' Motion to Dismiss ("Dr. Christiansen's Response") contained within *Dr. Christiansen's Supplemental Brief.* Although not titled as such, *Dr. Christiansen's Supplemental Brief* contains an argument plainly in opposition to the *12(b) Motion to Dismiss of Defendants The Board of Education of the County of Upshur, Stacy Marteney, and Christine Miller* (the "Motion to Dismiss"). Dr. Christiansen's Response presents a vehement argument against the Motion to Dismiss, contending that it is the Upshur School Board Parties, not the State Health Officer's, duty to enforce compulsory immunization. This argument contradicts the plain language of the statute and its implementing regulations: thus, Dr. Christiansen's Response must be addressed herein.

JA517

Defendants, the Upshur School Board Parties[2], submit this Reply Memorandum ("Reply") in Support of their Motion to Dismiss (ECF 30), and for the reasons set forth below, respectfully request that the Court grant the Motion to Dismiss.

## I.    RELEVANT FACTS

Following the receipt of the Superintendent's Update, in December 2023, Stacey Marteney ("Ms. Marteney") of the Board contacted Mrs. Perry regarding K.P.'s vaccination status and informed her that K.P. was required by law to receive required vaccinations if she desired to continue her education at [Upshur County Virtual School].[3]  Compl. ¶ 75.  W. Va. Code § 16-3-4. Ex. A, ECF 30.  On or around December 27, Ms. Marteney followed up with Mrs. Perry regarding K.P.'s vaccination status.  Compl. ¶ 76.  Mrs. Perry reiterated that K.P. was not vaccinated and would not be vaccinated.  *See generally* Compl.  In January 2024, K.P. withdrew from [Upshur County Virtual School] because she elected not to receive the required vaccinations. *Id*.  On April 1, 2024, Mrs. Perry asked Ms. Marteney, "Can we do a religious exemption for [K.P.] to attend virtual school?"  Ex. 7, Compl., ECF 1.  Ms. Marteney responded that, "there is still not a religious exemption available." *Id*.  Limited medical exemptions are permitted and may be granted by the State Health Officer "upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine."  Compl., ECF 1, ¶ 19. W. Va. Code § 16-3-4(h).

---

[2] The Upshur School Board Parties is the collective name for Defendant Board of Education for the County of Upshur, Defendant Stacey Marteney, and Defendant Christine Miller.

[3] Confoundingly, in their most recent court filing, Plaintiffs continue to refer to the "Virtual Academy," even though the West Virginia Virtual Academy is a separate and distinct entity from the Upshur County Virtual School. Based on the record evidence, the West Virginia Virtual Academy has no interest and should be dismissed entirely from the instant suit.

## II.    ARGUMENT

The constitutional relief sought by Plaintiffs cannot be effectuated without joining the West Virginia Department of Education ("WVDE") and the State Superintendent ("State Superintendent").  *See* F. R. Civ. P. 19.  At the same time, while the WVDE and the State Superintendent are "necessary," they cannot be joined due to Eleventh Amendment Immunity, thus rendering them "indispensable."  F. R. Civ. P. 19(b).  Plaintiffs erroneously refer to this dilemma as "gamesmanship," but nothing could be further from accurate as this situation is specifically contemplated by the Rules.  *Id.*  The Rules offer the specific remedy of dismissal, as equity so requires, when parties are "necessary" and "indispensable" but cannot be joined.  *Id.*

Plaintiffs argue that they resolved this conflict by filing their lawsuit against the "chief enforcers" of West Virginia Code § 16-3-4.  Contrary to the statute, Plaintiffs contend that the Upshur School Board Parties are the "primary enforcers" of the state's compulsory immunization statute.  Pls.' Resp., ECF 49 at p. 2.  Likewise, in his Response, Dr. Christiansen contends he lacks "specific authority to enforce the challenged law [W. Va. Code § 16-3-4]."  Dr. Christiansen's Resp., ECF 47 at p. 5.  Disingenuously, Dr. Christiansen argues that enrollment at school is at issue in West Virginia Code § 16-3-4, rather than compulsory immunization under the Public Health law.  These arguments are incorrect under the plain reading of the statute.

First, Dr. Christiansen is the "chief enforcer" of West Virginia Code § 16-3-4.  Second, the Upshur School Board Parties lack authority to consider a religious exemption to the compulsory immunization requirements in West Virginia.  The Upshur School Board Parties cannot provide the relief Plaintiffs seek; resultingly, Plaintiffs have failed to sue the proper state officers under *Ex parte Young*.  Third, because Plaintiffs failed to join necessary and indispensable parties, this Court is authorized to dismiss the Upshur School Board Parties under Rule 19 of the Federal Rules of Civil Procedure.

3

In addition, Plaintiffs fail to state a claim against the Upshur School Board Parties upon which relief may be granted. The Upshur School Board Parties lack the authority or the responsibility to consider a religious exemption to the immunization requirements under West Virginia Code § 16-3-4. Further, it is clearly not their decision whether to grant or deny Plaintiffs such an exemption. The Upshur Board, Superintendent Miller, and Ms. Marteney are not tasked with or authorized to consider a religious exemption to the mandatory immunization requirements in West Virginia. As a result, they are not proper parties to this action. With respect to the Upshur School Board Parties, the Complaint should be dismissed because it does not allege "enough facts to state a claim to relief that is plausible on its fact." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (emphasizing the necessity of plausibility). For those reasons and all the reasons stated in their Motion to Dismiss, this Court should dismiss the Complaint against the Upshur School Board Parties as it fails to state a claim upon which relief may be granted.

A.    **Dr. Christiansen bears the statutory duty to compel vaccination and to "obstruct and prevent" the introduction or spread of communicable or infectious diseases in West Virginia.**

In order to comprehend the nature of Dr. Christiansen's duty, it is first necessary to understand the organization of the West Virginia Department of Health ("DOH").[4] The DOH is "charged with the administration of this chapter [16], and shall have those powers and duties respecting the administration of the state public health system as authorized, granted, and imposed by this chapter and elsewhere at law." W. Va. Code § 16-1-1. The DOH is led by a Cabinet Secretary appointed by the governor. *See* W. Va. Code § 16-1-3. Pertinent here, the Bureau of

---

[4] As this Court is likely aware, on January 1, 2024, the Department of Health and Human Resources (formerly, the "DHHR") was re-organized into three distinct departments, pursuant to HB 2006 passed during the 2023 Legislative Session.

Public Health is under the auspices of the DOH. *See* W. Va. §§ 16-1-1, 16-1-5, 16-1-6. In addition, the "***State Health Officer" means the person appointed as Commissioner and State Health Officer of the Bureau*** [of Public Health]. W. Va. C. S. R. 64-95-2, *see* 2.11 (emphasis added). Accordingly, Dr. Christiansen serves as the Commissioner of the Bureau of Public Health and the State Health Officer.

Generally, the Secretary of the [former] Department of Health and Human Resources [now DOH], specifically the Bureau for Public Health (the "Bureau"), is authorized to "adopt rules to ***obstruct and prevent the introduction or spread of communicable or infectious diseases*** into or within the state, and the [***State Health Officer***] ***shall have the power to enforce these regulations***." W. Va. C. S. R. § 64-95-1 (emphasis added). Specifically, the Bureau promulgates the interpretive rule setting forth its interpretation of West Virginia Code § 16-3-4. *Id.* Moreover, "***the Legislature has granted the Commissioner/State Health Officer extensive powers to protect the public health, i.e. restricting the liberty of persons*** through measures such as quarantine, enter upon and inspecting private property, asserting authority of any epidemic or endemic conditions, compelling physical examinations and ***compelling vaccinations***." *Id.* at 1.8 (emphasis added). The aforementioned section of the State Rule mirrors the language of West Virginia Code § 16-3-1:

> The ***state director of health is empowered to*** establish and strictly maintain quarantine at such places as he may deem proper and forbid and ***prevent the assembling of the people in any place***, ***when the state director of health*** or any county or municipal health officer ***deems that the public health and safety so demand***, and the state board of health ***may adopt rules and regulations to obstruct and prevent the introduction or spread of…communicable or infectious diseases into or within the State***, and the state director of health shall have the ***power to enforce these regulations by detention and arrest, if necessary.*** The state director of health shall have power to enter into any town, city, factory, railroad train, steamboat or other place whatsoever, and enter upon and inspect

> private property for the purpose of investigating the sanitary and hygienic conditions and the presence of cases of infectious diseases, and may, at his discretion, take charge of any epidemic or endemic conditions, **and enforce such regulations as the state board of health may prescribe**…

W. Va. Code § 16-3-1. In other words, the implementing regulations instruct that the Legislature has endowed Dr. Christiansen, as State Health Office and Commissioner of the Bureau, with the power to protect the public health and to compel vaccination. W. Va. C. S. R. § 64-95-1 *et seq.*; W. Va. Code § 16-3-1.

Dr. Christiansen contends that West Virginia Code § 16-3-1 outlining the enforcement powers is a "different statute *not* challenged here." Def.'s Letter, ECF 50. However, surely Dr. Christiansen does not contend that different sections of Chapter 16 (Public Health), Article 3 (Prevention and Control of Communicable and Other Infectious Diseases) are not meant to be read in concert. To the extent that Dr. Christiansen argues that West Virginia Code § 16-3-1 is not to be read together with 16-3-4, Dr. Christiansen invites this Court to err.

Instead, this Court must be guided by longstanding rules of statutory construction. "In our review of a statutory provision, it is essential to afford the enactment an interpretation that comports with the intent of the Legislature." *Lowe v. Richards*, 234 w. Va. 48, 55, 763 S.E.2d 64, 71 (2014). Further, "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 107 S.E.2d 353 (1959). *Accord* Syl. Pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation.").

Here, West Virginia Code § 16-3-1 is entitled "State director of health authority to quarantine and *to enforce regulations*; state board of health *authority to issue regulations to control infectious or contagious diseases*." This code section outlines enforcement power and provides the Bureau with the authority to promulgate implementing regulations in West Virginia State Code Rule § 64-95-1, *et seq.* As noted previously, Dr. Christiansen is the Commissioner of the Bureau and the State Health Officer, as appointed by the Secretary of the DOH. *See* W. Va. Code § 16-1-5. As the Commissioner of the Bureau and its "chief executive," Dr. Christiansen maintains extensive powers and duties pursuant to West Virginia Code § 16-1-6, including "*to enforce all laws of this state concerning public health*." W. Va. Code § 16-1-6 (a)(2) (emphasis added). In addition, as Commissioner, Dr. Christiansen is empowered "*[t]o exercise all other powers delegated to the commissioner by the secretary or by this chapter or otherwise in this code, to enforce all health laws, and to pursue all other activities necessary and incident to the authority* and area of concern entrusted to the bureau or the commissioner." W. Va. code § 16-1-6(a)(19) (emphasis added).

It is clear that the Legislature intended to empower the Bureau to promulgate the regulations implementing Chapter 16, Article 3. It is also clear that Dr. Christiansen as Commissioner of the Bureau and as the State Health Officer is empowered to enforce West Virginia Code §§ 16-3-1 and 16-3-4. The statute in question and its implementing regulations impose an enforcement duty on Dr. Christiansen. That duty is not nullified just because Dr. Christiansen contends that it "bears no relation to reality." Pl.'s Letter, ECF 50. Nor are Dr. Christiansen's statutorily-imposed duties voided because he has "not ever purported to possess this power" or because "he expressly rejects it." *Id.*

Dr. Christiansen attempts to avoid his statutory duty as the State Health Officer, as the "primary enforcer" of the West Virginia Code § 16-3-4, Chapter 16 (Public Health), Article 3 (Prevention and Control of Communicable and Other Infectious Diseases).  Pl.'s Letter, ECF 50. To do so, Dr. Christiansen mischaracterizes the enforcement obligation of "the specific law the plaintiff challenges."  *See Doyle* 1 F.4th 249, 255 (4th Cir. 2021).  Here, the law that Plaintiffs challenge is the constitutionality of West Virginia Code Section 16-3-4.  By the plain language of the statute and its implementing regulations, it is the Bureau of Public Health and its appointed Commissioner and State Health Officer, Dr. Christiansen, who carries the burden of enforcing compulsory immunization.  *See* W. Va. Code §§ 16-3-1, 16-3-4, W. Va. C.S.R. 64-95-1, *et seq.* Plaintiff's K.P.'s withdrawal from Upshur County Schools was an ancillary effect of her election not to comply with her compulsory immunization.  Here, Dr. Christiansen improperly seeks to supplant his statutory duty of enforcement of compulsory immunization onto the Upshur School Board Parties, specifically Superintendent Miller and Ms. Marteney.

**B.      The WVDE and State Superintendent are "necessary" and "indispensable" but cannot be joined; thus, this Court is authorized to dismiss the Upshur School Board Parties.**

Perplexingly, Plaintiffs argue that injunctive relief against the Upshur School Board Parties would flow (upward) to the State Superintendent and the West Virginia Department of Education, contending that the State Superintendent and the WVDE are "agents" or acting in "active concert or participation" with the Upshur School Board Parties.  Pls.' Response, ECF 49 at p. 2.  On the contrary, the Upshur School Board Parties are agents of the State Superintendent and the WVDE and are under the control of these bodies, thereby leading to the conclusion that an injunction against the Upshur School Board Parties cannot directly redress the injury complained of in this case.  Further, the Upshur School Board Parties lack the "special relation" and "greater

proximity" to the disputed statute that are necessary to trigger the *Ex parte Young* exception to Eleventh Amendment immunity.

Moreover, the WVDE and the State Superintendent are both "necessary" parties to the instant action. Plaintiffs argue that "complete relief" can be afforded in the absence of the WVDE and the State Superintendent. Pl.'s Response, ECF 49 at p. 5. However, that is not the case. In the Motion to Dismiss, the Upshur School Board Parties detailed the nature of the near-complete intervention by the State in Upshur County Schools. ECF 45, generally. The WVDE, via the affidavit of Jeffrey Kelley, attested to the circumstances of such intervention and the resultingly "very limited authority" of the Upshur School Board Parties. *Id.* As the Upshur School Board Parties remain under the state's intervention, it is difficult to conjure injunctive relief that would not necessitate the State's authority to carry out. The Upshur School Board Parties recognize this Court's discretion to fashion injunctive relief that may flow to other parties, but emphasize the overall extraordinary nature of injunctive relief that should not be granted without the most searching and careful exercise of discretion. *Heldman v. U.S. Lawn Tennis Ass'n*, 354 S.Fupp. 1241 (S.D. N.Y. 1973).

Further, the Upshur School Board Parties maintain that the WVDE and the State Superintendent are "necessary" by virtue of their "interest relating to the subject of the action" and disposal of the action in their absence may "as a practical matter impair or impede the [WVDE and State Superintendent's] ability to protect the interest" or "leave [the Upshur School Board Parties] subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations." The Upshur School Board Parties assert that the WVDE and its head, the State Superintendent, have asserted an interest by affidavit in the instant proceedings, sufficient to

9

establish their necessity.  *Uncommon Sense 1 LLC*, 2024 U.S. Dist. LEXIS 87063, at * 5 (N.D. W. Va. May 14, 2024).

Further, a judgment rendered in the WVDE and State Superintendent's absence will subject the Upshur School Board Parties to a "substantial risk" of multiple or inconsistent obligations.  Fed. R. Civ. P. 19(a)(1)(B).  The "substantial risk" is demonstrated by the existence of actual litigation involving the same subject matter in a separate forum.  *McEvoy v. Diversified Energy Co. PLC*, No. 5:22-CV-171, 2023 WL 6192768, at *6 (N.D.W. Va. June 1, 2023).  Here, the Upshur School Board Parties direct this Court's attention to *W. Va. Parents for Religious Freedom v. Christiansen*, 685 F. Supp. 3d 371, appeal filed (N.D.W. Va. August 2, 2023) (examining the identical statute in dispute and noting the recent enactment of a state statute requiring that state action substantially burdening a person's exercise of religion must withstand strict scrutiny, pending appeal before the 4th Circuit).[5]  Accordingly, the Upshur School Board Parties assert that "substantial risk" is demonstrated by actual litigation involving the same subject matter in a separate forum, such to establish that the WVDE and State Superintendent are "necessary" under Rule 19.  While not named in the aforementioned litigation, the Upshur School Board Parties point out that there is "substantial risk" that they may be subject to inconsistent obligations: obligations under any potential Order in the instant action and separate obligation(s) as determined by the Fourth Circuit in the disposition of the *West Virginia Parents for Religious Freedom* lawsuit.

---

[5] The Upshur School Board Parties observe that while the *West Virginia Parents for Religious Freedom* action is pending on appeal, the two school board employees named therein in their official capacity, Belinda Moss, a principal, and Mindy Wilson, a principal, were dismissed early in the proceedings.  Interestingly, Plaintiff West Virginia Parents for Religious Freedom are also represented by the instant Plaintiffs' counsel and *voluntarily dismissed* Ms. Moss and Ms. Wilson.  *Id.; see Plaintiffs' Voluntary Dismissal of Claims against Defendant Mindy Workman*, ECF 32, and *Stipulation and Proposed Order of Dismissal of Belinda Moss*, ECF 33.  Thus, the lawsuit proceeds on appeal with Dr. Christiansen, in his official capacity, as the sole defendant.

Plaintiffs point to a case involving desegregation for the proposition that joinder is not necessary where a school district "failed to provide a single example of how the state has impeded the district's compliance" with a court order and federal law. *Stanley v. Darling Co. Sch. Dist.*, 84 F.3d 707 (4th Cir. 1996). Here, Plaintiffs' reliance on *Stanley* is inapposite, as its facts are distinguishable, and the court's reasoning concerning joinder is unrelated. Here, the Upshur School Board Parties do *not* contend that the State impeded its compliance with state law. Additionally, Plaintiffs do not assert that a court order has been violated. Moreover, the Fourth Circuit did not rely on failure to provide examples of impediments to compliance as the basis of its finding of district court error, but rather that the district court had erroneously treated a Rule 19 motion as a Rule 20 motion for permissive joinder. *Id.* at 715. Such is not the case here, and Plaintiffs' reliance on *Stanley* is misplaced.

So, too, with *Robertson v. Jackson*, cited by Plaintiffs to support their assertion that joinder of additional officials to an action was not necessary because the official named in the suit was sufficient to effect the relief ordered. *Robertson v. Jackson*, 972 F.2d 529 (4th Cir. July 20, 1992). Plaintiffs wholly failed to observe that in *Robertson* the district court enjoined the *Commissioner of the Virginia Department of Social Services*, in his official capacity, because, *inter alia*, it found that Virginia's *local* departments of social services operated as the Commissioner's *agents*. *Id.* Moreover, the *Robertson* Court did not address the question of whether local agencies were necessary because the *Commissioner* was able to bring about full compliance with federal law. *Id.* at 535-536. The Upshur School Board Parties also observe that the court in *Robertson* emphasized that the Commissioner had failed to move for dismissal for failure to join a party under Rule 19, prior to issuance of the preliminary injunction. *Id.* Such is not the case here. Contrary to Plaintiffs' argument, *Robertson* supports the Upshur School Board Parties' position that the

11
JA527

WVDE and State Superintendent are necessary and indispensable because it is the WVDE and the State Superintendent, like the Commissioner, who have "the power to provide meaningful relief" and to bring full compliance with the law. *Id.*

The WVDE and State Superintendent are "necessary" and "indispensable" but cannot be joined due to their immunity under the Eleventh Amendment; thus, this Court is authorized to dismiss the Upshur School Board Parties.

> **C.     The Upshur School Board Parties lack the requisite "special relation," "greater proximity," and "some connection" to the disputed statute; therefore, the *Ex parte Young* exception to Eleventh Amendment immunity does not apply.**

Plaintiffs' primary cited authority –*Bostic* – does not support a finding that the Upshur School Board Parties have "some connection" necessary to be proper defendants. *Bostic v. Schaefer*, 760 F.3d (4th Cir. July 28, 2014). In *Bostic,* the circuit clerk who was "tasked with '***granting and denying*** applications for marriage licenses' had 'some connection with the enforcement of the [Virginia Marriage Laws disallowing same sex marriage],'" such to prohibit Eleventh Amendment immunity. Pl.'s Response, ECF 49 at p. 2 (emphasis added).

In contrast, here Ms. Marteney and Ms. Miller did not have the "requisite connection" to the state law at issue. W. Va. Code § 16-3-4. In *Bostic*, the clerk took the relevant facts (that the marriage applicants were of the same sex) and applied it to the relevant law (the Virginia Marriage Laws) in order to determine whether the marriage license application would be granted or denied. *Bostic*, 760 F. 3d at n. 3.

Here, neither Ms. Marteney nor Ms. Miller applied the Plaintiffs' facts to law in order to grant or deny her a religious exemption. Ms. Marteney merely reminded Mrs. Perry of her obligation of compulsory immunization under West Virginia Code § 16-3-4 and informed Plaintiffs that West Virginia did not have a religious exemption. Ex. 7, Compl., ECF 1. W. Va.

Code § 16-3-4. Unlike *Bostic*, neither Ms. Marteney nor Ms. Miller was tasked with or given the authority to consider a religious exemption to the mandatory immunization requirements in West Virginia. Neither Ms. Marteney nor Ms. Miller had the authority to "deny" Plaintiffs a religious exemption, as there was no such religious exemption provided for in the statute. Thus, Ms. Marteney merely informed Ms. Perry of the current status of state law. As a result, they do not have "some connection" to the enforcement of the disputed law.

Moreover, the *only* exemption to compulsory immunization is the limited medical exemption as determined by the State Health Officer. Stated differently, the *State Health Officer* determines whether an exemption to West Virginia Code § 16-3-4 will be granted. No other state officer, and certainly none of the Upshur School Board Parties, had the authority or responsibility to consider exemptions to the immunization requirements. It is quite clearly not a decision for the Upshur School Board Parties whether an exemption is to be granted. Even the Complaint demonstrates that the School Board Parties simply relayed to Plaintiffs what the state law stated on the issue. Ex. 7, Compl., ECF 1. Specifically with respect to Ms. Marteney, she made clear when asked whether K.P. could attend virtual school with a religious exemption, that a religious exemption did not exist. *Id*. She did not deny K.P. a religious exemption, because she had no authority to grant or deny such a request, as there was no such provision in the statute.

In their six-paragraph prayer for relief, Plaintiffs seek only one form of relief that relates to the Upshur School Board Parties: issuance of a "preliminary and permanent injunction prohibiting Defendants, their agents, servants, employees and any other persons acting on their behalf from enforcing West Virginia Code § 16-3-4 against Plaintiffs, unless the government provides an option for Plaintiffs to request a religious exemption to the Virtual Academy." ECF 1 at p. 55-56. It is clear that the "government" could only refer to the State Legislature, and if the

13

JA529

State Legislature were to codify a religious exemption, the Upshur School Board Parties would have no alternative than to accept it. Under the existing statute, the only other person with authority to consider an exemption is Dr. Christiansen as the State Health Officer.

A "general 'supervisory' role" does not suffice to trigger the *Young* exception. *Ass'n of Am. Railroads v. Hudson,* 2024 WL 1626105 (E.D.Va. April 15, 2024) (citing affirmatively *Doyle*, 1 F.4th 249, for the proposition that defendants must maintain "greater proximity to" the challenged statute). Moreover, the *Doyle* Court found it necessary "to search for more than the general authority to enforce the laws of the state." *Id.* at 255. In *Doyle*, in analyzing the application of *Ex parte Young,* the *Doyle* Court found the Governor's general duty to enforce state law was not enough to overcome his immunity from suit under the Eleventh Amendment. *Id.* The court analyzed the Governor's power to direct the state Secretary of Health to enforce the statute at issue. *Id.* Moreover, the Court found it dispositive that the Governor could *not* direct its agent [the Secretary of Health] to enforce the disputed act.

Here, the enforcement power behind West Virginia Code § 16-3-4 lies clearly with the Bureau of Public Health and Dr. Christiansen. Consequently, the Upshur School Board Parties cannot direct the Bureau or Dr. Christiansen to take action or to utilize their enforcement power. Likewise, the Upshur School Board Parties cannot direct the State Legislature to enact a religious exemption to W. Va. Code § 16-3-4. Therefore, nothing in West Virginia law provides the requisite "special relationship" to the enforcement of the statute at issue. On the contrary, as discussed above, all statutory and regulatory authority emphasizes that Dr. Christiansen maintains the "special relationship" with the disputed statute, as well as the power to enforce the statute. Ms. Miller and Ms. Marteney have, at most, a general authority to enforce state laws that affect the schools, but lack the authority to direct Dr. Christiansen or the Bureau to take enforcement action.

14
JA530

Resultingly, they lack the "requisite connection" to the enforcement of West Virginia Code § 16-3-4 that would permit an exception to Eleventh Amendment immunity to apply.

**D.      Plaintiffs failed to state a claim against the Upshur School Board Parties; thus, the Complaint should be dismissed against them pursuant to Rule 12(b)(6).**

"Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their claim must be dismissed." *Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955 (2007).  Here, dismissal of the Upshur School Board Parties is proper, because it cannot be shown that the Upshur School Board Parties have any responsibility or authority to consider a religious exemption to West Virginia's compulsory immunizations that does not exist under the law.  Thus, the Upshur School Board Parties are entitled to dismissal based on Plaintiffs' failure to state a claim against the Upshur School Board Parties upon which relief may be granted.

As argued above and in prior briefing, the Upshur School Board Parties are duty-bound to comply with state law and the directives of the State Superintendent of Schools and the WVDE.  *See* W Va. Code § 18-4-10.  *See also State v. Rouzer, 127 W. Va. 392, 32 S.E.2d 865 (1945); Dooley v. Board of Education, 80 W. Va. 648, 93 S.E. 766 (1917).*  Accordingly, the Upshur School Board Parties have no statutory authority to thwart state law and/or a directive by the State Superintendent and the WVDE.  As such, Plaintiffs have not sought relief from the proper party and have therefore failed to state a claim against the Upshur School Board Parties or to nudge their claims from conceivable to plausible, necessitating dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**III.      CONCLUSION**

For the reasons stated above, the Motion to Dismiss should be granted.

15
JA531

/s/ Robert J. Kent
Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, West Virginia  26102
(304) 420-5504
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, West Virginia  26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

Counsel for Defendants The Board of
Education of the County of Upshur, Stacy
Marteney, in her official capacity and
Christine Miller, in her official capacity

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, individually and
on behalf of their minor child K.P.,

      Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc.,
d/b/a West Virginia Virtual Academy,*

      Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE KLEEH

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2024, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

counsel of record.

                                        */s/ Robert J. Kent*
                                        Robert J. Kent

17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and ANTHONY PERRY,
individually and on behalf of
their minor child K.P.,

       Plaintiffs,

v.                                Civil Action No. 2:24-CV-18

STACY MARTENEY et al,

       Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [ECF NO. 29], GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 7] AND DENYING DEFENDANT'S MOTION TO STAY [ECF NO. 22]**

Pending before the Court are Defendants Stacy Marteney, Christine Miller, and the Upshur County Board of Education's Motion to Dismiss [ECF No. 29], Plaintiffs' Motion for Preliminary Injunction and Expedited Consideration [ECF No. 7] as well as Defendant Matthew Christiansen's Motion to Stay [ECF No. 22]. The motions are fully briefed and, after oral argument on August 12, 2024 at the Clarksburg point of holding court, are ripe for decision. For the reasons and to the extent set forth herein, Plaintiffs' Motion for Preliminary Injunction [ECF No. 7] is **GRANTED**, Defendants' Motion to Dismiss [ECF No. 29] is **GRANTED IN PART** and **DENIED IN PART** and Defendant's Motion to Stay [ECF No. 22] is **DENIED**.

Perry et al. v. Marteney et al. 2:24-CV-18

### Preliminary Injunction Order

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs, Krystle and Anthony Perry, individually and on behalf of their minor child, K.P., filed their Complaint on July 5, 2024. ECF No. 1. Therein, they claim their respective First Amendment rights have been infringed by West Virginia's mandatory vaccination law, W. Va. Code § 16-3-4. Specifically, they claim the mandatory vaccinations provided for under state law run counter to their sincerely held religious beliefs and, with Defendants' refusal to enroll K.P. in virtual school, they seek relief under 42 U.S.C. § 1983 including injunctive relief and attorneys' fees. In their pending motion, Plaintiffs request the Court enjoin Defendants from enforcing the challenged statute against K.P. as it pertains to her efforts to enroll in virtual schooling for the 2024-2025 academic year.

Defendants argue against any injunction and, via separate motion, urge the Court to stay this matter under the Pullman abstention doctrine. In addition, the Upshur County Defendants urge the Court to dismiss Plaintiffs' Complaint for multiple reasons including Eleventh Amendment immunity and failure to join indispensable parties.

**Perry et al. v. Marteney et al.**　　　　　　　　　　　**2:24-CV-18**

**Preliminary Injunction Order**

## II.　FINDINGS OF FACTS

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact in support of the injunction entered with this Order.[1]

Plaintiffs filed the instant civil action, individually and on behalf of their minor child, K.P., against the School Board Parties — the Upshur County Board of Education, Superintendent Christine Miller, and Virtual School Coordinator Stacey Marteney; Dr. Matthew Christiansen, as the State Health Officer and Commissioner of the Bureau of Public Health; and Mr. Doug Cipoletti,[2] as Executive Director of the West Virginia Virtual Academy, on July 5, 2024. See generally Compl., ECF No. 1.

From August 2022 through January 2024, K.P., Plaintiffs' minor daughter, was enrolled in an online learning program but was not physically present in a classroom with other children. Id. ¶¶ 2 and 70. K.P. was enrolled in Upshur County Virtual School for approximately 16 months. Id. ¶ 75.[3]

---

[1] The Court offered each party the opportunity to call witnesses and present any other evidence they believed the Court should consider at the August 12, 2024 hearing. The parties declined the invitation noting the written record was sufficient.

[2] Mr. Cipoletti has been replaced by Bryan Hoylman as a Defendant. ECF No. 20.

[3] The Complaint alleges K.P. was enrolled in the West Virginia Virtual Academy; however, she was actually enrolled as a student with the Upshur County Virtual School – a separate program offered exclusively through Upshur County. The parties agreed at the April 12, 2024, hearing this was the case.

Perry et al. v. Marteney et al.                                  2:24-CV-18

### Preliminary Injunction Order

Regarding the mandatory immunization of school children, West Virginia Code § 16-3-4 prohibits K.P. from attending school in West Virginia unless she receives all the vaccines required under the statute absent medical exemption. Id. ¶ 1. In West Virginia, it is unlawful for any child to attend "any of the schools of the state or a state-regulated childcare center until he or she has been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough" and "[n]o person shall be allowed to enter school without at least one dose of each required vaccine." Id. ¶ 18; see also W. Va. Code § 16-3-4. Similarly, no child may be "admitted or received in any of the schools of the state" unless they have received the required vaccinations. ECF No. 1 at ¶ 99; see also W. Va. Code § 16-3-4. K.P. has not received all the vaccines listed in the statute. ECF No. 1 at ¶ 6. Plaintiffs allege that they possess deeply held religious beliefs that forbid them from fully vaccinating K.P., as required under W. Va. Code § 16-3-4. Id. ¶ 11.[4]

On December 18, 2023, the Superintendent of the West Virginia Department of Education sent the Superintendent's Update email, which included a directive to county school systems across the

---

[4] No dispute has been raised as to this allegation and the Court accepts it as true for purposes of this motion.

4

JA537

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

**Preliminary Injunction Order**

state, informing them that all full-time virtual students were "required to be fully immunized according to W. Va. Code § 16-3-4 exactly as they would be when enrolling for in-person instruction" and that the school boards were to "review the enrollment records of [their] full-time virtual students and . . . correct any non-compliance enrollment occurrences."

On June 14, 2023, the West Virginia State Board of Education authorized an immediate intervention of the Upshur County School system. As a result of the Special Circumstance Review, it was the recommendation of the West Virginia Department of Education that extraordinary circumstances existed in the county that constituted major impediments to the provision of education programs and services for students, and that the Upshur County school system be issued Non-approval status. It was further recommended that since these extraordinary circumstances had been documented and existed, delaying the intervention by the State Board into Upshur County Schools for any period of time would not have been in the best interest of the students and staff in Upshur County in accordance with W. Va. Code § 18-2E-5. The State Board made findings related to preliminary investigations and broadly delegated the county's statutory authority to the State Board. See also W. Va. Code § 18-2E-5. Among the State Board's findings was that "the authority of the Upshur County Board of Education

5

JA538

Perry et al. v. Marteney et al.                          2:24-CV-18

**Preliminary Injunction Order**

shall be limited in areas that compromise the delivery of a thorough and efficient education to its students as designated by the WVBE . . .". In addition, the State Board appointed Stephen L. Wotring as interim Superintendent and granted the Deputy State Superintendent the authority to hire a county superintendent to replace the interim. The State Board "limited the authority of the Upshur County Board of Education as to finances, personnel, federal programs and any other areas designated by the WVBE. . ." On June 14, 2023, the State Board commenced its immediate intervention. In January 2024, following the State Board's takeover, K.P. withdrew from Upshur County Virtual School because she elected not to receive the required vaccinations due to religious beliefs.

Plaintiffs' eight-year-old child, K.P., was enrolled in the Upshur County Virtual School for 17 months, from August of 2022 to January of 2024. ECF No. 1 at ¶ 134. Defendant Miller is the duly empaneled Superintendent of the Upshur County School system and directs Defendant Marteney's actions, including enrollment and dis-enrollment of students in the virtual school. Id. ¶ 94. In December 2023, Defendant Marteney, the Virtual Learning Coordinator for the Upshur School District, informed Plaintiffs that K.P. would not be enrolled in the Upshur County Virtual School if she did not receive all vaccines required under W. Va. Code §

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

**Preliminary Injunction Order**

16-3-4.  Id. ¶ 75.  Plaintiffs thereafter requested a religious exemption for K.P. so she could continue her education in the virtual school without receiving any additional vaccine doses. Defendants rejected that request.  Id. ¶ 183; see also ECF No. 1-7 (denial of Plaintiffs' religious exemption request).

In their verified Complaint, Plaintiffs allege, and submit competent evidence via their verifications, Defendant Marteney is "tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of W. Va. Code § 16-3-4 against school-aged children desiring to attend the Virtual Academy, and she enforced the [statute] against the Plaintiffs and excluded K.P. from the Virtual Academy" after Plaintiffs requested a religious exemption.  ECF No. 1 ¶ 92.  Defendant Miller is also tasked, under W. Va. Code § 18-4-10, with implementing and enforcing all procedures of state law, including enforcing W. Va. Code § 16-3-4 against K.P., which necessarily extended to oversight of the denial of her religious exemption request and exclusion from the virtual school.  Id. ¶ 94.

West Virginia Governor Jim Justice vetoed a bill passed by the West Virginia Legislature during the 2024 regular session that would have allowed for exemptions from vaccination requirements for students enrolled only in virtual public schools.  Id. ¶ 143. Currently, the only exemption to the compulsory immunization of

**Perry et al. v. Marteney et al.** **2:24-CV-18**

**Preliminary Injunction Order**

school children is a medical exemption. Id. ¶¶ 144 and 170; see also W. Va. Code § 16-3-4.

In their Complaint, Plaintiffs seek a declaration by this Court related to the constitutionality of W. Va. Code § 16-3-4, specifically the lack of religious exemption thereto. Id. Plaintiffs allege violations of their First Amendment Free Exercise Rights. Id. at Count I. Additionally, Plaintiffs seek to enjoin the Upshur County Board from implementing and enforcing W. Va. Code § 16-3-4 as it relates to K.P. Id.

Given the issues presented in the myriad of motions pending, a review of certain West Virginia statutes as it pertains to the parties and their duties under law is necessary.

As a statutory corporation, a West Virginia county school board only has those powers expressly granted by state law or which arise by necessary implication from expressly granted powers. See, e.g., Shinn v. Bd. of Educ., 20 S.E. 604 (W. Va. 1894) ("The board of education of a school district is a corporation created by statute with functions of a public nature expressly given and no other; and it can exercise no power not expressly conferred or fairly arising from necessary implication, and in no other mode than that prescribed or authorized by statute."); Honaker v. Bd. of Educ., 24 S.E. 544 (W. Va. 1896). Regarding boards of education, the Supreme Court of Appeals of West Virginia has

Perry et al. v. Marteney et al.                        2:24-CV-18

## Preliminary Injunction Order

observed "the rule of law applies of strict construction and a consequent limitation of the rights which may be exercised by them and the duties which they can legally perform." Herald v. Bd. of Educ., 65 S.E. 102 (W. Va. 1909).

Historically and currently, a board of education is a "creature of statute" with no powers other than those expressly given to it or that arise by necessary implication. See, e.g., State v. Rouzer, 32 S.E.2d 865 (W. Va. 1945); Dooley v. Board of Education, 93 S.E. 766 (W. Va. 1917). Thus, the Board may only act in the mode prescribed or authorized by statute. Id. In addition, the Board is a political subdivision of the State of West Virginia, maintains a corporate character, and is charged with the control and management of the schools and the district pursuant to West Virginia Code §§ 18-5-1, 18-5-5, and 18-5-13.

A county superintendent of schools has statutory duties enumerated by the West Virginia Legislature. Specifically, a county superintendent shall:

> (1) Act as the chief executive officer of the county board as may be delineated in his or her contract or other written agreement with the county board, and, under the direction of the state board, execute all its education policies;

*****

**Perry et al. v. Marteney et al.**                           **2:24-CV-18**

### Preliminary Injunction Order

> (10) Exercise all other authority granted by
> this chapter or required by the county board
> or state board; []

W. Va. Code § 18-4-10.

With respect to compulsory immunization of school children,

West Virginia Code § 16-3-4 provides:

> (a) Whenever a resident birth occurs, the
> commissioner shall promptly provide parents of
> the newborn child with information on
> immunizations mandated by this state or
> required for admission to a public, private
> and parochial school in this state or a state-
> regulated child care center.

> (b) Except as hereinafter provided, a child
> entering school or a state- regulated child
> care center in this state must be immunized
> against chickenpox, hepatitis-b, measles,
> meningitis, mumps, diphtheria, polio,
> rubella, tetanus and whooping cough.

> (c) No child or person may be admitted or
> received in any of the schools of the state or
> a state-regulated child care center until he
> or she has been immunized against chickenpox,
> hepatitis-b, measles, meningitis, mumps,
> diphtheria, polio,, rubella, tetanus and
> whooping cough or produces a certificate from
> the commissioner granting the child or person
> an exemption from the compulsory immunization
> requirements of this section.

> (d) Any school or state-regulated child care
> center personnel having information
> concerning any person who attempts to be
> enrolled in a school or state-regulated child
> care center without having been immunized
> against chickenpox, hepatitis-b, measles,
> meningitis, mumps, diphtheria, polio,
> rubella, tetanus and whooping cough shall
> report the names of all such persons to the
> commissioner.

**Perry et al. v. Marteney et al.**                          **2:24-CV-18**

**Preliminary Injunction Order**

(e) Persons may be provisionally enrolled under minimum criteria established by the commissioner so that the person's immunization may be completed while missing a minimum amount of school. No person shall be allowed to enter school without at least one dose of each required vaccine.

(f) County health departments shall furnish the biologicals for this immunization for children of parents or guardians who attest that they cannot afford or otherwise access vaccines elsewhere.

(g) Health officers and physicians who provide vaccinations must present the person vaccinated with a certificate free of charge showing that they have been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough, or he or she may give the certificate to any person or child whom he or she knows to have been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough.

(h) The commissioner is authorized to grant, renew, condition, deny, suspend or revoke exemptions to the compulsory immunization requirements of this section, on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine.

(1) A request for an exemption to the compulsory immunization requirements of this section must be accompanied by the certification of a licensed physician stating that the physical condition of the child is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine.

Perry et al. v. Marteney et al.                    2:24-CV-18

### Preliminary Injunction Order

> (2) The commissioner is authorized to appoint and employ an Immunization Officer to make determinations on request for an exemption to the compulsory immunization requirements of this section, on a statewide basis, and delegate to the Immunization Officer the authority granted to the commissioner by this subsection.
>
> (3) A person appointed and employed as the Immunization Officer must be a physician licensed under the laws of this state to practice medicine.
>
> (4) The Immunization Officer's decision on a request for an exemption to the compulsory immunization requirements of this section may be appealed to the State Health Officer.
>
> (5) The final determination of the State Health Officer is subject to a right of appeal pursuant to the provisions of article five, chapter twenty-nine a of this code.
>
> (i) A physician who provides any person with a false certificate of immunization against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio,, rubella, tetanus and whooping cough is guilty of a misdemeanor and, upon conviction, shall be fined not less than $25 nor more than $100.

W. Va. Code § 16-3-4.

Effective September 14, 2015, the State Board of Education promulgated a legislative rule related to "Health Promotion and Disease Prevention," known as Policy 2423. 126 W. Va. C.S.R. § 51. Specifically, this legislative rule includes provisions related to statewide immunization tracking, state-declared health promotion through up-to-date immunizations, disease prevention measures

12

JA545

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

**Preliminary Injunction Order**

through immunizations, and required vaccinations for students. See 126 W. Va. C.S.R. 51 at §§ 4.23, 5.1, 6.1, 6.2, 6.3, 6.4, 7.1.

### III.   ANALYSIS

#### A. Subject Matter Jurisdiction and Ex Parte Young

In Count I of the Complaint, Plaintiffs allege the Upshur County Defendants (the Upshur County Board of Education, Defendant Marteney, and Defendant Miller) and Defendant Christiansen have and continue to violate their respective First Amendment rights and seek redress, specifically injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1988, under 42 U.S.C. § 1983.  ECF No. 1.  That claim vests this Court with jurisdiction per 28 U.S.C. § 1331—federal question jurisdiction.[5]

Defendants argue, however, the Eleventh Amendment prohibits Plaintiffs from pursuing their claims in this Court.  Plaintiffs

---

[5] During the August 12, 2024 oral argument, the parties alluded to the limitations on federal court jurisdiction under Article III of the United States Constitution.  Of course, "[f]ederal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).  The parties cannot conjure subject-matter jurisdiction, nor can a defect in subject-matter jurisdiction be waived.  See United States v. Cotton, 535 U.S. 625, 630 (2002).  Thus, questions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised sua sponte by the court. See Bender, 475 U.S. at 541 ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it.") (internal quotation marks omitted).

Perry et al. v. Marteney et al.　　　　　　　　　　　2:24-CV-18

### Preliminary Injunction Order

contend the relief sought does not run afoul of constitutional immunity. The Court, being mindful of the Fourth Circuit's direction in Sonda v. West Virginia Oil and Gas Conservation Comm'n, 92 F.4th 213 (4th Cir. 2024),[6] considers the issue of jurisdiction first.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court of the United States has interpreted this Amendment to mean that a state may not "be sued as defendant in any court in this country without [its] consent . . .." Hans v. Louisiana, 134 U.S. 1, 17 (1890) (quoting Cunningham v. R.R. Co., 109 U.S. 446, 451 (1883)); see also Doyle v. Hogan, 1 F.4th 249, 254 (4th Cir. 2021) (citing Va. Off. For Protection & Advocacy v. Stewart, 563 U.S. 247 (2011) ("In general, States may not be haled into federal court without their consent.")). The question of Eleventh Amendment immunity is a jurisdictional

---

[6] As discussed infra, Defendants urge the Court to exercise its discretion and decline Plaintiffs' invitation to adjudicate their First Amendment claims or, at least, stay this case invoking Pullman abstention. Sonda is much discussed in the briefs and herein on that issue. However, the Fourth Circuit made clear in Sonda that subject matter jurisdiction must be considered initially. See id. at 219-220.

**Perry et al. v. Marteney et al.**                          **2:24-CV-18**

### Preliminary Injunction Order

one.   See Suarez Corp. Industries v. McGraw, 202 F.3d 676, 683 n.12 (4th Cir. 2000) (citation omitted).

### 1. Dr. Christiansen as A State Entity

The threshold (but not necessarily dispositive) issue is whether any of the defendants are considered "the state" under the Eleventh Amendment. The Court addresses each Defendant in turn starting with the more obvious question of Defendant Dr. Christiansen. He serves as State Health Officer and Commissioner for the West Virginia Department of Health and Human Resources. ECF No. 1 at ¶ 95. Under the challenged statute, W. Va. Code § 16-3-4, Dr. Christiansen is charged with implementing the mandatory vaccination requirements for school-aged children, while also granting medical exemptions for the same. Id.[7] He is only named as a defendant in his official capacity. Id. An "official capacity suit" is merely another way to assert a claim against the state itself.  See Panico v. City of Westover, Civil Action No. 21-CV-96, 2022 WL 989120, at *6 (N.D.W. Va. March 31, 2022) (citing Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)).  Thus, Dr. Christiansen is considered a state official for Eleventh Amendment purposes.

---

[7]  Plaintiffs allege Defendant Christiansen is charged with "enforcing" W. Va. Code § 16-3-4.  For the reasons discussed herein, the Court disagrees with that interpretation of his duties under that statute.

Perry et al. v. Marteney et al.　　　　　　　　　　2:24-CV-18

**Preliminary Injunction Order**

## 2. Upshur County Defendants as State Entities

The Upshur County Defendants present a more complicated assessment. Typically, "counties [and therefore their employees] are not arms of the state and thus do not fall within the ambit of the Eleventh Amendment." Workman v. Mingo County Schools, 667 F. Supp. 2d 679, 685 (S.D.W. Va. 2009). However, as discussed above, the State Board of Education has assumed control of the Upshur County Board of Education. It has also, under its statutory authority, appointed the individual defendants, Virtual Learning Coordinator Stacy Marteney and Superintendent Christine Miller, to their positions. The parties have thoroughly addressed the complicating factor the State takeover presents here. At the August 12, 2024 oral argument, Plaintiffs offered to dismiss the Upshur County Board of Education as a defendant noting it an unnecessary party to secure the injunctive relief sought here and to avoid any Eleventh Amendment immunity entanglements. No party did or has objected. The Court, having no objection of its own, hereby **DISMISSES** the Upshur County Board of Education as a party-defendant at Plaintiffs' request.

Two inquiries can bring a local government body within the protection of Eleventh Amendment immunity. First, "if the State treasury will be called upon to pay a judgment against a governmental entity, then Eleventh Amendment immunity applies to

**Perry et al. v. Marteney et al.**                                  **2:24-CV-18**

## Preliminary Injunction Order

that entity." <u>Cash v. Granville Cty Bd. of Educ.</u>, 242 F.3d 219, 223 (4th Cir. 2001). Because Plaintiffs in this matter seek only declaratory and prospective injunctive relief, the first factor does not apply.

The second inquiry, often referred to as the "sovereign dignity" inquiry, considers whether the government entity and the State are "sufficiently close to make the entity an arm of the State." <u>Id</u>. at 224. In determining whether a government entity is an "arm of the state," the Court must consider:

> (1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys;
>
> (2) the scope of the entity's concerns—whether local or statewide—with which the entity is involved; and
>
> (3) the manner in which State law treats the entity.

<u>Id</u>. In <u>Cash</u>, the Fourth Circuit concluded that because, under North Carolina law, the local school board had nearly full autonomy to act, including the power to hire and fire administrators, because its concerns were generally local, and because the State treats local school boards as local entities, the local school board in <u>Cash</u> was not an arm of the State.

This Court has the benefit of Judge Goodwin's analysis in <u>Workman</u>. There, Judge Goodwin applied the sovereign dignity test

17

JA550

**Perry et al. v. Marteney et al.**                                        **2:24-CV-18**

### Preliminary Injunction Order

to the entity defendant Mingo County Board of Education, concluding that it was an arm of the State entitled to sovereign immunity. Workman, 667 F. Supp.2d at 687. The court reached this conclusion primarily because the Mingo Board had been taken over by the State Board of Education under W. Va. Code § 18-2E-5(p)(4)(C). Under that provision, the court reasoned that because the Mingo Board "ha[d] little to no rights of autonomy and self-control," and because the State Board was effectively "empowered to manage the schools in Mingo County and accordingly control the Mingo Board," the Mingo Board—after takeover—was an arm of the State entitled to state sovereign immunity. As a result, the court concluded that all claims against the Mingo Board were barred in federal court and dismissed it as a defendant.

Here, the State Board of Education has used the same statute to take over the Upshur County Board of Education. See ECF No. 40-2. Through its takeover order, the State Board has removed the county superintendent and all employees who served at the pleasure of the county superintendent. Id. at ¶ 6; 9. The State Board further limited the Upshur Board's authority "in areas that comprise the delivery of a thorough and efficient education to its students as designated by the WVBE by rule," including delegating decision-making authority to the Deputy State Superintendent. Id. at ¶ 5. Although the provisions of the takeover law are now

Perry et al. v. Marteney et al.                                    2:24-CV-18

### Preliminary Injunction Order

somewhat different, the level of control possessed by the State Board remains the same.  Accordingly, the Upshur Board is, in the circumstances presented, an arm of the state entitled to state sovereign immunity. That entity has already been voluntarily dismissed.  See supra.

However, the County Superintendent and Virtual Learning Coordinator remain parties in their official capacities.  ECF No. 1. ¶¶ 92 and 94.  The County Superintendent, Defendant Miller, was hired by the Deputy State Superintendent, see ECF No. 40-2 at ¶ 7–8, and operates under the authority of the State Board of Education via the takeover order.  Moreover, because the Deputy State Superintendent was empowered to fill all administrative positions in the Upshur County Schools, see ECF No. 40-2 at ¶ 10, both the County Superintendent and the Upshur County Virtual Learning Coordinator would be considered "state officials" for Eleventh Amendment purposes. See Workman, 667 F. Supp. 2d at 688.  "Even though the language of the Eleventh Amendment preserves sovereign immunity of only the **States** of the Union, it is settled that this protection extends also to 'state agents and state instrumentalities,' or stated otherwise, to 'arms of the State' and State officials." Cash, 242 F.3d at 222 (emphasis in the original) (cleaned up).

**Perry et al. v. Marteney et al.**                           **2:24-CV-18**

### Preliminary Injunction Order

### 3. <u>**Ex parte Young**</u>

Plaintiffs contend quite correctly this does not end the inquiry, however.  In <u>Ex parte Young</u>, the Supreme Court observed that "a suit against individuals, for the purpose of preventing them, as officers of a state, from **enforcing** an unconstitutional enactment, to the injury of the rights of the plaintiff, is not a suit against the state within the meaning of the [Eleventh] Amendment." 209 U.S. 123, 154 (1908) (emphasis added) (citation omitted).

> If the act which [a state officer] seeks to enforce [is] a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

<u>Id</u>. at 159-60.   Accordingly, "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective."  <u>Republic of Paraguay v. Allen</u>, 134 F.3d 622, 627 (4th Cir. 1998).

20
JA553

Perry et al. v. Marteney et al.                          2:24-CV-18

### Preliminary Injunction Order

Nevertheless, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act[.]"  Ex parte Young, 209 U.S. at 157; see also Doyle, 1 F.4th at 254. Otherwise, a plaintiff "is merely making him a party as a representative of the State, and thereby attempting to make the State a party."  Id. The Fourth Circuit has further explained that "Ex parte Young requires a 'special relation' between the state officer and the challenged statute to avoid the Eleventh Amendment's bar."  Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001); Doyle, 1 F.4th at 254.  Moreover, a general authority to enforce the laws of a state is not a close enough relation.  Id.  "Instead, the officer sued must be able to enforce, if he [or she] so chooses, the specific law the plaintiff challenges."  Doyle, 1 F.4th at 255.  Overall, "[t]he exception is narrow: it applies only to prospective relief, [and] it does not permit judgments against state officers declaring that they violated federal law in the past. . .."  P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

### a.   Dr. Christiansen Remains Immune

The Court first examines Ex parte Young with respect to Dr. Christiansen, named only in his official capacity as State Health

**Perry et al. v. Marteney et al.**                              **2:24-CV-18**

### Preliminary Injunction Order

Officer and Commissioner of the Bureau of Public Health.  ECF No. 1.  The relief sought is largely limited to prospective enforcement of the West Virginia mandatory vaccine law, W. Va. Code § 16-3-4, as it pertains to Plaintiffs.  Dr. Christiansen's legal authority under the challenged statute is limited to (1) providing parents of newborn children with information on mandated vaccinations, W. Va. Code § 16-3-4(a); (2) providing medical exemptions, W.Va. Code § 16-3-4(c), (h); (3) developing a minimal criteria for the provisional enrollment of a student who has "at least one dose of each required vaccine," "so that the [student's] immunization may be completed while missing a minimum amount of school," W. Va. Code § 16-3-4(e); and (4) appointing and employing an Immunization Officer, W. Va. Code § 16-3-4(h)(2).  As Plaintiffs vociferously protest, West Virginia law does not provide Dr. Christiansen or anyone else authority to grant any other exemptions including exemption for religious objections.

Dr. Christiansen is irrelevant to fashioning the remedy requested in the Complaint.  Dr. Christiansen cannot force Upshur County officials – even while that county's schools are under State control - to re-enroll the Plaintiff. The State Health Officer does not have the authority to mandate that any student be enrolled, or unenrolled in a school. In short, the State Health Officer has no control over the State Superintendent, the County

**Perry et al. v. Marteney et al.**　　　　　　　　　　　　　　　　　**2:24-CV-18**

### Preliminary Injunction Order

Board of Education, or any individual school. See W. Va. Code §§ 16-1-5 (designating that the State Health Officer may also serve as the Commissioner of the Bureau for Public Health); 16-1-6 (enumerating powers of the Commissioner of the Bureau for Public Health). In short, Dr. Christiansen lacks the legal ability to remedy the alleged constitutional violation as Plaintiffs expressly seek in their Prayer for Relief. See ECF No. 1, at ¶¶ 283-84. No "special relation" or even "some connection" exists between Defendant Christiansen and the relief sought here. See Doyle, 1 F.4th at 254. Accordingly, this Court lacks jurisdiction over Dr. Christiansen as he remains vested with immunity from suit in this Court under the Eleventh Amendment and must be dismissed.[8]

---

[8] Dr. Christiansen also argues Plaintiffs lack standing to seek even injunctive relief against him in his official capacity. Although not raised via Rule 12(b)(1) motion, "federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990) (internal quotations and citations omitted), holding modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004). For the same reasons the Court finds Dr. Christiansen is cloaked in Eleventh Amendment immunity here, the Court concludes Plaintiffs have not established either the requisite "causal connection" between their claimed injury and Dr. Christiansen's conduct or that Dr. Christiansen could, even under this Court's command, redress that injury. See Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315 (4th Cir. 2002). Plaintiffs' lack of standing with respect to their claims against Dr. Christiansen requires his dismissal on this separate, independent basis.

Perry et al. v. Marteney et al.                    2:24-CV-18

Preliminary Injunction Order

## b. Upshur County Individual Defendants Are Not Immune

With respect to Defendants Marteney and Miller, the Court ultimately reaches a different decision, however. Again, although the Eleventh Amendment technically bars a party from suing a state or its agency to seek injunctive relief,[9] a plaintiff may bring the suit against a state officer in his or her official capacity seeking prospective injunctive relief, thereby effecting the same result. Seminole Tribe v. Florida, 517 U.S. 44, 71 n.14 (1996) ("An individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law."). It remains a narrow exception to constitutional sovereign immunity. "Young's applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." Papasan v. Allain, 478 U.S. 265, 277 (1986); Griffin v. Cnty. School Bd. of Prince Edward Cnty., 377 U.S. 218, 228 (1964) (noting "suits against state and county officials" to enjoin unconstitutional action are permitted under Ex parte Young). In such cases, citizens can bring suits against a state officer, in his official capacity, where he has a "special

_____

[9] See Cory v. White, 457 U.S. 85, 91 (1982) ("Thus, the Eleventh Amendment by its terms clearly applies to a suit seeking an injunction.").

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

## Preliminary Injunction Order

relation" to the challenged act.  Id. at 157; see also Quern v. Jordan, 440 U.S. 332, 346-49 (1979); Edelman v. Jordan, 415 U.S. 651, 665-69 (1974).

To meet the "special relation" requirement, the challenged official must have "proximity to and responsibility for the challenged state action," thus ensuring "that a federal injunction will be effective with respect to the underlying claim." South Carolina Wildlife Federation v. Limehouse, 549 F.3d 324, 332-33 (4th Cir. 2008).  This test does not require the challenged statute specify the official's role, but where there are express obligations, the officer's duty is made clearer. See Ex parte Young, 209 U.S. at 157. Ultimately, the "important and material fact" is that "the state officer, by virtue of his office, has some connection with the enforcement of the act."  Id.

Defendant Miller ("Superintendent Miller") is the duly appointed Superintendent of the Upshur County School System and has been sued only in her official capacity as Superintendent. Her duties are outlined in W. Va. Code § 18-4-10 and include enforcement of all policies and procedures by state law, including, as is relevant here, enforcement of W. Va. Code § 16-3-4 against Plaintiffs.  Again, Superintendent Miller was appointed by the State Department of Education, and is subject, at present, to their oversight rather than that of the local board.  See ECF 40-2.

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

## Preliminary Injunction Order

Among other things, statutory authority renders Superintendent Miller the "chief executive officer" of the board and empowers her to "under the direction of the state board, execute all its education policies." W. Va. Code § 18-4-10(1) and (10).

Defendant Marteney works as the Virtual Learning Coordinator for Upshur School Schools, the system through which Plaintiffs enrolled, and attempted to re-enroll, K.P. into the Upshur County Virtual School. ECF No. ¶ 92. Marteney is sued solely in her official capacity. Id. Ms. Marteney is tasked with implementing and enforcing, and does implement and enforce, the mandatory vaccination requirements of W. Va. Code § 16-3-4 and cited this statute when refusing to re-enroll K.P. in the county's virtual school. Id. Plaintiffs allege Marteney was primarily responsible for the decision made subject of the Complaint. Id. ¶¶ 75-79.

In fact, the challenged statute, specifically W. Va. Code §16-3-4(c) and (d) charges the schools and school boards to enforce the mandatory vaccine requirement. Those sections provide:

> (c) No child or person may be **admitted** or received **in any of the schools of the state** or a state-regulated child care center until he or she has been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio,, rubella, tetanus and whooping cough or produces a certificate from the commissioner granting the child or person an exemption from the compulsory immunization requirements of this section.

**Perry et al. v. Marteney et al.** **2:24-CV-18**

### Preliminary Injunction Order

> (d) Any **school** or state-regulated child care center personnel having information concerning any person who attempts to be **enrolled in a school** or state-regulated child care center without having been immunized against chickenpox, hepatitis-b, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus and whooping cough shall report the names of all such persons to the commissioner.

Id. (emphasis added).

This Court once again finds Judge Goodwin's analysis in Workman compelling on this particular issue. There, the plaintiffs asserted claims against the Mingo County Board of Education, which had likewise been taken over by the State Board of Education, and others challenging the constitutionality of W. Va. Code § 16-3-4. See Workman, 667 F. Supp.2d at 681-684. Judge Goodwin found the official capacity claims against the individual defendants including the State Superintendent of Schools and the Superintendent of Mingo County Schools survived Eleventh Amendment immunity challenges under Ex parte Young such that he "must address the merits of [plaintiff's] claims." Id. at 688. In doing so, he highlighted the fact that the county superintendent (post-state take over) "was hired by a state officer, to enact state policy." Id. "Local officers, depending on the particular circumstances,

27

**Perry et al. v. Marteney et al.**                                **2:24-CV-18**

**Preliminary Injunction Order**

may be entitled to Eleventh Amendment protection as agents of the state."  Id. (citation omitted).[10]

The same result is appropriate here.[11]  Both Defendants Marteney and Miller were installed after the State Board of Education assumed control of the Upshur County Board of Education and its operations.  In their respective roles of Virtual Learning Coordinator and County Superintendent, they have the authority to admit and enroll students, or not to do so, in accordance with state law including W. Va. Code § 16-3-4.  The Court, at this preliminary injunction stage, concludes both Defendants Marteney and Miller have the requisite degree of "some connection" to the West Virginia mandatory vaccine statute.  Thus, considering the prospective injunctive relief sought, this Court has jurisdiction

---

[10] In affirming Judge Goodwin's grant of summary judgment to defendants, the Fourth Circuit did not substantively address plaintiffs' assignment of error on subject matter jurisdiction including the Eleventh Amendment. See Workman v. Mingo County Board of Education, 419 Fed. Appx. 348 (4th Cir. 2011).
[11] The Upshur County Defendants inexplicably urge this Court to follow Judge Goodwin's lead in Workman and find the individual defendants "agents of the state" for Eleventh Amendment purposes but to plot a different path on application of Ex parte Young. ECF No. 45 at 17.  They argue Defendants Marteney and Miller were only hired to "enact state policy" which ostensibly includes W. Va. Code § 16-3-4.  The Court rejects the inconsistent argument instead concluding those assigned duties establish "some connection" to the challenged statute triggering Ex parte Young.

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

**Preliminary Injunction Order**

over Plaintiffs' claims against those specific Defendants pursuant to Ex parte Young.[12]

**B. Pullman Abstention**

Defendant Dr. Christiansen first raised the issue of abstention in his Motion to Stay. He has now been dismissed which arguably renders that relief moot. However, the Upshur County Defendants argued in support of abstention or, alternatively, a stay. The Court therefore considers whether either is appropriate here.  First, the Court must – and does – determine it has jurisdiction over this matter.  See Sonda, 92 F.3d at 219 (noting a court's "independent obligation to satisfy itself of its jurisdiction.").  Plaintiffs' claims arise under federal law, i.e., 42 U.S.C. § 1983, vesting original jurisdiction here.  See 18 U.S.C. § 1331.  Defendants make no argument or suggestion to the contrary.[13]

"The generally applicable rule is that a federal court, whose jurisdiction has been invoked, must exercise that jurisdiction and

---

[12] The Upshur County Defendants do argue that some "state treasure" may be implicated calling into question Ex parte Young's application.  The Court finds that argument unavailing upon review of Plaintiffs' Complaint.  The only monetary recovery sought is for attorney's fees under 42 U.S.C. § 1988.  Such relief does not vitiate jurisdiction here.  See Hutto v. Finney, 437 U.S. 678 (1978); Missouri v. Jenkins, 491 U.S. 274 (1989); Kentucky v. Graham, 473 U.S. 159 (1985).
[13] The Court rejects the remaining Defendants Eleventh Amendment immunity argument.  See supra.

JA562

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

<u>Preliminary Injunction Order</u>

address the matter before it." <u>Sonda</u>, 92 F.3d at 219. Both the Supreme Court and the Fourth Circuit have repeatedly instructed district courts this is their "strict duty." <u>Martin v. Stewart</u>, 499 F.3d 360, 363 (4th Cir. 2007) (quoting <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 716 (1996)). Indeed, the Supreme Court has emphasized that this duty is a "virtually unflagging obligation." <u>Deakins v. Monaghan</u>, 484 U.S. 193, 203 (1988) (quoting <u>Colo. River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 813 (1976)). Federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." <u>Cohens v. Virginia</u>, 19 U.S. 264, 404 (1821) (Marshall, C.J.).

However, "an extraordinary and narrow exception" to this duty exists when abstention is justified by the relevant circumstances, as for example, under the abstention doctrine articulated in <u>Pullman</u>. See <u>Quackenbush</u>, 517 U.S. at 728 (cleaned up). Defendants ask the Court to abstain from deciding the issues presented or stay this matter pending state court resolution of the purported state law issues implicated. The <u>Pullman</u> exception may be applied when "there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." <u>Wise</u>

Perry et al. v. Marteney et al.                     2:24-CV-18

**Preliminary Injunction Order**

v. Circosta, 978 F.3d 93, 101 (4th Cir. 2020) (en banc) (quoting
Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d
170, 174 (4th Cir. 1983)).

Defendants argue abstention is appropriate here considering
the 2023 enactment of the Equal Protection for Religion Act
("EPRA") in West Virginia. That statute, found at W. Va. Code §
35-1A-1, largely codifies the traditional strict scrutiny standard
deployed in constitutional question litigation. Specifically, the
EPRA prohibits the state from "substantially burden[ing] a
person's exercise of religion unless applying the burden to that
person's exercise of religion in a particular situation is
essential to further a compelling governmental interest; and is
the least restrictive means of furthering that compelling
governmental interest . . . ." W. Va. Code § 35-1A-1(a)(1). The
EPRA, however, also creates a "claim" for violation of this
standard for "injunctive or declaratory relief and reimbursement
of costs and reasonable attorney fees." W. Va. Code § 35-1A-
1(b)(1).

Plaintiffs, however, assert no EPRA claim here. See generally
Compl., ECF No. 1. In fact, they have repeatedly disclaimed any
such cause of action here. This strikes the Court as significant
as to whether exercising its discretion under Pullman is even an
option. The first step in a Pullman analysis is to determine if

**Perry et al. v. Marteney et al.**                2:24-CV-18

### Preliminary Injunction Order

there is "an unclear issue of state law **presented for decision**." <u>Wise</u>, 978 F.3d at 101 (emphasis added). The Fourth Circuit has further noted the ambiguous state law claim must be "in issue" and "not duplicative" of the asserted claims. <u>Educational Services, Inc. v. Maryland State Board for Higher Education</u>, 710 F.2d 170, 174 (1983). Simply, neither of these prerequisites are satisfied here.

Again, Plaintiffs have expressly disavowed an EPRA claim. It is therefore not "presented" or "in issue" directly. Moreover, it is difficult to discern what ambiguity exists in the EPRA which would justify this Court pausing consideration of Plaintiffs' claims given the presence of jurisdiction. The statute codifies strict scrutiny and enables a state law challenge to any state effort to burden religious observance. Nothing about the statute is unclear as it is, contrary to <u>Educational Services</u>' holding, duplicative of Plaintiffs' claims before this Court.

Defendants also tepidly point to the mandatory vaccine statute as a potential basis for triggering <u>Pullman</u> abstention. Like EPRA, nothing in W. Va. Code § 16-3-4 presents as ambiguous. The mandatory vaccine statute specifically lists the required vaccines and declares only those medically exempted are excused from compliance. Again, nothing in either statute at the forefront of Plaintiffs' claims is ambiguous such that deference to the West

**Perry et al. v. Marteney et al.**                                   **2:24-CV-18**

### Preliminary Injunction Order

Virginia state courts is advisable.   "[W]hen a statute is not ambiguous, there is no need to abstain even if state courts have never interpreted the statute."  City of Houston, Tex. v. Hill, 482 U.S. 451, 469 (1987).[14]

Defendants rely heavily upon Judge Bailey's reasoned decision in West Virginia Parents for Religious Freedom v. Christiansen, 685 F. Supp.3d 371 (N.D.W. Va. 2023) where His Honor elected to invoke Pullman abstention.  There, the plaintiffs asserted a constitutional challenge to the same statute, W. Va. Code § 16-3-4, but sought wider relief including mounting a facial challenge, in addition to an as-applied challenge, to the statute.  After the State of West Virginia submitted its amicus curiae brief arguing the EPRA was "directly relevant" to the issues before the Court, Judge Bailey granted the defendant's motion for summary judgment to the extent it urged Pullman abstention was the proper course of action.

Respectfully, this Court has a different interpretation of the issues presented in this specific case. Plaintiffs have undertaken a different tact in this case:  different parties,

---

[14] As noted, the EPRA merely codifies the strict scrutiny standard. As the Court discusses supra, there is little ambiguity about the impact strict scrutiny analysis has on Plaintiffs' as-applied challenge to the mandatory vaccine statute either.  "[S]trict scrutiny, in practice, is virtually impossible to satisfy . . ..". Washington Post v. McManus, 944 F.3d 506, 520 (4th Cir. 2019)

Perry et al. v. Marteney et al.                              2:24-CV-18

### Preliminary Injunction Order

different facts (a student only seeking ability to enroll virtually), and a different constitutional challenge (as-applied challenge only).  Plaintiffs eschewed any reference to the EPRA and, instead, Defendants ask the Court to impose that statute and potential claim here over Plaintiffs' objection.  Also, here, the Court does not have the benefit of the "State's" position in this as-applied challenge as Judge Bailey had – despite notice being afforded.  ECF No. 40-1.  The EPRA, although not presented here, is duplicative of Plaintiffs' First Amendment challenge.

In summary, the Court does not find the Pullman factors to be satisfied; therefore, it would be inappropriate to abstain where jurisdiction is otherwise established.  See Sonda, 92 F.4th at 219-220.

### C. Rule 19 Motion to Dismiss

Defendants Marteney and Miller also move to dismiss Plaintiffs' Complaint for failure to join an indispensable party arguing the State Board of Education and State Superintendent should have been named as party-defendants.  ECF No. 29.  Specifically, Defendants argue they are powerless to "consider a religious exemption" to W. Va. Code § 16-3-4 and, in addition, the state takeover renders them largely unable to do much of anything

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

### Preliminary Injunction Order

other than follow direction from the State Board and State Superintendent.[15]

"Courts are loathe to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." Owens-Illinois, Inc. v. Meade, 186 F.3d 435, 441 (4th Cir. 1999) (citation omitted). Therefore, before dismissing, courts conduct an in-depth, two-step inquiry to assure non-joinder is in fact fatal to the claim. See National Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of South Carolina, Inc., 210 F.3d 246, 249 (4th Cir. 2000) ("Federal Rule of Civil Procedure 19 sets forth a two-step inquiry for a district court to determine whether a party should be joined in an action."). First, courts consider whether a party is necessary "because of its relationship to the matter under consideration." Owens-Illinois, Inc., 186 F.3d at 440. Next, "[i]f a party is necessary, it will be ordered into the action." Id. Only when a party cannot be joined will the court "determine whether the proceeding can continue in its absence, or whether it is indispensable pursuant to Fed. R. Civ. P. 19(b) and the action must be dismissed." Id.; see also

---

[15] Defendants Marteney and Miller likewise argue Defendant Christiansen is indispensable as the "chief enforcer" of W. Va. Code § 16-3-4, the singular statute made subject of Plaintiffs' as-applied challenge here. The Court, for reasons set forth previously, rejects this argument.

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

## Preliminary Injunction Order

Teamsters Local Union No. 171 v. Keal Driveaway Co., 173 F.3d 915, 917–18 (4th Cir. 1999).

Federal Rule of Civil Procedure 19(a) identifies persons that are to be joined "if feasible," including a person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction, if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties, or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect that interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

In determining whether a party is indispensable, Rule 19 specifies the following factors for the Court to consider:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
> (A) protective provisions in the judgment;
>
> (B) shaping the relief; or
>
> (C) other measures;

36

JA569

Perry et al. v. Marteney et al.                        2:24-CV-18

### Preliminary Injunction Order

> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b)(1)-(4).

The Upshur County Defendants argue both the West Virginia Department of Education and the West Virginia State Superintendent of Schools are indispensable parties here based on their respective duties imposed under state law. Plaintiffs contend the named (and remaining) defendants, if enjoined, can afford them complete relief.

### 1. No other party is necessary to afford Plaintiffs complete relief.

The Court agrees with Plaintiffs here. If the Court enjoins Defendants Marteney and Miller and – even - those acting in concert with them "from enforcing W. Va. Code § 16-3-4 against Plaintiffs, unless the government provides an option for Plaintiffs to request a religious exemption to the Virtual Academy" (ECF No. 1 at ¶ 55), Plaintiffs would obtain complete relief against the existing parties to the suit, and that relief would be sufficient to remedy the constitutional violations alleged. See Dixon v. Edwards, 290 F.3d 699, 713 (4th Cir. 2002) (holding that a party was not necessary where the "injunction entered by the district court in fact gave [the plaintiff] complete relief.").

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

### Preliminary Injunction Order

Defendants Marteney and Miller's assertion that complete relief cannot be provided without the State Department of Education and the State Superintendent as parties to the suit is unpersuasive.  Defendants claim the State Board and the State Superintendent are tasked generally with "interpreting" and "enforcing" the laws touching on public schools, including the mandatory vaccination law, and that they consequently have an "interest" in this litigation.  See ECF No. 30 at 14.  Defendants Marteney and Miller then imply they will potentially be subject to "incurring inconsistent obligations" if the Court grants injunctive relief, and the State Department of Education and the State Superintendent then interpret the mandatory vaccination statute contrary to the Court's directives and require them to violate a federal court order.

Other courts have held that inclusion of sufficient officials to effect relief satisfies the Rule 19 requirements of joining necessary parties, even if perhaps other parties have some interest in the matter – rejecting the contentions of Defendants here. See Fitzgerald v. Wildcat, 687 F. Supp. 3d 756, 784–785 (W.D. Va. 2023) (holding that inclusion of sufficient officials in their official capacities to afford relief meets the necessary party requirement); see also Salt River Project Agr. Imp. & Power Dist. v. Lee, 672 F.3d 1176, 1180 (9th Cir. 2012).  Again, the Supreme

Perry et al. v. Marteney et al.                          2:24-CV-18

## Preliminary Injunction Order

Court has explained that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985). Thus, they are not "suit[s] against the official personally, for the real party in interest is the entity." Id. at 166.

Here, the County Superintendent is acting under the authority and agent of the State Board due to the takeover of the local district. And her inclusion in her official capacity is sufficient to impute their interests in all events. Moreover, the State Board and State Superintendent are unable to merely replace Superintendent Miller to avoid the requirements of an injunction, because the official capacity suit against her and any injunction entered against her in her official capacity will flow to any successor in office. See Fed. R. Civ. P. 25(d).

In Robertson v. Jackson, 972 F.2d 529 (4th Cir. 1992), the official primarily responsible for enforcement of the challenged action argued that other officials should be made a party. However, the Fourth Circuit found no error in not joining the additional officials to the action because the official before the Court was sufficient to provide the relief ordered. Id. at 535. The court noted "no evidence has been presented to suggest he cannot do so with the authority he enjoys under Virginia law."

Perry et al. v. Marteney et al.                              2:24-CV-18

**Preliminary Injunction Order**

Id.  "The potentiality that the Commissioner may, at some future time, be unable to cause a particular local agency to comply with federal requirements does not relieve him of his responsibility under federal law to attempt fully to ensure compliance."  Id.

Later, the Fourth Circuit followed the same path in Staley v. Darlington County Sch. Dist., 84 F.3d 707 (4th Cir. 1996). There the Fourth Circuit found that joinder of the state board, despite their general supervision over local school districts, was not necessary under Rule 19.  The Court reasoned including the local officials who engaged in segregation was sufficient to fashion and award the desegregation injunctive relief orders entered by the court.

The same reasoning applies here.  The Fourth Circuit in Stanley concluded the state board was not necessary because "the [School] District has failed to provide a single example of how the State has impeded the district's compliance with the court's order and federal law since 1970."  Id. at 714.  There, the court ultimately found no error by not forcing the Plaintiffs to include the state board because it was not necessary to afford relief. Id. ("The federal rules, however, do not authorize a defendant to compel an unwilling plaintiff to assert a claim against a second defendant.").

Perry et al. v. Marteney et al.                                    2:24-CV-18

<u>Preliminary Injunction Order</u>

In terms of joinder of the State Board of Education, the Fourth Circuit in <u>Jackson</u> observed that "[w]e do not address the question of whether we should refuse to entertain the claim of necessary parties, because we do not believe that either the State Board or the local agencies are parties that must be joined to grant complete relief." <u>Id</u>. at 536. To that end, "[t]he district court's order, requiring the Commissioner to bring about full compliance with federal timely processing and program access requirements, cannot be considered either 'partial' or 'hollow' relief." <u>Id</u>. (citing Fed. R. Civ. P. 19(a)(1) advisory committee's note; and 3A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice, P 19.071[1] (2d ed. 1991) (joinder is not necessary "where, although certain forms of relief are unavailable due to a party's absence, meaningful relief can still be provided")). "Neither the State Board nor the local agencies has been shown to be an impediment to the achievement of full compliance with the federal regulations." <u>Id</u>.

The analysis in <u>Robertson</u> is equally applicable here. There is no evidence that inclusion of the State Board of Education, or of the State Superintendent, is necessary to effect remedial relief. Enjoining Defendants Miller and Marteney is sufficient to effect K.P.'s re-enrollment. Defendants' arguments to the contrary are unavailing. <u>See, e.g., Luce v. Lexington Cnty. Health</u>

41
JA574

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

## Preliminary Injunction Order

<u>Servs. Dist.</u>, 3:22-03998-MGL, 2023 WL 8809994, at *6 (D.S.C. September 20, 2023) (determining that state official was not a necessary party and inclusion of local officials in official capacity was sufficient).  The specific claim and relief sought here ultimately informs the Court's decision.  "An 'as applied' challenge contends that a law's application to a particular person under particular circumstances deprives that person of a constitutional right.  Thus, a successful 'as applied' challenge precludes the enforcement of a statute against a plaintiff alone." <u>Marcellus v. Virginia State Bd. of Elections</u>, 168 F. Supp. 3d 865, 872 n.8 (E.D. Va. 2016), <u>aff'd,</u> 849 F.3d 169 (4th Cir. 2017) (citing <u>Fed. Election Comm'n v. Wisconsin Right to Life, Inc.</u>, 551 U.S. 449, 481 (2007)).  The remaining Defendants – Ms. Marteney and Mr. Miller – are sufficient to permit the Court to fashion a full and proper remedy if warranted.

2. **There is no prejudice to the State parties and no inconsistent obligations imposed on Defendants Marteney and Miller.**

Defendants also argue prejudice if the State Board and/or State Superintendent are not present to defend their interests and potential inconsistent obligations if this case proceeds as postured.  The Court disagrees.

First, the nature of the Board and Superintendent's duty under the challenged statute is minimal.  The enforcement mechanism of

**Perry et al. v. Marteney et al.** 2:24-CV-18

### Preliminary Injunction Order

W. Va. Code § 16-3-4 lies with the local school system. See W. Va. Code § 16-3-4(c) ("No child or person may be admitted or received in any of the schools of the state . . . "). Other than generalized supervision responsibility, see W. Va. Code § 18-2-5, the State Board and Superintendent have no direct connection to the mandatory vaccination statute. The state takeover of Upshur County schools makes no significant difference here. The duly appointed County Superintendent and Virtual Learning Coordinator are charged with county-level administration. Therefore, outside of an interest in enforcing the law generally, those entities have no real interest to defend here.

Defendants Marteney and Miller are also not, realistically, exposed to "incurring inconsistent obligations" under Rule 19(a)(1)(B)(ii) if the Court grants injunctive relief. There is no legitimate scenario where any entity, including the State Board or State Superintendent, would direct the remaining Defendants to ignore or act in contravention of an order from this Court. Judge Chambers of the Southern District of West Virginia dismissed a similar argument in Nelson v. Warner, 446 F. Supp. 3d 119, 126 (S.D.W. Va. 2020) - albeit in a facial challenge. Regardless, this Court is satisfied it has jurisdiction over the remaining Defendants and Plaintiffs' claims thereby ensuring compliance with any ultimate resolution and judgment. Moreover, because this is

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

**Preliminary Injunction Order**

an as-applied challenge, injunctive relief would only extend to Defendants Marteney and Miller with respect to K.P. and her enrollment in the Upshur County Virtual School.

"Dismissal of a case is a drastic remedy, however, which should be employed only sparingly." Teamsters Local Union No. 171, 173 F.3d at 918. In determining whether to dismiss a complaint, a court must proceed pragmatically, "examin[ing] the facts of the particular controversy to determine the potential for prejudice to all parties, including those not before it." Id. Having done so, the Court concludes no necessary parties, and certainly no indispensable parties, are absent. Defendants' motion on this ground is therefore **DENIED.**

### D. Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) (quoting Winter v. Nat. Res. Def. Counsel, Inc., 555 U.S. 7 (2008)); see Peterson v. Nat'l Telecomms. & Info. Admin., 505 F. Supp.2d 313, 317 (E.D. Va. 2006) (quoting Direx Israel Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1992)) (recognizing that "[a] preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching

Perry et al. v. Marteney et al.                          2:24-CV-18

### Preliminary Injunction Order

power, which is to be applied only in the limited circumstances which clearly demand it").

In order to justify the extraordinary remedy that a preliminary injunction provides, the movant has the burden of demonstrating the following: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." Dewhurst, 649 F.3d at 290 (internal quotation marks and citations omitted); see Direx Israel, 952 F.2d at 812 (indicating that the moving party bears the burden of demonstrating the propriety of a preliminary injunction).  In Dewhurst, the United States Court of Appeals for the Fourth Circuit emphasized the fact that controlling precedent from the Supreme Court mandates that a plaintiff "clearly show" that he is likely to succeed on the merits. Dewhurst, 649 F.3d at 290 (quoting Winter, 555 U.S. at 22) (emphasis added).

The demanding standard outlined in Dewhurst becomes even more exacting when, as here, a plaintiff seeks a preliminary injunction that mandates action, as opposed to the typical form of preliminary injunctive relief seeking to preserve the status quo pending trial. See East Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004) (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir.

Perry et al. v. Marteney et al.                      2:24-CV-18

Preliminary Injunction Order

1980)) (noting that "mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demands such relief"). Preliminary injunctions are ordinarily intended to "protect the status quo and to prevent irreparable harm during the pendency of the lawsuit or alternately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). In Microsoft, the Fourth Circuit elaborated that such "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Id. (citation omitted). The court further noted that the "application of th[e] exacting standard of review [for preliminary injunctions] is even more searching" when the movant requests relief that "is mandatory rather than prohibitory in nature." Id.

With this framework in mind, the Court turns to the substance of Plaintiffs' claims against Defendants.

**E. The Free Exercise Clause**

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The "Free Exercise" component of the First Amendment applies to states through the

46
JA579

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

### Preliminary Injunction Order

Fourteenth Amendment, rendering "the legislatures of the states as incompetent as Congress to enact such laws." Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

The Supreme Court has held that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Fulton v. City of Philadelphia, 593 U.S. 522 (2021) (quotation omitted). In considering whether a plaintiff's rights under the Free Exercise Clause are infringed, a court must determine whether the plaintiff's religious exercise has been burdened and whether the burden the government has imposed is constitutionally permissible. Id. A plaintiff bears the burden of showing an infringement of his or her rights under the Free Exercise Clause, and if he or she does so, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of [Supreme Court] case law." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 142 S. Ct. 2407, 2421 (2022).

To establish a Free Exercise violation, a plaintiff may show that "a government entity has burdened his [or her] sincere religious practice pursuant to a policy that is not neutral or generally applicable." Id. at 2422 (quotation omitted). As with many constitutional challenges, the key issue here is the level of scrutiny the Court must apply. When a religiously neutral and

Perry et al. v. Marteney et al.                    2:24-CV-18

**Preliminary Injunction Order**

generally applicable law incidentally burdens Free Exercise rights, courts will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest.  See Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021) (citing Employment Division v. Smith, 494 U.S. 872, 878-82 (1990)).  When a law is not neutral or generally applicable, however, the statute may survive only if it is narrowly tailored to achieve a compelling governmental interest.  Id. at 1881 (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)).

In determining whether a law is neutral or generally applicable, "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." Fulton, 593 U.S. at 533 (quotation omitted).  Under that rule, if a state reserves the authority to "grant exemptions based on the circumstances underlying each application," it must provide a compelling reason to exclude "religious hardship" from its scheme. Id. (quoting Smith, 494 U.S. at 884).  A law also fails to be generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  Id.

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

<u>Preliminary Injunction Order</u>

A policy is not neutral if it is "specifically directed at religious practice," meaning that it either "discriminates on its face" or "religious exercise is otherwise its object."  <u>Kennedy</u>, 597 U.S. at 526 (quotations omitted).  "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."  <u>Fulton</u>, 593 U.S. at 533 (citing <u>Masterpiece Cakeshop, Ltd. V. Colo. Civ. Rights Comm'n</u>, 584 U.S. 617, 138 S. Ct. 1719, 1730-32 (2018)).  "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny."  <u>Kennedy</u>, 597 U.S. at 526.

1. **West Virginia's Mandatory Vaccine Program is not generally applicable.**

Plaintiffs contend the West Virginia mandatory vaccination statute institutes a discretionary exemption to the compulsory vaccination schedule that permits families with medical objections to seek medical exemptions but prohibits families with religious objections from seeking an exemption for religious reasons.

Defendants argued the contrary of course.  They do concede general applicability may be absent when a law provides "a mechanism for individualized exemptions," because it creates the risk that administrators will use their discretion to effectively create exemptions on a case-by-case basis, exempting individuals from complying with the law for secular reasons, but not religious reasons.  <u>Smith</u>, 494 U.S. at 884 (citations omitted).  Defendants

49

JA582

**Perry et al. v. Marteney et al.**                        **2:24-CV-18**

<u>Preliminary Injunction Order</u>

note, in <u>Smith</u>, the Court considered an exemption that was granted for "good cause" as an example of such "individualized exception." 494 U.S. at 884. Similarly, they argue, in <u>Fulton</u>, a city official was able to create exemptions in his or her "sole discretion," which was violative of the general applicability framework. <u>Fulton</u>, 593 U.S. at 523.

Defendants rely heavily on the First Circuit's decision in <u>Does 1-6 v. Mills</u>, 16 F.4th 20 (1st Cir. 2021), in urging the Court to find W. Va. Code § 16-3-4 generally applicable. In <u>Does 1-6</u>, the First Circuit assessed a challenge to Maine's state regulation mandating healthcare workers receive a COVID-19 vaccination. <u>See id</u>. at 24. Among the many issues raised, the court had to determine which level of scrutiny applied to the healthcare workers' constitutional claims and specifically if the state regulations were generally applicable under <u>Smith</u>. <u>See id</u>. at 29-30. The court ultimately concluded the regulatory scheme was generally applicable subjecting the Maine vaccination rule to something less stringent than strict scrutiny. "The emergency rule does not require the state government to exercise discretion in evaluating individual requests for exemptions." <u>Id</u>. at 30.

That conclusion stands to reason because no state official approval or review of the exemption is required under Maine's compulsory vaccination rules. No "request" is actually made.

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

### Preliminary Injunction Order

Instead, a "medical exemption is available to an employee who provides a written statement from a licensed physician, nurse practitioner or physician assistant that, in the physician's, nurse practitioner's or physician assistant's professional judgment, immunization against one or more diseases may be medically inadvisable."  Me. Rev. Stat. Ann. tit. 22, § 802.  Nor is there any administrative appeal to a Maine state, county, or local government agency for an adverse decision or the like.  An employer is only required to keep the physician's certification "in the permanent health record for that employee for a minimum of six years after termination."  Code Me. R. tit. 10-144 Ch. 264, § 3.  Maine's statutory and regulatory scheme is sufficiently different from West Virginia's mandatory vaccination statute to make Does 1-6 readily distinguishable on the generally applicable issue.[16]

Although W. Va. Code 16-3-4 does not tend toward the unbridled discretion found in Fulton ("sole discretion") or Smith ("good cause"), the Court finds the medical exemption provided in West Virginia law, as applied to K.P., to be sufficiently discretionary

---

[16] The Court likewise finds Defendants' other points of authority – Miller v. McDonald, No. 1:23-CV-00484 EAW, 2024 WL 1040777 (W.D.N.Y. Mar. 11, 2024) and Royce v. Bonta, No. 3:23-CV-02012-H-BLM, 2024 WL 1269485 (S.D. Cal. Mar. 25, 2024) – on this question unavailing as well.  The Court finds the other cited authority that predates Fulton unpersuasive.  See, e.g., ECF No. 21 at p.12.

Perry et al. v. Marteney et al.                          2:24-CV-18

### Preliminary Injunction Order

to fall outside the "generally applicable" field.  The statute provides the health commissioner "is authorized to grant . . . exemptions to the compulsory immunization requirements . . . on a statewide basis, upon sufficient medical evidence that immunization is contraindicated or there exists a specific precaution to a particular vaccine."  W. Va. Code § 16-3-4(h).  The statute is silent as to an exemption for any family who may have religious objections. As alleged in the Complaint, Defendants communicated the same to Plaintiffs when they requested a religious exemption for K.P.

At the first level of the medical exemption process, a physician must complete a form, the Request for Medical Exemption from Compulsory Immunization Form,[17] requesting an exemption and justifying the request.  If and when the medical exemption form is signed by a physician, it is then forwarded to the State's Immunization Officer for personalized review. See ECF No. 1-2, Dr. Alvin Moss Declaration, ¶¶ 5-12.  According to the West Virginia Office of Epidemiology and Prevention Services, the Immunization Officer will review the evidence obtained from the child's

---

[17]    The form can be located at https://oeps.wv.gov/immunizations/Documents/Childcare,%20School%20and%20College%20Requirements/WV%20Medical%20Exemption%20Request%20Form-05-03-2024.pdf (last visited October 15, 2024).  It provides several lines for the physician to discuss medical diagnoses and any "further information you feel is relevant to this request."

Perry et al. v. Marteney et al.                          2:24-CV-18

Preliminary Injunction Order

physician. If the evidence or information is incomplete, the Immunization Officer will make a request for additional evidence. If all the evidence received by the Immunization Officer, including **all medical opinion(s),** is consistent and there is sufficient evidence to determine whether to grant an exemption, the Immunization Officer will make a determination or decision based on that evidence. If the exemption is approved, that student is permitted to attend school without having received the mandated vaccines. If the Immunization Officer denies the medical exemption, the decision can be appealed to the State Health Officer, who reviews the appeal on a case-by-case basis and determines whether to uphold or reverse the State Immunization Officer's decision. See W. Va. Code § 16-3-4(h)(4).

In practice, based on the record currently before the Court, there is significant individualized discretion in this process. First, the Exemption Request form requires diagnosis information and "any other relevant information" from a practicing physician. The Immunization Officer then considers evidence including "medical opinions" in determining whether to approve the request. Plaintiffs also provide testimony from Dr. Alvin Moss, a West Virginia physician, who has evaluated schoolchildren and determined in his discretion whether their health conditions qualify them for a medical exemption under West Virginia Code §

**Perry et al. v. Marteney et al.**                           **2:24-CV-18**

## Preliminary Injunction Order

16-3-4(h).  See ECF No. 1-2, ¶¶ 12-17.  Dr. Moss further details the inherent case-by-case discretion associated with evaluating these requests.  Id. at ¶¶ 8-12.  The criteria by which medical exemptions are evaluated are not objective and are subject to the opinion of each government official who evaluates the exemption request and differing outcomes can and are reached depending on the evaluator of the request.  Id. Moreover, the implementing regulations for the medical exemption provide for consideration of "evidence from medical sources, such as medical history, **opinions**, and statements about treatment the child has received."  W. Va. C.S.R. § 64-95-17.2.a.2 (emphasis added).

As Dr. Moss's Declaration makes clear, the practice of medicine including in the area of contraindication for vaccines involves discretion and judgment.  Reasonable minds, of course, may differ.  The process set forth in W. Va. Code § 16-3-4 involves multiple layers of medical judgment and review.  Initially, a practicing physician offers his or her opinions. Then, the government becomes involved reviewing and passing judgment on the treating physician's recommendation.  This review requires discretion and judgment to be exercised – not the simple task of checking objective boxes.  Ultimately, the Court concludes this process is sufficiently similar to the standards at issue in Fulton

Perry et al. v. Marteney et al.                    2:24-CV-18

**Preliminary Injunction Order**

and Smith to consider W. Va. Code § 16-3-4 short of general applicability.

The Court therefore concludes W. Va. Code 16-3-4 is not a generally applicable statute under Fulton.[18]  Thus, Plaintiffs' as-applied challenge triggers strict scrutiny.

### 2. Defendants fail to satisfy strict scrutiny.

Where strict scrutiny applies, government policy survives "only if it advances interests of the highest order and is narrowly tailored to achieve those interests," meaning that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so."  Fulton, 593 U.S. at 541 (quotation omitted).  When considering the governmental interests at issue, a court must not rely on "broadly formulated interests"; instead, it "must scrutinize the asserted harm of granting specific exemptions to particular religious claimants."  Id. (quotation omitted).  The relevant question is not whether the government has a compelling interest in enforcing its policies generally, but instead whether the government has such an interest in denying a religious exemption to a particular plaintiff.  Id.

The parties debate the impact of the Fourth Circuit's decision in Workman here.  That case, decided over 13 years ago, addressed

---

[18] The Court need not – and for purposes of resolving the pending motions, does not – reach the question of whether W. Va. Code § 16-3-4 is neutral.

**Perry et al. v. Marteney et al.**                                  **2:24-CV-18**

### Preliminary Injunction Order

the same statute challenged here, W. Va. Code 16-3-4.  Workman, 419 Fed. Appx. 348 (4th Cir. 2011).[19]  Ultimately, the Fourth Circuit affirmed Judge Goodwin's summary judgment finding for the defendants noting the mandatory vaccination statute served a compelling state interest.  Id. at 353.  "[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."  Id.: see also Does 1-6 v. Mills, 16 F.4th 20, 32 (1st Cir. 2021) ("Few interests are more compelling than protecting public health against a deadly virus.").[20]

Notably, however, the Workman court did not address whether the statue was sufficiently narrow in its tailoring.[21]  The court

---

[19] Plaintiffs make much of Workman being an unpublished decision. Although "unpublished opinions are not binding precedent in this circuit," Rule 32.1 permits citation to the decision which occurred after January 1, 2007.  Even if unpublished, this Court affords serious and significant consideration to any pronouncement of the Fourth Circuit and has done so here.  Considering the recent developments in the law and for all the reasons articulated herein, the Court reaches a different conclusion.

[20] Plaintiffs argue the efficacy and purpose of some of the mandated vaccines should inform the Court's decision here.  The Court finds it unnecessary to delve into those matters to resolve the pending motions.  Moreover, the Court does not believe it proper to adjudicate such important questions without the benefit of a fully developed factual record.

[21] Defendants also point the Court to the Supreme Court of Appeals of West Virginia's decision in D.J. v. Mercer County Board of Education, No. 13-0237, 2013 WL 6152363 (W. Va. November 22, 2013). There, the court considered a challenge to the State's vaccination requirements under the West Virginia Constitution's equal protection and due process clauses.  It does not appear a Free Exercise challenge was mounted.  Although not binding here, the Court always gives careful consideration to the State's highest

Perry et al. v. Marteney et al.                         2:24-CV-18

**Preliminary Injunction Order**

relied on the oft-cited combination of Jacobson v. Massachusetts, 197 U.S. 11 (1905) and Prince v. Massachusetts, 321 U.S. 158 (1944).  The Jacobson decision was certainly prevalent in the litigation surrounding various COVID-era executive orders and the like.  There, the Supreme Court found compulsory vaccination against smallpox a valid exercise of the state's police power without infringing any federal constitutional rights.  See Workman, 419 Fed. Appx. at 353.  Of course, since Workman and the even further removed time of Jacobson, the Supreme Court has wrestled with Free Exercise Clause challenges to the exercise of that "police power" during the COVID pandemic.  This Court now has the benefit of that analysis and guidance in assessing Plaintiffs' claims here.

As discussed above, if strict scrutiny applies, Defendants must satisfy the stringent strict scrutiny standard – and both prongs of it.  "[H]istorically, strict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'"  Tandon v. Newsom, 593 U.S. 61, 64-65 (2021) (quoting Church of Lukumi Babaly Aye, Inc.,

---

court's analysis particularly on matters of State law such as those presented here.  However, the Supreme Court of Appeals did not consider the "narrowly tailored" prong of the strict scrutiny analysis despite acknowledging its application and the compelling interest of protecting the health and safety of the public.  Id. at *4.  The Court, therefore, finds little guidance in that decision when resolving Plaintiffs' claims here.

**Perry et al. v. Marteney et al.**                                **2:24-CV-18**

**Preliminary Injunction Order**

508 U.S. at 546).  "That standard is not watered down; it really means what it says."  Id. (internal quotations and citations omitted).  At this stage of these proceedings, considering Workman and the other authority Defendants cite, the Court finds Defendants have carried their burden to show a compelling state interest in preventing the spread of infectious disease.  See, e.g., D.J. v. Mercer County Board of Education, 2013 WL 6152363, at *4 ("[T]he protection of the health and safety of the public is one of the most important roles of the state."); Does 1-6, 16 F.4th at 32 ("Few interests are more compelling than protecting public health against a deadly virus.").

However, the Court finds Defendants have failed to demonstrate W. Va. Code § 16-3-4 is narrowly tailored to achieve the identified compelling state interest.  As an initial matter, and as Plaintiffs note, 45 other states have religious or philosophical exemption options to their vaccine mandates.  Thus, it is readily apparent the approach West Virginia has taken is broader than other states, rendering any suggestion W. Va. Code § 16-3-4 is narrowly tailored to advance the identified compelling interest of stemming infectious disease spread unpersuasive.[22]

---

[22] As discussed supra, Governor Justice's veto message touted the broad sweep of West Virginia's vaccination requirements and its relative success rate in advancing the state's compelling interest in curbing the spread of contagious disease.

Perry et al. v. Marteney et al.                     2:24-CV-18

### Preliminary Injunction Order

In addition, West Virginia has also provided carve outs for other students removed from physical school structures from the mandatory vaccination statute. Specifically, children are exempted from compulsory school attendance requirements, and are excluded from "any other provision of law relating to education," if they participate in learning pods or microschools. W. Va. Code § 18-8-1(n)(8). Under West Virginia law, a "learning pod" means "a voluntary association of parents choosing to group their children together to participate in their elementary or secondary academic studies as an alternative to enrolling in a public school, private school, homeschool, or microschool, including participation in an activity or service provided to the children in exchange for payment." W. Va. Code § 18-8-1(n)(1)(A). A "microschool" "means a school initiated by one or more teachers or an entity created to operate a school that charges tuition for the students who enroll and is an alternative to enrolling in a public school, private school, homeschool, or learning pod." W. Va. Code § 18-8-1(n)(1)(B).

Unlike students enrolled in virtual school such as K.P., West Virginia pupils advancing their education in either an otherwise permissible learning pod or microschool are excluded from the requirements of W. Va. Code § 16-3-4. There is no statutory requirement that either learning pods or microschools adhere to or

Perry et al. v. Marteney et al.                    2:24-CV-18

### Preliminary Injunction Order

teach any religious curriculum or belief system. These students, like virtual students, rarely, if ever, physically attend class or school. It therefore strains reason to find W. Va. Code § 16-3-4 is sufficiently tailored to advance the State's interest within constitutional confines when similarly situated secular students are excused from the statute's reach. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." Church of Lukumi Babaly Aye, Inc., 508 U.S. at 543.

In determining there exists a narrower path to advance the State's compelling interest, the Court also considers recent legislative activity demonstrating the possibility. During the 2024 Regular Legislative Session, the West Virginia Legislature passed House Bill 5105 which sought to amend the challenged statute here, W. Va. Code § 16-3-4, by, inter alia, creating an exemption to the mandatory vaccine requirement for full-time virtual public school students. Governor Justice vetoed this legislation citing feedback primarily from the medical community and West Virginia's

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

**Preliminary Injunction Order**

success in combating the spread of the diseases listed in W. Va. Code § 16-3-4(b) – the compelling interest here.[23]

However, House Bill 5105 bolsters Plaintiffs' argument that a more narrowly tailored approach is possible to advance that interest which, to withstand strict scrutiny, the Constitution requires.  "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000) (citation omitted) (assessing Free Speech claim under the First Amendment).  Many other states have deployed a less restrictive measure to advance the identified compelling interest.  The West Virginia Legislature has indicated it is possible as well.  At

---

[23] Respectfully, the political machinations of the legislative process assist the Court only in assessing if a more narrowly tailored approach is available.  The merits of the arguments over House Bill 5105 are better left to other branches of government. Legislative enactments, of course, must remain within the Constitution's framework.  As the Supreme Court summarized,

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943).

Perry et al. v. Marteney et al.                         2:24-CV-18

### Preliminary Injunction Order

this point, Defendants have failed to sustain their burden on this issue.

Having found W. Va. Code § 16-3-4 is subject to strict scrutiny in deciding Plaintiffs' Free Exercise challenge, the Court finds Plaintiffs are likely to succeed on the merits in that the mandatory vaccine statute is not sufficiently narrowly tailored to satisfy Constitutional safeguards. The Court, therefore, must assess the remaining Winter factors.

### 3. Plaintiffs will suffer Irreparable Harm.

Plaintiffs must also demonstrate irreparable harm for injunctive relief to issue. See Hyman v. City of Salem, 396 F. Supp.2d 666, 670 (N.D.W. Va. 2019) (citation omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). The Supreme Court has been clear and has reiterated in recent years that a plaintiff may be "irreparably harmed by the loss of free exercise rights 'for even minimal periods of time.'" Tandon, 593 U.S. at 64 (quoting Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020)). The Fourth Circuit has echoed the same. "[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction." Ross v. Meese, 818 F.2d 1132, 1135 (4th Cir. 1987);

Perry et al. v. Marteney et al.                                    2:24-CV-18

### Preliminary Injunction Order

see also Recht v. Justice, No. 5:20-CV-90, 2020 WL 6109430, at *7 (N.D.W. Va. June 26, 2020) (Bailey, J.).

Based on the record before it, the Court finds Plaintiffs are likely to suffer irreparable harm.  Plaintiffs' Free Exercise rights vis-à-vis their legal obligation to educate K.P. have been burdened.  K.P. has been denied her parents' preferred method of constitutionally-required education.  As alleged in their Complaint, and there is no present dispute, Plaintiffs have and will continue to face obstacles in homeschooling K.P. as Mrs. Perry works full-time to provide for her family and Mr. Perry suffers from physical disabilities.  Of course, Plaintiffs face criminal prosecution and sanctions if they fail to educate their daughter. See W. Va. Code § 18-8-2.  These hardships are imposed solely because Plaintiffs refused to sacrifice their religious beliefs. K.P. was enrolled and excelling in the Upshur County Virtual School program prior to Defendants' refusal to afford her a religious exemption from West Virginia's mandatory vaccine statute in response to the December 2023 email blast from the State Superintendent.[24]  Plaintiffs have satisfied their burden to demonstrate irreparable harm at this stage.

---

[24] The record presently before the Court does not reveal any particular prompt for the State Superintendent's email about virtual students and their vaccination status.  That missive was the impetus for K.P. being disenrolled and this Free Exercise challenge being filed.

Perry et al. v. Marteney et al.                              2:24-CV-18

Preliminary Injunction Order

## 4. Balance of Equities and Public Interest

With respect to the third and fourth Winter factors, the Court turns to Judge Bailey's analysis and summary in Recht.

> [T]he third and fourth Winter factors (the balance of equities and the public interest) are established when there is a likely First Amendment violation. Id. at 191. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). It also teaches that "upholding constitutional rights surely serves the public interest." Id.

Recht, 2020 WL 6109430, at *7. The Court, having found Plaintiffs are likely to succeed on their First Amendment claim, also concludes the remaining Winter factors counsel in favor of issuing the requested injunctive relief.

## IV. CONCLUSION

As the Supreme Court has long observed, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Fulton, 593 U.S. at 533 (quoting Thomas v. Review Bd. Of Ind. Employment Security Div., 450 U.S. 707, 714 (1981)). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force

64
JA597

Perry et al. v. Marteney et al.                                    2:24-CV-18

## Preliminary Injunction Order

citizens to confess by word or act their faith therein." Barnette, 319 U.S. at 642.  The wisdom of Plaintiffs' choices about vaccines is rightfully not before this Court. Vindication of their First Amendment rights is, however.  Their burden to secure proactive injunctive relief is not a light one.  Defendants' burden in surviving strict scrutiny is a heavier one.

### A.   Scope of Injunction

Here, Plaintiffs have satisfied their burden while Defendants have failed in theirs; thus, the Court grants the injunctive relief sought in the Complaint.  To be clear, Plaintiffs assert **only** an as-applied challenge with respect to W. Va. Code § 16-3-4 and specifically as to how Defendants have applied that statute to K.P. in refusing to enroll her in the Upshur County Virtual School program.  The preliminary injunction issued here is **only** designed to prevent Defendants from continuing to violate Plaintiffs' First Amendment rights and to permit K.P.'s enrollment in that virtual schooling program if she seeks a valid religious exemption from Defendants.   This Court makes no finding on the facial constitutionality of W. Va. Code § 16-3-4; nor does the Court's order apply to any other students in any other educational program elsewhere in the State of West Virginia.

Therefore, pursuant to Fed. R. Civ. P. 65(d), Defendants and their officers, agents, servants, and employees, and anyone acting

**Perry et al. v. Marteney et al.**                                    **2:24-CV-18**

Preliminary Injunction Order

in active concert or participation with them (collectively hereinafter, "the Enjoined Parties"), are hereby **PRELIMINARILY ENJOINED** as follows:

> **Effective October 15, 2024, the Enjoined Parties shall be enjoined from enforcing W. Va. Code § 16-3-4 against Plaintiffs, unless Defendants provide an option for requesting a religious exemption that is meaningfully processed.  K.P. shall not be prevented from enrolling in the Upshur County Virtual School due to her unvaccinated status.**

This injunction shall remain in place as stated herein pending further Order of this Court.

## B.   Rule 65(c) Security

Rule 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  "This rule is mandatory and unambiguous." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999).  Failure to require a bond upon issuing injunctive relief is considered reversible error.  See District 17, UMWA v. A&M Trucking, Inc., 991 F.2d 108, 110 (4th Cir. 1993).  Here, no party has requested any specific bond be required or set. The record does not reveal significant risk of grave potential harm to either Defendant if this injunction ultimately proves

66

JA599

**Perry et al. v. Marteney et al.**                    **2:24-CV-18**

### Preliminary Injunction Order

improvidently granted.  In such circumstances, the Fourth Circuit

has instructed:

> In fixing the amount of an injunction bond,
> the district court should be guided by the
> purpose underlying Rule 65(c), which is to
> provide a mechanism for reimbursing an
> enjoined party for harm it suffers as a result
> of an improvidently issued injunction or
> restraining order. The amount of the bond,
> then, ordinarily depends on the gravity of the
> potential harm to the enjoined party:
>
> > [T]he judge usually will fix
> > security in an amount that covers
> > the potential incidental and
> > consequential costs as well as
> > either the losses the unjustly
> > enjoined or restrained party will
> > suffer during the period he is
> > prohibited from engaging in certain
> > activities or the complainant's
> > unjust enrichment caused by his
> > adversary being improperly enjoined
> > or restrained.
>
> 11A Charles Alan Wright et al., Federal
> Practice & Procedure § 2954, at 292 (2d
> ed.1995).  Where the district court determines
> that the risk of harm is remote, or that the
> circumstances otherwise warrant it, the court
> may fix the amount of the bond accordingly.
> In some circumstances, a nominal bond may
> suffice. See, e.g., International Controls
> Corp. v. Vesco, 490 F.2d 1334 (2d Cir.1974)
> (approving district court's fixing bond amount
> at zero in the absence of evidence regarding
> likelihood of harm).

Hoechst Diafoil Co., 174 F.3d at 421 n.3.

    Considering the totality of the record and circumstances

before the Court, the Rule 65(c) bond is fixed at zero dollars.

**Perry et al. v. Marteney et al.**                                   **2:24-CV-18**

### Preliminary Injunction Order

See, e.g., Bernstein v. Sims, 643 F. Supp.3d 578, 589 (E.D.N.C. 2022) ("In light of the important federal rights at issue in this case, and absent any request from defendants for plaintiff to provide security, the Court determines a zero dollar bond is appropriate in this instance.").

In summary, for the reasons set forth herein, the pending motions are decided as follows:

1. Plaintiffs' Motion for Preliminary Injunction [ECF No. 7] is **GRANTED**;

2. Defendant Christiansen's Motion to Stay [ECF No. 22] is **DENIED**; and

3. Defendants Marteney and Miller's Motion to Dismiss [ECF No. 29] is **DENIED.**

Furthermore, Dr. Mathew Christiansen is hereby **DISMISSED** as a Defendant in this action.

It is so **ORDERED.**

The Clerk is hereby directed to forward a copy of this Order to all counsel or record.

The Clerk is **DIRECTED** to transmit copies of this Order to counsel of record.

**DATED:**  October 15, 2024

_Tom 8 Kleeh_
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, *individually and
on behalf of their minor child K.P.*,

   Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc.,
d/b/a West Virginia Virtual Academy*,

   Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE KLEEH

### DEFENDANT STACY MARTENEY AND DEFENDANT CHRISTINE MILLER'S NOTICE OF APPEAL

Pursuant to Federal Rules of Appellate Procedure 3 and 4, and 28 U.S.C. 1292(a)(1), notice is hereby given that Defendant Stacy Marteney and Defendant Christine Miller's ("Upshur Individuals Defendants") appeal to the United States Court of Appeals for the Fourth Circuit from the Order entered in this action on October 15, 2024 [ECF No. 52] granting Plaintiffs' motion for a preliminary injunction, and any and all other orders, decisions, rulings, findings, and conclusions underlying or relating to that Order.

DATE: November 11, 2024

JA602

*/s/ Ryan S. Moore*
Robert J. Kent (5010)
Ryan S. Moore (14155)
Bowles Rice LLP
Fifth Floor, United Square
501 Avery Street, Post Office Box 49
Parkersburg, West Virginia 26102
(304) 420-5504
Facsimile (304) 420-5587
rkent@bowlesrice.com
rmoore@bowlesrice.com

Leigh Anne Wilson (13927)
Bowles Rice LLP
125 Granville Square, Suite 400
Morgantown, West Virginia 26501
(304) 554-2603
Facsimile (304) 285-2530
lwilson@bowlesrice.com

Counsel for Defendants Stacy Marteney, in
her official capacity and Christine Miller, in
her official capacity

JA603

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRYSTLE PERRY and
ANTHONY PERRY, individually and
on behalf of their minor child K.P.,

       Plaintiffs,

v.

STACY MARTENEY *in her official capacity
as the Virtual Learning Coordinator of the
Upshur County Virtual School;* THE BOARD
OF EDUCATION OF THE COUNTY OF
UPSHUR; CHRISTINE MILLER, *in her
official capacity as Superintendent of the
Upshur County School District*; DR. MATTHEW
CHRISTIANSEN, *in his official capacities as
the State Health Officer and Commissioner of the
Bureau of Public Health;* and BRYAN HOYLMAN
*in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc.,
d/b/a West Virginia Virtual Academy,*

       Defendants.

CIVIL ACTION NO. 2:24-cv-18
JUDGE KLEEH

**CERTIFICATE OF SERVICE**

I hereby certify that on November 11, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Ryan S. Moore*
Ryan S. Moore

17210221.1

JA604